**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

Case No.: 9:21-cv-80391-RLR

KEITH TAIG, individually, and on behalf of
others similarly situated,

      Plaintiffs,

v.

CITY OF VERO BEACH, CHIEF DAVID
CURREY in his individual capacity,
CAPTAIN KEVIN MARTIN (RETIRED) in
his individual capacity, LIEUTENANT
JOHN PEDERSEN in his individual
capacity, DETECTIVE PHIL HUDDY in his
individual capacity, DETECTIVE SEAN
CROWLEY in his individual capacity, and
DETECTIVE MIKE GASBARRINI in his
individual capacity,

      Defendants.

_____

## AMENDED CLASS ACTION COMPLAINT

Plaintiff/Class Representative, Keith Taig, on behalf of himself and all others similarly

situated, hereby files this Class Action Complaint against the City of Vero Beach ("Vero Beach"),

Chief David Currey, Captain Kevin Martin (retired), Lieutenant John Pedersen, Detective Phil

Huddy, Detective Sean Crowley and Detective Mike Gasbarrini (collectively, "the Individual

Defendants") and alleges as follows:

## JURISDICTION AND VENUE

1.      This is an action at law pursuant to 42 U.S.C. § 1983 for deprivation under color of

state law of rights, privilege, and immunities secured by the Fourth Amendment of the United

States Constitution.

*Amended Class Action Complaint*

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §§ 1343(a)(3) and (4).

3.      The Court may award attorney's fees pursuant to 42 U.S.C. § 1988(b) and should tax costs pursuant to 28 U.S.C. § 1920.

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because this is the District in which all the events or omissions giving rise to Plaintiff and the class members' claims occurred and 28 U.S.C. §1391(c) because all Defendants reside within this District.

## **PARTIES**

5.      Plaintiff Keith Taig is an individual residing in Indian River County, Florida.

6.      The City of Vero Beach ("the City") is located in Indian River County, Florida.  Its police department is a law enforcement agency located within Vero Beach in Indian River County.

7.      David Currey is employed as a Chief of Police by the City of Vero Beach, is over the age of eighteen (18), upon information and belief is a resident of Indian River County, Florida, and is being sued in his individual capacity for knowingly violating the class members' constitutional rights.  Currey is the individual (1) tasked with the ultimate responsibility of ensuring his officers are properly trained; (2) that supervised and approved of the illegal surveillance; and (3) personally identified all the members of the class in a press conference and falsely identified them as being involved in human trafficking.

8.      Kevin Martin was formerly employed as a Captain of Police by the City of Vero Beach, is over the age of eighteen (18), upon information and belief is a resident of Indian River County, Florida, and is being sued in his individual capacity for knowingly violating the class members' constitutional rights.  He is currently retired and previously had direct supervision and responsibility over the officers who conducted the illegal surveillance.

*Amended Class Action Complaint*

9.      John Pedersen is employed as a Lieutenant of Police by the City of Vero Beach, is over the age of eighteen (18), upon information and belief is a resident of Indian River County, Florida, and is being sued in his individual capacity for knowingly violating the class members' constitutional rights.  At all times relevant to this action, Pedersen had direct supervision and responsibility for the officers who conducted the illegal surveillance.

10.      Phil Huddy is employed as a Sergeant of Police by the City of Vero Beach, is over the age of eighteen (18), upon information and belief is a resident of Indian River County, Florida, and is being sued in his individual capacity for knowingly violating the class members' constitutional rights.  At all times relevant to this action, Huddy was a supervisor within the Detective Division with direct supervision and responsibility for the officers who conducted the illegal surveillance.

11.      Sean Crowley is employed as a Detective by the City of Vero Beach, is over the age of eighteen (18), upon information and belief is a resident of Indian River County, Florida, and is being sued in his individual capacity for knowingly violating the class members' constitutional rights.  Crowley is the affiant responsible for the two affidavits (later referenced in this action as the "November Affidavit" and "December Affidavit") that led to the improper issuance of the surveillance order and the improper surveillance and ultimate arrest of the class members.  At all times relevant to this action, Crowley was a co-lead detective that executed the improper investigation that led to the illegal recording of the class members in a private place.

12.      Mike Gasbarrini is employed as a Detective by the City of Vero Beach, is over the age of eighteen (18), upon information and belief is a resident of Indian River County, Florida, and is being sued in his individual capacity for knowingly violating the class members' constitutional rights.  At all times relevant to this action, Gasbarrini was a co-lead detective that

*Amended Class Action Complaint*

executed the improper investigation that led to the illegal recording of the class members in a private place.

## CLASS ACTION ALLEGATIONS

13.     Keith Taig is an adequate class representative because he, like all members of the proposed class, suffered the same injury (invasion of privacy under §1983 and subsequent arrest and prosecution) caused by the same unlawful conduct (unconstitutional/unlawful video recording), which was committed by the same defendants, at the same location (the East Spa, located at 2345 14th Avenue, Suite 10, Vero Beach, Florida or "the Spa"), during approximately the same time period.  Moreover, like all members of the proposed class, Mr. Taig was recorded without his permission.

14.     The class is defined as customers who visited the Spa from November 29, 2018 to January 27, 2019, who were illegally video-recorded without their knowledge or consent, criminally charged, identified in the media for their wrongful charge during the referenced time period, and publicly humiliated in the media as being involved.

15.     Damages are readily ascertainable as to the effect of the unlawful and unconstitutional activity committed by the Defendants upon the members of the class.

16.     Questions of law common to the class, include, without limitation, whether:

    (a)     Defendants deprived the class of their collective rights and privileges and immunities secured by the Constitution of the United States and laws while acting under color of law;

    (b)     Defendants improperly applied for and obtained the "sneak and peek" warrants for the video surveillance recklessly and/or under false pretenses;

    (c)     The "sneak and peek" warrants issued in the investigation were unconstitutional;

    (d)     Defendants intentionally misrepresented their investigation to the public as human trafficking, rather than solicitation of prostitution, in an effort to

*Amended Class Action Complaint*

inflame public opinion against members of the class and subject these members to humiliation, ridicule, and scorn, effectively creating a punishment for members of the class without a hearing being conducted;

(e)     Defendants violated the strict requirement of minimization contained in the warrants by failing to minimize the intrusion upon the class members' constitutionally-protected right to privacy in direct violation of the trial court's order; and

(f)     The class members had a reasonable expectation of privacy in the locations where they were illegally recorded.

17.     Mr. Taig seeks class certification pursuant to Federal Rule of Civil Procedure 23(b)(1) because prosecuting separate actions would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendants.   Moreover, prosecuting separate actions would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

18.     Mr. Taig seeks class certification pursuant to Federal Rule of Civil Procedure 23(b)(3) because the questions of law and fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.  If Defendants are found liable as to one class member, including Mr. Taig, they will be liable as to all class members.  Moreover, a class action is required because adjudicating this matter in separate actions could lead to conflicting determinations of fact and law.

19.     Class action treatment is superior as it will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.   The benefits of proceeding through the class mechanism, including

*Amended Class Action Complaint*

providing injured persons with a method of obtaining redress on claims that it might not be practicable to pursue individually, substantially outweigh the difficulties, if any, that may arise in the management of this class action.

20.     Defendants have acted unconstitutionally on grounds that apply equally to all class members.

21.     Members of the class are numerous and joinder is impracticable.  The number of injured class members in this action is close to one hundred fifty (150).

22.     The claims of Mr. Taig are typical, if not identical, to those of absent class members.  All members of the class were damaged by the same wrongful conduct of Defendants.

## **FACTUAL BACKGROUND**

23.     This class action stems from an egregious constitutional violation of the class members' fundamental right to privacy guaranteed by the Fourth Amendment to the United States Constitution when they were surreptitiously monitored, and illegally recorded, and filmed by the Vero Beach Police Department ("VBPD") during their investigation for suspected prostitution, racketeering, and human trafficking activities occurring at the Spa.

24.     On or about June 28, 2018, Chief Currey received an anonymous letter from a citizen regarding the Spa.

25.     Thereafter, Detectives Mark Van Dhuynslager and Michael Gasbarrini proceeded to visit the Spa, at least twice, to investigate.

26.     Upon information and belief, Detectives Dhuynslager and Gasbarrini entered the Spa as early as July 2018 to investigate.

27.     On one such occasion, Detective Gasbarrini entered the Spa and was approached by a female.

*Amended Class Action Complaint*

28.     On such occasion, Detective Gasbarrini asked the female at the Spa how much for a massage; the female then went behind the counter, wrote a price for a massage on computer paper, and handed it to him.

29.     On that same occasion, when Detective Gasbarrini attempted to leave the Spa, stating that he had a friend waiting for him in the car (Detective Van Dhuynslager), the same female masseuse approached him, put one hand on Detective Gasbarrini's back and one on his chest, tried to rub his chest, and asked him not to leave.

30.     Following these visits, neither Detective Gasbarrini nor Detective Van Dhuynslager opened an investigation.   Importantly, neither documented their actions to conduct this investigation.

31.     After Chief Currey started to receive more calls about the Spa, he decided to initiate an investigation and contacted Captain Martin to proceed forward.

32.     Upon information and belief, the VBPD did not formally document these calls regarding the Spa to substantiate Chief Currey's account of why the investigation began.

33.     According to Captain Martin, the VBPD learned of the suspected activities at East Spa because (i) Chief Currey received multiple complaints; (ii) Captain Gonzalo from the Sheriff's Office had also heard information about it; and (iii) one of the health inspectors with the Department of Health had mentioned the Spa to Detective Crowley.

34.     On or about the fourth week of August 2018, investigators from the VBPD's Special Investigations Unit ("SIU") and the United States' Department of Homeland Security ("Homeland Security") initiated its investigation into alleged prostitution activities occurring at the Spa.

*Amended Class Action Complaint*

35.     On or about September 14, 2018 and September 18, 2018, the VBPD's SIU conducted an undercover operation and sting of the Spa.  The SIU executed this by sending Detective Brock in as an undercover patron of the Spa and equipped him with a hidden audio/video device for safety and evidentiary purposes.

36.     On both occasions, Detective Brock received massages by an Asian female, believed to be Lanfen Ma ("Ma"), and on both occasions, he was approached and asked if he would like sexual favors or acts performed on him for a monetary sum.  Detective Brock declined these offers on both occasions, and Detectives Gasbarrini and Crowley de-briefed Detective Brock after each encounter with Ma.

37.     Prior to the investigation, Detective Brock did not receive any briefing with respect to human trafficking or prostitution.

38.     Prior to going undercover, Detective Brock did not speak with or to any confidential informants, business owners, or anyone else who had lodged complaints regarding the Spa.

39.     According to Detective Brock, at the time of investigation his sole understanding was that he was going undercover to investigate "strictly" prostitution activities.

40.     At the time Detective Brock went undercover, he did not observe any massage therapist indicate to him in any way, shape, or form that she was being held against her will.

41.     At the time Detective Brock went undercover, no massage therapist indicated to him that she was involved in human trafficking.

42.     In spite of being solicited for prostitution during both undercover visits, Detective Brock did not make an arrest.

*Amended Class Action Complaint*

43.     Detective Brock indicated that he spent months going in and surveilling the Spa including parking across the street, taking down tag numbers, and recording who was coming and going from the Spa.

44.     At one point, Detective Brock indicated that he followed the "madam" of the Spa or Lanyun Ma.

45.     According to Detective Brock, he did not see or talk to any confidential informant, business owner, or anybody else that complained about the Spa.

46.     At no point of time during his surveillance or training did Detective Brock indicate a clear understanding of the minimization requirements employed in the investigation of the Spa.

47.     On September 25, 2018, Detectives Gasbarrini and Crowley and Homeland Security Investigations Special Agent McCreary ("Agent McCreary") conducted further surveillance of the exterior areas of the Spa.  During that surveillance, they spoke with two males who left the Spa about what occurred while inside the Spa.  In recorded interviews, both males advised the detectives and agent that they were offered multiple sexual favors for money by an Asian woman at the Spa.  The experiences of these two males were similar to that of Detective Brock's undercover visits to the Spa.

48.     On October 31, 2018, VBPD and Homeland Security took further steps in its surveillance of the Spa and installed a camera on a nearby telephone pole just southwest of the Spa.  The purpose of this camera was to provide twenty-four (24) hour surveillance of the exterior of the business.  Detective Crowley attested that between the dates of 10/31/2018 and 11/20/18 the surveillance revealed that women working inside the Spa slept inside the premises and only left when in the company of Ma.

*Amended Class Action Complaint*

49.     In his November 27, 2018 "Affidavit for Surreptitious Entry and Installation of Electronic Surveillance Camera," ("November Affidavit"), submitted to County Court Judge Cynthia Cox ("Judge Cox"), Detective Crowley indicated that he and Detective Gasbarrini conducted multiple hours of covert surveillance during the months of September and October 2018, noting that all customers observed during that time were male.  Despite the VBPD's two documented undercover operations, Detective Crowley asserted that "without the use of electronic surveillance the entire prostitution organization will not be able to be identified or prosecuted."  A copy of the November Affidavit is attached hereto as **"Exhibit A."**

50.     Detective Crowley further indicated that he conducted trash pulls on the following dates: 10/8/18, 10/9/18, 10/10/18, 10/15/18, and 10/17/18.  Those trash pulls revealed, *inter alia*, condoms, napkins or tissues with seminal fluid on them, packaging for a sex toy, and feminine hygiene products.  The VBPD collected photos of these objects from those trash pulls and included them in the November Affidavit.

51.     In the November Affidavit, Detective Crowley attested that he believed a prostitution organization was being operated at the premises based on the statements of the customers, the volume of male customers, short-term traffic, the items found in the trash pulls, undercover operations, and intelligence gathered from the surveillance.

52.     Notably missing from the November Affidavit was exculpatory evidence such as findings from the Department of Health that indicated that no person was living inside the Spa.

53.     Despite the various observations and surveillance conducted and outlined in the November Affidavit, Detective Crowley requested further authorization to enter the Spa to conduct covert electronic video surveillance of the interior of the Spa to identify participants believed to be a part of the "criminal enterprise" or deriving funds from the proceeds of any prostitution

*Amended Class Action Complaint*

activities. There was no indication that the intent was also to gather evidence to prosecute the actual customers of the Spa, including Plaintiff and the proposed class.

54.     On November 27, 2018, Judge Cox issued an "Order for Surreptitious Entry and Installation of Electronic Surveillance Camera," ("November Order") which afforded VBPD the ability to enter the Spa and install surveillance cameras for the purpose of monitoring the premises "for a period no longer than 30 days."  The November Order further required that officers were to take steps minimizing the invasion of privacy "to any parties not engaged in the unlawful acts set forth in the affidavit."  This Order also required that the Defendants report back to the Court within ten days and provide an inventory.  The Order specifically did <u>not</u> permit recording and <u>only</u> allowed monitoring.  Importantly, on page 2 of the Order, which contained minimization instructions, one of the officers, believed to be Detective Crowley, initialed that page—indicating his acknowledgment of the instructions to minimize and not to record.  A copy of the November Order is attached hereto as **"Exhibit B."**

55.     The cameras that were installed did not have the ability to be switched on or off, making minimization required by the Order impossible.  Conveniently, this was not reported back to the Judge who signed the November Order.

56.     On November 29, 2018, VBPD and Homeland Security installed cameras, without audio capability, within the Spa.  Notably, cameras were installed where customers had a known expectation of privacy and where video surveillance is precluded by Florida statute.

57.     Despite specifically being instructed to only monitor and not record, the detectives knowingly allowed the surveillance system to record 24 hours a day, 7 days a week for 60 days and intentionally withheld this fact from the Judge who signed the warrant authorizing the surveillance.

*Amended Class Action Complaint*

58.     The acts that were observed via the installed surveillance system served as the premise for the next December 28, 2018 "Affidavit for Surreptitious Entry and Installation of Electronic Surveillance Camera," ("December Affidavit") sworn and subscribed to by Detective Crowley, which was submitted to County Court Judge Paul B. Kanarek ("Judge Kanarek") despite the fact that the required return of service was never submitted for the first warrant.  A copy of the December Affidavit is attached hereto as **"Exhibit C".**

59.     Between the dates of 11/29/18 and 12/27/18, Detective Crowley observed approximately one hundred (100) sex acts for money, therefore making this second 30-day video surveillance/recording period unnecessary.

60.     On 12/06/18 and 12/22/18, tracking devices were installed on vehicles believed to transport "women participating in the criminal enterprise and funds used to contribute to the criminal enterprise or derived from the enterprise".

61.     Despite observing multiple sex acts for money and the monitoring and tracking of the vehicles used to transport the females believed to be participating in the criminal enterprise at the Spa, Detective Crowley pursuant to a sworn affidavit improperly requested additional authorization to conduct an additional thirty (30) days of video surveillance at the Spa.

62.     This second 30-day period was requested in spite of the alleged concern that women were working at the Spa against their will.

63.     This second 30-day period was requested in spite of the fact that the officers had video surveillance early on in the first 30-day period of sex acts for money—enough to convict of RICO and enough to make arrests and stop the entire "operation."

*Amended Class Action Complaint*

64.     According to Captain Martin, the cameras recorded 24/7, nothing was done to limit the running of the cameras employed in this investigation, and there was never an indication in either search warrant to the Judge that the cameras were incapable of being turned off.

65.     Captain Martin later indicated that he would make sure the language of the orders and the search warrants line up in this investigation and affirmatively indicated that he would make sure the VBPD does what the order requires.

66.     In the December Affidavit, Detective Crowley attested that there was probable cause to believe that the Spa "is being utilized to operate a prostitution and racketeering organization and/or derive support from the proceeds of prostitution".

67.     Again, notably missing from the December Affidavit was exculpatory evidence such as findings from the Department of Health that indicated that no person was living inside the Spa.

68.     On December 28, 2018, Judge Kanarek issued an "Order for Surreptitious Entry and Installation of Electronic Surveillance Camera," which again afforded VPBD the ability to enter the Spa and install surveillance cameras for the purpose of monitoring the premises "for a period no longer than 30 days" ("December Order").  Similar to the November Order issued by Judge Cox, this December Order provided that officers were to take steps minimizing the invasion of privacy.  Additionally, as in the prior November Order, the December Order did not authorize any recording.  A copy of the December Order is attached hereto as **"Exhibit D."**

69.     According to Lieutenant Pedersen, Chief Currey was the individual responsible for making the final decisions in the Spa investigation, including requesting this second 30-day period for further surveillance.

*Amended Class Action Complaint*

70.     On or about January 11, 2019, the Office of the State Attorney instructed VBPD officials to stop recording sex acts and instead shift its focus to human trafficking activities.  This instruction was noted in a Department of Homeland Security report.

71.     In light of this instruction, the VBPD dropped the investigation altogether but continued to let the cameras record for the remainder of the second 30-day period.

72.     On or about January 25, 2019, Sergeant Huddy emailed Sergeant Rivera, expressing that that "[the VPBD] has captured, approximately 200 sexual acts . . . through interior video surveillance.  We had acquired a break-in order during the last week in November and continue to monitor the inside of the premises.   An extension of the existing break-in order was acquired on December 29, 2018 and we will, most likely, get a third extension next week."

73.     So, the VBPD was looking at a third extension in spite of the clear instructions to discontinue the recording of prostitution activities occurring at the Spa.

74.     Upon information and belief, throughout the VBPD's investigation of the Spa, improper reporting frequently took place.  For example, surveillance logs from the SUI Video Room and logs from the field units often reflected discrepancies on the times and persons entering the Spa.  In a one-time span, Detective Crowley might note 7 entries while the surveillance team would note more than 20.

75.     In the wake of these various improper video-surveillance activities, warrants were sought for the class members' arrests for the charges of, *inter alia*, solicitation of prostitution pursuant to section 796.07, Fla. Stat.

76.     Aside from seeking warrants, the VBPD also held a press conference on February 19, 2019, that lasted approximately one hour, in which the VBPD not only named the class

*Amended Class Action Complaint*

members subject to their investigation, but publicly made available the class members' photos as well, while wrongfully claiming they were involved in suspected human trafficking.

77.     Upon information and belief, several individuals at that press conference were publicly identified although no arrest warrants were issued for them.

78.     At the state trial court level, the class members moved to suppress the surveillance evidence gathered and obtained pursuant to Judge Cox's November Order and Judge Kanarek's December Order.

79.     On April 23, 2019, County Court Judge Nicole P. Menz ("Judge Menz") heard arguments from the State of Florida and defense counsel for the class members on the issue of whether the surveillance evidence gathered and obtained pursuant to Judge Cox's November Order and Judge Kanarek's December Order were improperly obtained in a manner which violated the Fourth Amendment of the United States Constitution and should be suppressed as an unreasonable search and seizure.

80.     At that hearing, Detective Crowley testified that:

(a)     The whole investigation was initiated when VBPD Chief, David Currey, alerted Detectives Crowley and Gasbarrini to anonymous citizen complaints made in reference to the Spa.

(b)     He and Detective Gasbarrini initially conducted surveillance at the Spa location.

(c)     Both he and Detective Gasbarrini were supervised by Detective Sergeant Huddy and Detective Lieutenant Pedersen.

(d)     Prior to the arrests of the Plaintiff and his class, he had never made any prostitution arrest.

(e)     "[W]e had to watch the entire massage to see if [the sex act] was going to take place."

(f)     His interpretation of the minimization requirement meant that if he did not monitor the surveillance activities 24/7 for sixty (60) days, as he was authorized, then he believed he was minimizing the surveillance.

*Amended Class Action Complaint*

(g)  He acknowledged that the VBPD knew it was a possibility that people would become nude in the massage room.

(h)  Aside from the video surveillance at the Spa in which he was involved, Detective Eder, who was also involved in the operation, went into the business next door to the Spa, began listening through the walls, and audio-recorded it—none of which was authorized by Judges Cox or Kanarek.

(i)  The VBPD did not report back to the judges with their findings from the investigation within a ten-day time period, as required by the November and December Orders.

81.   The evidence presented at the Motion to Suppress hearing indicated the improper manner of the video surveillance that was carried out by the detectives responsible for the monitoring of the cameras at East Spa.

82.   Each and every camera installed at the spa recorded all activity in the spa for 24 hours a day 7 days a week for 60 straight days regardless of whether anyone in law enforcement was actually monitoring the recordings.

83.   Moreover, the cameras recorded when law enforcement officials decided to take a day off and not monitor any activity at the Spa.

84.   As evidenced by video surveillance logs, Detective Crowley, Detective Gasbarrini, Lieutenant Pedersen and Sergeant Huddy signed in daily to conduct the Spa investigation.

85.   As further evidenced by video surveillance logs, Chief Currey and Captain Martin and Assistant State Attorney Ryan Butler on occasion, would all monitor the recordings of what was taking place inside the Spa together.

86.   There was no effort at all on the part of law enforcement to minimize the 60 days' worth of recordings, and law enforcement kept those recordings stored on a server at the VBPD.

*Amended Class Action Complaint*

87.     Throughout the investigation, Sergeant Huddy was responsible for all his detectives reporting to him.  Sergeant Huddy later indicated that it was part of his duty to sign off on the reports made to him and to review the search warrants.

88.     Sergeant Huddy indicated that he verbally followed up with reports and things of that nature.

89.     According to Sergeant Huddy, a Florida Department of Law Enforcement ("FDLE") human trafficking course is issued every two years, but only certain VBPD officials involved in the Spa investigation completed this course.

90.     Upon information and belief, Chief Currey took the FDLE human trafficking course in 2013, Detective Crowley in 2014, Lieutenant Pedersen in 2014, and Detective Gasbarrini in 2019.

91.     Although the Orders contained express instructions to minimize and <u>only</u> allowed monitoring, it was apparent at the hearing that the VBPD violated those express instructions and chose to record instead of monitor and took no actions to minimize those recordings.

92.     Prior to the investigation of the Spa, State Attorney, Jeffrey Hendriks, a Martin County prosecutor, circulated a memorandum associated with minimization requirements to Detective Gasbarrini, Detective Crowley, Sergeant Huddy, and Lieutenant Pedersen.

93.     Lieutenant Pedersen forwarded that same memorandum to Captain Martin so he was also aware of the minimization instructions.

94.     That same memorandum provided that recording would only be permitted if a criminal act was surveilled.

95.     At the Motion to Suppress hearing, Mr. Andrew Metcalf, Esq. (defense counsel) and Detective Crowley exchanged the following regarding minimization:

*Amended Class Action Complaint*

10  Q The Judge called -- you asked for the Judge to

11  specifically require you guys to take steps to minimize the

12  invasion of privacy to any parties not participating in

13  criminal conduct?

14  A Yes, sir.

15  Q That was put in the order?

16  A Yes.

17  Q That was asterisked and highlighted? There was an

18  asterisk put there by Judge Cox. Correct?

19  A Yes, sir.

(Hr. Tr. p. 68).  A copy of the April 23, 2019 motion to suppress hearing transcript is attached hereto as **"Exhibit E."**

96.     On May 16, 2019, Judge Menz issued an "Order Granting Defendant's Motion to Suppress" ("Order Granting Suppression"), explaining that the Motion to Suppress must be granted due to a "fatal flaw" in the manner in which the Orders permitting the surveillance were obtained; improper manner in which the Surveillance Orders were drafted and signed; as well as the manner in which Judge Cox's November Order and Judge Kanarek's December Order were conducted by representatives of the VBPD.  A copy of this Order Granting Suppression is attached hereto as **"Exhibit F."**

97.     In the Order Granting Suppression, Judge Menz addressed whether the plaintiff and members of his class had a legitimate expectation of privacy in the massage room of the Spa and whether that expectation was reasonable.  Judge Menz opined, "Clearly anyone seeking a massage in a professional setting has a reasonable subjective expectation of privacy. . . . it is the opinion of

18

*Amended Class Action Complaint*

this Court that there is a reasonable expectation of privacy in a massage room and therefore the defendant had a legitimate expectation of privacy that is protected by the Fourth Amendment to the United States Constitution."

98.     In that same Order Granting Suppression, Judge Menz addressed law enforcement's "disregard of the duties" to minimize the invasion of privacy of those not engaged in the unlawful acts, which as Judge Menz noted was "in direct violation of the Order signed by Judge Cox on November 27, 2018 and the Order signed by Judge Kanarek on December 28, 2018."

99.     Specifically, Judge Menz detailed that the evidence presented at the suppression hearing indicated that detectives responsible for the monitoring of the cameras at the Spa recorded all activity in the Spa for 24 hours a day, 7 days a week, for 60 straight days – even on days when law enforcement decided to "take a day off."  In the Order Granting Suppression, Judge Menz concluded that "[t]here is no doubt that this total lack of minimization is anything other than a violation which requires the suppression of all video evidence. . . . Video surveillance is the most intrusive form of surveillance utilized by the government to investigate crime.  As such, it is incumbent upon the government that the rights of private law abiding citizens are not infringed upon during that surveillance."

100.     Aside from the investigation of the activities occurring at the Spa named in this action, the State of Florida ("the State") had conducted investigations of other massage parlors located in Indian River, Martin, and Palm Beach counties using similar, if not identical, tactics as those used by the VBPD.  Like Judge Menz, the trial court judges in the aforementioned counties entered orders suppressing the video surveillance conducted by the law enforcement officials in those jurisdictions.

*Amended Class Action Complaint*

101.    The State thereafter appealed all of the trial court orders granting motions to suppress non-audio video surveillance that was recorded with hidden cameras covertly installed inside massage parlors suspected of housing prostitution activity.

102.    On appeal, the Fourth District Court of Appeal consolidated all appellate issues emanating from the State's investigation of spas located in Indian River, Martin, and Palm Beach counties.  These appeals were titled: *State v. Kraft*, 4D19-1499, *State v. Freels*, 4D19-1655, and *State v. Zhang*, 4D19-2024.  The *State v. Freels* case involved the Order Granting Suppression that is applicable to the VBPD's investigation of the Spa.

103.    The appellate court ultimately found that the trial courts in all of the jurisdictions properly concluded that the criminal defendants had standing to challenge the video surveillance and that total suppression of the video recordings was constitutionally warranted.  A copy of this Opinion is attached hereto as "**Exhibit G.**"

104.    For purposes of this class action, the Fourth District Court of Appeal's holding and reasoning concerning the VBPD's investigation in *State v. Freels* is the most relevant portion of the Opinion.

105.    In *State v. Freels*, the county court certified the following four questions of great public importance to the Fourth District Court of Appeal:

(a)    Did the Defendant have a legitimate expectation of privacy such that he is entitled to claim the protection of the Fourth Amendment? and,

(b)    Did the issuing Court have authority under the Fourth Amendment to authorize a Video Surveillance Warrant? and,

(c)    If the issuing Court had the power to authorize a Video Surveillance Warrant, does the Video Surveillance Warrant issued in this case satisfy Fourth Amendment requirements? and,

(d)    If the issuing Court had the power to authorize a Video Surveillance Warrant and the Warrant satisfied Fourth Amendment requirements, was

20

*Amended Class Action Complaint*

the Video Surveillance Warrant executed in a manner sufficient to satisfy Fourth Amendment requirements?

106.    The appellate court accepted jurisdiction to address these questions and discuss in detail the VBPD's undercover investigation of alleged prostitution activities occurring at the Spa.

107.    There, the appellate court noted the following significant details:

(a)    VBPD officials installed hidden cameras and used them to monitor and record spa customers as they undressed and received massages in private massage rooms;

(b)    For the first twenty days, two detectives monitored the video feeds from 8 a.m. to 11 p.m., but after this fifteen-hour period, the cameras continually recorded and were unattended for the full 30 days;

(c)    The police observed nearly 100 sex acts during this period;

(d)    The lead detective in that investigation applied for an extension of the 30-day surveillance period, noting that police had witnessed the counting of for large sums of money and women being transported to and from the spa;

(e)    The judge approved the warrant and granted the extension, again instructing the VBPD to minimize the intrusion on lawful activity. Detectives monitored the feed only for an additional 10 days, but the cameras ran and recorded until the expiration of the period specified in the second warrant;

(f)     In total, the VBPD monitored the video feeds for 30 out of the 60 possible days;

(g)    Most of the prostitution activities occurred at the end of the massage or the beginning, which, as the Fourth District Court of Appeal noted "complicated efforts to minimize because, if the detectives did not monitor the beginning of the massages, they may have missed an act of prostitution."; and

(h)    After the video surveillance was conducted, numerous defendants were charged with misdemeanor counts of solicitation of prostitution, and the county court suppressed the videos, concluding that the police failed to minimize the intrusion on the privacy of individuals not engaged in unlawful activity and noting that the police monitored the feeds only 50% of the allowed time while the camera recorded for the entire 60 days.

*Amended Class Action Complaint*

108.    The appellate court began its analysis with the Fourth Amendment's prohibition on unreasonable searches, which protects individual privacy against certain types of government intrusion.

109.    In its analysis, the appellate court reasoned that the spa-client defendants in all of these cases had a subjective and objectively reasonable expectation of privacy in the massage parlor rooms because the surveillance took place in a professional private setting where clients are expected to partially or fully disrobe.   Moreover, the appellate court reasoned the spa owners and their employees had a reasonable right to expect that the interactions with nude or partially nude clients in the massage rooms would not be exposed to the public.

110.    Although the State argued that most of the customers who were recorded and monitored engaged in unlawful activity and could not rely on Fourth Amendment rights, the appellate court rejected the "state's circular argument that the defendants lacked a privacy interest because they were engaging in criminal behavior", reasoning that "as case law shows us, Fourth Amendment rights are nearly always safeguarded by those who are criminally prosecuted."

111.    After the appellate court concluded that the defendants had standing to challenge the search, it next considered whether minimization requirements were applicable to the surveillance utilized in the undercover investigations and whether those requirements were properly defined or applied in the affidavits submitted by VBPD.

112.    Because the Fourth Amendment does not expressly reference the term "minimization", the State maintained to the appellate court that the existing probable cause and particularity requirements of the Warrant Clause amply safeguard protected privacy interests. However, the appellate court also rejected this argument, pointing the State to "many years of clear federal jurisprudence on this issue."

*Amended Class Action Complaint*

113.    Specifically, the appellate court cited to *U.S. v. Mesa-Rincon*, 911 F.2d 1433 (10th Cir. 1990), which states five requirements for video surveillance that define more specifically the probable cause and particularity requirements of the Fourth Amendment, including a minimization requirement ("the order is specifically precise so as to minimize the recording of activities not related to the crimes under investigation.").

114.    The appellate court declared that "[t]he act of video surveillance itself is perhaps the most intrusive form of electronic law enforcement spying," and, as support, cited to *Mesa-Rincon*'s analogy that "Television surveillance is identical in its indiscriminate character to wiretapping and bugging.  [However], [i]t is even more invasive of privacy, just as a strip search is more invasive than a pat-down search . . ."

115.    The appellate court concluded that the warrants failed to contain sufficient minimization guidelines and that the police did not sufficiently minimize the video recording of those with no connection to the ongoing spa investigation.  In stark comparison, the detectives in Jupiter monitored the video feeds only during business hours and three detectives monitored and recorded video from the hidden cameras over five days.

116.    Specifically, the appellate court noted that law enforcement failed to "take the most reasonable, basic, and obvious minimization technique, which was simply to not monitor or record female spa clients."

117.    The Fourth District Court of Appeal even went so far as to specifically state that of all the cases it was considering in the appeals,  the VBPD's investigation was the "most egregious example" of failure to minimize because their cameras recorded continuously (24 hours a day/7 days a week) for 60 days.

*Amended Class Action Complaint*

118.    Having found no minimization employed in the surveillance used for the Spa, the Court next considered whether application of the exclusionary rule to bar evidence obtained in an illegal search and seizure was proper in light of the good faith exception set forth under *U.S. v. Leon*, 468 U.S. 897 (1984).

119.    Under *Leon*, the appellate court acknowledged that the test is whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization.

120.    Although the State argued that the good faith exception applied, the appellate court again rejected the State's argument, reasoning that the warrant applications themselves cited *Mesa-Rincon*.

121.    In its conclusion, the Fourth District Court of Appeal upheld the trial court orders suppressing unconstitutionally captured footage, commenting that the "type of law enforcement surveillance utilized in these cases is extreme."

122.    In a special concurrence, Judge May clarified that while the State clung to "section 933.03, Florida Statutes (2019), for life support, that provision's 'plain text' simply authorizes a search warrant '[w]hen any property shall have been used: … [a]s a means to commit any crime.'" . . .It does not authorize this surveillance type for prostitution-related offenses."

123.    As such, the Fourth District Court of Appeal went to great lengths to emphasize that this type of video surveillance evidence was not permissible for prostitution-related offenses and was not in accordance with Florida statutory law.

124.    In the wake of the Fourth District Court of Appeal's opinion, the class members that were subject to the VBPD investigation and who were charged now bring a civil suit seeking to deter future violations of this type of misconduct.

*Amended Class Action Complaint*

125.    The Defendants' actions which exhibited an intentional and blatant disregard of the rights provided by the Fourth Amendment to the United States Constitution deprives them of the right to claim that they are protected by the concept of qualified immunity since they could not have reasonably believed or concluded that their actions were constitutionally permissible.  As reiterated, *supra*, these actions of the Defendants include, but are not limited, to the following:

(a)    The November Affidavit, prepared by Detective Crowley, that the surveillance would be "conducted in such a way as to minimize the visual surveillance . . .", yet there was a complete failure of minimization.

(b)    The November Affidavit requested that "…the Court Order [the Warrant] direct that video surveillance must immediately terminate when it is determined that the video surveillance is unrelated to this investigation", yet video surveillance unrelated to the investigation did take place.

(c)    The November Order specifically required and emphasized that "While monitoring the premises to be searched, the executing officers shall take steps to minimize the invasion of privacy to any parties not engaged in the unlawful acts set forth in the affidavit."  Despite this requirement in the November Order, there was no minimization.

(d)    The November Order further required that an "original of this warrant, together with the original inventory shall be returned and filed with the Judge in and for Indian River County, or before any Court having jurisdiction as stated above within ten (10) days of the date of the issuance of this warrant."  But, there was no return of the original of the warrant or an original inventory in spite of video evidence being obtained.

(e)    The December Affidavit again provided that the surveillance would be conducted in such a way as to minimize the visual surveillance, yet there was no minimization.

(f)    The December Affidavit again provided that surveillance "…must immediately terminate when it is determined that the video surveillance is unrelated to this investigation", yet this required termination did not take place.

(g)    The December Order also required that minimization take place, but, again, there was no minimization.

*Amended Class Action Complaint*

    (h)    The December Order again required the warrant together with the original inventory shall be returned within ten days of the issuance of the warrant, yet no return of video evidence was made.

    (i)    The December Order required that the surveillance cameras be monitored for a period of no longer than thirty (30) days, yet after only ten (10) days the VBPD abandoned the surveillance operation and kept the monitors running for the full thirty (30) days with absolutely no monitoring or minimization.

    (j)    Detective Crowley admitted at the April 23, 2019 hearing before Judge Nicole P. Menz on the Motion to Suppress that he knew the difference between "monitoring" and "recording" and that the Orders permitting visual surveillance did not state that there could be recording.

    (k)    At all times material hereto, Detective Crowley was always aware of the concept of minimization, as evidenced by the fact that he admitted at the suppression hearing that it was he that requested the Judge to require the steps to be taken to minimize the invasion of privacy of individuals not engaged in criminal activity.

    (l)    At the suppression hearing, Detective Crowley admitted that, to his knowledge, only two predicate acts were required to show racketeering, but the VBPD actually observed one hundred (100) in the first thirty (30) days. In fact, he admitted that so many acts had been observed that he met with the Indian County State Attorney's Office and a joint decision was made to terminate the surveillance permitted by the December Order prior to the end of the 30-day period. Yet, despite this fact, the cameras and recording continued for the full period.

    (m)    Further, the Fourth District Court of Appeal explicitly provided that the VBPD's surveillance was the most egregious because they recorded continuously for sixty (60) days, and considering their blatant disregard/ignorance of decades-old federal law (such as *Mesa-Rincon*) setting out the requirements for obtaining a warrant to conduct secret video surveillance in private locations, did not act in good faith with respect to minimization.

126.    Mr. Taig has retained undersigned counsel to represent him and the class members in this action to vindicate their rights.

127.    All conditions and requirements to bringing this action have been satisfied.

**<u>Count I – 42 U.S.C. § 1983 (Fourth Amendment Violation – Search and Seizure)</u>**

26

*Amended Class Action Complaint*

128.    Plaintiff incorporates and re-alleges allegations 1-127 set forth above as though fully set forth herein.

129.    The class members had a reasonable expectation of privacy when they were at the Spa, including while in private rooms located on private property at the Spa.

130.    The Defendants' actions, including their monitoring and recording of the class members' conduct while located in a private room located on private property, deprived the class members of their rights, privileges, and immunities secured and guaranteed by the Fourth Amendment to the United States Constitution.

131.    Specifically, and among other things, Defendants' actions: (1) violated the class members' rights to be free from unreasonable search and seizure; (2) violated the class members' rights to procedural due process; and (3) violated the class members' constitutional right to privacy.

132.    In doing so, the Defendants acted willfully, maliciously, and in violation of law, established practices, and their duties.

133.    As a result, the class members suffered and continue to suffer invasion of their privacy, embarrassment, emotional distress, loss of business opportunities, and substantial expenses—including legal fees and court costs—in vindicating their rights.

134.    The Defendants improperly and maliciously deprived the plaintiff and members of the class of control over their privacy, person, and dignity.

135.    The Defendants knew that minimization should have been employed by them at the time of surveillance, and as required by Judge Cox in her November Order and by Judge Kanarek in his December Order, but Defendants willfully and blatantly disregarded any attempts to

*Amended Class Action Complaint*

minimize an intrusion of privacy by choosing to continuously record the activities of those within the private massage parlor.

136.    As a direct result, the class members' footage of their activities within the private massage parlor have been obtained, seized, recorded, and re-watched without their knowledge or consent.  This footage was a gross invasion of privacy because the class members were illegally recorded by the VBPD, instead of being monitored, which was the only thing authorized by the trial court judges.

137.    Further, as a result of the improper actions of the Defendants, members of the class were improperly charged with the crime of engaging in prostitution, charges which were ultimately withdrawn.

138.    The class members have also been fearful that videos of them engaging in sex acts are in danger of being broadcast online and republished *ad infinitum* causing further irrevocable and permanent damages to them.

### Count II – 42 U.S.C. § 1983
### (Fourth Amendment Violation – Failure to Train/Supervise Against the City)

139.    Plaintiff incorporates and re-alleges paragraphs 1-127 set forth above as though fully set forth herein.

140.    The VBPD, while acting under color of state law and under the guise of investigating alleged human trafficking, did intentionally, willfully, and maliciously, with deliberate indifference, and/or reckless disregard for the natural and probable consequences of their actions, illegally record the class members while those members were located in a private massage room located on private property.

141.    These actions were done in direct violation of the trial court's November and December Orders, which directed the VBPD, *inter alia*, "to monitor [the] surveillance cameras for

*Amended Class Action Complaint*

a period of no longer than 30 days, and forthwith make return of your doings upon executing this warrant, which you are commanded to execute as the law directs within ten days from the date thereof."

142.    Instead, the VBPD continuously recorded for two 30-day periods and made no return of their doings within the specified ten (10) days' time frame and in spite of the fact that video evidence was obtained.

143.    The trial court's November and December Orders further provided that "the executing officers shall take steps to minimize the invasion of privacy".

144.    However, the continuous and gratuitous recording of <u>all</u> activities of those who visited the Spa indicate that the VBPD failed to adequately train or supervise its employees on minimization.

145.    The continuous and gratuitous recording of all activities of those who visited the Spa occurred despite VBPD receiving a minimization memorandum that specifically instructed officials to record only when criminal activities were taking place.

146.    The VBPD's failure to adequately train or supervise its employees with respect to the minimization techniques employed in the Spa investigation constitutes a custom or policy. Specifically, the continuous and gratuitous recording of all activities of those who visited the Spa show that the City had a policy or custom of not taking reasonable steps to train its employees on adequate minimization techniques.

147.    The City's custom or policy of failure to adequately train or supervise its employees with respect to the minimization techniques employed in the Spa investigation caused its employees (VBPD officials) to film Plaintiff and the proposed class members in a private space with no minimization whatsoever and in violation of their constitutional rights.

*Amended Class Action Complaint*

148.    The City's custom or policy of failure to train its employees (VBPD officials) on adequate minimization techniques show that the City acted with a deliberate indifference to the privacy rights of those who were filmed without their knowledge in a private, massage room at the Spa.

149.    The trial court's November and December Orders had further provided that the "original of this warrant, together with the original inventory shall be returned and filed with the Judge in and for Indian River County, or before any Court having jurisdiction as stated above within ten days of the date of issuance of this warrant."

150.    However, the original of the warrant and the original inventory was never returned and filed with the trial court judges within the specified ten (10) days' time frame and in spite of the fact that video evidence was obtained.

151.    Aside from the express instructions/directions set forth by the trial court judges in their Orders, the VBPD is also governed by General Orders that address various subject matters law enforcement must be trained on.

152.    Specifically, VBPD's General Order #28, which governs conduct, duties, and responsibilities of VBPD law enforcement, provides that "All members shall perform their duties as required or directed by law, department policy, or by order of a superior officer."  A copy of General Order #28 is attached hereto as **"Exhibit H."**

153.    Despite being well aware of General Order #28, VBPD chose not to perform their duties as directed, required, and set forth by Judge Cox in the November Order and Judge Kanarek in the December Order.

154.    Moreover, VBPD's General Order #57, which governs search warrants, provides that "The original search warrant together with the original affidavit and original inventory and

*Amended Class Action Complaint*

Return must be filed with the Clerk of Court having jurisdiction of the offense.  This should be done within ten (10) days after issuance, or if the search was on the 10th day, then the day following. . . . The affiant will return the search warrant to the Clerk of Court as prescribed by Florida law."  A copy of General Order #57 is attached hereto as **"Exhibit I."**

155.    Despite being well aware of General Order #57, the VBPD chose not to return the original affidavit and original inventory nor file the Return with the Clerk of Court.

156.    Despite being well aware of General Order #57, the VBPD chose not to return the search warrant to the Clerk of Court as prescribed by Florida law.

157.    Had the City properly trained their law enforcement officers (VBPD) in minimization requirements, and to follow direct Court orders, as well as procedures outlined in their own General Orders, they would not have acted with reckless indifference to the class members' Fourth Amendment rights.

158.    Accordingly, the City's overall failure to properly supervise and train the officers conducting the investigation was the direct and proximate cause of the class members' injuries.

<u>**Count III – 42 U.S.C. § 1983**</u>
<u>**(Fourth Amendment Violation – Failure to Train/Supervise Against the Individual Defendants)**</u>

159.    Plaintiff incorporates and re-alleges paragraphs 1-127 set forth above as though fully set forth herein.

160.    Chief Currey, alongside Captain Martin, initiated this Spa investigation after receiving anonymous complaints and phone calls.

161.    In furtherance of this investigation, Detective Crowley, Detective Gasbarrini, Sergeant Huddy, Lieutenant Pedersen, and Captain Martin worked with individuals from the State

*Amended Class Action Complaint*

Attorney's office and received a memorandum on minimization techniques that should be employed in light of the sneak and peek warrants that were issued.

162.    That minimization memorandum provided in part that recording should take place whenever criminal activity was observed.

163.    Despite that instruction, all officers supervised, monitored, and recorded Plaintiff and the proposed class members at <u>all</u> times in the private massage rooms at the Spa.

164.    Despite all Individual Defendants admitting that enough sexual acts were observed early on in the investigation (the initial 30-day period) to account for the suspected prostitution activities, each continued to play a role in the continuous filming and recording of all the Spa patrons 24/7 for two 30-day periods (total of continuous recording and filming for 60 days).

165.    Each Individual Defendant had a custom or policy of failure to train and/or supervise its fellow officers to employ the proper minimization techniques necessary for a sneak and peek warrant.

166.    This failure to train and/or supervise led to and caused the gratuitous recording of Plaintiff and the proposed class members in a private space with no sense of minimization and in violation of their constitutional rights.

167.    Moreover, had the Individual Defendants in this action properly supervised the officers below them (and one another) conducting the investigation and ensured their compliance with existing court orders and departmental rules and regulations, they would not have violated the class members' Fourth Amendment rights.

168.    Accordingly, the Individual Defendants' overall failure to properly supervise and train the officers conducting the investigation was the direct and proximate cause of the class members' injuries.

*Amended Class Action Complaint*

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that

(a)     The Court determine that this action may be maintained as a class action

pursuant to Federal Rules of Civil Procedure 23(b)(1) and (3);

(b)     The Court award Plaintiff and the class members compensatory damages,

including prejudgment interest, in an amount to be determined at trial;

(c)     The Plaintiff and the class members recover their costs of this suit, including

reasonable attorneys' fees, as provided by the law; and

(d)     The Court grant the Plaintiff and the class members such relief as the nature

of the case may require or as may be deemed just and proper by this Court.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a trial by jury on all issues so triable.

Respectfully submitted,

**FISHER POTTER HODAS, PL**
515 North Flagler Drive - Suite 800
West Palm Beach, FL 33401
Telephone:    561-832-1005
Facsimile:       561-820-9375
*Attorney for Plaintiffs*

By:  */s/Gerald F. Richman*
          Gerald F. Richman
          Florida Bar No.: 066457
          gerry@fphlegal.com
          eservice@FPHlegal.com

# EXHIBIT "A"

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT IN
AND FOR THE COUNTY OF INDIAN RIVER
STATE OF FLORIDA

## AFFIDAVIT FOR SURREPTITIOUS ENTRY AND INSTALLATION OF
## ELECTORNIC SURVEILLANCE CAMERA

BEFORE ME, _____, a Judge of Indian River County,
personally came Det. Crowley, who being first duly sworn, deposes and says, under oath,
that the facts contained in this affidavit support this application for a search and seizure
warrant authorizing the installation and monitoring of a video surveillance camera in the
premises to be searched as follows:

TO WIT: To arrive at the premises to be entered start at the intersection of 23rd Street
and 14th Ave. From the aforementioned intersection travel north on 14th Ave. for
approximately one half block. The premises to be entered is located in a plaza located on
the west side of 14th Ave. The premises to be entered is tan in color with a brown roof.
The plaza is a single story multi unit structure. The numbers 2345 are affixed to the east
side of the building. The premises to be entered is the fifth business from the east and has
a tinted glass front door. To the right side of the front door there is a blue sign with the
words East Spa Therapeutic massage. On the tinted glass door the number 10 is affixed
The address for the premises to be entered is 2345 14th Ave. suite #10.

The premises and curtilage occupied by or under the control of a Yongzhang Yan,
Lanyun Ma and others at this time unknown. Your affiant has reason to believe there is
active prostitution being performed at the premises to be entered, which is in violation of
the Laws of the State of Florida prohibiting prostitution and person(s) deriving support
from the proceeds of prostitution, in violation of Chapter 796.06, 796.07, and
Racketeering, in violation of Chapter 895.03, Florida Statutes.

That the facts tending to establish the grounds for this application and the probable cause
to believe that such facts exist are as follows:

1. Your affiant is a sworn law enforcement officer and is employed by the Vero
   Beach Police Department. Your affiant has been a law enforcement officer since
   November of 2010 after completing his Basic Law Enforcement Training. Your
   affiant has completed over 188 hours of Advanced training. Since February of
   2018 your affiant has been assigned to the Special Investigations Unit of the Vero
   Beach Police Department as a Detective investigating narcotic and vice crimes in
   and around the City of Vero Beach. Prior to becoming a Detective, your affiant
   was a patrol officer and task force officer, involved in numerous drug arrests.

2. As a result of your Affiant's training and experience, the following information
   about prostitution organizations are known:

A. Prostitutes constantly maintain, on hand, quantities of United States currency in order to maintain and finance their on-going business.

B. Prostitute organizations maintain books, records, receipts, notes, ledgers, tally sheets, and other papers relating to the income for the business.

C. Prostitute organizations commonly maintain addresses or telephone numbers in book or papers, which reflect names, addresses, and or telephone numbers for their associates in the prostitution organization, although said items, may be in code.

D. Prostitute organizations commonly operate under the false business of massage parlors as a business front in order to hide their illegal activity.

E. Prostitute organizations use advertisements on the internet to gain clients.

F. Prostitute organizations also use cellular telephones in conducting the ongoing criminal enterprise.

3. During the fourth week in August 2018 the Vero Beach Police Department's Special Investigations Unit and Homeland Security Investigations began an investigation into possible prostitution taking place at East Spa massage parlor located at 2345 14th Ave. suite #10 in the City limits of Vero Beach. The investigation began as a result of numerous citizen complaints. An online search of the East Spa's listed business phone number (772)-999-5347 utilizing the google search engine was conducted. This revealed a number of advertisements on sites dedicated to sexual encounters to include backpage.com, liveescortreviews.com, adultlook.com, and rubratings.com. Many of these advertisements included photos of young Asian women who were dressed in revealing clothing and were sexually provocative in nature. Listed on a number of the advertisements were both the address and phone number of East Spa.





4. East Spa is located at 2345 14th Ave. suite #10, Vero Beach FL, 32960. The business, according to its website, operates from 0900 hours to 2200 hours but based of surveillance that will be described later in this affidavit, the business typically closes between the hours of 2200 and 2300 hours.



A check of the business through Sunbiz.org Division of Corporations revealed that the spa began as a corporation under the name Jade Massage on 12/01/2016. The owner, Yongzhang Yan has multiple active corporations listed in Sunbiz.org which include AA Massage, A+ Massage and East Spa. All of these businesses have addresses in Indian River County FL. East Spa has been found to be the only active business in the city limits of Vero Beach, FL. The only authorized person listed to manage the corporation, East Spa, is Yongzhang Yan, with a principal office of 2345 14th Ave. suite #10, Vero Beach, FL, 32960. It is also listed as the mailing address.

A report generated by the Department of Health showed that Lanfen Ma (license #75762) and Shuxiang Zhang (license#74864) are listed as employees of East Spa. On 09/10/2018, Det. Gasbarrini and your affiant made contact with Carla Sutherland, who is an Investigation Specialist with the Florida Department of Health. On this date Sutherland conducted an establishment inspection of East Spa. Sutherland advised that she encountered two licensed massage therapists working inside. These employees were identified as Lanfen Ma and Shuxiang Zhang. Both employees were Asian females and both provided photo identification (Texas and New York driver licenses). Sutherland also advised that the owner and president of East Spa was listed as Yongzhang Yan. Sutherland advised that all the business's applicable licenses were up to date, but did note that the FL Department of Health had a case on Lanfen Ma, for aiding and abetting



unlicensed massage therapy, in Sarasota in 2016. Sutherland provided your affiant with photo copies of both Lanfen Ma and Shuxiang Zhang's driver licenses which contained photographs of each subject.

A report generated by HSI Special Agent McCreary via the CLEAR application revealed another female, Lanyun Ma is currently married to and resides with, East Spa owner, Yongzhang Yan (1748 23rd St. Vero Beach, FL. 32960). The report included photographs of Lanyun Ma. Lanyun Ma (02/02/1970), has a criminal history that includes charges of *No conviction.* human trafficking and prostitution, out of Massachusetts and New York, between 2008 and 2012. She was convicted of prostitution in Massachusetts in 2012. It is common, in this type of industry, to work at multiple establishments that are under the same owner. Your affiant believes Lanyun Ma is currently working at East Spa due to evidence gathered during surveillance of day to day operations at East Spa and the residence at 1748 23rd St. She has been observed coming and going from both the residence and business multiple times throughout each day. Lanyun Ma also had two other listed addresses of note on previous Department of Health licensing forms. In 2017 she had a listed address of 2312 Gulf Gate Dr. Sarasota, FL 34231. A check of this address revealed it was the previous location of Oriental foot Massage under the corporation name LANFEN MA INC., Lanfen Ma (licensed massage therapist at East Spa) being the registered agent of the business. In 2014 Lanyun Ma had a listed address of 133-43- 41st Rd. #2R Flushing, NY. 11355. It should be noted that it is common knowledge among law enforcement that work in crimes involving human trafficking and prostitution that the majority of Asian females that are involved with a massage businesses where prostitution is being conducted have a current or previous address out of Flushing, New York.

5. On 09/14/2018 and 09/18/2018 the Special Investigations Unit conducted a prostitution sting operation at the East Spa, utilizing Det. Brock #691 in an undercover capacity, posing as a patron. Det. Brock was dressed in plain clothes and equipped with an audio/video device for safety and evidentiary purposes. Prior to the operation Det. Brock was also shown photographs of Lanfen Ma and Shuxiang Zhang who we knew to work at the establishment. Det. Brock detailed each encounter as follows:

"On 09/14/2018 at 13:00 hrs. I assisted the Vero Beach Police Department's Special Investigative Unit (S.I.U.) with an undercover operation regarding possible prostitution activity at massage parlor identified as East Spa, 2345 14th Avenue, Suite 10, in Vero Beach. After a thorough operational briefing, Detectives Gasbarinni and Crowley provided me with one hundred and seventy dollars ($170.00) in United States Currency. I was provided with an audio/video device to record and monitor the operation. On 09/14/18, at 1303 hours, I arrived at East Spa, 2345 14th Avenue, Suite 10. Upon entering the front/south door of East Spa I observed a desk located at the front of the business with a sign listing prices for massages varying in duration. At that time an Asian woman exited from a room that was covered by a curtain. I recognized the woman from a Texas driver license that I had been previously shown by the SIU Detectives as a possible suspect named Lanfen Ma. Ma directed me to the sign at the front desk and asked me which massage I wanted. I told her that I wanted the thirty (30) minute massage and she asked for the payment of $50.00. I paid her the $50.00 massage fee. Ma then escorted me

to a dimly lit room with a single massage table. The first thing I noticed about Ma was how she was dressed. She was wearing a white spandex type mini dress and her breasts were barely covered. Through the material in her dress I could prominently see that she was wearing a dark colored thong and her dress barely covered her buttocks.

Once inside the room, Ma told me to get undressed and she promptly left the room. I undressed down to my boxers and laid face down on the massage table. Shortly thereafter, Ma re-entered the room and began massaging my back concentrating on my hips. She then asked me what hurt the most and I told her "my neck". Ma began massaging my neck and at one point she crawled up on the table with me, straddling my head with her crotch just inches above my head. During that time she began concentrating on my hips and lower back. Ma then moved from the table and told me to roll onto my back. At that time she began rubbing the inside of my thighs and at one point she briefly ran her hand over my crotch. Ma then climbed back onto the massage table, now straddling my thighs. Her panties were in plain view as her dress was raised up. Ma pushed herself closer towards my face and whispered, "You want?" while making an up and down motion with her hand demonstrating manual sex. I asked Ma, "You mean a hand job?" Ma replied, "Shhh not so loud, we must be quiet". I then whispered, "You talking about a hand job or blow job?" Ma responded, "You want this?" Ma pointed to her mouth, "That's," she then held up one finger on one hand and made a zero then a zero with her other hand ($100). I then asked, "What about?" and I made a hand gesture as if doing manual sex. Ma whispered, "This much" and held up five fingers on one hand and her thumb on the other ($60). Ma continued to massage my legs and while still straddling me she said, "You want this?" and pointed at her crotch, "that" and then she held her fingers up to show one hundred sixty dollars ($160). I then pointed at her crotch and said "One sixty?" Ma said, "Yes." Ma then pointed at her mouth. I asked her, "I get that and that?" as I pointed at her crotch and her mouth, "For one sixty?" Ma said, "Yes, since it your first time". "Normally", she then held up her fingers and made a one hundred, then another one hundred sign ($200). I told Ma that I didn't have enough money with me so I would bring more money next time. Ma told me the massage was finished and for me to get dressed.

After I was dressed, Ma re-entered the room and briefly touched my crotch with one hand and had her other hand on my chest. Ma then said, "You tip me?" I reached into my pocket, pulled out a twenty dollar ($20.00) bill, handed it to Ma and told her I'd be back next week. At that time I gathered my belongings and left the premises at approximately 1333 hours.

I then returned to the Vero Beach Police Department and was debriefed by Detectives Gasbarrini and Crowley."

"On 09/18/18 at 1245 hrs I assisted the Vero Beach Police Department's Special Investigative Unit (S.I.U.) with an undercover operation regarding possible prostitution activity at massage parlor identified as East Spa, 2345 14th Avenue, Suite 10, in Vero Beach. After a thorough operational briefing, Detectives Gasbarinni and Crowley provided me with one hundred dollars ($100.00) in United States Currency. I was provided with an audio/video device to record and monitor the operation.

On 09/18/18 at 1300 hrs I arrived at the East Spa, 2345 14th Avenue, Suite 10. Once there I observed a desk located at the front of the business with a sign listing prices for



massages varying in duration. At that time an Asian woman approached me from a long hall. I recognized the woman from a New York State driver license that I had been shown by the S.I.U. Detectives as a possible suspect named Shuxiang Zhang. Zhang directed me to the sign at the front desk and asked me which massage I wanted. I told her that I wanted the thirty (30) minute massage and she asked for the payment of $50.00. I paid her the $50.00 and she escorted me to a room with a single massage table.

Once inside, I undressed down to my boxers and lied face down on the table. Shortly thereafter, Zhang walked in to the room and asked if I wanted a hard or medium massage. I told her medium. At that time she began massaging my back, legs and hips. She then massaged my neck. Zhang then told me to roll over onto my back which I did. Zhang started massaging my legs and at one point ran her hand briefly over my penis. Several minutes later she asked, "Is there anything you would like"? I asked her what did she mean. She said, "You tell me." I told her I didn't know what she was asking. Zhang seemed nervous and started saying, "You trouble, you trouble, you police?" We continued back and forth until she said, "You can have anything, you just say." At that time I told her that, "I know what the other girl was offering." Zhang said, "I give you what Yo Yo give you". I told her, "Yo Yo said $60.00 and I motioned a hand job, $100.00 for a blow job and $200.00 for (pointing at her crotch) for everything." Zhang responded, "I give you (motioning a hand job) for $50.00 as she held up five fingers on one hand, pointing at her mouth $100.00 as she held up one finger and $160.00 for everything." She whispered to me. I reiterated, $50.00 for a hand job, $100.00 for a blow job and $160.00 for that as I pointed at her crotch. She said, "Yes, so what you want"? I told her I didn't bring enough money and she said, "You check money." I then walked over to my shorts and checked my money. I laid back down on the table and she said, "So, what you want"? I told her I didn't have enough money and she said, "Yes you do, I do this (motioning a hand job) for $40.00". Zhang then responded, "You can pay with credit card." I pointed at her crotch again and said, "I want that, so I'll just wait until next week." Zhang lifted her dress exposing her crotch. She was wearing a pink colored thong. Zhang turned around with her dress lifted to show me her buttocks. She then said, "I thought you were trouble, police or something." I laughed and told her, "I was just nervous and was afraid to ask for what I wanted. I don't want you to throw me out of here for asking." Zhang bent down over me with her face close to mine. I thought she was going to whisper something in my ear as she had been doing. Instead, she kissed me on the lips and said, "Next time you come in and take off (motioning to my underwear) and tell me what you want." I told her I would just wait until next week. Zhang once again kissed me, this time on the side of the mouth and another time on the cheek. I removed myself from the table and began to get dressed. Zhang sat next to me and said, "I will give you my number so you can call me." She then asked for a tip and I told her that I would take care of her next time. I then gathered my belongings and left the business. I then returned to the Vero Beach Police Department and was debriefed by Detective Gasbarrini and Crowley."

6. Although several traffic stops have been made on clients of the prostitution organization, further investigation into the proceeds of the illegal organization is needed. Without the use of electronic surveillance the entire prostitution organization will not be

able to be identified or prosecuted. Electronic surveillance, without the ability of audio, will allow law enforcement to further the investigation by identifying the prostitutes and clients. It will also allow law enforcement to investigate the manner in which the organization operates.

7. On 09/25/2018, at approximately 1300 hrs Det. Gasbarrini, HSI Agent McCreary, and your affiant conducted further surveillance of the East Spa. We made contact with two male subjects after they left the East Spa and they agreed to speak to us about what occurred while inside the establishment. Both subjects agreed to speak to us on their own accord. Both subjects were advised that they were not under arrest and were free to leave at any time. During recorded interviews both men advised that while inside the business an Asian woman offered multiple sexual favors for money. Both men were then shown photographs of the subjects we knew to be working in the East Spa and both identified Shuxiang Zhang as the woman who offered the sex acts for money. Both subjects described similar accounts to Det. Brock's experience during the sting operations on 09/14/2018 and 09/18/2018. Both men also advised that Zhang used hand motions and pointed to body parts when offering the sex acts for money.

8. Throughout the months of September and October 2018, Det. Gasbarrini and your affiant have conducted multiple hours of covert surveillance at East Spa. Your affiant has observed a large amount of traffic in and out of the business. The patrons observed entering the business were all male during the times of surveillance. The majority of the subjects observed exited the business after being inside for only approximately 30 minutes to an hour.

9. On 10/01/2018, at approximately 0700, Det. Gasbarrini and your affiant began surveillance of 1748 23rd St while Lt. Pedersen #628 conducted surveillance of East Spa. At approximately 0720 hrs. Det. Gasbarrini and I observed Lanyun Ma (spouse of Yongzhang Yan) exit the residence and walk eastbound on 23rd St. Lanyun Ma then turned northbound through the alley in the 1500 block of 23rd St. Lt. Pedersen then observed Lanyun Ma emerge from the alley and approach the front doors of the East Spa. She was observed using keys to open the front doors and enter the business. At this time Lt. Pedersen was relieved at his place of surveillance by Det. Brumley #662. At approximately 0750, Det. Brumley advised that Lanyun Ma and an unknown Asian female exited the East spa and entered a red Lincoln that was already parked in front of the business. Your affiant followed the vehicle as it exited the parking lot of the East Spa and conducted mobile surveillance on the vehicle. Your affiant observed Lanyun Ma to be driving the vehicle and the unknown female was seated in the back seat. The front passenger seat was unoccupied. At approximately 0800 the vehicle came to a stop at 1750 US Hwy. 1 (Wal-Mart Grocery). Your affiant observed Lanyun Ma park the vehicle in a parking spot and both women exited the vehicle and entered the store. Det. Gasbarrini and your affiant continued surveillance on the subjects inside the store. Once inside the store they were observed walking directly to the aisle where condoms were sold. Lanyun Ma was observed crouching in front of the display of condoms and having a brief discussion with the unknown female. Ma was then observed selecting two 24-packs of Trojan bare skin condoms (48 total) and they were placed into the shopping cart. The



women then continued to shop in the store for a brief time longer before checking out. Lanyun Ma was observed paying for both boxes of condoms and placing them into the cart. She then conducted two additional purchases of assorted groceries. It appeared as though Lanyun Ma made the purchase of condoms with cash and made the other purchases debit/credit card. Your affiant then observed them exit the store and again enter the red Lincoln. Ma was then observed driving directly back to the East Spa without stopping at any other location. Upon arriving at the East Spa, Det. Brumley observed Ma and the unknown female enter the business through the front door. Det. Brumley advised that the unknown female was carrying grocery bags as she entered. Det. Brumley was able to capture them entering the business on a video recording device. At this time Det. Gasbarrini and your affiant returned to Wal-Mart and met with security officer, Christopher Callaway. Callaway accessed the video surveillance footage and we were able to observe the purchases made by Ma. Your affiant collected copies of the surveillance footage as well as still images of the subjects as they exited the store. Your affiant also collected copies of the receipts for the purchases made by Ma. This confirmed that the condom purchase was made with cash and the other two additional grocery purchases made with a credit/debit card.



10. Throughout your affiant's hours of surveillance, no women have been observed leaving the business property on their own. The only time any of the females have been observed leaving the property is in the presence of Lanyun Ma who is transporting them off site in a vehicle. It appears as though the women are not only working and engaging in prostitution at the business, but also living there. The business has been observed being opened in the morning, by individuals already inside, without anyone else arriving to do so.

11. Your affiant conducted trash pulls on 10/8/18, 10/9/18, 10/10/18, 10/15/18, and



10/17/18 from a garbage can located on the west side of the business, in the alleyway. The can is positioned directly against East Spa's west wall and the women have been observed discarding bags of trash in this can during the hours of surveillance. During the trash pulls, grocery style bags were found in the can which contained food and napkins/tissues that had a sticky semi liquid substance within them. Through my training and experience, I know that establishments where prostitution is taking place, napkins or tissues are commonly used to clean off a male client or the prostitute of the semen as a result of the sexual act that takes place. Tissues collected during a trash pull on 10/17/2018 were field tested for the presence seminal fluid with a positive result. Also located were used condoms and feminine hygiene products to include feminine wipes, and a douche. Also located was packaging for a sex toy and a tube of Terconazole Cream which is used to treat vaginal infections. Your affiant also located hand written ledgers that appeared to be keeping track of the money each girl collected during the course of the day. Mail and receipts from East Spa were also found. One of the receipts was a card purchase containing the name Lanyun Ma.

Below are some photos from the trash pulls on 10/08/2018-10/09/2018:







Below are some photos from the trash pulls on 10/15/2018:



12. On 10/31/2018, Homeland Security Investigations and the City of Vero Beach Utilities assisted with the installation of a pole camera on a telephone pole that is positioned to the southwest of the target business. The camera faces northeast and has a direct and unobstructed view of the front door of the business and partial view of the exterior parking lot around it. The camera was installed to provide 24 hour surveillance of the exterior of the business. This surveillance between the dates of 10/31/18 and 11/20/18 confirmed that the women working inside the business are sleeping inside the business overnight and only leave the property when in the company of Lanyun Ma who transports them off site in a vehicle. The women spent the night at the business every night during the aforementioned 21 days of video surveillance and are obviously living on site. The video surveillance also revealed that the clientele at the business is exclusively male and no female customers visited the business during the aforementioned 21 days of video surveillance.

13. Your Affiant believes the totality of circumstances regarding the statements of customers, the volume of male customer's, short term traffic, items located during trash pull, outcome of undercover operations, intel gathered during extended visual surveillance and information gathered on the business through various investigative techniques leads your Affiant to believe that a prostitution organization is being operated at the premises to be entered.

14. Your affiant Crowley states that the following investigative procedures are usually employed in the investigation of this type of criminal case. These procedures have either been tried and not succeeded in achieving the goals of the investigation, are too dangerous, or may jeopardize the investigation if employed or are not applicable in this particular investigation.

A.  Search Warrant: Based on the facts of the investigation up to this point, your affiant believes that there is probable cause for the issuance of a search warrant for the premises. There is no reason, however, to believe a search warrant executed at the location would reveal the structure of the racketeering enterprise or provide the evidence necessary to prove a violation of Chapter 895 and Chapter 796 Florida Statutes Additionally, it is unlikely that a search warrant would result in the discovery of an active act of prostitution since your affiant knows of no method by which law enforcement officers could predict when such an act was going to occur. The execution of a search warrant would only serve to alert the principals that an investigation was pending which would frustrate the purpose of this investigation.

B.  Informants: Your affiant has received information from informants following traffic stops by law enforcement officers. These informants, however, could only provide statements of acts that occurred in the premises to be searched. Due to the nature of these acts, these statements are uncorroborated. Furthermore, these informants could not provide any information related to the structure of the criminal enterprise or the distribution of proceeds collected in exchange for the acts of prostitution. Finally, law enforcement officers could not utilize informants to engage in acts of prostitution because, unlike purchases of narcotics under Chapter 893, informants acting under the

direction of law enforcement officers may not violate Chapter 796.

C.   Surveillance: Your affiant and other officers have conducted surveillance of the premises to be searched and have not obtained any information other than that previously listed above. While additional surveillance may lead to other customers of the enterprise who admit unlawful acts, there is no reason to believe that other customers could identify the organizational structure of the enterprise or reveal the distribution of the proceeds from the unlawful activity. Surveillance outside the premises does not allow officers to see inside the business, which is where the unlawful activity is being conducted.

D.   Subpoenas: Subpoenas for appearance before the State Attorney or before the Grand Jury by law provide immunity to the persons subpoenaed. Even with this grant of immunity, there is no reason to believe that information gained by way of State Attorney investigative subpoena or by testimony before a State Grand Jury would be truthful or complete information. Additionally, subpoenas to known customers of the principals of this organization might alert the organization as to the nature of the investigation and would frustrate the investigation's attempts to identify all of the principals or gather evidence against them. In addition, even if some of the customers testified, your affiant has no reason to believe that any of them know the extent of the organization or that the objectives of this investigation could or would be accomplished because of the extent of the organization.

E.   Interviews: Your affiant believes that additional interviews of known customers would produce insufficient information as to the identities of all of the persons involved in the enterprise and in fact would produce untruthful or incomplete evidence. Additionally, the interviews would frustrate the investigation if the persons involved in the enterprise were to learn of the interview.

F.   Use of Undercover Police Officers: Although useful, an undercover officer is of limited use in an investigation such as this one. Law enforcement officers are not exempt from the provisions of Chapter 796 and would have to prevent any acts of prostitution beyond the solicitation stage of the offense. An undercover officer is not able to identify all the principals of the enterprise or gain the evidence necessary to meet the objectives of this investigation.

G.   Trash Pull: Although a trash pull does produce additional evidence of possible prostitution taking place within the business, it does not offer specific examples to establish the predicate crime of prostitution, which is required to charge deriving funds from the proceeds of prostitution which then provides the required specified unlawful activity to charge racketeering.

Your affiant believes a "visual surveillance warrant" is needed to identify and arrest subjects involved in prostitution as it relates to the Deriving of Funds from the proceeds of Prostitution and racketeering occurring at and due to the East Spa located at 2345 14th Ave. Vero Beach, FL 32960 Suite #10. While probable cause exists to believe prostitution is

occurring inside the business, your affiant and any fellow officers are unable to directly observe the prostitution, which provides the necessary element to the charge of deriving funds from the proceeds of prostitution which in turn then provides the necessary specified unlawful activity for the establishment of a charge of racketeering without the assistance of covert visual, non-audio surveillance.

Additionally, the focus of this investigation is not only the customers committing prostitution but more importantly those involved in deriving funds from the proceeds of prostitution, to include the owner(s) and/or manager(s) of the business and possibly any o the women of prostitution working at the business. Your affiant believes that a "visual surveillance warrant" is the best and only way law enforcement can conclusively say prostitution is occurring inside the business. Thus, while voluntary statements of customers exiting the business is supportive to this argument, it is not enough, in and of itself, to establish the predicate crime of prostitution, which is required to charge deriving funds from the proceeds of prostitution which then provides the required specified unlawful activity to charge racketeering. Additionally, while the previous customer statements, undercover operations, and surveillance do lend support to the belief that probable cause exists to suppose that prostitution is occurring inside the business, it does not allow for a furtherance of an investigation regarding the deriving funds from the proceeds of prostitution and racketeering without great risk to our case. Therefore, video surveillance is the only option to obtain definite evidence of prostitution occurring inside the business to further our investigation. Video surveillance can also show the collection and exchange of money, furthering our investigation into how the business is funded and operated.

IT IS REQUESTED that your affiant is allowed to surreptitiously enter the described location for the purpose of covertly conducting electronic video surveillance of the interior location of the location to identify participants in the criminal enterprise, commonly referred to as a "visual surveillance warrant". There shall be no capability on any of the installed equipment to allow audio monitoring or recording. The entry may be made within ten days of issuance of this warrant, in the daytime or the nighttime, or on Sunday, to forthwith install, monitor and perform maintenance on electronic video surveillance on the said premises herein before specified. Once monitoring of the subject premises begins, your affiant will continue monitoring for no more than 30 days without further order of this court.

IT IS FURTHER REQUESTED that this Court direct that its Order be executed as soon as practicable after it is signed and that all monitoring of visual surveillance shall be conducted in such a way as to minimize the visual surveillance and disclosure of the visual surveillance intercepted to those communications relevant to the pending investigation

IT IS FURTHER REQUESTED the visual surveillance warrant authorized by this Court's Order must terminate upon attainment of the authorized objectives or, in any event, at the end of thirty (30) days measured from the day on which investigative or law enforcement officers first begin to conduct an interception or ten (10) days after the Order is entered



IT IS FURTHER REQUESTED that the Court Order direct that video surveillance must immediately terminate when it is determined that the video surveillance is unrelated to this investigation. Video Surveillance must be suspended immediately when it is determined that none of the named targets or any of their confederates, when identified, are participants in criminal conduct.

IT IS FURTHER REQUESTED that the Court Order that video surveillance should, at least, continue for a number of minutes to determine whether or not a sexual act is taking place during, at the beginning, or at the end of a paid for massage. If such a sexual act is unclear but may be related to a massage / sexual act, video surveillance may continue until such time as it is determined that the activity clearly no longer relates to any type of sexual activity. The above instructions regarding the number of minutes needed to determine whether or not a sexual act is taking place will vary until experience has been gained.

IT IS FURTHER REQUESTED that the Court Order that the Vero Beach Police Department is authorized, to intercept and record the visual, non-verbal conduct and activities occurring at 2345 14th Ave. Suite #10. Vero Beach, County of Indian River, State of Florida and others as yet unknown, concerning the above-described offenses at the premises. Such video surveillance shall not terminate automatically when the type of conduct & activity described above has first been observed but shall continue until the conduct or activity is intercepted that reveals the manner in which the above named, and others as yet unknown participate in the specified offenses and reveals the identities of their co-conspirators, their methods of operation, and the nature of any conspiracy, or for a period of time not to exceed 30 days

IT IS FURTHER REQUESTED that the Court Order the warrant shall be terminated or renewed based upon the evidence gleaned from the surveillance. Due to the property location and the covert nature of the criminal enterprise, no other, less intrusive investigatory means employed thus far have been successful, nor are they likely to be in the future. Upon termination of this order Your Affiant shall forthwith make return of his doings within ten days from the date thereof. Upon termination of the conditions justifying the need for covertness, notice of the surreptitious search will be given within seven days to the responsible person(s) of the location to be searched.



BASED ON YOUR AFFIANT'S knowledge, training and experience, there is probable cause to believe that the business located at 2345 14th Ave. Suite #10. Vero Beach, **Indian River County, State of Florida,** is being utilized to operate a prostitution and racketeering organization and/or derive support from the proceeds of prostitution.

BASED ON all the foregoing information, your Affiant also has probable cause to believe that a violation of the laws of the State of Florida, to-wit: Chapter 796 and Chapter 895 , Florida State Statutes, exists in the premises addressed at 2345 14th Ave. Suite #10. Vero **Beach, Indian River County, State of Florida** WHEREOF, affiant makes this affidavit and prays the issuance of a visual surveillance warrant in due form of law for the surreptitious installation of video monitoring equipment within the above described premises for the said property, heretofore described, and for the monitoring and recording of visual non-audio conduct and safe keeping of the property, subject to the order of this Honorable Court or such other Court having jurisdiction over the offense, by the duly constituted officers of the law.

AFFIANT

Detective Sean Crowley,

SWORN to and subscribed before me this _____ day of _____ 2018.

JUDGE in and for INDIAN RIVER COUNTY, FLORIDA



# EXHIBIT "B"

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT IN AND
FOR THE COUNTY OF INDIAN RIVER
STATE OF FLORIDA

## ORDER FOR SURREPTITIOUS ENTRY AND INSTALLATION OF ELECTRONIC SURVEILLANCE CAMERA

IN THE NAME OF THE STATE OF FLORIDA, TO ALL AND SINGULAR:

The Sheriff of Indian River County and his lawful deputies, the Chief of the Vero Beach Police Department and all police officers having jurisdiction over the premises to be searched / surveilled in Indian River County, Florida, and any State Attorney Investigator,

WHEREAS, application in writing, supported by affidavit of a credible witness, or witnesses, has this day been made before the undersigned Judge Cynthia Cox, in for Indian River County, Florida, and

WHEREAS, the Court finds that the affiant has established that other reasonable methods to obtain the evidence sought have either been attempted and failed or are unlikely to accomplish the stated goals of the affiant's investigation, and

WHEREAS, said facts made known to and considered by me have caused me to certify and find that the facts set forth in said affidavit show and constitute probable cause for the issuance of this surveillance warrant, and the Court being satisfied of the existence of said grounds set forth in the affidavit in that on or in a certain premises known and described as follows:

TO WIT: To arrive at the premises to be entered start at the intersection of 23rd Street and 14th Ave. From the aforementioned intersection travel north on 14th Ave. for approximately one half block. The premises to be entered is located in a plaza located on the west side of 14th Ave. The premises to be entered is tan in color with a brown roof. The plaza is a single story multi unit structure. The numbers 2345 are affixed to the east side of the building. The premises to be entered is the fifth business from the east and has a tinted glass front door. To the right side of the front door there is a blue sign with the words East Spa Therapeutic massage. On the tinted glass door the number 10 is affixed. The address for the premises to be entered is 2345 14th Ave. suite #10.

The premises and curtilage occupied by or under the control of a Yongzhang Yan, Lanyun Ma and others at this time unknown. Your affiant has reason to believe there is active prostitution being performed at the premises to be entered, which is in violation of the Laws of the State of Florida prohibiting prostitution and person(s) deriving support from the proceeds of prostitution, in violation of Chapter 796.06, 796.07, and Racketeering, in violation of Chapter 895.03, Florida Statutes.

NOW THEREFORE, you, with proper and necessary assistance, are hereby commanded in the name of the State of Florida, in the daytime or in the nighttime, or on Sunday, to enter the said premises 2345 14th Ave. suite #10. Vero Beach, FL, to enter and install in the premises to be searched video surveillance cameras, and to monitor these surveillance cameras for a period of no longer than 30 days, and forthwith make return of your doings upon executing this warrant, which you are hereby commanded to execute as the law directs within ten days from the date thereof. While monitoring the premises to be searched, the executing officers shall take steps to minimize the invasion of privacy to any parties not engaged in the unlawful acts set forth in the affidavit. The officers shall also make efforts to minimize the disclosure of this surveillance operation to only those sworn law enforcement officers pertinent and relevant to this surreptitious investigation and those sworn law enforcement officers involved in the operation shall be explained this Order as well as the Florida Statute pertaining to Contempt of Court.

The original of this warrant, together with the original inventory shall be returned and filed with the Judge in and for Indian River County, or before any Court having jurisdiction as stated above within ten days of the date of issuance of this warrant.

The Court finds that a copy of this Order need not be left at the premises to be searched because leaving the order at the premises would defeat the purposes of this warrant.

WITNESS my hand and seal this ___ day of November, 2018.


_____
JUDGE in and for Indian River County, Florida

# EXHIBIT "C"

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT IN
AND FOR THE COUNTY OF INDIAN RIVER
STATE OF FLORIDA

**AFFIDAVIT FOR SURREPTITIOUS ENTRY AND INSTALLATION OF
ELECTORNIC SURVEILLANCE CAMERA**

BEFORE ME, _Paul B Kanarek_____, a Judge of Indian River County,
personally came Det. Crowley, who being first duly sworn, deposes and says, under oath,
that the facts contained in this affidavit support this application for a search and seizure
warrant authorizing the installation and monitoring of a video surveillance camera in the
premises to be searched as follows:

TO WIT:  To arrive at the premises to be entered start at the intersection of 23rd Street
and 14th Ave. From the aforementioned intersection travel north on 14th Ave. for
approximately one half block. The premises to be entered is located in a plaza located on
the west side of 14th Ave. The premises to be entered is tan in color with a brown roof.
The plaza is a single story multi unit structure. The numbers 2345 are affixed to the east
side of the building. The premises to be entered is the fifth business from the east and has
a tinted glass front door. To the right side of the front door there is a blue sign with the
words East Spa Therapeutic massage. On the tinted glass door the number 10 is affixed
The address for the premises to be entered is 2345 14th Ave. suite #10.

The premises and curtilage occupied by or under the control of a Yongzhang Yan,
Lanyun Ma and others at this time unknown. Your affiant has reason to believe there is
active prostitution being performed at the premises to be entered, which is in violation of
the Laws of the State of Florida prohibiting prostitution and person(s) deriving support
from the proceeds of prostitution, in violation of Chapter 796.06, 796.07, and
Racketeering, in violation of Chapter 895.03, Florida Statutes.

That the facts tending to establish the grounds for this application and the probable cause
to believe that such facts exist are as follows:

1. Your affiant is a sworn law enforcement officer and is employed by the Vero
   Beach Police Department. Your affiant has been a law enforcement officer since
   November of 2010 after completing his Basic Law Enforcement Training. Your
   affiant has completed over 188 hours of Advanced training. Since February of
   2018 your affiant has been assigned to the Special Investigations Unit of the Vero
   Beach Police Department as a Detective investigating narcotic and vice crimes in
   and around the City of Vero Beach.   Prior to becoming a Detective, your affiant
   was a patrol officer and task force officer, involved in numerous drug arrests.

2.    As a result of your Affiant's training and experience, the following information
about prostitution organizations are known:

A. Prostitutes constantly maintain, on hand, quantities of United States currency in order to maintain and finance their on-going business.

B. Prostitute organizations maintain books, records, receipts, notes, ledgers, tally sheets, and other papers relating to the income for the business.

C. Prostitute organizations commonly maintain addresses or telephone numbers in book or papers, which reflect names, addresses, and or telephone numbers for their associates in the prostitution organization, although said items, may be in code.

D. Prostitute organizations commonly operate under the false business of massage parlors as a business front in order to hide their illegal activity.

E. Prostitute organizations use advertisements on the internet to gain clients.

F. Prostitute organizations also use cellular telephones in conducting the ongoing criminal enterprise.

3. During the fourth week in August 2018 the Vero Beach Police Department's Special Investigations Unit and Homeland Security Investigations began an investigation into possible prostitution taking place at East Spa massage parlor located at 2345 14th Ave. suite #10 in the City limits of Vero Beach. The investigation began as a result of numerous citizen complaints. An online search of the East Spa's listed business phone number (772)-999-5347 utilizing the google search engine was conducted. This revealed a number of advertisements on sites dedicated to sexual encounters to include backpage.com, liveescortreviews.com, adultlook.com, and rubratings.com. Many of these advertisements included photos of young Asian women who were dressed in revealing clothing and were sexually provocative in nature. Listed on a number of the advertisements were both the address and phone number of East Spa.




4. East Spa is located at 2345 14th Ave. suite #10, Vero Beach FL, 32960. The business, according to its website, operates from 0900 hours to 2200 hours but based of surveillance that will be described later in this affidavit, the business typically closes between the hours of 2200 and 2300 hours.



A check of the business through Sunbiz.org Division of Corporations revealed that the spa began as a corporation under the name Jade Massage on 12/01/2016. The owner, Yongzhang Yan has multiple active corporations listed in Sunbiz.org which include AA Massage, A+ Massage and East Spa. All of these businesses have addresses in Indian River County FL. East Spa has been found to be the only active business in the city limits of Vero Beach, FL. The only authorized person listed to manage the corporation, East Spa, is Yongzhang Yan, with a principal office of 2345 14th Ave. suite #10, Vero Beach, FL, 32960. It is also listed as the mailing address.

A report generated by the Department of Health showed that Lanfen Ma (license #75762) and Shuxiang Zhang (license#74864) are listed as employees of East Spa. On 09/10/2018, Det. Gasbarrini and your affiant made contact with Carla Sutherland, who is an Investigation Specialist with the Florida Department of Health. On this date Sutherland conducted an establishment inspection of East Spa. Sutherland advised that she encountered two licensed massage therapists working inside. These employees were identified as Lanfen Ma and Shuxiang Zhang. Both employees were Asian females and both provided photo identification (Texas and New York driver licenses). Sutherland also advised that the owner and president of East Spa was listed as Yongzhang Yan. Sutherland advised that all the business's applicable licenses were up to date, but did note that the FL Department of Health had a case on Lanfen Ma, for aiding and abetting

unlicensed massage therapy, in Sarasota in 2016. Sutherland provided your affiant with photo copies of both Lanfen Ma and Shuxiang Zhang's driver licenses which contained photographs of each subject.

A report generated by HSI Special Agent McCreary via the CLEAR application revealed another female, Lanyun Ma is currently married to and resides with, East Spa owner, Yongzhang Yan (1748 23rd St. Vero Beach, FL. 32960). The report included photographs of Lanyun Ma. Lanyun Ma (02/02/1970), has a criminal history that includes charges of human trafficking and prostitution, out of Massachusetts and New York, between 2008 and 2012. She was convicted of prostitution in Massachusetts in 2012. It is common, in this type of industry, to work at multiple establishments that are under the same owner. Your affiant believes Lanyun Ma is currently working at East Spa due to evidence gathered during surveillance of day to day operations at East Spa and the residence at 1748 23rd St. She has been observed coming and going from both the residence and business multiple times throughout each day. Lanyun Ma also had two other listed addresses of note on previous Department of Health licensing forms. In 2017 she had a listed address of 2312 Gulf Gate Dr. Sarasota, FL 34231. A check of this address revealed it was the previous location of Oriental foot Massage under the corporation name LANFEN MA INC., Lanfen Ma (licensed massage therapist at East Spa) being the registered agent of the business. In 2014 Lanyun Ma had a listed address of 133-43- 41st Rd. #2R Flushing, NY. 11355. It should be noted that it is common knowledge among law enforcement that work in crimes involving human trafficking and prostitution that the majority of Asian females that are involved with a massage businesses where prostitution is being conducted have a current or previous address out of Flushing, New York.

5. On 09/14/2018 and 09/18/2018 the Special Investigations Unit conducted a prostitution sting operation at the East Spa, utilizing Det. Brock #691 in an undercover capacity, posing as a patron. Det. Brock was dressed in plain clothes and equipped with an audio/video device for safety and evidentiary purposes. Prior to the operation Det. Brock was also shown photographs of Lanfen Ma and Shuxiang Zhang who we knew to work at the establishment. Det. Brock detailed each encounter as follows:

"On 09/14/2018 at 13:00 hrs. I assisted the Vero Beach Police Department's Special Investigative Unit (S.I.U.) with an undercover operation regarding possible prostitution activity at massage parlor identified as East Spa, 2345 14th Avenue, Suite 10, in Vero Beach. After a thorough operational briefing, Detectives Gasbarinni and Crowley provided me with one hundred and seventy dollars ($170.00) in United States Currency. I was provided with an audio/video device to record and monitor the operation. On 09/14/18, at 1303 hours, I arrived at East Spa, 2345 14th Avenue, Suite 10. Upon entering the front/south door of East Spa I observed a desk located at the front of the business with a sign listing prices for massages varying in duration. At that time an Asian woman exited from a room that was covered by a curtain. I recognized the woman from a Texas driver license that I had been previously shown by the SIU Detectives as a possible suspect named Lanfen Ma. Ma directed me to the sign at the front desk and asked me which massage I wanted. I told her that I wanted the thirty (30) minute massage and she asked for the payment of $50.00. I paid her the $50.00 massage fee. Ma then escorted me

to a dimly lit room with a single massage table. The first thing I noticed about Ma was how she was dressed. She was wearing a white spandex type mini dress and her breasts were barely covered. Through the material in her dress I could prominently see that she was wearing a dark colored thong and her dress barely covered her buttocks.

Once inside the room, Ma told me to get undressed and she promptly left the room. I undressed down to my boxers and laid face down on the massage table. Shortly thereafter, Ma re-entered the room and began massaging my back concentrating on my hips. She then asked me what hurt the most and I told her "my neck". Ma began massaging my neck and at one point she crawled up on the table with me, straddling my head with her crotch just inches above my head. During that time she began concentrating on my hips and lower back. Ma then moved from the table and told me to roll onto my back. At that time she began rubbing the inside of my thighs and at one point she briefly ran her hand over my crotch. Ma then climbed back onto the massage table, now straddling my thighs. Her panties were in plain view as her dress was raised up. Ma pushed herself closer towards my face and whispered, "You want?" while making an up and down motion with her hand demonstrating manual sex. I asked Ma, "You mean a hand job?" Ma replied, "Shhh not so loud, we must be quiet". I then whispered, "You talking about a hand job or blow job?" Ma responded, "You want this?" Ma pointed to her mouth, "That's," she then held up one finger on one hand and made a zero then a zero with her other hand ($100). I then asked, "What about?" and I made a hand gesture as if doing manual sex. Ma whispered, "This much" and held up five fingers on one hand and her thumb on the other ($60). Ma continued to massage my legs and while still straddling me she said, "You want this?" and pointed at her crotch, "that" and then she held her fingers up to show one hundred sixty dollars ($160). I then pointed at her crotch and said "One sixty?" Ma said, "Yes." Ma then pointed at her mouth. I asked her, "I get that and that?" as I pointed at her crotch and her mouth, "For one sixty?" Ma said, "Yes, since it your first time". "Normally", she then held up her fingers and made a one hundred, then another one hundred sign ($200). I told Ma that I didn't have enough money with me so I would bring more money next time. Ma told me the massage was finished and for me to get dressed.

After I was dressed, Ma re-entered the room and briefly touched my crotch with one hand and had her other hand on my chest. Ma then said, "You tip me?" I reached into my pocket, pulled out a twenty dollar ($20.00) bill, handed it to Ma and told her I'd be back next week. At that time I gathered my belongings and left the premises at approximately 1333 hours.

I then returned to the Vero Beach Police Department and was debriefed by Detectives Gasbarrini and Crowley."

"On 09/18/18 at 1245 hrs I assisted the Vero Beach Police Department's Special Investigative Unit (S.I.U.) with an undercover operation regarding possible prostitution activity at massage parlor identified as East Spa, 2345 14th Avenue, Suite 10, in Vero Beach. After a thorough operational briefing, Detectives Gasbarinni and Crowley provided me with one hundred dollars ($100.00) in United States Currency. I was provided with an audio/video device to record and monitor the operation.

On 09/18/18 at 1300 hrs I arrived at the East Spa, 2345 14th Avenue, Suite 10. Once there I observed a desk located at the front of the business with a sign listing prices for

massages varying in duration. At that time an Asian woman approached me from a long hall. I recognized the woman from a New York State driver license that I had been shown by the S.I.U. Detectives as a possible suspect named Shuxiang Zhang. Zhang directed me to the sign at the front desk and asked me which massage I wanted. I told her that I wanted the thirty (30) minute massage and she asked for the payment of $50.00. I paid her the $50.00 and she escorted me to a room with a single massage table.

Once inside, I undressed down to my boxers and lied face down on the table. Shortly thereafter, Zhang walked in to the room and asked if I wanted a hard or medium massage. I told her medium. At that time she began massaging my back, legs and hips. She then massaged my neck. Zhang then told me to roll over onto my back which I did. Zhang started massaging my legs and at one point ran her hand briefly over my penis. Several minutes later she asked, "Is there anything you would like"? I asked her what did she mean. She said, "You tell me." I told her I didn't know what she was asking. Zhang seemed nervous and started saying, "You trouble, you trouble, you police?" We continued back and forth until she said, "You can have anything, you just say." At that time I told her that, "I know what the other girl was offering." Zhang said, "I give you what Yo Yo give you". I told her, "Yo Yo said $60.00 and I motioned a hand job, $100.00 for a blow job and $200.00 for (pointing at her crotch) for everything." Zhang responded, "I give you (motioning a hand job) for $50.00 as she held up five fingers on one hand, pointing at her mouth $100.00 as she held up one finger and $160.00 for everything." She whispered to me. I reiterated, $50.00 for a hand job, $100.00 for a blow job and $160.00 for that as I pointed at her crotch. She said, "Yes, so what you want"? I told her I didn't bring enough money and she said, "You check money." I then walked over to my shorts and checked my money. I laid back down on the table and she said, "So, what you want"? I told her I didn't have enough money and she said, "Yes you do, I do this (motioning a hand job) for $40.00". Zhang then responded, "You can pay with credit card." I pointed at her crotch again and said, "I want that, so I'll just wait until next week." Zhang lifted her dress exposing her crotch. She was wearing a pink colored thong. Zhang turned around with her dress lifted to show me her buttocks. She then said, "I thought you were trouble, police or something." I laughed and told her, "I was just nervous and was afraid to ask for what I wanted. I don't want you to throw me out of here for asking." Zhang bent down over me with her face close to mine. I thought she was going to whisper something in my ear as she had been doing. Instead, she kissed me on the lips and said, "Next time you come in and take off (motioning to my underwear) and tell me what you want." I told her I would just wait until next week. Zhang once again kissed me, this time on the side of the mouth and another time on the cheek. I removed myself from the table and began to get dressed. Zhang sat next to me and said, "I will give you my number so you can call me." She then asked for a tip and I told her that I would take care of her next time. I then gathered my belongings and left the business. I then returned to the Vero Beach Police Department and was debriefed by Detective Gasbarrini and Crowley."

6. Although several traffic stops have been made on clients of the prostitution organization, further investigation into the proceeds of the illegal organization is needed. Without the use of electronic surveillance the entire prostitution organization will not be

able to be identified or prosecuted. Electronic surveillance, without the ability of audio, will allow law enforcement to further the investigation by identifying the prostitutes and clients. It will also allow law enforcement to investigate the manner in which the organization operates.

7. On 09/25/2018, at approximately 1300 hrs Det. Gasbarrini, HSI Agent McCreary, and your affiant conducted further surveillance of the East Spa. We made contact with two male subjects after they left the East Spa and they agreed to speak to us about what occurred while inside the establishment. Both subjects agreed to speak to us on their own accord. Both subjects were advised that they were not under arrest and were free to leave at any time. During recorded interviews both men advised that while inside the business an Asian woman offered multiple sexual favors for money. Both men were then shown photographs of the subjects we knew to be working in the East Spa and both identified Shuxiang Zhang as the woman who offered the sex acts for money. Both subjects described similar accounts to Det. Brock's experience during the sting operations on 09/14/2018 and 09/18/2018. Both men also advised that Zhang used hand motions and pointed to body parts when offering the sex acts for money.

8. Throughout the months of September and October 2018, Det. Gasbarrini and your affiant have conducted multiple hours of covert surveillance at East Spa. Your affiant has observed a large amount of traffic in and out of the business. The patrons observed entering the business were all male during the times of surveillance. The majority of the subjects observed exited the business after being inside for only approximately 30 minutes to an hour.

9. On 10/01/2018, at approximately 0700, Det. Gasbarrini and your affiant began surveillance of 1748 23rd St while Lt. Pedersen #628 conducted surveillance of East Spa. At approximately 0720 hrs. Det. Gasbarrini and I observed Lanyun Ma (spouse of Yongzhang Yan) exit the residence and walk eastbound on 23rd St. Lanyun Ma then turned northbound through the alley in the 1500 block of 23rd St. Lt. Pedersen then observed Lanyun Ma emerge from the alley and approach the front doors of the East Spa. She was observed using keys to open the front doors and enter the business. At this time Lt. Pedersen was relieved at his place of surveillance by Det. Brumley #662. At approximately 0750, Det. Brumley advised that Lanyun Ma and an unknown Asian female exited the East spa and entered a red Lincoln that was already parked in front of the business. Your affiant followed the vehicle as it exited the parking lot of the East Spa and conducted mobile surveillance on the vehicle. Your affiant observed Lanyun Ma to be driving the vehicle and the unknown female was seated in the back seat. The front passenger seat was unoccupied. At approximately 0800 the vehicle came to a stop at 1750 US Hwy. 1 (Wal-Mart Grocery). Your affiant observed Lanyun Ma park the vehicle in a parking spot and both women exited the vehicle and entered the store. Det. Gasbarrini and your affiant continued surveillance on the subjects inside the store. Once inside the store they were observed walking directly to the aisle where condoms were sold. Lanyun Ma was observed crouching in front of the display of condoms and having a brief discussion with the unknown female. Ma was then observed selecting two 24-packs of Trojan bare skin condoms (48 total) and they were placed into the shopping cart. The

women then continued to shop in the store for a brief time longer before checking out. Lanyun Ma was observed paying for both boxes of condoms and placing them into the cart. She then conducted two additional purchases of assorted groceries. It appeared as though Lanyun Ma made the purchase of condoms with cash and made the other purchases debit/credit card. Your affiant then observed them exit the store and again enter the red Lincoln. Ma was then observed driving directly back to the East Spa without stopping at any other location. Upon arriving at the East Spa, Det. Brumley observed Ma and the unknown female enter the business through the front door. Det. Brumley advised that the unknown female was carrying grocery bags as she entered. Det. Brumley was able to capture them entering the business on a video recording device. At this time Det. Gasbarrini and your affiant returned to Wal-Mart and met with security officer, Christopher Callaway. Callaway accessed the video surveillance footage and we were able to observe the purchases made by Ma. Your affiant collected copies of the surveillance footage as well as still images of the subjects as they exited the store. Your affiant also collected copies of the receipts for the purchases made by Ma. This confirmed that the condom purchase was made with cash and the other two additional grocery purchases made with a credit/debit card.



10. Throughout your affiant's hours of surveillance, no women have been observed leaving the business property on their own. The only time any of the females have been observed leaving the property is in the presence of Lanyun Ma who is transporting them off site in a vehicle. It appears as though the women are not only working and engaging in prostitution at the business, but also living there. The business has been observed being opened in the morning, by individuals already inside, without anyone else arriving to do so.

11. Your affiant conducted trash pulls on 10/8/18, 10/9/18, 10/10/18, 10/15/18, and

10/17/18 from a garbage can located on the west side of the business, in the alleyway. The can is positioned directly against East Spa's west wall and the women have been observed discarding bags of trash in this can during the hours of surveillance. During the trash pulls, grocery style bags were found in the can which contained food and napkins/tissues that had a sticky semi liquid substance within them. Through my training and experience, I know that establishments where prostitution is taking place, napkins or tissues are commonly used to clean off a male client or the prostitute of the semen as a result of the sexual act that takes place. Tissues collected during a trash pull on 10/17/2018 were field tested for the presence seminal fluid with a positive result. Also located were used condoms and feminine hygiene products to include feminine wipes, and a douche. Also located was packaging for a sex toy and a tube of Terconazole Cream which is used to treat vaginal infections. Your affiant also located hand written ledgers that appeared to be keeping track of the money each girl collected during the course of the day. Mail and receipts from East Spa were also found. One of the receipts was a card purchase containing the name Lanyun Ma.

Below are some photos from the trash pulls on 10/08/2018-10/09/2018:





Below are some photos from the trash pulls on 10/15/2018:



12. On 10/31/2018, Homeland Security Investigations and the City of Vero Beach Utilities assisted with the installation of a pole camera on a telephone pole that is positioned to the southwest of the target business. The camera faces northeast and has a direct and unobstructed view of the front door of the business and partial view of the exterior parking lot around it. The camera was installed to provide 24 hour surveillance of the exterior of the business. This surveillance between the dates of 10/31/18 and 11/20/18 confirmed that the women working inside the business are sleeping inside the business overnight and only leave the property when in the company of Lanyun Ma who transports them off site in a vehicle. The women spent the night at the business every night during the aforementioned 21 days of video surveillance and are obviously living on site. The video surveillance also revealed that the clientele at the business is exclusively male and no female customers visited the business during the aforementioned 21 days of video surveillance.

13. On 11/27/2018, an order for surreptitious entry and installation of electronic surveillance cameras was completed and signed by Judge Cox. On 11/29/2018 the Vero Beach Police Department and Homeland Security Investigations installed cameras without the capability of audio inside 2345 14th Ave. Suite #10. Between 11/29/2018 and 12/27/2018, your affiant has observed the performance of approximately 100 sex acts for money. Your affiant has also observed the counting and transportation of large sums of money and the transportation of women to and from the spa. Each of the women transported to the spa have been observed in commission of sex acts for money.

14. On 12/01/2018 at 0739 hrs, Lan Yun Ma was observed leaving East Spa in her red Lincoln MKX, Texas TAG: KJX3977 with an unknown female. The unknown female left with suitcase to an unknown location with Ma in the aforementioned vehicle. The unknown female had been staying and working at the East Spa since 10/31/18. On 11/30/18 the aforementioned female was observed participating in six separate sex acts at the East Spa for money.

On 12/01/2018 at 0849 hrs, Lan Yun Ma arrives back at East Spa with new unidentified female and luggage. Lan Yun Ma takes large amounts of US currency out of her purse when she enters East Spa with female. Lan Yun Ma counts large sums of money at front desk.

On 12/04/2018 at 2040 hrs, Lan Yun Ma gets a bag from unidentified female at front counter. Lan Yun Ma counts and gathers large amount of money and places it in a white plastic bag. At 2136 hrs unidentified female and Lan Yun Ma start to load 2016 Red Lincoln with bags. Lincoln leaves NB on US 1 from East Spa with unidentified female driving. Det. Brumley and Cpl. Hesse follow the aforementioned vehicle to AA Massage at 1547 US Sebastian FL. Unidentified female exits and brings in white plastic bag, matching the description of the bag that Lan Yun Ma was placing the money into at East Spa. Unidentified female leaves AA massage and travels south bound on US 1. Det. Brumley and Cpl. Hesse stated they lost visual of the Red Lincoln south bound US 1 just south of Sebastian FL.

On 12/10/2018 at 0710 hrs, Lan Yun ma counts money at front desk of East Spa. Lan Yun Ma places money into her purse and bag and exits East Spa. Lan Yun Ma travels north bound US 1 in red Lincoln MKX with money at 0744 hrs. Lan Yun Ma arrives at AA massage at 0758 hrs and meets Kenneth Zullo who is standing next to his Toyota Utility (FL tag#KENBILT). Lan Yun Ma enters AA massage with money, bags and Zullo. Lan Yun Ma leaves AA massage and heads south bound on US 1. At 0855 hrs Lan Yun Ma arrives back at the East Spa. Sebastian Police Department assisted with surveillance during this time period. Sgt. Finnegan (Sebastian PD) observes Zullo leave AA massage with aforementioned bag and drive to his residence at 121 Curtis Cir, Sebastian, FL.

On 12/10/2018 at 2007 hrs, Det. Brock observed a Zullo arrive at the East Spa in the aforementioned Toyota utility. Zullo picks up an unknown female (Jane Doe #4) and leaves north bound US 1. Det. Brock followed Zullo and Jane Doe #4 to Mulligans (806 Indian River Dr. Sebastian Fl.) After having a drink at Mulligans, Zullo and Jane Doe #4 traveled south on US 1. Zullo then arrived at 121 Curtis Cir. (Zullo's residence) with Jane Doe #4. The following morning Zullo returned Jane Doe #4 to the business. Zullo has since picked up this Jane Doe #4 on multiple occasions and dropped her off at the East Spa between 12/10/2018 and Dec. 12/26/2018. Your affiants have observed through court authorized surveillance Jane Doe #4 committing fourteen sexual acts at East Spa with customers of the business.

On 12/16/2018 Zullo arrives at the East Spa driving the aforementioned Toyota with another unidentified female (Jane Doe #5) and her luggage. The female stays at the East Spa between 12/16/2018 and 12/18/2018. During her stay at the East Spa, your affiant observed through court authorized surveillance Jane Doe # 5 committing seven sexual acts at the business with customers.

On 12/19/2018 at 0836 hrs, Zullo arrives at East Spa. Zullo loads Jane Doe #5's luggage into the aforementioned Toyota. Jane Doe #5 gets into passenger side of Toyota and leaves with Zullo driving. Toyota was last seen south bound 14th Avenue. Zullo arrives back at the East Spa without Jane Doe #5 at 1136 hrs.

On 12/06/18 and 12/22/18 court authorized tracking devices were installed on the aforementioned vehicles that were identified as vehicles used to transport both women participating in the criminal enterprise and funds used to contribute to the criminal enterprise or derived from the enterprise.

16. On 12/06/2018, Lan Yun Ma was observed leaving 2345 14th Ave. Suite#10 and enter the aforementioned Red Lincoln. The court authorized tracking device revealed Lan Yun Ma traveled west bound on SR 60 to Yee Haw Junction. The vehicle then went north bound on the Florida Turnpike. The Lincoln & Lan Yun Ma entered Orlando in the area of 1101 S Lee Ave. Your affiant contacted Cpl. Denton of the Orlando Police Department who conducted surveillance of this address. Cpl. Denton advised that he located both the aforementioned Red Lincoln and the Black Toyota Venza (FL tag#HAWE17) registered to Lan Yun Ma and previously driven by Yongzhang Yan (Owner of East Spa) parked at 1101 S. Lee Ave. in Orlando, FL.

On 12/22/2019, at 0811, your affiant observed Lan Yun Ma enter the front passenger door of the vehicle owned and operated by Kenneth Zullo. Zullo proceeds to drive Ma to Wal-Mart grocery (1750 US Hwy 1.). At 0811 Ma enters Wal-Mart and purchases items before exiting at 0821. Zullo then drives Ma back to East Spa where he backs into a parking spot directly in front of the business and items are unloaded from the vehicle and brought inside. Since the tracking device has been installed on Zullo's vehicle it has been observed at East Spa multiple times.

On 12/24/2018, at approximately 0730 the black Toyota Venza registered to Lan Yun Ma (FL tag#HAWE17) is observed via surveillance video pulling into the East Spa parking lot and parking directly in front of the spa. The driver of the vehicle, who is observed exiting the driver seat is an Asian male your affiant recognized to be spa owner Yongzhang Yan. An unknown Asian female (Jane Doe #6) who is transported to the East Spa by Yan exits the passenger side of the vehicle. Yan then assists the female remove her suitcases from the vehicle and the two enter the spa. Yan is then observed carrying other items from the vehicle into the spa. Lan Yun Ma is then observed exiting the spa with her purse and entering the passenger seat of the vehicle. The vehicle is then observed exiting the East Spa parking lot.

Prior to this Yongzhang Yan had not been observed at East Spa since 11/07/2018, at 1317 when he was observed dropping off Lan Yun Ma and carrying unknown boxed items to the front of East Spa to be brought inside. He then left and was observed driving to the FL turnpike. Prior to that he was observed pulling up to the front of East Spa on 10/31/2018, at 1459. He was observed parking in front of the business before Lan Yun Ma walks out of the spa to his vehicle and hands him a small package. He was then observed leaving in the vehicle.

On 12/25/2018, at approximately 1239 hrs. Zullo arrives at East Spa and JD #4 enters his vehicle. JD #4 is not observed returning to East Spa until 12/26/2018 at 0825 hrs. Over this period of time Zullo's vehicle is observed via tracking device at multiple locations including AA Massage in Sebastian and his residence.

17. Your affiant Crowley states that the following investigative procedures are usually employed in the investigation of this type of criminal case. These procedures have either been tried and not succeeded in achieving the goals of the investigation, are too dangerous, or may jeopardize the investigation if employed or are not applicable in this particular investigation.

    A.   Search Warrant: Based on the facts of the investigation up to this point, your affiant believes that there is probable cause for the issuance of a search warrant for the premises. There is no reason, however, to believe a search warrant executed at the location would reveal the structure of the racketeering enterprise or provide the evidence necessary to prove a violation of Chapter 895 and Chapter 796 Florida Statutes Additionally, it is unlikely that a search warrant would result in the discovery of an active act of prostitution since your affiant knows of no method by which law enforcement

officers could predict when such an act was going to occur. The execution of a search warrant would only serve to alert the principals that an investigation was pending which would frustrate the purpose of this investigation.

B.   Informants: Your affiant has received information from informants following traffic stops by law enforcement officers. These informants, however, could only provide statements of acts that occurred in the premises to be searched. Due to the nature of these acts, these statements are uncorroborated. Furthermore, these informants could not provide any information related to the structure of the criminal enterprise or the distribution of proceeds collected in exchange for the acts of prostitution. Finally, law enforcement officers could not utilize informants to engage in acts of prostitution because, unlike purchases of narcotics under Chapter 893, informants acting under the direction of law enforcement officers may not violate Chapter 796.

C.   Surveillance: Your affiant and other officers have conducted surveillance of the premises to be searched and have not obtained any information other than that previously listed above. While additional surveillance may lead to other customers of the enterprise who admit unlawful acts, there is no reason to believe that other customers could identify the organizational structure of the enterprise or reveal the distribution of the proceeds from the unlawful activity. Surveillance outside the premises does not allow officers to see inside the business, which is where the unlawful activity is being conducted.

D.   Subpoenas: Subpoenas for appearance before the State Attorney or before the Grand Jury by law provide immunity to the persons subpoenaed. Even with this grant of immunity, there is no reason to believe that information gained by way of State Attorney investigative subpoena or by testimony before a State Grand Jury would be truthful or complete information. Additionally, subpoenas to known customers of the principals of this organization might alert the organization as to the nature of the investigation and would frustrate the investigation's attempts to identify all of the principals or gather evidence against them. In addition, even if some of the customers testified, your affiant has no reason to believe that any of them know the extent of the organization or that the objectives of this investigation could or would be accomplished because of the extent of the organization.

E.   Interviews: Your affiant believes that additional interviews of known customers would produce insufficient information as to the identities of all of the persons involved in the enterprise and in fact would produce untruthful or incomplete evidence. Additionally, the interviews would frustrate the investigation if the persons involved in the enterprise were to learn of the interview.

F.   Use of Undercover Police Officers: Although useful, an undercover officer is of limited use in an investigation such as this one. Law enforcement officers are not exempt from the provisions of Chapter 796 and would have to prevent any acts of prostitution beyond the solicitation stage of the offense. An undercover officer is not able to identify all the principals of the enterprise or gain the evidence necessary to meet the

objectives of this investigation.

G.    Trash Pull: Although a trash pull does produce additional evidence of possible prostitution taking place within the business, it does not offer specific examples to establish the predicate crime of prostitution, which is required to charge deriving funds from the proceeds of prostitution which then provides the required specified unlawful activity to charge racketeering.

Your affiant believes an additional 30 day extension of this "visual surveillance warrant" is needed to identify and arrest subjects involved in prostitution as it relates to the Deriving of Funds from the proceeds of Prostitution and racketeering occurring at and due to the East Spa located at 2345 14th Ave. Vero Beach, FL 32960 Suite #10. While probable cause exists to show prostitution is occurring inside the business, additional visual surveillance is necessary to further identify the organizational structure of the criminal enterprise. Additional visual surveillance would also allow officers to observe monetary transactions and the actions of the female employees being transported to the East Spa from other locations.

Additionally the involvement of Kenneth Zullo was unknown prior to the initial "visual surveillance warrant" being signed and his activities came to light because of the surveillance. The extent and nature of his involvement is still unknown. Likewise, the involvement of Yongzhang Yan was also unknown until he was observed transporting a new female to the spa on 12/24/2018. An additional 30 days of surveillance can assist in determining the extent and nature of both of these subjects involvement in the criminal enterprise.

Additionally, the focus of this investigation is not only the customers committing prostitution but more importantly those involved in deriving funds from the proceeds of prostitution, to include the owner(s) and/or manager(s) of the business and possibly any o the women of prostitution working at the business. Your affiant believes that a "visual surveillance warrant" is the best and only way law enforcement can conclusively say prostitution is occurring inside the business. Thus, while voluntary statements of customers exiting the business is supportive to this argument, it is not enough, in and of itself, to establish the predicate crime of prostitution, which is required to charge deriving funds from the proceeds of prostitution which then provides the required specified unlawful activity to charge racketeering. Additionally, while the previous customer statements, undercover operations, and surveillance do lend support to the belief that probable cause exists to suppose that prostitution is occurring inside the business, it does not allow for a furtherance of an investigation regarding the deriving funds from the proceeds of prostitution and racketeering without great risk to our case. Therefore, video surveillance is the only option to obtain definite evidence of prostitution occurring inside the business to further our investigation. Video surveillance can also show the collection and exchange of money, furthering our investigation into how the business is funded and operated.

IT IS REQUESTED that your affiant is allowed to continue the electronic video surveillance of the interior location of the location to identify participants in the criminal enterprise, commonly referred to as a "visual surveillance warrant". There shall be no capability on any of the installed equipment to allow audio monitoring or recording. The entry may be made within ten days of issuance of this warrant, in the daytime or the nighttime, or on Sunday, to forthwith install, monitor and perform maintenance on electronic video surveillance on the said premises herein before specified. Once monitoring of the subject premises begins, your affiant will continue monitoring for no more than 30 days without further order of this court.

IT IS FURTHER REQUESTED that this Court direct that its Order be executed as soon as practicable after it is signed and that all monitoring of visual surveillance shall be conducted in such a way as to minimize the visual surveillance and disclosure of the visual surveillance intercepted to those communications relevant to the pending investigation

IT IS FURTHER REQUESTED the visual surveillance warrant authorized by this Court's Order must terminate upon attainment of the authorized objectives or, in any event, at the end of thirty (30) days measured from the day on which investigative or law enforcement officers first begin to conduct an interception or ten (10) days after the Order is entered

IT IS FURTHER REQUESTED that the Court Order direct that video surveillance must immediately terminate when it is determined that the video surveillance is unrelated to this investigation. Video Surveillance must be suspended immediately when it is determined that none of the named targets or any of their confederates, when identified, are participants in criminal conduct.

IT IS FURTHER REQUESTED that the Court Order that video surveillance should, at least, continue for a number of minutes to determine whether or not a sexual act is taking place during, at the beginning, or at the end of a paid for massage. If such a sexual act is unclear but may be related to a massage / sexual act, video surveillance may continue until such time as it is determined that the activity clearly no longer relates to any type of sexual activity. The above instructions regarding the number of minutes needed to determine whether or not a sexual act is taking place will vary until experience has been gained.

IT IS FURTHER REQUESTED that the Court Order that the Vero Beach Police Department is authorized, to intercept and record the visual, non-verbal conduct and activities occurring at 2345 14th Ave. Suite #10. Vero Beach, County of Indian River, State of Florida and others as yet unknown, concerning the above-described offenses at the premises. Such video surveillance shall not terminate automatically when the type of conduct & activity described above has first been observed but shall continue until the conduct or activity is intercepted that reveals the manner in which the above named, and others as yet unknown participate in the specified offenses and reveals the identities of their co-conspirators, their methods of operation, and the nature of any conspiracy, or for

a period of time not to exceed 30 days

   IT IS FURTHER REQUESTED that the Court Order the warrant shall be terminated or renewed based upon the evidence gleaned from the surveillance. Due to the property location and the covert nature of the criminal enterprise, no other, less intrusive investigatory means employed thus far have been successful, nor are they likely to be in the future. Upon termination of this order Your Affiant shall forthwith make return of his doings within ten days from the date thereof. Upon termination of the conditions justifying the need for covertness, notice of the surreptitious search will be given within seven days to the responsible person(s) of the location to be searched.

BASED ON YOUR AFFIANT'S knowledge, training and experience, there is probable cause to believe that the business located at **2345 14th Ave. Suite #10. Vero Beach, Indian River County, State of Florida**, is being utilized to operate a prostitution and racketeering organization and/or derive support from the proceeds of prostitution.

   BASED ON all the foregoing information, your Affiant also has probable cause to believe that a violation of the laws of the State of Florida, to-wit: Chapter 796 and Chapter 895 , Florida State Statutes, exists in the premises addressed at **2345 14th Ave. Suite #10. Vero Beach, Indian River County, State of Florida** WHEREOF, affiant makes this affidavit and prays the issuance of a visual surveillance warrant in due form of law for the surreptitious installation of video monitoring equipment within the above described premises for the said property, heretofore described, and for the monitoring and recording of visual non-audio conduct and safe keeping of the property, subject to the order of this Honorable Court or such other Court having jurisdiction over the offense, by the duly constituted officers of the law.

AFFIANT

Detective Sean Crowley,

SWORN to and subscribed before me this ⟶ 28 day of _____,
2018.

JUDGE in and for INDIAN RIVER COUNTY, FLORIDA

# EXHIBIT "D"

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT IN AND
FOR THE COUNTY OF INDIAN RIVER
STATE OF FLORIDA

## ORDER FOR SURREPTITIOUS ENTRY AND INSTALLATION OF
## ELECTRONIC SURVEILLANCE CAMERA

IN THE NAME OF THE STATE OF FLORIDA, TO ALL AND SINGULAR:

The Sheriff of Indian River County and his lawful deputies, the Chief of the Vero
Beach Police Department and all police officers having jurisdiction over the premises to
be searched / surveilled in Indian River County, Florida, and any State Attorney
Investigator,

WHEREAS, application in writing, supported by affidavit of a credible witness,
or witnesses, has this day been made before the undersigned Judge _Kanarek_, in
for Indian River County, Florida, and

WHEREAS, the Court finds that the affiant has established that other reasonable
methods to obtain the evidence sought have either been attempted and failed or are
unlikely to accomplish the stated goals of the affiant's investigation, and

WHEREAS, said facts made known to and considered by me have caused me to
certify and find that the facts set forth in said affidavit show and constitute probable
cause for the issuance of this surveillance warrant, and the Court being satisfied of the
existence of said grounds set forth in the affidavit in that on or in a certain premises
known and described as follows:

TO WIT:  To arrive at the premises to be entered start at the intersection of 23rd Street
and 14th Ave. From the aforementioned intersection travel north on 14th Ave. for
approximately one half block. The premises to be entered is located in a plaza located on the
west side of 14th Ave. The premises to be entered is tan in color with a brown roof. The plaza
is a single story multi unit structure. The numbers 2345 are affixed to the east side of the
building. The premises to be entered is the fifth business from the east and has a tinted glass
front door. To the right side of the front door there is a blue sign with the words East Spa
Therapeutic massage. On the tinted glass door the number 10 is affixed. The address for the
premises to be entered is 2345 14th Ave. suite #10.

The premises and curtilage occupied by or under the control of a Yongzhang Yan,
Lanyun Ma and others at this time unknown. Your affiant has reason to believe there is
active prostitution being performed at the premises to be entered, which is in violation of
the Laws of the State of Florida prohibiting prostitution and person(s) deriving support
from the proceeds of prostitution, in violation of Chapter 796.06, 796.07, and
Racketeering, in violation of Chapter 895.03, Florida Statutes.

NOW THEREFORE, you, with proper and necessary assistance, are hereby commanded in the name of the State of Florida, in the daytime or in the nighttime, or on Sunday, to enter the said premises 2345 14th Ave. suite #10.Vero Beach, FL, to enter and install in the premises to be searched video surveillance cameras, and to monitor these surveillance cameras for a period of no longer than 30 days, and forthwith make return of your doings upon executing this warrant, which you are hereby commanded to execute as the law directs within ten days from the date thereof. While monitoring the premises to be searched, the executing officers shall take steps to minimize the invasion of privacy to any parties not engaged in the unlawful acts set forth in the affidavit. The officers shall also make efforts to minimize the disclosure of this surveillance operation to only those sworn law enforcement officers pertinent and relevant to this surreptitious investigation and those sworn law enforcement officers involved in the operation shall be explained this Order as well as the Florida Statute pertaining to Contempt of Court.

The original of this warrant, together with the original inventory shall be returned and filed with the Judge in and for Indian River County, or before any Court having jurisdiction as stated above within ten days of the date of issuance of this warrant.

The Court finds that a copy of this Order need not be left at the premises to be searched because leaving the order at the premises would defeat the purposes of this warrant.

WITNESS my hand and seal this 28 day of December, 2018.

JUDGE in and for Indian River County, Florida

# EXHIBIT "E"

Filing # 92852289 E-Filed 07/19/2019 02:36:41 PM

```
                                                                 Page 1

                           IN THE CIRCUIT COURT OF THE
                           NINETEENTH JUDICIAL CIRCUIT
                           IN AND FOR INDIAN RIVER COUNTY
                           STATE OF FLORIDA


                           VOLUME I OF II

     STATE OF FLORIDA,

       Plaintiff,

     vs.

     JOVANY AGUILERA             CASE NO.: 3119MM393A
     MOHAMMED TURKI ALHARBI      CASE NO.: 3119MM404A
     FUAD S. ALJADAANI           CASE NO.: 3119MM572A
     GARRETT M. ALLEN            CASE NO.: 3119MM561A
     JOSEPH R. ANGLESANO         CASE NO.: 3119MM366A
     GREGORY ARNONE              CASE NO.: 3119MM367A
     JUSTIN L. BAUER             CASE NO.: 3119MM421A
     DAVID RAY BLACK             CASE NO.: 3119MM350A
     JON BROECKER                CASE NO.: 3119MM353A
     DONALD SCOTT BROWN          CASE NO.: 3119MM355A
     PATRICK VINCENT BROWN       CASE NO.: 3119MM392A
     PAUL DENNIS BROWNING        CASE NO.: 3119MM357A
     SCOTT BUESCHER              CASE NO.: 3119MM369A
     VANDERLEI CASTRO            CASE NO.: 3119MM432A
     WILLIAM ERVIN CHANCELLOR    CASE NO.: 3119MM436A
     JEFFREY CHANDLER            CASE NO.: 3119MM480A
     DAVID CLARK                 CASE NO.: 3119MM368A
     KEVIN COYNE                 CASE NO.: 3119MM372A
     JOHN CRAIN                  CASE NO.: 3119MM371A
     LOUIS R. CROOK              CASE NO.: 3119MM417A
     FRANK DE LISI               CASE NO.: 3119MM397A
     CLAUDIO DE OLIVEIRA         CASE NO.: 3119MM387A
     OTTAVIO FRANCESO DIDOMENCIO CASE NO.: 3119MM379A
     WALTER L. DIXON, II         CASE NO.: 3119MM445A
     ISIAH DRISDOM               CASE NO.: 3119MM330A
     MANUEL ESQUIVEL             CASE NO.: 3119MM422A
     WILLIAM ESTES               CASE NO.: 3119MM399A
     WILLIAM ESTES, JR.          CASE NO.: 3119MM395A
     JON FOREST                  CASE NO.: 3119MM385A
     ROBERT FREELS               CASE NO.: 3119MM328A
     ROMAN GAMEZ                 CASE NO.: 3119MM389A
     STEPHEN GEARY               CASE NO.: 3119MM337A
     VITO C. GIOIA               CASE NO.: 3119MM412A
     RICHARD GOLLILNGE           CASE NO.: 3119MM406A
     MICHAEL GRIGGS              CASE NO.: 3119MM420A
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

STATE OF FLORIDA VS. ROBERT TRELLES, ET AL
L. T. CASE NO. 312019MM000328A, ET AL   DCA CASE NO. 4D19-1655, ET AL

Page 2

| 1  | CARL GUIDICE, JR.          | CASE NO.: 3119MM334A |
|    | NEAL ALLEN HAGER           | CASE NO.: 3119MM449A |
| 2  | MARK D. HASSETT            | CASE NO.: 3119MM333A |
|    | DAVID F. HEALY             | CASE NO.: 3119MM348A |
| 3  | JOSEPH E. HENDRICKS, JR.   | CASE NO.: 3119MM405A |
|    | RANDY HINES                | CASE NO.: 3119MM560A |
| 4  | MICHAEL W. HUCKS           | CASE NO.: 3119MM410A |
|    | JOSEF JORG                 | CASE NO.: 3119MM345A |
| 5  | HARRY RICHARD KAPLAN       | CASE NO.: 3119MM343A |
|    | HAROLD E. KEMP             | CASE NO.: 3119MM342A |
| 6  | LOUIS G. KIRBY             | CASE NO.: 3119MM339A |
|    | MARK LOUIS KIRK            | CASE NO.: 3119MM438A |
| 7  | JOHN DAVID KOSTYLA         | CASE NO.: 3119MM336A |
|    | KEVIN LAPHAM               | CASE NO.: 3119MM384A |
| 8  | SHUN LEE                   | CASE NO.: 3119MM402A |
|    | ALAN LHOTA                 | CASE NO.: 3119MM394A |
| 9  | RONG LI                    | CASE NO.: 3119MM398A |
|    | JAMES LUNDEEN              | CASE NO.: 3119MM391A |
| 10 | KENNETH M. MAKSYM          | CASE NO.: 3119MM373A |
|    | JAMES MARCIL               | CASE NO.: 3119MM426A |
| 11 | GERARD MAZZA               | CASE NO.: 3119MM424A |
|    | CLEMENT MCBRIDE            | CASE NO.: 3119MM419A |
| 12 | PETER MCBRIDE              | CASE NO.: 3119MM415A |
|    | CLARENCE MCCLAIN           | CASE NO.: 3119MM409A |
| 13 | JOHN MCCULLEY              | CASE NO.: 3119MM451A |
|    | TERRY ALFRED MERWIN        | CASE NO.: 3119MM354A |
| 14 | BARRY MILLS                | CASE NO.: 3119MM428A |
|    | JOSEPH RAY MOYER           | CASE NO.: 3119MM484A |
| 15 | BRIAN K. OLAISEN           | CASE NO.: 3119MM411A |
|    | ADAM READ PALMA            | CASE NO.: 3119MM413A |
| 16 | JONATHAN PESHKE            | CASE NO.: 3119MM358A |
|    | KENNETH PHILLIPS, JR.      | CASE NO.: 3119MM407A |
| 17 | NEIL POWERS                | CASE NO.: 3119MM378A |
|    | BRUCE PURPLE               | CASE NO.: 3119MM490A |
| 18 | ANTHONY RANDAZZO           | CASE NO.: 3119MM433A |
|    | GREGORY ALAN READER        | CASE NO.: 3119MM376A |
| 19 | BILL MICHAEL RIZKALLAH     | CASE NO.: 3119MM562A |
|    | PAUL A. RODLIFF            | CASE NO.: 3119MM554A |
| 20 | CONNER THOMAS RUF          | CASE NO.: 3119MM556A |
|    | SHAWN ROBERT RYAN          | CASE NO.: 3119MM338A |
| 21 | WILLIAM SAUNDERS           | CASE NO.: 3119MM388A |
|    | MICHAEL SEARS              | CASE NO.: 3119MM441A |
| 22 | MARK PATRICK SPERO         | CASE NO.: 3119MM383A |
|    | KEITH ALLAN TAIG           | CASE NO.: 3119MM365A |
| 23 | JOHN W. TAYLOR             | CASE NO.: 3119MM447A |
|    | SCOTT L. TAYLOR            | CASE NO.: 3119MM359A |
| 24 | LUIS R. VEGA               | CASE NO.: 3119MM352A |
|    | GEORGE TIMOTHY WARD        | CASE NO.: 3119MM361A |
| 25 | CHARLES WATERHOUSE         | CASE NO.: 3119MM454A |

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 142

Page 3

```
 1   HANS WEDE                    CASE NO.: 3119MM459A
     KENNETH WESSELL             CASE NO.: 3119MM347A
 2   JAMES L. WEST               CASE NO.: 3119MM340A
     BRUCE JAMES WICKERS         CASE NO.: 3119MM335A
 3   DEANGILO LARAYE WILLIAMS    CASE NO.: 3119MM400A
     MARK YOUSSEF                CASE NO.: 3119MM363A
 4
       Defendants.
 5   _____/

 6

 7                TRANSCRIPT OF HEARING PROCEEDINGS

 8                     MOTION TO SUPPRESS

 9                THIS CAUSE came on for hearing before

10        the Honorable Nicole P. Menz, Judge of the

11        above court at the Indian River County

12        Courthouse, Vero Beach, Florida, on the 23rd

13        day of April, 2019.

14

15

16

17

18

19

20

21

22

23

24

25
```

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 143

STATE OF FLORIDA vs. ROBERT TREELS, ET AL

L. T. CASE NO. 312019MM000328A, ET AL   DCA CASE NO. 4D19-1655, ET AL

```
                                                      Page 4
  1   THE APPEARANCES were as follows:
  2   FOR PLAINTIFF:   Office of the State Attorney
                       2000 16th Avenue
  3                    Vero Beach, Florida 32960
                       BY:  Steven R. Wilson, Esquire
  4                         Levering Evans, Esquire
                            Ryan L. Butler, Esquire
  5
      FOR DEFENDANT:   Adam Chrzan, Attorney at Law
  6                    1443 20th Street, Suite F
                       Vero Beach, Florida 32960
  7                    BY:  Adam Chrzan, Esquire
  8   FOR DEFENDANT:   The Law Offices Of David Golden, P.A.
                       903 SE Central Parkway
  9                    Stuart, Florida 34994
                       BY: David Golden, Esquire
 10
      FOR DEFENDANT:   Law Office of Bobby Guttridge
 11                    1601 20th Street
                       Vero Beach, Florida 32960
 12                    BY:  Bobby D. Guttridge, Esquire
 13   FOR DEFENDANT:   Thomas A. Kennedy, P.A.
                       1426 21st Street
 14                    Vero Beach, Florida 32960
                       BY:  Thomas A. Kennedy, Esquire
 15
      FOR DEFENDANT:   The Kessler Law Firm
 16                    101 North US Highway 1, Suite 200
                       Fort Pierce, Florida 34950
 17                    BY:  Michael J. Kessler, Esquire
 18   FOR DEFENDANT:   Kibbey Wagner
                       416 Camden Avenue
 19                    Stuart, Florida 34994
                       BY:  Richard Kibbey, Esquire
 20
      FOR DEFENDANT:   Margaret Keys McCain, P.A.
 21                    1605 19th Place
                       Vero Beach, Florida 32960
 22                    BY:  Margaret K. McCain, Esquire
 23   FOR DEFENDANT:   Wayne R. McDonough, P.A.
                       1901 25th Street
 24                    Vero Beach, Florida 32960
                       BY:  Wayne R. McDonough, Esquire
 25
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 144

```
                                                              Page 5

 1

 2   FOR DEFENDANT:    Green & Metcalf, P.A.
                       1245 20th Street
 3                     Vero Beach, Florida 32960
                       BY:  Andrew B. Metcalf, Esquire
 4
     FOR DEFENDANT:    Law Office of Edward J. Mosher, P.A.
 5                     210 South Depot Drive
                       Fort Pierce, Florida 34950
 6                     BY:  Edward J. Mosher, Esquire

 7   FOR DEFENDANT:    Ohle & Ohle
                       423 Delaware Avenue
 8                     Fort Pierce, Florida 34950
                       BY:  Michael R. Ohle, Esquire
 9
     FOR DEFENDANT:    John H. Power, Attorney at Law
10                     2182 Ponce De Leon Circle
                       Vero Beach, Florida 32960
11                     BY:  John H. Power, Esquire

12   FOR DEFENDANT:    Sercombe Law
                       601 21st Street, Suite 300
13                     Vero Beach, Florida 32960
                       BY:  Daniel Sercombe, Esquire
14
     FOR DEFENDANT:    Stone & Stone
15                     1964 14th Avenue
                       Vero Beach, Florida 32960
16                     BY:  Robert E. Stone, Esquire

17   FOR DEFENDANT:    Law Office Kenneth N. Weaver
                       2285 West Eau Gallie Boulevard
18                     Melbourne, Florida 32935
                       BY:  Kenneth N. Weaver, Esquire
19
     FOR DEFENDANT:    Steve Ziskinder Law Office, P.A.
20                     311 S 2nd Street, Suite 102B
                       Fort Pierce, Florida 34950
21                     BY:  Steve Ziskinder, Esquire

22

23

24

25
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 6

1                    I N D E X

2   VOLUME I.......................................Page 1

3   WITNESS

4    KEITH TAIG
      Direct Examination by Mr. Metcalf............Page 17
5
     OFFICER SEAN CROWLEY
6      Direct Examination by Mr. Metcalf............Page 29
       Cross-Examination by Mr. Ziskinder...........Page 88
7      Cross-Examination by Mr. Sercombe............Page 89
       Cross-Examination by Mr. Golden..............Page 90
8      Cross-Examination by Mr. Kennedy.............Page 91
       Cross-Examination by Mr. Kibbey..............Page 94
9      Cross-Examination by Mr. Butler..............Page 97
       Redirect Examination by Mr. Metcalf..........Page 102
10
     VOLUME II......................................Page 106
11
     JOHN PEDERSEN
12     Direct Examination by Mr. Metcalf............Page 125

13   CHIP BROCK
       Direct Examination by Mr. Metcalf............Page 128
14     Cross-Examination by Mr. Guttridge...........Page 140
       Redirect Examination by Mr. Metcalf..........Page 142
15
     CARLA SUTHERLAND
16     Direct Examination by Mr. Metcalf............Page 144

17   KYLE EDER
       Direct Examination by Mr. Metcalf............Page 148
18     Cross-Examination by Mrs. McCain.............Page 155
       Cross-Examination by Mr. Sercombe............Page 157
19     Cross-Examination by Mr. Golden..............Page 158
       Cross-Examination by Mr. Chrzan..............Page 161
20     Cross-Examination by Mr. Golden..............Page 162
       Cross-Examination by Mr. Kessler.............Page 163
21
     MICHAEL GASBARRINI
22     Direct Examination by Mr. Metcalf............Page 165
       Cross-Examination by Mr. Guttridge...........Page 184
23     Cross-Examination by Mr. Kennedy.............Page 186
       Cross-Examination by Mr. Chrzan..............Page 190
24
     CERTIFICATE OF REPORTER........................Page 105
25                                                 Page 218

Page 7

1

2

3                    EXHIBITS ADMITTED INTO EVIDENCE

4    Defendant's Exhibit No. 1........................Page 36
     Defendant's Exhibit No. 2........................Page 36
5    Defendant's Exhibit No. 3........................Page 36
     Defendant's Exhibit No. 4........................Page 36
6    Defendant's Exhibit No. 5........................Page 41
     Defendant's Exhibit No. 6........................Page 97
7    Defendant's Exhibit No. 7........................Page 97

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 147

Page 8

1        (Thereupon, the above-entitled hearing was held on

2   April 23, 2019 at 8:30 a.m.)

3        THE COURT:  Good morning.  For purposes of

4   organization what I need to do is I need to go through each

5   of the lawyers.  I am going to have you all state your

6   clients.  And if you have case numbers for purposes of the

7   record, it would be very helpful to the clerk.  Mr. Metcalf,

8   we will accommodate you, sir.

9        MR. METCALF:  Thank you.

10        THE COURT:  So I have a list, but I think there

11   have been several add-ons since 5:00 yesterday.  So we will

12   have to update everybody's list.  First of all, let's start

13   with Mr. Golden.

14        MR. GOLDEN:  Good morning.  Mark Kirk is 2019-438.

15        THE COURT:  Mark Kirk?

16        MR. GOLDEN:  Yes, ma'am, K-I-R-K.  There is Carl

17   Guidice, 2019-334.  Walter Dixon is 2019-445.  Jeff Chandler

18   is 2019-480.

19        THE COURT:  Mr. Golden, I did review the motion

20   to suppress that you filed in each of those cases.  It

21   appears to mirror that of Mr. Metcalf's.

22        MR. GOLDEN:  Yes, ma'am.

23        THE COURT:  Was there anything additional specific

24   to your client that was not included in Mr. Metcalf's?  I

25   did not see anything, but for purposes of how we are going

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 9

1    to proceed today I wanted to know.

2           MR. GOLDEN:  I appreciate you asking.  No, ma'am.

3           THE COURT:  Thank you, sir.  Mr. Guttridge?

4           MR. GUTTRIDGE:  Yes, ma'am.  Mahammed Alharbi,

5    Case No. 2019MM404.  Aljadaani which is 2019MM572.  Donald

6    Brown, 2019MM355.  William Estes, Jr. and there is a William

7    Estes.  William Estes, Jr. is Case No. 2019MM395.  Michael

8    Hinshaw is -- we are not doing the sheriff's cases, just the

9    Vero Beach cases?

10          THE COURT:  Right.

11          MR. GUTTRIDGE:  Barry Mills, 2019MM428.  John

12   Taylor 2019MM447.  William DeAngilo, 2019MM400.  That is it.

13          THE COURT:  Mr. Guttridge, did you just file the

14   motion to adopt Mr. Metcalf's with just that brief factual

15   summary?  You didn't file a separate motion to suppress?

16          MR. GUTTRIDGE:  We filed a motion adopting his

17   motion in its entirety without additions or deletions.  The

18   motion includes his motion in our motion.  We don't have any

19   other issues, your Honor, other than the issues that were

20   raised.

21          THE COURT:  Thank you.  Mr. Kennedy?

22          MR. KENNEDY:  Just one, Josef Jorj 2019MM345.

23          THE COURT:  Mr. Kennedy, you also just filed a

24   motion adopting Mr. Metcalf's.  Correct?

25          MR. KENNEDY:  Correct.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 149

Page 10

1           THE COURT:  Mr. Kessler?

2           MR. KESSLER:  Good morning, Judge.  Judge, I have

3   Mark Hassett, H-A-S-S-E-T-T, 2019MM333.  I join Mr.

4   Metcalf's motion.

5           THE COURT:  Mrs. McCain?

6           MRS. MCCAIN:  Yes, your Honor.  I am representing

7   David Kostyla, he is No. 312019MM00336.  Judge, I did file

8   an earlier motion.  I have not had the opportunity to adopt

9   Mr. Metcalf's recent motion.  So I would make an ore tenus

10  motion to adopt his motion in its entirety.

11          THE COURT:  Mr. Kirschner?  He is not here.  Mr.

12  Metcalf, we will save you for the end.  Mr. Mosher?

13          MR. MOSHER:  Good morning, your Honor.  I am

14  present on behalf of Isaiah Drisdom, 2019MM330.  Present on

15  behalf of Stephen Geary, 2019MM337.  Present on behalf of

16  James Marcil, 2019MM426.  And Joseph Moyer, 2019-484.  And I

17  adopted Mr. Metcalf's motion in its entirety.

18          THE COURT:  You also filed a separate motion to

19  suppress in the each of those, but it references the

20  sheriff's office in every single one of these.  The motion

21  that you filed in each of those of four you just --

22          MR. MOSHER:  It must have been an error.  I

23  apologize.  They are all Vero Beach cases.

24          THE COURT:  So the motion that you specifically

25  filed I should ignore?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 150

Page 11

```
1              MR. MOSHER:  Yes.

2              THE COURT:  And you will adopt Mr. Metcalf's?

3              MR. MOSHER:  Yes.

4              THE COURT:  Mr. Ohle?

5              MR. OHLE:  Good morning, your Honor.  William

6    Estes, 2019MM399.  Kevin Lapham, 2019MM384.  And last I have

7    Peter McBride which is 2019MM415.  And I adopt Mr. Metcalf's

8    motion.

9              THE COURT:  Thank you.  Mr. Power?

10             MR. POWER:  I don't have the case numbers with me,

11   Judge, but I can give you names.  Bill Rizkallah, Ken

12   Phillips, Bruce Purple, Neil Powers, and James Lundeen.  I

13   have adopted the motion.

14             THE COURT:  Mr. Sercombe?

15             MR. SERCOMBE:  Yes, your Honor.  Congratulations.

16             THE COURT:  Thank you.

17             MR. SERCOMBE:  Your Honor, I have Mr. Anglesano,

18   2019MM000366.  I have adopted Mr. Metcalf's motion.

19   However, one thing that is different I think with my case is

20   there is audio of my client.  And I would also additionally

21   ask you to suppress that.

22             THE COURT:  Did you file a separate motion?

23             MR. SERCOMBE:  I didn't, your Honor.

24             THE COURT:  You did not?

25             MR. SERCOMBE:  No.  I only joined at the late
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Case 9:21-cv-80391-RLR   Document 72   Entered on FLSD Docket 10/08/2021   Page 88 of 336

STATE OF FLORIDA vs. ROBERT TRELLIS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL    DCA CASE NO. 4D19-1655, ET AL

Page 12

1    hour.

2              THE COURT:  Do you also have Louis Kirby?

3              MR. SERCOMBE:  Yes, your Honor.  2019MM000339,

4    your Honor.

5              THE COURT:  Mr. Stone?

6              MR. STONE:  Good morning, your Honor.  I have the

7    first page Mr. Richard Gollinge in the case of 2019-406.

8    Harry Kaplan, 2019-343.  Harold Kemp, 2019-342.  That may be

9    the sheriff's department.

10             THE COURT:  I have a Jovany Aguilera.

11             MR. STONE:  I think that is a sheriff's department

12   case.  I did have one other, Judge.  Harold Kemp, Harry

13   Kaplan, Mr. Gollinge.

14             THE COURT:  Jovany Aguilera is Vero Beach.  So

15   that might be the one you are thinking of.

16             MR. STONE:  Okay, Jovany Aguilera.  I thought that

17   was the sheriff's department.  I do have one sheriff's

18   department case.  I think that is it.

19             THE COURT:  Okay, thank you.  Kenneth Weaver, Mr.

20   Weaver?  Mr. Ziskinder?

21             MR. METCALF:  Judge, he is here.  I think he might

22   be in front of Judge Vaughn.

23             THE COURT:  Mr. Kibbey, did you join?

24             MR. KIBBEY:  Yes, your Honor.  Mr. Metcalf and I

25   are cocounsel on Mr. Youssef's case.

Page 13

```
 1            MR. STONE:  Your Honor, I forgot.  I join in Mr.

 2    Metcalf's motions.

 3            THE COURT:  Okay.  And Mr. Chrzan, do you have a

 4    motion pending?

 5            MR. CHRZAN:  Just observing, Judge.

 6            THE COURT:  Is there anyone --

 7            MALE ATTORNEY:  Judge, I am also co-counsel in Mr.

 8    Youssef's case with Mr. Metcalf and Mr. Kibbey.

 9            THE COURT:  Mr. Metcalf, do you have your list of

10    all of your clients in front of you?

11            MR. METCALF:  I don't, Judge.

12            THE COURT:  I do have a list.  I will rattle them

13    all off.  Will you let me know if you think I have missed

14    somebody?

15            MR. METCALF:  Yes.

16            THE COURT:  Gregory Arnone, Justin Bauer, Paul

17    Browning, Castro Vanderlie, Claudio DeOliveria, Ottavio

18    Didomenico, Jon Forest, Robert Freels, Roman Gomez, Vito

19    Gioia, David Healy, Randy Hines, Alan Lhota, John McCulley,

20    Anthony Randazzo, Paul Rodliff, Keith Taig, Hans Wede,

21    Kenneth Wessel, Bruce Wickers and Mark Youssef?

22            MR. METCALF:  That sounds correct, your Honor.

23            THE COURT:  Did I miss anybody?

24            MR. GOLDEN:  There is one other gentleman set on

25    your document, Shun Lee, L-E-E.  I have a Case No. that was
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 153

Page 14

1    a Vero Beach PD case that could certainly apply to the

2    motion, but it hasn't been filed because it was set before

3    you down the road.  It wasn't one of the cases originally.

4            THE COURT:  So it is a solicitation case, and it

5    is a Vero Beach Police Department?

6            MR. GOLDEN:  Yes, ma'am.

7            THE COURT:  Do you want ore tenus to adopt Mr.

8    Metcalf's motion for purposes of today to resolve it today?

9            MR. GOLDEN:  Yes, ma'am, I would, please.  It is

10   2019MM402 is the case number.

11           THE COURT:  State, did you all get that?  We are

12   going to add one on?

13           MR. GOLDEN:  Thank you.

14           THE COURT:  You are welcome.  Mr. Metcalf, this is

15   your motion.  I am imagining you are going to do the bulk of

16   the heavy lifting today.

17           MR. METCALF:  Judge, if I may, I provided the

18   State a Xerox of this.  It is a notebook that might help you

19   sort through all of this.  Your Honor, first, I would invoke

20   the rule of sequestration of the witnesses.

21           THE COURT:  If you have been subpoenaed as a

22   witness in this case, the rule of sequestration has been

23   invoked.  That means you do have to wait out in the hall

24   until you are called to testify.  You may not discuss your

25   testimony with anyone other than the lawyers.  So make sure

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 154

Page 15

1    that you do not discuss your testimony while you are

2    waiting.  So if you have been subpoenaed as a witness to

3    testify at any point today, I would ask that you step out

4    into the hallway, please.

5           MR. METCALF:  Judge, with your permission, do you

6    mind if I sit during this?

7           THE COURT:  That is fine.

8           MR. METCALF:  I cant' really see.  Judge, I would

9    first like before we get too far into it, I would like

10   recognition that we have standing, that each defendant is an

11   aggrieved person with a right of privacy, a specific right

12   of privacy that has been invaded in this case by government

13   intrusion.  I assume the State has no objection to the

14   standing?

15          MR. BUTLER:  No, we do.  Standing has to be

16   proven.  Defense has the burden here.  State v. Setzler, 667

17   So. 2d 343.  It is a First DCA case from 1995 explains that

18   in the context of exception, the burden of standing is on

19   the defense.  And they have to either show that they were,

20   in fact, recorded or at least were the owners of the

21   premises where the recording took place.

22          So I know that some of the defendants in these

23   cases are claiming it is not them, it was mistaken identity.

24   I don't know which ones are claiming that and which ones

25   aren't, but we are not going to waive standing at this

Page 16

1    point.

2         MR. METCALF:  Judge, I am happy to call at least

3    one client today just in case the State did that.  But I

4    would point out if the State, it seems as though they are

5    adopting 934 as analogous authority to do what they did

6    here.  Is that what I just heard, Mr. Butler?

7         MR. BUTLER:  No.

8         MR. METCALF:  He referenced the wiretap.  That is

9    all.  But, Judge, under 934, if that is the analogous

10   authority, then 934 specifically calls for a motion to

11   suppress by aggrieved persons.  I can establish that my

12   clients are aggrieved.

13        The State has alleged that each of them are in the

14   video, but I can call a witness or I can call all

15   twenty-four of my clients and have the Court at a later date

16   have you reserve on the issue of standing, but I can call

17   one just to go forward with today.

18        THE COURT:  Yes, sir.

19        MR. METCALF:  I call Keith Taig.

20        BAILIFF:  Up here, sir.

21        THE COURT:  Raise your right hand.  Do you swear

22   or affirm that the testimony you are about to give is the

23   truth, the whole truth and nothing but the truth?

24   AND THEREUPON,

25                    KEITH TAIG,

Page 17

1         Called as a witness on behalf of the Defendants

2         herein, after having been first duly sworn, was

3         examined and testified as follows:

4                         DIRECT EXAMINATION

5              THE WITNESS:  Yes, ma'am.

6              THE COURT:  Thank you, sir.  Have a seat.

7    BY MR. METCALF:

8         Q    Sir, can you state your name.

9         A    Keith tag.

10        Q    Where do you live, Mr. Taig?

11        A    6886 61st Street in Vero Beach, Florida.

12        Q    You have lived here in Vero for many years?

13        A    Twenty-five years.

14        Q    Did it come to pass that you visited a facility in

15   Vero Beach, in the City of Vero Beach called East Spa during

16   the month of either November or December of 2018?

17        A    Yes, sir.

18        Q    You have been charged in this case with

19   solicitation of prostitution; is that true?

20        A    Yes, sir.

21        Q    Have you had the chance to review a video

22   purporting to be you receiving a massage and sexual conduct

23   is portrayed on that video?

24        A    Have I seen it?

25        Q    Are you aware that the video exists?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 157

Page 18

1       A    Yes, sir.

2       Q    Do you dispute in any way that you visited East

3    Spa, and that you were engaged in a consensual sexual act in

4    East Spa?

5       A    I went there.  Yes.

6       Q    Did you have sex on a video?

7       A    Did I have sex?  What is the definition of sex?

8       Q    Intercourse or masturbation or in any way touched

9    by in a sexual manner by a spa employee?

10      A    Yes.

11      Q    You don't deny your identity of that being you on

12   that video.  Correct?

13      A    No.

14      Q    Was that a closed -- was it in a business, East

15   Spa?  Is that a business?

16      A    Yeah.  It was in a licensed owned therapeutic

17   massage building.

18      Q    Was the door closed when you were in the room?

19      A    Yes.

20      Q    Were there windows in that room?

21      A    No, sir.

22      Q    Was there anyone present other than you and the

23   employee of East Spa?

24      A    No.

25      Q    Did you anticipate that you would be recorded in

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 19

1    any way when you went into that facility?

2        A    No, sir.

3        Q    When you went into that facility, did you expect

4    to become unclothed as part of your massage?

5        A    Yes, sir.

6             MR. METCALF:  Your Honor, I have nothing further.

7             THE COURT:  State?

8             MR. BUTLER:  Judge, we would agree that would

9    establish standing.

10            THE COURT:  Okay.  Thank you, sir.

11            MR. METCALF:  Your Honor, I would certainly like

12   to proceed and ask the Court to reserve ruling as the

13   standing on each and every other defendant that has joined

14   into the motion today, if that is going to be the State's

15   stance.

16            THE COURT:  State?

17            MR. BUTLER:  Judge, I don't have any objection if

18   he is not prepared today to establish standing.  I think

19   there are other defendants here, though.  So if they are

20   here, I think we should go ahead and establish standing for

21   those who are present.

22            MR. METCALF:  I will do that on another day.  I

23   have got twenty-four other people to deal with.  I don't

24   think that is necessary today.

25            THE COURT:  We will reserve on that issue.  I will

Page 20

1   do that on behalf of all of the defendants who have adopted

2   or have filed their own motion to suppress unless there is

3   other lawyers here that have their clients here and would

4   like to take care of that this morning.  Mr. Guttridge?

5          MR. GUTTRIDGE:  I don't, Judge, but are you going

6   to set a date or a procedure or we can do it by affidavit,

7   if the State is agreeable to that?

8          THE COURT:  Yes.  I thought I saw Mr. Ziskinder

9   walk in.  Mr. Ziskinder, for the record, will you tell me

10  the clients that you have, sir, and if you happen to have

11  their case numbers for the purposes of the motion?

12         MR. ZISKINDER:  Yes, your Honor.  One is Frank

13  DeLisi, D as in David, E-L-I-S-I.  The Case No. is

14  397MM2019.

15         THE COURT:  Okay.

16         MR. ZISKINDER:  The other one is Manuel Esquivel.

17  That is Case 2019-422-MM.

18         THE COURT:  Did you adopt Mr. Metcalf's or did you

19  file your own separate motion?

20         MR. ZISKINDER:  I filed a pleading adopting the

21  multi motions.

22         THE COURT:  Okay, great.

23         MR. ZISKINDER:  And I was up in Judge Vaughn's

24  courtroom, your Honor.

25         THE COURT:  No problem.  Thank you, sir.  Mr.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 21

1   McDonough, did you have a case this morning?

2           MR. MCDONOUGH:  Yes.  I join with the motion.

3           THE COURT:  Who is your client, sir?

4           MR. MCDONOUGH:  Mr. Crain, C as in Charlie,

5   C-R-A-I-N.

6           THE COURT:  And the first name?

7           MR. MCDONOUGH:  John Crain.

8           THE COURT:  Do you happen to have that case

9   number?

10          MR. MCDONOUGH:  Yes, ma'am, if I can get my

11  glasses.

12          THE COURT:  Sure.

13          MR. MCDONOUGH:  I actually do not have the file

14  with me, Judge.  I am sorry.

15          THE COURT:  Okay.  We will look it up, but you

16  filed a motion adopting Mr. Metcalf's?

17          MR. MCDONOUGH:  Yes, I joined in.

18          THE COURT:  Very good, thank you.  Go ahead, Mr.

19  Metcalf.

20          MR. METCALF:  Judge, just a way of brief opening,

21  this is kind of new frontier in that the government has gone

22  farther than I have ever seen it go in a misdemeanor case,

23  which all of our clients are charged with misdemeanors.

24          I look for precedent in the State of Florida and

25  was surprised that there was none.  On the other hand I am

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 22

1    not surprised at all, Judge, because this just shocks the

2    conscience, in my view.  There is no more invasive

3    technique, investigatory technique that could ever be

4    employed than to go into a business where people have a

5    heightened right of privacy and surreptitiously install

6    cameras with a delayed notification on the warrant.  We call

7    them sneak-and-peek warrants.

8            Florida is not right with a lot of precedent on

9    that.  There is Federal precedent.  The Court I am sure is

10   going to be aware in Indian River County cases, I assume

11   that this office, the State Attorney's Office were involved

12   with both because they are in their jurisdiction.  They

13   actually cite Mesa-Ricon as the gold standard for the

14   issuance of these warrants which tracks Title 3

15   authorization.

16           Chapter 934 adopted Title 3 almost word for word,

17   your Honor.  So I assume that the authority they were going

18   to rely on today is Chapter 934, Mr. Butler did not yield

19   that.  So now I am at a loss to what authority they are

20   possibly looking at.  If they are not looking at 934, it

21   would appear that they are just making up the capability to

22   tape people.

23           Judge, before we get into whether the warrants --

24   you know, we don't deal with warrants in misdemeanor court

25   that often because they are misdemeanors.  But before we

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 23

1    look at warrant reviews in general and what our burden is

2    and we look at Franks and Leon and Johnson and Jackson,

3    before we look any of that, we have to see what is their

4    authority to do what they did and what is the authority of

5    the Court to issue that kind of a warrant.

6            You can establish probable cause that a crime is

7    being committed and establish probable cause that you should

8    get a search warrant, but that doesn't mean you can order as

9    a Judge waterboarding to establish as part of the search.

10   You can't order something that is illegal.

11           So in this case, without governing authority, if

12   they were not adopting 934, if they are not adopting Title

13   3, what is their authorization to do what they did?  So I

14   find no Florida authority to allow surreptitious video

15   recording.

16           The other issue, your Honor, that we need to deal

17   with before we get into hours of testimony and a hearing is

18   who authorized this application.  934, your Honor, deals

19   with wiretap.  There are cases, and I have supplied in the

20   memorandum, your Honor, that tell us this deserves a higher

21   scrutiny.  That is what U.S. v. Mesa-Ricon stands for.  This

22   is more evasive than wiretap.

23           Men are going into a place that they don't expect

24   a camera to be.  They are being recorded.  And these people

25   knew, law enforcement knew, your Honor, that they were going

Page 24

1    to be nude.  They knew they were going to be nude.

2            So in Mesa-Ricon, this was a business.  And the

3    Court applied a medium standard of privacy.  It was a

4    business with blacked out windows, and they were

5    investigating counterfeiting, but a man was caught at his

6    desk masturbating.  And they gave that a medium level of

7    privacy and established that other businesses could have a

8    higher.

9            Your Honor, they know going into this that people,

10   whether they are going in there for prostitution or regular

11   massage are going to get naked in a massage parlor.  I think

12   we can all agree to that.  You are going to get nude by

13   definition.  This is higher than Mesa-Ricon.  Mesa-Ricon

14   didn't even address anything higher than medium.

15           I know I am talking about cases that we haven't

16   gone through yet, but, Judge, we need to establish in 934

17   who authorized the warrant, the warrant application.  And

18   934 tells us that if it was not authorized by the State

19   Attorney, not assistants, not them looking at it, not them

20   saying this is okay, but the State Attorney, and it must

21   have been done in writing, then it is gone.  We don't go

22   another step further if that is the authority.

23           So this Court adopts 934 as analogous authority,

24   if they can't establish that Bruce Colton himself authorized

25   this warrant in writing pursuant to State v. Birs, pursuant

Page 25

1    to Copeland v. State, and I will give you the cites, Judge.

2    435 So. 2d 842 is Copeland.  For the record, 394 So. 2d 1054

3    is State v. Birs.  If they don't establish that it was in

4    writing by Bruce Colton, we don't go any further.  It is

5    over.

6            Your Honor, we next look at 933.08 and how it was

7    executed.  The affiant in this case is Sean Crowley.  Your

8    Honor, 933.08 and the Vargas case and the Morris case, and I

9    will give the Court a cite on that.  Morris is 622 So. 2d

10   67.  Vargas is 667 So. 2d 175 which is a Supreme Court case

11   in the State of Florida.

12           If Officer Crowley was not present in supervising

13   the installation of the cameras, under 933.08, those cases,

14   we are done.  It is over.

15           Next, your Honor, we must look at the order

16   itself.  Without disparaging Judge Cox at all, Courts are

17   not to be rubber stamped or quasi law enforcement officers

18   in issuance of warrants.  They are to look at applications

19   and they are to provide learned educated orders either

20   granting or not granting the authority to do what they are

21   asking to do.

22           Judge Cox issued an order that requires, that

23   allowed monitoring only.  There was no authorization to

24   record any of these men.  Specifically, she issued a ten-day

25   return, your Honor, where they were to come back, report

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 165

Page 26

1     their doings to Judge Cox.  I would suppose at that point

2     Judge Cox could determine if recording was say going to be

3     authorized.  But they in their application, being Sean

4     Crowley, designates a difference between monitor and record.

5     They differentiate the two.

6            There are some cases out there, your Honor, that

7     deal with the fact that if you are allowed to monitor, then

8     you could record, but those are not in situations where

9     there is a right of privacy.  That is an officer wearing a

10    wire where he has been invited into a home.  We have

11    Article 1, section 23 establishing citizens of Florida the

12    right of privacy.  In that situation, Judge Cox found it

13    apropos to only give them monitoring.  She did not allow the

14    recording.

15           So I think the motion wins on those three issues

16    right now, your Honor, but we are prepared to go forward and

17    address Franks.  We are prepared to address Leon.  We are

18    prepared to address whatever authority, I am guessing 934,

19    but they seem not, but we are prepared to go forward on that

20    issue.

21           THE COURT:  State, what is your response to Mr.

22    Metcalf's assertion that under 934 it must have been

23    authorized by the State Attorney?

24           MR. BUTLER:  Chapter 934 governs the wiretaps.

25    This is not a wiretap.

Page 27

1               MR. METCALF:  Judge, then I would ask what their

2    authority to proceed with this warrant is?

3               THE COURT:  State?

4               MR. BUTLER:  The Fourth Amendment.

5               THE COURT:  What about with regard to Statute

6    933.08 the fact that Crowley must have been present during

7    the installation?

8               MR. BUTLER:  I thought we were going to hear some

9    testimony on that, Judge.

10              THE COURT:  You are prepared to present that?

11              MR. BUTLER:  Well, it is their burden.

12              THE COURT:  All right, Mr. Metcalf.

13              MR. METCALF:  Your Honor, I would call Officer

14   Crowley.

15              Judge, I guess if they are not going under 934,

16   just to say the Fourth Amendment, I don't know that that

17   gets us anywhere because there is clearly analogous cases in

18   the Federal Court system that deal with video recording.

19   And if the Fourth Amendment, Article 1, section 12 adopts

20   the Fourth Amendment.  And the decisions of the United

21   States Supreme Court and the relative case law.

22              So Article 1, section 12 it is written in that, if

23   I am not mistaken, in that article that we are to look to

24   the Supreme Court and we are to look at Federal authority

25   when it comes to that and to the Fourth Amendment.  It has

Page 28

1    been interpreted in Federal Court, Judge.  This has been

2    dealt with.

3            So if they are looking in the Fourth Amendment and

4    Federal authority, we look at Mesa-Ricon.  And Mesa-Ricon

5    adopts Title 3 or Title 18 rather, Chapter 119, section 2510

6    through 2522.  It adopts them.  Florida has adopted those

7    under 934.  So there exists no possible other authority.

8    You can't say Fourth Amendment.  That is not going to fly

9    when you have Article 1, section 12.

10           So I believe, your Honor, it could potentially

11   save a lot of time, but I think the Court, I would ask the

12   Court with all due respect to make a ruling on that issue.

13           THE COURT:  I imagine that they are going to rely

14   on Mesa because they cite that in their applications for the

15   warrant.  So I am imagining that that is going to be the

16   foundation of their argument.

17           MR. METCALF:  It does not.

18           THE COURT:  Correct me if I am wrong, but I am

19   anticipating that is what it is you are going to argue.  And

20   I would imagine they are going to make that same argument

21   with regard to the Vero Beach Police Department as we

22   proceed.  I think that is what they are going to be hanging

23   their hat on.

24           MR. METCALF:  If they hang their hat on that, then

25   Title 3, Chapter 18, section 2516, 934 mimics it.  But if

Page 29

1    they are relying on that, I guess it doesn't require our

2    State Attorney because they could have envisioned that.  We

3    have a statute that adopts that.  So in wiretap cases it

4    requires the State Attorney.  If they are saying that, then

5    they are just relying on Mesa-Ricon and not State authority.

6              THE COURT:  I would anticipate that is probably

7    going to be the argument or at least one of the arguments

8    from the State.

9              MR. METCALF:  Your Honor, I call Officer Crowley.

10             THE COURT:  Raise your right hand.  Do you swear

11   or affirm that the testimony you are about to give is the

12   truth, the whole truth and nothing but the truth?

13   AND THEREUPON,

14                  OFFICER SEAN CROWLEY,

15       Called as a witness on behalf of the Defendants

16       herein, after having been first duly sworn, was

17       examined and testified as follows:

18                    DIRECT EXAMINATION

19             THE WITNESS:  Yes, I do.

20   BY MR. METCALF:

21       Q    Sir, can you state your name.

22       A    Sean Crowley.

23       Q    Officer Crowley or is it officer or detective?

24       A    Detective.

25       Q    How long have you been a detective?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 30

1        A      Since February of 2018.

2        Q      Since February of 2018?

3        A      Yes, sir.

4        Q      You were the lead detective in this case?

5        A      Co-case agent.

6        Q      Who was the other case agent?

7        A      Detective Gasbarrini.

8        Q      How did this investigation begin?

9        A      The Vero Beach Police Department received a few

10   citizen complaints in reference to a massage parlor in town,

11   East Spa.

12       Q      Who were those complaints made by?

13       A      They were anonymous complaints.  They wanted to

14   remain anonymous.

15       Q      Did they make them directly to you?  How did you

16   become aware of it?

17       A      One was made directly to our chief of police who

18   alerted myself and, well, actually both of them were to the

19   chief of police.  And he alerted myself and Detective

20   Gasbarrini.

21       Q      And that spawned all of this?

22       A      Yes, sir.

23       Q      So you had no knowledge at all of what was going

24   on in the sheriff's office or down in Jupiter and Palm Beach

25   or in Martin County?

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 170

```
                                                         Page 31
 1       A      No.

 2       Q      It wasn't all one big thing?

 3       A      Not initially, no.

 4       Q      So it just all happened coincidentally at the same

 5  time?

 6       A      Yes, sir.

 7       Q      At some point, and we will get to it later, you

 8  made an application for a search warrant; is that correct?

 9       A      Yes, sir.

10       Q      You are the affiant in that case?

11       A      Yes, sir.

12       Q      Who authorized that application?

13       A      As far as what Judge signed it?

14       Q      Well, no.  Did you work with the State Attorney?

15       A      Yes, ASA Butler.

16       Q      Did you ever have any dealings with Mr. Colton

17  himself?

18       A      No, sir.

19       Q      What is your, if you have any, what is your

20  specific experience with regards to prostitution?

21       A      Nothing beyond my years as a detective in the

22  special investigations unit that deals with vice crimes in

23  the city.  And then I have had basically in-service training

24  throughout my nine-year career that related to prostitution

25  here and there and made prostitution arrests on patrol.
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

Page 32

1      Q    So you have never investigated, I mean, had you

2  ever made a prostitution arrest?

3      A    Um, no, I don't believe I made an arrest for

4  prostitution.  No.

5      Q    You at this point had been a detective for a

6  couple of months, a few months?

7      A    Seven or eight months.

8      Q    Had you had any investigations with regards to

9  human trafficking or money laundering?

10     A    Not as lead to anything.  I have assisted in

11  cases.

12     Q    As a detective?

13     A    No, sir.

14     Q    When the warrant was -- I am going to jump ahead,

15  and I will come back.  When the warrant was finally issued

16  in this case and executed and the cameras were being

17  installed, that happened.  Right?

18     A    Yes.

19     Q    Were you present?

20     A    Yes.

21     Q    And you supervised the installation of the

22  cameras?

23     A    I was present on scene.

24     Q    What does that mean?

25     A    I didn't put the cameras in the building myself,

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 33

1    but I was on scene assisting.

2         Q    Where were you?

3         A    Throughout the process, I was I either in the

4    adjoining business.  I was in the actual business itself

5    briefly and then also out in front of the business.

6         Q    When you said briefly, you were actually in the

7    room when they were installing them, but, otherwise, you

8    were in the building next door?

9         A    As it was being set up, I was in the building next

10   door.

11        Q    Out in the front?

12        A    Yes, sir.

13        Q    Who assisted -- you said it was you and Gasbarrini

14   that started it after you received this complaint from Chief

15   Curry?

16        A    Yes, sir.

17        Q    What is the first thing you did after you received

18   the complaint?

19        A    Initially, we conducted surveillance at the

20   location just kind of checking out, observing what goes on

21   there.

22        Q    Was there already a special investigative unit set

23   up or was it just at this point you and Gasbarrini?

24        A    That is our special investigations unit at Vero

25   Beach Police Department.

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

STATE OF FLORIDA VS. ROBERT FREELS, ET AL

L. T. CASE NO. 312019MM000328A, ET AL   DCA CASE NO. 4D19-1655, ET AL

Page 34

1        Q      Had you ever drafted, been a part of a warrant

2    application process before?

3        A      Search warrants, not installation orders.

4        Q      The order that was executed in this case, was that

5    a proposed order that you provided to the Judge or is that

6    something the Judge drafted herself?

7        A      I drafted it.

8        Q      You drafted it?

9        A      Yes, sir, it was proposed.

10        Q      Was there any questions from Judge Cox after you

11    gave it to her or she just signed it?

12        A      She read it.  I can't recall any specific

13    questions.

14        Q      Were there any amendments that you to needed to

15    make or any clarifications?

16        A      No, sir.

17              MR. METCALF:  Your Honor, if I can approach?

18              THE COURT:  Yes.

19    BY MR. METCALF:

20        Q      I am going to show you what has been marked as

21    Defense Exhibits 1, 2, 3 and 4, and ask you if you know what

22    those are?

23        A      Those are the applications and orders for the

24    installation.

25        Q      You are familiar with these documents?

Indian River Court Reporting & Video Conferencing LLC – 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 35

1        A    Yes, sir.

2        Q    Those are true and accurate copies of those

3   documents?

4        A    Yes, sir.

5        Q    The order in this case that was executed, it

6   called for a ten-day inventory, did it not?

7        A    Yes, sir, I believe it did.

8        Q    Did you provide an inventory?

9        A    No.  We didn't remove anything from the business

10  so there was no inventory.

11       Q    Did it require a ten-day report back to report

12  your doings?

13       A    I believe it did, but like I said, we didn't have

14  anything to return to the Court.

15       Q    I am not asking anything to return.  You had

16  something to report, though.  You took some action, did you

17  not?

18       A    Yes.

19       Q    Did you ever report back to Judge Cox?

20       A    No.

21       Q    Within that order, was there any instruction about

22  termination once your investigatory goals were obtained or

23  was there just a thirty-day cap?

24       A    Thirty days on how long we could actually do the

25  monitoring of the video.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

STATE OF FLORIDA VS ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL   DCA CASE NO. 4D19-1655, ET AL

Page 36

1          MR. METCALF:  Your Honor, I would render these

2    into evidence.  I think they are in your packet.  The State

3    has the same copy.

4          THE COURT:  Any objection from the State?

5          MR. BUTLER:  No objection.

6          THE COURT:  It will be admitted as 1, 2, 3 and 4

7    without objection.

8          THE CLERK:  We need to verify the first one.

9          MR. METCALF:  1, 2, 3 and 4.  Do you need them

10   back?

11         THE CLERK:  Yes.

12         MR. METCALF:  The affidavits are 1 and 3.  The

13   orders are 2 and 4.  Judge, for the record, Exhibit 1 is the

14   11/27 application.  Exhibit 2 is the 11/27 order.  Exhibit 3

15   is the extension application which is December 28.  And

16   Exhibit 4 is the order.

17      (Defendant's Exhibit Nos. 1, 2, 3 and 4 were admitted

18   into evidence.)

19   BY MR. METCALF:

20      Q    So you started some surveillance, you and

21   Gasbarrini?

22      A    Yes, sir.

23      Q    At some point, Department of Homeland Security

24   became involved.  When was that?

25      A    I am not sure the exact date.  It was the

Page 37

1    beginning of September.

2        Q    Was it right out of the gate?

3        A    Within the first couple of weeks of the

4    investigation.

5        Q    What kind of surveillance did you take?

6        A    Initially, myself and Detective Gasbarrini just

7    did it in a covert vehicle in the area of the exterior of

8    the business.

9        Q    Who was supervising you?  Anybody in the

10   investigation, you and Gasbarrini or were was anyone --

11       A    Our Detective Sergeant Huddy and Detective

12   Lieutenant Pedersen.

13       Q    At some point, moving along in your application

14   under the facts that led up to all of this, you engaged a

15   Department of Health Inspector?

16       A    Yes, sir.

17       Q    Tell us about that?

18       A    Detective Gasbarrini is the one who actually spoke

19   to the inspector, Carla Sutherland, and basically made her

20   aware of the complaints that we received.  She advised that

21   she would do like an annual inspection of the business.

22       Q    Did she do that?

23       A    Yes, sir.

24       Q    When did she do that?

25       A    That was on September 10, 2018.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

STATE OF FLORIDA VS ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL    DCA CASE NO. 4D19-1655, ET AL

Page 38

1    Q    What was the result of her insertion into the

2    business and her inspection?

3    A    She advised that she encountered two female

4    massage therapists working in the business.  They had

5    up-to-date licenses and provided us with information on

6    them.  And that was it.

7    Q    So you sent her in there; is that correct?

8    A    We advised her of the complaint that we had, and

9    she advised that she could do that.  We didn't tell her to

10   go in there.

11   Q    She had been doing this all throughout the circuit

12   and down in Palm Beach as well.  Correct?

13   A    I can't speak on that.  I am not sure.

14   Q    You had no idea about other investigations going

15   on?

16   A    I don't know if Carla Sutherland was involved in

17   that.

18   Q    But this was the MO that each agency used, insert

19   an inspector --

20   A    At this point in the investigation I had no idea

21   about any other agency's investigations.

22   Q    You sent her in there under your direction.

23   Correct?

24   A    No.

25   Q    No?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 178

Page 39

1      A     No.  We just advised her of the complaint.  She

2    advised that she would do an inspection.

3      Q     Did she find anything out of the ordinary

4    whatsoever?

5      A     I believe she stated that there was like daybeds

6    in there, but she didn't say that anything necessarily stuck

7    out to be too off the wall.  No.

8      Q     In fact, one of the questions is whether people

9    are domiciling within the facility, is it not?

10      A     I believe so.  Yes.

11      Q     And she said no, didn't she?

12      A     I don't recall.  I don't remember her necessarily

13    saying that, but I also don't remember her telling me that

14    people were.

15      Q     Did she provide you with the inspection 369 with

16    the Department of Health that goes in there and goes through

17    a checklist?  Did she go through a checklist with you?

18      A     She briefly explained to that us.  Yes.

19      Q     There were no violations?

20      A     No.

21      Q     One of the questions in the checklist is whether

22    people are living in the place or domiciling in the place;

23    is that right?

24      A     I don't have it in front of me, but it could be.

25    Yes.

Page 40

1       Q       Do you know who Cynthia Pagano is?

2       A       I believe she is Ms. Sutherland's partner.

3       Q       Are you aware she did an inspection the very next

4   day?

5       A       She went in -- I don't believe that is accurate.

6   She went in there with Ms. Sutherland.

7       Q       Did she go in the same day?

8       A       Yes, sir.

9       Q       Ms. Pagano?

10      A       I believe so.  Yes, sir.

11      Q       And she did the inspection, and you were given a

12  copy of that?

13      A       Yes.

14              MR. METCALF:  Your Honor, if I could approach?

15              THE COURT:  Yes.

16  BY MR. METCALF:

17      Q       Let me show you what has been marked as Defense

18  No. 5 and see if your recognize that.

19      A       Yes, sir.

20      Q       What is that?

21      A       The health inspection.

22      Q       What is the date on that, the date of the

23  inspection?

24      A       It says 9/11/18.

25      Q       But the date that you said Ms. Sutherland went in

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

```
                                                            Page 41

 1   was September 10?

 2        A    Yes, I believe so.

 3        Q    So were there two inspections or just one?

 4        A    There was only one inspection.  There was either

 5   an error on her part or an error on our part.

 6             MR. METCALF:  Your Honor, I offer into evidence

 7   Defense Exhibit No. 5.

 8             THE COURT:  Any objection?

 9             MR. BUTLER:  No objection.

10             MR. METCALF:  It is in your packet.

11             THE COURT:  Exhibit 5 will be admitted without

12   objection.

13        (Defendant's Exhibit No. 5 was admitted into evidence.)

14   BY MR. METCALF:

15        Q    So at this point with the complaints you have sent

16   in the Department of Health person, and there is no

17   violations.  Has your suspicion been quelled?

18        A    No, sir.

19        Q    Why not?

20        A    Like I said, we did surveillance of the spa.  The

21   clientele in and out of the spa was predominantly male.  I

22   don't think we saw any females go in the spa within the time

23   of physical surveillance.

24        Q    How much time of physical surveillance had gone

25   by?
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 42

1      A    We did surveillance every single day from the

2  beginning of the complaint throughout the investigation.

3      Q    As of September 11.  Do you have a start date in

4  the investigation?  We are talking about September 11.

5      A    It was the fourth week of August is when we

6  started.  I don't remember the exact date.

7      Q    Maybe two weeks you had been investigating so far?

8      A    Could be, yes, two weeks.

9      Q    Is that the only suspicion you have now?

10     A    No, sir.  I also conducted a search of the

11  business' phone number online which immediately produced,

12  just a Google search produced a number of advertisements for

13  escorts and basically sexual favors for money.

14     Q    How did you obtain the phone number?

15     A    It is on the front door of the business.

16     Q    You confirmed.  So that phone number matched the

17  front door?

18     A    Yes, sir.

19     Q    The one that you Google searched?

20     A    Yes, sir.

21     Q    When you say advertisements and you write that in

22  your application, are these paid for advertisements by that

23  spa or do they just happen to be advertisements on websites

24  that review people?

25     A    They are a paid for advertisement.  At that time,

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

STATE OF FLORIDA VS ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL   DCA CASE NO. 4D19-1655, ET AL

Page 43

1    I can't 100 percent say who paid for the advertisement, but

2    generally it is the business advertising itself.

3        Q    How do you know they are paid for advertisements

4    and not up by a third party that reviews spas?

5        A    Because throughout the investigation we observed,

6    and there is certain specific review sites, but then there

7    is also -- these aren't just review sites.  These are actual

8    ads that are placed online.

9        Q    You did some financial work later on in the case?

10       A    Yes, sir.

11       Q    Did you ever uncover any payments to these sites?

12       A    Yes, I did.

13       Q    The review site, but at the time you had the

14   application, did you subpoena any of those records?

15       A    Not initially, no.

16       Q    You did that after you got the video?

17       A    I don't know if the subpoenas were sent out prior

18   to the video or they were in the middle of the

19   investigation.

20       Q    Did you send out any subpoenas in this case,

21   period, before you put that video up?

22       A    I did not personally.

23       Q    Did anybody?

24       A    Not that I recall.  I am not sure.

25       Q    So you had no, in your mind there was no

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 44

1   confirmation that they had paid for anything at this point?

2   You didn't issue one single subpoena prior to that video?

3       A    No.

4       Q    You talked about numerous citizen complaints.  Did

5   you review with Ms. Sutherland and now Ms. Pagano whether

6   there had been any Department of Health complaints?

7       A    I am sure we did.  I don't recall.

8       Q    There is a public portal that is maintained by law

9   that is accessible to you just like it is to me that does

10  complaints of every massage parlor; is that right?  Do you

11  degree with me on that?

12      A    I am not sure of that.

13      Q    Floridahealthsource.gov?

14      A    I am not sure.  I am not aware of that.

15      Q    So the Department of Health didn't tell you we can

16  put our fingers on whether or not there has been any

17  complaints of this spa?

18      A    I never had that conversation with anyone.

19      Q    You didn't ask, did you?

20      A    Not that I recall, no.

21      Q    So you are not aware that there has never been a

22  single complaint against East Spa through the Department of

23  Health?  Not one?

24      A    No, I am not aware of that.

25      Q    Did you go to SunBiz.org and look up the business

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

Page 45

1    structure?

2         A    Yes, sir.

3         Q    So you knew who owned the spa?

4         A    Yes.

5         Q    Or who at least was designated to be -- does it

6    say the owner on SunBiz.org?

7         A    I believe it says president on the SunBiz.  Yes,

8    sir.

9         Q    Who was that?

10        A    Yongzhang Yan was the male's name.

11        Q    Did it have anyone listed on SunBiz.org?

12        A    No, I don't believe so.

13        Q    You mention in your application that there was an

14   ad on Backpage?

15        A    Yes, sir.

16        Q    Backpage, are you aware that Backpage was shut dun

17   to the public in April of 2018?

18        A    Yes, sir.

19        Q    How were you able to see that?

20        A    When you Googled the phone number, as I did, there

21   is still links to specific Backpage ads.  I attached the

22   specific Backpage ad that I located in the warrant.  And it

23   is on page 2 of the warrant, I believe.

24        Q    This is one of those ads that you never confirmed

25   through any kind of subpoena work that linked it back to the

Page 46

1    business itself; is that correct?

2         A    Correct.

3         Q    The other people working within the spa, Ms. Zhang

4    and Lanfen Ma or Lanyun Ma, how did you become aware of

5    their identity?

6         A    Of Ms. Zhang?

7         Q    Yes.  Was that through the infiltration with the

8    Department of Health?

9         A    Ms. Sutherland provided us with her name.

10        Q    So the business had a valid license.  Correct?

11        A    Yes, sir.

12        Q    Those two women had valid licenses.  Correct?

13        A    Yes.

14        Q    Did you review any NCIC records at this time with

15   regards to Lanfen Ma and Ms. Zhang?  I can't pronounce her

16   first name.

17        A    I believe we accessed their, um, we ran them to

18   get their driver's license information.

19        Q    Was there any criminal history record of either of

20   these two women?

21        A    No, I don't believe so.

22        Q    No links to prostitution whatsoever?

23        A    For Lanfen and Ms. Zhang?

24        Q    Correct.

25        A    No, I don't believe so.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

STATE OF FLORIDA VS ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL   DCA CASE NO. 4D19-1655, ET AL

Page 47

1    Q    So did that quell your suspicions at this point?

2 There is no complaints?  There is nothing in their past?

3    A    No, sir.

4    Q    Is it fair to say at this point all you have are

5 advertisements that you didn't doublecheck at this point?

6    A    No.  We had complaints from concerned citizens.

7 We had our physical surveillance that we did.  And then we

8 always had the advertisements.

9    Q    And the physicals surveillance is the men?  It

10 just seems to be a lots of men going there?

11    A    Yes, sir.

12    Q    At some point Homeland Security identified Lanyun

13 Ma?

14    A    Yes, sir.

15    Q    How did that happen?

16    A    After getting in contact with Special Agent

17 McCreary with Homeland Security, she conducted a search of

18 one of their applications that we don't have access to and

19 advised that had Lanyun Ma was married to the owner

20 Yongzhang Yan and provided us with information on her.

21    Q    What kind of information?

22    A    Gave us a photograph of her, advised us that she

23 had a massage license.  And she previously ran spas in other

24 states and was arrested in other states for different

25 charges related to her running the spas.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 48

1       Q       Any related to prostitution?

2       A       Yes.  She was arrested for prostitution and human

3       trafficking.

4       Q       Were you provided the disposition of those cases?

5       A       Yes, sir.

6       Q       Was she convicted of them?

7       A       Yes.  She was convicted of prostitution.

8       Q       Is that just simple prostitution?

9       A       Yes.  And that was noted in the warrant.

10      Q       It was noted in the application?

11      A       Yes, sir.

12      Q       That she had a prostitution conviction?

13      A       Yes, sir.

14      Q       But you placed in there that she had a criminal

15      history of human trafficking?

16      A       Yes.  She was arrested for that.

17      Q       But she was acquitted of that or that charge was

18      dropped?

19      A       Yes, sir.

20      Q       Did you inform the Court of that?

21      A       That wasn't specifically noted.

22      Q       But you did note there was a criminal history

23      leading the Court to believe she was involved with human

24      trafficking?

25      A       Just advised she was arrested for human

Page 49

1    trafficking.

2         Q    It doesn't say that, does it?  What does it say in

3    the application?

4         A    It says she has a criminal history that included

5    charges of human trafficking and prostitution.

6         Q    And you provided no disposition outlining that

7    that charge was dropped; is that right?

8         A    No.  I just provided the prostitution charge she

9    was convicted of.

10        Q    But you knew that charge of human trafficking had

11   been dropped, didn't you?

12        A    I knew there was a plea deal of some sort.

13        Q    That case had been dropped as part of whatever?

14        A    Yes, sir.

15        Q    Ms. Lanyun Ma resides with Mr. Yan?

16        A    She did.  Yes, sir.

17        Q    Was Lanfen Ma and Ms. Zhang, were they seen

18   exiting, coming and going from the spa?

19        A    No, they were not unless in the company of Lanyun

20   ma.

21        Q    Where was your surveillance set up?

22        A    We would park in different locations around in the

23   area of the spa.

24        Q    Did you have 360-degree surveillance of the spa at

25   all times?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 50

 1       A    No, but we always had visual on the front door.

 2   And there is only one exit.

 3       Q    There is no backdoor to this spa?

 4       A    No, sir.

 5       Q    No side entrance?

 6       A    No.

 7       Q    Only one exit and one entrance?

 8       A    Yes.

 9       Q    That is the front door?

10       A    Yes, sir.

11       Q    Did you ever see either of Lanfen Ma or Ms. Zhang

12   with cell phones in their hands?

13       A    We did throughout the investigation, yes.  I am

14   not sure when, but yes.

15       Q    They were able to call?

16       A    They had cell phones.

17       Q    Did you ever prior to putting in a camera or

18   requesting cameras, did you do any kind of pen registers or

19   trap and traces on their cell phones?

20       A    No, sir.

21       Q    Did you ever have an opportunity to know what

22   their cell phone was?

23       A    No, sir, not at that point.

24       Q    You sent in an undercover.  Right?

25       A    Yes.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 51

1        Q       Who was that?

2        A       Detective Brock.

3        Q       Tell us about that.

4        A       Detective Brock went in on the 14th of September

5    and the 18th of September.  He was equipped both with audio

6    and visual surveillance equipment to monitor the events that

7    took place inside, was given department-issued funds.  Went

8    in there asked for, I believe, a thirty-minute massage both

9    times.  Received a massage, and then was propositioned for

10   sex acts following the massage.

11       Q       So he was solicited?

12       A       Yes.

13       Q       The genitalia was actual touched?

14       A       I believe he advised that he was grazed over his

15   boxer briefs.

16       Q       So is it fair to say that Ms. Zhang -- was it both

17   times Ms. Zhang or was it each?

18       A       It was both of them, one each time.

19       Q       So the two people working, let's get this clear,

20   in the spa is Lanfen Ma and Ms. Zhang?

21       A       At this time, yes.

22       Q       Lanyun Ma is just coming and going?

23       A       At this point, we would observe her coming and

24   going from the spa.  So we assumed she worked there, but at

25   the time of the undercover operation she was not inside the

Page 52

1    spa.

2         Q    And Lanyun, her connection is she lives with the

3    owner?

4         A    Yes, sir.

5         Q    When Brock went in, he was solicited and otherwise

6    offered to commit a sex act for money?

7         A    Yes, sir.

8         Q    They went through an entire price list with him?

9         A    Yes, sir.

10        Q    And both times the female was the initiator?

11        A    Yes.

12        Q    Not Officer Brock?

13        A    No.

14        Q    The second visit on September 18, was Officer

15   Brock provided the opportunity to have Ms. Zhang's phone

16   number?

17        A    I believe he stated that she told him she could

18   give him her phone number.

19        Q    Did he take it?

20        A    No.

21        Q    So he had an opportunity to obtain a phone number

22   where you could do a pen registry or a trap and trace,

23   subpoena records for the phone, and he didn't take it; is

24   that right?

25        A    I suppose so.  He didn't take the phone number.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 53

1    Q    Did you guys talk about how important maybe

2  getting a phone number would be to furthering identify the

3  people that are part of some alleged criminal enterprise?

4    A    No, we didn't.

5    Q    In your experience, wouldn't that be very valuable

6  if you had the phone number where you could do a trap and

7  trace or pen registry to see who is calling that person?

8    A    It could be beneficial to see who is calling the

9  person, but it wouldn't be beneficial to prove the charge of

10 racketeering what we were trying do.

11   Q    Part of racketeering is to identify the

12 enterprise.  Right?  That is the first step; isn't it?

13   A    Correct, but just getting the phone number of who

14 she is calling, we didn't feel --

15   Q    Have you ever applied for a pen registry or a trap

16 and trace?

17   A    No.

18   Q    Do you know what I am talking about when I say pen

19 registry and trap and trace?

20   A    I know what you are talking about, but at that

21 point in the investigation we didn't think to do that.

22   Q    No.  You thought to go get a camera first.  Right?

23   A    Not at that exact point, no.

24   Q    After Officer Brock goes in there and he is

25 propositioned by the two women, you then have some

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 54

1    interaction with two civilian men that come out; is that

2    correct?

3        A    Yes, sir.

4        Q    What are their names?

5        A    I don't recall their names off the top of my head.

6        Q    Did you have direct interaction with either one of

7    them?

8        A    Yes, sir.

9        Q    Is this Michael Gary and Oscar Gomez?

10       A    Yes.

11       Q    How did you have contact with them?  How did that

12   come about?

13       A    We were doing surveillance at the spa.  We

14   observed Mr. Gary, that is who we spoke to first, we

15   observed him leaving the spa and approached him and made

16   contact with him after he left the spa.

17       Q    What did you tell him?

18       A    Detective Gasbarrini had the conversation with him

19   initially, but basically we advised him that we had

20   complaints at that spa that he just came from.  And we would

21   like if, he was willing, to make a statement for us of what

22   took place inside.

23       Q    This is Mr. Gary you are talking about now?

24       A    Yes, sir.

25       Q    Was Mr. Gomez stopped that same very day?

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 55

1      A      Yes, sir.

2      Q      How many other stops had you done prior to that?

3      A      Those are the only two.

4      Q      How many stops did you do after that?

5      A      Those are the only two.

6      Q      The only two guys you ever talked to in this whole

7  thing, both readily without any hesitation talked to you and

8  told you exactly what are you needed to know?

9      A      Yes, sir.

10     Q      And you guys made the conscious decision not to

11 mind that source of information any further by doing any

12 other stops like that.  Right?

13     A      No.  We didn't want to stop too many individuals

14 and possibly have somebody alert the people inside the

15 business of police stopping and talking to individuals about

16 what goes on.

17     Q      Did you give them some sort of offer of immunity

18 if they talked to you?

19     A      No.  We made it clear that there is no promises or

20 anything like that, and there was no threats or anything.

21     Q      You didn't tell them if you talk to us, we are not

22 worried about what you did in there, we are not going to

23 bother?  You didn't tell them that?

24     A      Not that I recall, no.

25     Q      Did Detective Gasbarrini?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

```
                                                    Page 56
 1        A    Like I say, I don't recall that.  I know that we
 2   said we can't make any promises and we can't threaten you.
 3   If you are willing to make a statement to us, we appreciate
 4   it.
 5        Q    So no comments at all about we are not worried
 6   about what you did, we just need to know?
 7        A    Not that I recall.  I don't recall making that
 8   statement.
 9        Q    Did the men to the exact T tell you exactly what
10   Brock told you, that they were the onces soliciting?
11        A    Very similar accounts.  Yes.
12        Q    They made it clear it was the female prostitutes
13   that initiated the contact?
14        A    That is what they told us.  Yes.
15        Q    Did you ever send in another undercover after
16   Brock had two successful visits?
17        A    No, sir.
18        Q    No other one was willing to do it or you guys
19   thought you are not going to do it?
20        A    We didn't want to send in an undercover too many
21   times.  Even the second time he was in there, she was
22   suspicious of him and was saying she thought he may be
23   police.  So we didn't want to send in an undercover again
24   and possibly compromise the investigation.
25        Q    Between these two women you have four acts of
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

```
                                                            Page 57

 1   solicitation; is that correct?

 2        A    We have the two undercover and then the statements

 3   of the individuals that exited.

 4        Q    You had the ability to get her phone number, but

 5   you didn't; is that right?

 6        A    Detective Brock was offered her phone number.

 7        Q    You know the corporate structure.  Yan owns it.

 8   You have got Lanfen Ma.  Right?

 9        A    We know Yongzhang Yan owns the spa, but he was

10   never seen at this point at the spa.  So we didn't really

11   know who ran the day-to-day operations or who collected

12   money or anything like that.

13        Q    And he has never been charged, right, because you

14   couldn't get enough evidence on him?

15        A    Yes, sir.  He hasn't been charged.

16        Q    You never got a trap and trace on his phone at

17   all, did you?

18        A    No, sir.

19        Q    At this point, did you become aware that Indian

20   River County Sheriff was running an investigation as well at

21   the exact same time?

22        A    I am not sure the exact date that we were aware of

23   that.  We were initially advised that Martin County had an

24   investigation at the exact same time as us that I believe

25   they started prior to ours that we were unware of.  Then I
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 58

1    believe Indian River County began an investigation around

2    the same time.  I am not sure when exactly.

3         Q    The State Attorneys that you were working with,

4    who were you working with?

5         A    Ryan Butler and Jeff Hendriks was working with the

6    Martin County case.

7         Q    Did they not share information with the sheriff

8    who was running the investigation?

9         A    No.  Like I said, I know they were running an

10   investigation.  I am not sure at what time Indian River

11   started their investigation.

12        Q    How many different prostitutes up until the point

13   we are at now which is after Brock and after the two men,

14   how many prostitutes were you aware of working at each spa?

15        A    The two that Brock encountered.

16        Q    So after the two men visit, what do you do next?

17        A    We just continued surveillance at that point and

18   began to observe Lanyun Ma frequent the business more so

19   than she had prior.

20        Q    At some point you followed her to a store where

21   she made purchases; is that correct?

22        A    Yes, sir.

23        Q    Where did she go?

24        A    She went to the Wal-Mart Grocery on U.S. 1 and

25   17th Street.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 59

1    Q    She made some purchases with a debit card?

2    A    Yes, sir.

3    Q    After she left, you had contact with loss

4    prevention or someone working within Wal-Mart?

5    A    Yes, sir.

6    Q    They agreed to provide you video?

7    A    Yes.

8    Q    You were aware at that point she did use a card to

9    make payments?

10    A    Yes, sir.

11    Q    Did you issue any sort of subpoena for her credit

12    card?

13    A    Those were subpoenaed at some point.

14    Q    But after you got the cameras?

15    A    I am not sure.

16    Q    What would you need to look at to tell me when you

17    got it?

18    A    It was either Detective Evans or Detective Eder

19    who subpoenaed those records.  I am not sure the exact date.

20    Q    Earlier, I thought we established that you guys

21    didn't issue a single subpoena prior to going in and getting

22    cameras?

23    A    I am not sure the exact dates of the subpoenas

24    being issued.

25    Q    Let me ask the question this way.  Did you issue

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 199

Page 60

1   one single subpoena prior to asking Judge Cox to give you

2   permission to install cameras at each spa?

3        A     Again, I am not sure of the exact date.  So I

4   can't say yes or no.

5        Q     I know you are not sure of the exact dates.  I am

6   asking you if you issued any subpoenas prior to the

7   installation of cameras.  I don't need the exact date.

8        A     I cant' answer that.  I don't know because I don't

9   know the dates.

10       Q     After this visit to Wal-Mart, you didn't issue the

11   debit card subpoena.  That was done later.  We can say that.

12   Right?  The debit card subpoena, that was done later?

13       A     I am not sure on the dates of the subpoenas.

14       Q     For the purposes of the hearing, who is going to

15   be able to answer my question when I call them?

16       A     Detective Evans and Detective Eder are the ones

17   that subpoenaed financial records.  So they would be the

18   ones to answer that.

19       Q     You then conduct some trash pulls?

20       A     Yes, sir.

21       Q     Within those trash pulls, did you find any

22   receipts?

23       A     Yes, sir.

24       Q     For purchases?

25       A     Receipts that were -- the name Lanyun Ma was on

Page 61

1    the receipts.  There were no purchases, customer purchases

2    in the trash pulls we completed.

3         Q    You found evidence of used condoms and semen?

4         A    Yes, sir.

5         Q    Did that solidify your belief that there is

6    prostitution going on which you already knew.  Right?

7         A    That assisted us in that belief.  Yes, sir.

8         Q    Were there any appointment notebooks or ledgers or

9    anything in those trash pulls?

10        A    Yes, sir.

11        Q    What were they?

12        A    There was different sheets of like notebook paper

13   that had apparent ledgers on them handwritten with a

14   Sharpie.

15        Q    You would agree that cameras within the massage

16   room were not going to produce any kind of evidence like

17   that, right, ledgers, receipts, notebooks?  You are just

18   going to capture sex.  Right?

19        A    Well, no.  You are going to capture money

20   transactions in the massage rooms.  At that point, I didn't

21   know where they kept their ledger.  It could have been in

22   the massage room.  It could have been anywhere.

23        Q    After the very first day, you knew that.  Right?

24        A    The very first day?

25        Q    You knew where the ledgers were kept after the

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 62

1    first day?

2         A     Of the?

3         Q     Installation?

4         A     We knew there was a ledger at the front desk.

5         Q     You guys looked around when you installed the

6    cameras.  Right?

7         A     Briefly.  It wasn't a search of the business.  We

8    were just in there to install the cameras.

9         Q     How did you do that?  If women were never leaving,

10   tell me how you installed the cameras.

11        A     We went to the business under the ruse of a power

12   issue.  With the assistance of City of Vero Power, the women

13   came out of the business, and we went in and installed it.

14        Q     Up in the roof, in the ceiling?

15        A     Yes, sir.

16        Q     Were you there?  You said you were in and out.

17   Right?

18        A     Yes, sir.

19        Q     So a lot of installation was being done while you

20   were outside or in another room?

21        A     Yes, sir.

22        Q     Did you actually see, were you actually able to

23   see them installing the cameras?

24        A     Yes.

25        Q     Physically see them?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

Page 63

1       A       Yes, at different points.

2       Q       Did you tell them where to put it?  Who is they

3    anyway?

4       A       The Department of Homeland Security tech officers.

5       Q       It was their decision where to put the cameras?

6       A       Yes, sir.

7       Q       They were climbing up in the ceiling to do it?

8       A       They were feeding stuff through the ceiling and

9    then from below the ceiling.  They weren't crawling in the

10   ceiling.

11      Q       The women were in the room when that was

12   happening?

13      A       No.  The women came outside.

14      Q       With you?

15      A       With me.  Yes, sir.

16      Q       You talked to them about what was going on in

17   there?

18      A       Yes.

19      Q       Did you see any evidence anyone was living in

20   there when you went in there?

21      A       No, not at that time.

22      Q       So the cameras get installed.  What are the hours

23   that you are to record?

24      A       The initial twenty, the first twenty days we

25   recorded from 8:00 a.m. or we viewed it from 8:00 a.m. until

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 64

1    11:00 p.m. each day.

2         Q     In your application, in your affidavit, that was

3    drafted by you?

4         A     Yes, sir.

5         Q     What were you using as authority?

6         A     I am sorry?

7         Q     Like what statute?  What were you trying to

8    outline?  What were you following?  There is a lot of very

9    specific things about the details of the offense and the

10   description of the location.

11        A     The possible racketeering enterprise.

12        Q     I mean, who came up with the language in obtaining

13   in the affidavit?  Was it you or was it the State Attorney?

14        A     It was with the assistance of the State Attorney.

15        Q     Did you have an identifying authority?  The

16   wiretap statute or Title 3?  What did you guys uses as

17   authority?

18        A     I don't recall the exact which one it is.  It

19   wasn't a wire, not a T3.

20        Q     What is that?

21        A     It wasn't a wiretap because there was no audio.

22        Q     I know it is not.  So what statute did you use; do

23   you know?

24        A     I can't cite the exact.

25        Q     Was it a Federal statute or a State statute?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 65

1     A   I am not sure.

2     Q   In your application you discussed -- if you will

3 look at, I will give you Exhibit No. 1.  Within the

4 application you start making paragraphs it is requested, it

5 is further requested.  That is going to be about page 13 in

6 the application.

7     A   Yes, sir.

8     Q   Did you inform the Court in the application

9 exactly where you were going to put the cameras?

10    A   No, sir.

11    Q   Did you inform the Court in the application that

12 you were going to put a camera in a massage room where

13 people were getting massages?

14    A   It wasn't specifically stated which rooms they

15 were placed in.

16    Q   Did the order instruct you where specifically to

17 put any cameras?

18    A   No.

19    Q   Did you ask the Court to monitor the authority to

20 monitor and record?

21    A   Did I ask the Court for that?

22    Q   Yes.  In your application?

23    A   Yes.  On the last page I stated the recording and

24 monitoring.

25    Q   You made it explicit that there would be no

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

Page 66

1    monitoring or recording of audio?

2        A    Of audio, yes, sir.

3        Q    That is on page 13 under the first it is

4    requested?

5        A    Yes, sir.

6        Q    Can you read that paragraph?

7        A    It is requested that your affiant is allowed to

8    surreptitiously enter the described location for the purpose

9    of covertly conducting electronic video surveillance of the

10   interior location of the location to identify participants

11   in the criminal enterprise commonly referred to as a visual

12   surveillance warrant.  There shall be no capability on any

13   of the installed equipment to allow audio monitoring or

14   recording.

15       Q    At that point, there is a difference between

16   monitoring and recording.  Right?  You call it out as two

17   separate things.  You are not going to monitor or record

18   audio.  Right?

19       A    I stated there shall be no capability of audio

20   monitoring or recording.

21       Q    Monitoring is something totally different than

22   recording.  Correct?

23       A    I suppose it could be.

24       Q    I mean, you are an educated man.  The word monitor

25   means something different than record to you, doesn't it?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

STATE OF FLORIDA VS ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL   DCA CASE NO. 4D19-1655, ET AL

Page 67

1      A     Specifically, it is not the same definition.  No.

2      Q     It is two different things.  If they meant the

3 same thing, you wouldn't say two words.  Right?

4      A     I said two words.  I don't know.

5      Q     The order, did it ever give you the authority to

6 record?

7      A     I believe the exact language was monitor in the

8 order.

9      Q     So I am asking you a different question.  Did it

10 give you the authority to record?

11      A     It was a criminal case, and that is evidence of

12 the crime.  So I believe there was authority to record.

13 Yes.

14      Q     You believe there was?

15      A     Yes.

16      Q     I understand that.  Did the order give you

17 authority to record?

18      A     Yes.

19      Q     It says that in the order?

20      A     The specific word of record was not stated, but --

21      Q     So I can have you read the order, but I don't want

22 to do that.  Did the order say you could record?

23      A     Not specifically record, no.

24      Q     You knew going into this, you made it clear in the

25 application that you were going intercept in massage rooms.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 68

1    Was that implicit in your order?  You didn't specifically

2    call it out.  Was that what you wanted?

3         A    Yes, sir.

4         Q    You knew people by definition would become nude

5    even if they are innocently going in to get a massage?

6         A    I knew that was a possibility.

7         Q    Women take their tops off, their bras off.  Men

8    take their shorts off, underwear off?

9         A    Yes, sir.

10        Q    The Judge called -- you asked for the Judge to

11   specifically require you guys to take steps to minimize the

12   invasion of privacy to any parties not participating in

13   criminal conduct?

14        A    Yes, sir.

15        Q    That was put in the order?

16        A    Yes.

17        Q    That was asterisked and highlighted?  There was an

18   asterisk put there by Judge Cox.  Correct?

19        A    Yes, sir.

20        Q    Did you guys ever record people that were in there

21   not partaking in sex?  Did that ever happen?

22        A    There was three individuals throughout the entire

23   time of surveillance that did not receive a sex act.

24        Q    Were they recorded, too?

25        A    Yes, sir.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

STATE OF FLORIDA VS ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL   DCA CASE NO. 4D19-1655, ET AL

Page 69

1    Q    So you didn't minimize that invasion of their

2    privacy, did you?

3    A    We took steps to minimize, but the sex act

4    sometimes happened at the end of the massage.  So we had to

5    watch the entire massage to see if that was going to take

6    place.

7    Q    Who were the three people that you recorded?

8    A    There was one individual who came in the room and

9    received a legitimate massage and then exited.

10   Q    What is their name?

11   A    I have it in our notes.  I am not sure.

12   Q    Do you know any of their names?

13   A    I know the other two names.  Yes, sir.

14   Q    What are they?

15   A    Louis Crook and Paul De Lisi because they also

16   came back on other occasions or previously received sex acts

17   at the spa.

18   Q    But on these two occasions they did not?

19   A    Yes.

20   Q    But you recorded them anyway?

21   A    Yes, sir.

22   Q    Was anyone actually sitting there watching the

23   live feed?

24   A    Yes.

25   Q    At all times?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 70

1       A    Yes, sir.  It would be minimized if there was no

2   one in the room.

3       Q    But there was never, the Department of Homeland

4   Security set up a recording to take place starting at

5   8:00 a.m. and terminating at 11:00 p.m.  Correct?

6       A    The video recorded at all times, but it was

7   minimized.  When no one was in the room, the room wasn't

8   being observed.  The desk was always being watched between

9   hours we were conducting the surveillance.  So the initial

10  twenty days, yes, 8:00 a.m. to 11:00 p.m. myself and

11  Detective Gasbarrini were the ones doing that surveillance.

12  And the desk would be being viewed during those hours.  The

13  room being viewed when individuals entered.

14      Q    What did minimize mean to you?

15      A    To minimize the invasion of privacy of individuals

16  in the location.

17      Q    So you felt like you had to watch all the way up

18  until the person left?

19      A    Yes, sir.  Like I said, some people received

20  massages first and then the sex act took place at the end of

21  the massage.  So if we minimized it at the beginning of the

22  massage, there is potential that you could have missed a

23  crime being committed.

24      Q    How many men were assigned to watch these videos,

25  the live feed?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 71

1      A      Only two at the time.  It was myself and Detective

2   Gasbarrini the entire investigation except for two hour

3   periods on one day each.

4      Q      So you were in there from 8:00 until 11:00 every

5   day other than you missed two hours?

6      A      Yes, sir.  That was on the first twenty days.

7   Later in the investigation, we didn't stay until 11:00 p.m.,

8   but it would be from 8:00 a.m. until late afternoon.

9      Q      How many sex acts were recorded in first thirty

10  days?

11     A      In the first thirty days?  I don't have the exact

12  number.  It was upwards of 100.

13     Q      Outside of the people we named, were there any

14  other prostitutes identified in the first thirty days?

15     A      In the first thirty days?  There was other, there

16  were other prostitutes in the business.  They were not

17  identified at that point.

18     Q      Were they observed committing sex acts?

19     A      Yes, sir.

20     Q      Why weren't they identified?

21     A      Because all we had was video of them at that

22  point.  We didn't have any way to identify them at that

23  point.

24     Q      How many women were there that you can't identify

25  in the first thirty days?

Page 72

1      A      Five, I believe, four in the first thirty days.

2    One was later identified.  Three of them we never

3    identified.

4      Q      What was her name that you later identified?

5      A      Yan Xu, Y-A-N X-U.

6      Q      Were these women ever arrested or charged with a

7    crime?

8      A      She was, yes, sir.

9      Q      Other than that, the other ones?

10     A      Other than her?

11     Q      The other women?

12     A      There was other women arrested.  Yes, sir.

13     Q      In the first thirty days, any women in the first

14   thirty days?

15     A      No one was arrested in the first thirty days.

16     Q      I am saying that you knew about in the first

17   thirty days?

18     A      A warrant was issued for Lanfen Ma who was

19   previously identified.  The other three women, we did not

20   identify and Yan Xu that later identified was arrested.

21   They were all observed in the first thirty days.

22     Q      How did these other women arrive at the spa?

23     A      Yan Xu was picked up and driven to the spa by

24   Lanyun Ma.  The other women arrived by unknown males

25   dropping them off in front of the spa.

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

STATE OF FLORIDA VS ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL   DCA CASE NO. 4D19-1655, ET AL

Page 73

1       Q       Of those three women that you are not able to

2    identify, how far into the thirty days did the first one

3    appear?  My question is this:  Outside of Zhang and Lanfen

4    Ma who you knew about before you ever went in there?

5       A       Yes, sir.

6       Q       How many days go by before you find another?

7       A       Zhang was transported away from the spa and

8    replaced by another female who we did not identify within

9    the first two days of viewing.

10      Q       The camera goes in on November 27?

11      A       The 29th it was installed.

12      Q       The 29th it is installed.  You are watching.  And

13   when the is the first time you see someone that you don't

14   know come into that spa?  You know Lanyun Ma.  You know

15   Lanfen Ma and you know Zhang.  So when is the first time you

16   see someone come in?

17      A       I believe the first day we were actually observing

18   which is the second -- the camera was put in on the 29th.

19   We started observing on the 30th.  There was a new female in

20   the spa.

21      Q       Who was that?

22      A       She was never identified.

23      Q       Other than simple payments, tips, whatever you

24   want to call it after the sex act is consummated, that it

25   happened, did you ever see on video in the room transactions

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 74

1    of racketeering or money laundering or human trafficking?

2        A    Women would collect money in the room.  And then

3    they would give money to Lanyun Ma who was primarily at the

4    front desk throughout the investigation.  And she would put

5    money in different envelopes which we were able to observe

6    via that camera and different things like that that we would

7    then be able to know when she was leaving with money and

8    making bank runs, things of that nature.

9        Q    You are able to identify women handing money to

10   Lanfen Ma?

11       A    Yes, sir.

12       Q    Did you see the other women with cell phones as

13   well, the unidentified women?

14       A    I don't know if all of them did, but we did

15   observe women with cell phones.  Yes, sir.

16       Q    The application in this case, was it ever

17   authorized in writing to you by anybody?

18       A    Are you waiting on me?

19            THE COURT:  Is that a question?

20   BY MR. METCALF:

21       Q    I asked you a question.

22            THE COURT:  It seemed like an unfinished question.

23   BY MR. METCALF:

24       Q    Was it ever authorized by anyone in writing?  Did

25   anyone authorize your application in writing?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 75

1      A      I guess I don't understand the question.

2      Q      Did the State Attorney, Mr. Colton, did he

3  authorize the issuance of this warrant in writing to you?

4      A      No, sir.

5      Q      The application?

6      A      No, sir.

7      Q      Never signed off on it?  Never reviewed it?

8      A      Not that I am aware of, no.

9      Q      You knew within the room you are not going to see

10  this corporate structure of this spa.  Right?  That is not

11  something you are going to get a camera in the room.  Right?

12     A      We didn't know exactly what we would see in the

13  rooms.

14     Q      Was there any discussion about just employing

15  maybe an alternative investigative technique like just a

16  simple audio wiretap so you can hear what is going on in the

17  room?  You kind of already know.  Right?

18     A      Well, we wanted to be able to actually visually

19  observe the crimes taking place and see where the money and

20  things like that were -- how the transactions and the

21  structure of the business from inside.

22     Q      You don't have to see it to know it is taking

23  place, do you?

24     A      I feel as though seeing it would have been a

25  better option than just hearing audio.  I don't think that

Page 76

1    would allow us to know exactly what is going on inside.

2        Q    Your goal was to identify women engaging in

3    prostitution and deriving funds?  Is that basically it?

4    That was your goal, your investigatory goal?

5        A    It was to identify the racketeering enterprise and

6    then the deriving support from the prostitution and the

7    prostitution.

8        Q    As you said, the payments to Lanyun Ma and to

9    Lanfen Ma, those are happening at the desk.  Correct?

10       A    There is both payments at the desk and payment in

11   the room.

12       Q    Payments in the room are between the man and the

13   woman.  Right?

14       A    Generally, yes.

15       Q    They go out.  And the payments that are then given

16   to the house, that is done at the desk?

17       A    Some individuals paid directly at the desk.  They

18   may have not paid in the room.  Some paid just in the room

19   and did not pay at the desk.  Payment happened in both

20   spots.

21       Q    I am talking about when the prostitute pays the

22   house their cut, that is done at the desk.  Right?

23       A    Generally, yes, sir.

24       Q    You knew you had Brock go in and identify two

25   women soliciting him and otherwise asking him to engage in

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 77

1    prostitution?

2         A    Yes.

3         Q    You had the two men?

4         A    Yes, sir.

5         Q    Was there any thought put into, hey, if a new

6    woman comes in and we have to identify yet another player,

7    we could send in an undercover because that is a new woman?

8    She wouldn't know.

9         A    Like I said, every time you send in an undercover,

10   that heightens the chance that they may be identified.

11   After the first time when the female he had just met wasn't

12   the same girl as the first time advised that she thought he

13   may be police, that made us believe that that was a risk

14   that could jeopardize the investigation.

15        Q    It is the same guy you sent in there twice.  You

16   could use another guy?

17        A    Right.  That was the reason why we did not.

18        Q    Maybe if his behavior is consistent with other

19   people, they would say this is normal?

20        A    That is the reason we did not send in an

21   undercover an additional time.

22        Q    But undercovers, the times you sent in, they

23   worked and you were able to identify two separate

24   individuals soliciting?

25        A    Yes, sir.

Page 78

1      Q     As far as wiretaps into the phones, did you guys

2    ever ask for that?

3      A     No, sir.

4      Q     Was that contemplated prior to issuing

5    surveillance video?

6      A     It was spoken about, but we found this was the

7    best option.

8      Q     Your agency is famously involved with a wiretap

9    that captured 100,000 calls in the local pill mill case.

10   Right?

11     A     I believe that took place.  I wasn't working here.

12     Q     But you are aware that 100,000 different phone

13   calls that exposed the entire racketeering, allegedly

14   exposed an entire racketeering organization was captured

15   from taps on phones.  Right?

16     A     I can't speak on that.

17     Q     Did you guys ever discuss that?

18     A     I haven't discussed that with anyone.  No.

19     Q     No inventory was provided to the Judge telling her

20   where you install cameras.  Correct?

21     A     No, sir.

22     Q     No report backs ever happened about what you were

23   finding out, what you were discovering.  Correct?

24     A     No, sir.

25     Q     You didn't talk about how it would be minimized.

Page 79

1    Right?

2         A      That was discussed at the initial her signing it.

3         Q      So you would agree that within that order, both

4    orders, the extension which is Exhibit 4 and the original

5    order which is Exhibit 2, you would agree that there was a

6    requirement that you forthwith make return of your doings

7    upon executing this warrant?

8         A      Yes, sir.

9         Q      That never happened.  You agree with me?

10        A      Yes.

11        Q      Did anyone tell you why that provision exists?

12        A      No.  Due to the fact that we didn't take anything

13   out of the spa, that is why we did not.

14        Q      They didn't ask you tell us what you took out of

15   the spa.  It says report back your doings.

16        A      Right.  I am just telling you why we didn't.

17        Q      The things that you did after you got the cameras,

18   they include GPS tracking.  Correct?

19        A      Yes.

20        Q      Subpoenaing bank records.  Correct?

21        A      Yes.

22        Q      You even had a situation where you went into the

23   business next door and began listening through the walls.

24   Right?

25        A      Yes, I believe Detective Eder did.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 80

1        Q        And Detective Eder audio recorded it.  Correct?

2        A        Yes.

3        Q        Was that ever authorized?

4        A        No.  It is in the adjoining business.  So he is

5    allowed to record in there.

6        Q        Did he use any amplification to record or you are

7    saying he could hear the conversation through the walls?

8        A        He could hear it through the wall.

9        Q        So no microphone, nothing?

10        A        No, sir.

11        Q        Did you see the device he used to record with?

12        A        Yes.  It was just his handheld recorder.

13        Q        Were you able to overhear for yourself?

14        A        I never did surveillance from that room, but while

15    we were in that room, in that adjoining business looking in

16    there prior to the install and during the install, you could

17    hear through the wall.  Yes, sir.

18        Q        So we have GPS tracking.  We have subpoenas going

19    out to banks?

20        A        Yes, sir.

21        Q        That wasn't done prior to this.  Right?

22        A        I don't remember the exact dates.  They were done

23    throughout the investigation.  So they were done after as

24    well.

25        Q        You are now traditionally just tailing people,

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 81

1    right, following them around?

2         A    Yes, sir.

3         Q    That is after the warrant?

4         A    Yes.

5         Q    Did you discuss in the order -- there is a

6    thirty-day cap.  We talked about this briefly.  But was

7    there any language in there that says it shall terminate

8    when the described communication is obtained?  Once you are

9    able to, not communicate each individual time, but once you

10   get enough evidence to document the crimes you were looking

11   at, was there any language about terminating surveillance?

12        A    No, sir.

13        Q    So it was just a thirty-day cap?

14        A    Yes, sir.

15        Q    Do you know how many predicate acts are required

16   to show racketeering?

17        A    Two.

18        Q    You had 100 after the first thirty days?

19        A    Yes, sir.

20        Q    Were you aware that the Palm Beach County Sheriff,

21   you became aware that they issued delayed notification for

22   video surveillance.  Correct?

23        A    Yes, sir.

24        Q    Their observation lasted five days.  Does that

25   sound right?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 82

1       A    I am not familiar with exactly how long theirs

2   lasted.

3       Q    You are not familiar?

4       A    I am not.  No, sir.

5       Q    Yours went on for sixty days.  Right?

6       A    Yes, sir.  Thirty days of actual monitoring the

7   room and forty-two days of monitoring the desk, but there

8   were two thirty-day warrants.

9       Q    Did there come a point in time where you were

10  contacted by the Office of the State Attorney saying, hey,

11  enough is enough.  Stop looking in the rooms.  On

12  January 10, did that happen?

13      A    Yeah.  January 9 was the last day we monitored the

14  actual room.  That was basically due to the fact that we

15  were building the case, following the money more at that

16  point.

17      Q    But the whole basis of keeping the warrant going

18  for the extension was that there was, what, new females

19  coming in and out?

20      A    New females coming in and out as well as the owner

21  Yongzhang Yan emerged and started showing up at the business

22  more.  And there was another gentleman who emerged as a

23  possible part of the enterprise.

24      Q    Those two guys weren't in massage rooms soliciting

25  prostitution, were they?

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 83

1      A    No, but like you said, there was other girls

2   coming in as well.

3      Q    Did the girls stop?  On January 10 did that all

4   stop?

5      A    No.

6      Q    So you guys just decided, you were told by the

7   State Attorney enough is enough, stop videoing in the room?

8      A    No.  It was just a decision that was made jointly.

9   We could have continued.  We weren't told not to.  We felt

10  it was at that point in the investigation that we didn't

11  need to.

12     Q    Did you have a suspect that you guys believed was

13  engaged in human trafficking?

14     A    Yes, sir.

15     Q    Have you found any victims of human trafficking?

16     A    Yes, sir.  We interviewed one individual who

17  advised that she did it, committed the acts against her will

18  and was in fear.

19     Q    Who is that?

20     A    What is her name?

21     Q    Yes.

22          MR. BUTLER:  Judge, I am going to object.  There

23  is a protective order signed by Judge Vaughn prohibiting the

24  release of that victim's name.  I think also under the

25  Florida Constitution she has a right to keep confidential.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 84

1           THE COURT:  Sustained.

2   BY MR. METCALF:

3       Q     Was this prostitute working within the spa?

4       A     Yes, sir.

5       Q     What about the other unidentified one?

6       A     They were unidentified because they left prior to

7   the execution of our search warrant at the end.

8       Q     This last one, the one you are referring to, she

9   was identified when you executed the search warrant at the

10  end?

11      A     She was identified that day.  Yes, sir.

12      Q     By logic, are you saying that the other women

13  could have been alleged victims?  You guys just didn't

14  decide to stop it and find out who they were?  Is that what

15  you are saying?

16      A     The reason we didn't stop it is because we were

17  still building our racketeering case.

18      Q     That was more important than human trafficking

19  victims potentially?

20      A     At that point we didn't know if anyone was a

21  victim.

22      Q     I want to be clear.  You didn't receive a

23  directive from the State Attorney, Ryan Butler, to stop

24  filming prostitution on January 10, 2019?

25      A     It was a joint decision.  It wasn't a direct order

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 85

1    or anything like that.

2        Q    Did he call you and say I think you should stop?

3        A    I don't recall that conversation.  I think it was

4    just in talking about the case we decided that.

5        Q    You would agree that the second order, the

6    extension order which is Exhibit 4 had the exact same

7    language as the order in Exhibit No. 1.  Correct?

8        A    Much of it.  Yes, sir.

9        Q    Anything different?

10       A    There is additional probable cause added in

11   reference to movement of girls, the emergence of the male

12   who was possibly involved and things related to movement of

13   money.

14       Q    I am talking about the order, not your

15   application.

16       A    The order itself, no, sir.

17       Q    The order itself is the exact duplicate.  Correct?

18       A    Yes, sir.

19       Q    Of the first one.  Correct?

20       A    Yes.  With the standard changes of dates and

21   stuff.

22       Q    Again, it authorizes you to monitor.  It wants you

23   to report back to this Judge within ten days?

24       A    Yes.

25       Q    Did you report back?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

STATE OF FLORIDA VS ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL   DCA CASE NO. 4D19-1655, ET AL

```
                                                          Page 86

 1        A     No, sir.

 2        Q     By this time, you have got a ton of videos.

 3   Before, you said you just installed cameras.  Now you have

 4   got a lot of videos.  You referenced a couple of them, but

 5   did you report back anything to them?

 6        A     No, sir.

 7        Q     This is a separate and distinct order, would you

 8   agree?

 9        A     Yes.

10        Q     I want to be clear.  That is two orders because we

11   have two orders.  So we have two warrants, two orders?

12        A     Yes.

13        Q     Earlier, you discussed that you drafted that

14   order?

15        A     Yes, sir.

16        Q     When you say you drafted it, what I mean, I mean

17   you typed it up?

18        A     Yes.

19        Q     Is it something you cut and pasted from something

20   else or is it something you typed up?

21        A     No, I typed it up.

22        Q     Did you look at some other order?

23        A     I looked at other examples of this type of order.

24   Yes, sir.

25        Q     You had other examples of video surveillance
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

STATE OF FLORIDA VS ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL   DCA CASE NO. 4D19-1655, ET AL

Page 87

1    orders?

2         A    Yes, sir.

3         Q    Where from?

4         A    Indian River County Sheriff's Office had a case

5    prior.

6         Q    When?  Like fifteen years ago?

7         A    I am not sure of the exact date.  It was previous

8    to this case.

9         Q    This order seems to be identical to the one used

10   in Martin County, the exact same words.  Is that just a

11   coincidence?

12        A    No, I don't believe that is accurate.

13        Q    So you got the order from Indian River County

14   Sheriff?  You asked them to send you an order?

15        A    I honestly do not recall who sent me the order,

16   but it was an Indian River County Sheriff's Office order.

17             MR. METCALF:  Judge, at this time I don't have any

18   other questions.  A lot of other men, lawyers here who have

19   joined in are certainly free to.

20             THE COURT:  Does anyone else have any questions?

21   Any of the other defense lawyers on behalf of any --

22             MR. ZISKINDER:  I do, your Honor.

23             THE COURT:  Mr. Ziskinder.

24             MR. ZISKINDER:  He mentioned one of my clients.

25                  CROSS-EXAMINATION

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 88

1    BY MR. ZISKINDER:

2        Q    Detective, you said that Mr. DeLisi --

3        A    Yes, sir.

4        Q    -- came in for a legitimate massage?

5        A    Yes, he came in.  I don't know.  I don't have the

6    exact dates off the top of my head.  I believe in December

7    he came in and did not receive a legitimate massage and got

8    a sex act and then came in on a later date and at that time

9    he got a legitimate massage.

10       Q    Was it Frank DeLisi?  You said different first

11   names.

12       A    I may have said the wrong name.  I know his last

13   name was DeLisi.

14       Q    There was only one DeLisi that you encountered?

15       A    Yes.

16       Q    So the first time you videotaped him there was a

17   sex act involved?

18       A    Yes, sir.

19       Q    And then there was one other time where you saw

20   him come in and there was none?

21       A    Yes, sir.

22       Q    Did you speak with him after he was videotaped?

23       A    No, sir.

24       Q    What about the other time?

25       A    I have never spoken to him.  No, sir.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 89

1    Q    To your knowledge, did any other law enforcement

2   officer speak with him?

3    A    Not to my knowledge.

4    Q    Do you recall whether payment was made on that

5   video?

6    A    On which one?

7    Q    The first one?

8         MR. BUTLER:  Judge, that is not something that is

9   pled in the motion to suppress.

10        THE COURT:  Sustained.

11        MR. ZISKINDER:  Nothing further.  Thank you.

12        THE COURT:  Mr. Sercombe?

13        MR. SERCOMBE:  I do, your Honor.

14                  CROSS-EXAMINATION

15   BY MR. SERCOMBE:

16        Q    My client Mr. Anglesano, he was mentioned in

17   discovery for audio.  Did you have a warrant for that audio?

18        MR. BUTLER:  Judge, I am going to object to also

19   there has been no motion filed as to that.

20        THE COURT:  Sustained.  Mr. Sercombe, if you have,

21   since you didn't file a separate motion, obviously the State

22   has not been put on notice that you perhaps were going to

23   challenge some audio.  So I am going to ask if you do have a

24   challenge to that, we will hear that separately.

25        MR. SERCOMBE:  So I can file that, your Honor?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 90

1            THE COURT:  Yes.  Anybody else?  Mr. Golden?

2                      CROSS-EXAMINATION

3    BY MR. GOLDEN:

4       Q    Just briefly.

5            Officer, in the application you mention that you

6    put in the language monitor and record; is that correct?

7       A    Yes, sir.

8       Q    That was your doing?

9       A    Yes, sir.  I wrote the order.

10      Q    And you also prepared the order, too.  Correct?

11      A    Yes, sir.

12      Q    Did you draft it yourself?  Did you type it?

13      A    Yes, sir.

14      Q    Your order specifically left out the word record;

15   is that correct?

16      A    I don't believe the word record is in there.

17      Q    I mean, so you intentionally left it out.  You

18   omitted it?

19      A    I don't believe I intentionally left it out.

20      Q    But you did?

21      A    Yes.  I wrote -- I didn't put record in there.

22      Q    When the Judge reviewed the application, she saw

23   you intended to monitor and record, but then relied on your

24   order that you would only be monitoring.  Correct?

25      A    I don't know what the Judge believed.  I don't

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 91

1    know how to answer that.

2        Q    The Judge didn't cross out record?

3        A    Okay.

4        Q    Right?

5        A    No.

6        Q    You did by leaving it out?

7        A    I didn't cross out record.  It wasn't written.

8        Q    Right.  So the Court had every reason to believe

9    that you would not be recording but only monitoring based on

10   your preparation of that order?

11       A    I don't believe that is, I don't, I mean, I don't

12   believe that is true.

13       Q    You told Mr. Metcalf that there was some idea that

14   monitor meant record or you would have that authority to

15   record, but you are the one that actually recognized the

16   distinction when you prepared the application?

17       A    Again, I don't know how to answer that.  Record

18   was not written in the order itself.  No.

19            THE COURT:  Any other lawyers?  Mr. Kennedy.

20                       CROSS-EXAMINATION

21   BY MR. KENNEDY:

22       Q    Just a couple on behalf of Josef Jorg.

23            Good morning, Detective.  You testified that

24   despite the order instruction to report back within ten

25   days, you did not do that.  Correct?

Page 92

1      A    Yes, sir.

2      Q    Within the first ten days of -- you began

3   recording in November of 2018.  Correct?

4      A    Yes, sir.

5      Q    Within the first ten days of recording, you had

6   quite a number of examples of sex acts from the massage

7   room.  Correct?

8      A    Yes, sir.

9      Q    Is it fair to say that those acts were all of a

10  similar ill?  They were all sort of the same?  They involved

11  different acts, but involved an act and perhaps a payment?

12     A    I wouldn't say they were all that.  I wouldn't say

13  they were the same.  Some people received a massage and then

14  a sex act and vice versa.  Some people just received a sex

15  act.  I wouldn't say they were the same.

16     Q    They were all acts that you subsequently could

17  charge as solicitation of prostitution, perhaps engaging in

18  prostitution.  Correct?

19     A    Yes, sir.

20     Q    But you didn't see any sort of coercive activity

21  as it relates to human trafficking, correct, during the

22  first ten days?

23     A    In the massage room?

24     Q    Yes.

25     A    No.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 93

1       Q      You didn't see any business enterprise activity

2   within the massage room other than the act of prostitution

3   itself?

4       A      The acts of prostitution as well as the collection

5   of money that was then given to the person who emerged as

6   the one running the spa.

7       Q      That was given outside of the massage room?

8       A      And collected, but previously collected in the

9   massage room.  Yes.

10      Q      Everything that happened, is it fair to say that

11  what happened inside the massage room was consistent with

12  the crime of prostitution?  Yes?

13      A      Prostitution occurred in there, but there was also

14  the collection of money that aided our investigation into

15  the racketeering and the other charges.

16      Q      In terms of numbers you said, without holding you

17  to it, upwards of 100 acts occurred in the first thirty

18  days?

19      A      Yes, sir.

20      Q      Is it fair to say something like five to ten acts

21  per day occurred in the first ten days?

22      A      I would say that is fair.  I don't know the exact.

23      Q      Whatever it was, but it was a substantial number

24  of these similar acts.  Correct?

25      A      Yes, sir.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 94

1      Q    All of which could have been reported back to the

2   Court for modification or limitation of your authority.

3   Correct?

4      A    Yes, they could have been.

5           MR. KENNEDY:  Nothing further.

6           THE COURT:  Anybody else?  Mr. Kibbey, yes, sir.

7                    CROSS-EXAMINATION

8   BY MR. KIBBEY:

9      Q    Sir, is it your testimony this morning that when

10   you prepared the order that Judge Cox signed that you would

11   be surprised if it matched the wording of the Martin County

12   order?

13     A    Yes, I would be, I guess.  They are similar

14   orders.  I don't know.

15     Q    But you didn't have any access to the Martin

16   County order to prepare your order?

17     A    Not that I recall.

18     Q    When you say you prepared it, what equipment did

19   you prepare it on?

20          MR. BUTLER:  Judge, what is the relevance of this?

21          MR. KIBBEY:  It goes to his credibility, your

22   Honor.

23          MR. BUTLER:  What equipment he prepared it on?

24          MR. KIBBEY:  Yes.

25          MR. BUTLER:  How is that relevant to his

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 234

Page 95

1   credibility?

2              MR. KIBBEY:  You will see.

3              MR. BUTLER:  A typewriter versus a computer?

4              THE COURT:  What are you showing him, Mr. Kibbey?

5              MR. KIBBEY:  I am going to show him, your Honor,

6   the order from Martin County signed by Judge Belanger about

7   forty days prior.

8              THE COURT:  Show that to Mr. Butler.

9              MR. KIBBEY:  The State has got a copy.

10  BY MR. KIBBEY:

11     Q    I would like to show you Exhibit A.  You have

12  already seen it.  That is your order.  Correct?

13     A    Yes, sir.

14     Q    Exhibit B is one from Judge Belanger.  You are

15  saying you haven't seen Exhibit B before?

16     A    Like I said, not that I recall.  No.

17     Q    Getting back to the equipment, what printer did

18  you use to print the order on?

19              MR. BUTLER:  Objection, relevance.

20              THE WITNESS:  I don't recall.

21              THE COURT:  Overruled.

22  BY MR. KIBBEY:

23     Q    You don't recall.  Was it in your department or

24  was it at the State Attorney's Office?

25     A    I would have printed it in my department.

Page 96

1    Q    So is there any explanation for why Judge

2    Belanger's order looks to have been printed exactly the same

3    way on the same equipment?  Did you print his order?

4    A    I have no idea.

5    Q    Wait a minute.  You don't know if you printed

6    Judge Belanger's order?

7    A    Like I said, I don't recall seeing the order.  No.

8        MR. KIBBEY:  Your Honor, we would move to have

9    these both admitted as exhibits.

10        THE COURT:  Any objection?  The one order is

11    admitted already.

12        MR. BUTLER:  Right.  I believe the witness

13    couldn't identify Judge Belanger's order.  What is the

14    relevance of that?  He says he hadn't seen it before.

15        MR. KIBBEY:  Your Honor can draw the relevance

16    when you look at they are identical, wording, type font,

17    spacing, etc.

18        MR. BUTLER:  That is a smoking gun as to what?

19        MR. KIBBEY:  It goes to credibility of this

20    witness, your Honor.

21        THE COURT:  We will allow it over objection.

22        MR. KIBBEY:  No further questions.

23        THE COURT:  Let's continue.  Mr. Kibbey is with

24    Mr. Metcalf.  So we will number his next exhibit, whatever

25    that next number is.

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 236

Page 97

1          THE CLERK:  Six and 7.

2          (Defendant's Exhibit Nos. 6 and 7 were admitted into

3    evidence.)

4          MR. METCALF:  Judge, I don't think there is any

5    further questions.

6          THE COURT:  Any other questions?  Mr. Butler, do

7    you have any questions of Detective Crowley?

8                       CROSS-EXAMINATION

9    BY MR. BUTLER:

10         Q    Just a couple of questions, Detective.  When you

11   were talking about the complaints that you had received

12   prior to getting the actual warrant signed by Judge Cox, did

13   you receive complaints from any of the adjoining businesses?

14         A    I believe one of the people that called the chief

15   was of the adjoining business.

16         Q    What was the nature of that complaint?  What was

17   that person complaining about?

18         A    The frequency of men in and out.

19         MR. METCALF:  Judge, I am going to object.  If it

20   is not in the application, then it doesn't really matter.  I

21   am asking questions that were in the application.  It

22   doesn't matter what is in his mind.  It matters that he

23   wrote numerous citizen complaints.  So it really doesn't

24   matter who made them.  I don't see the relevance.  If it is

25   in the application, it is what is in the application.

Page 98

1          MR. BUTLER:  Judge, he has questioned him for two

2     hours about things that weren't in the application.

3          MR. METCALF:  Because, Judge, I have to prove

4     omissions.  I have to.  They can't -- I have to prove

5     omissions under Franks and misleading statements.  So I am

6     allowed to ask that.

7          MR. BUTLER:  And I am allowed to followup.

8          THE COURT:  Overruled.

9     BY MR. BUTLER:

10     Q    You can answer.

11     A    There was basically a frequency of men in and out

12     of the business.  They could also hear what they thought

13     were sex, I guess sex noises taking place in the spa.  That

14     was basically the complaint.

15     Q    I am sorry?

16     A    That was basically the complaint.

17     Q    When you were describing the actual installation,

18     at some point you said that you were in the building next

19     door.  I just wanted to clarify that.  Was there a separate

20     physical structure next to the spa?

21     A    It is basically a strip of offices.  Directly next

22     door there is another office that shares a wall.

23     Q    So it is one building with multiple businesses in

24     the building?

25     A    Yes, sir.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

STATE OF FLORIDA VS. ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL   DCA CASE NO. 4D19-1655, ET AL

Page 99

1       Q       Were you in the office next door to the spa at

2   some point?

3       A       The office directly next to it.  Yes.

4       Q       You were asked about the Wal-Mart purchase.  Do

5   you recall what it was that Lanyun Ma purchased with the

6   debit card?

7       A       Yes.  She purchased assorted food.  Then she also

8   purchased a box of condoms.

9       Q       Did she pay for the condoms with the debit card?

10      A       I will have to refer to the order.  I don't recall

11  exactly.

12      Q       Look at paragraph 10 of your application.  You

13  have a photograph in there of Lanyun Ma bending down and

14  picking up a box of condoms at the Wal-Mart.  Do you see

15  that?

16      A       Yes, sir.

17      Q       Right above that you talk about how she paid for

18  the condoms?

19      A       She paid for the condoms with cash.  And she made

20  the other purchases with a card.

21      Q       For how many total days were you authorized

22  between Judge Cox and Judge Kanarek to watch what was going

23  on inside the business?

24      A       Sixty days.

25      Q       How many days did you actually watch what was

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 100

 1   going on inside the massage rooms?

 2       A     Thirty days.

 3       Q     How many additional days did you watch the cash

 4   register area?

 5       A     A total of forty-two days.

 6       Q     You described already how from the first twenty

 7   days or so you and Detective Gasbarrini monitored for about

 8   fifteen hours a day?

 9       A     Yes, sir.

10       Q     After that, did you monitor for less?

11       A     Yes.

12       Q     Can you give us a breakdown of that?

13       A     Yes, sir.  We didn't monitor -- we monitored the

14   first two weekends.  Following that, we would monitor the

15   week and then Saturdays and Sunday we no longer monitored.

16   As of the 26th of December, we monitored from 8:00 a.m. to

17   9:00 p.m.  That was on the 26th and 27th.

18           The 28th we monitored from 8:00 a.m. until 16:30

19   hours.  We did not monitor the 29th and 30th.  The 31st we

20   monitored from 8:00 a.m. to 5:00 p.m.  We did not monitor on

21   January 1.  And then the remaining days that was monitored

22   was no later from 8:00 a.m. to no later to 17:00.  The last

23   two days were 4:00 in the afternoon.

24       Q     During the time, the thirty days that you were

25   monitoring what was going on inside the massage room, how

Page 101

1    many times did you monitor an individual going into the

2    massage room receiving some kind of service?

3        A    That was 145.

4        Q    Of those 145, how many of those involved sex acts?

5        A    142.

6        Q    I think you have already said that the three that

7    didn't involve sex acts, two of those were actually repeat

8    customers who had previously or subsequently involved in a

9    sex act?

10       A    Yes, sir.

11       Q    And there was one individual that didn't come back

12   that was not involved in a sex act?

13       A    Yes, sir.

14       Q    Of the 142 sex acts that you were observing, how

15   many of those sex acts began with a massage, a regular

16   massage?

17       A    Eighty-three.

18       Q    How many of those sex acts involved a sex act

19   occurring first?

20       A    Fifty-nine.

21       Q    So the majority of the time people received a

22   legitimate massage and then a sex act followed?

23       A    Yes, sir.

24       Q    Yet there were fifty -- I am sorry.  How many?

25       A    Fifty-nine.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 102

1      Q      Fifty-nine different times when people came and

2   just had the sex act up front.  Was that then followed by a

3   massage?

4      A      Some the sex act was up front and then followed by

5   a massage and some they came and just received a sex act.

6            MR. BUTLER:  Thank you, Judge.

7            THE COURT:  Any redirect, Mr. Metcalf?

8                      REDIRECT EXAMINATION

9   BY MR. METCALF:

10     Q      As far as you mentioned being next door, and we

11  are talking about, I want to talk about specifically when

12  the cameras are being installed.  So the times you were next

13  door in that office building?

14     A      Yes, sir.

15     Q      Not with the guys installing the cameras?

16     A      Correct.

17     Q      A lot of the time you were outside with the women?

18     A      Yes.

19     Q      Distracting them?

20     A      Yes.

21     Q      That was your job, to kind of dupe them while the

22  guys were in there installing the cameras?

23     A      Yes, sir.

24     Q      Is that correct?

25     A      Yes.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 103

1      Q    As far as you eluded to the fact that a lot of

2   this was only visited by men during that twenty-one-day

3   period?

4      A    Yes, sir.

5      Q    Did you guys look at what the national average is

6   on how many men go to spas as opposed to women?  Was that

7   something abnormal?

8      A    The fact that there was no women clientele at all,

9   I found that abnormal.  Yes.

10     Q    Based on what?  Just your personal gut?

11     A    Just based on I believe common knowledge that both

12  sexes receive massages.

13     Q    That debit card, whether what it was purchased

14  for, you knew there was a debit card and you knew it was

15  used at Wal-Mart.  And you had subpoena power with Wal-Mart

16  to theoretically get those records.  Right?

17     A    Yes, sir.

18     Q    And you later did get those records on that debit

19  card, didn't you?

20     A    Yes, sir.

21     Q    By this time, the use of this debit card and

22  through your surveillance, you knew there were two

23  undercover visits?

24     A    Yes, sir.

25     Q    Two men who had gone in there.  So you knew there

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 104

1   was prostitution going on?

2        A    Yes, sir.

3             MR. METCALF:  Nothing further.

4             THE COURT:  Any other defense lawyers have any

5   other questions?  May this witness be excused?

6             MR. METCALF:  Judge, I would ask him to stick

7   around.

8             THE COURT:  Okay.  If you will wait in the

9   hallway, sir.  Do not discuss your testimony with anybody.

10  Call your next witness.

11                      (END OF VOLUME I OF II)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 244

Page 105

1    STATE OF FLORIDA          )
                               :  SS
2    COUNTY OF INDIAN RIVER    )

3

4                              CERTIFICATE

5

6          I, KATHY DUNCOMBE, a Shorthand

7     Reporter and Notary Public of the State of Florida

8    at Large, do hereby certify that I was authorized to and

9    did report stenographically the foregoing proceedings and

10   that the transcript is a true and correct transcription of

11   those proceedings.

12         DATED this 24th day of April, 2019.

13

14   _Kathy Duncombe_
     KATHY DUNCOMBE

15

16

17

18

19

20

21

22

23

24

25

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Filing # 92852289 E-Filed 07/19/2019 02:36:41 PM

Page 106

IN THE CIRCUIT COURT OF THE
NINETEENTH JUDICIAL CIRCUIT
IN AND FOR INDIAN RIVER COUNTY
STATE OF FLORIDA

VOLUME II OF II

STATE OF FLORIDA,

  Plaintiff,

vs.

| | |
|---|---|
| JOVANY AGUILERA | CASE NO.: 3119MM393A |
| MOHAMMED TURKI ALHARBI | CASE NO.: 3119MM404A |
| FUAD S. ALJADAANI | CASE NO.: 3119MM572A |
| GARRETT M. ALLEN | CASE NO.: 3119MM561A |
| JOSEPH R. ANGLESANO | CASE NO.: 3119MM366A |
| GREGORY ARNONE | CASE NO.: 3119MM367A |
| JUSTIN L. BAUER | CASE NO.: 3119MM421A |
| DAVID RAY BLACK | CASE NO.: 3119MM350A |
| JON BROECKER | CASE NO.: 3119MM353A |
| DONALD SCOTT BROWN | CASE NO.: 3119MM355A |
| PATRICK VINCENT BROWN | CASE NO.: 3119MM392A |
| PAUL DENNIS BROWNING | CASE NO.: 3119MM357A |
| SCOTT BUESCHER | CASE NO.: 3119MM369A |
| VANDERLEI CASTRO | CASE NO.: 3119MM432A |
| WILLIAM ERVIN CHANCELLOR | CASE NO.: 3119MM436A |
| JEFFREY CHANDLER | CASE NO.: 3119MM480A |
| DAVID CLARK | CASE NO.: 3119MM368A |
| KEVIN COYNE | CASE NO.: 3119MM372A |
| JOHN CRAIN | CASE NO.: 3119MM371A |
| LOUIS R. CROOK | CASE NO.: 3119MM417A |
| FRANK DE LISI | CASE NO.: 3119MM397A |
| CLAUDIO DE OLIVEIRA | CASE NO.: 3119MM387A |
| OTTAVIO FRANCESO DIDOMENCIO | CASE NO.: 3119MM379A |
| WALTER L. DIXON, II | CASE NO.: 3119MM445A |
| ISIAH DRISDOM | CASE NO.: 3119MM330A |
| MANUEL ESQUIVEL | CASE NO.: 3119MM422A |
| WILLIAM ESTES | CASE NO.: 3119MM399A |
| WILLIAM ESTES, JR. | CASE NO.: 3119MM395A |
| JON FOREST | CASE NO.: 3119MM385A |
| ROBERT FREELS | CASE NO.: 3119MM328A |
| ROMAN GAMEZ | CASE NO.: 3119MM389A |
| STEPHEN GEARY | CASE NO.: 3119MM337A |
| VITO C. GIOIA | CASE NO.: 3119MM412A |
| RICHARD GOLLILNGE | CASE NO.: 3119MM406A |
| MICHAEL GRIGGS | CASE NO.: 3119MM420A |

00267179-acac-40ed-90b6-273d293d8722

J.A. 246

STATE OF FLORIDA VS. ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL   DCA CASE NO. 4D19-1655, ET AL

Page 107

```
 1    CARL GUIDICE, JR.             CASE NO.: 3119MM334A
      NEAL ALLEN HAGER             CASE NO.: 3119MM449A
 2    MARK D. HASSETT              CASE NO.: 3119MM333A
      DAVID F. HEALY               CASE NO.: 3119MM348A
 3    JOSEPH E. HENDRICKS, JR.     CASE NO.: 3119MM405A
      RANDY HINES                  CASE NO.: 3119MM560A
 4    MICHAEL W. HUCKS             CASE NO.: 3119MM410A
      JOSEF JORG                   CASE NO.: 3119MM345A
 5    HARRY RICHARD KAPLAN         CASE NO.: 3119MM343A
      HAROLD E. KEMP               CASE NO.: 3119MM342A
 6    LOUIS G. KIRBY               CASE NO.: 3119MM339A
      MARK LOUIS KIRK              CASE NO.: 3119MM438A
 7    JOHN DAVID KOSTYLA           CASE NO.: 3119MM336A
      KEVIN LAPHAM                 CASE NO.: 3119MM384A
 8    SHUN LEE                     CASE NO.: 3119MM402A
      ALAN LHOTA                   CASE NO.: 3119MM394A
 9    RONG LI                      CASE NO.: 3119MM398A
      JAMES LUNDEEN                CASE NO.: 3119MM391A
10    KENNETH M. MAKSYM            CASE NO.: 3119MM373A
      JAMES MARCIL                 CASE NO.: 3119MM426A
11    GERARD MAZZA                 CASE NO.: 3119MM424A
      CLEMENT MCBRIDE              CASE NO.: 3119MM419A
12    PETER MCBRIDE                CASE NO.: 3119MM415A
      CLARENCE MCCLAIN             CASE NO.: 3119MM409A
13    JOHN MCCULLEY                CASE NO.: 3119MM451A
      TERRY ALFRED MERWIN          CASE NO.: 3119MM354A
14    BARRY MILLS                  CASE NO.: 3119MM428A
      JOSEPH RAY MOYER             CASE NO.: 3119MM484A
15    BRIAN K. OLAISEN             CASE NO.: 3119MM411A
      ADAM READ PALMA              CASE NO.: 3119MM413A
16    JONATHAN PESHKE              CASE NO.: 3119MM358A
      KENNETH PHILLIPS, JR.        CASE NO.: 3119MM407A
17    NEIL POWERS                  CASE NO.: 3119MM378A
      BRUCE PURPLE                 CASE NO.: 3119MM490A
18    ANTHONY RANDAZZO             CASE NO.: 3119MM433A
      GREGORY ALAN READER          CASE NO.: 3119MM376A
19    BILL MICHAEL RIZKALLAH       CASE NO.: 3119MM562A
      PAUL A. RODLIFF              CASE NO.: 3119MM554A
20    CONNER THOMAS RUF            CASE NO.: 3119MM556A
      SHAWN ROBERT RYAN            CASE NO.: 3119MM338A
21    WILLIAM SAUNDERS             CASE NO.: 3119MM388A
      MICHAEL SEARS                CASE NO.: 3119MM441A
22    MARK PATRICK SPERO           CASE NO.: 3119MM383A
      KEITH ALLAN TAIG             CASE NO.: 3119MM365A
23    JOHN W. TAYLOR               CASE NO.: 3119MM447A
      SCOTT L. TAYLOR              CASE NO.: 3119MM359A
24    LUIS R. VEGA                 CASE NO.: 3119MM352A
      GEORGE TIMOTHY WARD          CASE NO.: 3119MM361A
25    CHARLES WATERHOUSE           CASE NO.: 3119MM454A
```

00267179-acac-40ed-90b6-273d293d8722

J.A. 247

Page 108

| | | |
|---|---|---|
| 1 | HANS WEDE | CASE NO.: 3119MM459A |
| | KENNETH WESSELL | CASE NO.: 3119MM347A |
| 2 | JAMES L. WEST | CASE NO.: 3119MM340A |
| | BRUCE JAMES WICKERS | CASE NO.: 3119MM335A |
| 3 | DEANGILO LARAYE WILLIAMS | CASE NO.: 3119MM400A |
| | MARK YOUSSEF | CASE NO.: 3119MM363A |

4

 Defendants.

5  _____/

6

7                TRANSCRIPT OF HEARING PROCEEDINGS

8                      MOTION TO SUPPRESS

9                THIS CAUSE came on for hearing before

10      the Honorable Nicole P. Menz, Judge of the

11      above court at the Indian River County

12      Courthouse, Vero Beach, Florida, on the 23rd

13      day of April, 2019.

14

15

16

17

18

19

20

21

22

23

24

25

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 248

STATE OF FLORIDA VS ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL   DCA CASE NO. 4D19-1655, ET AL

```
                                                          Page 109
 1   THE APPEARANCES were as follows:
 2   FOR PLAINTIFF:   Office of the State Attorney
                      2000 16th Avenue
 3                    Vero Beach, Florida 32960
                      BY:  Steven R. Wilson, Esquire
 4                         Levering Evans, Esquire
                           Ryan L. Butler, Esquire
 5
     FOR DEFENDANT:   Adam Chrzan, Attorney at Law
 6                    1443 20th Street, Suite F
                      Vero Beach, Florida 32960
 7                    BY:  Adam Chrzan, Esquire
 8   FOR DEFENDANT:   The Law Offices Of David Golden, P.A.
                      903 SE Central Parkway
 9                    Stuart, Florida 34994
                      BY: David Golden, Esquire
10
     FOR DEFENDANT:   Law Office of Bobby Guttridge
11                    1601 20th Street
                      Vero Beach, Florida 32960
12                    BY:  Bobby D. Guttridge, Esquire
13   FOR DEFENDANT:   Thomas A. Kennedy, P.A.
                      1426 21st Street
14                    Vero Beach, Florida 32960
                      BY:  Thomas A. Kennedy, Esquire
15
     FOR DEFENDANT:   The Kessler Law Firm
16                    101 North US Highway 1, Suite 200
                      Fort Pierce, Florida 34950
17                    BY:  Michael J. Kessler, Esquire
18   FOR DEFENDANT:   Kibbey Wagner
                      416 Camden Avenue
19                    Stuart, Florida 34994
                      BY:  Richard Kibbey, Esquire
20
     FOR DEFENDANT:   Margaret Keys McCain, P.A.
21                    1605 19th Place
                      Vero Beach, Florida 32960
22                    BY:  Margaret K. McCain, Esquire
23   FOR DEFENDANT:   Wayne R. McDonough, P.A.
                      1901 25th Street
24                    Vero Beach, Florida 32960
                      BY:  Wayne R. McDonough, Esquire
25
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 249

STATE OF FLORIDA VS ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL    DCA CASE NO. 4D19-1655, ET AL

Page 110

```
 1
 2   FOR DEFENDANT:    Green & Metcalf, P.A.
                       1245 20th Street
 3                     Vero Beach, Florida 32960
                       BY:  Andrew B. Metcalf, Esquire
 4
     FOR DEFENDANT:    Law Office of Edward J. Mosher, P.A.
 5                     210 South Depot Drive
                       Fort Pierce, Florida 34950
 6                     BY:  Edward J. Mosher, Esquire
 7   FOR DEFENDANT:    Ohle & Ohle
                       423 Delaware Avenue
 8                     Fort Pierce, Florida 34950
                       BY:  Michael R. Ohle, Esquire
 9
     FOR DEFENDANT:    John H. Power, attorney at Law
10                     2182 Ponce De Leon Circle
                       Vero Beach, Florida 32960
11                     BY:  John H. Power, Esquire
12   FOR DEFENDANT:    Sercombe Law
                       601 21st Street, Suite 300
13                     Vero Beach, Florida 32960
                       BY:  Daniel Sercombe, Esquire
14
     FOR DEFENDANT:    Stone & Stone
15                     1964 14th Avenue
                       Vero Beach, Florida 32960
16                     BY:  Robert E. Stone, Esquire
17   FOR DEFENDANT:    Law Office Kenneth N. Weaver
                       2285 West Eau Gallie Boulevard
18                     Melbourne, Florida 32935
                       BY:  Kenneth N. Weaver, Esquire
19
     FOR DEFENDANT:    Steve Ziskinder Law Office, P.A.
20                     311 S 2nd Street, Suite 102B
                       Fort Pierce, Florida 34950
21                     BY:  Steve Ziskinder, Esquire
22
23
24
25
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 250

Page 111

1                       I N D E X

2    VOLUME I.......................................Page 1

3    WITNESS

4     KEITH TAIG
       Direct Examination by Mr. Metcalf............Page 17
5

     OFFICER SEAN CROWLEY
6      Direct Examination by Mr. Metcalf............Page 29
       Cross-Examination by Mr. Ziskinder...........Page 88
7      Cross-Examination by Mr. Sercombe............Page 89
       Cross-Examination by Mr. Golden..............Page 90
8      Cross-Examination by Mr. Kennedy.............Page 91
       Cross-Examination by Mr. Kibbey..............Page 94
9      Cross-Examination by Mr. Butler..............Page 97
       Redirect Examination by Mr. Metcalf..........Page 102
10

     VOLUME II......................................Page 106
11

     JOHN PEDERSEN
12     Direct Examination by Mr. Metcalf............Page 125

13   CHIP BROCK
       Direct Examination by Mr. Metcalf............Page 128
14     Cross-Examination by Mr. Guttridge...........Page 140
       Redirect Examination by Mr. Metcalf..........Page 142
15

     CARLA SUTHERLAND
16     Direct Examination by Mr. Metcalf............Page 144

17   KYLE EDER
       Direct Examination by Mr. Metcalf............Page 148
18     Cross-Examination by Mrs. McCain.............Page 155
       Cross-Examination by Mr. Sercombe............Page 157
19     Cross-Examination by Mr. Golden..............Page 158
       Cross-Examination by Mr. Chrzan..............Page 161
20     Cross-Examination by Mr. Golden..............Page 162
       Cross-Examination by Mr. Kessler.............Page 163
21

     MICHAEL GASBARRINI
22     Direct Examination by Mr. Metcalf............Page 165
       Cross-Examination by Mr. Guttridge...........Page 184
23     Cross-Examination by Mr. Kennedy.............Page 186
       Cross-Examination by Mr. Chrzan..............Page 190
24

     CERTIFICATE OF REPORTER........................Page 105
25                                                   Page 218

00267179-acac-40ed-90b6-273d293d8722

STATE OF FLORIDA VS ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL   DCA CASE NO. 4D19-1655, ET AL

Page 112

1

2

3                    EXHIBITS ADMITTED INTO EVIDENCE

4    Defendant's Exhibit No. 1.......................Page 36
     Defendant's Exhibit No. 2.......................Page 36
5    Defendant's Exhibit No. 3.......................Page 36
     Defendant's Exhibit No. 4.......................Page 36
6    Defendant's Exhibit No. 5.......................Page 41
     Defendant's Exhibit No. 6.......................Page 97
7    Defendant's Exhibit No. 7.......................Page 97

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 252

Page 113

1       (The above-entitled hearing continued as follows in

2    Volume II.)

3           MR. METCALF:   Judge, at this time before we go any

4    further, under State v. Morris, 622 So. 2d 67, it is a

5    Fourth District Court of Appeals case.   I can provide it to

6    the Court and Mr. Butler a copy.

7           THE COURT:   Can you just give me the cite again?

8           MR. METCALF:   622 So. 2d 67.   The companion case

9    to that is Vargas which is a Supreme Court of Florida case,

10   667 So. 2d 175.   Your Honor, I direct you to footnote 3 on

11   Morris on the first page, but it goes onto the second page

12   which is actually page 68 of the opinion.

13          Basically while a police officer waited in a

14   separate room, it did not take part in the search or take

15   custody of the records.   That is a search for records, but

16   933.02 deals with search warrants and what you have to do.

17          You can't go and apply for a search warrant and be

18   the affiant and then have nothing to do with execution.   The

19   execution of this warrant, Judge, was the installation of

20   the cameras.   That was the execution.   They were

21   installing cameras.

22          It had to be done in such a way as to minimize the

23   invasion of privacy and to follow the exact prescription of

24   the order.   That is what happened in this case.

25          They went in and searched a doctor's office.   The

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 114

1    officer waited in a separate room and let the solicitor

2    general do the search.  The Court said, the Fourth DCA said,

3    no, you can't do that.  You were the one who applied.  You

4    are the one who asked for the search warrant.  And you are

5    the one authorized to execute the search warrant.

6            The delay here, Judge, the search is when they

7    installed the camera.  The notification comes later.  He

8    didn't have anything to do really with the installation of

9    those cameras.  I just asked him five times.

10           He was in the room next door.  He was outside as

11   the dupe.  He was the guy faking out the women.  He had

12   nothing to do.  He wasn't in there supervising.  And you

13   can't delegate that to anyone else.  He had to be there to

14   make sure the order was followed.  He can't let the

15   Department of Homeland Security do it.  He cut them loose.

16   He can't do it.

17           Under Morris, the prescription for the cure for

18   this is suppression.  The warrant is gone.  It is not a

19   wishy-washy case, Judge.  In that case, under 933.08 it

20   provides search warrants to be served by officers mentioned

21   therein.  These guys weren't mentioned in the application.

22   They weren't the affiants.

23           The search warrant shall in all cases be served by

24   any of the officers mentioned in its discretion, in its

25   direction.  No one else was authorized in the order.  No

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 254

Page 115

1    one, but by no one other person except in the aid of the

2    officer requiring it.

3           That is what is written in there, but Morris goes

4    on to say if you delegate the authority of other people,

5    that is the end of it.  So he did exactly that.  He went

6    outside and tricked these women into coming outside with

7    him, hung out with them while he delegated it to the

8    Department of Homeland Security.  They are not mentioned

9    anywhere in this order as being authorized to install or to

10   execute the warrant.  So I would say we stop right here and

11   that is the end of it under Morris.

12          THE COURT:  State?

13          MR. BUTLER:  Florida Statute 933.08 specifically

14   says that officers who are serving the warrant can be aided

15   by other officers, other people.  That is exactly what

16   Detective Crowley said.  He was present.  He served the

17   warrant.  He was inside the actual building.  He was

18   outside.  He was next door.  He was clearly there.  He was

19   conducting the search.  He was serving it.  He was aided by

20   I think he said technicians from Homeland Security who were

21   crawling around in the ceiling installing the cameras.  That

22   is complete authorized by the statute.

23          MR. METCALF:  Judge, Morris interprets the

24   statute, and it is a Fourth District Court of Appeals case.

25          THE COURT:  What about the paragraph on the bottom

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 255

Page 116

1   of page 3?  Obviously, I just was handed this case so I am

2   only looking at it for the first time.

3           But in the first column at the bottom where it

4   says under the statute it essentially says that the person

5   who authorizes the warrant must participate in or supervise

6   the search even where he requires the assistance of others

7   to do so.  Isn't that exactly what happened here?

8           MR. METCALF:  Judge, if you are outside, you are

9   not supervising the search.  That is exactly right.  He must

10  participate in or supervise.

11          THE COURT:  Right.  So isn't his presence being

12  there, would that not be supervising others or assisting him

13  with the installation?

14          MR. METCALF:  Judge, if you look at the Morris

15  case, what he did is he went there and he said to the

16  solicitor general or whoever it was I will wait in another

17  room.  That is exactly --

18          THE COURT:  He didn't say that.  I don't think

19  there was any testimony that the detective said that.

20          MR. METCALF:  Judge, he left the room.  How do you

21  supervise from outside?  How do you participate in the

22  installation of cameras from outside?  What we are talking

23  about, Judge, is --

24          THE COURT:  I can think of a number of ways you

25  can participate.  You can have a discussion about how you

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 256

Page 117

1  are going to install those cameras.  The person installing

2  the cameras can come back and say this is how we installed

3  those cameras.  I can think of any number of ways you could

4  participate in the execution of the installation of

5  the cameras.

6          MR. METCALF:  Judge, I would ask the Court to

7  examine carefully that case.  It appears that he showed up

8  that day.  He was there and then basically turned over the

9  search to other people and went into another room.  I am

10  sure he could have had discussions, too, about what they

11  were going to look for and what to do, but that is not what

12  the Court says.

13          The Court distinguished it when you leave the room

14  and turn it over to someone to execute your warrant and you

15  are not in the same room, that is it.  Vargas is the same

16  exact thing in a Supreme Court setting, your Honor.

17          THE COURT:  Mr. Butler, any additional argument?

18          MR. BUTLER:  No, Judge.

19          THE COURT:  I don't think Statute 933.08 and the

20  Morris case states the proposition that you are proposing,

21  Mr. Metcalf.  So I am going to deny your request to grant

22  the motion to suppress at this time under those reasons,

23  sir.

24          MR. METCALF:  Your Honor, I think Mr. Butler

25  referred to Mesa-Ricon.  Again, he simply answered the

00267179-acac-40ed-90b6-273d293d8722

Page 118

1    Fourth Amendment allows us to install cameras.  I take great

2    issue with that statement, but the specific Mesa-Ricon is a

3    Tenth Circuit Case that derives, it sets the standard for

4    the five things that must be present if you are going to use

5    video.  It is the only case that I know of that specifically

6    deals with that on a Federal level.

7            It derives its authority from United States

8    Code 18, Chapter 119, section 2516 which is the

9    authorization of a wiretap.  Your Honor, Mesa-Ricon doesn't

10   exist without an authorizing statute.  That case would not

11   be able to -- it doesn't exist without it.  So it draws from

12   that.

13           2516 on the Federal level requires that the

14   warrant be authorized in writing by in this case the

15   Attorney General, the Deputy Attorney General, the Associate

16   Attorney General or any Assistant Attorney General.  It goes

17   through a list of that.

18           Florida, if we are going to allow this kind of

19   behavior in Florida by the government to go in and tape, we

20   are going to be making new case law I guess because

21   Mesa-Ricon is the Federal.  So here the State is analogous

22   authority going to 934.  934 requires the State Attorney in

23   wiretap cases to in writing authorize applications.

24           So Mr. Butler cannot just get away with saying the

25   Fourth Amendment.  Mesa-Ricon, there is only one case out

00267179-acac-40ed-90b6-273d293d8722

J.A. 258

Page 119

1    there that authorizes surreptitious video surveillance, and

2    that is it.  And it derives it from an enacting statute in

3    the Federal law.

4            Here, we are in the State of Florida now.  934 is

5    the enacting statute.  It requires Bruce Colton, only Bruce

6    Colton to authorize in writing this application.  It was not

7    done here.  That is the testimony that has been elicited.

8            The State doesn't get to pick and choose and throw

9    out, hey, we are allowed to do this and you guys figure out

10   why.  The Fourth Amendment doesn't give them permission to

11   do this, Judge.  They have to have an authority.  And that

12   is the only possible authority they can draw on.

13           So I am asking the Court to grant the motion to

14   suppress at this time citing 2516 as the acting authority

15   for Mesa-Ricon and 934 for the state wiretap statute.  It is

16   the only possibly enacting statute.

17           THE COURT:  State, your response?

18           MR. BUTLER:  Are we done with the evidentiary

19   portion?

20           MR. METCALF:  No.

21           MR. BUTLER:  I prefer to -- I think for purposes

22   of the record, it is more work for us.  I think that

23   submitting a written closing, a written brief at the end,

24   apply case law would be a better practice than doing

25   piecemeal.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 120

1          THE COURT:  I think Mr. Metcalf is trying to

2    shorten the motion to suppress by indicating it should be

3    granted at this time based on the testimony that we have

4    already heard under Mesa.  Right?

5          MR. METCALF:  Yes.  And I am also trying to figure

6    out what direction to go with witnesses because the State,

7    with all due respect to Mr. Butler, the game they are

8    playing is we don't have to tell you why we are authorized

9    to do this.  They can solve the whole mystery if they tell

10   us under what authority do they think they can put video

11   cameras in a place where people have a right of privacy.

12         MR. BUTLER:  Mesa-Ricon which is a Tenth Circuit

13   Case, and there are other numerous other Federal Appellate

14   Court cases that talk about the use of covert surveillance

15   cameras that don't capture audio.  But what Mesa-Ricon talks

16   about and they discuss this is that Title 3 which is the

17   Federal Wiretap Code provision doesn't apply to non-audio

18   surveillance.

19         But they do say in the opinion that nevertheless,

20   the general Fourth Amendment requirements are still

21   applicable to video surveillance and suppression is required

22   when the government fails to follow these requirements.

23         So then what the Court does is the Court says

24   let's figure out what provisions the Fourth Amendment

25   requires for video surveillance.  And they look to some of

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 260

Page 121

1    the provisions in the wiretap statutes for guidance such as

2    the provision that the applicant show that they used other

3    investigative methods short of installing the cameras.  So

4    they adopt that.  In fact, what they say is that we adopt.

5    We adopt these five requirements.

6           So they are not saying that suddenly Title 3

7    applies.  In fact, they are saying the opposite, that Title

8    3 does not apply.  Chapter 934 is virtually identical to

9    Title 3, but there are numerous provisions in 934 that go to

10   wiretaps.  They don't all apply to video surveillance.

11          The general constitutional principles that the

12   Ricon Court adopted seemed to be what the Federal Courts say

13   should apply when you are dealing with a covert video

14   surveillance camera.  It still goes back to the Fourth

15   Amendment.

16          So this idea that there is a reliance on Chapter

17   934 is incorrect.  That is not what the case says.  In fact,

18   there is a Florida case.  It is Paul Minotty v. Baudo;

19   B-A-U-D-O.  It is 42 So. 3d 824, a Fourth DCA from 2010

20   where the Fourth DCA dealt with the issue of a surveillance

21   camera that was installed in a business that did not -- it

22   wasn't supposed to record audio.

23          And what the Court said, I will go to the actual

24   page number here.  I am looking at page 832 of the opinion.

25   We agree with our sister circuits and they are quoting from

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 261

Page 122

1    United State v. Larios which is a First Circuit Court of

2    Appeals case.  We agree with our sister circuits that by

3    explaining meaning the text of Title 3 does not apply to

4    silent video surveillance.

5         There is no question that every requirement of 934

6    Title 3 doesn't apply to video surveillance.  What does

7    apply are general Fourth Amendment principles which the rack

8    case lays out pretty well, the ones that they have adopted.

9         MR. METCALF:  Judge, in Ricon, No. 5 in it, the

10   order does not allow the period of interception to be longer

11   than necessary to achieve the objective of the authorization

12   or in any event no longer than thirty days.

13        934, the State is saying Ricon is cherrypicking

14   what it wants out of the wiretap statute when the case is

15   riddled with just saying, look, factually, this is more

16   intrusive than wiretaps.  The safeguards that are in place

17   for wiretaps, this is even worse to take someone's video.

18   You are audio recording someone here.  They are taking

19   images of naked people.  What more invasiveness could you

20   be.

21        Ricon codifies, puts into their five-step

22   procedure, Judge, that that is the order that has to have

23   that limiting instruction.  It is written within 934 that

24   you have to have it.  If you don't have it, and there are

25   cases dealing with wiretaps that if you don't have that

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 123

1   language in there, if you just put a thirty-day cap, that

2   defeats the warrant.  Ricon doesn't extinguish the

3   safeguards of 2316.  It amplifies them.  The State is

4   saying, hey, if you get these five things of Ricon, that is

5   all you need, but you still have to look at the authorizing

6   analogous statutes because those are there to protect us.

7          Ricon doesn't just eliminate those protections.

8   There is no law.  So Ricon is just an interpretation.  They

9   basically begged the Federal Government, I think, in their

10  wording to pass a law if they want to.  Until then they are

11  borrowing from the wiretap statute.  That is what Ricon is

12  all about.

13         Ricon is not necessarily controlling here.  This

14  is the State of Florida.  We have Article 1, section 23.

15  And we have a specific right of privacy in this state.

16  Article 1, section 12, you can't ignore the Fourth

17  Amendment, but Judge, Ricon is an amplification of enacting

18  statutes that govern wiretap.

19         Here, there is reasons that you have the State

20  Attorney do it.  They didn't do that.  These guys were cut

21  loose.  And they submitted an order that is just some

22  generic junk.  We are talking about invading the right of

23  privacy of people in the most intimate setting.  And Ricon

24  only deals with -- also is not controlling over this case

25  because it deals with a medium level of the right to

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

                                                    Page 124

1    privacy, just a medium level.  We have a high level here.

2    This was an office.  This is a massage place.

3           I disagree with Mr. Butler that you can ignore the

4    governing statutes because that is what Ricon looked to.

5           THE COURT:  Mr. Butler, did you want to make any

6    further argument?

7           MR. BUTLER:  No, your Honor.

8           THE COURT:  I am not going to grant the motion to

9    suppress at this point.  I will take that point under

10   advisement.  I do know the State wants to submit some case

11   law with to that.  So for purposes of the hearing --

12          MR. METCALF:  We will plod on.  Judge, could we

13   call John Pedersen?

14          THE COURT:  Would you raise your right hand.

15   Do you swear or affirm that the testimony you are about to

16   give is the truth, the whole truth and nothing but the

17   truth?

18   AND THEREUPON,

19                        JOHN PEDERSEN,

20       Called as a witness on behalf of the Defendants

21       herein, after having been first duly sworn, was

22       examined and testified as follows:

23                    DIRECT EXAMINATION

24          THE WITNESS:  I do.

25          THE COURT:  Thank you, sir.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

STATE OF FLORIDA VS ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL   DCA CASE NO. 4D19-1655, ET AL

Page 125

1    BY MR. METCALF:

2         Q    Sir, can you state your name.

3         A    John Pedersen.

4         Q    You are employed at the Vero Beach Police

5    Department?

6         A    I am.

7         Q    What is your role?

8         A    I am the supervisor of the detective division,

9    lieutenant.

10        Q    With regards to this case that revolves around the

11   investigation arrest arising out of conduct at East Spa, did

12   you supervise in that investigation?

13        A    I was, and I was assisted by Sergeant Phil Huddy.

14        Q    Was there anyone above you other than the Chief of

15   Police?  Was the State Attorney involved in the

16   investigation?

17        A    We received assistance from the State Attorney's

18   Office.  I reported to my captain, Captain Kevin Martin and

19   Chief David Curry.

20        Q    Who did you receive assistance from at the State

21   Attorney's Office?

22        A    We met with ASA Ryan Butler and Steve Wilson and I

23   believe there was ASA Hendriks.

24        Q    Were you working in concert with Indian River

25   County Sheriff's in their investigation going on as well?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 265

Page 126

1    Were you familiar with that?

2         A    We were not working their case.

3         Q    Were you guys reporting back and forth to each

4    other about your finding and what was going on?

5         A    What is your exact question?

6         Q    Were you and the sheriff liaisoning back and forth

7    about what was happening in your case?

8         A    I was not, no.  I mean, some of my detectives

9    might have had conversations with other detectives, but, no,

10   I was not meeting with other sheriff's department detectives

11   and asking them about their ongoing case.

12        Q    The application and orders, there are two

13   applications for search warrant executed by Vero Beach

14   Police Department.  There is two orders authorizing the

15   search warrant.  Did you have any supervisory role in

16   drafting those applications or orders?

17        A    No, I did not.  The detectives, they drafted the

18   orders and they took them to the State Attorney's Office.

19        Q    Do you know how they drafted them?  Did they type

20   them out or did they cut and past them from some other

21   order?

22        A    I don't know.  They would have typed the order and

23   taken them to the State Attorney's Office for approval and

24   then to a Judge.

25        Q    As far as your active role in the investigation,

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 127

1   did you have any like on a day-to-day basis with monitoring

2   or following witnesses, anything like that?

3       A    On a day-to-day basis I monitored the case.  On

4   some days I assisted with field surveillance.  I followed

5   suspects, persons of interest.  I assisted other detectives.

6   I reviewed reports.

7       Q    Did you apply for any subpoenas or for records or

8   anything like that?

9       A    No, I did not.

10      Q    You actively covertly followed people, like tailed

11  them in your car?

12      A    As best as I can in the unmarked police car that I

13  have.  I don't know how covert it was, but, yes, I do follow

14  people in my unmarked police car.

15      Q    Were you present the day the video was installed?

16      A    I was not present on scene.

17      Q    Were you present the day that the notification was

18  provided and the arrests were made at the spa?

19      A    Was I present at East Spa on the date that the

20  warrant was served?

21      Q    Right.

22      A    I was at the bank that morning on February 19.  I

23  later went to East Spa that morning while our officers were

24  still there conducting the search and arrest warrant.

25          MR. METCALF:  Nothing further.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

STATE OF FLORIDA VS ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL   DCA CASE NO. 4D19-1655, ET AL

Page 128

1          THE COURT:  No other attorneys have questions?

2   Mr. Butler?

3          MR. BUTLER:  No questions.

4          THE COURT:  May this witness be excused?

5          MR. METCALF:  Yes.

6          THE COURT:  Thank you.  You may go about your day.

7          MR. METCALF:  I call Detective Chip Brock.

8          BAILIFF:  What was the last name, sir?

9          MR. METCALF:  Brock.

10          THE COURT:  Would you raise your right hand.

11   Do you swear or affirm that the testimony you are about to

12   give is the truth, the whole truth and nothing but the

13   truth?

14   AND THEREUPON,

15                    CHIP BROCK,

16      Called as a witness on behalf of the Defendants

17      herein, after having been first duly sworn, was

18      examined and testified as follows:

19                  DIRECT EXAMINATION

20          THE WITNESS:  I do.

21          THE COURT:  You may have a seat.

22   BY MR. METCALF:

23      Q    Good afternoon, sir.

24      A    Good afternoon.

25      Q    Good morning.  Can you state your name.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 268

Page 129

1       A       Detective Chip Brock.

2       Q       You are a detective obviously with the Vero Beach

3   Police Department?

4       A       Yes, sir, I am.

5       Q       You were employed back last year during the

6   investigation of East Spa?

7       A       Yes.

8       Q       It is our understanding that you went in East Spa

9   as an undercover?

10      A       Yes, sir, I did.

11      Q       You went to East Spa.  Did you arrive in your

12  personal vehicle or an unmarked car?

13      A       It was an unmarked.

14      Q       How were you dressed?

15      A       I was dressed I believe in shorts and a T-shirt I

16  think is what it was.

17      Q       Were you aware that East Spa existed prior to

18  this?

19      A       No, sir.

20      Q       When you were brought into this, were you part of

21  the investigation ongoing or did they bring you in to be an

22  undercover?

23      A       I was the undercover.  I did some surveillance

24  after that.

25      Q       What kind of surveillance did you do after your

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

Page 130

1   undercover?

2       A    Just sitting in the parking lot just observing

3   cars coming and going.

4       Q    Preparing applications and warrants, you had

5   nothing to do with that.  Right?

6       A    No, sir, I did not.

7       Q    In the day-to-day operations of the investigation,

8   you had no supervisory role or anything like that?

9       A    No, sir.

10      Q    As far as September 14 and September 18, those are

11  the dates you went in as an undercover?

12      A    Yes, sir.

13      Q    You go in, and you are wearing shorts and T-shirt?

14      A    Something like that.  Street clothes.

15      Q    Were you familiar at this time with who you

16  thought would be inside of the spa?

17      A    Yes, sir.

18      Q    Who were you told would be in there?

19      A    I was told it was going to be Lanfen Ma.

20      Q    Were you provided a photograph of her?

21      A    Yes, sir.  Her driver's license.

22      Q    Anyone else?

23      A    Not that day it wasn't.  That day it was Lanfen Ma

24  is who I was told.

25      Q    When you went there, was there any other female

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 270

Page 131

1    present?

2         A    I didn't see anyone else.  When I first walked in,

3    I heard Lanfen Ma speak to someone else.  There was like a

4    curtain, and someone was behind the curtain.  I heard her

5    speak to someone.

6         Q    You were not told about Ms. Zhang?

7         A    I had, but I don't know the exact if it was during

8    that time or if it was that or what.

9         Q    I guess for the record Liyan Zhang?

10        A    Yes, it was -- I don't know how you say it.  Zhang

11   is the last name.

12        Q    So those are the two people that you thought could

13   be there?

14        A    Yes.

15        Q    Were you told to ask for Lanfen Ma?

16        A    No, sir.

17        Q    When I asked you who would you expect to be there

18   and you said Lanfen, why did you --

19        A    That was the person that day that they said would

20   probably be there.  I just knew from the driver's license

21   photo I had seen.

22        Q    So they were coming and going.  You were told that

23   was going to be the day that Ms. Ma would be the one

24   working?

25        A    I don't know who was coming and going.  I just

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 132

1    know that they had shown me the driver's license and said

2    that is probably who is going to be there.  And I went in

3    there, and that was who it was.

4        Q    I don't want to beat a dead horse, but they didn't

5    show you a picture of Ms. Zhang?

6        A    I don't know if they did or not, sir.

7        Q    So on September 14 you go in there.  Tell us what

8    happens.  When you walk in the door, what happens?

9            MR. BUTLER:  If I could just interpose an

10   objection.  My understanding of the motion is there is a

11   motion which challenges the overall probable cause to issue

12   the warrant which we know is limited to the four corners of

13   the affidavit.  So you have to go just on the affidavit.

14           And then there is another part of the motion which

15   alleges there were certain material omissions of exculpatory

16   material.  I know that one of those was a claim that

17   Detective Brock didn't get the phone number of this woman.

18   But I am not aware of any other claims regarding his work as

19   an undercover.  So this sounds more like a deposition than a

20   motion to suppress that really deals with a fairly discreet

21   issue that is pled in the motion.

22           MR. METCALF:  Judge, I should be afforded the

23   opportunity.  We are in a misdemeanor case where, A, we have

24   an escalated time period.  This Court, this county doesn't

25   afford a gazillion continuances to accommodate a misdemeanor

00267179-acac-40ed-90b6-273d293d8722

J.A. 272

Page 133

1   case.  I was told by Judge Morgan this case is going to be

2   over in June.  We have moved as quickly as we can.

3           So we don't have depositions.  I can't possibly

4   know if there is an omission based on 2,000 pages of

5   discovery provided by the State because they saw fit to

6   give me everybody's discovery.  So I should be able to ask

7   Detective Brock some questions to see if he omitted anything

8   from the report because that is under Johnson, one of the

9   ways to attack a warrant.

10          THE COURT:  Overruled.  You may proceed.

11  BY MR. METCALF:

12      Q    Sir, when you went in, tell us what you saw.

13      A    I walked in the door.  There was like a desk right

14  there.  They had the prices of the different times, you

15  know, the different lengths of massage you could get.

16      Q    So they had a menu?

17      A    Yes, sir.

18      Q    What were the prices?

19      A    I don't remember all of the prices.  From my

20  report, I remember what I had written down which was a

21  thirty-minute massage for $50.

22      Q    Is that what you paid?

23      A    Yes, sir.

24      Q    Was that the price on the menu?

25      A    Yes, sir.

STATE OF FLORIDA VS ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL    DCA CASE NO. 4D19-1655, ET AL

Page 134

1    Q    You walked in.  You now know you are with Lanfen

2   Ma?

3    A    Yes.  I was greeted by her.  She escorted me to a

4   room.

5    Q    Once inside the room -- I don't need every

6   blow-by-blow detail, but basically what happened?

7    A    I went inside.  She told me.

8         MR. BUTLER:  Again, I am going to object.  You

9   have to specifically plead the motion to suppress.  If I

10   understand correctly, he wants to fish.  So what that means

11   is if he hears something which he says is a material

12   omission, then he is suddenly going to add that to his

13   motion to suppress.

14         The rule is very specific that we are entitled to

15   know why we are here.  We are entitled to know what the

16   claims are.  He has filed a motion which specifically lays

17   out a number of claims that he says are material omissions.

18   It is unfair to the State to allow them to go and conduct a

19   deposition and then just Willy-Nilly ad hoc amend motions to

20   suppress from the middle of a hearing.  That is a lack of

21   notice to the State.  How can we prepare for something like

22   that?

23         MR. METCALF:  Your Honor, he didn't prepare the

24   application.  I don't know if he even knows what is in the

25   application.  He didn't have anything to do with it.  His

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 274

Page 135

1    testimony, his direct testimony could show that the

2    applicant misled the Court by misinterpreting everything he

3    said.

4            I have every right to ask him about it.  And to

5    find out in advance is impossible.  I can't know what his

6    testimony is.  Depositions aren't allowed in a misdemeanor

7    case.  So how in the world can I accommodate Mr. Butler.

8            MR. BUTLER:  He could file a motion for a

9    deposition because Courts do allow depositions in

10   misdemeanor cases.  And it would certainly shorten the

11   length of the hearing if we are going to have to sit here

12   and listen to a deposition of the fifteen people he has

13   waiting outside.

14           MR. METCALF:  Judge, I am not going to call all

15   fifteen people.  Detective Brock is a material witness to

16   what happened in there that established probable cause.

17           THE COURT:  I will overrule the objection, but --

18           MR. METCALF:  We will go quick.

19   BY MR. METCALF:

20       Q    Sir, you paid what was on the menu?

21       A    Yes, sir.

22       Q    Went into the room.  Did you receive a half-hour

23   massage?

24       A    Yes, sir.

25       Q    At the end of that massage, what happened?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 136

1      A     I got dressed and left.

2      Q     Were you ever solicited for sex?

3      A     Yes.

4      Q     Tell me about that.

5      A     Well, it started off like any normal massage.  I

6   go in there.  I disrobe down to my boxers.  She tells me to

7   lay on my stomach.  I laid on my stomach.  She started

8   rubbing my back.  I thought this is no different than any

9   other massage.

10          Then at one point I felt the bed kind of rock.

11   And I look and I see one knee on one side of my head,

12   another knee on the other side of my head.  She is wearing a

13   little bitty miniskirt.  I just kind of looked up and her

14   crotch is right basically on top of my head, maybe this

15   close from me.

16      Q     At some point it progresses into did she touch you

17   in your genitalia?

18      A     Yes.

19      Q     You elude to in your, well, you don't elude.  It

20   is eluded to that you go through some price structure for

21   sex?

22      A     Yes, sir.

23      Q     What was that?  How did you do that?

24      A     Well, she, of course, she flipped me over on my

25   back and she started rubbing my legs and then came up and

00267179-acac-40ed-90b6-273d293d8722

Page 137

1    rubbed my penis, just kind of brushed over it.  Then she

2    crawled up like straddling my legs.  So she is in a little

3    Spandex minidress now up to her waist so all I see is just

4    panties.

5            She is giggling really awkwardly.  She asked me

6    what I wanted.  I played dumb.  I was like I don't know.

7    What are you talking about?  Then she started pointing.  She

8    wasn't saying anything, but she would be pointing like at

9    her mouth or at her crotch or the hand job.  That is what

10   she would do.

11       Q    You did nothing to solicit her?

12       A    No, sir.

13       Q    She solicited you?

14       A    Threw it right out there.

15       Q    You would agree that she at that point had

16   solicited you for sex or offered to commit sexual acts for

17   payment?

18       A    Yes, sir.

19       Q    She discussed the acts with motions?

20       A    She was doing the motions, and I kept playing

21   dumb.  I don't know what you are saying.

22       Q    She discussed money and sex?

23       A    Yes.

24       Q    The transaction, how did it end?  Obviously, you

25   didn't have sex with her.  So how did you get out of there?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 138

1       A    I told her I didn't bring enough money with me

2    that day.

3       Q    Did that raise any problems that you told her that

4    that or you just walked out?

5       A    No, that was it.  She said get dressed.

6       Q    Did she offer to provide you a phone number?

7       A    No, sir.

8       Q    The second time on September 18, now it is with

9    Ms. Zhang?

10      A    Yes, sir.

11      Q    The same thing?

12      A    Same basic thing.  She was a little more

13   aggressive, but the same basically.

14      Q    So she came on to you even harder than Ms. Ma?

15      A    I think so.

16      Q    At the end of that, any problems?  Did you use the

17   same excuse I don't have any money?

18      A    The same thing.

19      Q    Any issue with that?

20      A    No.  She said check, make sure.  So I went over

21   and looked in my pocket and I said no.  She said, yeah, you

22   do.  I said, no, I don't.  I said because I want all of it.

23   I don't want the cheap stuff.

24      Q    Did she tell you to do it next time?

25      A    Yeah.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 139

1      Q      Did she have any problem with that?

2      A      No, she didn't seem to.  She seemed to be okay

3   with it.

4      Q      Did she offer to give you her phone number?

5      A      She did.  Yes, sir.

6      Q      Did you accept it?

7      A      No, sir.  I just got -- I don't know.  For

8   whatever reason I was getting dressed.  At one point she

9   reaches over.  I thought she was going to whisper something

10  to me so I kind of turned and she kissed me which was kind

11  of, you know, I wasn't ready for it.  And I think everything

12  just kind of got lost from there.  I just kind of forgot

13  about it.  And she didn't mention it anymore.

14     Q      Over the years of your training and experience,

15  have you ever investigated criminal enterprises, you know,

16  racketeering, money laundering, any of that?

17     A      No, sir.  I was always at the street level as a

18  patrolman.

19     Q      Were you given any instruction when you went in

20  there?  If you can obtain information, let us know what it

21  is.

22     A      My whole job was just to go in there and, of

23  course, report everything that I had seen, witnessed and

24  stuff.

25     Q      You were solicited twice.  You were being told

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 279

STATE OF FLORIDA VS ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL   DCA CASE NO. 4D19-1655, ET AL

Page 140

1    what to do by Crowley?

2        A    I mean, they are the ones that told me to go in

3    and who the people were and what to kind of expect.

4        Q    Was there no discussion since now they had engaged

5    in prostitution twice and soliciting you both of just

6    shutting it down and making an arrest right then and there?

7        A    I don't know what they discussed.  They didn't

8    discuss it with me.  No, sir.  I just went in, and I did my

9    report.  I was pretty much done with it other than, like I

10   said, the surveillance once in a while.

11       Q    So you watched some of the videos, live feeds?

12       A    Yeah.

13            MR. METCALF:  Nothing further.

14            THE COURT:  Any questions from any other of the

15   defense counselors.  Mr. Butler?  I am sorry, Mr. Guttridge.

16                        CROSS-EXAMINATION

17   BY MR. GUTTRIDGE:

18       Q    Officer Brock, when you first went in there, you

19   sat down.  You went there.  She solicited you.  There was no

20   problem with that.  You didn't follow through with that and

21   you left on good terms.  Right?

22       A    Yes, sir.

23       Q    And the second time you went in there the same

24   thing.  Correct?

25       A    Yes, sir.

00267179-acac-40ed-90b6-273d293d8722

Page 141

 1      Q     Did you get the number at the end of the second

 2   time?  Did she give you the number?

 3      A     No, sir.  That is what I told Mr. Metcalf is I

 4   think it just kind of went over my head.  I didn't even

 5   really pay attention to it other than she asked for it.  I

 6   just, I didn't ask her for it.  She didn't give it to me or

 7   anything like that.

 8      Q     That was at the end?

 9      A     That was at the end.

10      Q     At the end of the second one?

11      A     The second one.

12      Q     At any point in time was there any kind of

13   uncomfortable, were you put in an uncomfortable position

14   where she thought you were a law enforcement officer?

15      A     Yeah, she kept saying -- because she was trying to

16   explain to me like once again doing the gestures.  I was

17   just playing dumb, like I don't understand what you want.

18   She is like you trouble, you trouble, you are police, you

19   are police, you trouble, stuff like that.

20      Q     Is that how it ended?

21      A     Like I said, it ended she kissed me on the lips,

22   you know.

23      Q     Notwithstanding this idea that you are trouble,

24   you are trouble, which is sort of a term of art with them,

25   they don't want to get arrested by the police?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 142

 1      A    Yes, sir.

 2      Q    It ended with her kissing you.  So she wasn't very

 3   suspicious at that point.  Correct?

 4      A    I guess not.  Even after she was saying you

 5   trouble, you trouble, she was still discussing money.  And

 6   then, like I say, gave me the peck on the lips at the end.

 7      Q    So based on those two encounters, you would expect

 8   if you went in there again, they would give you a massage

 9   and still see you again.  Correct?

10      A    Well, if they didn't recognize me, yes, sir, I

11   would think so.

12      Q    If they didn't recognize you -- they would

13   recognize you as being the same person that came in if they

14   didn't recognize you as a law enforcement officer?

15      A    Right.

16      Q    But you had no reason to believe she recognized

17   you as a law enforcement officer because of the fact she

18   kissed you?

19      A    No, sir.

20           THE COURT:  Any other defense attorneys have

21   questions?

22           MR. METCALF:  I have one.

23                     REDIRECT EXAMINATION

24   BY MR. METCALF:

25      Q    Sir, you are not the only officer at Vero Beach

Page 143

```
 1   Police.  Right?

 2        A    No, sir, I am not.

 3        Q    They could have pooled from a different guy.

 4   Right?

 5        A    Absolutely.

 6             THE COURT:  Mr. Butler, any questions?

 7             MR. BUTLER:  No questions.

 8             THE COURT:  May this witness be excused?

 9             MR. METCALF:  Yes, sir.

10             THE COURT:  Thank you.  You are free to go about

11   your day.

12             THE WITNESS:  Thank you, Judge.

13             THE COURT:  Call your next witness, Mr. Metcalf.

14             MR. METCALF:  Your Honor, can I call Carla

15   Sutherland.

16             BAILIFF:  Face the Judge and raise your right

17   hand.

18             THE COURT:  Do you swear or affirm that the

19   testimony you are about to give is the truth, the whole

20   truth and nothing but the truth?

21   AND THEREUPON,

22                      CARLA SUTHERLAND,

23        Called as a witness on behalf of the Defendants

24        herein, after having been first duly sworn, was

25        examined and testified as follows:
```

00267179-acac-40ed-90b6-273d293d8722

Page 144

1                   DIRECT EXAMINATION

2           THE WITNESS:  Yes, I do.

3           THE COURT:  Thank you.  Have a seat.

4    BY MR. METCALF:

5      Q     Can you state your name, ma'am.

6      A     Carla Sutherland.

7      Q     Where do you work?

8      A     For the Florida Department of Health.

9      Q     How long have you been there?

10     A     Since 2015.

11     Q     You are familiar with why you are here?

12     A     Yes, sir.

13     Q     On September 10 or 11 did you conduct an

14   inspection of East Spa?

15     A     I did not conduct the inspection.  No.

16     Q     Did you go inside East Spa?

17     A     Yes, I did.

18     Q     Why did you go in there?

19     A     I went in to do a compliance inspection along with

20   the inspector that was inspecting, doing an inspection of

21   the spa.

22     Q     Is that normal that the two of you go in there?

23     A     Sometimes.

24     Q     The other person with you was who?

25     A     Cynthia Pagano.

00267179-acac-40ed-90b6-273d293d8722

Page 145

1        Q        Did an inspection get done?

2        A        Cynthia conducted an inspection.

3        Q        Was there any violations at all during the

4    inspection?

5        A        I did not conduct the inspection so I cannot say

6    on that.

7        Q        Are you aware of any complaints that have ever

8    been filed against East Spa with the Department of Health?

9        A        Yes.

10       Q        Are there any?

11       A        There were some in the past.  Yes.

12       Q        What kind of complaints?

13       A        There were unlicensed medical activity going on

14   which means there were individuals that could have been

15   practicing and was practicing medicine without a license

16   which means they were supposed to be licensed as a

17   therapist.  And some of the therapists were not licensed,

18   but this was in the past.

19       Q        Did that shut them down or what happened?

20       A        No.  Typically, when an individual is practicing

21   without a license, they are issued a notice to cease and

22   desist and sometimes a citation.

23       Q        Did you see any indication of people domiciling in

24   East Spa?

25       A        I did not get past the reception area.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 285

STATE OF FLORIDA VS ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL   DCA CASE NO. 4D19-1655, ET AL

Page 146

1       Q     If an officer said that you reported back that,

2    that would not be correct?

3       A     That I seen --

4       Q     Yes.

5       A     I did not see if anybody was living there because

6    I was only in the reception area.

7       Q     As far as any other complaints, has there ever

8    been any complaint ever about prostitution in East Spa?

9       A     I was contacted by Vero Beach PD back in July of

10   last year that they had received a complaint that there was

11   prostitution going on in that facility.

12      Q     From these anonymous sources.  Right?  Is that

13   what they told you, from anonymous sources?

14      A     They didn't say where the complaint came from.

15   They just said they had received a complaint.

16      Q     DOH doesn't have any those kind of complaints, do

17   they, from anybody?

18      A     Solicitation complaints?

19      Q     Right.

20      A     Sometimes the public does file a complaint with

21   DOH alleging that there is prostitution going on in an

22   establishment.

23      Q     Did that ever happen with East Spa?

24      A     Not to my knowledge.

25      Q     The women inside East Spa were licensed massage

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 286

Page 147

1    therapists?

2         A    On the day that I went in, yes, sir.

3              MR. METCALF:  Nothing further.

4              THE COURT:  Any questions from any other defense

5    attorneys?  No?  Mr. Butler, any questions?

6              MR. BUTLER:  No, ma'am.

7              THE COURT:  May this witness be excused?

8              MR. METCALF:  Yes.

9              THE COURT:  Thank you.  You are free to go about

10   your day.

11             THE WITNESS:  Thank you.

12             MR. METCALF:  Judge, can I call Kyle Eder.

13             THE COURT:  Good morning.  Would you raise your

14   right hand.  Do you swear or affirm that the testimony you

15   are about to give is the truth, the whole truth and nothing

16   but the truth?

17   AND THEREUPON,

18                        KYLE EDER,

19        Called as a witness on behalf of the Defendants

20        herein, after having been first duly sworn, was

21        examined and testified as follows:

22                     DIRECT EXAMINATION

23             THE WITNESS:  I do.

24             THE COURT:  Thank you.  You may have a seat.

25   BY MR. METCALF:

00267179-acac-40ed-90b6-273d293d8722

J.A. 287

```
                                                    Page 148

 1        Q     Can you state your name, sir.

 2        A     Kyle Eder.

 3        Q     You work for Vero Beach Police?

 4        A     That is correct.

 5        Q     Were you involved with the investigation with East

 6   Spa?

 7        A     Yes.

 8        Q     What was your role?

 9        A     I sent out subpoenas and I did surveillance at the

10   spa.

11        Q     When did you send out subpoenas?

12        A     Multiple times.  Probably a dozen.

13        Q     What kind of subpoenas?

14        A     Bank records, credit cards, statements.

15        Q     When you say multiple times, did this happen after

16   the video was already installed at East Spa?

17        A     Which one?  Throughout the whole investigation I

18   sent out subpoenas.

19        Q     I understand.  On November 28 there was an order

20   entered I believe within a day or so that cameras were

21   installed at East Spa?

22        A     Okay.

23        Q     You are aware of that.  Right?

24        A     I am aware there was video surveillance at East

25   Spa.  Yes.
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

STATE OF FLORIDA VS ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL   DCA CASE NO. 4D19-1655, ET AL

Page 149

1      Q    Did your subpoena start after the cameras were

2   already put in there?

3      A    I can't recall.

4      Q    When did you become aware that there was cameras?

5      A    When we started doing surveillance over there.

6      Q    You don't have any idea when your first subpoena

7   got issued?

8      A    I could find out.  I don't know off top of my head

9   which one.

10     Q    You wouldn't have been doing things without

11  Officer Crowley knowing about it, would you?

12     A    No.

13     Q    If you had subpoenaed things, you would think that

14  Officer Crowley would have put that in the application,

15  right, if he knew that you had already subpoenaed records?

16          MR. BUTLER:  Objection, calls for speculation.

17          THE COURT:  Sustained.

18  BY MR. METCALF:

19     Q    Tell me about your surveillance.  Did there come a

20  time that you were next door to East Spa during working

21  hours?

22     A    Yes, sir.

23     Q    What was the purpose of that?

24     A    To get a better view of the people coming in and

25  out.  And I was also recording audio.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 289

Page 150

1    Q    Was there a pole camera already installed

2  recording people coming in and out?

3    A    Yes.

4    Q    There was only one entrance?

5    A    That is correct.

6    Q    What better angle did you need than the pole cam?

7    A    To see them when they are coming in towards the

8  door.  The camera is not a high-resolution camera.  You

9  definitely get a better view yourself when you are standing

10  right there less than five feet away from the door.

11    Q    You needed a person to do that?  You couldn't have

12  put a camera there?

13    A    I wasn't involved with the camera install.

14    Q    How many times did you go next door?

15    A    Probably about eight.

16    Q    How did you get in there?

17    A    I had a key.

18    Q    Who gave you the key?

19    A    I got it from the special investigation office.

20    Q    Did they get permission from the landlord to have

21  that key or do you know?

22    A    I don't know.

23    Q    They didn't tell you whether you were entering

24  unlawfully or not?

25    A    They did not.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 290

Page 151

1     Q    You went in and listened.  You went inside there.

2   Correct?

3     A    That is correct.

4     Q    The purpose of that was to audio?

5     A    To get a better view of the people coming in and

6   out.  During that, I happened to hear audio from the

7   neighboring business so I recorded it.

8     Q    How many times did that happen?

9     A    Every time I was in there.

10    Q    Did anyone know you were doing that?

11    A    At my department?

12    Q    Yes.

13    A    Yes.

14    Q    They knew you were audioing?

15    A    Yes.

16    Q    Did you use any kind of enhancing equipment?

17    A    No.

18    Q    So you could hear through the walls?

19    A    No.

20    Q    Do you know the business that used to be there?

21    A    I do not.  No.

22    Q    Do you have any idea how long it was vacant?

23    A    I think it was pretty recent, but I don't know.

24   It looked like they were doing work in there.

25    Q    Do you know how many different men you audioed?

00267179-acac-40ed-90b6-273d293d8722

J.A. 291

Page 152

1            MR. BUTLER:  Judge, I am going to object as to

2    relevance.  There has been no motion filed with respect to

3    audio recordings.

4            THE COURT:  Sustained.

5            MR. METCALF:  I will move on.

6    BY MR. METCALF:

7        Q    When you audio recorded, when you did, could you

8    here acts of sex going on?

9            MR. BUTLER:  Same objection, Judge.

10           MR. METCALF:  Judge, at this point it is not

11   included.  There is a material omission and a misleading,

12   they are misleading the Court by saying we explored all

13   possible, I mean, that is not the exact language, but

14   alternative less invasive means.  This is an alternative

15   less invasive means.  And if it is working for him, then I

16   want to know when he started it and why he didn't do it.

17   And then he can testify.

18           MR. BUTLER:  Was that pled in your motion?

19           MR. METCALF:  Absolutely.

20           THE COURT:  They do articulate several lists of

21   intrusive means.

22           MR. BUTLER:  Is this one of the ones that was pled

23   they should have recorded the audio from the business next

24   door?

25           MR. METCALF:  Judge, I don't have to specifically

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 153

1    call out every less invasive means in the motion.

2              THE COURT:  I will overrule the objection at this

3    point.  I will let you go into that.

4    BY MR. METCALF:

5         Q    Was the camera already installed when you were

6    listening in there?

7         A    Yes.

8         Q    And you could hear just fine in there?

9         A    I can't say hear everything, but there are times

10   when you could hear very clearly.

11        Q    Did you ever go in there before the cameras were

12   installed?

13        A    No.

14        Q    Do you know if anyone from Vero Beach did or had

15   access before the cameras were installed?

16        A    I don't know.

17        Q    Could you hear sex acts?

18        A    You could hear noise associated with sex acts.

19   Yes.  Moaning, yes.

20        Q    One person in particular, could you hear them

21   negotiate for sex or talk about sex?

22        A    I heard them ask for how long they wanted.  Most

23   of them said an hour.  Then some guys asked to see what

24   girls were working.  So they brought the girls out.  Some

25   people asked for more than one.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

STATE OF FLORIDA VS ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL   DCA CASE NO. 4D19-1655, ET AL

Page 154

1      Q     And then heard them have sex?

2      A     I heard moaning, yes.  From the front entrance

3  from when they walk in, I heard them talking.  And then they

4  go back and down the hall is where I hear them.

5      Q     How many men were in there at one time when you

6  were doing it?  There wasn't like twenty men in there, were

7  there?

8      A     No.

9      Q     Just one?

10     A     Most of the time just one.

11     Q     You had seen that specific person come in?

12     A     Yes.

13     Q     You watched them come in?

14     A     Yes.

15     Q     So you could identify them?

16     A     Yes.

17     Q     And then you could hear them negotiate for sex and

18  have sex just by listening?

19     A     I don't hear the negotiation for sex.  I hear

20  asking about other girls working and then people going back

21  in the room.

22     Q     Did you say someone said what do you want?

23     A     Yeah.  That is that commonly asked.  They asked

24  about time, like an hour long, half hour.  Usually they

25  would just say times, like I want an hour.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 155

1    Q    If you had an amplifying source, do you think you

2    could have heard better?

3    A    Maybe because you don't hear everything that is

4    going on.

5    Q    When you went into the room, did you have to get

6    closer to the wall or put your ear up against the wall?

7    A    I didn't put my ear up against the wall.

8    Obviously, the closer I was to the wall the better I could

9    hear, but I never had to physically touch the wall to hear.

10   Q    Have you reviewed your recordings?

11   A    Some of them.

12   Q    You can clearly hear people talking?

13   A    Some are better than others.  Some are very clear.

14   Q    You are able to attribute to that specific person,

15   the defendants in this case, those conversations because you

16   were able to identify them.  Correct?

17   A    For a couple of them, yes.

18        MR. METCALF:  Nothing further.

19        THE COURT:  Any questions from any other defense

20   attorneys?  Mrs. McCain?

21                    CROSS-EXAMINATION

22   BY MRS. MCCAIN:

23   Q    Sir, when did you send out your first subpoena in

24   this case?

25   A    I don't know.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 295

Page 156

1      Q    You didn't bring any of your information with you

2    today?

3      A    No.

4      Q    About when you sent out for a subpoena?

5      A    No.

6      Q    Were you assisting Detective Crowley in preparing

7    the application for the search warrant?

8      A    I did meet Evans.  The other detective was the one

9    that completed the subpoenas for the search warrants.

10     Q    I am asking about the application for the search

11   warrant.  You are saying that Lee Evans prepared the

12   application for the search warrant?

13     A    For the bank records?  What are we talking about?

14     Q    No.  For the search warrant to put the cameras in?

15     A    I did not do the cameras.  No.

16     Q    Did you assist Detective Crowley in doing that?

17     A    I don't believe so.  No.

18     Q    Who assisted Detective Crowley in doing that?

19     A    I don't know.

20     Q    You are saying that Lee Evans --

21     A    I thought you were talking about bank records.

22     Q    Lee Evans subpoenaed the bank records?

23     A    We were both doing subpoenas for the bank records.

24   You were asking about a search warrant.  He did the search

25   warrant to lock the funds in the banks.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 296

Page 157

 1     Q     What was the first search warrant you did, without

 2   giving me the date, which is the first subpoena that you

 3   sent out in this case?

 4     A     The first subpoena?

 5     Q     Yes, sir.

 6     A     I don't know.  It was probably for the Wal-Mart

 7   purchases.

 8     Q     For the Wal-Mart purchases?

 9     A     If I had to guess.  I am only guessing.

10     Q     Which one was the second one?

11     A     I don't know.

12     Q     How many did you prepare?

13     A     Probably a dozen.  Possibly more.

14     Q     When did you first begin working on this case?

15     A     I believe it was October.

16           MRS. MCCAIN:  I don't have any further questions.

17           THE COURT:  Mr. Sercombe, yes, sir.

18                    CROSS-EXAMINATION

19   BY MR. SERCOMBE:

20     Q     Detective, who were you able to specifically

21   identify listening through the wall?  Which defendants?

22     A     I don't know off the top of my head.

23     Q     Do you know Anglesano?  Was he one?

24     A     The name.

25     Q     How were you able to identify him based on

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 297

Page 158

1    listening through the wall?  How did you do that?

2         A    As I said, I was watching them coming in and out

3    of these businesses.

4         Q    So you timed him going in and then be able to know

5    that it was him?  Could there have been other customers in

6    there as well?

7         A    I don't know if there were any other customers in

8    there at the time.

9         Q    So did you identify him based on the fact that he

10   was the only one who went in?

11        A    If I was at the business next door or I was in

12   close proximity to where I had eyes on him.

13             THE COURT:  Mr. Golden, yes, sir.

14                       CROSS-EXAMINATION

15   BY MR. GOLDEN:

16        Q    I just want to make sure we are seeing the same

17   thing you are saying.  You are in the adjoining business or

18   property monitoring what is occurring next door.  Right?

19        A    Yes.  It is a strip plaza.

20        Q    Yes, sir.  And the business that you are in, does

21   it run as deep as the spa business next door?

22        A    I don't know if it has the same layout, but it

23   runs just as deep.  There is a long hallway that goes all

24   the way back.

25        Q    So when you are listening, you are able to change

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 298

Page 159

1    locations within the premises you are in.  Correct?

2         A    Correct.

3         Q    So when someone walks into the business next door

4    where the front desk is, you are positioned, I am assuming,

5    more up front?

6         A    Correct.  I am still close to the door where they

7    first walked in.

8         Q    When they are taken farther back to one of the

9    interior rooms, you are able to change your location, also?

10        A    Yes.

11        Q    When you tell us that you are able to hear, you

12   are not hearing as you state put up front where you were

13   initially or I am assuming you are moving back, also?

14        A    I get a better view back further into the

15   business.

16        Q    So you are able to do that on each occasion

17   depending on where you think they are moving next door,

18   also?

19        A    Yes.

20        Q    Are you wired in at all visually to any of

21   the cameras or monitors that are set up there?

22        A    No.

23        Q    At all?

24        A    Correct.

25        Q    So you are doing this by guesstimation, if you

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 160

1    will.  Once you assume that the business is done or

2    concluded at the front desk and they are moved to the back,

3    you are moving along inside?

4        A    That is correct.

5        Q    Are there adjoining walls to any of the those

6    massage rooms to where you are standing inside?

7        A    Are there adjoining walls?

8        Q    Well, I mean, any of the massage rooms that you

9    are talking about, are they adjoining --

10       A    They share a wall?

11       Q    Yes, sir.

12       A    Like am I on the other side of the wall directly?

13   I don't know.  I have never been in the East Spa.

14       Q    But that is how you are able to hear what you have

15   described.  Correct?

16       A    Yes.  I am trying to get as close as possible so I

17   can get the best audio.

18            THE COURT:  Mr. Chrzan, I think you are here as an

19   observer, sir.

20            MR. CHRZAN:  Well, no, actually, Judge, about an

21   hour and a half ago I filed motions to join.  I just haven't

22   had an opportunity to put that on the record.

23            THE COURT:  Who is your client?

24            MR. CHRZAN:  My clients are Jon Peshke,

25   P-E-S-H-K-E, 2019MM358.  Brian Olaisen, 2019-411.  Rong Li,

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 161

1    L-I, 2019MM398.  John Broecker, 2019MM353.  And Louis Crook,

2    2019MM417.

3              THE COURT:  Say the second again, sir.

4              MR. CHRZAN:  Brian Olaisen, O-L-A-I-S-E-N.  Rong

5    Li was L-I.  And Broecker was B-R-O-E-C-K-E-R.

6              THE COURT:  Okay.  Yes, sir.

7                        CROSS-EXAMINATION

8    BY MR. CHRZAN:

9         Q    Three brief questions.  You said you moved

10   throughout to get a better view?

11        A    I could never see what was going on.  If I said

12   that, I misspoke.

13        Q    What was the type, and I know that said this so if

14   you did I apologize, the type of recording device that you

15   used?

16        A    It is a small one you can buy at the store.

17        Q    Like a little micro recorder?

18        A    Yes.

19        Q    Did you hold that up against the wall?

20        A    No.  I held to close to the wall.  I never held it

21   against the wall.

22             MR. CHRZAN:  I have nothing further.

23             THE COURT:  Mr. Golden.

24                        CROSS-EXAMINATION

25   BY MR. GOLDEN:

00267179-acac-40ed-90b6-273d293d8722

J.A. 301

Page 162

1        Q    I have just a couple of followups.

2             The premises that you were in, do you know when

3   you were able to gain access to that location?

4        A    Can you explain further?

5        Q    Sure.  When were you first able to have access to

6   that?

7        A    That business?  The adjoining business?

8        Q    Yes, sir.

9        A    I believe it was in December.  I don't remember

10  the specific dates.

11       Q    Was how that obtained?

12       A    I don't know.

13       Q    Was that anything you did or you were just told --

14       A    I was told that the next door place was vacant and

15  that they had a key for it.  I forgot how they said they got

16  the key, but they had the key for it.  And we were able to

17  go this in there.

18       Q    I think you indicated that it had been vacant for

19  quite some time.  Correct?

20       A    I don't recall saying that.  I don't know how long

21  that was vacant.

22       Q    Do you recall what business was there previously?

23       A    No.

24       Q    Do you know why access wasn't obtained earlier?

25       A    No.

00267179-acac-40ed-90b6-273d293d8722

J.A. 302

Page 163

1            MR. GOLDEN:  Thank you.

2            THE COURT:  Mr. Sercombe, did you have another

3    question?

4            MR. SERCOMBE:  Chrzan asked my exact question.

5            THE COURT:  Any other defense attorneys with

6    questions?  Mr. Kessler, yes, sir.

7                         CROSS-EXAMINATION

8    BY MR. KESSLER:

9        Q    Can you tell us how many different patrons or

10   customers that you audio recorded?

11       A    I believe it was only three that I could identify.

12       Q    How many additional that you did not identify?

13       A    There were times I took recordings where there

14   weren't even customers in there.  When the employees were

15   talking amongst each other and I could hear it barely, I

16   would record that, also.

17       Q    But how many customers or patrons do you believe

18   that you also recorded that you have not identified?

19       A    I don't know.

20           MR. KESSLER:  Thank you, Judge.

21           THE COURT:  Any other defense attorneys?  Mr.

22   Butler, any questions?

23           MR. BUTLER:  No, your Honor.

24           THE COURT:  May this witness be excused?

25           MR. METCALF:  Yes, your Honor.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 164

1        THE COURT:  Thank you, sir.  You may go about your

2   day.

3        MR. METCALF:  Your Honor, I would call Joseph

4   Cappetto.

5        THE COURT:  Okay.

6        MR. METCALF:  Homeland Security probably ignored

7   by subpoena.  Let me just confirm that I gave him the list.

8        BAILIFF:  There is no response in the hall.

9        MR. METCALF:  Dedre McCreary.

10       BAILIFF:  No response.

11       MR. METCALF:  Xavier Martinez.

12       BAILIFF:  No response.

13       MR. METCALF:  The last guy is Mark Phillips.

14       BAILIFF:  No answer.

15       MR. METCALF:  Gasbarrini.

16       THE COURT:  Raise your right hand.  Do you swear

17  or affirm that the testimony you are about to give is the

18  truth, the whole truth and nothing but the truth?

19  AND THEREUPON,

20                  MICHAEL GASBARRINI,

21      Called as a witness on behalf of the Defendants

22      herein, after having been first duly sworn, was

23      examined and testified as follows:

24                  DIRECT EXAMINATION

25       THE WITNESS:  I do.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 304

STATE OF FLORIDA VS ROBERT FREELS, ET AL

L. T. CASE NO. 312019MM000328A, ET AL   DCA CASE NO. 4D19-1655, ET AL

Page 165

1          THE COURT:  Go ahead.  Thank you have a seat.

2   BY MR. METCALF:

3      Q    Can you state your name.

4      A    Michael James Gasbarrini.

5      Q    You are a detective with Vero Beach Police

6   Department?

7      A    I currently do crime scene investigation.

8      Q    What was you assignment back in November or

9   December of last year?

10     A    I was assigned special investigations unit.

11     Q    Were you a detective then?

12     A    Yes, sir.

13     Q    You were, I guess, kind of co in charge with this

14  investigation along with Sean Crowley?

15     A    Yes.  I worked with Detective Crowley.

16     Q    How did you become involved?  Was it assigned to

17  you by the Chief?

18     A    I would say probably in the fall of 2018 Detective

19  Van D'Huynslager who was a detective at the time had

20  received a couple of anonymous complaints about East Spa.

21     Q    Today, detective Crowley came back out, and you

22  haven't discussed any of your testimony with him, have you?

23     A    No, sir.

24     Q    The videos, were you present the day they were

25  being installed by the Department of Homeland Security?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 305

Page 166

1      A    Yes, sir.

2      Q    Where were you located when that was happening?

3      A    Outside the building.

4      Q    Where was Detective Crowley?

5      A    He was partially inside the building and partially

6    outside the building.

7      Q    Who installed the cameras?

8      A    Homeland Security.

9      Q    Who decided where to put the cameras?

10     A    Homeland Security.

11     Q    Where did you get the cameras?

12     A    Homeland Security.

13     Q    Did you and Officer Crowley in any way participate

14   in the installation of those cameras?

15     A    Minimally.

16     Q    How is that?

17     A    Getting the ceiling tiles where the cameras were

18   placed for Homeland Security as the Department rented the

19   suite next door for a few months.  So while they were in

20   there working, we had been responsible for the suite.  So we

21   just kind of managed the suite for them.

22     Q    So the suite had nothing to do, I mean, the suite

23   was next door.  Right?

24     A    Yes, sir.  We installed all of the cameras in the

25   suite next door and then had moved them over to East Spa.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 306

STATE OF FLORIDA VS ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL   DCA CASE NO. 4D19-1655, ET AL

Page 167

1      Q    Okay.  So you kind of stored them there?  What do

2   you mean?

3      A    Earlier in the day, we had taken the ceiling tiles

4   and the video and had put the video into the actual tiles.

5   And then once installation was going to occur, moved the

6   tiles to East Spa.

7      Q    Who did that?

8      A    I think partially Detective Crowley and mostly

9   Homeland Security.

10     Q    So he helps stage it next door and put the cameras

11  inside the ceiling tiles?

12     A    Yes, sir.  He may have helped him, you would have

13  to ask him, but he may have helped them pass the tiles from

14  building to building because they did it through the

15  ceiling.

16     Q    As far as the location and the decision making,

17  that was delegated over to Homeland Security?

18     A    Yes, sir.

19     Q    Detective Crowley wasn't in there with them when

20  they were doing that?  He was next door?

21     A    You would have to ask Deputy Crowley.

22     Q    Did you ever see him go outside?

23     A    Yes, sir.

24     Q    What was that for?

25     A    The females that were working at the spa were

00267179-acac-40ed-90b6-273d293d8722

Page 168

1    outside.  They had some questions.  So he was helping to

2    answer some questions.

3        Q     Were you out there with him?

4        A     Yes, sir.

5        Q     What were the questions?

6        A     They had questions of when they could go back in.

7    If they had a vehicle there, they wanted to go in the

8    vehicle because it was a little chilly outside.  So they

9    wanted to go in and get warm.

10       Q     This all started from numerous citizen complaints.

11   Were you privy to those complaints?

12       A     Some of them, yes.

13       Q     They were made to you?

14       A     Through either the Chief or through email.

15       Q     So you don't know who made the complaints?

16       A     The owner of Vero.com was probably our main

17   complaint.

18       Q     Like the newspaper Vero.com?

19       A     It is Vero.com.  They originally had the suite

20   next door.

21       Q     Okay.  Were you present when Carla Sutherland and

22   Cynthia Pagano entered from the Department of Health?

23       A     I was not present at the spa.  No.

24       Q     Do you know when the first subpoena was issued in

25   this case?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 169

1      A     No, sir.  You probably would have to ask either

2   Detective Eder or Detective Evans.

3      Q     Are you safe in saying that it was the

4   installation of the cameras?

5      A     I actually can't say.

6      Q     Did you have dealings with the two men that were

7   stopped outside of East Spa?

8      A     Yes, I did.

9      Q     Did you attempt to stop anyone else other than

10  those two men in the entire history of this case?

11     A     Yes.  Once the installation of the cameras

12  occurred, we had stopped some men leaving.

13     Q     That were not arrested?

14     A     No, sir.

15     Q     What were you stopping them for?

16     A     No.  We had arrested the ones we had stopped once

17  the cameras were installed.

18     Q     So guys would go in -- I don't understand what you

19  are saying.  What are you saying?

20     A     It is my understanding you asked if we had stopped

21  anyone after the installation of the cameras, and my answer

22  was yes because we had stopped some gentlemen leaving the

23  spa after they had attended.

24     Q     So you confirmed who they were and stuff like

25  that?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 309

Page 170

1       A       Yes, sir.

2       Q       So if you couldn't get them on a pole camera, you

3   would pull them over?

4       A       Yes, sir.

5       Q       The sole purpose of that stop was to identify

6   them?

7       A       Yes, sir.

8       Q       As far as the installation of the cameras, going

9   back to that, is it fair to say that the Detective Crowley

10  delegated that task to the Department of Homeland Security?

11      A       I wasn't inside the building so you would have to

12  ask Detective Crowley what he did.  Like I said, when he was

13  on the outside of the building, he was helping with the

14  females that worked at the spa.

15      Q       The equipment was all Homeland?

16      A       Yes, sir.  We didn't own any of the equipment,

17  Vero Beach Police.

18      Q       So the subpoenas you say are Eder and that is Lee

19  Evans?

20      A       Yes.

21      Q       Did all of the subpoenas?

22      A       Yes, sir.

23      Q       Did you do any surveillance?

24      A       I did.

25      Q       Going back to those two men, though, they were

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 171

1    stopped before the camera.  Do you know who I am talking

2    about?

3        A    I do.

4        Q    That is in September some time?

5        A    I know the gentlemen you are speaking of.  Yes.

6        Q    Were there any other male subjects stopped prior

7    to the installation of the cameras?

8        A    Detective Van D'Huynslager and I had stopped

9    one gentleman coming out of there probably six months prior

10   before Detective Crowley and I even started with

11   investigation.

12       Q    How was that?  What happened there?

13       A    We started a brief investigation and Detective Van

14   D'Huynslager was sent back to road patrol.  And we didn't

15   have anyone else working the unit.

16       Q    What did the guy tell you?

17       A    He advised that he was there from Orlando

18   installing I think elevators, I believe.  He had found the

19   website.  I think it was Romance.  That he had received a

20   hand job.

21       Q    That was six months prior?

22       A    Yes, sir.

23       Q    Did that find its way into the affidavit?

24       A    I don't believe so.

25       Q    Did you tell that to Detective Crowley?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 172

1      A     Yes, sir.

2      Q     This man, did you threaten him with prosecution if

3   he didn't talk you or arrest if he didn't talk to you?

4      A     We didn't make any threats or promises.

5      Q     I am talking about the one guy.

6      A     Correct, no.

7      Q     The same with the other two guys?

8      A     Correct.

9      Q     Did he tell you that the actions were initiated by

10  the women inside?

11     A     He didn't say.  He just advised that there was a

12  payment involved.

13     Q     Do you know if it was the same women?

14     A     I do not know if it was the same women.

15     Q     What made you stop that guy?

16     A     The same thing.  We received like a citizen

17  complaint or through the Chief.  I don't recall which.  We

18  had done some surveillance out there and decided just to

19  stop someone that was leaving and just ask them.

20     Q     Because of Van D'Huynslager kind of moved onto

21  something else, it just died?

22     A     Yeah.  I was in the unit by myself.  I started

23  working some general crimes cases.  So I didn't have time or

24  the manpower to re-pick up the investigation.

25     Q     Outside of that third guy, any other stops?

```
                                                       Page 173

  1       A    No, sir.

  2       Q    The videos, as far as minimizing what you

  3  captured, every minute that they were on was someone

  4  watching the video live?

  5       A    No, sir.  Only the time that we were manning the

  6  computers.  If we weren't at the computer station or at

  7  home, we had logged off the portal.

  8       Q    There would be times where the spa was open and

  9  functioning and running where you guys logged off?

 10       A    Yes, sir.

 11       Q    Were they still recording, the cameras?

 12       A    Yes, they were recording.

 13       Q    Then what would you do, go back and watch them

 14  later?

 15       A    No, sir.  No one has seen the videos.

 16       Q    So there could be a whole lot of people captured

 17  on video that you know nothing about?

 18       A    Correct.

 19       Q    On civilians?

 20       A    Yes, sir.

 21       Q    There has been no minimization efforts at all with

 22  regard to those people.  Right?

 23       A    No one has looked at the video.  So I believe

 24  there has been some minimization.

 25       Q    But no one has looked at those videos.  How much
```

00267179-acac-40ed-90b6-273d293d8722

J.A. 313

Page 174

1    footage is there?  How many hours?

2        A    I wouldn't know the hours or the amount of time or

3    footage in this.  I haven't gone back and looked at it.

4        Q    So the cameras never stopped recording.  They were

5    set by Homeland Security to record from 8:00 a.m. to

6    11:00 p.m.  Does that sound right?

7        A    No, sir.  They recorded twenty-four hours a day.

8    We were just viewing a certain portion of each day.

9        Q    Okay.  So they didn't stop ever recording while

10   they were up?

11       A    Yes, sir, that is correct.

12       Q    Do you know where those videos are today, the

13   recordings?

14       A    Yes.  They are stored on a hard drive that is in

15   the Vero Beach Police Department evidence.

16       Q    They were recording the entire time.  Were you

17   guys watching that place the entire time?  I mean, you took

18   Sundays and Saturdays off.  Right?

19       A    Yes.  We had taken days off.

20       Q    If people, if a little old lady went in there and

21   received a massage, that is captured and recorded?

22       A    Theoretically.

23       Q    Anyone that went in there on your day off, it got

24   recorded?

25       A    Yes, sir.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 314

Page 175

1      Q     Were you aware of the directives in the order or

2    was that mostly Crowley?

3      A     Detective Crowley wrote the order.

4      Q     When you say he wrote it, he like came up with

5    those words or he like cut and pasted from somewhere else?

6      A     We had used some guidelines from an Indian River

7    County case.  I don't recall the exact case.

8      Q     So the minimization requirement that is within

9    that that says that you guys are to take minimization

10   efforts to make sure that -- it says while monitoring the

11   premises to be searched, the executing officer shall take

12   steps to minimize the invasion of privacy to any parties not

13   engaged in the unlawful act set forth in the affidavit?

14     A     Yes, sir.

15     Q     Realistically, that didn't happen, did it, if you

16   guys are recording all the time?

17     A     I believe it did.

18     Q     How so?

19     A     We were only viewing the video when we are

20   actually at the computer desk.  So we are minimizing any

21   time, you know, when there is no one in front of the screen.

22     Q     So your definition of minimization is when you are

23   watching it?

24     A     There is only a certain portion of the time that

25   we are watching.  So at the time we are not at the screen or

00267179-acac-40ed-90b6-273d293d8722

Page 176

1    the desk, like I said, we are not viewing the footage.  No

2    one has seen the footage.

3         Q    Was there any discussion amongst you and Detective

4    Crowley about the fact his order requested the ability to

5    monitor and record, but your order only allowed you to

6    monitor?

7         A    Yes, sir.  I think once we were able to get or

8    once Detective Crowley was able to get the affidavit signed,

9    we believed that it was okay for us to record what was

10   taking place inside the spa.

11        Q    But that wasn't -- you read the order.  Correct?

12        A    I read it.

13        Q    It does not authorize recording, does it?

14        A    No, sir.

15        Q    Were you familiar with the fact that Eder and a

16   few others were recording things next door, audio recording?

17        A    Yes, sir.

18        Q    Did you guys ever contemplate installing wiretaps,

19   audio wiretaps as opposed to video?

20        A    No, we did not.

21        Q    Do you know if Eder was recording in that room

22   before or after the installation of cameras?

23        A    I believe it was after.

24        Q    Are you aware of any subpoena that was issued

25   prior to the installation of cameras?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 177

1       A      Not to my knowledge, no.

2       Q      Every single woman that worked in that spa would

3  you agree at some point was a witness to have a cell phone?

4       A      I guess I couldn't say 100 percent, but I would

5  say the majority definitely had a cell phone.

6       Q      Were there any thoughts of issuing pen registers,

7  trap and traces or wiretaps onto their phones to record

8  their calls?

9       A      I don't recall.

10      Q      That certainly never happened.  Right?

11      A      No, sir, it didn't happen.

12      Q      Did you go with Detective Crowley when the order

13  was executed by Judge Cox?

14      A      To have it signed off here at the courthouse?

15      Q      Yes.

16      A      I believe so.

17      Q      Did Judge Cox have any clarification questions or

18  was it in any way unclear what she was ordering?

19      A      She had gone back to her chambers with Detective

20  Crowley.  I stayed in the courtroom because they were in the

21  middle of court.

22      Q      The order required you guys to report back to

23  Judge Cox.  Are you aware of that?

24      A      Yes, sir.

25      Q      Did you guys ever do that?

00267179-acac-40ed-90b6-273d293d8722

Page 178

1       A    I did not.

2       Q    Do you know if Detective Crowley ever did that?

3       A    You would have to ask him.

4       Q    Your application specifically asked for language

5   that terminates the authorization to monitor and record once

6   the investigative goals are achieved; is that correct?

7       A    Yes, sir.

8       Q    Does that language appear in the order?

9       A    I don't have the order in front of me.

10          MR. METCALF:  So 1 is application, and 2 is order,

11  3 is application, 4 is order.

12          THE COURT:  Make sure you have No. 1 and 2.

13          MR. METCALF:  Judge, to correct the record, I have

14  been referring to it, Exhibit 1 is the November 27

15  application.  Exhibit 2 is the order for November 27.

16  Exhibit 3 is the application for December 28.  And Exhibit 4

17  is the order.

18  BY MR. METCALF:

19      Q    I am going to show you what has been entered as

20  Defense Exhibit 3 and 4.  These are the orders --

21          MR. METCALF:  I am sorry, Judge.

22          THE COURT:  That is okay.

23  BY MR. METCALF:

24      Q    I am showing you what has been marked as Defense

25  Exhibit 4.  That is Judge Kanarek's order.  Defense

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 179

1   Exhibit 2 is Judge Cox's order.  Judge Cox is the first one.

2   That is the second one.

3        A    Okay.

4        Q    Going into that order, we talked about the report

5   that was there.  Was there any language in there telling you

6   guys to cease and desist, to stop, terminate, whatever words

7   the surveillance once the investigative goals have been

8   achieved or thirty days?

9        A    Yes, sir.

10       Q    Is it just the thirty days or does it tell you to

11  stop once your objective is met?

12       A    It stops once your objectives have been met.

13       Q    Does it say that in the order?

14       A    I don't recall.

15       Q    That is why I gave it to you.

16       A    Okay.  Yes, sir.

17       Q    Where does it say that?

18       A    That it should cease the surveillance.

19       Q    Can you read it?

20       A    Yes.  It says to monitoring of the surveillance

21  cameras for a period of no longer than thirty days.

22       Q    So it says thirty days?

23       A    Yes, sir.

24       Q    I got that.  But does it say anything about

25  ceasing, stopping once your investigative goals have been

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 319

Page 180

1    obtained?

2         A    No, sir.

3         Q    But the application you are requesting that the

4    Judge issue an order says that; is that right?

5         A    That is fair.

6         Q    That same language does not appear in the order?

7         A    Correct.

8         Q    The extension order, by the time that next order

9    is signed, is it fair to say over a 100 sex acts had been

10   videoed?

11        A    Yes.  I would say somewhere around that.

12        Q    Were you familiar with the logic of why there

13   would be a need to continue?

14        A    Yes, sir.  There was some new suspects.  Some were

15   new.  We were also trying to gather more information and

16   some more evidence on the suspects that we were continuing

17   investigating.

18        Q    Suspects that wound up being arrested or women

19   that couldn't be identified because you guys didn't stop?

20        A    There were women that weren't identified at the

21   time.  There was the business owner, Yongzhang Yan.

22        Q    He has never been arrested?

23        A    Correct.  We were still working on that

24   investigation.  So, like I said, we were extending the

25   further investigation.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 181

1    Q    As far as the cameras, were there any new people

2    other than the women, any of new people involved with the

3    criminal enterprise?

4    A    We had money changing hands.  We had a gentleman

5    that was transporting the women.  Like I said, we still had

6    Yongzhang Yan who was not consistently at the spa.

7    Q    The money you are talking about exchanging hands

8    and the man that was transporting people, that was captured

9    via surveillance that had nothing to do with videos inside

10   massage rooms; isn't that right?

11   A    You wouldn't know that unless you continued to

12   monitor.

13   Q    You are referring to Ken Zullo?  He is mentioned

14   in the report?

15   A    Yes, Mr. Zullo and Yan.

16   Q    You never see him transporting women into a

17   massage room.  Right?  That is something you see out in the

18   road?

19   A    Well, that is where you would have to transport

20   them is out on the road.  Yes.

21   Q    So alternative techniques, other than what has

22   been going on, I am talking what is going on in that massage

23   room, you don't see any of those continuing things in the

24   massage room itself?  There is no need to --

25   A    Not to that point.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 321

```
                                                      Page 182
 1      Q    So there was no need to keep videoing until let's

 2  say fifty sex acts?

 3      A    Just because it didn't happen to the point doesn't

 4  mean that we could have seen something in that room that

 5  could have benefited our investigation effort.

 6      Q    All of the women that were seen after the

 7  installation of the cameras other than Zhang, Lanyun Ma,

 8  Lanfen Ma, you knew about Mr. Yan the owner.  In the second

 9  extension, did you discover any new suspects in the criminal

10  enterprise?

11      A    Not in the room, no, sir.

12      Q    So all of the people in the criminal enterprise

13  had been identified by the time the extension comes?

14      A    There was still some female employees that we

15  hadn't identified.

16      Q    And they have never been identified?  Prostitutes?

17      A    After, I believe in Orlando there was one woman

18  that was identified that was in our spa.

19      Q    As far as the criminal enterprise and the

20  structure and the exchange of the money, transporting people

21  and going to and from banks, you would agree all of that is

22  obtained outside of what was going on in that room; is that

23  fair to say?

24      A    Yes, sir.

25      Q    What is being captured in that room are just acts
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

```
                                                        Page 183

 1    of prostitution?

 2         A     Yes, sir.

 3         Q     You don't see inside of that room what happens to

 4    the money that individual prostitute gets?

 5         A     Sometimes you do.

 6         Q     Like what?

 7         A     Well, if the gentleman that is in the room hands

 8    the female the money, sometimes she may put it in her

 9    brassiere, put it in the desk that is in the room or you can

10    see her carry the money outside of the room and still have

11    it her hand when she approaches the desk and put it into a

12    drawer or bag or what have you.

13         Q     Were you able to establish tribute payments to the

14    house from the workers or was the house making the money on

15    the front end?

16         A     I think it just depends on the customer.

17         Q     Are you able to in any way establish that from the

18    video inside the room what the house is taking?

19         A     Well, if they pass the desk on the way into the

20    business and they don't make a payment and then make a

21    payment inside the room, I mean, it is fair to say that they

22    are paying the house fee and the prostitution fee in the

23    room.

24         Q     Are you able to ever then see them get paid back

25    to the house ever?
```

00267179-acac-40ed-90b6-273d293d8722

J.A. 323

STATE OF FLORIDA VS ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL   DCA CASE NO. 4D19-1655, ET AL

Page 184

1     A    No, sir.

2     Q    Again, the only thing exchanging hands and going

3  on in that room is sex and someone paying the prostitute for

4  sex?

5     A    Paying a fee.  Yes, sir.

6     Q    Were you aware of the investigations going on with

7  the sheriff in Palm Beach and Jupiter?

8     A    Yes, sir.

9     Q    Were you guys all working together or was it just

10  all a big coincidence this happened at one?

11     A    When we first started our investigation, ASA

12  Hendriks advised us it was a coincidence that Martin County

13  had also had an investigation.

14     Q    I think I am about done.  Are you aware of any

15  written authorization provided by the State Attorney Mr.

16  Colton in this case?

17     A    No.

18     Q    For the application?

19     A    Not to my knowledge.

20          MR. METCALF:  I don't have anything.

21          THE COURT:  Mr. Guttridge.

22                    CROSS-EXAMINATION

23  BY MR. GUTTRIDGE:

24     Q    Just briefly.  You had video recorded

25  approximately 100 in the first search warrant.  You videoed

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 324

Page 185

1   recorded approximately 100 people that were arrested; is

2   that correct?

3        A    Yes.

4        Q    There was a lot of the videotape from that that

5   was in the massage room that you actually never looked at;

6   is that correct?

7        A    Anything during that period when we were operating

8   at our computers that we were actually on our computers and

9   watching we looked at.  Anything after that was after our

10  hours was never looked at.

11       Q    During all of those incidents and all of that

12  watching in the massage room, was there anything that would

13  have given you an indication that you would have obtained

14  more evidence or evidence of future crimes or things that

15  you did not already have based on what you had already seen?

16       A    Yes.  The owner of the business, he wasn't a

17  staple, if you will, at the business.  We had some

18  unidentified girls.  So, yeah, we were building our

19  investigation through those videos.

20       Q    You felt that the video would give you more

21  information about the owner of the business?

22       A    Probably.

23       Q    If I am going to somehow be in the massage room?

24       A    Yeah, it was certainly a possibility.

25       Q    I understand it was a possibility, but did any of

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 325

Page 186

1    the evidence that you obtained from looking at the massage

2    videos in the massage room indicate that?  Did any of the

3    things that you saw in there indicate that you are going to

4    get any other sort of evidence you had not already gotten?

5         A    No, sir.

6              MR. GUTTRIDGE:  Thank you.

7              THE COURT:  Any other questions from any other

8    defense attorneys?  Mr. Kennedy?

9                   CROSS-EXAMINATION

10   BY MR. KENNEDY:

11        Q    On behalf of Mr. Jorg.

12        A    Hi, Mr. Kennedy, how are you?

13        Q    Hi.  Going to the pole cameras, do you know what I

14   mean when I say pole camera?

15        A    Yes, sir.

16        Q    That was installed several weeks, maybe a month

17   before the issuance of the surreptitious cameras; isn't that

18   right?

19        A    That is correct, sir.

20        Q    It was set up in the same way, around-the-clock

21   recording as the interior cameras?

22        A    Yes, sir.

23        Q    So there is around the clock capturing of people

24   coming in and going out of the business?

25        A    Correct.

Page 187

1     Q     The day of the installation was November 28?

2     A     I believe the 29th.

3     Q     The 29th?

4     A     Yes, sir.

5     Q     Including November 29.  So the pole camera would

6     have captured the execution of that warrant.  Correct?

7     A     Yes.

8     Q     At least as it relates to the outside?

9     A     Correct, it would have.

10    Q     That material is on a hard drive in the Vero Beach

11    Police Department?

12    A     Yes, sir.

13    Q     With regard to the two gentlemen, I guess you

14    added a third gentleman that was actually stopped and you

15    asked them about what had occurred.  Correct?

16    A     Correct.

17    Q     They basically admitted to the information that

18    you later gained through this video within the massage room.

19    They basically admit those things happened.  Correct?

20    A     Correct.

21    Q     And Van D'Huynslager, I guess you didn't continue

22    that because he was no longer involved in that operation?

23    A     Yes, sir.

24    Q     But you could have.  You could have continued to

25    selectively ask people coming out of the business,

00267179-acac-40ed-90b6-273d293d8722

J.A. 327

Page 188

1    inobtrusively, discreetly asked people if they wanted to

2    talk to you.  Correct?

3         A    I was moved to a different unit.  I was doing a

4    different job.  The unit basically got disbanded until

5    Detective Crowley had joined.  That is when we re-picked up

6    the investigation.

7         Q    You are a detective.  So you are familiar with the

8    use of confidential informants?

9         A    Yes, sir.

10        Q    No confidential informant was utilized in this

11   case.  Correct?

12        A    No, sir.

13        Q    That is a very common law enforcement technique.

14   Correct?

15        A    Correct.

16        Q    In fact, when you arm confidential informants with

17   money, you can even record, once you conduct a later search

18   you can record that that money changed hands.  Right?

19        A    Correct.

20        Q    So you would not only have a transaction and

21   tangle evidence of that, but you would also have the

22   testimony of the confidential informant.  Correct?

23        A    Correct.

24        Q    Confidential informants were never used in this

25   case?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 189

1      A      No.  We used an undercover officer.

2      Q      You are aware of a GPS warrant, a Jones warrant?

3   Have you ever heard that term?

4      A      Yes, sir.

5      Q      You are familiar that in this case on two

6   occasions, at least two occasions that I am aware of those

7   were applied for and granted.  Correct?

8      A      Yes, sir.

9      Q      Were there any other vehicles that you continued

10  to use that technique to track participants in the

11  enterprise with this sort of suspected trafficking?

12     A      Yeah.  There was some other vehicles that we

13  possibly could have used the GPS.

14     Q      And you didn't do that?

15     A      No, sir.

16     Q      With regard to wiretap warrants, did you

17  participate in the formulation of the video warrants in this

18  case or was it just Detective Crowley?

19     A      The actual affidavits?

20     Q      Yes, the applications.

21     A      Yeah.  I assisted him with the applications and

22  some of the things leading up to the applications.

23     Q      Did you interact with the State Attorney's Office?

24     A      Yes, sir.

25     Q      Did you discuss wiretap warrants?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 190

1        A      I don't recall.

2        Q      Do you recall a discussion that maybe a video

3   warrant might be easier to get than a wiretap warrant?

4        A      Not that I recall.

5        Q      With regard to the third person that you

6   discovered, a guy from Orlando, you said he was an elevator

7   technician or something like that?

8        A      Yes, sir.

9        Q      There is actually an elevator company right next

10  door; is that correct?

11       A      Yes, sir.

12       Q      Did he work for that company?

13       A      No.

14       Q      He worked for a different elevator company?

15       A      The elevator company was out of Orlando.

16              MR. KENNEDY:  Nothing further.

17              THE COURT:  Any of defense attorneys?  Mr. Chrzan,

18  yes, sir.

19                         CROSS-EXAMINATION

20  BY MR. CHRZAN:

21       Q      Detective, I think you were talking about

22  continuing the videoing.  First of all, about a third of the

23  time the cameras were not monitored or there was no live

24  body viewing.  Correct?

25       A      There was a portion of time there was no live.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 191

```
 1      Q     4:00 p.m. to 8:00 a.m.?

 2      A     For the first I think twenty days.

 3      Q     Did you ever go back and review any of that

 4   footage?

 5      A     No, sir.

 6      Q     What would you have potentially found in the rooms

 7   or in the videoing of the rooms that might have helped with

 8   either the exchange of money in furtherance of a criminal

 9   conspiracy or the transportation of the women?  What would

10   you expect to find in those rooms as you continued your

11   taping?

12      A     You asked me why we got the extension?

13      Q     No.  I am asking you specifically what you have

14   expected to find in the rooms, what would be videoed, what

15   would be captured on video to show the furtherance of the

16   criminal conspiracy in terms of exchange of money with the

17   house and the owners or the transportation of the women?

18      A     I apologize.  I might misunderstand.  Are asking

19   for like after hours?

20      Q     No.  I am asking at any point did you see anything

21   that furthered the criminal conspiracy inside those rooms

22   beyond just a sex act between gentlemen and the prostitutes

23   that were there?

24      A     Just the money changing hands from the room to

25   back up front at the desk.
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

STATE OF FLORIDA VS ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL   DCA CASE NO. 4D19-1655, ET AL

Page 192

```
 1      Q    But you didn't actually see the money being taken
 2 to the front desk, did you?
 3      A    On some occasions, yes.
 4      Q    So there were cameras outside the rooms, too?
 5      A    Yes, sir.
 6      Q    But you never saw how that was being divvied up or
 7 who it was potentially going to in furtherance of the
 8 racketeering?
 9      A    Sure.  The majority of the cash was given to
10 Lanyun Ma.
11      Q    That was done outside the rooms.  Correct?
12      A    I believe on a few occasions there was money
13 handed to Lanyun inside the room.
14      Q    By who?
15      A    Female worker.
16      Q    You also mentioned that you said you guys
17 continued videoing because some of the female employees had
18 not been identified yet?
19      A    Yes.
20      Q    How would you expect other than capturing them,
21 their faces on video, how would you expect to identify them
22 through video footage that was taken inside the room?  Like
23 a driver's license that fell on the ground?
24      A    For instance, the female that we had recovered in
25 Orlando, she started out in East Spa in December.  She had
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 193

1    been transported to a spa in Orlando in January.  We weren't

2    able to identify her.  Once we recovered her in Orlando in

3    February, we were able to look at the video in the room and

4    match her up to identify her.

5        Q    The pole camera is in existence the entire time.

6    Correct?

7        A    Sure.  But each camera gives different angles and

8    better views.

9        Q    That identification was not made based on what you

10   had captured in the room, but based on actually what you

11   obtained in Orlando?

12       A    Able to match up it up with video that was in the

13   room.

14            MR. CHRZAN:  I have nothing further.

15            THE COURT:  Any other questions from defense

16   attorneys?  Mr. Butler, any questions?

17            MR. BUTLER:  No questions.

18            THE COURT:  May this witness be excused?

19            MR. METCALF:  Yes, your Honor.

20            THE COURT:  Thank you, sir.  You are free to go

21   about your day.

22            THE WITNESS:  Thank you.

23            MR. METCALF:  Judge, I have no more witnesses.

24            THE COURT:  Is the State calling any witnesses?

25            MR. BUTLER:  No.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 333

Page 194

```
1              THE COURT:  Did you, Mr. Metcalf, want to present

2    argument today or do you want to rely on your memo?  I was

3    going to allow everybody an opportunity to submit additional

4    authority.  I wanted some input from both the State and the

5    group of defense attorneys as to how much time.

6              MR. METCALF:  I would like some brief argument,

7    not just rely.

8              THE COURT:  Can we take a five-minute break?

9              MR. METCALF:  Yes, ma'am.

10             THE COURT:  Let's take a five-minute break.

11             BAILIFF:  All rise.  Court will be in recess.

12                         (BREAK)

13             BAILIFF:  All rise.  You may be seated.

14             THE COURT:  We are back on the record.  And I do

15   need to add an additional attorney, Attorney Kenneth Weaver.

16   Mr. Weaver, who is your client, sir?

17             MR. WEAVER:  His name is Charles Waterhouse, your

18   Honor, Case No. 2019MM000454.

19             THE COURT:  Thank you, sir.  You have been here

20   throughout the hearing, and I appreciate that.

21             MR. WEAVER:  Yes, I have.

22             THE COURT:  Mr. Metcalf, did you want to present

23   some argument?

24             MR. METCALF:  Your Honor, just briefly because I

25   think some things kind of came out that I wasn't aware of.
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 195

1          Judge, I don't think I need to go through the

2     general warrant review.  I think the Court knows how to

3     review warrants, Franks, Johnson and Leon.

4          Your Honor, I have got to be honest.  I know that

5     Mesa-Ricon does limit.  I guess my point has been in the

6     Federal system Mesa-Ricon says we don't have to adopt all of

7     the requirements of Title 3 of Title 18 because the Fourth

8     Amendment will kick in.  We don't have to adopt all of that

9     because that is a Congressional action.  So Congress hasn't

10    acted.

11         So they adopted their own requirements, but they

12    pulled the most specific protections out of 2516 that they

13    could.  And No. 5, your Honor, is a big one.  In Mesa-Ricon

14    the fifth requirements, Judge, is that the order does not

15    allow the period of interception to be longer than necessary

16    to achieve the objective of the authorization or any of them

17    no longer than thirty days.  So the order must say that.

18         Now, I am going to guess that the State is saying

19    that that "or" means you have to have one or the other.  You

20    don't have to have both.  But the cases in Florida, your

21    Honor, that interpret 934, and I know that they are saying

22    934 is not it, they tell us that you have to have both and

23    so does the statute.  You have to have both.  And it has

24    been interpreted what the "or" means in 934.

25         And just a reminder, Judge, 934 tracks the exact

00267179-acac-40ed-90b6-273d293d8722

Page 196

1    same language of 2516 which authorizes wiretaps.  Mesa-Ricon

2    pulled from 2516 the very most important parts in this exact

3    language they pulled from 2516.

4         What we are here today, Judge, to do is decide is

5    Mesa-Ricon the gold standard?  Is it?  Because if it is,

6    they adopted that very language.  In Copeland, I will cite

7    again for the record, Judge, I think it is a very important

8    case, 435 So. 2d 842.

9         In that it talks about this language.  It says the

10   purpose of the requirement of 934.094(e) which is the exact

11   same statute as 2516(4)(e), the exact same statute.  It says

12   the purpose of this requirement that the issuing Court

13   indicate the order whether the order shall automatically

14   terminate when the desired conversation has been, first,

15   seized as to prevent a general search in violation of the

16   Fourth and Fourteenth Amendments to the Federal Constitution

17   and Article 1, section 12 of the Florida Constitution.

18        Mr. Butler is saying he derives his authority,

19   their authority to do this from the Fourth Amendment, that

20   you can do searches and seizures.  There is a Florida case

21   that says the reason that language is in there is because we

22   don't want a general search and violation of the Fourth

23   Amendment.  So I guess there is some small agreement there

24   that the Fourth Amendment governs.

25        It goes on to say that the thirty-day statutory

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 336

Page 197

1    maximum is simply a statutory limitation which terminates

2    every order at the expiration of thirty days regardless of

3    whether desired communication has been obtained or the

4    object of the order has been obtained.

5         They require that limiting language with the

6    thirty-day order in this case.  So Mesa adopts the language

7    of 2516(4)(e) and (5).  It adopts that language.

8         THE COURT:  Isn't that language more you can't go

9    past thirty days, but if your purpose has been accomplished,

10   then you may only record for twenty days?  I think that is

11   what especially in Mesa is saying.  I don't see in Mesa

12   where it indicates that you have to have those two phrases,

13   parts of No. 5 spelled out.

14        MR. METCALF:  Well, Mesa doesn't --

15        THE COURT:  Are you saying Copeland is the one

16   that is going to tell me in the order it is going to say you

17   have say until your purpose is achieved or thirty days?

18        MR. METCALF:  Right.  Mesa doesn't say that,

19   Judge.  I grant that, but Mesa adopts that No. 5.

20        THE COURT:  Agreed.

21        MR. METCALF:  We are in Florida.  So we have to

22   look to Florida law.  And Florida law, again, says under

23   934, and remember that has been adopted, that has adopted

24   the language of 2516, but Mesa pulls from that very

25   important language of 2516(4)(e) that requires, that statute

00267179-acac-40ed-90b6-273d293d8722

J.A. 337

Page 198

1    requires both be there.  It requires that the order shall

2    say that.

3            Copeland interprets basically what the word "or"

4    means.  What the word "or" means is that the thirty days is

5    just telling you that is a cap, an absolute cap, but you

6    better have in the order instructions to law enforcement

7    that they are to stop.  Otherwise, Judge, they are going to

8    run every one thirty days if they want.

9            I applaud the fact that they may have taken

10   holidays off and Sundays off and not recorded.  Well,

11   actually, I guess they did record nonstop.  That never

12   stopped.  But the fact that they didn't look when they

13   wanted a Sunday and Saturday off, they didn't feel like

14   watching pornography and wanted to have a normal day, they

15   didn't look.

16           But this is designed to prohibit them from just

17   making an investigation go on forever, that language.  And

18   they didn't include it.  What is really important, Judge, is

19   they put it in their application.  They knew they had to

20   have that language in the application.  But where they

21   failed, your Honor, is they printed out some form order that

22   has been bouncing around for fifteen years, according to

23   Detective Crowley, that hasn't been reviewed.  They failed

24   in putting that limiting instruction.

25           Your Honor, there may not a specific -- Mesa-Ricon

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 338

Page 199

1    may not say that, but the Copeland case is binding because

2    it adopts the same logic of Mesa.  And that protection is

3    there for a reason.  It talks about it is there in Copeland

4    to prohibit general searches that are prohibited in the

5    Fourth Amendment.

6           Judge, we must also recognize in Article 1,

7    section 23 we are free from government intrusion.  We have a

8    specific right of privacy.  So, Judge, that is one of the

9    big points I would also make.  Your Honor, the building next

10   door was never contemplated in the motion because that came

11   out today.  They are in there basically listening.

12          One of the requirements in Mesa-Ricon is that

13   No. 4, the Judge issuing the order find that normal

14   investigative procedures have been tried and have failed and

15   reasonably appear unlikely to succeed.  They have tried for

16   a period to be too dangerous.

17          Your Honor, this case is chocked full of

18   alternative techniques that I believe Officer Crowley

19   intentionally misled this Court about whether they would be

20   successful.  He admitted the ones that he didn't put in

21   there.  If he does that, he cannot reasonably rely on the

22   protection of Leon.  You can't do that.  You can't mislead

23   the Court and have material admissions and then fall back on

24   Leon and say, well, I just followed what the Judge said.  If

25   you are responsible for the material misleading, then Leon

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 339

Page 200

1    is not going to shield you.

2         But what they did in here is they misled the Court

3    in believing we sent in a guy, an undercover in the second

4    visit.  There is a little suspicion because it is the same

5    guy.  They have a whole arsenal of police at their beck and

6    call they could have sent in there.  They could have sent in

7    an unknown number every time a new girl came in.

8         THE COURT:  And how is sending in ten different

9    undercovers ever going to lead to evidence of deriving

10   support for prostitution or RICO?

11        MR. METCALF:  Because, Judge, you can do it in

12   combination with other investigatory techniques.  If you put

13   a wiretap in there which is less invasive and you have an

14   audio wiretap or you have Eder next door with a listening

15   device listening in, maybe get a warrant to amplify that.

16        So it is the totality of the things they could

17   have done.  They could have had a wiretap along with sending

18   in undercovers.  Undercovers establish every time a new girl

19   comes in.  You establish who she is.  And she solicits that

20   undercover.  So now you know she is engaging in

21   prostitution.

22        All you need now -- you don't have to see it.  I

23   don't mean to sound -- we don't have to see crimes being

24   committed to prosecute them.  This is a new standard that

25   they have committed.  I guess I am going to have a defense

00267179-acac-40ed-90b6-273d293d8722

J.A. 340

Page 201

1   in every case from now on that if they don't have videotape,

2   they can't prove it.

3          They could have used less invasive techniques of

4   sending in undercovers, establishing each individual girl as

5   they came was engaging in prostitution.  Then at that point

6   you wiretap.  You get their phones.  They all had phones.

7   You find out who they are.  They didn't get the first phone.

8   They didn't do the first trap and trace, no pen registers.

9   They could have tapped their phone calls.

10          They could have identified the entire racket, who

11   was doing what.  And they mislead the Court in saying that

12   those techniques don't work.

13          Judge, they don't say that we can't achieve our

14   goals by using the undercover.  They are saying it won't

15   work because he will get found out or that you have to

16   consummate the act.  You don't have to consummate the act.

17   Solicitation is a crime in and of itself.  Engaging is

18   offering to commit.  They establish it every time they send

19   in an undercover.

20          You use that in combination with other

21   investigatory techniques like wiretap that you don't have to

22   invade privacy of God knows how many people because they

23   really don't know.  They have no idea how many people they

24   have recorded.

25          So, Judge, I think that leads us into there was no

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 341

Page 202

1   minimization.  Minimization is, okay, we are not just going

2   to not watch it.  They recorded nonstop.  Judge Cox

3   asterisks that part in her order.  She told them.

4           What is an invasion of privacy, Judge?  Is an

5   invasion of privacy, are they only protected if the officers

6   actually watch it or is the actual invasion the video

7   itself?

8           Judge Cox put a big asterisk next to the line

9   while monitoring the premises to be searched, the executing

10   officer shall take steps to minimize the invasion of privacy

11   to any parties not engaged in the unlawful act set forth in

12   the affidavit.

13           THE COURT:  Do you think just by its very nature

14   that the cameras recorded twenty-four hours a day for sixty

15   days, that that in and of itself indicates no minimization?

16           MR. METCALF:  Absolutely.  Absolutely, Judge.  I

17   will tell you it is part of the motion, and I understood you

18   were hearing the next one, I know this because I was sent a

19   recording of a woman.  They just happened to let it loose in

20   the sheriff's case.  They haven't let these loose yet.  They

21   exist.  They know they exist.  And they invaded the right of

22   privacies of innocent people.  And they said at least three

23   men that they know of went in there and didn't commit sex

24   acts but were recorded.  So not monitoring it.  They were in

25   charge.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 342

Page 203

1          THE COURT:  What would it matter if it was

2    recording from 11:00 p.m. to 8:00 a.m. when the business was

3    closed?

4          MR. METCALF:  Well, I suppose that wouldn't.  But,

5    Judge, if they took a day off and they weren't at their

6    computers but that spa was open, which they did Saturday,

7    Sunday, big days maybe for that spa.  They recorded all day

8    long.  And they captured innocent people by their own

9    admissions, the three men.

10          Judge, there was no minimization techniques

11    employed here.  If you capture -- unfortunately, even

12    through deposition I will never know.  It will require --

13    and Judge Morgan entered an order in the other case for them

14    to turn over every video to me because of that exact act.

15          We know the Vero Beach Police did the exact same

16    thing.  They recorded innocent people.  That is what Judge

17    Cox told them not to do.  How many times can you not

18    minimize and it be a problem?  If it is just one little

19    thing and they slipped up, okay.  They admitted under oath

20    that it went on all the time.

21          So the thirty days, the first thirty, I think they

22    said out of the total sixty they know about thirty of them.

23    They still tape the other thirty days.  So they only have

24    given over 50 percent of the videos.

25          THE COURT:  I anticipate the State probably will

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

STATE OF FLORIDA VS ROBERT FREELS, ET AL

L. T. CASE NO. 312019MM000328A, ET AL   DCA CASE NO. 4D19-1655, ET AL

Page 204

1   assert an argument that the minimization occurred when they

2   are sitting at their computer and they are monitoring those

3   cameras.  And that when they see that there is not a sex

4   act, they are not watching it.

5            MR. METCALF:  But, Judge --

6            THE COURT:  Is that not minimizing?

7            MR. METCALF:  No, because here is the problem.

8   They recorded it.  They weren't authorized to do that, by

9   the way.  They recorded it.  And they now have it in their

10  possession.  And I am quite positive they didn't mean to

11  turn it over to me in the other case, but they did.

12           So if he can turn it over in that other case, I am

13  not going to accuse the police that they are going to mass

14  release it, but they could.  When they record it is the

15  invasion.  It is not the dissemination of it.  It is the

16  invasion that potentially -- your Honor, I would be

17  petrified to think that there is a recording of me

18  innocently going to a spa, and it is out there.

19           If it is a woman that is going in there that is

20  sixty years old, I guess they could probably know.  They are

21  making that judgment call, and they didn't make the judgment

22  call.  So just shutting their eyes off or turning their

23  computer off and not watching this video, the invasion

24  happened and they admitted it about three men.  That is the

25  most important part.  They admitted that three innocent men

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 344

STATE OF FLORIDA VS ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL   DCA CASE NO. 4D19-1655, ET AL

Page 205

 1    were recorded that weren't charged.

 2           They also omitted a material fact that they

 3    stopped a third John.  That is huge because they said, oh,

 4    we didn't want to tip off anymore.  They did two in one day.

 5    Both cooperated.  Six months earlier they get a full

 6    cooperator.  These men aren't offered immunity.  They tell

 7    exactly the same story that Detective Brock tells.  They say

 8    they can't use them anymore.  They write in their affidavit,

 9    oh, we can't use them because we are afraid they will tip.

10    That is just not believable.  It is a material misstatement

11    to the Court.

12           I think Mr. Kennedy brought up that they didn't

13    even contemplate or address with the Court the possibility

14    of using a confidential informant.  They could have sent in

15    a CI to go in there to infiltrate the entire organization.

16    Judge, this is what they keep referring to.  We are

17    concerned about money laundering.  We are concerned about

18    racketeering.  They are using prostitution as a predicate

19    act.  I get it.

20           But how many predicate acts of prostitution do

21    they need to prove racketeering?  The minimum is two.  They

22    have got 100.  And it is not until January 10 that there is

23    a conversation with the State that they basically say, okay,

24    we are going to stop video in the rooms.  After 150 people,

25    they decide, oh, we have got enough.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 345

STATE OF FLORIDA VS. ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL   DCA CASE NO. 4D19-1655, ET AL

Page 206

1          Under their logic, this warrant could keep going

2     and going every time a new woman came in.  They could say,

3     well, she is deriving funds.  We need that predicate act to

4     prove that.  They knew the four central people involved in

5     this case on the first day.  Ken Zullo is the only other

6     person that comes along.  And he is charged with

7     transporting prostitution.  That is it.

8          Everyone else they knew about.  They knew who

9     Lanyun Ma was.  They knew Lanfen Ma.  They knew Ms. Zhang

10    and one other lady that they wound up getting captured in

11    the video.  That is it.  And for that they ran a video until

12    they got 150 men.

13         Finally, Judge, the monitoring only, I know that

14    has been hammered and hammered.  Judge, I expect the State

15    is going to argue a case called State v. Hume.

16         THE COURT:  How do you spell that last name?

17         MR. METCALF:  H-U-M-E.  It is in my memorandum.

18    Actually, it is not in my memorandum.  It is State v. Hume.

19    I can give you the case cite.  It is 512 So. 2d 185.  It is

20    a Supreme Court of Florida case.  It basically says if

21    officers are allowed to record with a body camera, then they

22    are allowed to monitor.

23         So an officer goes in in an undercover capacity.

24    He is wearing a body camera.  It is a drug bust, I believe.

25    They are saying if you can monitor that, he can send it out

00267179-acac-40ed-90b6-273d293d8722

J.A. 346

Page 207

1   to the other officers.  They can sit there and write notes

2   about what they are hearing and seeing on the body cameras.

3   But why do that because when you can just record because the

4   recording would be a better memorialization than a writing.

5   So they say if you can monitor in that case, of course, you

6   can record.

7           THE COURT:  But that is a body camera?

8           MR. METCALF:  That is a body camera case on a

9   warrantless search.  It is not a search rather, Judge.  Here

10  is the big difference.  I want the State if they have it to

11  show a case where you can go into a place where there is a

12  right of privacy where a warrant has been issued, and they

13  say monitoring and recording there is no difference.  I

14  can't find that case.

15          So the fact that these men had an expectation of

16  privacy, it appears we don't know and we are not here to say

17  who wrote that order, whether it was Crowley or they cut and

18  pasted or it was Judge Cox who did it herself.  It doesn't

19  matter.  Judge Cox signed it.  Judge Cox had the ability to

20  add things to it, subtract things to it.  They could

21  question her.  They could clarify it.  They could do all

22  kinds of things.  They didn't do that.  She signed an order

23  that only allowed monitoring.

24          The big important part to this, Judge, is she had

25  a ten-day report back.  You are to report back to me within

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 208

1    ten days about what you did, about your doings.  They

2    ignored that.

3          I believe, Judge, there is case law that

4    establishes that a fatal flaw in and of itself.  You can't

5    ignore that.  It is not just you are in contempt of the

6    Court's order.  There is a reason for report back.  I want

7    to know what you did, what you installed.  They are saying

8    we don't have an inventory yet because we don't have any

9    recordings yet.

10          I don't know that that is true.  They have to come

11   back with an inventory which exists in the sheriff's case,

12   by the way, where they installed how many cameras, what they

13   were doing, what they were receiving.

14          At that point, Judge, the purpose of you coming

15   back to me and telling me what you did, maybe then she

16   grants the recording.  Maybe she just wants them to monitor

17   it first to see if they can see what they think they are

18   going to see and then, okay, now you can record.

19          But she limited it.  Whether she wrote it, whether

20   she came up with that language or they materially misled

21   her, it doesn't matter.  She didn't authorize it.  And they

22   are not allowed to decide for themselves what they can and

23   cannot do.  They are limited by that order.  I think that is

24   a fatal flaw to what they did.  They executed it wrong.

25          And I started out this by saying, Judge, you can

Page 209

1    find probable cause.  I can fail Franks.  I can fail all of

2    that, but you cannot issue an order that is illegal.  And

3    you have to abide by the rules and you can't operate outside

4    the order.

5            You can't authorize waterboarding.  And if you

6    authorize a search and seizure of, you know, a car, they

7    can't go out on their on and say, well, we are going to

8    search the house.  You have to follow the commands that you

9    were given.  There is a ten-day callback.  They don't do it.

10   They don't provide an inventory as required in the order.

11   Judge, finally, they go ahead and record when monitoring was

12   only allowed.

13           Those are the big points, your Honor.  I provided

14   obviously a very long memorandum.  I would ask the Court to

15   find those the things I felt I needed to supplement.

16           THE COURT:  Does any other defense lawyers want to

17   make any other closing argument on the record?  I am going

18   to allow an opportunity for you all to submit authority.  We

19   are going to talk about that.  Is there any additional

20   argument?

21           MR. KENNEDY:  I just want to say two things, your

22   Honor.

23           THE COURT:  Yes, sir, Mr. Kennedy.

24           MR. KENNEDY:  With regard to the ten days, I just

25   want to point out if that violation of the warrant is

00267179-acac-40ed-90b6-273d293d8722

Page 210

1    considered to be fatal, and I think it should be, then it is

2    not a dispositive ruling.  In other words, the State can

3    still proceed based on what the officer saw if he takes out

4    what they saw isn't right.

5          So this Court could grant that motion and prevent

6    the introduction of the evidence that was recorded.  I just

7    add to that being Fourth Amendment invasion because it is an

8    ongoing invasion because that intrusion continues so long as

9    that evidence exists.

10          With regard to comment of Mr. Butler that the

11   Fourth Amendment is a source of authority for invasion of

12   privacy, that is the opposite of my understanding of the

13   Constitutional protections and even 934 limit the State's

14   law enforcement ability to invade privacy.  It is not a

15   source of authority.

16          In Florida, under Article 123, section 23 there

17   has to be a specific source of authority, and I believe it

18   is this kind of interception of communication.  So if there

19   isn't specific grant of authority and the State is not

20   relying on 934, then there is no authority for the issuance

21   of a warrant.  It is a warrantless search.  We all agree if

22   it is a warrantless search, it is illegal.

23          I just join with Mr. Metcalf in all of the

24   deficiencies as it relates to the failure to exhaust the

25   techniques, the misleading and omissions as it relates to

00267179-acac-40ed-90b6-273d293d8722

STATE OF FLORIDA VS ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL   DCA CASE NO. 4D19-1655, ET AL

Page 211

1    those efforts.

2         MR. METCALF:  Just very quickly, the huge task

3    before the Court, if the Court was to find that those

4    deficiencies in and of themselves, and what I am talking

5    about is the ten-day callback, not having the limiting

6    language to stop and these things that just kill the warrant

7    by themselves, if the Court was to find that those didn't

8    have, you know, Judge, you have to look at necessity.  When

9    did this stop becoming necessary.  When was enough enough.

10        And Mesa-Ricon talks about what needs to be in the

11   order, how long do they keep getting to say we need to do

12   this?  We have to look at necessity as well.  Is that no

13   longer needed.  So we have to analyze maybe the warrants if

14   we get to that point, and I think we don't get to that point

15   clearly, but is the extension necessary?  In Palm Beach,

16   five days was enough.  That is crazy to me that we needed

17   sixty.

18        Your Honor, the last thing is I do not yield that

19   Bruce Colton wasn't required to authorize this application.

20   Again, that is 934 language, but it exists in the statute

21   that gave rise to Mesa-Ricon that they pulled from.  I don't

22   read Mesa-Ricon saying if these five things are done that we

23   don't have any problem with you.  You might have a problem

24   with the Fourth Amendment, but you still, your Honor, there

25   are reasons prosecutors have to authorize applications like

00267179-acac-40ed-90b6-273d293d8722

J.A. 351

Page 212

1    this.

2            I have a lot of cases that talk about, again, with

3    no disparaging meant to Judge Cox, rubber stamping orders.

4    It looks like that is what happened here.  There was no

5    review.  It was okay.  Judge, we have to protect our

6    citizens.  That is why those statutes exist.  That is why we

7    require the State Attorney to review this and not just cut

8    these guys loose.

9            THE COURT:  Any other argument?  Any other

10   defense?  Mr. Mosher.

11           MR. MOSHER:  I just wanted to address something.

12   I think Mr. Kennedy said that it is not, I guess,

13   dispositive if you find -- I would disagree with that

14   because I don't think witnesses are allowed to testify about

15   a video unless it is presented to the jury itself.

16           I would also agree with Mr. Metcalf.  His

17   memorandum is comprehensive.  Law enforcement needs to try

18   the least intrusive means first and to fail before they

19   begin to climb that ladder to get the video surveillance.

20           THE COURT:  Anyone else?  Mr. Sercombe, did you

21   have something to add, sir?

22           MR. SERCOMBE:  Yes, briefly.  Your Honor, I would

23   like to say I don't have knowledge and wisdom of my

24   colleagues to that extent, but I would like to say that this

25   is a door that would be open that would degrade the

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

                                                              Page 213

 1    Constitutional rights and the privacy right of our fellow

 2    citizens.  Any man or woman that goes into a massage room

 3    will be affected by this, and they will not know that they

 4    are not being monitored.  That is all.

 5              THE COURT:  Thank you, sir.  Any other defense

 6    attorneys?  Mr. Kessler.

 7              MR. KESSLER:  You said you are going to allow

 8    reasonable time for us to submit --

 9              THE COURT:  Yes.  First, let me see if the State

10    wants to -- are you all going to argue anything this

11    afternoon?

12              MR. WILSON:  Not orally, Judge.  I think the only

13    issue that I would bring up is we reserve on the issue of

14    standing.  I think that that should be resolved prior to any

15    deadline being set for a response.

16              MR. METCALF:  Judge --

17              THE COURT:  Well, I mean, I will disagree with you

18    there, but, yes, I do understand we reserved on the

19    standing, and we will address that.  How long would you all

20    like to be able to submit authority, any authority that you

21    would like the Court to consider?

22              MR. KESSLER:  Judge, I am going to ask if you

23    could give two weeks.  I could do it sooner than that, but

24    my mother is going to undergo a heart procedure in about

25    half an hour.  And I don't know what is going to happen.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

Page 214

1          THE COURT:  Is two weeks sufficient for everyone?
2   That it is probably more than enough.
3          MR. WILSON:  I believe two weeks would be
4   sufficient.
5          MR. KENNEDY:  Would that give an opportunity to
6   reply, since we are the moving party, we could have an
7   opportunity to reply after the State responds. I would ask
8   for a brief period of time after the State's filing.
9          THE COURT:  Okay, so let's do this.  Let's require
10  both sides, any defense attorneys that want to submit and
11  for those that are not here, if you all will pass this
12  message onto those that are not here, I will require both
13  the defense and the State to submit any additional authority
14  that you would like the Court to consider by Tuesday, May 7
15  by 5:00 p.m.
16          And then I will allow the defense to respond to
17  anything that the State has.  I am only going to give you a
18  week to do that.  If you could do that by Tuesday, May 14 at
19  5:00 p.m. I will hold off issuing any ruling until after
20  date, May 14.  And then in between then and now we will
21  address the issue of standing.  Is that sufficient for
22  everyone?  Any questions?  Let me talk to Judge Morgan and
23  see if we can.
24          MRS. MCCAIN:  Judge, if I may, the issue perhaps
25  is that Judge Morgan's docket call on my particular case is

00267179-acac-40ed-90b6-273d293d8722

J.A. 354

Page 215

1   set for May 15.  You are allowing deadlines beyond that

2   time.  We would obviously need to be able to continue our

3   cases without prejudice to our clients.

4          THE COURT:  Judge Morgan will be told my

5   deadlines.  I am going to go tell him that right now.

6          MR. METCALF:  For the record, I am handing her

7   Copeland.

8          MR. MOSHER:  And just to clarify, as far as the

9   issue of standing goes --

10          THE COURT:  We will have a special hearing to

11   address every clients' issue with regard to standing.

12          MR. MOSHER:  I thought I heard Mr. Kessler mention

13   something about affidavit.

14          THE COURT:  I don't know if the State --

15          MR. WILSON:  It may be sufficient, Judge.  We just

16   have to see what that affidavit contains.

17          THE COURT:  If the State will allow that to happen

18   by affidavit, then we will not have to have a hearing.

19          MR. METCALF:  Can I just say something?  Here is

20   my problem.  I established standing with one client.  So the

21   State is in a way, and I know what they are doing, prior to

22   the issuance of the Court's order, they want these men to

23   come in and go that is me on the video, identify themselves.

24          Now, to the Court, and I am not predicting that

25   you are granting my motion, I am not saying that, Judge, but

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 355

Page 216

1    if you grant the motion, they are going to have a mad rush

2    of people going, yeah, that is me on the video.

3            THE COURT:  I think the State's argument is I

4    couldn't even begin to consider to grant your motion if you

5    haven't shown --

6            MR. METCALF:  Well, you could on Mr. Taig.

7            THE COURT:  Correct.

8            MR. METCALF:  And then we could let everyone else

9    establish standing after that ruling.  Your Honor, if you

10   deny my motion, which I pray that you won't, if you deny the

11   motion, why should these men have to come forward and

12   establish standing and say that is me on that video?

13           I don't agree.  They are wanting us to give them

14   an element of their charge by identifying our clients.  I

15   think Mr. Taig, you can just make the ruling on Mr. Taig.

16   Now these men have all joined in and they can establish

17   standing after Mr. Taig's ruling if they need to.

18           I would caution my fellow lawyers that they might

19   be setting themselves up for 3.850 motion if they go and

20   establish standing.

21           THE COURT:  I anticipate this will come as an

22   issue in the second series of motions to suppress in front

23   of Judge Morgan.

24           MR. METCALF:  I have a person coming for that as

25   well, Judge.  I figured Mr. Butler would pull something like

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 356

Page 217

1    this.

2            THE COURT:  Is there anything else we need to put

3    on the record?  I am going to go off the record.

4        (Thereupon, at 1:30 p.m., the above-entitled hearing

5    was concluded.)

6

7                    (END OF VOLUME II OF II)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

00267179-acac-40ed-90b6-273d293d8722

J.A. 357

Page 218

1    STATE OF FLORIDA          )
                               :  SS
2    COUNTY OF INDIAN RIVER    )

3

4                         CERTIFICATE

5

6         I, KATHY DUNCOMBE, a Shorthand

7     Reporter and Notary Public of the State of Florida

8    at Large, do hereby certify that I was authorized to and

9    did report stenographically the foregoing proceedings and

10   that the transcript is a true and correct transcription of

11   those proceedings.

12         DATED this 24th day of April, 2019.

13

14   *Kathy Duncombe*
     KATHY DUNCOMBE

15

16

17

18

19

20

21

22

23

24

25

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 358

# EXHIBIT "F"

IN THE COUNTY COURT OF THE NINETEENTH JUDICIAL CIRCUIT
IN AND FOR INDIAN RIVER COUNTY

STATE OF FLORIDA,
    Plaintiff,

vs.                             Case No.    312019 MM 000560 A

RANDY HINES,
    Defendant.
_____/

## ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS

THIS CAUSE having come before the Court at the Defendant's Motion to Suppress the surveillance evidence gathered pursuant to two (2) Orders for Surreptitious Entry and Installation of Electronic Surveillance Camera (the "Orders"), on April 23, 2019, the Court having heard the testimony; reviewed the memorandum of law provided by the Office of the State Attorney along with the original memorandum of law as well as the supplemental memorandum provided by the defense; and considering the relevant case law finds as follows:

The defense arguments as to the following issues are without merit: 1) lack of probable cause for the initial approval of the Order on November 27, 2018 and the extension Order on December 28, 2018; 2) claim that the affiant knowingly and intentionally misled Judge Cox and Judge Kanarek pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674 (1978) and *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405 (1984); 3) claim that the Order only authorized the "monitoring" and not the recording of the cameras; 4) claim that there were less intrusive means of investigation available to the State and that the video surveillance warrant was not a necessity; and 5) the renewal of the Order by Judge Kanarek on December 28, 2018 was not necessary to achieve the stated objectives – gathering evidence of prostitution and evidence of deriving support from the proceeds of prostitution in violation of Florida Statute.  It is the opinion of this Court after having given great deference to the Circuit Court Judges that approved the Orders, the Motion to Suppress must be granted because of a fatal flaw in the execution of those Orders.

Summary of the Facts

After having received numerous citizen complaints regarding activity at East Spa located at 2345 14th Avenue, Suite 10 in Vero Beach, Florida.  The Vero Beach Police Department began an investigation into possible prostitution taking place at the spa. Detectives did a Google search of the phone number listed for the spa and discovered that the phone number appeared in several ads for escorts and in ads for sex for money.  A check of the business through Sunbiz.org found that East Spa was a licensed massage parlor owned by Yongzhang Yan.  It was discovered that in addition to East Spa, Mr. Yan owned several other massage parlors in the State of Florida.  At this point, Detective Gasbarrini contacted an investigator with the Department of Health and asked the investigator to do an annual inspection of the spa.  As a result of that inspection, Linfen Ma and Shuxiang Zhang were identified as licensed massage therapists working at the spa.  It soon became known that Lanyun Ma was also associated with East Spa and that she was married to the spa owner, Yongzhang Yan. Ms. Lanyun Ma has a criminal history out of New York and Massachusetts that include charges for human trafficking and prostitution.

On two (2) separate occasions, Detective Chip Brock went into the spa in an undercover capacity for the purpose of receiving a massage.  Each time he paid for the service at the front reception desk and was then led to a private dimly lit massage room within the business.   Once in the room, Det. Brock was instructed to get undressed and lay face down on the massage table.  The massage therapist then entered the room. On each visit, the massage therapist began massaging Det. Brock and then at some point inquired as to whether he would like to engage in various sex acts for additional money.

Law enforcement furthered its investigation by conducting visual surveillance at the spa leading to contact with two (2) men that advised while inside the spa the women conducting the massage offered them sex acts for money.  Through the visual surveillance of the spa, law enforcement noticed that large numbers of men were visiting the business and were staying for short periods of time.  Visual surveillance of the subjects at the spa saw Lanyun Ma purchase large amounts of condoms at Wal-Mart.

Trash pulls were conducted at the spa on multiple dates and from the garbage law enforcement was able to retrieve napkins with what field tested positive for the presence of seminal fluid along with female hygiene products, mail, receipts and what appeared to be ledgers tracking the amount of money coming into the spa each day.

At this point, law enforcement sought a warrant for the video recording of the interior of East Spa.  The recordings that were obtained as a result of the Orders for Surreptitious Entry and Installation of Electronic Surveillance Camera are what are at issue in this case and are what the defense seeks to suppress as an unreasonable search and seizure.

### Standing

The first issue to be addressed is the issue of standing.  At the hearing, Keith Taig testified under oath that he visited the East Spa in November or December of 2018.  He also identified himself as being the person seen in the video which depicts a sexual act between himself and a female.  At the conclusion of that testimony, Assistant State Attorney Ryan Butler indicated that the testimony provided by Mr. Taig was sufficient to establish standing to challenge the Order.  This Court then entered an Order on Standing for Motion Suppress allowing each of the defendants that joined in the Motion to Suppress or whom filed their own Motion to Suppress to provide an affidavit to the Clerk of Court to establish standing.  The defendant has submitted an affidavit or has provided testimony under oath in open court establishing his individual standing to contest the search and seizure conducted in this case.

### Legitimate Expectation of Privacy

The State of Florida is also challenging whether the defendant has standing to challenge the Orders because he lacks the requisite expectation of privacy that is protected by the Fourth Amendment from unreasonable searches and seizures.  Article I, Section 12 of the Florida Constitution provides that an individual's right against unreasonable searches and seizures "shall be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court."  Art.I, Sec. 12 (Fla. Const.)  The State relies on the United States

Supreme Court's ruling in  *Minnesota v Carter,* 525 U.S. 83, 119 S.Ct. 469 (1998)  for the proposition that the defendant does not have an expectation of privacy in this case. That reliance is misplaced. The Court found in *Carter*, that the defendants in that case did not have an expectation of privacy in an apartment that they were simply visiting for a short period of time for the sole purpose of conducting illicit activity, namely, the packaging of cocaine.  The State argues that the defendant in this case does not have an expectation of privacy because he visited the Spa, an open business, for a short period of time for the purpose of conducting illicit activity, receiving a sex act.  In support of this argument, the State cites to *State v.* Davis, 623 So2d 622 (Fla. 4th DCA 1993) and *State v.* Conforti, 688 So.2d 350 (Fla. 4th DCA 1997).  That analysis fails to recognize that the expectation of privacy is a personal right that attaches to an individual rather than a right that attaches to a particular place. *Minnesota v. Olson*, 495 U.S. 91, 110 S.Ct. 1684 (1990)

The analysis in the case at issue must focus on whether the defendant had a legitimate expectation of privacy in the massage room of East Spa and whether that expectation of privacy was reasonable. *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421 (1978).  Clearly, anyone seeking a massage in a professional setting has a reasonable, subjective expectation of privacy.  It is customary that for the purposes of a massage in a spa that is open to the public that the client is escorted to a private secluded room. Once inside the massage room, out of the view of the massage therapist, the client typically removes some if not all of his or her clothing.  The defendant in this case did exactly this.  Receiving massage services at a spa in some form of undress have become a societal norm and the expectation of privacy one expects while receiving that massage is one society objectively supports as reasonable.  *Minnesota v. Olson*, 495 U.S. 91, 110 S.Ct. 1684 (1990)

Just as there is a reasonable expectation of privacy in a doctor's office, a dressing room or fitting room of a department store or a restroom in a business, it is the opinion of this Court that there is a reasonable expectation of privacy in a massage room and therefore the defendant had a legitimate expectation of privacy that is protected by the Fourth Amendment to the United States Constitution.

Law Applicable to Video Surveillance

Both the defense and the State concede that there is no Florida authority directly on point that allows for surreptitious recording by video pursuant to a search warrant. We must therefore look to federal law for that authority.  We find some guidance in *United States v Mesa-Rincon*, 911 F.2d 1433 (10th Cir. 1990).   The court in *Mesa-Rincon,* indicated that a magistrate shall issue an order permitting video surveillance only when:

(1) there has been a showing that probable cause exists that a particular person is committing, has committed or is about to commit a crime;

(2) the order particularly describes the place to be searched and the things to be seized in accordance with the fourth amendment;

(3) the order is sufficiently precise so as to minimize the recording of activities not related to the crimes under investigation;

(4) the judge issuing the order finds that normal investigative procedures have been tried and have failed or reasonably appear to succeed if tried or appear to be too dangerous; and

(5) the order does not allow the period of interception to be longer than necessary to achieve the objection of the authorization, or in any event longer than thirty days.

*Mesa-Rincon at 1436.*

The real issue for this court is the manner with which the Orders were executed. Specifically, the lack of steps taken by law enforcement to minimize the invasion of privacy to any person not engaged in unlawful acts.    Judge Cox signed the Order allowing the installation of cameras at East Spa on November 27, 2018.   Homeland Security, working in conjunction with the Vero Beach Police Department determined the locations within the Spa to place the cameras.  Homeland Security agents then installed the cameras on November 29, 2018 using equipment belonging to Homeland Security. The cameras were placed to record the front reception desk where clients check in, select the service to be provided from a menu card and then pay for those services. Cameras were also installed in the individual private massage rooms.   Once

the cameras were installed at the Spa, they were set to record continuously.  At no time over the period of 60 days were the cameras turned off.

Law enforcement began monitoring the cameras on November 30, 2018.   Law enforcement was not authorized to monitor or record the innocent person that simply went to the massage parlor for a massage.  Yet, that is exactly what occurred.    This Court disagrees with the State's assertion that the lack of minimization was not specifically pled in the defendant's Motion to Suppress and should therefore not be considered by the Court.  (See Motion to Suppress paragraphs 12 and 16)   This Court also finds the State's assertion that it has been "prevented from responding to any specific claim, since none was made" without merit in light of the fact that the State did not submit its State's Response to Defendant's Motion to Suppress until May 6, 2019, well after the nearly four (4) hour Motion to Suppress hearing at which a great deal of testimony was taken concerning the minimization efforts of law enforcement as well as after having received a copy of the Motion to Suppress hearing transcript.

The evidence in this case must be suppressed as a result of law enforcement's disregard of the duties to "minimize the invasion of privacy to any parties not engaged in the unlawful acts set forth in the (search warrant) affidavit" in direct violation of the Order signed by Judge Cox on November 27, 2018 and the Order signed by Judge Kanarek on December 28, 2018.  The Affidavits for Surreptitious Entry and Installation of Electronic Surveillance Camera (the "Affidavits") provided broad guidelines for minimization including: "that all monitoring of visual surveillance shall be conducted in such a way as to minimize the visual surveillance and disclosure of the visual surveillance intercepted to those communications relevant to the pending investigation;" surveillance must immediately terminate when it is determined that the video surveillance is unrelated to this investigation;" that video surveillance should, at least, continue for a number of minutes to determine whether or not a sexual act is taking place during, at the beginning, or at the end of a paid for massage."   While the Orders themselves did not contain any of those broad guidelines from the Affidavits, the Orders

did state that "the executing officers shall take steps to minimize the invasion of privacy to any parties not engaged in the unlawful acts set forth in the affidavit."  [1]

The evidence presented at the Motion to Suppress by the detectives responsible for the monitoring of the cameras at East Spa was that each and every camera installed at the spa recorded **all** activity in the spa for 24 hours a day 7 days a week for 60 straight days whether or not anyone in law enforcement was monitoring the recordings. The cameras recorded on Saturdays and Sundays when law enforcement decided to "take a day off" and not monitor any activity whatsoever at the spa as well as other days that the spa was open for business.  The entirety of the 60 days worth of recordings are presently being stored on a server at the Vero Beach Police Department.  There was no effort at all on the part of law enforcement to comply with the extremely broad minimization guidelines they themselves requested the Court impose.  There is no doubt that this total lack of minimization is anything other than a violation which requires the suppression of all video evidence.

In the State's Response, the State discusses various minimization techniques that have been authorized by Federal Courts over time including intrinsic minimization which occurs when law enforcement discontinues monitoring after they determine that the activity is not relevant to the purpose of the investigation; transcribing only those communications pertinent to the investigation; and extrinsic minimization in which law enforcement would limit the number of hours or days that are monitored.  *United States v. Daly,* 535 F.2d 434 (8th Cir. 1976); *Bynum v. United States,* 475 F.2d 832 (2nd Cir. 1973); *United States v. Chavez*, 533 F.2d 491 (9th Cir. 1976)   Interestingly, none of the minimization techniques articulated by the State were utilized in this case with the possible exception of what the State argues was "extrinsic minimization".   It is the State's contention that extrinsic minimization was done in the present case because law enforcement did not monitor all of the recordings.  In fact, the testimony indicated that law enforcement only monitored for 50% of the allowed time – 30 out of the 60 days authorized.  That argument would have some merit but for the fact that 100% of all of

---

[1] While the defendant does not challenge the language in the orders, this court has doubts about the lack of specificity in the orders as to camera placement, minimization procedures to use with male customers and minimizing the impact on female clients.

the cameras installed intercepted and recorded for the entirety of the 60 days authorized by the Court.  Extrinsic minimization would have consisted of powering down the cameras when law enforcement was not actively monitoring the cameras.

        Detectives testified that during the time when law enforcement was monitoring the cameras, there were three (3) individuals that were recorded that did not engage in a sex act at the time they were being both monitored and recorded.  Had the State been using intrinsic minimization, these three (3) individuals would not have been recorded receiving a legitimate spa service in the privacy of a massage room.  But perhaps what is most notable, is that there remains on a hard drive somewhere at the Vero Beach Police Department, recordings that were made but were never monitored – 30 full days worth.  We will not know how many more innocent clients were intercepted and recorded simply receiving a massage on a Saturday or Sunday afternoon unbeknownst to them that the government was recording their every move.  As stated by Judge Kathleen H. Roberts in her Order in *State v. Frahm*, 2019-000445-MM (Martin County, County Court, May 1, 2019) "the innocent client was treated the same by law enforcement as the criminal element they sought to capture. "

        Video surveillance is the most intrusive form of surveillance utilized by the government to investigate crime.  As such, it is incumbent upon the government that the rights of private law abiding citizens are not infringed upon during that surveillance.  Thus, minimization is a strict requirement under both the Fourth Amendment and *Mesa*.  The lack of minimization by the law enforcement entrusted to monitor the cameras requires the suppression of the video recording in this case.

        DONE AND ORDERED in Vero Beach, Indian River County, Florida, on this 16th day of May, 2019.

05/16/2019 13:17:00
2019 MM 000460 A

eSigned by MENZ, NICOLE  05/16/2019 13:17:00 6AiVzu-e

**Nicole P. Menz, COUNTY JUDGE**

cc:
STATE ATTORNEY
ANDREW METCALF, ESQ

# EXHIBIT "G"

301 So.3d 981
District Court of Appeal of Florida, Fourth District.

STATE of Florida, Appellant,
v.
Robert KRAFT, Appellee.
State of Florida, Appellant,
v.
Robert Freels, et al, Appellees.
State of Florida, Appellant,
v.
Hua Zhang, Lei Wang, Lei Chen,
and Shen Mingbi Appellees.

No. 4D19-1499
|
Nos. 4D19-1655
|
4D19-1656
|
4D19-1657
|
4D19-1658
|
4D19-1659
|
4D19-1660
|
4D19-1661
|
4D19-1662
|
4D19-1663
|
4D19-1664
|
4D19-1665
|
4D19-1666
|
4D19-1667
|
4D19-1668
|
4D19-1669
|
4D19-1670
|

4D19-1671
|
4D19-1672
|
4D19-1673
|
4D19-1674
|
4D19-1675
|
4D19-1676
|
4D19-1677
|
4D19-1678
|
4D19-1679
|
4D19-1680
|
4D19-1681
|
4D19-1682
|
4D19-1683
|
4D19-1684
|
4D19-1685
|
4D19-1686
|
4D19-1687
|
4D19-1688
|
4D19-1689
|
4D19-1690
|
4D19-1691
|
4D19-1692
|
4D19-1693
|
4D19-1694
|
4D19-1695



|
4D19-1696
|
4D19-1697
|
4D19-1698
|
4D19-1699
|
4D19-1700
|
4D19-1701
|
4D19-1702
|
4D19-1703
|
4D19-1704
|
4D19-1705
|
4D19-1706
|
4D19-1707
|
4D19-1708
|
4D19-1709
|
4D19-1710
|
4D19-1711
|
4D19-1712
|
4D19-1713
|
4D19-1714
|
4D19-1715
|
4D19-1716
|
4D19-1717
|
4D19-1718
|
4D19-1719
|

4D19-1732
|
4D19-1733
|
4D19-1734
|
4D19-1735
|
4D19-1736
|
4D19-1737
|
4D19-1738
|
4D19-1739
|
4D19-1740
|
4D19-1741
|
4D19-1742
|
4D19-1743
|
4D19-1744
|
4D19-1745
|
4D19-1746
|
4D19-1747
|
4D19-1748
|
4D19-1749
|
4D19-1750
|
4D19-1751
|
4D19-1752
|
4D19-1753
|
4D19-1754
|
4D19-1755
|
4D19-1756



4D19-1757

4D19-1758

4D19-1759

4D19-1760

4D19-1761

4D19-1762

4D19-1763

4D19-1764

4D19-1765

4D19-1766

4D19-1767

4D19-1768

4D19-1769

4D19-1770

4D19-1771

4D19-1772

4D19-1773

4D19-1774

4D19-1775

4D19-1776

4D19-1777

4D19-1778

4D19-1779

4D19-1780



4D19-1781

4D19-1782

4D19-1783

4D19-1784

4D19-1785

4D19-1803

4D19-1804

4D19-1805

4D19-1806

4D19-1807

4D19-1808

4D19-1809

No. 4D19-2024

[August 19, 2020]

**Synopsis**

**Background:** Defendants, who operated massage parlors, were charged in separate cases in the 15th Judicial Circuit, Palm Beach County, Leonard Hanser, J., and Joseph Marx, J., and in the County Court, Indian River County, David C. Morgan, J., and Nicole P. Menz, J., with misdemeanor and felony prostitution-related offenses, based on allegations that the parlors were providing sexual services. The courts granted defendants' motions to suppress video evidence of parlors' interior. State appealed and the appeals were consolidated.

**Holdings:** The District Court of Appeal, Ciklin, J., held that:

[1] defendants had standing to challenge law enforcement's use of hidden cameras to surveil the massage parlors' interior;

[2] law enforcement was obligated to minimize the intrusion on privacy of defendants and their clients;

[3] law enforcement failed to sufficiently minimize the recording of innocent clients;

[4] law enforcement did not act in good faith in obtaining search warrants; and

[5] exclusion of all video surveillance was warranted, rather than solely recordings of innocent conduct.

Affirmed.

May, J., concurred specially with separate opinion.

**Procedural Posture(s):** Appellate Review; Pre-Trial Hearing Motion.

West Headnotes (19)

[1]   **Criminal Law**   👉 Reception of evidence

A trial court's ruling on a motion to suppress comes to the appellate court with a presumption of correctness, and the court must interpret the evidence, inferences and deductions therefrom in favor of sustaining the trial court's ruling. U.S. Const. Amend. 4.

[2]   **Searches and Seizures**   👉 Persons, Places and Things Protected

What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection, but what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. U.S. Const. Amend. 4.

[3]   **Searches and Seizures**   👉 Privacy interest or expectation, in general

In order to establish standing to raise a Fourth Amendment violation, a defendant must demonstrate a legitimate expectation of privacy in the area searched or the item seized. U.S. Const. Amend. 4.

[4]   **Searches and Seizures**   👉 Expectation of privacy

The inquiry into whether a defendant has a legitimate expectation of privacy under the Fourth Amendment in an area searched or an item seized involves two distinct questions: (1) whether the individual has exhibited an actual (subjective) expectation of privacy – i.e., whether the individual has shown that he or she seeks to preserve something as private, and (2) whether the subjective expectation of privacy is one that society recognizes as reasonable – i.e., whether the expectation is objectively justifiable under the circumstances. U.S. Const. Amend. 4.

[5]   **Searches and Seizures**   👉 Particular concrete applications

Defendants, who operated massage parlors, and their clients had a legitimate expectation of privacy in massage rooms once the doors to such rooms were closed, and thus defendants had standing to challenge law enforcement's use of hidden cameras as an unlawful search under the Fourth Amendment in defendants' cases for prostitution-related offenses, despite State's argument that most of the customers recorded were engaged in unlawful sexual activity; surveillance took place in a professional private setting where clients were expected to partially or fully disrobe, and state statutes expressly recognized a legitimate expectation of privacy in places where a reasonable person could believe that he or she could fully disrobe in private. U.S. Const. Amend. 4; Fla. Stat. Ann. §§ 810.145(1)(c), 877.26.

[6]   **Searches and Seizures**   👉 Persons, Places and Things Protected

The Fourth Amendment protects people from unreasonable searches, not places. U.S. Const. Amend. 4.

[7]   **Telecommunications**   👉 Scope; minimization

45 Fla. L. Weekly D1965

Law enforcement was obligated to minimize the intrusion on privacy of defendants, who operated massage parlors allegedly providing sexual services, and their clients in conducting video surveillance of the parlors' interior by means of hidden cameras, despite lack of minimization requirements in the plain text of the Fourth Amendment, supporting grant of defendants' motions to suppress in their cases for prostitution-related offenses. U.S. Const. Amend. 4.

**[8]** **Telecommunications** 🔑 Scope; minimization

For purposes of the Fourth Amendment, the use of a video camera is considered an extraordinarily intrusive method of searching. U.S. Const. Amend. 4.

**[9]** **Searches and Seizures** 🔑 Skin, strip, and body searches

**Telecommunications** 🔑 Scope; minimization

For purposes of the Fourth Amendment, television surveillance is identical in its indiscriminate character to wiretapping and bugging; however, it is even more invasive of privacy, just as a strip search is more invasive than a pat-down search. U.S. Const. Amend. 4.

**[10]** **Criminal Law** 🔑 Electronic surveillance; telecommunications

**Telecommunications** 🔑 Scope; minimization

General Fourth Amendment requirements of reasonableness are still applicable to video surveillance; and suppression is required when the government fails to follow these requirements. U.S. Const. Amend. 4.

**[11]** **Telecommunications** 🔑 Application or Affidavit

**Telecommunications** 🔑 Scope; minimization

An order permitting video surveillance shall not be issued unless: (1) there has been a showing that probable cause exists that a particular person is committing, has committed, or is about to commit a crime, (2) the order particularly describes the place to be searched and the things to be seized in accordance with the fourth amendment, (3) the order is sufficiently precise so as to minimize the recording of activities not related to the crimes under investigation, (4) the judge issuing the order finds that normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or appear to be too dangerous, and (5) the order does not allow the period of interception to be longer than necessary to achieve the objective of the authorization, or in any event no longer than thirty days. U.S. Const. Amend. 4.

**[12]** **Telecommunications** 🔑 Scope; minimization

The Fourth Amendment requires that law enforcement minimize the invasion of privacy resulting from audio or video surveillance pursuant to a search warrant. U.S. Const. Amend. 4.

**[13]** **Telecommunications** 🔑 Scope; minimization

Law enforcement's use of hidden cameras to surveil the interior of defendants' massage parlors, which were allegedly providing sexual services, failed to sufficiently minimize the recording of innocent clients receiving lawful massages, in violation of the Fourth Amendment, supporting grant of defendants' motions to suppress in their trials for prostitution-related offenses; the search warrants did not set forth any written parameters to minimize the recording of innocent clients, law enforcement recorded female clients even though there was no suggestion or probable cause that female clients were receiving sexual services, and innocent clients had to potentially live with knowledge that nude videos of themselves were preserved on a server with unknown accessibility. U.S. Const. Amend. 4.

**[14]** **Telecommunications** 🔑 Scope; minimization

The purpose of the requirement that law enforcement minimize the invasion of privacy resulting from video surveillance pursuant to a search warrant is to avoid the recording of activity by persons with no connection to the crime under investigation who happen to enter an area covered by a camera. U.S. Const. Amend. 4.

**[15]** **Telecommunications** Scope; minimization

The question of whether law enforcement properly minimized the invasion of privacy resulting from video surveillance pursuant to a search warrant is a question of reasonableness. U.S. Const. Amend. 4.

**[16]** **Criminal Law** Searches, seizures, and arrests

The primary rationale behind the exclusionary rule, which bars use of evidence obtained in violation of the Fourth Amendment, is to deter law enforcement from violating constitutional rights. U.S. Const. Amend. 4.

**[17]** **Criminal Law** Particular cases

Law enforcement did not act in good faith in obtaining search warrants to surveil the interior of defendants' massage parlors, which were allegedly providing sexual services, by means of hidden cameras, supporting grant of defendants' motions to suppress pursuant to the Fourth Amendment's exclusionary rule in their trials for prostitution-related offenses; warrant applications cited decades-old federal law that set forth the need to minimize the recording of innocent conduct but warrants contained no minimization language. U.S. Const. Amend. 4.

**[18]** **Criminal Law** Exceptions Relating to Defects in Warrant

The test as to whether a police officer acted in good faith in obtaining a search warrant, as required for the State to use evidence obtained under the warrant that otherwise violates the Fourth Amendment, is whether a reasonably well

trained officer would have known that the search was illegal despite the magistrate's authorization of the search. U.S. Const. Amend. 4.

**[19]** **Criminal Law** Particular cases

Law enforcement ignored the Fourth Amendment's requirement to minimize the recording of innocent conduct in surveilling the interior of defendants' massage parlors by means of hidden cameras, and thus exclusion of all video surveillance was warranted, rather than solely recordings of innocent conduct, in defendants' trials for prostitution-related offenses based on allegations that their businesses were providing sexual services; law enforcement failed to take even the most basic and reasonable step of minimization by not monitoring or recording unsuspected female clients. U.S. Const. Amend. 4.

**\*985** Consolidated appeals and cross-appeals of nonfinal orders from the County Court for the Fifteenth Judicial Circuit, Palm Beach County; Leonard Hanser, Judge; L.T. Case Nos. 50-2019-MM-002346-AXXX-NB and 50-2019-AP-000074-AXXX-MB; the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Joseph G. Marx, Judge; L.T. Case Nos. 50-2019-CF-001606-AXX-MB, 50-2019-CF-001606-BXX-MB, 50-2019-CF-001606-CXX-MB, and 50-2019-CF-001606-DXX-MB; and the County Court for the Nineteenth Judicial Circuit, Indian River County; David C. Morgan and Nicole P. Menz, Judges; L.T. Case Nos. 312019MM000328A, 312019MM000330A, 312019MM000333A, 312019MM000334A, 312019MM000335A, 312019MM000336A, 312019MM000337A, 312019MM000338A, 312019MM000339A, 312019MM000340A, 312019MM000342A, 312019MM000343A, 312019MM000345A, 312019MM000347A, 312019MM000348A, 312019MM000350A, 312019MM000352A, 312019MM000353A, 312019MM000354A, 312019MM000355A, 312019MM000357A, 312019MM000358A, 312019MM000359A, 312019MM000361A, 312019MM000363A, 312019MM000365A, 312019MM000366A, 312019MM000367A,

312019MM000368A,  312019MM000369A,
312019MM000371A,  312019MM000372A,
312019MM000373A,  312019MM000376A,
312019MM000378A,  312019MM000379A,
312019MM000383A,  312019MM000384A,
312019MM000385A,  312019MM000387A,
312019MM000389A,  312019MM000391A,
312019MM000392A,  312019MM000393A,
312019MM000394A,  312019MM000395A,
312019MM000397A,  312019MM000398A,
312019MM000399A,  312019MM000400A,
312019MM000402A,  312019MM000404A,
312019MM000405A,  312019MM000406A,
312019MM000407A,  312019MM000409A,
312019MM000410A,  312019MM000411A,
312019MM000412A,  312019MM000413A,
312019MM000415A,  312019MM000417A,
312019MM000419A,  312019MM000420A,
312019MM000421A,  312019MM000422A,
312019MM000424A,  312019MM000426A,
312019MM000428A,  312019MM000432A,
312019MM000433A,  312019MM000434A,
312019MM000435A,  312019MM000436A,
312019MM000438A,  312019MM000440A,
312019MM000441A,  312019MM000442A,
312019MM000443A,  312019MM000445A,
312019MM000446A,  312019MM000447A,
312019MM000449A,  312019MM000450A,
312019MM000451A,  312019MM000452A,
312019MM000453A,  312019MM000454A,
312019MM000455A,  312019MM000456A,
312019MM000458A,  312019MM000459A,
312019MM000461A,  312019MM000462A,
312019MM000463A,  312019MM000465A,
312019MM000466A,  312019MM000470A,
312019MM000471A,  312019MM000474A,
312019MM000475A,  312019MM000476A,
312019MM000477A,  312019MM000478A,
312019MM000480A,  312019MM000481A,
312019MM000483A,  312019MM000484A,
312019MM000490A,  312019MM000491A,
312019MM000492A,  312019MM000493A,
312019MM000495A,  312019MM000496A,
312019MM000499A,  312019MM000502A,
312019MM000554A,  312019MM000556A,
312019MM000560A,  312019MM000561A,
312019MM000562A,  312019MM000572A,
312019MM000587A,  312019MM000588A,
312019MM000591A, and 312019MM000668A.

**Attorneys and Law Firms**

Ashley Moody, Attorney General, Amit Agarwal, Solicitor General, and Jeffrey Paul DeSousa, Deputy Solicitor General, Tallahassee, for appellant.

Derek L. Shaffer, William A. Burck, and Sandra Moser of Quinn Emanuel Urquhart & Sullivan, LLP, Washington, D.C., and Alex Spiro of Quinn Emanuel Urquhart & Sullivan, LLP, New York, NY, Pro Hac Vice; and Frank A. Shepherd of GrayRobinson, P.A., Miami, for appellee Robert Kraft.

Michael Ufferman of Michael Ufferman Law Firm, P.A., Tallahassee; and Andrew B. Metcalf of the Law Offices of Green, Metcalf & Lazan, Vero Beach, for appellees Robert Freels, et al.

Tama Beth Kudman of Tama Beth Kudman, P.A., West Palm Beach, for appellee Hua Zhang.

Kathleen S. Phang of Katie S. Phang, P.A., Coral Gables; Zachary P. Hyman of Berger Singerman LLP, Miami; Christopher N. Bellows and Edward Diaz of Holland & Knight LLP, Miami; William N. Shepherd and Jeff Schacknow of Holland & Knight, West Palm Beach, for appellee Lei Wang.

Michael S. Brown of the Law Office of Michael S. Brown, PLLC, Orlando, for appellees Lei Chen and Shen Mingbi.

Donnie Murrell, West Palm Beach, Amicus Curiae for Due Process Institute.

David Oscar Markus, National Co-Chair, Amicus Committee, Miami, Amicus Curiae for National Association of Criminal Defense Lawyers.

Andy Thomas, Public Defender, and Justin F. Karpf, Assistant Public Defender, Tallahassee, Amicus Curiae for The Florida Association of Criminal Defense Lawyers.

Leonard Feuer of Leonard Feuer, P.A., West Palm Beach, Amicus Curiae for Professor Stephen A. Saltzburg, Esq. of George Washington University Law School and Professor Ronald Goldstock, Esq. of New York University School of Law.

Harvey J. Sepler of Rimon, P.C., Hollywood, Amicus Curiae for The Independence Institute.

**Opinion**

Ciklin, J.

 **\*987**  In these three consolidated cases, [1] the State of Florida appeals trial court orders granting motions to suppress non-audio video surveillance that was recorded with hidden cameras covertly installed inside massage parlors suspected of housing prostitution activity. We find the trial courts properly concluded that the criminal defendants had standing to challenge the video surveillance and that total suppression of the video recordings was constitutionally warranted.

### I. Factual Background

These cases arise from investigations conducted by three law enforcement agencies on two massage parlors. We summarize the relevant facts of each investigation and the procedural posture leading to these appeals.

### A. The Jupiter Police Department's Investigation of the Orchids of Asia Day Spa in Jupiter, Florida - Kraft, 4D19-1499 and Zhang, 4D19-2024

Detectives with the Martin County Sheriff's Office were investigating prostitution and possible human trafficking at massage parlors in Martin County. They alerted a Jupiter Police Department detective about the Orchids of Asia Day Spa in the Town of Jupiter because one of Orchids of Asia Day Spa's former employees was allegedly managing the massage parlor being investigated in Martin County.

The Jupiter detective began researching websites that advertise prostitution services and found ads classifying the spa as a massage business where female employees offer a sexual act involving manual manipulation of the male genitals for money.

Jupiter police surveilled the spa for several days and observed more than 100 men enter and remain for 30 to 60 minutes. A few women entered the spa, and they exited soon after, leading the detective to conclude that the female patrons had not obtained prostitution services. The spa kept odd hours, sometimes staying open until midnight.

The detective contacted and shared his concerns with an investigator with the Florida Department of Health, who conducted an annual inspection. During the health inspection, the spa's manager appeared nervous. As the inspector entered rooms containing beds, clothing, a flat iron, and other personal items, the manager tried to cover things with a blanket.

During the health inspection, Jupiter police saw a woman discard something in the **\*988** dumpster outside the spa. Police pulled trash from the dumpster and retrieved tissues with seminal fluid. Police also found receipts matching a name ("Lulu") seen on one of the illicit massage websites. In furtherance of their investigation, police pulled over four men seen leaving the spa, and each one admitted to the detective that they paid a fee to receive manual stimulation at the end of the massage. Three of the men identified the spa employees that provided the services.

The Jupiter detective then applied for a warrant to install secret, non-audio video cameras in the spa and to monitor and record the video. A magistrate issued a warrant allowing police to install hidden cameras at the spa in places where prostitution was believed to be occurring and in the lobby. The warrant prohibited cameras in areas where prostitution was not suspected, such as the kitchen, bathroom, and personal bedrooms.

The warrant allowed non-audio video recording for no more than five days to obtain evidence of prostitution and the felony offense of deriving support from the proceeds of prostitution. The warrant did not discuss or otherwise direct any police conduct related to "minimization," and the detectives were not given any type of formal written instructions about how to minimize.

Using a phony bomb threat to clear the building, police installed hidden cameras in four of the spa's massage rooms and in the lobby. Three detectives monitored and recorded video from the hidden cameras over five days. The cameras recorded video continuously, but Jupiter detectives monitored the video feeds only during business hours.

The detectives toggled between the video feeds when they displayed or when they thought they might soon display criminal conduct. They focused on the end of the massages because the sexual conduct typically occurred at the end. In all, police recorded 25 spa customers pay for sexual services. Ten more customers were suspected to have paid for sex, but

45 Fla. L. Weekly D1965

the offenses could not be confirmed due to dim lighting. Four customers, including two women, were recorded who did not engage in illegal activity.

In *Kraft*, 4D19-1499, the appellee was filmed visiting the spa on two occasions and was stopped by the police while driving away after his second visit. He was later charged with two misdemeanor counts of soliciting prostitution.

In *Zhang*, 4D19-2024, the spa's employees—including the owner (Hua Zhang) and manager (Lei Wang)—were charged with misdemeanor and felony prostitution-related offenses.

Kraft and the spa employees moved to suppress the videos of the prostitution offenses on several grounds. The county court in Kraft's misdemeanor case granted the motion to suppress because the search warrant was deficient in failing to set out "minimization" [2] procedures and because police did not sufficiently minimize the recording of conduct outside the scope of the warrant.

 **\*989**  Additionally, the county court in Kraft's case certified three questions of great public importance:

  a. Does Defendant have standing to raise a Fourth Amendment defense to the Search Warrant Affidavit and Search Warrant, presented in this case? and,

  b. Does the Search Warrant satisfy Fourth Amendment requirements? and,

  c. Was the Search Warrant executed in a manner sufficient to satisfy Fourth Amendment requirements?

This court accepted jurisdiction.

Likewise, the circuit court in *Zhang* suppressed the videos on the same grounds, and the state has timely appealed both matters.

### B. The Indian River County Sheriff's Office Investigation of the East Sea Spa in Sebastian, Florida - Freels, 4D19-1655 [3]

The Indian River County Sheriff's Office began investigating the East Sea Spa in Sebastian, Florida, after learning that other law enforcement agencies were combating illicit massage businesses in their jurisdictions. A sergeant discovered that the spa had posted ads for sexual services on websites. The assigned sergeant surveilled the business and observed a disproportionate number of men visiting the spa. Many of the men looked around the parking lot suspiciously before entering. One man, a registered sex offender, fled the spa upon seeing a uniformed officer in the parking lot.

The sergeant pulled trash and located tissues with seminal fluid. He stopped two men leaving the spa, and they admitted that they paid for sexual gratification at the end of the massage.

The sergeant suspected that the female massage workers were living in the spa. Throughout his surveillance, he never saw the women leave at night and saw them leave just one time to shop at a department store. A Department of Health inspector conducted an inspection and observed clothing, suitcases, food, bedding, and other indicia that someone was living in the building.

The sergeant applied for a warrant to install hidden, non-audio video cameras in areas where prostitution was believed to be occurring. A magistrate issued the warrant and authorized monitoring for 30 days. The warrant instructed the detectives monitoring the video feeds to take steps to minimize the invasion of privacy to customers not engaged in illegal activity.

Law enforcement officials installed hidden cameras in the massage rooms and lobby. Two detectives monitored the video feeds for nine days over the ensuing 30-day period and recorded 43 acts of prostitution. Some of the sex acts occurred at the beginning or middle of the massages but most occurred at the end. When not monitoring the video feeds, the cameras were turned off and did not record.

After installing the cameras, the detectives learned that they could not entirely control the specific video feeds that would be recorded. They had the option to record none, one, or all four of the massage rooms at the same time. If two men were receiving illegal massages in rooms 1 and 2, and a woman entered room 3 for a legal massage, the detectives could not record the men without also recording the woman's spa services.

Police opted to continue recording under these circumstances, and as a result, four  **\*990**  women were recorded receiving lawful massages. The detectives would toggle to the video of the suspect massages and take the women's massages off-screen. The women's massages were recorded but not viewed.

When only one man was receiving an illegal massage, the detectives turned off the recording of the woman's massage. If only a woman was in the spa, they would stop recording altogether.

After the 30-day period expired, the detectives obtained a second warrant for another 30 days and monitored the video feeds for four more days. During the 13 days the cameras were monitored, police recorded a total of 67 massages and 63 of them involved prostitution. Every man that entered the spa paid for sexual services. Up to ten women received lawful massages during this span, and, as noted, four were recorded. The recordings were stored on a secure server that only the detectives could access.

The state brought misdemeanor solicitation of prostitution charges against numerous men recorded in the videos. The owner of the East Sea Spa is being prosecuted on felony charges in *Zhang*. [4]

The defendants moved to suppress the videos on several grounds. The county court judge suppressed the videos because law enforcement failed to minimize the intrusion on the privacy rights of law-abiding spa-goers and the warrant provided no written criteria for minimization. The judge noted the disturbing fact that innocent women were recorded in various stages of undress while receiving lawful massages.

The county court certified four questions of great public importance:

a. Did the Defendant have a legitimate expectation of privacy such that he is entitled to claim the protection of the Fourth Amendment? and;

b. Did the issuing Court have authority under the Fourth Amendment to authorize a Video Surveillance Warrant? and;

c. If the issuing Court had the power to authorize a Video Surveillance Warrant, does the Video Surveillance Warrant issued in this case satisfy Fourth Amendment requirements? and;

d. If the issuing Court had the power to authorize a Video Surveillance Warrant and the Warrant satisfied Fourth Amendment requirements, was the Video Surveillance Warrant executed in a manner sufficient to satisfy Fourth Amendment requirements?

This court accepted jurisdiction.

### C. The Vero Beach Police Department Investigation of the East Sea Spa in Sebastian, Florida - Freels, 4D19-1655

The Vero Beach Police Department began investigating the East Sea Spa after receiving citizen complaints that prostitution might be occurring there. A detective reviewed adult websites with ads showing the spa offered prostitution services. The detective discovered that the spa's manager, Lanyun Ma, who is also the wife of the spa's owner, had been arrested for prostitution and human trafficking offenses in New York and Massachusetts. She pleaded guilty to prostitution offenses in those cases.

An undercover detective visited the spa posing as a client. After the massage, the masseuse touched his groin and offered sexual activity for money. The detective **\*991** made up an excuse and declined the offer, but on his second visit, the masseuse grew suspicious and accused him of being "police." The detective leading the investigation opted against further undercover operations to avoid tipping off the spa.

Police pulled over two men seen leaving the spa, and both agreed to speak with the officers and reported experiences similar to the undercover detective's.

Police surveilled the spa and learned that the massage workers lived in the building and did not leave at night. When workers did leave the spa, they did so only under the spa manager's supervision. The spa's clientele was "exclusively male," and no female clients were seen during a three-week period.

Trash pulls produced napkins with seminal fluid, used condoms, and a package for a sex toy.

A magistrate issued a warrant for non-audio video surveillance inside the spa for no longer than 30 days. The warrant instructed detective monitors to "take steps to minimize the invasion of privacy to any parties not engaged in the unlawful acts set forth in the affidavit."

Law enforcement officials installed hidden cameras and used them to monitor and record spa customers as they undressed and received massages in private massage rooms. For the first 20 days, two detectives monitored the video feeds from 8 a.m. to 11 p.m. The cameras, however, recorded for the

full 30 days. Police observed nearly 100 sex acts during this period. The recordings made while the detectives were not monitoring the feeds had not been viewed by anyone. The video is stored on a hard drive in the police department's evidence lockup.

The lead detective applied for an extension of the 30-day surveillance period, noting that police had witnessed the counting of large sums of money and women being transported to and from the spa. The spa's manager and a man named Kenneth Zullo had brought new massage workers to the spa. The women would stay at the spa for several days or weeks before being moved to a different location. Every woman transported to the spa engaged in prostitution there.

A judge approved an extension of the warrant and again instructed police to minimize the intrusion on lawful activity. Detectives monitored the video feeds for 10 additional days.

In total, police monitored the video feeds for 30 out of the 60 possible days. Of the 145 monitored massages, 142 involved an act of prostitution. Two of the men who appeared to have received non-criminal massages had received prostitution services on other visits to the spa. Only one man monitored and recorded by police was not seen receiving sexual services.

Most of the prostitution occurred at the end of the massage (83 times) but on some occasions (59 times) the massages began with the act of prostitution. This complicated efforts to minimize because, if the detectives did not monitor the beginning of the massages, they may have missed an act of prostitution.

Numerous defendants were charged with misdemeanor counts of soliciting prostitution. One of the massage workers told police that she committed the acts against her will and was in fear. Police suspected that at least one individual was a victim of human trafficking.

The defendants in the misdemeanor cases moved to suppress the videos on many grounds. The county court suppressed the videos, concluding that police failed to minimize the intrusion on the privacy of individuals not engaged in unlawful activity. The court noted that, while police monitored the feeds only 50% of the **\*992** allowed time, the cameras recorded for the entire 60 days. Although only three lawful massages were monitored, the court suspected that more innocent spa clients may have been recorded.

The county court certified the same four questions set out in the discussion of the Indian River County Sheriff's Office's investigation. This court accepted jurisdiction. [5]

## II. Standard of Review

[1] The trial court's ruling on a motion to suppress comes to the appellate court with a presumption of correctness, and the court must interpret the evidence, inferences and deductions therefrom in favor of sustaining the trial court's ruling. *Pagan v. State,* 830 So. 2d 792, 806 (Fla. 2002). While the appellate court is bound by factual determinations which are supported by competent substantial evidence, it reviews mixed questions of fact and law *de novo. Cote v. State,* 14 So. 3d 1137, 1139 (Fla. 4th DCA 2009).

*Kelly v. State*, 77 So. 3d 818, 821 (Fla. 4th DCA 2012).

## III. Analysis

On appeal, the state argues that the trial courts erred in suppressing the video evidence because (1) the defendants lack standing to raise a Fourth Amendment challenge, (2) the warrants were not deficient because minimization is not a requirement under the Fourth Amendment, and (3) even if the warrants were deficient, the "good faith" exception to the exclusionary rule should apply. As we explain below in addressing each of these three arguments, we disagree. In the absence of any binding Florida law concerning silent video surveillance like that conducted in this case, the trial courts properly applied well-settled and persuasive federal law on the issue.

### A. The Defendants Have Standing to Raise a Fourth Amendment Defense

Our analysis begins with the Fourth Amendment's prohibition on unreasonable searches, which protects individual privacy against certain types of government intrusion:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated,

State v. Kraft, 301 So.3d 981 (2020)

45 Fla. L. Weekly D1965

and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Amend. IV, U.S. Const.

[2] [3] [4] "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. ... But what he [or she] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Thus, to establish standing to raise a Fourth Amendment violation, a defendant must demonstrate a legitimate expectation of privacy in the area searched or the item seized. The inquiry involves two distinct questions: (1) whether the individual has "exhibited an actual (subjective) expectation of privacy" – i.e., whether the individual has shown that he or she seeks to preserve something as private; and (2) whether the subjective expectation of privacy is one that society **\*993** recognizes as reasonable – i.e., whether the expectation is objectively "justifiable" under the circumstances. *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979) (quoting and applying *Katz* as the Court's "lodestar" for whether a particular form of government-initiated electronic surveillance is a search within the meaning of the Fourth Amendment). "Consistently with *Katz,* this court uniformly has held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *Smith,* 442 U.S. at 740, 99 S.Ct. 2577.

[5] The spa-client defendants in all of these cases had a subjective and objectively reasonable expectation of privacy in the massage parlor rooms. The surveillance took place in a professional private setting where clients are expected to partially or fully disrobe. The spa owners and their employees also had a reasonable right to expect that the interactions with nude or partially nude clients in the massage rooms would not be exposed to the public. As soon as the door to the massage room was closed, they had a reasonable expectation of privacy. *See Katz,* 389 U.S. at 351, 88 S.Ct. 507 ("[W]hat he [or she] seeks to preserve as private, even

in an area accessible to the public, may be constitutionally protected."); *Ramirez v. State,* 654 So. 2d 1222, 1223 (Fla. 2d DCA 1995) ("As soon as Ramirez entered the closed toilet stall he had a legitimate expectation of privacy ...."). Thus, the business owner, workers, and clients have standing to challenge the subject searches.

Florida statutory law further lends support to our conclusion that the defendants enjoyed a legitimate expectation of privacy in the massage rooms. While Florida has no statute that expressly addresses warrants for surreptitious, video-only surveillance by police, the Florida Legislature has recognized a legitimate expectation of privacy in this type of location in at least two statutes. Florida's statute defining the offense of video voyeurism defines when a person has a reasonable expectation of privacy:

"Place and time when a person has a reasonable expectation of privacy" means *a place and time when a reasonable person would believe that he or she could fully disrobe in privacy, without being concerned that the person's undressing was being viewed, recorded, or broadcasted by another,* including, but not limited to, the interior of a residential dwelling, bathroom, changing room, fitting room, dressing room, or tanning booth.

§ 810.145(1)(c), Fla. Stat. (2019) (emphasis added). Likewise, as noted by the trial court in *Kraft,* section 877.26, Florida Statutes (2019), prohibits merchants from "observ[ing] or mak[ing] use of video cameras or other visual surveillance devices to observe or record customers in the merchant's dressing room, fitting room, changing room, or restroom *when such room provides a reasonable expectation of privacy.*" (Emphasis added).

[6] These laws clearly undermine the state's argument that the defendants lacked standing because they had, at most, a diminished expectation of privacy in a business open to the public. As is long settled, "[t]he Fourth Amendment protects people, not places." *Katz,* 389 U.S. at 351, 88 S.Ct. 507 (rejecting the "trespass doctrine" espoused in past cases like *Olmstead v. United States,* 277 U.S. 438, 464, 48 S.Ct. 564, 72 L.Ed. 944 (1928), which had limited the Fourth Amendment to searches and seizures of tangible property, and holding that attaching a listening device to the outside of a public phone booth **\*994** was a search that violated the Fourth Amendment).

The state also argues that the spas were primarily used as a brothel, as most of the customers who were recorded and monitored engaged in unlawful activity, and thus, the state asserts, the defendants cannot rely on the Fourth Amendment rights of third parties who had their innocent conduct recorded. However, as case law shows us, Fourth Amendment rights are nearly always safeguarded by those who are criminally prosecuted. *See, e.g.*, *Katz*, 389 U.S. at 348, 88 S.Ct. 507 (reversing judgment of conviction for transmitting wagering information by telephone). Consequently, the state's circular argument that the defendants lacked a privacy interest because they were engaging in criminal behavior is uncompelling.

The trial courts properly concluded that the defendants had standing to challenge the search.

### B. Minimization Requirements are Applicable to the Surveillance at Hand, and the Requirements were not Properly Defined or Applied

 **[7]**  The state next argues that the trial courts erred in determining that adequate minimization procedures were neither defined nor applied because there are no minimization requirements within the text of the Fourth Amendment.

 **[8]**     **[9]**  The act of video surveillance itself is perhaps the most intrusive form of electronic law enforcement spying. As the Tenth Circuit held: "The use of a video camera is an extraordinarily intrusive method of searching." *United States v. Mesa-Rincon*, 911 F.2d 1433, 1442 (10th Cir. 1990). "Television surveillance is identical *in its indiscriminate character* to wiretapping and bugging. [However,] [i]t is even more invasive of privacy, just as a strip search is more invasive than a pat-down search ...." *Id.* at 1442-43 (alterations and emphasis in original) (quoting *United States v. Torres,* 751 F.2d 875, 885 (7th Cir. 1984)).

Presently there exists no binding Florida statute, Florida decisional law, or rule of criminal procedure that addresses this type of surreptitious, video-only surveillance as a law enforcement investigative tool.[6] Likewise, the text of the Fourth Amendment does not expressly reference the term "minimization." As a result of that void, the state maintains that this court need look no further than the plain text of the Fourth Amendment's Warrant Clause "because the

existing probable cause and particularity requirements [of the Warrant Clause] amply safeguard protected privacy interests." However, the state's argument ignores many years of clear federal jurisprudence on this issue.

 **[10]**     **[11]**  "[G]eneral fourth amendment requirements are still applicable to video surveillance; and suppression is required when the government fails to follow these requirements." *Mesa-Rincon*, 911 F.2d at 1437. In *Mesa-Rincon*, the Tenth Circuit rejected arguments that the district court lacked authority to authorize a search via silent video surveillance and that the warrant application did not satisfy Fourth **\*995** Amendment requirements. *Id.* at 1446. In consideration of "the underlying purposes of the fourth amendment and the intrusiveness of video surveillance," the Tenth Circuit adopted "five requirements for video surveillance that define more specifically the probable cause and particularity requirements of the fourth amendment," and which requirements expressly include the minimization requirement:

> An order permitting video surveillance shall not be issued unless: (1) there has been a showing that probable cause exists that a particular person is committing, has committed, or is about to commit a crime; (2) the order particularly describes the place to be searched and the things to be seized in accordance with the fourth amendment; (3) *the order is sufficiently precise so as to minimize the recording of activities not related to the crimes under investigation*; (4) the judge issuing the order finds that normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or appear to be too dangerous; and (5) the order does not allow the period of interception to be longer than necessary to achieve the objective of the authorization, or in any event no longer than thirty days.

*Id.* at 1437 (emphasis added).

The test derives from U.S. Supreme Court case law setting forth "the minimum constitutional standards" for secret audio surveillance. *United States v. Biasucci*, 786 F.2d 504, 510 (2d Cir. 1986) (applying the minimum constitutional standards required for audio surveillance set out in *Katz*, 389 U.S. at 354–59, 88 S.Ct. 507, and *Berger v. New York*, 388 U.S. 41, 58-59, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), to video surveillance). "Given the obvious similarities between aural and video electronic surveillance, we believe that the same constitutional standards governing the former should be applied in determining whether or not to authorize the latter." *Biasucci*, 786 F.2d at 510. The *Mesa-Rincon* formulation of the test has been expressly adopted and applied by other federal circuit courts of appeal. *E.g.*, *United States v. Falls*, 34 F.3d 674, 680 (8th Cir. 1994); *United States v. Koyomejian*, 970 F.2d 536, 542 (9th Cir. 1992).

Notably, the warrant applications in the cases now on appeal cited *Mesa-Rincon* and sought to comply with its requirements.

[12] Thus, it is clear that federal law has been sufficiently developed on this constitutional issue, and it is clear the trial courts did not err in determining that minimization is required. Indeed, the state's argument for a strict textual reading of the Fourth Amendment runs counter to decades of case law from the U.S. Supreme Court, such as *Berger*, 388 U.S. at 51, 87 S.Ct. 1873, where the Court recognized that it had receded from the strict textual approach that was applied in *Olmstead*, 277 U.S. 438, 48 S.Ct. 564. "Statements in [*Olmstead*] that a conversation passing over a telephone wire cannot be said to come within the Fourth Amendment's enumeration of 'persons, houses, papers, and effects' have been negated by our subsequent cases ...." *Berger*, 388 U.S. at 51, 87 S.Ct. 1873. Should there be any doubt, as the state respectfully urges, that minimization procedures "are not *constitutionally* required by the Fourth Amendment" (emphasis in original), we hereby find they are and caution that to hold otherwise would be directly counter to the Constitution, civil liberties, and the rule of law.

[13] [14] [15] We likewise uphold the trial courts' conclusions that the warrants failed to contain sufficient minimization guidelines and that police did not sufficiently minimize the video recording of innocent spa goers receiving lawful massages. "The purpose of the minimization requirement is **\*996** to avoid the recording of activity by persons with no connection to the crime under investigation who happen to enter an area covered by a camera." *Mesa-Rincon*, 911 F.2d at 1441. "The minimization question is one of reasonableness." *Id.* (quoting *United States v. Apodaca*, 820 F.2d 348, 350 (10th Cir. 1987)).

The warrants at issue did not set forth any specific written parameters to minimize the recording of innocent massage seekers, and law enforcement did not actually employ sufficient minimization techniques when monitoring the video or deciding what to record. In all the investigations, some innocent spa goers were video recorded and monitored undressed. There was no suggestion or probable cause to believe that female spa clients were receiving sexual services, yet law enforcement largely failed to take the most reasonable, basic, and obvious minimization technique, which was simply to not monitor or record female spa clients.

The most egregious example is the investigation by the Vero Beach Police Department in the *Freels* case where the cameras recorded continuously for 60 days. Thirty days' worth of unmonitored recordings remain in the police department's possession in that case. Other innocent spa clients may have been recorded nude – or partially undressed – on those days. Those innocent clients potentially live with the knowledge that nude videos of themselves are preserved on a server somewhere with unknown accessibility. In our ever increasingly digital world filled with hackers and the like, such awareness renders the surveillance a particularly severe infringement on privacy.

We agree with the trial courts that this is unacceptable. The trial courts properly applied the federal case law enforcing the minimum constitutional standards for secret video surveillance, and the state has not overcome the presumption of correctness in the trial courts' ruling that the minimization requirement was not satisfied.

### *C. Application of the Exclusionary Rule was Proper*

**[16]** Where evidence is obtained in an illegal search and seizure, the Fourth Amendment generally bars its use. *Mapp v. Ohio,* 367 U.S. 643, 648, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). "The primary rationale behind the exclusionary rule is to deter law enforcement from violating constitutional rights." *State v. Teamer,* 151 So. 3d 421, 430 (Fla. 2014). But like any good rule, it is not without exception.

**[17]** **[18]** The state contends that the "good faith" exception to the exclusionary rule set forth in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), should be applied because there was no judicial or statutory authority in Florida requiring minimization. In *Leon,* the Supreme Court declined to apply the exclusionary rule under circumstances that would not further its purpose of deterring unlawful police conduct. *Id.* at 922-23, 104 S.Ct. 3405. The Court held that generally "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope," there is generally "no police illegality and thus nothing to deter." *Id.* at 920-21, 104 S.Ct. 3405. The Court reasoned:

> In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or ... judgment that the form of the warrant is technically sufficient. "[O]nce the warrant issues, there is literally nothing more the [officer] can do in seeking to comply with the law." [*Stone v. Powell,* 428 U.S. 465, 498, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976)] (BURGER, C.J., concurring). Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the **\*997** deterrence of Fourth Amendment violations.

*Id.* at 921, 104 S.Ct. 3405 (first alteration in original) (footnote omitted). The test under *Leon* is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Id.* at 922 n.23, 104 S.Ct. 3405.

We cannot conclude here that the law enforcement agencies acted in good faith with respect to minimization due to the lack of Florida law on point. The warrant applications themselves cited the decades-old federal law (such as *Mesa-Rincon*) setting out the requirements for obtaining a warrant to conduct secret video surveillance in private

locations, including the need to minimize the recording of innocent conduct. These citations negate a finding of ignorance of minimization requirements.

**[19]** We further reject the state's argument that only recordings of innocent conduct should be excluded. [7] In construing the remedy for a failure to minimize under Florida's wiretapping statute, the Florida Supreme Court has held:

> [W]here the procedural requirements to minimize interception are blat[a]ntly ignored, as we have found them to have been in the instant cause, the entire wiretap evidence must be suppressed; where violations of the minimization requirements occur [d]espite efforts to meet the minimization requirements, however, only the unauthorized interceptions need be suppressed.

*Rodriguez v. State,* 297 So. 2d 15, 21 (Fla. 1974).

The trial courts did not err in determining that the minimization requirements were ignored, as opposed to merely being unmet despite efforts to satisfy them. As previously discussed, the agencies failed to take the most basic and reasonable step of minimization by not monitoring or recording the unsuspected female clients. We ascribe no ill motives to the procedural decisions made by the law enforcement agencies involved. But at best, each department was lulled into a zone of complacency where complacency cannot exist.

Under the facts of this case and guided by the Florida Supreme Court's holding in *Rodriguez,* the trial courts properly suppressed all of the unconstitutionally captured footage. To find otherwise in this context would undermine the purpose of the exclusionary rule—which is to deter future Fourth Amendment violations.

### IV. Conclusion

45 Fla. L. Weekly D1965

The type of law enforcement surveillance utilized in these cases is extreme. While there will be situations which may warrant the use of the techniques at issue, the strict Fourth Amendment safeguards developed over the past few decades must be observed. If they are not, any evidence obtained could very well be declared inadmissible as a matter of constitutional law. To permit otherwise would yield unbridled discretion to agents of law enforcement and the government, the antithesis of the constitutional liberty of people to be secure against unreasonable searches and seizures.

The federal case law cited herein pertaining to silent video surveillance is well **\*998** reasoned and widely accepted. Consequently, we must hold—as every federal circuit court and state court to consider the question has—that this type of intrusive, covert video surveillance is subject to heightened standards and procedures designed to implement Fourth Amendment protections, particularly in the face of the constantly expanding use of electronic surveillance techniques by law enforcement. And where the government fails to faithfully follow these standards and procedures, it will be held to account by the exclusion of the evidence obtained. The Fourth Amendment demands no less under these circumstances.

The trial courts did not err in concluding that total suppression was the appropriate remedy under the circumstances of this case. [8]

*Affirmed.*


Gross, J., concurs.

May, J., concurs specially with opinion.

May, J., concurring specially.
I concur with the majority. I write to address a single issue raised by the Kraft defense because I believe it lends further support for our decision.

The right to privacy is guaranteed in Florida's Constitution. Art. I, § 23, Fla. Const. Also engrained within Florida's statutory and case law is the prohibition against the use of audio surveillance for prostitution-related offenses. *See* § 934.07, Fla. Stat. (2019); *State v. Rivers,* 660 So. 2d 1360, 1363 (Fla. 1995). These two formidable principles also compel an affirmance in this case.

In his answer brief, Kraft argues Florida provides a statutory basis for the suppression order, thereby avoiding the constitutional issue. *See Delacruz v. State,* 276 So. 3d 21, 26 n.1 (Fla. 4th DCA 2019) (declining to reach constitutional question because the appeal was disposed on other grounds). Specifically, he argues "[n]o Florida statute authorizes surreptitious video surveillance, nor have Florida courts approved it." While the State relies on Chapter 934, Kraft argues that section does not authorize the use of this surveillance type for prostitution-related offenses. *See* § 934.07(1)(a), Fla. Stat. I agree.

First, our legislature had expressly limited audio surveillance "to certain major types of offenses and specific categories of crime." *See* § 934.07, Fla. Stat. Second, our supreme court then held "section 934.07 cannot be read as authorizing wiretaps to investigate *non-violent prostitution-related* offenses without contravening the requirements of" the federal wiretap law. *Rivers,* 660 So. 2d at 1363 (emphasis added). And third, subsequent to *Rivers,* our legislature removed *all* prostitution-related offenses from section 934.07. Ch. 2000-369, § 10, at 8, Laws of Fla (amending § 934.07, Fla. Stat. (1969)). This ensures that prostitution-related offenses are not considered "major types of offenses" warranting the significant intrusion of one's privacy by audio surveillance. *Cf.* **\*999** *Rivers,* 660 So. 2d at 1362–63. The video surveillance in this case falls prey to that same limitation.

And while the State clings to section 933.02, Florida Statutes (2019), for life support, that provision's "plain text" simply authorizes a search *warrant* "[w]hen any property shall have been used: ... [a]s a means to commit any crime." § 933.02(2)(a), Fla. Stat. It does not authorize this surveillance type for prostitution-related offenses. § 933.02, Fla. Stat.

Florida requires strict construction of "statutes authorizing searches." *Morris v. State,* 622 So. 2d 67, 68 (Fla. 4th DCA 1993). The State must adhere to that mandate. *See id.* Because Florida law does not expressly authorize either audio or video surveillance for prostitution-related offenses, the State's warrant was unauthorized and unsupported by Florida case law.

As Professors Stephen Saltzburg, Esq., and Ronald Goldstock, Esq., suggest in their amicus brief:

> The authorization of electronic or video surveillance for petty crimes as a steppingstone in an effort to investigate more serious offenses would make a mockery of the designated crime requirement. Such a subterfuge would violate the princip[le] that continuous invasions of privacy must be reserved for occasions when the need to do so was critical. ... Florida law provides no basis for seeking a warrant for electronic eavesdropping of conversations in a misdemeanor prostitution case, and there is no reason to believe that either the legislature or judiciary would want to permit such warrants when intrusive video surveillance is at issue.

> ....

> The need to limit electronic and visual surveillance to serious crimes is vital if a society continues to value personal privacy and freedom, even as the advance of technology poses unprecedented threats and intrusions. ... The development and proliferation of compact, inexpensive, wireless video surveillance technology poses a unique, unprecedented threat to erode the personal privacy against government that Americans have enjoyed since the Founding. ... And it has allowed the government to "record[ ] ... in graphic visual detail ... very personal and private behavior" like "[n]o other technique" could. *United States v. Mesa-Rincon*, 911 F.2d 1433, 1442 (10th Cir. 1990).

Lastly, no good-faith exception can save the State's violation of both our statutory and case law limitation of similar types of surveillance. "The prohibition of [Chapter 934 is] absolute." *Atkins v. State*, 930 So. 2d 678, 682 (Fla. 4th DCA 2006). "Chapter 934 ... unequivocally expresses the Legislature's desire to suppress evidence obtained in violation of that chapter. ..." *State v. Garcia*, 547 So. 2d 628, 630 (Fla. 1989). Here, when law enforcement invoked Chapter 934, it was on notice that the State "cannot be read as authorizing [electronic surveillance] to investigate non-violent prostitution-related offenses." *Rivers, 660 So. 2d at 1363*. Good faith simply cannot exist in this legal environment.

Neither the Florida statutes, nor case law authorize covert audio surveillance to investigate prostitution-related offenses. It follows that the more intrusive video surveillance is also prohibited, providing yet another basis for affirmance.

### All Citations

301 So.3d 981, 45 Fla. L. Weekly D1965

---

### Footnotes

1   This court previously consolidated these three appellate cases (*State v. Kraft*, 4D19-1499, *State v. Freels*, 4D19-1655, and *State v. Zhang*, 4D19-2024) for purposes of resolution by the same panel. After a consolidated oral argument, we now consolidate these cases for purposes of this opinion. In *State v. Freels*, 4D19-1655, this court previously consolidated for all purposes more than 100 related cases raising the same issues.

2   The term "minimization" generally refers to warrant guidelines or techniques to be applied by law enforcement agents to narrow, or minimize, the breadth of the activity that is surveilled. *See generally People v. Floyd*, 41 N.Y.2d 245, 392 N.Y.S.2d 257, 360 N.E.2d 935, 939-40 (1976) (citing *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967)). As will be further discussed in our analysis, the minimization requirement "has its underpinnings in the Fourth Amendment interdiction of unreasonable search and seizures and its mandate that search warrants contain provisions 'particularly describing the place to be searched, and the persons or things to be seized.' " *Id.*, 392 N.Y.S.2d 257, 360 N.E.2d at 940.

3   The appeals in *Freels*, 4D19-1655, concern investigations conducted by two separate law enforcement agencies on the spa at issue. The investigations have distinct facts. The parties were permitted to file separate briefs concerning the two investigations.

4    Police believed that at least one of the workers at the spa was a victim of human trafficking although no such charges have been brought to date.

5    The defendants in *Freels*, 4D19-1655, filed notices of cross-appeal and have argued alternative bases to support the suppression orders. Our jurisdiction to review the defendants' appeals from the trial courts' non-final rulings is questionable. Defendants have essentially argued "tipsy coachman" grounds for affirmance. In this opinion, we do not decide the issues argued in the cross-appeals as it is not necessary to do so.

6    As the state contends, the electronic video surveillance at issue is not subject to the strictures of Florida's statute governing the security of communications and surveillance (chapter 934, Florida Statutes – Florida's "wiretapping statute") because the video cameras did not record audio. Chapter 934 protects the privacy of

     and restricts the interception of "wire and oral communications." 📄 § 934.01(2), Fla. Stat. (2019). In 📄 *Minotty v. Baudo*, 42 So. 3d 824, 832 (Fla. 4th DCA 2010), an appeal from a civil judgment for damages under chapter 934, this court held that silent video surveillance was not covered by the act, which applies solely to the interception of wire, electronic, or oral communications.

7    The state suggests that the remedy for the innocent spa clients is a civil lawsuit, like one already pending in federal court. We disagree. A costly, time-consuming civil remedy by unlawfully recorded persons is impractical and would not serve to meaningfully deter future violations. Were we to accept this argument, police in future cases could blatantly violate the privacy rights and Fourth Amendment protections of citizens and the only consequence would be the risk of future civil lawsuits that most citizens would not have the wherewithal to pursue.

8    The parties and amici have argued additional issues and alternative grounds for affirmance that we do not decide as it is not necessary to do so. However, the need for law enforcement use of silent video recording is a matter that could be addressed by the Legislature.

     Professors Stephen Saltzburg and Ronald Goldstock present strong arguments in their amicus brief why a warrant authorizing secret video surveillance (a "sneak and peak" warrant) has no place in a prostitution case and why the invasive video surveillance conducted here was unnecessary. They make a compelling argument that—as with other electronic surveillance such as wiretapping—the drastic step of installing secret cameras in private locations was intended to be limited to serious crimes and used only as a last resort in extraordinary situations.

---

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2021 Thomson Reuters. No claim to original U.S. Government Works.   18

# EXHIBIT "H"

# VERO BEACH POLICE DEPARTMENT
**Written Directives**

| | **General Order** | **28** |
|---|---|---|
| | **Subject:** Conduct, Duties and Responsibilities | |
| **Rescinds:** 08/01/16 | **Effective Date:** 06/23/17 | |
| **Pages:** 6 | **CFA Accreditation Standard(s)** *v 5.0*:, 7.01M, 15.17M | |

**PURPOSE:** To advise members of the department of their responsibilities during everyday interactions with the public and other department employees.

| I. Policy |
|---|
| II. Procedure |

| I.   Policy |
|---|

In addition to those duties, responsibilities and guides for conduct outlined for members throughout the rest of this manual, the following are included.

| II.   Procedure |
|---|

28.1 Members will strive to adhere to the Oath of Office, the Code of Ethics, the department's Mission Statement, and the policies of both the department and the City of Vero Beach.

28.2 Members will adhere to the laws of the United States, the State of Florida and the ordinances of the City of Vero Beach.

28.3 When on and off duty, members will conduct themselves in such a manner that they do not discredit themselves or the department.

28.4 Members will use the authority of their position to accomplish the tasks the public requires of the police department and not for the purpose of personal gain.

28.5 Members will treat the public courteously, avoiding harsh, violent, profane and insolent language whenever possible and will avoid the use of excessive force.

28.6 Officers who must use force when making an arrest will report such use in accordance with current directive.

28.7 It is the policy of this department that off-duty officers refrain from taking forcible police action except in circumstances, which seriously threaten life, property or public order.

28.8 The most appropriate police action to be taken by off-duty officers in less serious situations or in situations in which forcible police action itself may increase risk to the lives and safety of officers or other innocent persons is to request the assistance of an on-duty officer at the first opportunity.

28.9 Before taking any action while off-duty, officers should carefully consider the risks to themselves and to others that may be caused by sudden confrontation with armed criminals or suspects.  If feasible, the off-duty officer should identify himself/herself as a law enforcement officer before taking any action.

28.10 When operating a department vehicle while off-duty, officers must carry a properly registered firearm of a type specified by the department and with which they have met minimum department proficiency standards.

28.11 Members shall not seek personal publicity in the course of their employment.

28.12 All requests for public speeches, demonstrations and the like will be forwarded to the Chief of Police or Captain for approval and processing.  Members directly approached for this purpose shall suggest that the party submit his request in writing to the Chief of Police or Captain.

28.13 Members shall attend to requests from the public quickly and accurately avoiding unnecessary referral to other sections of the department.

28.14 All members must remain completely impartial toward all persons coming to their attention.  Violations of the law are against the community and not against an individual officer.

28.15 All citizens are guaranteed equal protection under the law; exhibiting partiality for or against a person for any reason, such as race, creed, color, social standing, community stature, or occupation shall be viewed as wanton and willful neglect in the performance of assigned duties.

28.16 Members shall always assist lost, helpless, injured or ill persons.  Every member is strictly charged to render first aid to stricken persons to the best of their ability.

28.17 Except where impractical, not feasible, or where the identity is obvious, officers shall identify themselves by displaying the official identification card and badge before taking police action.

28.18 When a member has knowingly come in contact with a subject having a contagious disease, or has been exposed to contagion, he/she shall at once notify his supervisor and comply with his/her instructions.

28.19 Members will study all General Orders and familiarize themselves with their contents and any future revisions to them.

28.20 Members will report to duty as assigned, either regularly or by emergency notice, and will be awake and alert at all times while on-duty.  Sleeping, loafing or idling while on-duty is strictly forbidden.

28.21 Members of the department are always subject to duty although periodically relieved of its routine performance. They shall, at all times, respond to the lawful orders of superior officers and other proper authorities as well as calls for assistance from citizens.

28.22 All members shall perform their duties as required or directed by law, department policy, or by order of a superior officer. All lawful duties required by competent authority shall be performed promptly as directed, notwithstanding the general assignment of duties and responsibilities.

28.23 Proper police action must be taken whenever required. The administrative delegation of the enforcement of certain types of laws and ordinances to particular units of the department does not relieve members of other units from the responsibility of those laws and ordinances when the occasion requires.

28.24 Members assigned to special duties are not relieved from taking proper action outside the scope of their specialized assignment when necessary.

28.25 Members on-duty shall be immediately and readily available to the public during duty hours.

28.26 Members of the department shall respond without delay to all calls for police assistance from citizens or other department or agency members.

28.27 All members are required to take appropriate police action toward aiding a fellow police officer exposed to danger or in a situation where impending danger may be present.

28.28 Members are required to establish and maintain a working knowledge of all laws and ordinances in force in the city, the policies and the orders of the department and division thereof. In the event of improper action or breach of discipline, it will be presumed that the member was familiar with the law or policy in question.

28.29 Members shall not induce or attempt to induce any member, other employee of the city, or any other person to commit an unlawful act or to act in violation of lawful and reasonable departmental or official policy or order.

28.30 Members will refrain from starting or spreading idle or malicious gossip or rumors about other employees or any other persons.

28.31 Members shall not engage in any conduct prejudicial to the reputation, good order or discipline of the police force.

28.32 Members shall refrain from any willful non-compliance with any of the policies adopted for the government of the City of Vero Beach and the police department.

28.33 Members shall not knowingly make an untruthful statement of any kind in a verbal or written report to any other department member or knowingly make an untruthful statement before any court or to any authorized government official, or willful omission or falsification of any material fact which should be included in any official report.

28.34 Members shall not show disrespect for or to any officer or other person by violent, coarse or insolent language or behavior.

28.35 Members shall treat other officers and associates with respect. They shall be courteous and civil at all times in their relationships with one another. When on-duty and particularly in the presence of other people and members, officers should be referred to by rank.

28.36 Members shall refrain from being openly antagonistic in their attitude toward other officers or fellow employees, criticizing departmental orders, policies, or rules, or from conduct detrimental to efficient public service.

28.37 Members shall not consume intoxicants while off-duty to the extent that the evidence of such consumption is apparent when reporting for duty.

28.38 On-duty members shall not partake of alcoholic beverages except that which is necessary in the performance of a police duty and only then with the specific consent and knowledge of a commanding officer. This exception does not extend to officers in uniform.

28.39 Members shall not at any time be intoxicated or display behavior or other indicators which would indicate they had consumed alcoholic beverages on-duty.

28.40 Members, whether on-duty or off-duty, will not purchase any alcoholic beverages, while wearing the police uniform, or any part thereof.

28.41 City vehicles will not be parked at or in close proximity to an establishment licensed to sell alcoholic beverages and whose major business is such sale, except on official business.

28.42 Members will strive to adhere to the Oath of Office, the Code of Ethics, the department's Mission Statement, and published values and the policies of both the department and the City of Vero Beach.

28.43 No member will house any alcoholic beverage within the police station or store, transport, or otherwise keep any alcoholic beverage in any police vehicle, except when necessary to carry out official police business.

28.44 Members shall not gamble while on-duty unless such gambling is necessary in the performance of a police duty. Lawful purchase of Florida Lottery tickets shall not be considered gambling.

28.45 Members while off-duty and not on any official business, shall not loiter in department areas to the extent that they interfere with normal police operations.

28.46 Members may suspend their police duties for a meal period but remain on call, subject to modifications by their supervisor. This shall not apply to certain non-sworn employees.

28.47 Members will use police time, equipment, and personnel for official business only.

28.48 Members shall not place or allow to be placed in/or on police vehicles or equipment any form of campaign or political literature or advertisement.

28.49 Members will refrain from conducting private business matters that interfere with the performance of their duties.

28.50 Members may carry personal cell phones while on-duty but their use for personal business must be discreet. Because of the increasing use of cellular technology by drivers while actively driving on the roadways and the inherent dangers associated with such distracted driving, the use of a cell phone/BlackBerry or other data device for anything other than phone calls while driving is expressly prohibited and may be a violation of FSS 316.305.

28.51 Members shall not use department letterhead stationery for private or personal correspondence.

28.52 Existence of facts establishing a violation of law, ordinance, or policy is all that is necessary to support any allegation of such as a basis for a charge and discipline under this section.

28.53 Nothing contained within this manual prohibits disciplining or charging members merely because the alleged act or omission does not appear in departmental General Orders, policy, ordinances or law.

28.54 Members having personal knowledge (not rumors) of other employees violating laws, ordinances, or General Orders shall report the facts of same in writing to their immediate supervisor.  If the matter is of such gravity that it must be brought to the immediate attention of the Chief of Police, the chain of command may be by-passed.

28.55 Members shall exercise due care and safety in the handling or use of all equipment to guard against damage or loss.

28.56 Members approached by any individual advising he/she is a sexual offender/ predator required to register by FSS 943.0435 will direct the individual to the Indian River County Sheriff's Office for registration purposes. This shall be accomplished by handing the sexual offender/predator a reporting flyer containing the contact information and registration procedures of the Indian River County Sheriff's Office. This form is located in the lobby of the police department or on the "N" drive.

28.57 No more than two marked police vehicles will, at any one time, be parked at any eating establishment, unless on official business.

28.58 Members are responsible for the delivery of vehicles and equipment for regularly scheduled maintenance and/or preventative maintenance. This shall include, but not limited to: monthly scheduled vehicle service, vehicle manufacture recall notices, annual radio preventative maintenance, radar calibrations, speedometer calibrations, tint meter calibrations or any other maintenance and/or preventative maintenance were the member was provided prior notice.

General Order 28 Approved: _____

David E. Currey
Chief of Police

# EXHIBIT "I"

# VERO BEACH POLICE DEPARTMENT
**Written Directives**

| | **General Order** | **57** |
|---|---|---|
| | **Subject:** Search Warrants | |
| **Rescinds:** 08/01/16 | **Effective Date:** 10/06/2019 | |
| **Pages:** 6 | **CFA Accreditation Standard(s)** *v 5.0*: **15.08M** | |

**PURPOSE:** To establish guidelines for the planning of the warrant application and execution of search warrants.

| I. | Discussion |
|---|---|
| II. | Policy |
| III. | Procedure |

## I.    Discussion

The successful prosecution of violators often depends upon the use of court-authorized search warrants.  These warrants will be executed in accordance with federal and state law in expectation of scrutiny by the trial courts.

It is important to realize that an authorized search warrant temporarily allows for the intrusion by police officers into otherwise private areas.  Execution of a search warrant is one of the more dangerous aspects of law enforcement work as it involves entry, sometimes a forced entry, into a residence or other location.  The responsibilities of each member and the methods of entry must be planned carefully.

## II.    Policy

Search warrants will be prepared and executed in conformance to law and this General Order.

## III.    Procedure

57.1 To obtain a search warrant, an officer must present a judge with sufficient information to constitute probable cause to believe that an offense has been or is being committed at a specific location.  The information may include but is not limited to, the following:

- Observations of illegal activity at a specific location

- The details of the purchase of a controlled substance, stolen property, or other contraband from a specific location

---

- Reliable information from a credible informant, determined to be reliable by the following criteria:

    o   The informant has supplied accurate information in the past

    o   The officer can confirm the informant's information with sufficient detail

    o   The informant provided the information under oath against his own interest

    o   The informant has demonstrated the ability to identify illegal contraband and/or illegal activity

**Drafting the Affidavit and Warrant**

57.2 Officers may request the assistance of an Assistant State Attorney when drafting a search warrant, when needed.  Final approval of the warrant is the responsibility of the Detective Division Commander or Supervisor.  The affidavit must include:

- A detailed description of the dwelling, structure, or conveyance to be searched.  This includes, but is not limited to: the name and street address, type and color of structure(s), window and door locations, and other identifying features of the location and curtilage

- A photograph of the dwelling, structure, or conveyance to be searched, if possible

- The Florida Statute violated

- Detailed chronologies of the events that support the application for the search warrant.  This includes any information that constitutes probable cause and will include, but is not limited to, the following:

- Sworn statements from witnesses

- Plain view observations

- Prior controlled purchases of illegal substances made from the location

- Positive results from issued Reagent test kits when the purchases involved controlled substances

- Information from a confidential informant with proven credibility

- Corroborating intelligence or past history information

- Corroborating statements of arrested subjects

- Signature spaces for the affiant(s) that will be attesting to the facts.  The affiant(s) names are to be typed in the appropriate spaces.

57.3 The warrant must include the following:

- Specific wording that commands the Chief or his officers to conduct the search, either in the day or nighttime and any day of the week including Sunday, with proper and necessary assistance

- A list of any items of evidentiary value suspected of being at the location at the time of the search

- Specific areas which may be searched

- A signature space for the judge

57.4 Upon locating a judge, the affiant will then be placed under oath and will sign the affidavit.  If the judge finds that probable cause exists, he/she will sign both the original and the true copies of the warrant.

57.5 A true copy of the entire search warrant will be left with the defendant or at the search location if the defendant is unavailable.

57.6 The original search warrant together with the original affidavit and original Inventory and Return must be filed with the Clerk of the Court having jurisdiction of the offense. This should be done within ten (10) days after issuance, or if the search was on the 10th day, then the day following. Unserved search warrants must also be delivered to the Clerk of the Court.

57.7 Photocopies of the warrant will be made for the State Attorney's Office and the case file.

57.8 When the premises or conveyance to be searched is already secured and in the custody and control of a law enforcement officer, or the search warrant has been secured to seize business records or files, the supervisor in charge of the investigation will be responsible for the deployment and assignment of tasks.  In all other circumstances, the service of a search warrant at premises will be considered a special assignment and the following guidelines apply.

57.9 The supervisor in charge of the detail will accomplish the following tasks:

- Formulate a course of action to include:

    o   Completing an Operations Plan

    o   Determining total manpower and support requirements

    o   Determining positioning and responsibilities of personnel

    o   Identifying approach routes

    o   Identifying primary and secondary entry points

        o   Identifying the need for special equipment, or weapons

        o   Consideration of special problems

• Conduct a pre-operation briefing in which individual and team assignments are specified

57.10 During the briefing, a diagram of the premises to be searched will be utilized to designate positions and personnel assignments.  This diagram will be submitted as a supplement to the report.

57.11 Photographs of the premises and known occupants will be utilized to brief personnel, when available.

57.12 All personnel who will participate in the service of the warrant operation should be present at the briefing by the supervisor of the detail.

57.13 Additionally, the supervisor of the detail shall:

- Issue specialized equipment as required

- Deploy personnel to survey the area before the service of the warrant

57.14 Personnel assigned to the detail will be deployed by the supervisor in charge to perform specified tasks or to be part of one of the following teams:

**Entry Team**

57.15 The entry team is responsible for gaining entry to the premises to be searched; to search the premises for persons; to prevent the destruction or disposal of evidence; and initially to secure the premises and persons.

57.16 The supervisor in charge will designate an entry team leader.

57.17 All entry team members will wear protective body armor or other authorized uniform clothing that clearly identifies team members as police officers, except when specialized circumstances dictate an entry by personnel in plainclothes or other attire.

**Inner Perimeter Team**

57.18 The inner perimeter team is responsible for containing and securing the exterior of the structure or premises to be searched; for preventing persons from escaping; and for denying unauthorized access to the scene.

57.19 The inner perimeter team will maintain their positions until the entry team has secured the structure or premises.

57.20 All inner perimeter team members will wear protective body armor or other authorized uniformed clothing that clearly identifies team members as police officers.

**Outer Perimeter Team**

57.21 In some instances deploying an outer perimeter team to provide crowd and/or traffic control may be necessary, and protection and security of police department vehicles.

57.22 The outer perimeter team shall be comprised of uniformed patrol officers. If an outer perimeter team is not deployed, the inner perimeter team will assume the responsibilities of the outer perimeter team.

**Warrant Service Team**

57.23 The warrant service team is responsible for executing the search warrant document; searching the structure or premises for evidence; properly securing, packaging, and transporting any evidence discovered at the scene; arresting the subjects named in the warrant; and arresting any other persons found violating the law as a result of probable cause established during the execution of the warrant.

57.24 At the direction of the supervisor in charge, and upon completion of their initial tasks, personnel from the other described teams can be assigned to the warrant service team.

57.25 At least one uniformed officer and a marked patrol vehicle will be present at all search warrants.

57.26 Unless a "no knock" entry is authorized, the entry team will knock and announce their purpose and identify themselves as law enforcement officers before entering the structure or premises to be searched.

57.27 The premises shall be entered using necessary means and systematically searched for occupants in the most efficient and expedient manner possible to prevent the escape of occupants, maintain officer safety, and prevent the destruction of evidence.

57.28 Persons who escape or flee from the premises will not be pursued outside the building or structure by entry team members unless exigent circumstances exist. Perimeter team members will be responsible for apprehending these subjects.

57.29 After all occupants are located and rendered safe and the premises are established, the entry team leader will notify the supervisor in charge of the detail that the premises are secure.

57.30 After receiving notification that the premises are secure, the supervisor in charge will instruct the warrant service team to enter the premises and execute the warrant. The supervisor in charge will release Fire/Rescue from its standby status.

57.31 The warrant service team will be responsible for the following:

- Hand delivering a copy of the warrant to an occupant of the premises to be searched

- To systematically search the premises for the items named in the warrant (the scope of each search should be limited to those areas where the objects could legitimately be concealed)

- Properly documenting all property seized

- Photographing and processing all property seized

- To arrest person(s) found violating the law as a result of probable cause established during the execution of the warrant

- To leave a full copy of the search warrant and a list of all items seized at the premises

- Preparation of a property receipt that duplicates the search warrant Inventory

- Preparation of an incident report with a copy of the search warrant attached

57.32 The supervisor in charge will ensure that all incident reports and required supplements are completed. The supervisor in charge will complete an After-Action Report. Copies of the Operations Plan and the After-Action Report shall be forwarded to the Professional Standards Accreditation Lieutenant.

57.33 The affiant will return the search warrant to the Clerk of the Court as prescribed by Florida law.

57.34 Dependent on the instructions of the judge who signed the warrant, the affiant will notify the judge of the warrant service, and will present all items seized during the search warrant for review.

General Order 57 Approved: _David E. Curry_

David E. Currey
Chief of Police