**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

**Case No. 9:21-CV-80391**

KEITH TAIG, individually, and on behalf of
others similarly situated,

      Plaintiffs,

v.

CITY OF VERO BEACH, CHIEF DAVID
CURREY in his individual capacity, CAPTAIN
KEVIN MARTIN (RETIRED) in his individual
capacity, LIEUTENANT JOHN PEDERSEN in
his individual capacity, DETECTIVE PHIL
HUDDY in his individual capacity, DETECTIVE
SEAN CROWLEY in his individual capacity,
AND DETECTIVE MIKE GASBARRINI in his
individual capacity,

      Defendants.

_____/

**PLAINTIFF KEITH TAIG'S STATEMENT OF DISPUTED FACTS IN OPPOSITION
TO MOVANT'S STATEMENT OF MATERIAL FACTS AND STATEMENT OF
ADDITIONAL MATERIAL FACTS IN OPPOSITION TO MOVANT'S MOTION FOR
SUMMARY JUDGMENT**

Plaintiff, Keith Taig, hereby files his Statement of Disputed Facts in Opposition to

Movant's Statement of Material Facts, and states as follows:

1.     Undisputed.

2.     Undisputed.

3.     Undisputed.

4.     Undisputed.

5.     Undisputed.

6.     Undisputed.

1

7.      Undisputed.

8.      Undisputed.

9.      Undisputed.

10.      Undisputed.

11.      Undisputed.

12.      Undisputed.

13.      Undisputed.

14.      Undisputed.

15.      Undisputed.

16.      Disputed.  The November and December Orders did not authorize recording of the video feed.  Exhibit C, Depo. Tr. Kevin Martin, pg. 53, ll. 14-22; Exhibit F, November Order, pgs. 1-2; Exhibit I, December Order, pgs. 1-2; Exhibit O, Tr. of Motion to Suppress Hearing before Judge Menz, pg. 67, ll. 21-23; Exhibit R, Order Granting Defendant's Motion to Suppress, pg. 6.

17.      Undisputed.

18.      Undisputed.

19.      Undisputed.

20.      Disputed.  Pedersen states that ASA Butler told him to have a room that was off limits.  Exhibit J, Depo. Tr. John Pedersen, pg. 60, ll. 7-12.

21.      Undisputed.

22.      Undisputed.

23.      Undisputed.

24.      Disputed.  The warrant was executed for two thirty-day periods and the cameras recorded 24/7.  Ex. A, Depo. Tr. Sean Crowley, pg. 41, ll. 8-24.

25.     Disputed.  There are discrepancies in the surveillance logs that call into question the exact amount.  Ex. M, compilation of surveillance logs.

26.     Undisputed.

27.     Undisputed.

28.     Undisputed.

29.     Undisputed.

30.     Undisputed.

31.     Undisputed.

32.     Undisputed.

## ADDITIONAL FACTS

Plaintiff, Keith Taig, hereby files his Statement of Additional Material Facts in Opposition to Movant's Motion for Summary Judgment filed on March 14, 2022, and states as follows:

1.     On or about June 28, 2018, Chief Currey received an anonymous letter from a citizen regarding the Spa.  Exhibit A, Depo. Tr. David Currey, pg. 46, ll. 20-24.

2.     Thereafter, Detectives Mark Van Dhuynslager and Michael Gasbarrini proceeded to visit the Spa, at least twice, to investigate.  Exhibit B, Depo. Tr. Michael Gasbarrini, pg. 49, ll. 20-25 – pg. 50, ll. 1-5.

3.     Upon information and belief, Detectives Dhuynslager and Gasbarrini entered the Spa as early as July 2018 to investigate.  *Id*.

4.     On one such occasion, Detective Gasbarrini entered the Spa and was approached by a female.  Exhibit B, Depo. Tr. Michael Gasbarrini, pg. 48, ll. 23-25 – pg. 49, ll. 1-15.

5.     On such occasion, Detective Gasbarrini asked the female at the Spa how much for a massage; the female then went behind the counter, wrote a price for a massage on computer paper, and handed it to him.  *Id*.

3

6.      On that same occasion, when Detective Gasbarrini attempted to leave the Spa, stating that he had a friend waiting for him in the car (Detective Van Dhuynslager), the same female masseuse approached him, put one hand on Detective Gasbarrini's back and one on his chest, tried to rub his chest, and asked him not to leave.  *Id.*

7.      Following these visits, neither Detective Gasbarrini nor Detective Van Dhuynslager opened an investigation.   Importantly,  neither  documented  their  actions  to  conduct  this investigation.  Exhibit B, Depo. Tr. Michael Gasbarrini, pg. 49, ll. 16-19.

8.      After Chief Currey started to receive more calls about the Spa, he decided to initiate an investigation and contacted Captain Martin to proceed forward.  Exhibit A, Depo. Tr. David Currey, pg. 18, ll. 16-24.

9.      Upon information and belief, the VBPD did not formally document these calls regarding the Spa to substantiate Chief Currey's account of why the investigation began.  Exhibit A, Depo. Tr. David Currey, pg. 51, ll. 13-24.

10.     According to Captain Martin, the VBPD learned of the suspected activities at East Spa because (i) Chief Currey received multiple complaints; (ii) Captain Gonzalo from the Sheriff's Office had also heard information about it; and (iii) one of the health inspectors with the Department of Health had mentioned the Spa to Detective Crowley.  Exhibit C, Depo. Tr. Kevin Martin, pg. 23, ll. 13-25.

11.     On or about the fourth week of August 2018, investigators from the VBPD's Special Investigations Unit ("SIU") and the United States' Department of Homeland Security ("Homeland Security") initiated its investigation into alleged prostitution activities occurring at the Spa.  Exhibit D, November Affidavit, para. 3.

12. On or about September 14, 2018 and September 18, 2018, the VBPD's SIU conducted an undercover operation and sting of the Spa. The SIU executed this by sending Detective Brock in as an undercover patron of the Spa and equipped him with a hidden audio/video device for safety and evidentiary purposes. Exhibit D, November Affidavit, para. 5.

13. On both occasions, Detective Brock received massages by an Asian female, believed to be Lanfen Ma ("Ma"), and on both occasions, he was approached and asked if he would like sexual favors or acts performed on him for a monetary sum. Detective Brock declined these offers on both occasions, and Detectives Gasbarrini and Crowley de-briefed Detective Brock after each encounter with Ma. *Id*.

14. Prior to the investigation, Detective Brock did not receive any briefing with respect to human trafficking or prostitution in the last 20 years. Exhibit E, Depo. Tr. Chip Brock, pg. 10, ll. 13-16.

15. Prior to going undercover, Detective Brock did not speak with or to any confidential informants, business owners, or anyone else who had lodged complaints regarding the Spa. Exhibit E, Depo. Tr. Chip Brock, pg. 30, ll. 4-9.

16. According to Detective Brock, at the time of investigation his sole understanding was that he was going undercover to investigate "strictly" prostitution activities. Exhibit E, Depo. Tr. Chip Brock, pg. 27, ll. 18-23.

17. At the time Detective Brock went undercover, he did not observe any massage therapist indicate to him in any way, shape, or form that she was being held against her will. Exhibit E, Depo. Tr. Chip Brock, pg. 27, l. 24 – pg. 28, l. 2.

18. At the time Detective Brock went undercover, no massage therapist indicated to him that she was involved in human trafficking. Exhibit E, Depo. Tr. Chip Brock, pg. 28, ll. 3-7.

19.     In spite of being solicited for prostitution during both undercover visits, Detective Brock did not make an arrest.  Exhibit E, Depo. Tr. Chip Brock, pg. 25, l. 13 – pg. 26, l. 8.

20.     Detective Brock indicated that he spent months going in and surveilling the Spa including parking across the street, taking down tag numbers, and recording who was coming and going from the Spa.  Exhibit E, Depo. Tr. Chip Brock, pg. 29, ll. 13-18.

21.     At one point, Detective Brock indicated that he followed the "madam" of the Spa or Lanyun Ma.  Exhibit E, Depo. Tr. Chip Brock, pg. 29, ll. 19-25.

22.     According to Detective Brock, he did not see or talk to any confidential informant, business owner, or anybody else that complained about the Spa.  Exhibit E, Depo. Tr. Chip Brock, pg. 30, ll. 4-9.

23.     At no point of time during his surveillance or training did Detective Brock indicate a clear understanding of the minimization requirements employed in the investigation of the Spa. Exhibit E, Depo. Tr. Chip Brock, pg. 32, ll. 16-25.

24.     On September 25, 2018, Detectives Gasbarrini and Crowley and Homeland Security Investigations Special Agent McCreary ("Agent McCreary") conducted further surveillance of the exterior areas of the Spa.  During that surveillance, they spoke with two males who left the Spa about what occurred while inside the Spa.  In recorded interviews, both males advised the detectives and agent that they were offered multiple sexual favors for money by an Asian woman at the Spa.  The experiences of these two males were similar to that of Detective Brock's undercover visits to the Spa.  Exhibit D, November Affidavit, para. 7.

25.     On October 31, 2018, VBPD and Homeland Security took further steps in its surveillance of the Spa and installed a camera on a nearby telephone pole just southwest of the Spa.  The purpose of this camera was to provide twenty-four (24) hour surveillance of the exterior

of the business.  Detective Crowley attested that between the dates of 10/31/2018 and 11/20/18 the surveillance revealed that women working inside the Spa slept inside the premises and only left when in the company of Ma.  Exhibit D, November Affidavit, para. 12.

26.     Detective Crowley indicated that he and Detective Gasbarrini conducted multiple hours of covert surveillance during the months of September and October 2018, noting that all customers observed during that time were male.  Despite the VBPD's two documented undercover operations, Detective Crowley asserted that "without the use of electronic surveillance the entire prostitution organization will not be able to be identified or prosecuted."  Exhibit D, November Affidavit, para. 6, para. 8.

27.     Detective Crowley further indicated that he conducted trash pulls on the following dates: 10/8/18, 10/9/18, 10/10/18, 10/15/18, and 10/17/18.  Those trash pulls revealed, *inter alia*, condoms, napkins or tissues with seminal fluid on them, packaging for a sex toy, and feminine hygiene products.  The VBPD collected photos of these objects from those trash pulls and included them in the November Affidavit.  Exhibit D, November Affidavit, para. 11.

28.     In the November Affidavit, Detective Crowley attested that he believed a prostitution organization was being operated at the premises based on the statements of the customers, the volume of male customers, short-term traffic, the items found in the trash pulls, undercover operations, and intelligence gathered from the surveillance.  Exhibit D, November Affidavit, para. 13.

29.     Notably missing from the November Affidavit was exculpatory evidence such as findings from the Department of Health that indicated that no person was living inside the Spa. Exhibit D, November Affidavit, para. 4.

30.     Despite the various observations and surveillance conducted and outlined in the November Affidavit, Detective Crowley requested further authorization to enter the Spa to conduct covert electronic video surveillance of the interior of the Spa to identify participants believed to be a part of the "criminal enterprise" or deriving funds from the proceeds of any prostitution activities. There was no indication that the intent was also to gather evidence to prosecute the actual customers of the Spa, including Plaintiff and the proposed class.  Exhibit D, November Affidavit, pg. 14.

31.     On November 27, 2018, Judge Cox issued an "Order for Surreptitious Entry and Installation of Electronic Surveillance Camera," ("November Order") which afforded VBPD the ability to enter the Spa and install surveillance cameras for the purpose of monitoring the premises "for a period no longer than 30 days."  The November Order further required that officers were to take steps minimizing the invasion of privacy "to any parties not engaged in the unlawful acts set forth in the affidavit."  This Order also required that the Defendants report back to the Court within ten days and provide an inventory.  The Order specifically did <u>not</u> permit recording and <u>only</u> allowed monitoring.   Importantly, on page 2 of the Order, which contained minimization instructions, one of the officers, believed to be Detective Crowley, initialed that page—indicating his acknowledgment of the instructions to minimize and not to record.  Exhibit F, November Order, pgs. 1-2.

32.     The cameras that were installed did not have the ability to be switched on or off, making minimization required by the Order impossible.   Most significantly, this was not reported back to the Judge who signed the November Order.  Exhibit G, Depo. Tr. Sean Crowley, pg. 39, l. 21 – pg. 40, l. 4.

33.     On November 29, 2018, VBPD and Homeland Security installed cameras, without audio capability, within the Spa.  Notably, cameras were installed where customers had a known expectation of privacy and where video surveillance is precluded by Florida statute.  Exhibit H, December Affidavit, para. 13.

34.     Despite specifically being instructed to only monitor and not record, the detectives knowingly allowed the surveillance system to record 24 hours a day, 7 days a week for 60 days and intentionally withheld this fact from the Judge who signed the warrant authorizing the surveillance.  Exhibit G, Depo. Tr. Sean Crowley, pg. 40, ll. 16-19.

35.     The acts that were observed via the installed surveillance system served as the premise for the next December 28, 2018 "Affidavit for Surreptitious Entry and Installation of Electronic Surveillance Camera," sworn and subscribed to by Detective Crowley, which was submitted to County Court Judge Paul B. Kanarek despite the fact that the required return of service was never submitted for the first warrant.  Exhibit H, December Affidavit, pgs. 1-18.

36.     Between the dates of 11/29/18 and 12/27/18, Detective Crowley observed approximately one hundred (100) sex acts for money, therefore making this second 30-day video surveillance/recording period completely unnecessary.  Exhibit H, December Affidavit, para. 13.

37.     On 12/06/18 and 12/22/18, tracking devices were installed on vehicles believed to transport "women participating in the criminal enterprise and funds used to contribute to the criminal enterprise or derived from the enterprise".  Exhibit H, December Affidavit, para. 14.

38.     Despite observing multiple sex acts for money and the monitoring and tracking of the vehicles used to transport the females believed to be participating in the criminal enterprise at the Spa, Detective Crowley pursuant to a sworn affidavit improperly requested additional

authorization to conduct an additional thirty (30) days of video surveillance at the Spa.".  Exhibit H, December Affidavit, pg. 17.

39.     This second 30-day period was requested in spite of the alleged concern that women were working at the Spa against their will.  Exhibit C, Depo. Tr. Kevin Martin, pg. 31, ll. 2-10, pg. 47, ll. 1-12.

40.     This second 30-day period was requested in spite of the fact that the officers had video surveillance early on in the first 30-day period of sex acts for money—enough to convict of RICO if warranted and enough to make arrests and stop the entire "operation."  Exhibit J, Depo. Tr. John Pedersen, pg. 68, ll. 14-20, pg. 129, ll. 18-25; Exhibit O, Tr. of Motion to Suppress Hearing before Judge Menz, pg. 81, ll. 15-19, pg. 205, ll. 20-25; Exhibit P, Depo. Tr. Phil Huddy, pg. 54, ll. 8-15; Exhibit S, Depo. Tr. Kyle Eder, pg. 13, ll. 10-21.

41.     According to Captain Martin, the cameras recorded 24/7, nothing was done to limit the running of the cameras employed in this investigation, and there was never an indication in either search warrant to the Judge that the cameras were incapable of being turned off.  Exhibit C, Depo. Tr. Kevin Martin, pg. 40, l. 19 – pg. 41, l. 14.

42.     Captain Martin later indicated that if he could do things differently, he would make sure the language of the orders and the search warrants line up in this investigation and affirmatively indicated that he would make sure the VBPD does what the order requires.  Exhibit C, Depo. Tr. Kevin Martin, pg. 53, ll. 14-22.

43.     In the December Affidavit, Detective Crowley attested that there was probable cause to believe that the Spa "is being utilized to operate a prostitution and racketeering organization and/or derive support from the proceeds of prostitution".  Exhibit H, December Affidavit, pg. 18.

44.     Again, notably missing from the December Affidavit was exculpatory evidence such as findings from the Department of Health that indicated that no person was living inside the Spa.  Exhibit H, December Affidavit, para. 4.

45.     On December 28, 2018, Judge Kanarek issued an "Order for Surreptitious Entry and Installation of Electronic Surveillance Camera," which again afforded VPBD the ability to enter the Spa and install surveillance cameras for the purpose of monitoring the premises "for a period no longer than 30 days".  Similar to the November Order issued by Judge Cox, this December Order provided that officers were to take steps minimizing the invasion of privacy. Additionally, as in the prior November Order, the December Order did not authorize any recording. Exhibit I, December Order, pgs. 1-2.

46.     According to Lieutenant Pedersen, Chief Currey was the individual responsible for making the final decisions in the Spa investigation, including requesting this second 30-day period for further surveillance.  Exhibit J, Depo. Tr. John Pedersen, pg. 139, l. 20 – pg. 140, l. 5.

47.     On or about January 11, 2019, the Office of the State Attorney instructed VBPD officials to stop recording sex acts and instead shift its focus to human trafficking activities.  This instruction was noted in a Department of Homeland Security report.  Exhibit K, Department of Homeland Security Report, pg. 1.

48.     Despite this instruction, the VBPD continued to let the cameras record for the remainder of the second 30-day period.  Exhibit B, Depo. Tr. Michael Gasbarrini, pg. 41, ll. 14-21; pg. 41, l. 22 – pg. 42, l. 8.

49.     On or about January 25, 2019, Sergeant Huddy emailed Sergeant Rivera, expressing that that "[the VPBD] has captured, approximately 200 sexual acts . . . through interior video surveillance.  We had acquired a break-in order during the last week in November and

11

continue to monitor the inside of the premises.   An extension of the existing break-in order was acquired on December 29, 2018 and we will, most likely, get a third extension next week." Exhibit L, Rivera email.

50.     So, the VBPD was looking at a third extension in spite of the clear instructions to discontinue the recording of prostitution activities occurring at the Spa.

51.     Upon information and belief, throughout the VBPD's investigation of the Spa, improper reporting frequently took place.  For example, surveillance logs from the SUI Video Room and logs from the field units often reflected discrepancies on the times and persons entering the Spa.  In a one-time span, Detective Crowley might note 7 entries while the surveillance team would note more than 20.  Exhibit M, compilation of video surveillance logs.

52.     In the wake of these various improper video-surveillance activities, warrants were sought for the class members' arrests for the charges of, *inter alia*, solicitation of prostitution pursuant to section 796.07, Fla. Stat.  Exhibit N, *State v. Kraft*, pg. 10.

53.     Aside from seeking warrants, the VBPD also held a press conference on February 19, 2019, that lasted approximately one hour, in which the VBPD not only named the class members subject to their investigation, but publicly made available the class members' photos as well, while wrongfully claiming they were involved in suspected human trafficking.  Exhibit A, Depo. Tr. David Currey, pg. 48, ll. 7-24, pg. 49, ll. 8-23, pg. 52, ll. 14-17.

54.     At the state trial court level, the class members moved to suppress the surveillance evidence gathered and obtained pursuant to Judge Cox's November Order and Judge Kanarek's December Order.  Exhibit O, Tr. of Motion to Suppress Hearing before Judge Menz.

55.     On April 23, 2019, County Court Judge Nicole P. Menz ("Judge Menz") heard arguments from the State of Florida and defense counsel for the class members on the issue of

whether the surveillance evidence gathered and obtained pursuant to Judge Cox's November Order and Judge Kanarek's December Order were improperly obtained in a manner which violated the Fourth Amendment of the United States Constitution and should be suppressed as an unreasonable search and seizure. *Id.*

56. At that hearing, Detective Crowley testified that:

(a) The whole investigation was initiated when VBPD Chief, David Currey, alerted Detectives Crowley and Gasbarrini to anonymous citizen complaints made in reference to the Spa.

Exhibit O, Tr. of Motion to Suppress Hearing before Judge Menz, pg. 30, ll. 12-20, pg. 146, ll. 9-19, pg. 165, ll.16-20.

(b) He and Detective Gasbarrini initially conducted surveillance at the Spa location.

Exhibit O, Tr. of Motion to Suppress Hearing before Judge Menz, pg. 30, ll. 4-14.

(c) Both he and Detective Gasbarrini were supervised by Detective Sergeant Huddy and Detective Lieutenant Pedersen.

Exhibit O, Tr. of Motion to Suppress Hearing before Judge Menz, pg. 37, ll. 9-12.

(d) Prior to the arrests of the Plaintiff and his class, he had never made any prostitution arrest.

Exhibit O, Tr. of Motion to Suppress Hearing before Judge Menz, pg. 32, ll. 1-4.

(e) "[W]e had to watch the entire massage to see if [the sex act] was going to take place."

Exhibit O, Tr. of Motion to Suppress Hearing before Judge Menz, pg. 70, ll. 1-23.

(f) His interpretation of the minimization requirement meant that if he did not monitor the surveillance activities 24/7 for sixty (60) days, as he was authorized, then he believed he was minimizing the surveillance.

Exhibit O, Tr. of Motion to Suppress Hearing before Judge Menz, pg. 70, ll. 1-23.

(g)    He acknowledged that the VBPD knew it was a possibility that people would become nude in the massage room.

Exhibit O, Tr. of Motion to Suppress Hearing before Judge Menz, pg. 68, ll. 4-9.

(h)    Aside from the video surveillance at the Spa in which he was involved, Detective Eder, who was also involved in the operation, went into the business next door to the Spa, began listening through the walls, and audio-recorded it—none of which was authorized by Judges Cox or Kanarek.

Exhibit O, Tr. of Motion to Suppress Hearing before Judge Menz, pg. 79, l. 22 – pg. 80, l. 12.

(i)    The VBPD did not report back to the judges with their findings from the investigation within a ten-day time period, as required by the November and December Orders.

Exhibit O, Tr. of Motion to Suppress Hearing before Judge Menz, pg. 93, l. 20 – pg. 94, l. 4.

57.    The evidence presented at the Motion to Suppress hearing indicated the improper manner of the video surveillance that was carried out by the detectives responsible for the monitoring of the cameras at East Spa.  Exhibit O, Tr. of Motion to Suppress Hearing before Judge Menz.

58.    Each and every camera installed at the spa recorded all activity in the spa for 24 hours a day 7 days a week for 60 straight days regardless of whether anyone in law enforcement was actually monitoring the recordings.  Exhibit O, Tr. of Motion to Suppress Hearing before Judge Menz, pg. 174, ll. 7-11, pg. 202, ll. 13-25.

59.    Moreover, the cameras recorded when law enforcement officials decided to take a day off and not monitor any activity at the Spa.  Exhibit O, Tr. of Motion to Suppress Hearing before Judge Menz, pg. 174, ll. 23-25.

60.     As evidenced by video surveillance logs, Detective Crowley, Detective Gasbarrini, Lieutenant Pedersen and Sergeant Huddy signed in daily to conduct the Spa investigation.  Exhibit M, compilation of video surveillance logs.

61.     As further evidenced by video surveillance logs, Chief Currey and Captain Martin and Assistant State Attorney Ryan Butler on occasion, would all monitor the recordings of what was taking place inside the Spa together.  *Id.*

62.     There was no effort at all on the part of law enforcement to minimize the 60 days' worth of recordings, and law enforcement kept those recordings stored on a server at the VBPD.  Exhibit J, Depo. Tr. John Pedersen, pg. 61, ll. 5-18.

63.     Throughout the investigation, Sergeant Huddy was responsible for all his detectives reporting to him.  Sergeant Huddy later indicated that it was part of his duty to sign off on the reports made to him and to review the search warrants.  Exhibit P, Depo. Tr. Phil Huddy, pg. 9, ll. 6-24.

64.     Sergeant Huddy indicated that he verbally followed up with reports and things of that nature.  *Id.*

65.     According to Sergeant Huddy, a Florida Department of Law Enforcement ("FDLE") human trafficking course is issued every two years, but only certain VBPD officials involved in the Spa investigation completed this course.  Exhibit P, Depo. Tr. Phil Huddy, pg. 11, ll. 14-25.

66.     Upon information and belief, Chief Currey took the FDLE human trafficking course in 2013, Detective Crowley in 2014, Lieutenant Pedersen in 2014, and Detective Gasbarrini in 2019.  Exhibit P, Depo. Tr. Phil Huddy, pg. 14, ll. 1-22, pg. 15, ll. 1-21.

67.     Although the Orders contained express instructions to minimize and <u>only</u> allowed monitoring, it was apparent at the hearing that the VBPD violated those express instructions and chose to record instead of monitor and took no actions to minimize those recordings.  Exhibit F, November Order, pg. 2; Exhibit I, December Order, pg. 2.

68.     Prior to the investigation of the Spa, State Attorney, Jeffrey Hendriks, a Martin County prosecutor, circulated a memorandum associated with minimization requirements to Detective Gasbarrini, Detective Crowley, Sergeant Huddy, and Lieutenant Pedersen.  Exhibit Q, e-mail chain, Bates Label 26680 TAIG.

69.     Lieutenant Pedersen forwarded that same memorandum to Captain Martin so he was also aware of the minimization instructions.  Exhibit Q, e-mail chain, Bates Label 30163 TAIG.

70.     That same memorandum provided that recording would only be permitted if a criminal act was surveilled.  Exhibit Q, e-mail chain, Bates Label 26681 TAIG – 26682 TAIG.

71.     At the Motion to Suppress hearing, Mr. Andrew Metcalf, Esq. (defense counsel) and Detective Crowley exchanged the following regarding minimization:

> 10  Q The Judge called -- you asked for the Judge to
>
> 11 specifically require you guys to take steps to minimize the
>
> 12 invasion of privacy to any parties not participating in
>
> 13 criminal conduct?
>
> 14 A Yes, sir.
>
> 15 Q That was put in the order?
>
> 16 A Yes.
>
> 17 Q That was asterisked and highlighted? There was an

18 asterisk put there by Judge Cox. Correct?

19 A Yes, sir.

Exhibit O, Tr. of Motion to Suppress Hearing before Judge Menz, pg. 68, ll. 10-19.

72.     On May 16, 2019, Judge Menz issued an "Order Granting Defendant's Motion to Suppress" ("Order Granting Suppression"), explaining that the Motion to Suppress must be granted due to a "fatal flaw" in the manner in which the Orders permitting the surveillance were obtained; improper manner in which the Surveillance Orders were drafted and signed; as well as the manner in which Judge Cox's November Order and Judge Kanarek's December Order were conducted by representatives of the VBPD.  Exhibit R, Order Granting Defendant's Motion to Suppress, pgs. 1-8.

73.     In the Order Granting Suppression, Judge Menz addressed whether the plaintiff and members of his class had a legitimate expectation of privacy in the massage room of the Spa and whether that expectation was reasonable.  Judge Menz opined, "Clearly anyone seeking a massage in a professional setting has a reasonable subjective expectation of privacy. . . . it is the opinion of this Court that there is a reasonable expectation of privacy in a massage room and therefore the defendant had a legitimate expectation of privacy that is protected by the Fourth Amendment to the United States Constitution."  *Id*. at 4.

74.     In that same Order Granting Suppression, Judge Menz addressed law enforcement's "disregard of the duties" to minimize the invasion of privacy of those not engaged in the unlawful acts, which as Judge Menz noted was "in direct violation of the Order signed by Judge Cox on November 27, 2018 and the Order signed by Judge Kanarek on December 28, 2018." *Id*. at 6.

75.     Specifically, Judge Menz detailed that the evidence presented at the suppression hearing indicated that detectives responsible for the monitoring of the cameras at the Spa recorded all activity in the Spa for 24 hours a day, 7 days a week, for 60 straight days – even on days when law enforcement decided to "take a day off."  In the Order Granting Suppression, Judge Menz concluded that "[t]here is no doubt that this total lack of minimization is anything other than a violation which requires the suppression of all video evidence. . . . Video surveillance is the most intrusive form of surveillance utilized by the government to investigate crime.  As such, it is incumbent upon the government that the rights of private law abiding citizens are not infringed upon during that surveillance."  *Id*. at 6-8.

76.     Aside from the investigation of the activities occurring at the Spa named in this action, the State of Florida ("the State") had conducted investigations of other massage parlors located in Indian River, Martin, and Palm Beach counties using similar, if not identical, tactics as those used by the VBPD.  Like Judge Menz, the trial court judges in the aforementioned counties entered orders suppressing the video surveillance conducted by the law enforcement officials in those jurisdictions.  Exhibit N, *State v. Kraft*, pg. 11.

77.     The State thereafter appealed all of the trial court orders granting motions to suppress non-audio video surveillance that was recorded with hidden cameras covertly installed inside massage parlors suspected of housing prostitution activity.  *Id*.

78.     On appeal, the Fourth District Court of Appeal consolidated all appellate issues emanating from the State's investigation of spas located in Indian River, Martin, and Palm Beach counties.  These appeals were titled: *State v. Kraft*, 4D19-1499, *State v. Freels*, 4D19-1655, and *State v. Zhang*, 4D19-2024.  The *State v. Freels* case involved the Order Granting Suppression that is applicable to the VBPD's investigation of the Spa.  Exhibit N, *State v. Kraft*, pg. 10-18.

79.     The appellate court ultimately found that the trial courts in all of the jurisdictions properly concluded that the criminal defendants had standing to challenge the video surveillance and that total suppression of the video recordings was constitutionally warranted.  Exhibit N, *State v. Kraft*, pg. 8.

80.     In *State v. Freels*, the county court certified the following four questions of great public importance to the Fourth District Court of Appeal:

> (a)     Did the Defendant have a legitimate expectation of privacy such that he is entitled to claim the protection of the Fourth Amendment? and,

> (b)     Did the issuing Court have authority under the Fourth Amendment to authorize a Video Surveillance Warrant? and,

> (c)     If the issuing Court had the power to authorize a Video Surveillance Warrant, does the Video Surveillance Warrant issued in this case satisfy Fourth Amendment requirements? and,

> (d)     If the issuing Court had the power to authorize a Video Surveillance Warrant and the Warrant satisfied Fourth Amendment requirements, was the Video Surveillance Warrant executed in a manner sufficient to satisfy Fourth Amendment requirements?

Exhibit N, *State v. Kraft*, pg. 10.

81.     The appellate court accepted jurisdiction to address these questions and discuss in detail the VBPD's undercover investigation of alleged prostitution activities occurring at the Spa. *Id*.

82.     There, the appellate court noted the following significant details:

> (a)     VBPD officials installed hidden cameras and used them to monitor and record spa customers as they undressed and received massages in private massage rooms;

> (b)     For the first twenty days, two detectives monitored the video feeds from 8 a.m. to 11 p.m., but after this fifteen-hour period, the cameras continually recorded and were unattended for the full 30 days;

> (c)     The police observed nearly 100 sex acts during this period;

(d)     The lead detective in that investigation applied for an extension of the 30-day surveillance period, noting that police had witnessed the counting of for large sums of money and women being transported to and from the spa;

(e)     The judge approved the warrant and granted the extension, again instructing the VBPD to minimize the intrusion on lawful activity. Detectives monitored the feed only for an additional 10 days, but the cameras ran and recorded until the expiration of the period specified in the second warrant;

(f)      In total, the VBPD monitored the video feeds for 30 out of the 60 possible days;

(g)     Most of the prostitution activities occurred at the end of the massage or the beginning, which, as the Fourth District Court of Appeal noted "complicated efforts to minimize because, if the detectives did not monitor the beginning of the massages, they may have missed an act of prostitution."; and

(h)     After the video surveillance was conducted, numerous defendants were charged with misdemeanor counts of solicitation of prostitution, and the county court suppressed the videos, concluding that the police failed to minimize the intrusion on the privacy of individuals not engaged in unlawful activity and noting that the police monitored the feeds only 50% of the allowed time while the camera recorded for the entire 60 days.

Exhibit N, *State v. Kraft*, pgs. 10-11.

83.     The appellate court began its analysis with the Fourth Amendment's prohibition on unreasonable searches, which protects individual privacy against certain types of government intrusion.  Exhibit N, *State v. Kraft*, pgs. 11-13.

84.     In its analysis, the appellate court reasoned that the spa-client defendants in all of these cases had a subjective and objectively reasonable expectation of privacy in the massage parlor rooms because the surveillance took place in a professional private setting where clients are expected to partially or fully disrobe.   Moreover, the appellate court reasoned the spa owners and their employees had a reasonable right to expect that the interactions with nude or partially nude clients in the massage rooms would not be exposed to the public.  Exhibit N, *State v. Kraft*, pg. 12.

20

85.     Although the State argued that most of the customers who were recorded and monitored engaged in unlawful activity and could not rely on Fourth Amendment rights, the appellate court rejected the "state's circular argument that the defendants lacked a privacy interest because they were engaging in criminal behavior", reasoning that "as case law shows us, Fourth Amendment rights are nearly always safeguarded by those who are criminally prosecuted." Exhibit N, *State v. Kraft*, pg. 13.

86.     After the appellate court concluded that the defendants had standing to challenge the search, it next considered whether minimization requirements were applicable to the surveillance utilized in the undercover investigations and whether those requirements were properly defined or applied in the affidavits submitted by VBPD.  Exhibit N, *State v. Kraft*, pgs. 13-14.

87.     Because the Fourth Amendment does not expressly reference the term "minimization", the State maintained to the appellate court that the existing probable cause and particularity requirements of the Warrant Clause amply safeguard protected privacy interests. However, the appellate court also rejected this argument, pointing the State to "many years of clear federal jurisprudence on this issue."  Exhibit N, *State v. Kraft*, pg. 13.

88.     Specifically, the appellate court cited to *U.S. v. Mesa-Rincon*, 911 F.2d 1433 (10th Cir. 1990), which states five requirements for video surveillance that define more specifically the probable cause and particularity requirements of the Fourth Amendment, including a minimization requirement ("the order is specifically precise so as to minimize the recording of activities not related to the crimes under investigation.").  Exhibit N, *State v. Kraft*, pgs. 13-14.

89.     The appellate court declared that "[t]he act of video surveillance itself is perhaps the most intrusive form of electronic law enforcement spying," and, as support, cited to *Mesa-*

*Rincon*'s analogy that "Television surveillance is identical in its indiscriminate character to wiretapping and bugging.  [However], [i]t is even more invasive of privacy, just as a strip search is more invasive than a pat-down search . . ."  Exhibit N, *State v. Kraft*, pg. 13.

90.     The appellate court concluded that the warrants failed to contain sufficient minimization guidelines and that the police did not sufficiently minimize the video recording of those with no connection to the ongoing spa investigation.  In stark comparison, the detectives in Jupiter monitored the video feeds only during business hours and three detectives monitored and recorded video from the hidden cameras over five days.  Exhibit N, *State v. Kraft*, pg. 8.

91.     Specifically, the appellate court noted that law enforcement failed to "take the most reasonable, basic, and obvious minimization technique, which was simply to not monitor or record female spa clients."  Exhibit N, *State v. Kraft*, pg. 14.

92.     The Fourth District Court of Appeal even went so far as to specifically state that of all the cases it was considering in the appeals,  the VBPD's investigation was the "most egregious example" of failure to minimize because their cameras recorded <u>continuously (24 hours a day/7 days a week)</u> for 60 days.  *Id*.

93.     Having found no minimization employed in the surveillance used for the Spa, the Court next considered whether application of the exclusionary rule to bar evidence obtained in an illegal search and seizure was proper in light of the good faith exception set forth under *U.S. v. Leon*, 468 U.S. 897 (1984).  Exhibit N, *State v. Kraft*, pgs. 14-15.

94.     Under *Leon*, the appellate court acknowledged that the test is whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization.  Exhibit N, *State v. Kraft*, pg. 15.

95.     Although the State argued that the good faith exception applied, the appellate court again rejected the State's argument, reasoning that the warrant applications themselves cited *Mesa-Rincon*.  *Id.*

96.     In its conclusion, the Fourth District Court of Appeal upheld the trial court orders suppressing unconstitutionally captured footage, commenting that the "type of law enforcement surveillance utilized in these cases is extreme."  Exhibit N, *State v. Kraft*, pg. 16.

97.     In a special concurrence, Judge May clarified that while the State clung to "section 933.03, Florida Statutes (2019), for life support, that provision's 'plain text' simply authorizes a search warrant '[w]hen any property shall have been used: … [a]s a means to commit any crime.'" . . .It does not authorize this surveillance type for prostitution-related offenses."  *Id.*

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that on this 8th day of April, 2022, I electronically filed the forgoing with the Clerk of the Courts by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

<div style="margin-left: 50%;">

**FISHER POTTER HODAS, PL**
515 North Flagler Drive - Suite 800
West Palm Beach, FL 33401
Telephone:     561-832-1005
Facsimile:     561-820-9375
*Attorney for Plaintiffs*

By: */s/Gerald F. Richman*
        Gerald F. Richman
        Florida Bar No.: 066457
        gerry@fphlegal.com

</div>