IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO.: 9:21-CV-80391-DMM/DLB


KEITH TAIG, individually, and on behalf of
others similarly situated,


       PLAINTIFFS,

-vs-


CITY OF VERO BEACH, CHIEF DAVID CURREY, in
his individual capacity, CAPTAIN KEVIN
MARTIN (RETIRED) in his individual
capacity, LIEUTENANT JOHN PEDERSON in his
individual capacity, DETECTIVE PHIL HUDDY
in his individual capacity, DETECTIVE SEAN
CROWLEY in his individual capacity, and
DETECTIVE MIKE GASBARRINI in his individual
capacity,


       DEFENDANTS.
_____/



DEPOSITION OF LIEUTENANT JOHN PEDERSEN
Pages 5 through 156
All Parties appearing via teleconference



Monday, July 19, 2021
9:46 a.m.- 3:17 p.m.


Stenographically Reported
By:  LAURA MELTON, RMR, CRR, FPR
Florida Professional Reporter
Appearing remotely from St. Lucie County, Florida

Lieutenant John Pedersen
July 19, 2021

```
 1   Remote Appearances:

 2   On Behalf of the Plaintiff(s):

 3    FISHER POTTER HODAS PLLC
      515 N. Flagler Drive
 4    Suite 800
      West Palm Beach, Florida 33401
 5    (561) 832-1005
      Gerry@fphlegal.com
 6    BY: GERALD F. RICHMAN, ESQ.

 7
      DERREVERE, STEVENS, BLACK, & COZAD
 8    204 Isle Verde Way
      Palm Beach Gardens, Florida 33418
 9    (561) 762-0079
      K5sche@aol.com
10    BY:  KENNETH J. SCHERER, ESQ.

11
     On Behalf of the Defendant(s):
12
      MEIER BONNER MUSZYNSKI O'DELL & HARVEY
13    260 Wekiva Springs Road
      Suite 2000
14    Longwood, Florida 32779
      (407) 872-7774
15    Reb@fltrialteam.com
      BY: ROBERT E. BONNER, ESQ.
16

17    DEAN, RINGERS, MORGAN & LAWTON
      201 E. Pine Street
18    Suite 1200
      Orlando, Florida 32801
19    (407) 422-4310
      Aflood@drml-law.com
20    BY:  ALYSSA J. FLOOD, ESQ.

21
     ALSO PRESENT:
22
     Darlene Suazo, Videographer
23   Investigator Kevin Gors
     Martina Caso
24

25
```

Lieutenant John Pedersen
July 19, 2021

```
1                   E X A M I N A T I O N S

2       Witness                                      Page

3

4     LIEUTENANT JOHN PEDERSEN

5           DIRECT EXAMINATION BY MR. RICHMAN.........      7

6           CERTIFICATE OF OATH......................    153

7           CERTIFICATE OF REPORTER..................    154

8           READ LETTER TO WITNESS...................    156

9

10    =========================================================

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Lieutenant John Pedersen
July 19, 2021

```
1   **Only Exhibits listed below were marked during

2   deposition and were provided electronically to

3   stenographer
```

                        E X H I B I T S

                PLAINTIFF'S MARKED FOR IDENTIFICATION

| Exhibit | Description | Page |
|---------|-------------|------|
| Exhibit 2 | VBPD General Order #54 | 28 |
| Exhibit 6 | VBPD Case Report | 50 |
| Exhibit 9 | Memorandum to Chief Currey on June 28, 2018 | 97 |
| Exhibit 11 | DHS Report | 103 |
| Exhibit 13 | Order Surreptitious Entry | 118 |
| Exhibit 14 | Affidavit Surreptitious Entry | 122 |
| Exhibit 15 | Order Surreptitious Entry | 128 |
| Exhibit 16 | DHS Report | 132 |
| Exhibit 17 | VBPD Report | 143 |
| Exhibit 19 | VBPD Report | 148 |

                DEFENDANT'S MARKED FOR IDENTIFICATION

| Exhibit | Description | Page |
|---------|-------------|------|
| | NONE | |

Lieutenant John Pedersen
July 19, 2021

```
 1        REPORTED REMOTELY FROM ST. LUCIE COUNTY, FLORIDA

 2                Monday, July 19, 2021, 9:46 a.m.

 3                     - - - - - - -

 4                (Witness presented government-issued

 5           identification at request of the stenographer.)

 6           Recording in progress.

 7           THE VIDEOGRAPHER:  We are now on video

 8     record.  Participants should be aware that this

 9     proceeding is being recorded, and as such, all

10     conversations held will be recorded unless there

11     is a request and agreement to go off the record.

12           Private conversations and/or attorney-client

13     interactions should be held outside of the

14     presence of the remote interface.

15           This is the remote video-recorded deposition

16     of John Pedersen being taken today, July 19th,

17     2021.  The time is now 1:46 p.m. UTC time.

18           We are here in the matter of Keith

19     Taig vs. City of Vero Beach.  My name is Darlene

20     Suavo, remote video technician on behalf of

21     U.S. Legal Support.  I am not related to any

22     party in this action, nor am I financially

23     interested in the outcome.

24           At this time will our court reporter on

25     behalf of U.S. Legal Support please enter the
```

Lieutenant John Pedersen
July 19, 2021

```
1      statement for remote proceeding into the record.

2           THE STENOGRAPHER:  Okay.

3           The attorneys participating in this

4      deposition acknowledge that I will be reporting

5      this deposition remotely and that I will

6      administer the oath remotely.  This arrangement

7      is pursuant to the Florida Supreme Court

8      Administrative Order No. AOSC20-32.

9           Please indicate your agreement, plaintiff

10     counsel and then defense counsel, by stating your

11     name and your agreement on the record.

12          MR. RICHMAN:  Gerald Richman, Fisher Potter

13     Hodas, representing the plaintiff.

14          MR. BONNER:  Bob Bonner on behalf of the

15     defendants, Kevin Martin, Lieutenant Pedersen,

16     Detective Huddy, Detective Crowley, Detective

17     Gasbarrini, and Chief Currey in their individual

18     capacities.  I agree.

19          MS. FLOOD:  Alyssa Flood on behalf of the

20     City and the defendants in their official

21     capacity, and I agree.

22          MR. SCHERER:  Ken Scherer with Fisher Potter

23     Hodas.  I agree.

24     ///

25     ///
```

Lieutenant John Pedersen
July 19, 2021

```
 1   THEREUPON:

 2                   LIEUTENANT JOHN PEDERSEN,

 3   a witness called by the Plaintiff, being first duly

 4   sworn, testified as follows:

 5                   DIRECT EXAMINATION

 6   BY MR. RICHMAN:

 7      Q.   Lieutenant, how do you prefer to be addressed?

 8   As John Pedersen?  John?  Or lieutenant?  Whatever you

 9   prefer.

10      A.   Last name is Pedersen, but you can just call me

11   by my first name John.  That's fine.

12      Q.   Okay.  John, would you please, for the record,

13   state your full name and your -- basically current

14   address.  As a police officer, if you don't want to give

15   us your home address, I understand that.

16      A.   Sure.

17           Well, my name is John Pedersen, P-E-D-E-R-S-E-N.

18   My business address at the Vero Beach Police Department

19   where I'm currently located is 1055 20th Street,

20   Vero Beach, Florida, 32960.

21      Q.   Would you tell us briefly your background.  First

22   your educational background after high school.

23      A.   After high school I attended a junior college.  I

24   attended a junior college in Mason City, Iowa.  It was

25   the North Iowa Area Community College.  I graduated from
```

Lieutenant John Pedersen
July 19, 2021

1   there in 1986 with an associate's degree.  I transferred

2   to the University of Northern Iowa.  I attended school

3   there from 1986 to 1988.  I graduated in May of 1988 with

4   a bachelor's degree in -- Bachelor of Art's Degree in

5   criminology.  And I can talk about my work-related

6   experience and training, whatever you want me to.

7       Q.   Yeah, that's -- that's what we are going at.  And

8   just as a matter of ground rules, if for any reason you

9   don't understand the question or it's not clear, please

10  let me know; otherwise, we will reasonably assume that

11  you understood it.

12      A.   Okay.

13      Q.   Is that all right with you?

14      A.   That's fine.

15      Q.   And I take it you have been through depositions

16  before; correct?

17      A.   Been a police officer for almost 32 years, yes,

18  sir, I have.

19      Q.   Okay.  Then tell us, if you would, your basic

20  background in terms of work experience, if you would just

21  chronologically.

22      A.   Sure.

23           After graduating college I -- I applied to some

24  different agencies.  I went and worked in what I called

25  my hometown, Cedar Falls, Iowa.  I applied with that

Lieutenant John Pedersen
July 19, 2021

1  department, the police department in northeast Iowa.

2  It's a city of about 38,000.  I was employed there.  I

3  was hired on August 28th of 1989.  And after I was hired,

4  I attended a -- a law enforcement training academy.

5  Iowa.  Received my certification as a peace officer or a

6  police officer in the State of Iowa.

7       I worked for the Cedar Falls Police Department

8  and I served in the capacity as a patrol officer.  I

9  served in the capacity of a part-time DARE officer.  The

10  last year I was there, I worked for the Tri-County Drug

11  Task Force as the Cedar Falls police investigator.

12  And -- and during my -- during that time, in 1995, I -- I

13  decided that I wanted to move to Florida to be with my

14  long-distance girlfriend who became my wife.

15       Long story short, Cedar Falls -- or I left Cedar

16  Falls in good accord after serving almost six years.  I

17  think I was two weeks shy of six years there.  Came, was

18  hired by the Vero Beach Police Department.  Vero Police

19  Department to -- wanted me to attend a longer police

20  academy, the full academy since I was coming from out of

21  state.

22       So I attended the Florida Recruit Academy, Law

23  Enforcement Academy in Fort Pierce, Florida, from October

24  of 1995 until about mid-February of 1996.  I served in

25  the capacity of a patrol officer until, I believe it was

Lieutenant John Pedersen
July 19, 2021

1    like May -- or, excuse me, March -- from 1995 -- from the

2    fall of '95 until the spring of 2002, I served in the

3    capacity of a patrol officer.  And after that I guess I

4    was promoted to a general crimes detective.  I served in

5    that capacity for -- from 2000 to 2002.  And from

6    2000 -- and in 2002 -- in the spring of 2002, I was

7    promoted to the rank of sergeant.  I served in that

8    capacity for four and a half years as a patrol

9    supervisor.

10          And in November of 2006, I was promoted to the

11   rank of lieutenant where I served in the capacity as a

12   patrol lieutenant shift commander.  Some additional

13   training I received -- there is all types of in-service

14   training that I received, but in the summer of 2008 as a

15   lieutenant, the City of Vero Beach, at my request -- I

16   requested to attend the FBI National Academy in Quantico,

17   Virginia.  I applied for that school.  I was accepted.  I

18   went to the National Academy up in Virginia from July of

19   2008 until mid-September of 2008, and -- where I returned

20   then to Vero Beach to continue to serve in my capacity as

21   patrol lieutenant.

22          And then in October of 2015, I was transferred

23   from the patrol division to the detective division as the

24   detective division lieutenant or supervisor.

25   Q.    Is that your current position?

Lieutenant John Pedersen
July 19, 2021

1    A.    No, it is not.

2    Q.    So what is your current position?

3    A.    My current position is -- I'm in the support

4    services division as a lieutenant.  We had a lieutenant

5    retire about a year ago.  And Chief wanted to transfer

6    all those lieutenants around, give us experience in other

7    fields.  So as professional standards lieutenant, I'm in

8    charge of our school resource officers; I'm in charge of

9    our public information officer; I'm in charge of

10   recruiting for police officers and civilian employees;

11   I'm in charge of our records divisions.

12          I'm our -- basically, our building

13   superintendent.  If something is broken with the building

14   or we need something new, I'm in charge of making sure

15   that we get that taken care of.

16   Q.    When did you assume that position?

17   A.    I assumed this position approximately one year

18   ago.  I believe it was in July of 2020, about one year

19   ago.  I don't have the exact date out in front of me, but

20   I believe it was July of 2020.

21   Q.    Did you request that change?

22   A.    No, I did not.

23   Q.    Do you know why that change was made?

24   A.    Yes, I do.  At the discretion of the chief of

25   police, we had -- Lieutenant Jerry Karchefski

Lieutenant John Pedersen
July 19, 2021

1   transferred.  I have been in that -- in my position for

2   about four and a half years.  And Chief, he regularly

3   rotates us lieutenants around after a certain number of

4   years.  We do that with our detectives; so rotate them

5   every five to six years.  And it's just -- that's --

6   we're at the discretion of the chief of police.

7       Q.   Did you take a course with FDLE relating to

8   investigation of human trafficking?

9       A.   I can't recall if I have taken any online classes

10  with FDLE.  I do know that Vero Beach Police Department,

11  every couple of years, we are required to take a human

12  trafficking refresher.  I know that in August of 2018 --

13  I checked my records this morning -- there was not a

14  certificate on file, but in August of 2018, I did attend

15  a human trafficking seminar at the Eastern Florida State

16  College that was arranged by Representative Bill Posey.

17  It was a -- I believe a half-day event up in Brevard

18  County at Eastern Florida State College that I attended.

19      Q.   Are all of the officers required to take that

20  human trafficking course in the Vero Beach Police

21  Department?

22      A.   You could ask that to Lieutenant Phil Huddy.  He

23  is in charge of our -- our training.  But I believe it's

24  a refresher that we take every two years, just a short

25  course.

Lieutenant John Pedersen
July 19, 2021

1    Q.   So your belief is that every officer goes through

2   that training every two years?  For --

3    A.   Lieutenant Huddy told me this morning, I believe

4   that's the case.  You would have to ask him to be

5   certain.

6    Q.   And that -- that information, though, would be in

7   the records for each police officer, correct, if they

8   took such a course?

9    A.   I believe so.  If there was an online refresher

10   training, we have a system called PowerDMS.  And if we do

11   online training, there should be some type of record of

12   that.

13    Q.   And do you recall taking it in May of 2020?

14   Would that be correct?

15    A.   Which course are you referring to?  An FDLE

16   course?

17    Q.   Yes.  An FDLE -- FDLE mandatory retraining,

18   identification and investigation of human trafficking, a

19   four-hour course.

20    A.   I don't have it right in front of me, sir.  But

21   if -- if you have a record that I -- that I took it, I'm

22   sure I attended it.  But for my exact recollect --

23   recollection, did I take this class specifically in May

24   of 2020?  I -- I -- there is a lot of online courses

25   that -- that we are required to attend.  But specifically

Lieutenant John Pedersen
July 19, 2021

1   for me to remember May of 2020, no, I do not.

2       Q.   Is the training that -- taking those kinds of

3   courses, as you understand it, mandatory?

4       A.   There are man- -- we get a -- on our -- on our

5   PowerDMS, we get notifications even if you are required

6   to take this course.  You take the course.  And then the

7   training sergeant, Sergeant Sean Toole, would record it

8   and put it into our system.  There are also courses that

9   an officer can voluntarily take online to FDLE if he or

10  she wants to improve their education.

11      Q.   Do you understand the difference between using

12  cameras, monitoring the cameras, and recording?

13      A.   What --

14      Q.   Did you understand my question?

15      A.   No, I don't.

16      Q.   If you have a video camera --

17      A.   Uh-huh.

18      Q.   -- is there a difference in your mind between

19  monitoring the camera, in other words, watching it and

20  recording what's on the cameras?  Are you following me?

21      A.   To me -- I wish you would ask a more specific

22  question.  Monitoring is you're looking at it.  Recording

23  is you're looking at it and capturing an image.

24      Q.   And keeping the image; correct?  The recording?

25  You are recording the image?

Lieutenant John Pedersen
July 19, 2021

 1    A.   Yes.

 2    Q.   Do you recall -- and I'm -- I'm kind of jumping

 3  ahead on here, but I would like to go to -- if we can put

 4  it up on the screen --

 5        MR. RICHMAN:  Pardon?

 6             (Inaudible personal conversation between

 7        Mr. Richman and an assistant.)

 8        MR. RICHMAN:  Oh, okay.  Pick up -- you have

 9    to bear with me just a moment.  We have to go and

10    get it to be able to put this up on the screen.

11    We switched rooms on here.  Because of a -- a

12    technical problem, we weren't able to record in

13    the other room.

14        THE WITNESS:  Sure.

15        MR. RICHMAN:  Can we go off the record just

16    for a moment while we go ahead and get those

17    documents?  That will save us time, I think.

18        THE VIDEOGRAPHER:  We're off the record,

19    10:00 a.m.

20             (A recess was taken from 10:00 a.m. to

21        10:03 a.m.)

22        THE VIDEOGRAPHER:  Back on the record,

23    10:03 a.m.

24  BY MR. RICHMAN:

25    Q.   Okay.  Back on the record.  We will get the

Lieutenant John Pedersen
July 19, 2021

1   documents to you later.  But let's just go ahead and

2   proceed.

3          Do you -- do you recall -- and we will show you

4   the document later, but -- that on January 10th, 2019,

5   the State Attorney's Office of Florida directing the

6   Vero Beach Police Department to discontinue monitoring

7   the cameras to identify sex acts, instead monitor the

8   cameras to identify possible human trafficking victims?

9   A.   I do not recall that, no.

10  Q.   Okay.  We will -- we will get it up on the screen

11  and show you the document related to it.

12         Were you involved at all in interfacing with the

13  State Attorney's Office in terms of the investigation of

14  the East Spa?

15  A.   I was.  I believe as the lieutenant, myself, and

16  Detective Sergeant Phil Huddy, we were in contact with

17  the State Attorney's Office.  But the case detectives,

18  Michael Gasbarrini, Sean Crowley, they were also in -- I

19  wouldn't say constant, but they were in almost daily

20  communication with the State Attorney's Office from day

21  one.

22         And, you know, we -- we did have Assistant State

23  Attorney Ryan Butler who is a senior state attorney, he

24  had spoken with us, myself, Detective Sergeant Huddy,

25  Captain Martin, Chief Currey, and Detectives Gasbarrini

Lieutenant John Pedersen
July 19, 2021

1    and Crowley, spoken very frequently for legal advice and

2    guidance on this case.

3        Q.   How frequently did you interface with

4    the -- anybody from the State Attorney's Office?

5        A.   Mr. Butler, probably at least on a -- we saw him

6    in the station here I would say on a weekly basis for

7    sure.

8        Q.   So if you had had any questions about procedures,

9    whatever, he was there, available at least once a week

10   from your own personal experience to answer questions?

11       A.   I would say that would be correct.  I mean, at

12   the -- I don't think more than two weeks would go by

13   before we had communication with Mr. Butler.

14       Q.   Do you know what the RMS computer system is?

15       A.   The RMS -- yes, our records management system,

16   yes.

17       Q.   Are you aware of anything related to this case

18   investigation, correspondence, memo, notes, diaries,

19   photos, videos of anything not being included in the RMS

20   computer system?

21       A.   No, I'm not, sir.  I -- I believe that everything

22   that's associated with this case was given to our records

23   personnel to attach to the file.  I -- I believe

24   everything for the case is with -- has been given to the

25   State Attorney's Office or been given to any defense

Lieutenant John Pedersen
July 19, 2021

1    attorney for this case.  I believe everything -- I

2    believe everything is attached or has been provided to

3    our records unit to attach to the case file, whether

4    electronically or in a paper form.

5        Q.   Were you in your position responsible for the

6    overall operations of the detective division during 2018

7    and 2019?

8        A.   I was.  But I was also -- I am and I was, but I

9    was also under the direction of my captain, my immediate

10   supervisor, Captain Kevin Martin and Chief David Currey.

11       Q.   Did you consider this case, the investigation of

12   the East Spa to be a complex case, complex investigation?

13       A.   Yes, I did.  It had a -- I have never worked a

14   case like this before.  I -- I thought it was -- it was

15   complex, but it was something that we continued to

16   investigate and continued to -- there were, there was a

17   lot of moving parts going on.

18       Q.   Who was the lead detective on the case?

19       A.   Detective Michael Gasbarrini and Detective Sean

20   Crowley were both lead detectives on the case.  I didn't

21   consider one of them -- well, Detective Gasbarrini at the

22   time was more senior than Crowley, but to me they were

23   both the lead detectives on this case.

24       Q.   Did either of them have any prior experience or

25   training with regard to human trafficking?

Lieutenant John Pedersen
July 19, 2021

1    A.   You would have to ask them or look at their

2    records with the Vero Beach Police Department as far as

3    human trafficking and any classes that we've attended or

4    maybe they've had that in their law enforcement recruit

5    academy.

6    Q.   Today you don't happen to know either way, would

7    that be a fair statement?

8    A.   Say that again, sir.

9    Q.   You don't know yourself one way or the other is

10   what you're saying, is that what I understand?

11   A.   I cannot confirm for you if they've had human

12   trafficking training.  If I've had human trafficking

13   training in the last two years, I'm sure they have too

14   but I can't speak for them.

15   Q.   How about with regard to electronic surveillance?

16   Have you had experience and training with regard to

17   electronic surveillance?

18   A.   In my capacity as a detective with the Tri-County

19   Drug Task Force, as the Cedar Falls police investigator.

20   As far as electronic surveillance, you mean like a --

21   Q.   Yes.

22   A.   -- an electronic device to capture a -- a drug

23   buy?  Yes, I have.

24   Q.   Okay.  And was that -- did you have any special

25   training or courses with regard to that?  Or is that

Lieutenant John Pedersen
July 19, 2021

1    on-the-job experience?

2         A.    It was on-the-job experience.   The Tri-County

3    Drug Task Force, we were -- we were in a city of 68,000

4    in Waterloo, Iowa, in the eight months, seven and a half

5    months that I served there.   And we worked with state and

6    federal officers, and local officers were on the task

7    force.   The federal guys were across the hall.   But, yes,

8    I -- I have had experience with the -- with the -- an

9    electronic device, yes.

10        Q.    John, were you involved -- in this particular

11   case, you recall that there was a motion to suppress

12   hearing at which you testified?

13        A.    Yes.

14        Q.    And would you say you were involved in a daily

15   basis with regard to the investigation of the East Spa or

16   intermittently or what?   How would you describe it, in

17   other words?

18        A.    Daily.   I would say -- I would say daily.   Almost

19   daily.   Because I'm the lieutenant for the division.   I'm

20   aware of what the officers are doing, scheduling

21   surveillance in the field, and in the electronic

22   surveillance room that we had, day-to-day operations,

23   reviewing reports.   Of all the other crimes that we're

24   still working at the same time, was I, myself working

25   this case 100 percent of the time?   No.   Was I aware of

Lieutenant John Pedersen
July 19, 2021

```
 1   what was going on?  Yes, I was.  I -- I assisted with

 2   field surveillance with other detectives in the field as

 3   well.

 4       Q.   Were you the direct supervisor of Sergeant Huddy

 5   and Detective Crowley?

 6       A.   Yes.

 7       Q.   And Gasbarrini?

 8       A.   Yes.

 9       Q.   Were you involved in overseeing the search

10   warrant application process in this case?

11       A.   Well, there -- there is more than one search

12   warrant on this case, which -- which search warrant are

13   you referring to?  For the East Spa itself?

14       Q.   Yes, for the East Spa itself.

15       A.   The -- the search warrant for the arrest in

16   February of 2019 or -- is that what you are referring to?

17       Q.   Yes.

18       A.   And did I review the paperwork for the search

19   warrant, is that the question you're asking?

20       Q.   That is the question I'm asking.

21       A.   I don't believe I reviewed their search warrant

22   for that.  You can ask Detective Sergeant.  Phil Huddy is

23   the lieutenant now.  But I don't recall reviewing their

24   search warrant application for the case.  Because we --

25       Q.   How about with regard to installation of cameras?
```

Lieutenant John Pedersen
July 19, 2021

1    Were you involved with regard to that?

2        A.   No, I don't believe I was.

3        Q.   Are you familiar with -- generally familiar with

4    the general orders with regard to the Vero Beach Police

5    Department?

6        A.   Which general orders are you referring to, sir?

7    Yes.

8        Q.   Well, in particular, with regard to search

9    warrants --

10       A.   Uh-huh.

11       Q.   -- do you know whether or not there was a change

12   in the general orders with regard to the use of search

13   warrants between 2018 and subsequent to that?

14       A.   Not that I'm aware of.

15       Q.   Do you know whether approval of a supervisor was

16   required with regard to search warrants in 2018?

17       A.   Well, approval of a search warrant is required by

18   a supervisor, and if the question you're -- I will let

19   you continue with your questions.

20       Q.   Well --

21       A.   Go ahead.

22       Q.   -- if -- if the current general order requires

23   approval of a supervisor with regard to search warrants,

24   what I'm asking you is:  Do you know whether that was

25   required in 2018 before there was a change in the general

Lieutenant John Pedersen
July 19, 2021

 1  order?

 2      A.   Are you just asking if -- if -- if it is required

 3  that a supervisor review a search warrant?  Is that what

 4  you are asking?

 5      Q.   Yes.

 6      A.   Yes.  Yes.  Supervisors -- I believe the

 7  supervisor is required to review that and if

 8  detective -- Sergeant Huddy reviewed that as my -- as a

 9  supervisor in my unit, that was fine with me.

10      Q.   And then how about in 2018?  Was that same

11  procedure in effect then or was there a change?

12      A.   I believe it was probably the same, sir.  I

13  don't -- I don't have that policy right in front of me.

14  I don't know if there was a change or not.  But I believe

15  a supervisor needs to look at the search warrant before

16  it goes over to the State Attorney or for approval.

17      Q.   Let me ask you about Sergeant Huddy.  He got

18  transferred into the detective division on October 1,

19  2018.

20          Do you recall that?

21      A.   That sounds about right.

22      Q.   And did you personally read the -- the drafts,

23  the search warrants with regard to Sergeant Huddy, with

24  Gasbarrini, and with Crowley?  In other words, were you

25  involved in personally reviewing the search warrants?

Lieutenant John Pedersen
July 19, 2021

1    A.   No.

2    Q.   With regard to the East Spa?

3    A.   I don't believe I was.  I knew that they -- the

4   detectives had conferred with the State Attorney's Office

5   for guidance in preparing those orders.  And they were

6   reviewed and I knew that they were approved by the State

7   Attorney's Office and a judge.

8    Q.   The State Attorney's Office was very closely

9   involved in this whole investigation, wasn't it,

10  practically on a day-to-day basis; right?

11   A.   I would say so, yes.

12   Q.   With regard to the investigation of the East Spa,

13  who was the main point of contact coordinating -- in

14  coordination with regard to the Vero Beach Police

15  Department with the State Attorney's Office?

16   A.   Our main point of contact with the State

17  Attorney's Office was Ryan Butler.

18   Q.   And who was the main point of contact with Ryan

19  Butler from the Vero Beach Police Department?

20   A.   Well, that was -- that was several of us.

21  Myself, Captain Martin, Chief Currey.  When Mr. Butler

22  came by, there were various times when not only myself,

23  Crowley, Gasbarrini, but Lieutenant Martin -- or, excuse

24  me -- Captain Martin would -- would have a meeting with

25  Mr. Butler, and so would Chief Currey.  We -- we

Lieutenant John Pedersen
July 19, 2021

1   met -- we met several times.

2        Q.    Can you tell us how Homeland Security got

3   involved in this investigation?

4        A.    You would probably have to ask Detective

5   Gasbarrini and Crowley for more -- something more

6   definitive.  But we asked for their assistance because

7   we -- we didn't have the electronic surveillance

8   equipment that we needed for this case.  We also needed

9   their assistance with -- with trying to identify people

10  that actually were employed at East Spa, and to ascertain

11  what their status was:  Were they a U.S. citizen?  Were

12  they a foreign national?  Are they here on a visa, a work

13  visa?  Did they have some other type of paperwork?  We

14  asked for their assistance with that.

15       Q.    Do you know who it was from your police

16  department that contacted them?

17       A.    I believe it would have been Detective Gasbarrini

18  or Detective Crowley.

19       Q.    Had you ever in your experience ever reached out

20  to ICE or known your department to reach out to ICE for

21  assistance?

22       A.    Yes.  We have.

23       Q.    When -- and under what circumstances?

24       A.    Well, I had a case a few years back where I had

25  to reach out to them for a -- it was a parental

Lieutenant John Pedersen
July 19, 2021

 1    kidnapping case and had to reach out to them for a

 2    suspect that had fled to a foreign country with

 3    her -- with her son against a Florida court order.  And I

 4    asked, how do I go about getting a flag on a U.S.

 5    passport?

 6        Q.   Let me ask you this:  So in terms of reaching out

 7    to ICE in this case, do you know -- are you aware of any

 8    written report where your department reached out to ICE

 9    specifically with regard to the investigation of the East

10    Spa?

11        A.   No, I'm not aware of any written report.  I'm

12    sure it would have -- would have just been a phone call

13    or a request from another law enforcement agency.

14        Q.   So are you aware of anything in the entire file

15    that shows how that request was made or when it was made

16    with regard to ICE?

17        A.   No, I'm not.

18        Q.   With regard to ICE, when the request is made --

19    and when I say "ICE," I'm referring to ICE and the

20    Department of Homeland Security -- when a request is made

21    to go ahead and get equipment, isn't there a process to

22    go ahead and request the equipment and request the

23    assistance?

24        A.   It would be contacting one of their agents, and

25    stating our request.  And then for that agent to get

Lieutenant John Pedersen
July 19, 2021

1   approval I would assume from one of their supervisors.

2       Q.   Anything in writing with regard to that as it how

3   that is done or you don't even bother to get anything in

4   writing?

5       A.   I don't know why we would need it, anything in

6   writing.  We ask for assistance and we obtained the

7   assistance when we request it.

8       Q.   So there is -- there's nothing in the way as far

9   as you know with regard to a process to go ahead and get

10  assistance from ICE and Homeland Security; correct?

11      A.   Not that I am aware of.  But before we did that,

12  we -- we would have spoken with Captain Martin and Chief

13  Currey and let them know, hey, this is what we're doing.

14  This is not something we went out and did all on our own

15  without my captain, Captain Martin, or Chief Currey being

16  unaware of.

17      Q.   You would have gotten the approval in effect from

18  your supervisor; correct?  To do that?

19      A.   Yes.  I mean, Captain Martin or Chief Currey

20  would have been briefed on what we were doing, yes, sir.

21      Q.   Are you aware of any memorandum, anything in

22  writing, that would document that process in this case

23  relating to the East Spa?

24      A.   I personally am not aware of anything in writing

25  that would document that.

Lieutenant John Pedersen
July 19, 2021

1          MR. RICHMAN:  Now I would like to, if we

2     can, put up on the screen some documents starting

3     with General Order Number 54, which is -- we have

4     it as Exhibit 2.  Tab 2.

5          MR. BONNER:  Don't see it yet.  There we go.

6              (Plaintiff's Exhibit 2, VBPD General Order

7          #54, was marked for identification.)

8  BY MR. RICHMAN:

9     Q.   Are you able to read that, sir?

10    A.   I can.  It's a little -- I -- I can read it

11 pretty good.  It's a little bit blurry but it's -- it's

12 okay.

13    Q.   Okay.  But what I want to go to on that is 54.6.

14    A.   Okay.

15    Q.   If we can scroll to that.

16         Okay.  Can you read, sir, 54.6?

17    A.   Yes, I can.  Do you want me to read it out loud?

18 I will.

19         "The detective division commander -- the

20 detective division commander is responsible to ensure

21 that all functions of the division are performed in a

22 manner consistent with state law, current directive, or

23 other directive that may pertain to such operation.  Such

24 functions include but are not limited to records keeping,

25 scheduling payroll, training, discipline, case

Lieutenant John Pedersen
July 19, 2021

1  assignment, case management, and case clearance."

2     Q.   That's the provision that you're familiar with;

3  correct?

4     A.   Yes, sir.

5     Q.   And who was the detective division commander of

6  the Vero Beach Police Department at the time of the East

7  Spa investigation?

8     A.   I was.

9     Q.   Now would you also please read out loud the next

10  one which is 54.7.

11     A.   "The detective division supervisor is responsible

12  for direct supervision of all functions of the division,

13  and will ensure they are performed in a manner consistent

14  with state law or other current directive that may

15  pertain to such operations such functions include but are

16  not limited to records keeping, scheduling, payroll,

17  training, discipline, case management -- case assignment,

18  case management, and case clearance."

19     Q.   Now, who was the detective division supervisor

20  with regard to the East Spa investigation?

21     A.   I was.

22     Q.   So you were both the detective division commander

23  and the detective division supervisor at the same time

24  with regard to the East Spa investigation; is that

25  correct?

Lieutenant John Pedersen
July 19, 2021

```
 1      A.   Yes.  But I will add there was another supervisor
 2   in my unit, not just myself.  I'm the commander and I
 3   have the supervisor, Detective Sergeant Phil Huddy.
 4      Q.   When you were familiar with this provision and
 5   understood it during the course of the East Spa
 6   investigation; correct?
 7      A.   Yes, sir.
 8      Q.   Okay.  I now want to go to what I will refer to
 9   as Tab 3 which is General Order No. 57 relating
10   specifically to search warrants.  If you can get that up
11   on the screen.
12           Can you see that one, sir?
13      A.   I can.
14      Q.   I want to go to the second page of that that's
15   entitled, "Drafting the Affidavit and Warrant," and
16   specifically to Section 57.2.
17           Would you read that out loud for us please?
18      A.   Okay.  Sure.
19      Q.   Just that paragraph.
20      A.   Officers -- "57.2:  Officers may request the
21   assistance of a state attorney, an assistant state
22   attorney when drafting a search warrant when needed.
23   Final approval of the warrant is the responsibility of
24   the detective division commander or supervisor.  The
25   affidavit must include..."
```

Lieutenant John Pedersen
July 19, 2021

1    Q.    And in this particular case, that -- that person

2    that they're referring to in terms of responsibility

3    regarding the search warrant, would that be you, sir?

4    For final approval?

5    A.    Well, sir, I look at it -- the way it's written

6    "detective division commander or supervisor."

7    The super- -- I am the commander and I have supervisor

8    and Detective Sergeant Phil Huddy.

9    Q.    With regard to the search warrant at the East

10   Spa --

11   A.    Uh-huh.

12   Q.    -- did you give final approval to that search

13   warrant or did someone else do it?

14   A.    I believe that was -- well, chief -- chief would

15   have been aware of the search warrant itself but as far

16   as looking at the final search warrant, are you talking

17   in -- which one are you talking about, sir?  Which -- so

18   I can be clear.

19   Q.    The search warrant that allowed the installation

20   of cameras.

21   A.    I believe that was reviewed by Detective Sergeant

22   Phil Huddy who was the supervisor within the detective

23   division.

24   Q.    Did you review it as well or not?

25   A.    I don't believe I did.  I believe I saw it after

Lieutenant John Pedersen
July 19, 2021

```
 1   the fact, after the State, after it had been approved.

 2       Q.   Now I want to go to what is referred to as Tab 4

 3   which is General Order No. 59 --

 4       A.   Sure.

 5       Q.   -- entitled "Surveillance, Undercover, Decoy and

 6   Raid Operations," would you look at that one, please,

 7   sir?

 8       A.   Sure.

 9       Q.   I want to direct your attention to 59.1.  Would

10   you read that first paragraph -- or that paragraph out

11   loud please, sir?

12       A.   The chief -- "59.1:  The chief of police or his

13   designee has authority to approve a surveillance

14   undercover, decoy, or raid operation.  Once approved, it

15   is the responsibility of the captain or his or her

16   designee to supervise and coordinate all aspects of the

17   operation conducted by officers, agents within his or her

18   division."

19       Q.   With regard to the search warrant that allowed

20   the installation of cameras, in this case who was it that

21   approved it?

22       A.   I believe it was Detective Sergeant Phil Huddy.

23       Q.   You believe he was the one designated by the

24   chief of police to do that?

25       A.   Well, I'm the detective division supervisor but
```

Lieutenant John Pedersen
July 19, 2021

```
1   the -- the -- the detective division commander.  As far

2   as who looks at that, you know, if -- if I sign off on

3   it or if the chief -- or if Detective Sergeant Phil Huddy

4   signs off on it, we are both acting in the capacity -- as

5   chief's designee.  And if we take something to the chief

6   for a raid operation, for the many of undercover drug

7   buys that I have worked before Sergeant Huddy came and

8   after he came, if I'm not there and if -- Sergeant Huddy

9   had the authority to take that operation to the chief for

10  approval.  If -- if I was there, and if -- if I reviewed

11  the plan myself, if I signed off on that plan myself,

12  then I would take it there.  You know?  This is -- it's

13  been -- we're in 2021.

14          As far as a recollection for each document that

15  was approved or signed, it would be, I guess, easier if

16  you would -- if I had the document in front of me to --

17  to look at to say for sure, hey, on this date, did you

18  review this document?  I'm going from my recollection to

19  the best of my ability on this case whether I reviewed --

20  whether I reviewed a certain document or not.

21      Q.   On the second paragraph -- the second sentence in

22  there, though, it says, "Responsibility of the captain or

23  his or her designee to supervise and coordinate all

24  aspects of the operation conducted by the officers,

25  agents within his or her division."
```

Lieutenant John Pedersen
July 19, 2021

1          Who was the one who did that?  Was it the captain

2     or did the captain designate somebody?

3          A.   I'm not sure if the captain designated myself and

4     Detective Sergeant Huddy to -- to conduct the operation

5     and to supervise the operation.  This was a large

6     operation that just not one supervisor could supervise by

7     themself.  I relied on Detective Sergeant Phil Huddy, he

8     relied on me, and we supervised the operation together.

9     And we were at the -- we were following orders from

10    Captain Kevin Martin and Chief Currey who were aware of

11    what we were doing.

12         Q.   So Captain Martin was directly involved; correct?

13         A.   Captain Martin is my immediate supervisor, and he

14    had a -- well, I'm sure daily briefing of what we were

15    going -- what we were doing each and every day.

16         Q.   Did Captain Martin designate any of that

17    responsibility to you or to someone else?  Or did he

18    handle it himself?  I'm really asking for all three

19    possible options there.

20         A.   Well, could you ask the questions one at a time?

21         Q.   Sure.

22         With regards to specifically to the search

23    warrant that we're referencing here involving the East

24    Spa, with the installation of cameras, was the person

25    that made the decision with regard to that, was it

Lieutenant John Pedersen
July 19, 2021

1   Captain Martin?  Was it yourself?  Or was it someone

2   else?

3       A.   As far as approving the search warrant, is that

4   your question?

5       Q.   The search warrant for the cameras, that's the

6   first part and the second is going to be coordinating the

7   operation.  Let's first take the search warrant itself.

8       A.   I -- as far as approving that search warrant, I

9   believe those -- that was approved by Detective Sergeant

10  Phil Huddy in his capacity as Detective Sergeant

11  supervisor within the detective division.

12      Q.   And now let's get to the second part which is

13  supervising and coordinating all aspects of the

14  operation.

15           Who had the primary responsibility for that?

16      A.   Well, it would have been my primary

17  responsibility.

18      Q.   So in terms of the operation, once the search

19  warrant was issued with Huddy involved and getting that

20  issued, you coordinated all aspects and supervised --

21  supervised all aspects of the operation, is that correct?

22      A.   All aspects of the -- of the operation is a -- is

23  a broad term.  I supervised everything that was under my

24  control at the time.  Did I -- was I working this case

25  every second of the day?  No.  I was assisted by

Lieutenant John Pedersen
July 19, 2021

```
 1   Detective Sergeant Huddy and he assisted me.  We both

 2   supervised the case together.  I had primary

 3   responsibility for this chief of police on following

 4   the -- my orders of the -- of the -- my -- my captain and

 5   my chief.

 6        Q.   But in effect what you are saying is, is that you

 7   had primary responsibility to supervise and coordinate

 8   but some of it you delegated?

 9        A.   Sure.  Uh-huh.  To Detective Sergeant Phil Huddy.

10        Q.   That's -- that's fine.  I just wanted to make

11   sure we're clear on that answer, okay?

12        A.   I -- I -- to the best of my recollection, sir, I

13   don't have anything to hide.  I'm giving you my honest

14   answers and, you know, as -- as far as each document that

15   went to the State Attorney's Office, Detective Sergeant

16   Phil Huddy, I relied on him a lot.  He had been an SIU

17   detective in the past.  And he has looked at plenty of

18   search warrants.  I have looked at plenty of search

19   warrants over the years.  I trusted Phil Huddy to review

20   the paperwork that was brought forth to him.

21        Q.   All right.  So now let me ask you to look at what

22   we have referred to as Tab 5, which is General Order No.

23   101.

24        A.   Okay.

25        Q.   Now I want to direct your attention -- we're
```

Lieutenant John Pedersen
July 19, 2021

1  going to skip all over to 101.34.

2     A.    Okay.

3     Q.    Would you read that out loud, please, sir?  It's

4  at page 8.

5     A.    I finally see it.  Okay.

6           "101.34:  The detective division will maintain

7  case files on active cases being investigated, types of

8  records maintained in the files include all written

9  reports, written statements, transcripts, and other

10  documents produced as a result of the investigation."

11     Q.    And that's a provision you are familiar with and

12  would be your responsibility to the extent that your

13  involved to enforce that; correct?

14     A.    Yes.  Myself as well as Detective Sergeant Phil

15  Huddy, yes.

16     Q.    Okay.  Now, you're not aware, from what you've

17  already testified to, of any written requests whatsoever

18  to Homeland Security; is that correct?

19     A.    Sir, I -- I'm not aware.  No, a written request

20  to Homeland Security?  I'm not aware.  If one exists,

21  that's possible but I'm -- I'm not aware of a written

22  request to Homeland Security.

23     Q.    Are you aware of any kind of a memorandum or

24  anything written anywhere about the fact that a request

25  was made of Homeland Security?

Lieutenant John Pedersen
July 19, 2021

1      A.   No, I'm not.  You can ask Detective Sergeant

2  Huddy or Detective Gasbarrini or Detective Crowley or

3  Chief Currey or Captain Martin.  Maybe they drafted some

4  document.  But I'm not aware of it.

5      Q.   I'm going to jump ahead and ask you this

6  question:  Do you recall with regard to this case there

7  was a press conference?

8      A.   After the -- in what, in February 2019?  Yes,

9  there was a press conference.

10      Q.   Were you involved in that press conference?

11      A.   I was a -- I watched the press conference, yes,

12  sir.

13      Q.   Were you present during the press conference?

14      A.   I was.

15      Q.   Were you involved in any of the planning relating

16  to the press conference?

17      A.   I was directed by Captain Martin and -- Captain

18  Martin and/or chief to provide a list of the subjects

19  that were being charged and to give that to -- to my

20  supervisors.

21      Q.   Anything else?

22      A.   Well, they -- Captain Martin or Chief Currey may

23  have also asked for photos, but I was not involved in

24  putting photos together.  I just -- they wanted a list of

25  the -- of the defendants and the charges.

Lieutenant John Pedersen
July 19, 2021

1    Q.   Was there a PowerPoint presentation made up for

2    that press conference, to your knowledge?

3    A.   I believe there was.  Like I said, sir, I'm

4    trying to recall things from three years ago.  The

5    PowerPoint -- Chief did do a PowerPoint.  Was I -- if

6    your question was, did I make the PowerPoint?

7    (Shakes head.)  I -- I don't know if I did or if I had

8    assistance from someone.  I -- it's been three years.  I

9    don't recall.

10   Q.   Do you know what happened to that PowerPoint

11   itself?  In other words, where it is that was used for

12   the press conference?

13   A.   I don't know, sir.

14   Q.   I'm just suggesting to you that we have not been

15   able to locate it, what's been produced in the

16   investigative file and that's why I'm asking if you had

17   any idea where it could possibly be.

18   A.   If -- I can -- I can search for it, if that's

19   what you're asking for.  But I have -- I believe that

20   press conference even went out in YouTube, did it not?

21   Q.   I'm sorry.  Say that again.

22   A.   Did that press conference not go out on YouTube?

23   Q.   I -- I couldn't tell you.

24   A.   Okay.

25   Q.   It was a press conference --

Lieutenant John Pedersen
July 19, 2021

1    A.   If you want me to research and to see if we have

2    a PowerPoint of this, I will be more than happy to do

3    that.  Do I know for sure that there is a PowerPoint

4    stored here at the police department?  I'm not sure of

5    that, where it went to.  If there is, I can try to look

6    it up and find it for you.  I have nothing to hide.

7    Q.   No, I appreciate your offer in that regard.  I'm

8    just telling you that we have not received it, what's

9    been produced so far.  So if it's available, we

10   appreciate your assistance --

11   A.   Sure.

12   Q.   -- in getting a copy of that.

13   A.   I will make a note of that.

14   Q.   Thank you.

15   A.   Sure.

16   Q.   Are you familiar with the general order?  I don't

17   have a copy of that to put up on the screen.  But --

18   well, actually, let me see if it's in here.  Yeah,

19   actually, if we go back to that same one --

20        THE SECRETARY:  The same one?

21        MR. RICHMAN:  Yes.

22   BY MR. RICHMAN:

23   Q.   Let me refer you to 101.36 in that same document.

24   A.   Okay.

25   Q.   Would you just read for us the first sentence in

Lieutenant John Pedersen
July 19, 2021

1  101.36?

2     A.    101.36, first sentence:  "Cases that are cleared

3  will be closed in the RMS computer system and sent to the

4  records division in their entirety for retention."

5     Q.    Okay.  Now, the question is:  Was this case, the

6  case involving the investigation of the East Spa, is that

7  a case that was cleared at any time?

8     A.    I would say, yes, it was cleared.  There were

9  supplemental reports that came in after the final search

10 warrant.  There were multiple supplements that came in

11 where there were interviews being done, where there were

12 arrests that were being made where someone that had been

13 arrested, got picked up and there was a supplement.  But

14 there was -- as officers would -- would write their

15 reports, they -- those reports would have been signed off

16 on by Detective Sergeant Phil Huddy or myself.  And once

17 those are verified in our computer system, and the

18 program we use is -- is Logisys and the report writing

19 software is called Logitrack.

20         When we as a supervisor sign off on it, it goes

21 from the officer's -- where it says, "complete by

22 detective so and so," and we sign off on it as -- as a

23 supervisor, we verify the report and then it gets

24 electronically pushed to the records division.

25     Q.    And that was all done in this case; correct?

Lieutenant John Pedersen
July 19, 2021

1      A.    Sir, I believe that all of the reports have been

2   done in this case and were submitted to the records

3   division.

4      Q.    And everything there was turned over to the State

5   Attorney's Office; correct?

6      A.    Yes, we have to do that for full disclosure.

7      Q.    The case was not yet closed at the time of the

8   press conference, though, was it?

9      A.    The case itself was not closed entirely.  We had

10  made arrests on the case, and I will let you continue

11  your questions.

12     Q.    All right.  I didn't hear what you just said.

13     A.    Can you restate your question?

14     Q.    Yes.  Two phases:  Was the case closed, A, at the

15  time of the press conference; and B, was it closed at the

16  time of the suppression hearing in this case?

17          Answer A first, if you would, at the time of the

18  press conference.

19     A.    Was the case completely closed?  The answer to

20  that would be no, because there was arrests that still

21  needed to be made.

22     Q.    Okay.  At the time of the suppression hearing was

23  it completely closed?

24     A.    When what -- when was the suppression hearing,

25  sir?

Lieutenant John Pedersen
July 19, 2021

1    Q.   I -- I had to look to you.  I'll tell you, I

2   don't have that one memorized.  Bear with me a second and

3   we will try to give you that date.

4    A.   Almost three years later, it's hard to remember,

5   you know, everything.  I am giving you my best

6   recollection of everything.

7    Q.   I understand you are doing the best you can.  And

8   I appreciate that.

9    A.   You are welcome.

10       MR. SCHERER:  The suppression hearing was

11       April 23, 2000.

12  BY MR. RICHMAN:

13   Q.   April 23rd, 2019 is the date of the suppression

14  hearing.

15       MR. SCHERER:  Number 5.

16  BY MR. RICHMAN:

17   Q.   So was it closed at that time, as far as you

18  know?

19   A.   I do not recall.  If there were still arrests

20  that -- that hadn't been completed, I -- I can't give you

21  an honest answer on that.  You know, was it -- was it

22  closed completely?  Like I said, it's -- it's July of

23  2021, and I am trying to look back, was every arrest made

24  by April?  I'm not sure.

25   Q.   Let me now ask you to look at 101.36 on that same

Lieutenant John Pedersen
July 19, 2021

1  document.  Would you read that out loud, please?

2     A.   "101.36:  Cases are cleared -- cases that are

3  cleared will be closed in the RMS computer system and

4  sent to the records division in their entirety for

5  retention.  The files will be incorporated with the

6  original file and retained and disposed of/purged in

7  accordance with Department of State of archive -- in

8  accordance with the Department of State Division of

9  Archives and Records Management."

10    Q.   Do you know whether that was done in this case?

11 In other words, whether it was closed in the RMS computer

12 system and sent to the records division or not?

13    A.   Is your -- is your question:  Was every report

14 done and was everything turned in?  Is that your

15 question?

16    Q.   Yes.  Everything relating to the East Spa

17 investigation.

18    A.   By April of 2019, is that the second part of your

19 question?

20    Q.   I believe that --

21    A.   As a former supervisor of that unit, I believe

22 that all of the reports have been done as of this date

23 and time.  I believe everything has been turned into our

24 records management system, to our records unit.

25    Q.   Would you describe for me to your understanding

Lieutenant John Pedersen
July 19, 2021

1  of what a Vero Beach Police Department inclusive case

2  report is.

3      A.   To me an Inclusive Case Report, you include all

4  of your documents related to the investigation, that you

5  turn in -- all your reports are completed.  You have

6  turned them in.  And you have everything turned in or

7  turned into evidence.

8      Q.   So basically everything should be in there, in

9  the Inclusive Case Report; correct?

10     A.   An Inclusive Case Report, yes, but there is times

11  where a detective has to type a supplemental report or

12  they want some more detail.

13     Q.   Thank you.  That's what I was going to ask you

14  next.  What is a case supplemental report?

15     A.   A case supplemental report could be, we have a

16  bank robbery here in town and there is an officer that

17  goes and investigates the bank robbery and I see someone

18  chasing someone down the street and they say I -- "I was

19  a witness to this," I do a supplement to that original

20  report.

21     Q.   And, for example, are any individual officer

22  supplements, do they end up being included in the

23  Inclusive Case Report, or do they end up just in a

24  supplemental report?

25     A.   The inclusive -- I mean, you are using some

Lieutenant John Pedersen
July 19, 2021

1    different terms.  For me, you have an officer that writes

2    the initial incident report.  And then have you officers

3    that write supplemental reports.  And there was -- a

4    large amounts of supplements that were written by each

5    and every detective or officer that assisted with this

6    case.

7        Q.   And they should all be in that file; correct?

8        A.   They should be, yes, sir.

9        Q.   Okay.  Would the Inclusive Case Report contain

10   written reports with regard to all periods of

11   surveillance in accordance with your department's

12   procedure?

13       A.   You keep using the term "inclusive."  I mean,

14   each detective that was on surveillance, he -- or they

15   wrote a supplemental report for their -- their

16   observations.

17       Q.   So we would be correct to say then that if there

18   are written reports done by any of the officers involved

19   in an investigation on surveillance, they should be in

20   the file; right?

21       A.   Yes, sir.  Yes, sir.  They should be.

22            I mean, a couple of years ago, the one I last

23   looked at, I think the total reports were, like,

24   275 pages or more, with many, many pages of supplemental

25   reports from individual officers.

Lieutenant John Pedersen
July 19, 2021

1    Q.   Have you then reviewed the Inclusive Case Report
2  in this case?  Involving the East Spa?
3    A.   When you say the "Inclusive Case Report," what
4  are you referring to, sir?  Are you referring to one big
5  long supplement or one long report by Detective
6  Gasbarrini or Crowley?
7    Q.   I'm talking about everything that would have been
8  included with regard to the investigation of the East
9  Spa.
10    A.   Have I read each and every supplement in this
11  case?
12    Q.   Yes.
13    A.   Probably not.  Have I reviewed most of them?
14  Between Detective Sergeant Huddy and myself, we reviewed
15  each of -- each of the supplements or reports that came
16  in.
17         Detective Sergeant Huddy, who is now Lieutenant
18  Huddy, he or I would have reviewed these report, these
19  supplemental reports, these surveillance supplemental
20  reports, as they came in and were attached to that main
21  case file, 2018-2297.  And I then believe we had six or
22  eight different cases from 2019 where we gave individual
23  case numbers for the date.  Of the --
24    Q.   Do you have any documents -- I'm sorry.  I
25  thought you finished your answer.

Lieutenant John Pedersen
July 19, 2021

1    A.    Between myself and/or Detective Sergeant Huddy,

2  now Lieutenant Huddy, either myself or Lieutenant Huddy

3  would have reviewed these reports as they came in.

4          On our computer screen, when I was in the

5  detective division, I would have my list, and there would

6  be -- or under the Logitrack reports, there would be -- a

7  report would pop up saying, you know, I need to review

8  this report.  And I would read the report, you know, and

9  I -- I would review it.  If it needed some type of

10  revision or spelling error, I would give it to the

11  detective and say, "Hey, fix this.  You spelled this

12  wrong," and it would be resubmitted to me, if it was good

13  to go.  And it would be verified by me and then it would

14  go to our -- our records division.

15          And these reports, as they came in, Lieutenant

16  Huddy -- excuse me -- Sergeant Huddy at the time,

17  Detective Sergeant Huddy, he had full authority to review

18  reports just like I did.  So between himself and myself,

19  we reviewed the supplements as they came in.  Have I read

20  each and every officer's individual supplemental report?

21  Probably not.  Did I review quite a few of them?  Yes, I

22  did.

23    Q.  Do you have possession of any documents, any

24  correspondence, memos, notes, diaries, photos, anything

25  at all related to the East Spa investigation that weren't

Lieutenant John Pedersen
July 19, 2021

1   included in the Inclusive Case Report?

2       A.    No.  The only thing that I have that we -- that I

3   turned in was just our -- our -- what's the report -- it

4   was just our logs of our -- of our daily operations

5   plans.  And those were -- those were provided to -- to

6   counsel here on this case.  But it wasn't a report.  It

7   was just a log of our operations day-to-day.

8       Q.    Have you reviewed the Inclusive Case Report in

9   this case yourself?

10      A.    You keep saying the "Inclusive Case Report," sir.

11  I mean, if you said, have I reviewed -- I mean, do you

12  want me to read the whole entire report?  Like --

13      Q.    I'm just asking -- you don't need to read it now.

14  What I'm just asking you is:  Did you review it at any

15  time?

16      A.    Again, you keep saying "Inclusive Case Report."

17  It was a report.  It would -- you have the main case file

18  written by the assigned detective.  And then you have

19  supplemental reports that came in from each and every

20  detective that assisted with the case.  Have I read the

21  entire case file?  I believe I have read most of

22  everything.  If I had a day off, maybe if I didn't read a

23  supplement, I -- I just -- I have -- I'm not going to

24  pigeonhole myself and say I read every single report.

25  Did I review most of everything that was on this case?  I

1    believe I did.

2            As these reports trickled in, if Lieutenant

3    Huddy, who is Detective Sergeant Huddy, if he signed off

4    a report and it went off my cue, then I didn't see that

5    report.  But we would have put these reports together and

6    provided them all to the State Attorney's Office.

7        Q.   To save us time what I'm going to do is just put

8    this up.  We will call this Exhibit Number 6.  It

9    consists of one document of 11 pages.

10       A.   Okay.

11                (Plaintiff's Exhibit 6, VBPD Case Report,

12            was marked for identification.)

13   BY MR. RICHMAN:

14       Q.   If -- all I would like you to do is just glance

15   at this as we scroll down, and you see the title of it is

16   Vero Beach Police Department Inclusive Case Report.  And

17   it's got the incident number, 2019000188.  This

18   particular one was printed on May 4, 2021.

19       A.   Okay.

20       Q.   Have you seen this document before?  If you can

21   just scroll through it, it consists of 11 -- the first

22   part of it consists of 11 pages.  And you will notice if

23   you get to -- it's in the beginning of it.  On page 4 --

24   starting with page 4, it indicates the report date, for

25   example, of page 4, of officer's supplemental two it says

Lieutenant John Pedersen
July 19, 2021

1    "Crowley."  Report date February 28, 2019.  And then it's

2    got supervisor review, John Pedersen.  "Pedersen," I

3    believe, you pronounce it --

4        A.   Right.

5        Q.   -- March 3, 2019.  Do you see that?

6        A.   I can see it, but it's very -- it's not -- it's

7    not clear.  But I can -- I can see where it says -- it

8    appears to say March -- it's just that the font is, maybe

9    without -- withstanding, it's -- it's not a crisp picture

10   to me.

11       Q.   Look at the -- let's see if we can blow it up a

12   little bit.

13           THE SECRETARY:  It won't let me make it

14       bigger.  That's what -- I'm trying to make it --

15           THE WITNESS:  That's fine.

16   BY MR. RICHMAN:

17       Q.   Is that better?

18       A.   Yes.

19       Q.   Okay.  I'm not going to go through each one of

20   these with you, but just simply to ask you with regard to

21   the procedure here on these reports, it's indicated that

22   Sean Crowley was the officer and the supervisor review

23   was John Pedersen.

24       A.   Yes, sir.

25       Q.   So out of all of those, you would have reviewed

Lieutenant John Pedersen
July 19, 2021

1    every single one of these reports in the normal course of

2    your duties; is that correct?

3        A.   If it says my name, and if there is an electronic

4    record of where I signed off on it, yes, I read that

5    supplement and electronically signed off on it.

6        Q.   Was your -- your direct supervisor during that

7    time Captain Martin?

8        A.   Yes.  Captain Kevin Martin, yes.

9        Q.   And how long had he been your supervisor?

10       A.   In my --

11       Q.   Approximately.

12       A.   Well, he was my -- we used to have a deputy chief

13   and when the department downsized a little bit, our

14   captain serves basically as the deputy chief of the

15   department without that title.

16            Detective -- or Captain Kevin Martin was my

17   supervisor.  When I entered the detective division in

18   October of 2015, he was my -- as a patrol lieutenant, he

19   would have been my immediate supervisor going back to,

20   you know, whenever the previous chief left -- when --

21   when he became the captain of the -- with the police

22   department, he became my immediate supervisor, whatever

23   date that may be.

24       Q.   In the normal course of events, how often would

25   you normally meet with Chief Currey?

Lieutenant John Pedersen
July 19, 2021

1      A.    Probably -- we had staff meetings, still do, on

2    Mondays, Wednesdays and Fridays.  Do you have a specific

3    question as far as this case?

4      Q.    Was Chief Currey on a day-to-day basis, a weekly

5    basis, or whatever, involved in this investigation of the

6    East Spa?

7      A.    Captain Martin and Chief Currey were both kept

8    abreast of what was going on on an almost daily basis

9    throughout the investigation.  Chief Currey, he would

10   come down, he would come down and speak with me, Captain

11   Martin would come down and speak with me.  I would go to

12   their office.  I would give them -- I would tell them

13   what was going on with the case.  Mr. Butler came by.  We

14   spoke.  And Captain and Chief were kept well aware of

15   what we were doing, our hours of operation, and what we

16   were doing.

17     Q.    Did you have staff meetings?  You mentioned,

18   what, about Monday, Wednesday -- Monday, Wednesday,

19   Friday, about three times a week?

20     A.    Generally.  Unless Captain Martin or Chief Currey

21   would have been out of town.

22     Q.    Are there minutes taken of those staff meeting?

23     A.    No, sir.

24     Q.    Did you ever take any notes during those staff

25   meetings?

Lieutenant John Pedersen
July 19, 2021

1      A.   I'll take a note if I had something to put on my

2   to-do list.

3      Q.   But you don't take detailed notes of what's

4   happening at the meetings, I take it?

5      A.   No.   No.   If it's -- if there is something that I

6   need to do or the chief says, "Hey, get this done," I

7   would -- I might make a little note to myself, hey, get

8   this done.

9      Q.   Let's go to Tab 7, if you would, and leave that

10   one out.

11        Are you familiar with the -- this document which

12   is the City of Vero Beach, the exempt job description?

13      A.   I haven't seen it in a while, but -- go ahead.

14      Q.   You certainly in the course of having been a

15   police lieutenant for a number of years, would be

16   familiar with this and follow the procedures that are set

17   forth here, would that be a fair statement, sir?

18      A.   Sir, I do my job to the best of my ability every

19   day.   And I try to follow the policies and procedures of

20   the police department, yes, sir.

21      Q.   And were you familiar with the -- a human

22   trafficking case that was reported to the Vero Beach

23   Police Department in 2016?

24      A.   We may have had a case come in, but I -- ask me

25   to recall something from 2016, it doesn't jump out at me.

Lieutenant John Pedersen
July 19, 2021

1    Q.   Let me see if this will help refresh your
2  recollection.  Let's go to Tab 8, please.
3        First, have you ever seen this document before,
4  which is entitled "Inclusive Case Report," and it relates
5  to a report time, if you will see on the left side of
6  August 28, 2016.
7    A.   Well, can I scroll down to look at the whole
8  report before I give you my -- give you my --
9    Q.   Absolutely.  Feel free to read it all.  That's
10 all it is is that one page.
11   A.   I don't know if I have seen this case in front of
12 myself before or not.  I may have -- I just -- it doesn't
13 stick to me where I recall that.  I don't believe this is
14 anything that we -- we -- I don't remember seeing this or
15 us taking action on this case.
16   Q.   Can you tell from that report, the Inclusive Case
17 Report, who would have been involved in it?  Where it
18 says, "On the above date and time I returned a call to
19 Vien V. Pham of San José, California."
20   A.   Can you scroll up?
21   Q.   Pardon?  Sure.
22   A.   This looks like Sergeant Toole took a report.  We
23 get reports that come in quite frequently where -- where
24 someone will say Vero Beach, and it will end up being not
25 a City of Vero Beach address but in the unincorporated

Lieutenant John Pedersen
July 19, 2021

```
 1   area of Vero Beach which would be Indian River County.
 2          So from looking at that, Sergeant Toole or
 3   Officer Toole at the time took a report and he had very
 4   limited information.
 5      Q.   Other than before, which you say you were really
 6   not familiar with, were you aware of a single incident of
 7   alleged human trafficking occurring in Vero Beach prior
 8   to the -- any allegations that were made with regard to
 9   the East Spa?
10      A.   Not that I can recall, sir.
11      Q.   And you know the difference, I presume, between
12   prostitution and the requirements of human trafficking;
13   correct?
14      A.   Yes.
15      Q.   Could you briefly explain your understanding of
16   what that difference is.
17      A.   For -- human trafficking can take many different
18   forms.  It can be somewhere someone -- you can have
19   someone who is engaged in prostitution, and they just do
20   that on their own.  Human trafficking can involve many
21   different things.  It can be domestic servitude; it can
22   be agricultural; it can be in a hotel, at a restaurant,
23   nail salon, massage parlor, anywhere where -- where
24   you're forcing the person to work and you're doing
25   something where you have got a hold on him, where you're
```

Lieutenant John Pedersen
July 19, 2021

1   keeping their driver's license, you're threatening them,

2   you're giving -- letting them live in poor working

3   conditions, you -- you're withholding pay because they

4   are a -- an illegal alien, and you tell them if they

5   complain, you're going to -- you're going to call the

6   Homeland Security.  It could be many different shapes and

7   forms for -- for human trafficking.

8        Q.   Would you agree with me, though, that one element

9   of human trafficking as opposed to a voluntary

10  prostitution, would be an element of coercion of some

11  sort?  I believe you already used the word but I just

12  want to confirm that.

13       A.   Human trafficking -- say, again, your question,

14  sir.

15       Q.   The human trafficking involves some element of

16  coercion.

17       A.   I would say so, yes, or putting a person in fear.

18  It could just be verbal.  It could be taking their

19  driver's license.  It could be taking their

20  U.S. -- taking their passport from a foreign country.

21       Q.   Again, an element of coercion; correct?

22       A.   Yeah, it could -- it could include coercion.  It

23  could just include, like I said, refusing to pay someone.

24  Threatening them.  Threatening their family.

25       Q.   In that incident back in 2016, you're not

Lieutenant John Pedersen
July 19, 2021

1  aware -- were even aware of that incident or allegation

2  of human trafficking, and you're not aware of any kind of

3  follow-up that occurred; fair statement?

4      A.   I -- like I said, I don't have recollection of

5  that, sir.  And if I -- if I did, I would tell you.

6           THE WITNESS:  Is there a point where I can

7      take a break in the next few minutes?

8           MR. RICHMAN:  Absolutely.  I should have

9      said that in the very beginning.  Anytime you

10     need a break, we will take a break.  How much

11     time do you need?

12          THE WITNESS:  Five minutes.

13          MR. RICHMAN:  You got it.  Okay.  We will go

14     off the record for five minutes.

15          THE VIDEOGRAPHER:  Off the record.

16     11:12 a.m.

17               (A recess was taken from 11:12 a.m. to

18          11:21 a.m.)

19          THE VIDEOGRAPHER:  Recording in progress.

20          Back on record 11:21 a.m.

21  BY MR. RICHMAN:

22     Q.   John, approximately how many search warrants,

23  just a ballpark, have you done in your career?

24     A.   That I have personally written myself?

25     Q.   Yes.  Just a rough number.

Lieutenant John Pedersen
July 19, 2021

1    A.   I -- not that many.  I'd probably, say, under ten

2    totally when I was in the drug task force.  Up in the

3    Midwest, I assisted detectives with many search warrants.

4    I was learning from them.  General crime detective, I

5    don't recall that I -- I don't recall an exact number.

6    Q.   Do you know what a sneak and peek warrant is?

7    A.   Well, I guess I do now.

8    Q.   Would you explain it, please.  Your

9    understanding.

10    A.   My understanding of it -- I'm not an attorney.

11    The -- law enforcement, you -- when you work a case, you

12    try to gather as much evidence as you can from when you

13    exhaust all -- all investigative efforts have been

14    exhausted, detectives can ask the Court to -- for a -- a

15    warrant to enter a place to gather additional evidence.

16    Q.   And have you had any experience with wire

17    intercepts --

18    A.   Excuse me?

19    Q.   -- prior to the -- have you had experience with

20    warrants relating to wire intercepts prior to the East

21    Spa case?

22    A.   Wire intercepts?  No, I have -- I have obviously

23    heard of cases with wire intercepts, you know --

24    you know, the John Gotti case that the FBI did years ago,

25    I'm aware of what they did on that case.  But no, me,

Lieutenant John Pedersen
July 19, 2021

1   myself, have I been involved in a -- in a wire intercept?
2   No.
3      Q.   Are you familiar with the concept of minimization
4   with regard to search warrants?
5      A.   I am as far as I was briefed by Assistant State
6   Attorney Ryan Butler.
7      Q.   And what did he tell you about that?
8      A.   He said this is not a wire intercept.  And we
9   were -- for minimization, we were to have a room that was
10  off limits.  And we did that.  We had -- the SIU office
11  was authorized personnel only, only people that were
12  working the case.  So as -- have a room with the
13  prohibited unauthorized access, that we kept a log of the
14  date and time of anyone entering that room, that we only
15  conducted surveillance, monitored and recorded what we
16  were doing during the hours of -- of the operation.  That
17  we didn't talk about the case with other people, only
18  people that were involved in the case.  That we -- that
19  if a female did come in the room, that we would shut off
20  the computer, turn off the screen and not look at it at
21  all.
22          What else?  Like I said, just, we were -- we were
23  monitoring the operation only during the hours of the
24  operation.  And we kept this information to -- to
25  ourselves so we didn't speak about this to other people

Lieutenant John Pedersen
July 19, 2021

1   in the department that were not working the case with us.

2   I'm sure there was other things that he told us.  I'm

3   just trying to recall everything that he -- that he told

4   us.  But --

5       Q.   Isn't it a fact that the cameras were running

6   24/7 for 60 days?

7       A.   The -- Ryan Butler was aware of that.  Told him

8   we didn't have any way to turn it off or on.  It was on

9   an HSI server, and the only people that had access to the

10  server were our detectives that were doing electronic

11  monitoring here that required them to log on with a

12  username and a password during the hours of the

13  operation.

14      Q.   The recording was occurring 24/7 and it was video

15  recorded 24/7?; correct?

16      A.   I believe so.  Like I stated, Mr. Ryan Butler was

17  aware of that recording with HSI server and their video

18  that was installed.

19      Q.   Okay.  And I appreciate the fact that you're

20  confirming that the assistant state attorney was --

21      A.   My chief and my captain were aware of that too.

22  Because it was recording, we weren't -- we weren't

23  looking at that during off hours.

24      Q.   But if they were -- if there were innocent people

25  involved, if there were -- if there were female customers

Lieutenant John Pedersen
July 19, 2021

1   of the spa that were there, without their knowledge, they

2   were being recorded 24/7; correct?

3           I'm not asking you who looked at it but they, in

4   fact, were being recorded 24/7 whether they were male or

5   female; isn't that correct?

6       A.   I don't know if I can answer that question.  I

7   know -- all I can say is during our hours of operation,

8   they only had customers that were coming in during the

9   hours that they were open.  That's what I saw myself.

10      Q.   Aside from what you saw, the question is:  If

11  there were any females there, female customers, there

12  wasn't anything that was done to prevent recording of the

13  female customers; isn't that correct?

14      A.   The recordings went continuously.  We did not go

15  back and play any recordings during the off hours.  We

16  only watched and recorded what was going on during the

17  hours of the operation.  We were told to do that, only

18  watch during the hours of the operation itself.  Not to

19  go back and look at anything else.  Only view during the

20  hours of the operation.

21      Q.   And did you see anything in the actual search

22  warrant that indicated that you were allowed to record as

23  opposed to monitor the cameras?  Do you understand the

24  distinction that I'm making?

25      A.   I understand the distinction.  And I also looked

Lieutenant John Pedersen
July 19, 2021

```
1    at as -- as a law enforcement officer -- and this has

2    been through the courts and all of that -- when we got

3    the order to monitor, to me, that -- we had permission to

4    record as well.  Why would we go and do all of this just

5    to watch and not gather any -- any digital recorded

6    evidence?  We're just going to watch it and just take

7    notes?

8            To me, when the State Attorney's Office approved

9    this, and the judge approved it, we were approved to

10   monitor and report.  Now, looking at it back in

11   hindsight, should the words "monitor" and "record,"

12   should that have been in the order?  Well, looking back

13   at it, I would say yes.  But we were -- when we have the

14   State Attorney who reviews this and says "you're good to

15   go," and they knew what we were going to do, the judge

16   knew what we were going to do, you know, that's -- to me,

17   the monitor was for all of us including the State,

18   including the chief, including the captain, why would I

19   want to record something that I'm not authorized -- that

20   we're not authorized to do?

21       Q.   It did not use the word "record," though; isn't

22   that a fact?

23       A.   That's -- that's a fact.  Yes, sir.  And from

24   my -- I saw the briefs that were written by the Florida

25   Attorney General's office.  And everything that we did, I
```

Lieutenant John Pedersen
July 19, 2021

1   felt we were doing excellent police work on this case.  I

2   felt that we were following the letter of the law.  I

3   felt that we were following the guidance of the State

4   Attorney's Office in doing everything right by us

5   monitoring and recording the case as we worked it day by

6   day.  I felt we were authorized by -- by the State

7   Attorney's Office and most importantly, by -- by the

8   judge.  And should there have been more, you know -- I

9   wish that "record" would have been added in there and we

10  could have saved ourselves a whole bunch of headaches.

11        But, I believe -- the State Attorney's Office

12  obviously knew what we were going to do.  The judge did

13  as well, I believe, and we're at where we're at today.

14     Q.   Okay.  Aside from what you believe the judge

15  knew, did you ever see anything with regard to the judge

16  that said that you could record 24/7, every person that

17  was in there, 24/7?

18     A.   Like I said, I'm just going to state it again, we

19  were following the guidance of the State Attorney's

20  Office and the judge.  And the --

21     Q.   And I hear what you are saying --

22     A.   Yes, sir.

23     Q.   -- if you go to the State Attorney's Office.  I'm

24  asking you, though, you saw warrants.  Did you ever see

25  anything that indicated that you were able to go ahead

Lieutenant John Pedersen
July 19, 2021

1    and record everything that went on, video record

2    everything that went on, in the East Spa for 60 days,

3    nonstop, regardless of whether it was a male or female?

4        A.   I believe that we were -- we were given

5    permission to monitor and record the operation.  Again,

6    we're following the guidance of the State Attorney's

7    Office that we didn't have the ability to shut the server

8    off.  I wish we would have had an old-style VCR where we

9    could hit stop and record and eject the tape after each

10   defendant.  That would have be the easiest to do.  We did

11   not have that -- that electronic capability.

12       Q.   Did you ever try -- I'm sorry, I didn't mean to

13   interrupt you.  Please finish your answer.

14       A.   No.  Go ahead.

15       Q.   Did you ever try to get that kind of capability

16   where you can turn it on, where you could turn it off, in

17   terms of monitoring?

18       A.   You would have to ask -- you would have to ask

19   Detective Gasbarrini, Detective Crowley.  They, at times,

20   had to get technical support from -- from HSI, if there

21   was an issue with the camera or a log-in problem.  But

22   like I said, we filed the guidance of the State

23   Attorney's Office who was aware of what we were

24   doing -- the issue -- I'm not going to say the issue with

25   the camera but the -- the recording of the camera.  And

Lieutenant John Pedersen
July 19, 2021

1   Butler said only -- "only view this during hours of the

2   operation," and we did that.  We kept a log.  We kept a

3   daily log.

4       Q.   You said you only used it during the hours of

5   operation.  But they were -- the cameras were on 24/7.

6   I'm not asking you --

7       A.   Right.  The cameras were on 24/7 --

8       Q.   I don't mean to interrupt but I'm not asking you

9   whether -- whether or not you turned them on, you turned

10  them off.  You couldn't turn them on or couldn't turn

11  off.  Bottom line is those cameras ran 24/7 for 60 days;

12  is that correct?

13      A.   I don't know if it was a -- for a full 60 days.

14  I believe at some point they -- we -- they started typing

15  up warrants in -- in mid-January sometime.  And then we

16  were -- I don't know the exact date that we ceased.  But

17  you can look at the -- you know, the -- when was the last

18  date we -- we made a case there in -- the first week or

19  two of January.

20      Q.   But, in any event, it was approximately 60 days,

21  number one.  And we know for 30 days it was done.  And

22  then there was a new warrant issued; correct?

23      A.   There was an application for another 30 days,

24  yes.  I don't believe that full 30 days of -- the second

25  warrant was utilized for the full 30 days.

Lieutenant John Pedersen
July 19, 2021

1    Q.   What we do know without any doubt that it was

2    solid for 30 days.  And then the warrant was produced at

3    the request basically of the police department, Sergeant

4    Huddy?

5    A.   Yeah.  It was -- it was requested for us to

6    continue and we continued, and as it -- now I'll state

7    again.  This was being recorded onto a server that no one

8    was watching.  It was on a server and we were monitoring

9    during hours of operation per the State Attorney's

10   Office.  And my captain and my chief were aware of this.

11   And we were told to continue.  We continued our

12   operation.

13   Q.   As a supervisor, do you review the daily work of

14   the subordinates that you are supervising?

15   A.   Sure.  Between myself and -- between myself and

16   Detective Sergeant Huddy, yes.

17   Q.   And you approve written reports of the people

18   that you are supervising?

19   A.   Yes, that's part of my duties, between myself and

20   Detective Sergeant Huddy, yes.

21   Q.   It's part your duty to approve search warrants?

22   A.   Part of my duty is to approve search warrants but

23   as you see in the general order there, it says "the

24   commander and supervisor."  Commander or supervisor.  And

25   when I have a Detective Sergeant that is a

Lieutenant John Pedersen
July 19, 2021

1    college-educated person that has been an SIU detective,

2    that had full ability and authority from me to sign

3    off/on, or approve any search warrant or paperwork that

4    came across their desk.

5         Q.   And who was that person --

6         A.   Detective Sergeant Huddy.

7         Q.   -- that you are talking about in this case?

8         A.   Well, Detective Sergeant Huddy as my -- as

9    another supervisor in the unit, to me, he -- he is a

10   peer.  He is a supervisor.  I'm a lieutenant.  He is a

11   sergeant but he is a supervisor and he has the ability to

12   sign and approve reports, documents, approve raid plans,

13   search warrants.

14        Q.   You know what racketeering activity is?

15        A.   Yeah.  I don't know -- I -- do I have the State

16   statute book in front of me?  I know if you commit two

17   predicated acts you can have something become

18   racketeering.

19        Q.   Does it include prostitution?

20        A.   It certainly does.

21        Q.   Was there any evidence in the investigation of

22   the Vero Beach -- by the Vero Beach Police Department in

23   the East Spa that would support human trafficking, to

24   your knowledge?

25        A.   Yes.

Lieutenant John Pedersen
July 19, 2021

1     Q.   Tell us your understanding of what you say that

2   is, human trafficking as opposed to prostitution.

3     A.    Human trafficking, I can say from my myself being

4   actively involved in this investigation, being on

5   surveillance, not seeing people being able to come -- or

6   I -- I didn't see -- you didn't see these employees of

7   the -- of the East Spa, maybe Lanyun Ma and someone else

8   may have left.

9         But we also saw when that place -- when we set up

10   early surveillance, we were like, jeez, are people

11   actually staying in here or are they walking from this

12   house down the street?  And then when we saw them come

13   one morning to -- to open the business, they opened it

14   from the inside.  Why are these people staying inside?

15   Why are they being locked in this business at night or

16   not being able to leave?  Why can't they walk down the

17   street and get a sandwich?  Why can't they go to the

18   7-Eleven?  They were controlled.  From what I saw, they

19   weren't allowed -- these different girls that came in,

20   they weren't allowed to come and go as they pleased.

21         I personally followed a vehicle where a guy

22   picked up a girl and he is driving her somewhere.  So

23   part of my surveillance, I start following this guy.  I

24   followed this car west -- I followed it south of

25   Fort Pierce, I followed the vehicle west on State Road 60

Lieutenant John Pedersen
July 19, 2021

1   in Okeechobee County.  And my vehicle -- the transmission

2   went completely out.  And I couldn't continue following

3   this.

4          When you're taking a -- a -- a worker from this

5   place and driving them somewhere else, where are they

6   driving them to?  You know, if they -- they are not

7   allowed to come and go as they please, we saw girls that

8   would be rotated -- oh, here we have a new girl coming

9   in.  We didn't know her name.  Okay, this is Jane Doe

10  number 1, this is Jane Doe 2, this is Jane Doe 3, 4, 5,

11  6, 7, 8, 9.  We had to name them by Jane Doe because they

12  kept rotating around.  Well, why would someone be -- why

13  would someone stay in a business if they're not free to

14  leave?  If they're -- if they're free to leave, why don't

15  they go home and go to an apartment or go to a house or

16  go stay at a hotel?  No, they're locked in this place

17  every night.

18         I'm a husband and I'm a father and it disgusted

19  me to see that occurring.  These girls weren't free to

20  come and go as they chose.

21         Lanyun Ma, yeah, she would come and go as she

22  would choose.  She would go to the bank or to a store and

23  come back, maybe run and do a food run.  And these girls,

24  the only time you would see them come out, they would

25  come out and maybe brush their hair and they'd go back

Lieutenant John Pedersen
July 19, 2021

```
 1   inside.
 2       Q.   They would come outside, though, and walk around
 3   the building; right?
 4       A.   They'll come out and walk outside the front door.
 5   They weren't free, that I saw, to have a -- they had a
 6   very short leash from what I saw, very short leash.
 7       Q.   If they can walk out the front door, they can
 8   keep on going; isn't that true?
 9       A.   I guess they can, but they didn't.
10       Q.   Regardless, that's not my point.  My question is:
11   They were free to be able to walk out the front door.
12   They go -- some of them would go on shopping -- they
13   would go on business and go buy things; right?
14       A.   Some would.  But you're only as free as you think
15   you are.  You're only as free as you think you are.
16       Q.   Do you know what they did at 11:00 at night?
17       A.   What's that?
18       Q.   You say they were in there when they finished
19   their work at 11:00 at night.  Was there anything in
20   terms of surveillance outside after 11:00 at night as to
21   whether any of them ever left the premises at night, to
22   your knowledge?
23       A.   We had a pole camera that was outside on the
24   alleyway that would look towards the front of the
25   business.  Could they -- could these girls have unlocked
```

Lieutenant John Pedersen
July 19, 2021

1   the door and walked out and fled?  Sure.  Did they?  No.

2      Q.   Did you -- when you say the door was locked, how

3   do you know the door was locked?

4      A.   Well, I'm assuming it's locked.  We saw them one

5   morning they came and they -- they -- it appeared they

6   unlocked the door and let people in from the outside.

7      Q.   Do you know for a fact that the door was locked

8   at night so that they could not leave?  That's all I'm

9   asking you is what you know, not what you may have

10  guessed or surmised.

11     A.   I cannot say for sure it was locked.  All I can

12  say is these people did not live a life that was

13  indicative of being free.

14     Q.   Do you know if they were being paid?  Or how they

15  are being paid?

16     A.   You can ask Detective Crowley and Gasbarrini

17  about, I believe, our human trafficking victim.  She

18  was -- I believe she was just allowed to keep tips only

19  and she had to pay for her food.  And I believe she had

20  to pay money to stay there as well.

21     Q.   What was the name of that person?

22     A.   I'm not going to divulge it to you.  It's human

23  victim trafficking.  It's listed on the report.

24     Q.   It's one person; correct?

25     A.   Yeah.  But how many others --

Lieutenant John Pedersen
July 19, 2021

1    Q.   Of all of the people that were living there,

2    there was one person you say was involved in human

3    trafficking; isn't that correct?

4    A.   She was the only one we could identify.  They

5    rotated girls around.  We did our best to follow them to

6    different places.  All the way to Orlando.

7    Q.   How many girls are we talking about?  Ladies?

8    A.   We had one that was identified as a human

9    trafficking victim.  We had --

10   Q.   Out of how many?

11   A.   I believe a total of nine.

12   Q.   A total number -- total number of people that

13   were there were nine people working at the East Spa, no

14   more than that?  You said they were rotated.

15   A.   To the best of my recollection, we had

16   approximately nine different girls or women that worked

17   there.

18   Q.   How many RICO cases have you been involved in in

19   your 25-plus years as an officer?

20   A.   Just this one.  And one when I was in the

21   Midwest.  And the one when I was in the Midwest, it was

22   just, I learned about it after the fact with the -- a

23   motorcycle gang that the OCDETF -- Organized Crime Drug

24   Enforcement Task Force was working.

25   Q.   Switching gears with you for a moment.

Lieutenant John Pedersen
July 19, 2021

1    A.    Sure.

2    Q.    If a detective is involved in surveillance --

3    A.    Uh-huh.

4    Q.    -- is that something that's supposed to be

5    reflected in the investigative file?

6    A.    If they're involved in surveillance, they're

7    supposed to write a supplemental report about their

8    observations during that surveillance period.

9    Q.    And whose responsibility is it to make sure that

10   that's reflected in the investigative file?

11   A.    Detective Sergeant Huddy and I, we reviewed the

12   reports as they came in from these officers.  And if

13   they -- some officers, they would write their reports as

14   they did surveillance.  There was a couple of detectives

15   that would have a couple of days of surveillance in a row

16   and they would write that in the one supplement.  We

17   preferred that they -- the reports would be done daily,

18   so we had a daily, separate report for each detective for

19   each surveillance.

20         But as the reports came in, Detective Sergeant

21   Huddy and I signed off on their supplemental reports.

22         And if I did surveillance, I wrote supplemental

23   reports too.

24   Q.    In your capacity as lieutenant, you approved the

25   expenditure of what is referred to as police department

Lieutenant John Pedersen
July 19, 2021

1  investigative or confidential funds for case expenses?

2      A.   I did.  And they were approved by Captain Martin

3  and Chief Currey at the -- at the end, yes.  Or

4  what -- what investigative expenses are you referring to?

5      Q.   Anything relating to the East Spa.

6      A.   Anything related to the East Spa, the overtime,

7  it was approved by me.  I -- let Captain Martin know,

8  "Hey, these are going to be our investigative costs," and

9  he said, just -- "Just keep track of it.  Keep track of

10  it."  And I did.  When we needed interpreters at the end,

11  that was arranged and the department got billed for that.

12      Q.   You mentioned the use of interpreters.  The

13  recordings that occurred, with regard to the -- any voice

14  recordings that occurred of the people working at the

15  spa, were those ever translated?

16      A.   Well, I know for the recordings at the spa, we

17  didn't have any audio inside the spa.

18      Q.   But you did at the -- next door; correct?

19      A.   Right.  Where we were authorized to be at.

20      Q.   Okay.  I'm not going to get into that right now.

21  But I want -- I want to ask you this, though:  With

22  regard to those recordings --

23      A.   Were those ever listened to by Chinese or

24  Mandarin interpreter?  I don't know.

25      Q.   Yes.

Lieutenant John Pedersen
July 19, 2021

1    A.   I don't know.  I know that the -- Detective Eder

2    who conducted those, he wrote supplemental reports.  And

3    he wrote down what he could hear and he recorded what he

4    could hear.

5    Q.   But were they ever translated?

6    A.   You would have to ask Detective Gasbarrini.  I'm

7    not sure.

8    Q.   Well, we will.  But I'm asking you if you know.

9    I take it you don't know one way or the other.

10   A.   I don't.

11       MS. FLOOD:  Objection.  Asked and answered.

12       THE WITNESS:  You would have to ask

13   Detective Gasbarrini.

14   BY MR. RICHMAN:

15   Q.   Was anything -- I'm sorry.  Was anything ever

16   reported to you that with regard to those audio

17   recordings that were done from next door, whether or not

18   there was anything in there indicating that those persons

19   that were being recorded without their knowledge were --

20   considered that they were being coerced, that they

21   were -- they were having major problems, anything like

22   that?  If you know.

23   A.   The only thing I know is Detective Eder said and

24   what he wrote in his report, that he could hear a male

25   customer making comments of whatever pleasure he was

Lieutenant John Pedersen
July 19, 2021

1   getting, that he could hear through the wall.

2       Q.   But in terms of the women that were working

3   there, you had no information at all with regard to what

4   they were saying, their mental state, or anything else

5   based upon on their internal conversations that were

6   being recorded without their knowledge, do you?

7       A.   No.

8       Q.   Do you know with regard to this specific case, as

9   far as expenses go, whether there is a breakdown anywhere

10  as to the related expenses?  In other words, monies that

11  were spent with regard to the investigation, where would

12  that information be?

13      A.   There was a -- what do they call it?  I'm just

14  trying to think of the name of it.  Cost of investigation

15  forms for each detective.  I kept track of those hours

16  for each day.  And I then -- Captain Martin said, hey,

17  you know, I will -- "If you get me their hours, I will

18  figure out the cost," so that -- that was some of the

19  work that I had to do, and to get to Captain Martin.

20      Q.   And, by the way --

21      A.   Yes.

22      Q.   -- how much time did you spend preparing for this

23  deposition?

24      A.   Excuse me?

25      Q.   How much time did you spend preparing for this

Lieutenant John Pedersen
July 19, 2021

1  deposition?

2      A.   About an hour or so.  I just got back from

3  vacation.  I did -- you know, I lived this case day-in

4  and day-out for a long time, and --

5      Q.   What did you review in preparation for the

6  deposition?  Anything?

7      A.   Not really.  Not really.  I just -- I looked at

8  the -- a -- a short supplement that I had written and

9  that was just really it.  I was, like, whatever you have

10  to ask, I will -- I will ask it, but it's like, you know,

11  275 pages of reports, they can ask me anything.  So,

12  you know, I'm not going to sit there and say let me look

13  up this page and give you an answer on this.  I'm -- I'm

14  giving you my honest answers, my recollection of this

15  case from November, December, January, February -- from

16  November of what, 2018, until February of 2019.

17          And earlier in the case that we -- you know, how

18  the case came to be, a complaint that we originally had.

19  And how that -- how the -- how detectives initially did

20  with Detective Chiprock (phonetic).

21      Q.   Who did you meet with in preparation -- and,

22  again, don't tell me anything that was said if you were

23  meeting with your lawyer -- but who did you meet with?

24      A.   I met with Bob Bonner.

25      Q.   Anyone else?

Lieutenant John Pedersen
July 19, 2021

1    A.   No.   Mr. Bonner told me to tell the truth, and

2   that's what I'm doing.

3         MR. RICHMAN:   I don't want to know anything

4      about what he told you.

5   BY MR. RICHMAN:

6    Q.   Did you say you also met with Huddy relating to

7   this deposition?

8    A.   I simply went upstairs this morning and said,

9   "Lieutenant Huddy," I said, "Can you look up and see if I

10  have a training record of me attending a human

11  trafficking case at Eastern Florida State College?"  I

12  did that this morning.  And he looked it up and said, "I

13  can't find, you know, a copy of that record," and I said

14  "Okay."

15        And I went online this morning and I Googled

16  human trafficking seminar Eastern Florida State College,

17  Bill Posey, and that's where I found that in -- I believe

18  it was August I printed it out -- sent it to the printer

19  down the hall and it showed August -- I think early

20  August I went to a training seminar up in Brevard County.

21   Q.   Okay.   Hopefully we got your whole answer on here

22  we had the screen frozen for just a moment.

23   A.   Okay.

24   Q.   The detectives that were involved in this

25  investigation -- was Detective Mike Gasbarrini the most

Lieutenant John Pedersen
July 19, 2021

1    experienced detective involved in the investigation

2    besides yourself?

3       A.   Mike and SIU Gasbarrini, was one of the most

4    experienced but Detective Sergeant Phil Huddy was also

5    very experienced.  Each -- each of these detectives comes

6    with a large amount of experience.

7       Q.   Did Detective Gasbarrini discuss the request to

8    transfer with you before he submitted it?

9       A.   I'm sure he did.  What?  You mean to -- to leave

10   SIU and go to crime scene unit?

11      Q.   Yes.

12      A.   I'm sure he probably did, yeah.

13      Q.   Do you recall anything about that conversation as

14   to why he wanted to leave?  Transfer?

15      A.   No.  I don't recall.  Officers sometimes ask for

16   a change of hours, maybe it's better for their -- for

17   their family or for personal reasons.  But no, I -- I

18   can't recall.

19      Q.   Let me ask you about Detective Crowley.  He got

20   transferred to the detective bureau on March 4th of 2018.

21           Do you recall that approximately?

22      A.   That sounds about right.  I would have had to do

23   some initial training with him and would have written a

24   memo to document his initial training, handling, and

25   dealing with confidential informants and whatnot under

Lieutenant John Pedersen
July 19, 2021

1    Rachel's Law.

2        Q.   Were you aware of his background at the time that

3    he got transferred in with regard to the department?

4        A.   Well, Sean had -- he had been an Orange County

5    deputy.  He then came to us.  He decided he was going to

6    leave us and I believe go up to Jacksonville.  And I

7    believe he had some issues with a -- a family member.

8    And he -- he decided he wanted to come back to Vero, and

9    he came back to Vero and he worked as an officer, did a

10   good job as a patrol officer and became -- got promoted

11   to detective.

12       Q.   Had he had any experience whatsoever in anything

13   relating to human trafficking?

14       A.   Detective Crowley?  I don't know.  You would have

15   to ask him.

16       Q.   Do you know if he took any courses with regard to

17   human trafficking?

18       A.   Sir, you would have to ask him.  I'm not aware.

19   Maybe he had -- like I said before, you know, there was

20   training that was required by our department, you could

21   see if he -- he has had to attend that.  He may have had

22   done trafficking training when he attended the Florida

23   Law Enforcement Academy, recruit academy.

24       Q.   Who made the decision to assign him as the lead

25   detective in this case relating to the spa?

Lieutenant John Pedersen
July 19, 2021

1    A.    Say that again.

2    Q.    Who made the decision to assign him as a lead

3  detective regarding the East Spa?

4    A.    Sir, the SIU unit consists of two people, Mike

5  Gasbarrini and Sean Crowley.  They -- they are -- they

6  were the lead on this.  This is their division.  Or their

7  SIU, it's their specialty.  And, yes, they were assigned

8  to work this case.  Chief of police said, "Hey, you guys

9  work this case."

10    Q.    And was there any -- from the standpoint of you

11  in your capacity as supervisor -- as a supervisor, any

12  investigation or consideration given as to whether or not

13  Crowley had experience with regard to anything relating

14  to either prostitution investigations or human

15  trafficking investigations?

16    A.    Not necessarily for human trafficking or

17  prostitution.  But he demonstrated his abilities by his

18  day-to-day work as a detective working drug cases, drug

19  overdoses, drug overdose deaths.  He shared his ability

20  to do the job and perform his functions.

21    Q.    Was he a deemed -- deemed in a -- at a prior time

22  with regard to having lied in a departmental

23  investigation relating to the stalking complaint

24  involving his ex-girlfriend?  Do you recall anything

25  about that?

Lieutenant John Pedersen
July 19, 2021

1      A.   Sir, this is -- I have never heard anything like

2   that.  And, I mean, if there is an internal investigation

3   that goes on, I'm not privy to every internal

4   investigation that goes on.  If there was, I was not

5   aware of this with Detective Crowley.  And when was that?

6      Q.   I can't really testify.  I can only suggest that

7   my understanding is --

8      A.   I'm not aware --

9      Q.   Prior to the time that he got assigned to -- just

10   before he got assigned to SIU.

11      A.   I am not aware of anything negative about

12   Detective Crowley that would have prohibited him from

13   doing his job.

14           Now, there is -- if an officer is -- if

15   they're a -- if they're a subject of an internal

16   investigation, the investigation runs its course, the

17   officer's, you know, they're either -- the violation is

18   sustained, they're exonerated, whatever that was,

19   you know.

20      Q.   You don't know?

21      A.   I don't know.

22      Q.   Fair enough.

23           And how about with regard to Detective Evans?  Do

24   you know why he got transferred back to the detective

25   bureau on November 30, 2018, which was the same

Lieutenant John Pedersen
July 19, 2021

1   day -- almost the same day that Huddy transferred in?

2       A.   You said -- what day did you say?

3       Q.   September 30, 2018.

4       A.   And your question is why?

5       Q.   Yes.  Did it have to do with budgetary issues or

6   something else or do you know?

7       A.   I -- I can't recall.  Maybe we had an opening in

8   the unit.  I'm just trying to -- trying to think.  I -- I

9   don't know what -- what the vacancy was in that time.

10  You know, Detective Evans has been here a long time.  He

11  is a former detective.  Went back to the road.  Maybe he

12  said, "Hey, I want to come back up here.  I want to do

13  this job again."

14      Q.   In the total scope of things, relating to the

15  Vero Beach Police Department, were prostitution cases

16  given high priority with regard to all the crimes that

17  you handled and investigated?

18      A.   All crimes are given a high priority.  I mean,

19  any -- any crime that's a crime against a person to me is

20  a high priority.  You have to -- anyhow, go ahead with

21  your question.

22      Q.   Do you consider this case involving the East Spa

23  to be one of the largest cases or the largest case in the

24  departmental history?

25      A.   In my history -- my time here, it was probably

Lieutenant John Pedersen
July 19, 2021

1  one of the longer cases that had been worked -- out of my

2  knowledge of cases that have been worked here.  But there

3  have been cases, you know, murder cases, cold cases that

4  have been worked, that have been large.

5      Q.   Are you familiar with the concept of solvability

6  ratings, rankings or ratings, within the detective

7  bureau?

8      A.   Say that again, Counselor.

9      Q.   Solvability ratings.

10     A.   Do you mean like UCR and case clearances?

11     Q.   Yes.

12     A.   Yeah, I'm aware of that.

13     Q.   And the detective bureau uses that, that -- or

14 designation; is that correct?

15     A.   Well, I used to be in charge of our uniform crime

16 report statistics and whatever our case clearance is is

17 what it is and that comes directly from the chief.  You

18 guys work the cases to the best of your ability.  Clear

19 as many them as you can.  But if we had a case where

20 our -- our clearance rate was lower than the previous

21 year, so be it.  You know, we want to make good cases.

22     Q.   I'm going to go to another topic now relating to

23 the issue of human trafficking.

24          Do you have any knowledge or experience with

25 regard to human trafficking and prostitution and issues

Lieutenant John Pedersen
July 19, 2021

1   relating to Asian females working in massage parlors?

2       A.   I do now.

3       Q.   Did you prior to this investigation?

4       A.   Just from articles I have read.  I have read some

5   about the Polaris Project and prostitution that's gone

6   on.  I -- like I said, the seminar, I attended that Bill

7   Posey put on up there.  He is from Florida State College.

8   And, you know, when I started working this case, I was

9   like this is -- you know, this is a human trafficking

10  case.  I feel this is a human trafficking case.  This

11  smells of a human trafficking case.  And, you know, let's

12  see where -- where this -- where this case goes.  And we

13  just worked it to -- every day.  But everything that I

14  saw, you know -- I will just stop there.

15      Q.   Okay.  Do you have any knowledge of where or

16  understanding as to where women involved in human

17  trafficking come from?  Where they live?

18      A.   Human trafficking victims can come from any walk

19  of life.  Like I said earlier, they can be someone that

20  works in a hotel, a restaurant, a massage parlor, a nail

21  salon, that works up in oranges or grapefruit, or on a

22  cattle ranch here in Florida.  It could be anywhere.

23      Q.   So you would agree that there -- there is really

24  no common knowledge that the majority of people involved

25  in human trafficking come from, for example, from

Lieutenant John Pedersen
July 19, 2021

1    Flushing, New York?

2        A.    A human trafficking victim can come from

3    anywhere.  A human trafficking victim could be born here

4    in Vero Beach, Florida and they could get a job working

5    with someone and then they -- they threaten them for

6    whatever reason and withhold their paycheck.  Doesn't

7    matter where you were born, but anyone has the ability if

8    they, you know, they -- they could -- it could happen.

9        Q.    Let me ask you:  If a report came to you in your

10   capacity as a detective lieutenant, how do you handle it

11   if it comes directly to you in terms of the paperwork?

12       A.    How do I assign a case if it comes in?

13       Q.    Right.  And what kind of paperwork is there that

14   confirms how it was assigned and what happens?

15       A.    When I was in the detective division, we would

16   sign into RMS, our records management system, go under

17   the case management.  Log on in the morning.  We would

18   see the new case that would come in.  Cases that would be

19   verified by a patrol supervisor or a corporal or a

20   sergeant or lieutenant in the patrol division.

21            Once those reports were -- the initial reports

22   were submitted by an officer, and signed off on by a

23   supervisor, they would electronically be forwarded to our

24   detective division.

25            When we would have our detective briefing, we

Lieutenant John Pedersen
July 19, 2021

1   would review the cases from the night before or the day

2   before.  Cases that were cleared by an arrest, were

3   cleared by arrests.  Cases that need to be assigned, were

4   assigned.  And then we would assign a detective to it,

5   electronically.  And that's how it would be assigned.

6       Q.   So there is going to be some kind of

7   documentation or paperwork with regard to any case that

8   comes in and gets assigned; is that correct?

9       A.   A case would be electronically assigned to a

10  detective if a follow-up investigation was warranted.

11      Q.   With regard to the video in this particular case,

12  the East Spa, was there any indication in any of the

13  videos that you saw or heard about that any of the women

14  were abused that were working at the spa?

15          MS. FLOOD:  Object to the form.

16          MR. RICHMAN:  I'm sorry.  Did you hear the

17      question?  There was an objection as to form but

18      that means you still answer it.

19          MR. BONNER:  You still have to answer.

20          MR. RICHMAN:  Do you want me to rephrase the

21      question?

22          THE WITNESS:  Sure.

23  BY MR. RICHMAN:

24      Q.   With regard to all of the monitoring that

25  occurred at the East Spa and anything that you've -- that

Lieutenant John Pedersen
July 19, 2021

1   you have viewed or personally saw, did you ever see

2   anything indicating that any of the women that were

3   working there were abused?

4          MR. BONNER:  Same objection.

5          You can answer.

6          THE WITNESS:  Physically abused and beaten?

7      No.  If you want to ask me if I personally

8      believe they were abused, it's not a place I

9      would want anyone I know to be.

10  BY MR. RICHMAN:

11     Q.   That really wasn't my question.  My question is

12  limited to:  Did you see anything indicating any kind of

13  physical abuse or coercion for the women that were

14  working there, in anything that you saw?

15     A.   No.  No.

16     Q.   Do you know whether the employees of the spa were

17  paid?  The women that were working there?

18     A.   I do not personally know.  You would have to ask

19  Detective Crowley and Gasbarrini.

20     Q.   Did you see any evidence at all from anything

21  that you saw, you had viewed, you heard, about whether or

22  not they were receiving any form of payment?

23     A.   Not from what I saw or -- you would have to ask

24  Detective Gasbarrini or Crowley if they saw payment being

25  made.  We saw payment being made by customers to the

Lieutenant John Pedersen
July 19, 2021

1   women.  As far as Lanyun Ma or someone else at the spa

2   who was in charge of paying the individual women,

3   I -- you would have to ask Detective Crowley or

4   Gasbarrini.

5       Q.   So you're not aware of any checks that were

6   actually made out to the employees for any payments that

7   were made to the employees at the spa; is that your

8   statement, sir?  You just have no knowledge either way?

9       A.   I don't recall if there was.  You

10  could -- Detective Evans might have knowledge of that.

11  He had some financial information from -- from banks.

12  But I have no knowledge of them getting paid directly by

13  check or cash, their employees.

14      Q.   Have you reviewed all of the videos that were

15  taken at the spa yourself?

16      A.   No.  Why would I do that?  That's part of

17  the -- I don't --

18      Q.   I'm not asking you --

19      A.   No.

20      Q.   -- whether you would or wouldn't, I'm just asking

21  you if you did.

22      A.   No.  There were times when I came in to the -- to

23  sign in to go out, you know, like, hey, what is going on?

24  But we -- we were under strict orders from myself, Huddy,

25  every detective, you know, we're not sitting in here

Lieutenant John Pedersen
July 19, 2021

1    watching what's going on on the screen.  That was the job

2    for the viewing monitoring detectives.  The detectives,

3    if you weren't monitoring -- an assignment to monitor,

4    you grabbed your binoculars, your surveillance equipment,

5    you looked at the daily log, you looked at the -- the

6    operations plans for the day, which didn't change too

7    much, and you went out and you worked your surveillance

8    post.

9        Q.   Who were the monitoring detectives that you are

10    referring to?

11        A.   The monitoring detectives mainly were Gasbarrini

12    and Crowley that were in the SIU office that had

13    the -- the -- that was locked and authorized personnel

14    only.  There was other detectives that filled in from

15    time to time, if a detective needed time off or a day

16    off, or if they had court.  Go ahead.

17        Q.   How about Detective Brock?  Did he do any

18    monitoring?

19        A.   You would have to ask Detective Brock.  Like I

20    said, this -- --

21        Q.   I'm only asking -- I'm only asking you, to your

22    knowledge, do you know if Detective Brock did any

23    monitoring?

24        A.   He may have.  I don't recall.  If it did, it was

25    maybe for a day or two.  I -- I don't recall.  You would

Lieutenant John Pedersen
July 19, 2021

1    have to ask Detective Brock.  Or look at the reports.

2        Q.   There was one person that you said was an alleged

3    victim of human trafficking.  You haven't given us the

4    name.  But, I mean, I'm asking -- what I'm asking you is,

5    is that somebody you interviewed yourself?

6        A.   I have saw her myself.  I did not interview her.

7    She sat in a three-and-a-half-hour interview -- or

8    three -- three to three-and-a-half-hour interview with a

9    victim's advocate, with an HSI agent, that spoke Chinese,

10   and Mandarin, both.  And she gave a very detailed account

11   of what occurred.  And that should be in the reports.

12   And that was -- it was either Crowley or Gasbarrini that

13   sat in with her during that interview.  I think it was

14   Crowley.

15       Q.   Was that person told in advance that she might

16   have to be involved in sexual acts before she started

17   working at the spa?  In other words, was she informed of

18   that before from the report that you received?  Do you

19   understand what I'm asking?

20       A.   No.  Say it again.

21       Q.   Okay.  With regard to that individual you are

22   referring to, the one who was an alleged human

23   trafficking victim, do you recall her being told before

24   she ended up going to the spa that some of the customers

25   may want sexual acts, and her being told that she did not

Lieutenant John Pedersen
July 19, 2021

1   have to perform such acts?

2          MR. BONNER:  Object to the form.

3          THE WITNESS:  You thought -- I can't answer

4      that question.  I know I have read her -- her

5      statement about what occurred or what -- I read

6      Detective Crowley's report or supplemental report

7      regarding that interview.  I read that a couple

8      of years ago.  I haven't read that recently.  I

9      think that question would best be suited for

10     Detective Crowley or Gasbarrini.  I believe it

11     was Crowley that sat in on that interview.  You

12     want me to answer a question based on her

13     interview that I did not sit in for three and a

14     half hours.  I -- I think that question is a

15     question that I can't fully answer for you.

16  BY MR. RICHMAN:

17   Q.   Do you know with regard to that person that we're

18  referring to, the one who was the alleged human

19  trafficking victim, whether or not her driver's license

20  was taken from her or whether simply a photograph was

21  made?

22   A.   Sir, again, same answer that I just gave you.  I

23  think -- I can't answer that for you in detail.  I don't

24  have a photographic memory.  I can't recall a

25  supplemental report I read two years ago.  You would have

Lieutenant John Pedersen
July 19, 2021

1  to ask Detective Crowley.

2      Q.   Did any video that you reviewed relating to the

3  East Spa indicate that any of the employees were being

4  restrained?

5          MR. BONNER:  Object to the form.

6          MR. RICHMAN:  He objected to form, you know

7      you can answer.  That is for the record, that he

8      is objecting.

9          THE WITNESS:  Did I see anyone physically

10     restrained?

11 BY MR. RICHMAN:

12     Q.   Yes.

13     A.   No.

14     Q.   Did any of the recordings show that any of the

15 employees were outside of the spa using cell phones?

16     A.   I can't recall a cell phone.  I can recall a

17 woman brushing her hair.  I -- I don't recall any of the

18 women who were there that -- there was maybe one that

19 left every now and then with Lanyun Ma to go to the store

20 or to go to the bank.  But the other -- your worker-type

21 (indicating) employee, female employee, they didn't go

22 more than -- from the corner of the building, toward the

23 south and west corner of that building, 20 feet away from

24 the door.

25     Q.   I'm asking you a different question, though.  Did

Lieutenant John Pedersen
July 19, 2021

1   you see any indication that any of them had or were using

2   cell phones?

3       A.   Not that I recall.  Not that I can recall using a

4   cell phone.

5       Q.   You don't recall that --

6       A.   I do know that Lanyun Ma, she was on a cell

7   phone.  But as far as anyone else, I can't recall anyone

8   else using a cell phone outside.

9       Q.   With regards specifically to the investigation at

10  the East Spa --

11      A.   Yes.

12      Q.   -- do you know who it was that assigned

13  Gasbarrini to basically doing the investigation at the

14  East Spa?

15      A.   SIU, both Gasbarrini and Crowley, were assigned

16  this investigation through me from the chief of police

17  who said, "Hey, we need to -- we need to look into this

18  place."

19      Q.   So it was the chief of police, it was Currey who

20  went ahead and said, "You need to look into this place"?

21      A.   Yes.

22      Q.   He said it to you and you in turn said it to

23  them.  Fair statement?

24      A.   Yeah.  At some point he received a complaint from

25  a business owner.  Chief Currey did.  He can give you

Lieutenant John Pedersen
July 19, 2021

1    more detail.

2       Q.   All I'm interested in -- and for your answer,

3    though, it was Chief Currey, came from Chief Currey who

4    then said, "This is the investigation I want done";

5    correct?  As far as you know?

6       A.   As far as I know, yes.

7       Q.   Were any of the anonymous complaints relating to

8    East Spa reporting prostitution or were they reporting

9    human trafficking, if you know?

10      A.   I believe it was allegations of prostitution or

11   sexual activity inside that business.

12      Q.   Were you aware of any other reports of possible

13   prostitution at other Vero Beach spas?

14      A.   And what time frame are you talking, sir?

15      Q.   Anytime from 2016 forward.

16      A.   There may have been some allegations at a -- I

17   can't think of the name of the place -- just north of the

18   police department here.  And -- but I don't think it was

19   anything we could substantiate at anywhere else.

20           I mean, during this time we were doing our

21   general investigations, and then everyone was pitching in

22   to do their -- to give -- provide assistance for the East

23   Spa case.

24      Q.   Are you familiar with a spa called The Pro Spa?

25      A.   I believe that's on 20th Place, near 10th Avenue.

Lieutenant John Pedersen
July 19, 2021

1      Q.   Do you know whether there were any arrests

2   relating to The Pro Spa as opposed to it being shutdown

3   by the Department of Health?

4      A.   Not that I can recall.

5      Q.   You mentioned that both Gasbarrini and Crowley

6   were kind of the lead people involved; correct?

7      A.   Yeah.  Yes, sir.

8      Q.   What -- was Crowley designed as the lead

9   detective or was Gasbarrini or were they just equal?

10     A.   To me they were just equal.  Mike was senior in

11  the unit but didn't say, hey, you are lead and you are

12  a -- less of a detective.  To me, they were equal.  They

13  were lead co-detectives, co-lead detectives on the case.

14          MR. RICHMAN:  Let's put up Exhibit Number 9

15      on the screen.  And that's the document dated

16      June 28, 2018.

17          Let's see if we can get that in a horizontal

18      fashion here.  It may be hard to read it

19      vertically.  "Rotate view" at the very top.

20          THE WITNESS:  One more.

21          THE SECRETARY:  All right.  There you go.

22              (Plaintiff's Exhibit 9, Memorandum to Chief

23          Currey on June 28, 2018, was marked for

24          identification.)

25  ///

Lieutenant John Pedersen
July 19, 2021

 1   BY MR. RICHMAN:

 2       Q.   Okay.  Can you read that, sir?

 3       A.   I can.

 4       Q.   Do you see that's a memorandum to Chief Currey on

 5   June 28, 2018?

 6       A.   Can you scroll up, please?

 7       Q.   Sure.

 8       A.   I, myself, wouldn't call it a memorandum.  It

 9   doesn't look like a -- doesn't look like something that

10   originated from our department.  It's from some outside

11   entity to chief, the letter.

12       Q.   Did you ever view this document?

13       A.   This is the -- I don't think I have seen this

14   before.  Not that I can recall.  I don't recall seeing

15   this.  Maybe I have.  But it just doesn't jump out at me.

16       Q.   So you don't recall receiving a copy of it or

17   anything else; right?

18       A.   Sir, I'm -- to the best of my recollection, I

19   don't recall seeing this.  Did Chief forward it to me?

20   He may have.  But this, it doesn't jump out at me and --

21   and -- where I say, oh, yeah, I remember this.

22       Q.   You're not aware of the fact that Gasbarrini was

23   assigned to follow up on that?

24       A.   Sir, I don't know if I was on vacation.  I don't

25   know if I reviewed this.  I don't know if -- I don't have

Lieutenant John Pedersen
July 19, 2021

1   a recollection of this -- this document in front of me.

2   Did I receive it in the past?  Possibly.  I just don't

3   recall.

4       Q.   If investigated, it would be something that

5   should be in the records at the Vero Beach Police

6   Department; correct?  If there was any follow up of

7   this complaint?

8       A.   What is your question?  You are saying this

9   should be included in the case file?

10      Q.   Should be included somewhere in the files at the

11  Vero Beach Police Department.  Maybe not necessarily this

12  case.  Would you agree with that?

13      A.   If it's related to the investigation, it -- you

14  know, it should be included in the -- in the case.

15      Q.   All right, sir.  We won't pursue that any further

16  since you don't have any direct knowledge of it.

17      A.   I don't have that.  If I had seen this before,

18  it's the amount of time that gone -- has gone by that I

19  don't recall seeing this.

20      Q.   And you don't recall --

21      A.   Go ahead.

22      Q.   You don't recall being asked by Chief Currey

23  about that letter or anything else about it.  Fair

24  statement?

25      A.   Not that I recall.  Like I said, this -- you're

Lieutenant John Pedersen
July 19, 2021

1    going back now to three years ago now.  I -- I don't

2    recall.  You know, Chief might give you a notepad,

3    you know, hey, contact this person, this is a complaint I

4    have (indicating).  Did he forward this e-mail to me?

5    Possibly.  Did he forward it possibly to Gasbarrini or

6    Crowley?  Possibly.  I don't recall seeing this.

7        Q.   Did you personally attend any meetings with any

8    federal or state regulatory officers or investigators,

9    inspectors regarding the East Spa?

10       A.   I would call any -- I recall that health

11   department officials came by, I believe, at some point

12   and spoke with us as well as HSI.  HSI -- I can't

13   remember her name -- Deanna McClary or something like

14   that.  Yeah, they came by.  And -- and assisted

15   Detectives Gasbarrini and Crowley.

16            MR. RICHMAN:  Let's move to Tab Number 10.

17   BY MR. RICHMAN:

18       Q.   This is an excerpt from your testimony.  That's a

19   motion to suppress hearing --

20       A.   Okay.

21       Q.   -- on April 23, 2019.  Have you reviewed this

22   before, sir?

23       A.   No, I have not.

24       Q.   At page 125 --

25       A.   Okay.

Lieutenant John Pedersen
July 19, 2021

1    Q.   -- if we scroll down there --

2    A.   Okay.

3    Q.   - do you see it says at line -- and I will read

4    it out loud -- "With regards to this case that revolves

5    around the investigation arrests arising out of conduct

6    at East Spa, did you supervise that investigation?"

7         And you answered "I was -- I was assisted by

8    Sergeant Phil Huddy."

9         Is that correct?  Not only did I read it correct,

10   but is that a correct statement?

11   A.   Yeah, I was involved in an investigation and I

12   was assisted by Phil Huddy.

13   Q.   And you went on further to say at line 17:  "We

14   received assistance of the State Attorney's Office.  I

15   reported to my captain, Captain Kevin Martin, and Chief

16   David Currey."

17   A.   Uh-huh.

18   Q.   "Question:  Who did you receive assistance from

19   at the State Attorney's Office?

20        Answer:  We met with ASA Ryan Butler and Steve

21   Wilson, and I believe there was ASA Hendriks."

22        Is that a correct statement and have I read it

23   correctly?

24   A.   Now looking at that, refreshing my memory, yeah,

25   Steve -- ASA Wilson, we met with him, and ASA Jeff

Lieutenant John Pedersen
July 19, 2021

1   Hendriks.  But Ryan Butler was our -- our local -- our

2   point of contact for the most part, from what I can

3   recall.

4        Q.   And, generally speaking, with regard to the GOs

5   that we talked about earlier --

6        A.   Uh-huh.

7        Q.   -- one of your duties is to review or supervise

8   the review of search warrants; correct?

9        A.   Yes.

10       Q.   Now, let's go to page 126.  The question asks

11  after line 12 through 15, talking about two orders

12  authorizing the search warrant:

13           "Question:  Did you have any supervisory role in

14  drafting those applications or orders?

15           Answer:  No, I did not.  The detectives, they

16  drafted the orders and they took them to the State

17  Attorney's Office."

18           Did I read that correctly, sir?

19       A.   Yeah, that's correct.  And -- but I have also

20  told you that Detective Sergeant Huddy did review those

21  orders.  I guess at -- you know, when I made that

22  statement in court, the -- that was the truth.  But

23  Detective Sergeant Phil Huddy reviewed those orders or

24  reviewed those applications.

25       Q.   And are you not required to review them as well?

Lieutenant John Pedersen
July 19, 2021

1    A.   By our general orders, from what I have looked at

2    this morning, as a detective division commander and a

3    supervisor, Detective Sergeant Huddy is also a supervisor

4    in the unit.  And he, to me, is authorized to review the

5    applications for search warrants and warrants.

6    Q.   But as you told us, you were not really involved

7    in the search warrants themselves, it was left to Huddy;

8    is that correct?

9    A.   Sir, I have answered this question time and time

10   again.  Yes.  I -- these -- you know, if -- if I,

11   you know, going back to this court date, should I have

12   gone before that and say, who -- "Who did you take this

13   to to look at before you took it to the State," you know,

14   should I have done that beforehand?  Yes.  Looking at

15   this and talking with detectives about this and talking

16   with -- I'm looking at this, yeah, this is something that

17   Huddy looked at and, to me, he is a supervisor in my unit

18   and he signed off -- or looked at their application.  It

19   went from -- from us to a State Attorney to a judge.

20              (Plaintiff's Exhibit 11, DHS Report, was

21        marked for identification.)

22   BY MR. RICHMAN:

23   Q.   Let me refer you to Exhibit Number 11 now.  Can

24   you read that synopsis, sir?

25   A.   I can.  This definitely is the first time I have

Lieutenant John Pedersen
July 19, 2021

1   seen this document, that I can recall.

2       Q.   Do you see it says that, "The resident agent in

3   charge of the Department of Homeland Security got a

4   request for assistance from the Vero Beach Police

5   Department special investigations unit, Detective S.

6   Crowley, provided information pertaining to East Spa."

7       A.   I can read that, yeah.

8       Q.   And then further it says, "Investigators arranged

9   an undercover police officer to visit East Spa on two

10  occasions.  Both times the undercover officer was offered

11  sex for money by two different Asian women working at the

12  massage establishments."

13          Wouldn't that offer of sex for money, even

14  without a physical act being involved, constitute

15  prostitution?

16      A.   Yes, it would.

17      Q.   And further it says, "Investigators obtained the

18  rescues from East Spa, with positive results to support

19  violations of prostitution in the East Spa."

20          Have I read that correctly?

21      A.   Yes.

22      Q.   And then we go to the next page, which are

23  details of the investigation, on the document from the

24  Department of Homeland Security.  And if we skip down, it

25  refers to Detective Crowley.

Lieutenant John Pedersen
July 19, 2021

1      A.    Uh-huh.

2      Q.    And they provided him information.  It says, "The

3   Vero Beach Police Department," VBPD is what it

4   specifically says, "received a complaint that

5   prostitution may be occurring at that location."

6          Have I read that correctly?

7      A.    Which paragraph was that?

8      Q.    It's the first paragraph.  It's the last sentence

9   in the first paragraph.

10     A.    I believe you read it correctly.

11     Q.    The next paragraph says, "Investigators arranged

12  an undercover police officer to visit East Spa on two

13  occasions.  Both times the undercover officer was offered

14  sex for money by two different Asian women working at the

15  massage establishments."

16         Have I read that correctly?

17     A.    Yes.

18     Q.    And the offer for sex -- of sex for money,

19  without any sexual act, would constitute prostitution;

20  correct?

21     A.    Yes.

22     Q.    And that would be a misdemeanor; correct?

23     A.    Correct.

24     Q.    And then it says, "On October 5, 2018, law

25  enforcement personnel met with the State Attorney

Lieutenant John Pedersen
July 19, 2021

 1   regarding obtaining a court order for video surveillance

 2   with positive results."

 3         With regard to that statement, did you ever view

 4   what they referred to as the "positive results"?

 5   A.    Did I -- is your question:  Did I ever look at

 6   the approved court order?

 7   Q.    No, not court order.  Did you ever see the video

 8   surveillance that's referenced there?

 9   A.    With Detective Brock being in the establishment?

10   Q.    I can't answer that, sir.  I'm only looking at

11   what is on the page.

12   A.    I can't recall if I reviewed the video or the

13   audio of Detective Brock being in there.  I do recall

14   reading supplements written by Detective Brock and the

15   detectives who have been on surveillance.

16   Q.    And the pole cameras -- was this where the pole

17   cameras were installed that were on the exterior, outside

18   of the spa?

19   A.    Are you asking a date?  Or are you just asking

20   was a pole camera installed?

21   Q.    Well, let me ask you it both ways.  First, were

22   pole cameras installed as part of this investigation?

23   A.    A pole camera was installed as a result of this

24   investigation.

25   Q.    Do I -- did you view any of the video from those

Lieutenant John Pedersen
July 19, 2021

1   pole cameras?

2       A.   Yeah, there are times where -- where I saw the

3   pole camera that was up as I -- before I would go out in

4   surveillance or if I would stop in, in the office and

5   sign in and checked in on the officers who were -- who

6   were on the monitoring assignment.

7       Q.   And was this -- this information from the

8   Department of Homeland Security investigation, which is

9   done back on September 19, 2018, in which they

10  specifically say that sex was offered for money by two

11  different Asians working at the East Spa, do you know why

12  no arrests were made at that time?  Any idea?

13      A.   Maybe direct that question directly to Captain

14  Martin or Chief Currey.  We were following orders.  We

15  were trying to take down this organization because to

16  simply make an arrest on these -- on a couple of people,

17  the spa could pop up somewhere else.

18      Q.   I understand you're saying we should ask them.

19  I'm asking if you know.

20      A.   Why we didn't make an arrest --

21      Q.   Right.

22      A.   -- at that time?

23           I believe it was from Captain Martin and Chief

24  Currey, we wanted to go after the organization, the

25  business itself.

Lieutenant John Pedersen
July 19, 2021

1    Q.   Were there any indication at that time that there

2  was any kind of force or coercion involved as opposed to

3  it just being prostitution?  To your knowledge?

4    A.   Force or coercion?  No.  But from the -- what we

5  saw on a surveillance stand, it was indicative that there

6  was something -- like I said, I went to that human

7  trafficking class, sir.  You know, what I saw out there

8  myself, how people are not leaving, they're -- there is

9  people that are staying in the establishment overnight.

10 Who is doing -- why would you do that?

11   Q.   Did you view the -- you 24/7, the camera?

12   A.   No, I didn't, sir.

13   Q.   Was Officer Brock the one who was solicited at

14 the East Spa?

15   A.   Detective Brock, yes.

16   Q.   Detective Brock.  Okay.

17        And even if he had been solicited twice would

18 have been enough to make an arrest for solicitation of

19 prostitution; isn't that correct?

20   A.   That is correct.

21   Q.   All right.  Now, I wanted to direct your

22 attention to basically Tab 12, which is the East Spa

23 search warrant.  And while this is a lengthy document,

24 I'm only going to ask you a few questions related to

25 that.

Lieutenant John Pedersen
July 19, 2021

 1    A.    Okay.

 2          MR. RICHMAN:   If you can put that up on the

 3    screen, please.

 4   BY MR. RICHMAN:

 5    Q.    First question is:  With regard to this affidavit

 6   that was submitted by Detective Crowley, first, did you

 7   review the affidavit before its submission?

 8    A.    As I stated to you before, no, I believe I did

 9   not and Detective Sergeant Huddy reviewed it.

10          This is -- we're talking with the detectives.

11   They said they had an order with the content that they

12   needed, that they -- that the State had approved of, and

13   they are getting legal advice from the State.  It was

14   approved by us on our end through Detective Sergeant

15   Huddy, approved by the State Attorney's Office, and

16   approved by a judge.

17    Q.    You answered my question, I believe, which is:

18   You didn't review the affidavit before its submission; is

19   that correct?

20    A.    I probably told you that an hour ago, and my

21   answer is "that's correct."

22    Q.    On number -- if you look to the second page of

23   that, there is records in there by Detective Crowley, in

24   paragraph 3 to "numerous citizen complaints."

25          Did you have any knowledge of what he is

Lieutenant John Pedersen
July 19, 2021

1    referring to as "numerous citizen complaints"?

2         A.   I don't have knowledge to that other than maybe

3    what you showed earlier with the -- the note -- the

4    letter sent to Chief or maybe it was the direct call

5    from -- from the business directly to the detective or to

6    Chief to the detective, hey, call this person.

7              Chief sometimes will directly contact a detective

8    and say, hey, I need you to look into this or pass

9    some -- some information on.  I mean, not every piece and

10   tidbit of information comes directly to a supervisor.

11   Sometimes Chief will go directly to a detective with a

12   piece of information.  So...

13        Q.   What I'm asking you is different, which is:  Do

14   you have any knowledge of -- --

15        A.   Sure.

16        Q.   -- the "numerous citizen complaints"; yes or no?

17        A.   Again -- your question, again, is who is the

18   basis of the numerous complaints?

19        Q.   Yes.

20        A.   No.  Other than -- other than the business there.

21   You know, I do recall Chief and I -- Chief Currey and I,

22   we at one time -- I don't know if it's documented

23   somewhere, I should have.  We went to that business and

24   on the north side of that East Spa, I don't know if it's

25   a mental health collaborative or whatever it is, they had

Lieutenant John Pedersen
July 19, 2021

 1   complained of hearing noises through the walls there.

 2       Q.   Let me go into the second page.  I should say the

 3   cover page of that document.

 4            Do you see the reference in the last paragraph on

 5   that page about a report generated by the Department of

 6   Health and that Lanyun Ma, I can't pronounce the name but

 7   it looks like Shuxiang, C-H-A-N-G, were listed as

 8   employees.  And then a contact was made with

 9   Carla Sutherland, an investigative specialist with the

10   Department of Health.

11            Were you aware of that investigation by the

12   Department of Health?

13       A.   I am aware that the detectives reached out to the

14   Department of Health.

15       Q.   And are you aware that they had photo ID with

16   Texas and New York driver's licenses as set forth here?

17       A.   I don't recall specifically, no.

18       Q.   Are you aware of the fact that Currey and the

19   supervisor of elections are advisers together for a

20   mental health group located next to the spa?

21       A.   I know Chief serves or is members of many

22   different boards.  No, I did not know that.

23       Q.   If you look at the next page, in the middle of

24   the page, do you see the statements in the last sentence?

25   And I asked you about this peripherally before where it

Lieutenant John Pedersen
July 19, 2021

1    says, "It should be noted that it's common knowledge

2    among law enforcement that working crimes involving human

3    trafficking and prostitution, that the majority of Asian

4    females are involved with a massage business -- with a

5    massage businesses," there a typo there, "where

6    prostitution is being conducted at a current or previous

7    address out of Flushing, New York."

8            Have I read that correctly, sir?

9    A.    You have read that paragraph -- or that portion

10   of that paragraph.

11   Q.    And can you recall my asking you about that

12   before about -- about whether it's common knowledge, and

13   you have indicated that it could be anywheres in the

14   country; right?

15   A.    That's correct.  But I'm also not an SIU

16   detective that -- that gets information from everywhere

17   and other sources.

18   Q.    Only -- I don't want to take up any more of your

19   time on this.  We will have an opportunity to talk to

20   Sergeant Crowley about it.

21   A.    He's not a sergeant yet.  He is just a detective.

22   Q.    Sorry.  I didn't mean to --

23   A.    I think you promoted him.

24   Q.    Inadvertently.

25           In Paragraph Number 12 of the affidavit submitted

Lieutenant John Pedersen
July 19, 2021

1    by Crowley, in the last sentence there, it says, "The

2    video surveillance also revealed that the clientele at

3    the business is exclusively male and no female customers

4    visited the business during the aforementioned 21 days of

5    video surveillance."

6            Do you have any knowledge of that either way as

7    to whether that is a correct statement?

8    A.    Well, number 1, I believe that would be a correct

9    statement because I don't believe any one of my officers

10   would perjure themselves and tell something to the Court

11   or the State Attorney's Office that is a lie.

12   Q.    That's not what I'm really asking you.  I

13   understand you want to stand behind your officers.  I'm

14   asking you, though, do you have any knowledge of that one

15   way or the other?

16   A.    From the times I sat out there or would drive by

17   there, I would say that's a correct statement.  There was

18   men that were going to that suite.

19   Q.    You are aware of the fact that there are women

20   that were observed during the 60 days in the video

21   surveillance that occurred once the cameras were

22   installed after this affidavit was filed; correct?

23   A.    Correct.  You can ask Detective Crowley or

24   Gasbarrini to confirm.  I believe we only had one female

25   customer going, but you can ask them, that question

Lieutenant John Pedersen
July 19, 2021

1    directly.

2       Q.   You're not aware of the fact that there was

3    testimony with regard to, at one point there being three

4    females and another point there being five females, you

5    don't know anything about that?

6       A.   I don't -- I don't recall that.  I can just tell

7    you what I saw when I was on surveillance.  I can tell

8    you every person that I saw go through the door was

9    a -- either a male customer or a female employee going

10   back inside the business.  And I spent many hours on

11   surveillance out there and I did not see one female

12   customer walk in at any time.

13      Q.   Let me show you -- skip over to page -- the Bates

14   stamp on the lower portion of it is 001119.

15           Do you see the statement in the third paragraph

16   from the bottom?

17      A.   I'm waiting for the page to come up.  Oh, third

18   paragraph from the bottom?

19      Q.   Correct.

20      A.   Okay.

21      Q.   Yeah, 1119.  We've got it.  It says in the middle

22   of the paragraph, "There shall be no capability on any of

23   the installed equipment to allow audio monitoring or

24   recording."

25           Have I read that correctly?

Lieutenant John Pedersen
July 19, 2021

1    A.    You're reading it correctly.

2    Q.    And right above that it refers to, in quotes, a

3  visual surveillance warrant, end of quote.

4          Have I read that correctly?

5    A.    Yes.

6    Q.    Now I will go to the next to the last page.  That

7  would be 120.

8          THE SECRETARY:  Yes.  I think it's -- yeah.

9  BY MR. RICHMAN:

10   Q.    I'm going to read out loud that second paragraph.

11         "It is further requested that the court order

12 that video surveillance should at least continue for a

13 number of minutes to determine whether or not a sexual

14 act is taking place during, at the beginning, or at the

15 end of a paid-for massage.  If such a sexual act is

16 unclear but may be related to a massage/sexual act, video

17 surveillance may continue until such time as it is

18 determined that the activity clearly no longer relates to

19 any type of sexual activity.  The above instructions

20 regarding the number of minutes needed to determine

21 whether or not a sexual act is taking place will vary

22 until experience has been gained," end of quote.

23         Have I read that correctly, sir?

24   A.    Yes.

25   Q.    With regard to that statement, do you see

Lieutenant John Pedersen
July 19, 2021

1   anything in there, in the affidavit, that -- that says

2   that there is going to be continuous recording of

3   everything that takes place, in this case, for the

4   30 days of the warrant as opposed to recording at least

5   for the number of minutes to determine whether a sexual

6   act is taking place?

7       A.   I don't mean to be a difficult.  Can you say the

8   question again one more time?

9       Q.   Do you see anything in that paragraph indicating

10  that the recording is to be continuous for the whole

11  time, for the 30 days as opposed to it being done only

12  for the number of minutes to determine whether a sexual

13  act is taking place?

14          And what -- what I'm getting at, so you will

15  understand the context, is the minimalization requirement

16  and doesn't this portion of the affidavit in support of

17  the warrant indicate that there is going to be only so

18  much recording as is necessary to record the sexual act?

19  Or I should say only such video surveillance to record

20  that?

21      A.   You know, it -- it is what it says there, sir.

22  And the detectives, like I said, again, we're following

23  the guidance of the State Attorney's Office.  And viewing

24  during the hours of operation, many of times the

25  act -- there was payment at end of the act which required

Lieutenant John Pedersen
July 19, 2021

1    the officers to watch or view, monitor, the whole entire

2    massage, and then many times the payment was made at the

3    end.

4        Q.   But at times -- when you say "many times it was

5    at the end," that would also imply that sometimes it

6    wasn't at the end; correct?

7        A.   Sir, you can ask Detective Crowley and Gasbarrini

8    that, in fact, and -- I believe in one of their documents

9    somewhere they broke down how many times payment was made

10   at the end.  And they can give you -- if you would ask

11   them that question in particular, I think you will get a

12   better response from me.  They were the viewing

13   detectives, you know, probably 90 plus percent of the

14   time.

15       Q.   Rest assured, we will ask them the appropriate

16   questions relating to that.  I'm only asking you just in

17   concept from what this says, it has the basic concept of

18   minimalization, if you record what is necessary, you

19   don't record continually based upon what is in that

20   paragraph right there in the warrant; isn't that true,

21   sir?

22       A.   We followed the minimization that Mr. Butler told

23   us to follow, sir.  He was aware of what we were doing

24   every day and the recording equipment could not be shut

25   off.  He told us to use a log, only view during the hours

Lieutenant John Pedersen
July 19, 2021

1  of the operation as which we did.

2     Q.   So if there was something wrong that was done, in

3  the way it was done, you're saying that the State

4  Attorney would have been responsible for it; right?

5     A.   We followed the legal guidance from them.  You

6  know, maybe we should have got guidance from someone

7  else.  But I believe -- we believed we were doing

8  everything right and lawful.

9              (Plaintiff's Exhibit 13, Order Surreptitious

10         Entry, was marked for identification.)

11  BY MR. RICHMAN:

12     Q.   Okay.  Then now let me show you Exhibit Number 13

13  which is the actual order that was entered in this case.

14         MR. RICHMAN:  If we can put that up on the

15     screen.

16  BY MR. RICHMAN:

17     Q.   While we're putting that up, my question is:  Did

18  you review and see this order that was entered by the

19  circuit court judge or, say, the judge in Indian River

20  County?

21     A.   I'm sure at some point, you know, after

22  the -- after the fact or in the case, what date did I

23  look at this?  What I know, sir, is that the officers,

24  they applied for a search warrant for this entry and

25  installation.  It was approved by the State and it was

Lieutenant John Pedersen
July 19, 2021

1    approved by the judge.  We were in direct contact with

2    the State Attorney's Office almost each and every day.

3       Q.   All I was asking is:  Did you see this order?

4       A.   At some point I saw this order.  On what date did

5    I see this order, I do not recall.

6       Q.   All right.

7            MR. RICHMAN:  Now, let's go to the second

8       page of that document.  Second page.

9            First paragraph.

10           And I'm down about seven lines.

11   BY MR. RICHMAN:

12      Q.   And I will read it out where it says:  "While

13   monitoring the premises to be searched, the executing

14   officer shall take steps to minimize the invasion of

15   privacy to any parties not engaged in the unlawful act

16   set forth in the affidavit," end of quote.

17           Have I read that properly?

18      A.   Yes.

19      Q.   Are you aware of any steps whatsoever that were

20   taken to minimize the invasion of privacy to any party

21   not engaged in what I refer to as the alleged unlawful

22   acts?

23      A.   We only viewed during the hours of the operation.

24      Q.   And during the hours of the operation, if there

25   were females that were in there receiving massages, was

Lieutenant John Pedersen
July 19, 2021

```
1   any step taken to minimize the invasion of their privacy?

2   In other words, to prevent them from being recorded in

3   any way, shape or form?

4      A.   You would have to ask Detective Crowley or

5   Gasbarrini.  The one female that did -- we only had one

6   room under video surveillance.  You would have to ask

7   them if that female came into the room, where there was

8   video surveillance, or if she went into the room where

9   they didn't see anything.  I don't -- you would have to

10  ask them, sir.

11     Q.   And where are you getting information that there

12  was only one female?

13     A.   To my knowledge, we only had one female come into

14  the establishment.  You know, maybe there was more.

15     Q.   Were you not aware of the testimony with regard

16  to the actual hearing in this case?

17     A.   No, sir, I'm not -- not to my knowledge.

18     Q.   If I may, sir.

19     A.   Go ahead.

20     Q.   You are not aware of any of the testimony in the

21  suppression hearing indicating that there was more than

22  one female who was videotaped?  Video recorded?

23     A.   No, sir, I'm not.  To my knowledge, my only

24  knowledge was we, the Vero Beach Police Department, only

25  had one female customer come into East Spa during our
```

Lieutenant John Pedersen
July 19, 2021

 1    hours of operation.  If you want to --

 2        Q.   How about any males that were there that were not

 3    involved in any allegedly elicit sexual act, were those

 4    males taped and recorded?

 5        A.   You would have to ask Detective Crowley or

 6    Gasbarrini, the exact numbers of that.  I'm not aware.

 7    Like I said, they had -- to our knowledge, they had two

 8    rooms where these massages were occurring.  We only had

 9    video surveillance on one room.  And as far as the number

10    of clients that came in and how many people and how many

11    clients engaged in an act of prostitution, you would have

12    to ask Detective Crowley and Gasbarrini the exact number

13    of people that came in that didn't have anything done.

14        Q.   I understand.  And we will ask them those

15    questions.  All I'm asking you is:  Are you aware of any

16    steps that were taken to minimize the invasion of privacy

17    of any of the parties, whether they were male or female,

18    that were not engaged in any unlawful acts?  To your

19    knowledge.

20        A.   To my knowledge, no, you would have to ask

21    Crowley and Gasbarrini.

22             MR. RICHMAN:  All right now, let's go to

23        Exhibit Number 14.

24    ///

25    ///

Lieutenant John Pedersen
July 19, 2021

```
 1                    (Plaintiff's Exhibit 14, Affidavit

 2            Surreptitious Entry, was marked for

 3            identification.)

 4   BY MR. RICHMAN:

 5       Q.    Okay.  In Exhibit Number 14, did you review that

 6   affidavit which is the second request for video

 7   surveillance of the East Spa?

 8       A.    To my recollection, no, sir, I don't believe I

 9   did.  If my initials are on it somewhere, I probably did.

10       Q.    Let me, with regard to that then, just ask you a

11   couple of questions --

12       A.    Sure.

13       Q.    -- since I hear you saying that you did not

14   review it.  Look at page 1098.  Did you see

15   that -- sorry.  We're not there yet.

16            THE SECRETARY:  All right.  I think I got

17       it.  There you go.

18   BY MR. RICHMAN:

19       Q.    You see that the second paragraph on that page,

20   there is a reference to December 10, 2018, that

21   Detective Brock observed a Zullo, Z-U-L-L-O, arrive at

22   the East Spa, and it talks about him picking up a female,

23   having a drink at Mulligan's?

24       A.    Yeah, I'm aware of that one.

25       Q.    With a Jane Doe?
```

Lieutenant John Pedersen
July 19, 2021

1      A.    Uh-huh.

2      Q.    And the following morning Zullo returned Jane Doe

3   to the business.

4            Are you aware of that?

5      A.    Yes, sir, I am.  Yeah.

6      Q.    And the Jane Doe Number 4 was who, do you know?

7   I'm not asking you the names for the record.  Do you know

8   who that was?

9      A.    I -- yeah, if I looked at her case file, I could

10   tell you who it was.  She was an employee that -- that

11   actually went to the spa up in Sebastian and Mr. Zullo,

12   it appeared, to have some type of relationship with this

13   one employee.

14      Q.    And from what you could even read right there, he

15   is a having a drink with her, he is taking her to

16   Mulligan's, he has got a relationship with her.  There is

17   nothing -- nothing at least there indicating that it's a

18   coercive relationship, is there, sir?

19      A.    No.  But she was the only female employee that we

20   saw leave there at night that was not Lanyun Ma or her

21   sister, Lan Fin.

22      Q.    Well, clearly this -- regardless, there is a

23   female employee there who is clearly free to come and go,

24   and is involved with Mr. Zullo; correct, and Detective

25   Brock observed that?

Lieutenant John Pedersen
July 19, 2021

1    A.   That one of -- that one employee, it appeared

2    that she had the ability to leave.

3    Q.   Okay.  And if you look at that page 1102.  Do you

4    see the statement in there at the top of the page third

5    line, it says, "There shall be no capability on any of

6    the installed equipment to allow audio monitoring or

7    recording."

8         Have I stated that correctly, sir?

9    A.   Yes.

10   Q.   And you see further it says, "Video

11   surveillance," this is the fourth paragraph, "must be

12   suspended immediately when it is determined that none of

13   the named targets or any of their confederates when

14   identified are participants in criminal conduct."

15        Have I read that correctly?

16   A.   Yes.

17   Q.   Do you know if that was done in this case?

18   A.   As I stated earlier, sir, we were following the

19   guidance of the State Attorney's Office with the

20   capability that we had with the HSI equipment, monitored

21   only during the recorded times, and if I didn't state it

22   earlier, I will state it now.

23        If the officers did witness a -- a massage where

24   there wasn't a criminal act, many times they had to watch

25   until the very end to make sure.

Lieutenant John Pedersen
July 19, 2021

1     Q.   But the fact of the matter is it was all recorded

2   regardless; isn't that correct?

3     A.   Yes, sir.  Same question you have asked me many

4   times.

5     Q.   Many times, but I'm looking just for a final

6   answer on that.

7          The recording occurred continuously for 60 days,

8   nothing was done to turn off the cameras, or stop the

9   cameras at any time during that 60 days; is that correct?

10    A.   That is correct.  And I will add that we did not

11  have the ability to push a stop button.

12    Q.   When you say you didn't have the ability to push

13  a stop button, you're telling me that technologically

14  there is no way you could have stopped a recording at any

15  time?

16    A.   Sir --

17    Q.   It's physically impossible?  Or you just don't

18  know?

19    A.   I believe that is the case.  You can ask that

20  directly to Crowley and Gasbarrini.  And that recorded

21  onto the -- onto the server that no one was watching, and

22  that's how we weren't -- that's how we were minimizing as

23  well.  We were only watching during the hours of

24  operation.

25    Q.   Listen carefully to this question, though.

Lieutenant John Pedersen
July 19, 2021

 1    A.   Sure.

 2    Q.   If you recorded continuously for 60 hours, how

 3  are you suspending immediately at any time, when it's

 4  determined that none of the named targets or any of their

 5  confederates were identified or participants in criminal

 6  conduct?  How are you able to do that with this

 7  installation for which you got a sworn affidavit and

 8  approval of a judge?  You can't do it, can you?

 9    A.   Can't do it.  It's a capability we should have

10  had.

11    Q.   Was that ever told to the judge that that

12  capability doesn't even exist so this portion of the

13  affidavit could not be carried out?  It was physically

14  impossible to do it?

15    A.   You would have to ask that to Detective Crowley

16  and Gasbarrini if they told that to the judge.

17    Q.   But you have no knowledge of that having been

18  told to the judge, fair statement?

19    A.   I -- fair statement.

20    Q.   Again, you know at the time of this affidavit was

21  done for the next 30 days, up to 30 days of monitoring,

22  you already had the experience from the first 30 days;

23  right?  Would have been done continuously, without

24  anything being stopped at any time; correct?

25    A.   That's correct.  Like I said, sir, viewed during

Lieutenant John Pedersen
July 19, 2021

1    the hours of operation and we were following the orders

2    of -- or following the legal guidance from ASA Butler and

3    the State Attorney's Office.  And we were following

4    direction from my captain, Captain Kevin Martin and Chief

5    David Currey.

6        Q.   John, I understand what you are saying, and you

7    were following orders and so on.  But my question simply

8    is:  Was the judge ever told that the recording is

9    continuous and that there was no way to suspend any of

10   the recording based upon the equipment that the

11   Vero Beach Police Department set up?

12       A.   Not that I am aware, sir.

13       Q.   All right.

14            MR. RICHMAN:  Let's go to Exhibit Number 15,

15       which is the actual order for surreptitious entry

16       and installation of an electronic surveillance

17       camera that was taken 30 days.

18            THE WITNESS:  Sir, can we take a break --

19       can I take another break coming up here after

20       this question?

21            MR. RICHMAN:  Yeah, let's take -- we will

22       take a break right after this document.

23            THE WITNESS:  Okay.

24            MR. RICHMAN:  And we can shortcut it after

25       that.

Lieutenant John Pedersen
July 19, 2021

```
 1              (Plaintiff's Exhibit 15, Order Surreptitious

 2         Entry, was marked for identification.)

 3  BY MR. RICHMAN:

 4     Q.   Have you seen this order for surreptitious entry

 5  and installation?

 6     A.   I'm sure I have seen it after the fact or during

 7  the case or after these appeals have come up, yes.

 8     Q.   Then you would see again, if we told you the

 9  second page of the order of the judge dated December 28,

10  2018, this statement which is the court order, and I

11  quote in the middle of the second -- in the middle of the

12  first full paragraph on the second page:  "While

13  monitoring the premises to be searched, the executing

14  officers shall take steps to minimize the invasion of

15  privacy to any parties not engaged in the unlawful acts

16  set forth in the affidavit."

17          To your knowledge, sir, was that done?  Was

18  anything done to minimize the invasion of privacy in the

19  sense of not videotaping parties that were not engaged in

20  unlawful facts?  To your knowledge?

21     A.   To my knowledge, no, you would have to ask

22  Gasbarrini and Crowley.

23          MR. RICHMAN:  All right, sir, we will

24       take -- we will take a brief break and then

25       hopefully -- tell me how much time you need and
```

Lieutenant John Pedersen
July 19, 2021

1    hopefully we can finish up and maybe I'll get

2    some lunch.

3         THE WITNESS:  Give me five minutes, sir.

4         MR. RICHMAN:  You got it.

5         THE VIDEOGRAPHER:  Off the record at

6    1:21 p.m.  Recording stopped.

7              (A recess was taken from 1:21 p.m. to

8         1:29 p.m.)

9         THE VIDEOGRAPHER:  Recording in on the

10   record 1:29 p.m.

11   BY MR. RICHMAN:

12   Q.   Do you recall our -- I asked you earlier about

13   Detective Brock.

14   A.   You asked me a question about Detective Brock.

15   What about him?

16   Q.   That he was solicited twice; right?

17   A.   From what I read, yes.

18   Q.   And for RICO, you have to have two predicate

19   acts; correct?

20   A.   Yes.

21   Q.   If he was solicited twice and you only needed the

22   two predicate acts, a RICO prosecution could have been

23   brought at that time, just with the two predicate acts;

24   correct, as you understand it?

25   A.   Yes.

Lieutenant John Pedersen
July 19, 2021

1      Q.   Who was it that made the decision to continue to
2   expand the investigation?  Do you know?
3      A.   The -- I'm sure the chief conferred with the
4   State Attorney's Office, but we -- like I said, we
5   briefed Chief on what was going on on a daily basis.  And
6   we continued our investigation, you know, depending on
7   these daily briefings.
8      Q.   And you would agree with me that it actually
9   wasn't necessary to film the sexual acts if you could
10  just simply determine that a -- the solicitation occurred
11  for prostitution; isn't that correct?
12     A.   I wouldn't agree with you on that.  If you
13  have -- if you -- there was evidence of a crime being
14  committed, and if you're -- if you're -- what you
15  believe, if you're -- if you believe you're authorized by
16  the Court to gather that evidence, I think you would want
17  to gather that evidence.
18     Q.   Well, I may not be making myself clear.  All I'm
19  saying is this:  If there is a -- for the crime of
20  prostitution, all there has to do, as you have already
21  acknowledged, is to be a solicitation.  You do not have
22  to complete the act; correct?
23     A.   That is correct.
24     Q.   Okay.  So if at the spa somebody was soliciting
25  prostitution, that alone would be enough without actually

Lieutenant John Pedersen
July 19, 2021

```
1   filming the sex act, isn't that true?  For purposes of

2   prosecution?

3       A.    I'm not the State Attorney, sir, and I don't --

4       Q.    I'm asking you your understanding.

5       A.    My understanding is, to make a good case, you

6   have to have eyewitness testimony, physical evidence.

7       Q.    Eyewitness testimony and physical evidence, are

8   they solicitation of prostitution?  Isn't that true?

9       A.    I believe as a police officer you should gather

10  the evidence that you can.  You are asking kind of a -- a

11  question based on speculation or my opinion.  I'm giving

12  you my opinion.

13      Q.    Okay.  I'm not -- I'm not speculating at all.

14  I'm asking you --

15      A.    Okay.

16      Q.    -- a simple question.  You have already told us

17  that with regard to the offense of prostitution that the

18  solicitation alone is enough and you do not have to

19  complete the act.  Are you with me so far?

20      A.    Yes, sir.

21      Q.    Okay.  Was any effort made as far as you know in

22  this case to go ahead and turn the cameras off once the

23  solicitation off -- offer was made?  In other words, once

24  the person offered themselves for it, which would

25  constitute the offense of prostitution, were the cameras
```

Lieutenant John Pedersen
July 19, 2021

1  turned off or any efforts made to turn them off, yes or

2  no?

3      A.   No, based on what I told you and the capabilities

4  of the system.

5      Q.   I understand what you said about the capabilities

6  of the system.  We're not going to rehash that.  That's

7  all in the record.  So we can move on.

8              (Plaintiff's Exhibit 16, DHS Report, was

9          marked for identification.)

10          MR. RICHMAN:  Let look at Exhibit Number 16.

11          THE WITNESS:  Okay.

12          MR. RICHMAN:  Put that up on the screen.

13          That's 16.  I think that's the wrong

14      exhibit.

15          THE SECRETARY:  It's Tab 16.  Do you see it

16      up there?

17          MR. RICHMAN:  Okay.  The one I've got, it is

18      the --

19          THE SECRETARY:  What do you have?

20          MR. RICHMAN:  -- Department of Homeland

21      Security.

22          THE SECRETARY:  Okay.

23          MR. RICHMAN:  I have 17 as --

24          THE SECRETARY:  Let me see.  Department of

25      Homeland Security report.

Lieutenant John Pedersen
July 19, 2021

```
1              MR. RICHMAN:  Yes.  So 16 is just out of
2       order here.
3              THE SECRETARY:  Got it.  That one?
4              MR. RICHMAN:  No.  It's short -- the one
5       that says "synopsis."  The short one.
6              MR. SCHERER:  That is 16.
7              THE SECRETARY:  Yeah.
8              MR. RICHMAN:  Okay.
9              MR. SCHERER:  That's 16.
10             MR. RICHMAN:  Okay.  Sorry for the
11      confusion.  Let's real quick go to 16, please.
12             Just go back one.
13             THE SECRETARY:  Okay.  What was the order?
14             MR. RICHMAN:  If you would bear with us, if
15      we weren't doing this by video, we could just
16      hand you the document.  So it's a little more
17      complicated.
18                  (An off-the-record discussion took place.)
19             MR. RICHMAN:  If we can't find it quickly,
20      we will just move on and go back to it.
21   BY MR. RICHMAN:
22      Q.   Let me just -- I will verbalize this to save
23   time since we can't --
24      A.   Okay.
25      Q.   -- -- find the exhibit on here.
```

Lieutenant John Pedersen
July 19, 2021

1    A.   Okay.

2    Q.   There is a document that says Department of

3    Homeland Security investigations, and it says approved

4    January 23, 2019.  And it refers to surveillance cameras

5    being installed East Spa November 29, 2018.  And then it

6    says, and I quote, "On January 10, 2019, the State of

7    Florida Attorney's Office directed VBPD to discontinue

8    monitoring the cameras to identify sex acts and instead

9    monitor the cameras to identify possible human

10   trafficking victims.  This report documents investigative

11   activities in this case."  End of quote.

12        Were you aware, sir, of that direction by the

13   State Attorney's Office to discontinue monitoring the

14   cameras to identify sex acts as stated here?

15   A.   I don't specifically recall that.  But I do

16   recall we had a meeting with the State Attorney's Office

17   in early January how we were going to discontinue

18   monitoring because our detectives needed to start typing

19   up their plans.

20   Q.   And did you discontinue the monitoring at that

21   time?

22   A.   I believe -- I don't know what -- what exact date

23   we did it, but I do know that we did discontinue

24   monitoring as far as my knowledge of this because we

25   weren't making any new cases.  We were just looking at

Lieutenant John Pedersen
July 19, 2021

1  the -- the pole camera outside and there were times where

2  we followed people around as they were coming and going

3  to and from Vero Beach, different locations.

4       Q.  Do we have it up on the screen now?  And I

5  apologize.  I'm getting it.  Do you see the paragraph,

6  the second paragraph there, which is the one I just

7  quoted?

8       A.  Okay.

9           I don't recall ever seeing this document before.

10  This is an HSI document?

11      Q.  That's correct.

12      A.  Okay.

13      Q.  I just quoted that to you.  And you testified for

14  your -- not having seen this document before, but

15  understanding that at some point it was monitoring

16  discontinued; is that correct?

17      A.  Well, at some point we -- we didn't -- there

18  wasn't a need to.  We felt we had enough against some of

19  our main criminal defendants for the RICO.  And that

20  we -- we started typing up the affidavit.  So the

21  detectives did.

22      Q.  All right.  You say enough with regard to RICO.

23  Was there ever a RICO case brought, to your knowledge?

24      A.  Yeah.  There was.  Kenneth Zullo and several

25  other of -- of the ones were charged with -- with RICO.

Lieutenant John Pedersen
July 19, 2021

1    Q.   Well, with regard to the prostitution issue, take

2    a look at the second page of this exhibit.  We have put

3    that up on the screen for you.  This is a document you

4    have not seen before either, since this is from the

5    Department of Homeland Security investigation?

6    A.   From the best of my recollection, I don't recall

7    seeing this document before.

8    Q.   And you -- but you see that it says in the third

9    paragraph -- or actually in the second paragraph it says,

10   "Vero Beach Police Department had received information

11   that prostitution may be occurring at that location."

12        You would agree with me that it doesn't say

13   anything about human trafficking; right?

14   A.   I didn't -- I would agree with that, I didn't

15   write this report.

16   Q.   I understand.  And then it says in the next

17   paragraph, on November 29th, the install -- the

18   surveillance cameras were installed.

19        Does that comport with your recollection about

20   when this started, November 29th?

21   A.   That is -- right, because I believe we

22   went -- the cameras -- our first day where we had

23   defendants was the --I believe, November 30th of 2018.

24   Q.   And it says, "The wire room is monitoring the

25   business from the inside during normal operating hours

Lieutenant John Pedersen
July 19, 2021

1    from 8:00 to 11:00 nightly commencing on November 30th."

2          And that's your recollection as well; right?

3    A.    That sounds correct.

4    Q.    But then it says, "On January 10, 2019, the State

5    of Florida Attorney's Office directed Vero Beach Police

6    Department to discontinue monitoring the cameras to

7    identify sex act and instead monitor the cameras to

8    identify possible human trafficking victims."

9    A.    Sir, as you just read that, I -- whoever wrote

10   this for HSI, I don't know who that is, and I don't know

11   where they received their information from.  You would

12   have to ask the HSI agent that typed this report.

13   Q.    And you see the use of the words "monitor the

14   cameras," you don't see the word "recording" anywhere in

15   there, do you, sir?

16   A.    Not in the HSI report, no, sir.

17   Q.    Do you know after January 10, 2019, whether or

18   not the cameras continued recording?

19   A.    I haven't reviewed the case file in -- like I

20   said, I briefly looked at it this morning for a little

21   while, sir.  You would have to ask Crowley or Gasbarrini

22   or allow me a chance to look at some documents to see a

23   specific date.  I mean, if we had new defendants, you

24   would you have to -- I would have to check.  I don't

25   know.

Lieutenant John Pedersen
July 19, 2021

1    Q.   But you can see from the next to the last

2  paragraph here, it says "As of January 22, 2019, wire

3  room personnel" -- it says, "and identified" -- I assume

4  that's a typo, "identified at least eight different Asian

5  females."

6        Were you aware of that statement having been made

7  at or about that time, which would indicate the cameras

8  were still going through January 22nd?

9    A.   Well, I don't read that into that statement.

10  I -- I know we've had -- at one point we had as many as

11  nine different women there that were -- many of them were

12  Jane Doe's until we could get them identified.  I don't

13  know where HSI gets that statement from.  You would have

14  to ask that agent.  I don't know.

15    Q.   All right, sir, I'm going to move on to -- skip

16  over some questions I have got here and see if we can

17  move to a conclusion here.

18        Were you aware of the law in Florida that

19  electronic surveillance is prohibited for use in

20  prostitution cases?

21    A.   No.

22    Q.   Did you ever review the opinion of Judge May in

23  this case at the Fourth District Court of Appeals in

24  which Judge May effectively says exactly what I have just

25  said?

Lieutenant John Pedersen
July 19, 2021

1      A.   I read articles in newspapers, did -- I read -- I

2   don't know if it was Judge May or I read some of the

3   rulings that came out.  I read what the -- briefs written

4   by ASA Butler to the Fourth DCA.  I read a brief sent to

5   the DCA by the Attorney General's Office.  Do I recall

6   what Judge Moody said in his order?  You know, other than

7   them saying that, you know, what -- what law enforcement

8   did was improper, and when they made case law?  No, I

9   don't recall exactly what the judge said.

10      Q.   And Judge May, by the way, is a woman.  I'm

11   talking about --

12      A.   Okay.

13      Q.   -- May who is on the Fourth District Court of

14   Appeals.

15          Were you the one who made the decision to go an

16   additional 30 days?  Beyond the first 30 days?  Your

17   answer is no?

18      A.   The -- solely me on my own?  The answer to that

19   is no.

20      Q.   Were you involved in that decision?

21      A.   I told the chief -- we told the chief, Huddy and

22   I and the -- and the SIU detectives, we told the chief

23   what was going on and where we were at with the case.

24   And Chief -- Chief is the -- makes the final decision

25   here, and I would say that the decision to continue would

Lieutenant John Pedersen
July 19, 2021

1   have came from the chief and Captain Martin to continue.

2   That's -- we just didn't say, let's continue.  We were

3   constantly getting direction, let's continue building the

4   case.  Let's build the case against the organization.

5       Q.  Did you -- I should say, were you involved in the

6   discussions as to why there wasn't enough evidence yet to

7   make a case and why more had to be done?

8       A.  We were working our case and it was -- it

9   was -- I would say the answer to that -- to your -- your

10  question you're asking is Chief Currey, Captain Martin,

11  we briefed them on what was going on and they said,

12  "let's continue the case."

13      Q.  And did you have any input on there as to whether

14  or not you believed it was necessary to do it for another

15  30 days with only information you had for the first

16  30 days?

17      A.  Well, we were still building a case against the

18  organization.  We were following people around.  We -- we

19  learned of trips to Orlando, trips to -- where people

20  were being picked up or dropped off at Orlando

21  International Airport.

22          Some spas were identified up in Orlando, two

23  different spas.  I believe one in Winter Park, one in the

24  City of Orlando.  Yong Zhang Yan's house was identified

25  in Orlando.  So, yeah, we were following all

Lieutenant John Pedersen
July 19, 2021

```
 1   investigative leads.

 2       Q.   With regard to the East Spa --

 3       A.   Uh-huh.

 4       Q.   -- did you or did you not have enough information

 5   to establish the misdemeanor crime of prostitution just

 6   with what you got in the first 30 days?

 7       A.   Your question is:  Did we have enough to

 8   establish the crime of prostitution within -- within the

 9   first 30 days?

10       Q.   Yes, sir.

11       A.   For prostitution, yes, but not for all of the

12   charges that we were trying to get for the entire

13   organization.

14       Q.   In fact, you had enough -- I'm sorry.  I didn't

15   mean to cut you off.

16       A.   I'm a lieutenant following orders.  And Chief and

17   Captain say "the case continues," the case continues.

18       Q.   Who is it that made the decision to have Crowley

19   be the one to do the affiant in the search warrant, if

20   you know?

21       A.   I don't know.

22       Q.   Did you personally meet with Currey or Martin and

23   review the search warrant with either of them, or really

24   learn about it after the fact, review it after the fact?

25       A.   Actually sit down and look at the search warrant
```

Lieutenant John Pedersen
July 19, 2021

1  document after the fact?

2      Q.   Right.

3      A.   No.  Not that I can recall.  I just know that --

4  how the detectives, hey, we're -- we're applying -- for

5  everything that they applied, for the initial -- for the

6  initial break-in order, for the -- for the -- to monitor,

7  which I felt was record as well and the second one, and

8  everything was -- it just wasn't me.  It was -- it was

9  Huddy.  It's all of this combined where we're getting

10  this legal advice and getting with Chief and Captain

11  Martin saying, "This is where we're at," and we would

12  meet with the -- and the chief -- during this, there were

13  times we would have a brief meeting down in the -- in the

14  SIU office or up in the chief's conference room and,

15  "Hey, this is where we're at.  Okay.  Let's continue.

16  Let's continue.  Let's continue building a case against

17  this organization."

18          And, you know, I'm not the State Attorney on this

19  case, and Mr. Butler, "Hey, let's continue.  Let's

20  continue working this and try to -- try to get more

21  information on -- and keep building the case on this

22  organization."  And that's what we did.

23          And, you know, we did -- we just continued the

24  investigation, and every time we came to a Captain Martin

25  or Chief, "Hey, let's continue, let's continue."

Lieutenant John Pedersen
July 19, 2021

1            And then when we got to January, it was like,

2    "Okay.  Let's stop doing what we're doing" and let's

3    start typing up -- the detectives to start typing up --

4    up their complaint affidavits on the -- on the defendants

5    in the case.

6        Q.   Did the police department have any separate

7    lawyer advising it beside the State Attorney's Office?

8        A.   On this case?  At this time?  No.  Just the State

9    Attorney's Office.

10       Q.   Let's go to Exhibit Number 17.

11       A.   Okay.

12               (Plaintiff's Exhibit 17, VBPD Report, was

13          marked for identification.)

14   BY MR. RICHMAN:

15       Q.   Make sure we have the right one.  That's the

16   Inclusive Case Report.

17       A.   Just for -- every report, on the top when you

18   print it out, it generally will say "Inclusive Case

19   Report."  So...

20       Q.   Okay.  What I'm referencing --

21           MR. RICHMAN:  Is this the one that is

22      5/4/2021?

23           THE SECRETARY:  1438 on the bottom.

24           MR. SCHERER:  No.  The bottom is 0335TAIG.

25           THE SECRETARY:  See?

Lieutenant John Pedersen
July 19, 2021

```
1              MR. SCHERER:  Go to 19.

2              THE SECRETARY:  That's it.

3              MR. SCHERER:  SR 1439.

4              THE SECRETARY:  I only have 18 exhibits.

5              Okay.  What's the --

6              MR. RICHMAN:  Bear with me just a moment.

7       We're almost done with the exhibits.  I just want

8       to make sure we've got the right one here.

9              MR. SCHERER:  This is 1439.

10             THE SECRETARY:  1439.

11             MR. RICHMAN:  No, it's totally different.

12             THE SECRETARY:  Just 1439 on the bottom.

13             MR. SCHERER:  Yes.

14             THE SECRETARY:  Okay.  What is the number on

15      the bottom, Bates number?

16             MR. SCHERER:  0335.

17             THE SECRETARY:  That's the one that -- is

18      that the one that we have?  16.

19             MR. SCHERER:  That's 17.  It says -- this

20      one here.

21             THE SECRETARY:  I think I got it.  0335.

22      Okay.

23             MR. SCHERER:  That is 17; right?  Yes.

24   BY MR. RICHMAN:

25      Q.   We will blow this up a little bit so you can see
```

Lieutenant John Pedersen
July 19, 2021

```
 1   it.

 2          THE SECRETARY:  I will make it bigger.

 3      That's as big as I can do it.

 4   BY MR. RICHMAN:

 5      Q.   Hopefully you can read this, sir.

 6      A.   Yes.

 7      Q.   It's indicated that it's a supplemental -- it's

 8   under the Inclusive Case Report, but it's a supplemental

 9   report.  And if we scroll on down -- so at the beginning

10   of it, it says, "On February 15, 2019, Detective

11   Gasbarrini completed and submitted a search warrant," it

12   gives the address for the East Spa, signed by Judge

13   Vaughn.

14      A.   Okay.  I see it.

15      Q.   And then if we scroll on down there, it refers

16   to -- it's the last -- next to the last paragraph.  It

17   says, in parentheses, "Throughout our investigation,

18   detectives observed less than five total legitimate

19   massages take place during more than 30 days of

20   court-ordered surveillance."

21          Were you aware of that statement of less than

22   five?

23      A.   I don't recall seeing this before.  I may have

24   read it, but that doesn't jump out at me as something I

25   remember or recall.
```

Lieutenant John Pedersen
July 19, 2021

1    Q.   Okay.  I'm going to move on to another exhibit.

2    That's all I wanted to ask you about that.

3         Assuming there was some legitimate massages, as

4    it's referred to there, are you aware of where the

5    documentation, if any, exists regarding the legitimate

6    massages?

7    A.   The detectives who were on monitoring, as they

8    viewed, they -- I would have written down what -- typed

9    up everything that I saw.

10        If they had a case that wasn't a crime, you know,

11   if they looked at the whole thing like a -- give me

12   your -- give me your question again.  I started going on.

13   Q.   Everything is supposed to be documented.  In

14   other words, if you are going ahead and monitoring

15   something like the massage parlor, the East Spa, aren't

16   you supposed to document the good and the bad, that there

17   were legitimate massages and not only illegitimate

18   massages?

19   A.   Well, we only came -- I would.  You know, as I

20   was on surveillance, if someone went in, I wrote down

21   their description, their plate number or whether they

22   became one of our defendants or someone went -- that went

23   into the room that was not recorded.

24   Q.   So, in short, the answer is they should all be

25   recorded and should all be documented?  If you're doing a

Lieutenant John Pedersen
July 19, 2021

1   surveillance, everything should be there, both the good

2   and the bad; correct?

3       A.   I would agree to that.

4       Q.   A couple of catch-up questions here and we're

5   almost done.

6            Who was the public information officer, if there

7   was one, for the Vero Beach Police Department in 2018 and

8   2019, assuming you had one?  Or did you have one?

9       A.   We had one and it would have -- probably would

10  have been Brad -- was it Brad Metz?  Or it could have

11  been Darrell Rivers.

12           MR. RICHMAN:  Bear with me just a moment.  I

13       have some more document -- a last document here,

14       but I think we're not going to use that.

15           THE WITNESS:  Okay.

16           MR. RICHMAN:  We will save time there.

17  BY MR. RICHMAN:

18      Q.   Were you personally involved in interviewing any

19  of the people that had been at the spa and were

20  subsequently arrested?

21      A.   I was.

22      Q.   How was it that you got personally involved in

23  that as opposed to other people who were working the case

24  being involved?

25      A.   All of us had been working long hours; and if a

Lieutenant John Pedersen
July 19, 2021

1    defendant got picked up on a charge, if -- if one of the

2    SIU detectives was available, we would -- we would try to

3    have them do the interview.  You know?  I -- I stayed out

4    of the building.  I would still carry a badge and a gun

5    like everyone else.  I -- it wasn't beneath me to do

6    surveillance, so it wasn't beneath me to do a short

7    recorded statement with a -- with a defendant or an

8    arrestee on the case.

9         MR. RICHMAN:  Up on the screen, the last

10       exhibit, which is 19, that's the Inclusive Case

11       Report.  Do you got that?

12            THE SECRETARY:  1439.

13            MR. SCHERER:  1439.

14              (Plaintiff's Exhibit 19, VBPD Report, was

15              marked for identification.)

16   BY MR. RICHMAN:

17     Q.   While we're looking for that exhibit, let me ask

18   you this.

19     A.   Sure.

20     Q.   You interviewed a number of people -- actually we

21   got it up on the screen now.  If you take a look at the

22   bottom part that is highlighted --

23     A.   Yeah.  I see it.

24     Q.   -- Exhibit Number 19.  It says, "On

25   February 20th, '19 at 2000 hours, Corporal Dominguez

Lieutenant John Pedersen
July 19, 2021

1    advised me, Lieutenant John Pedersen, that John West had

2    been arrested on an outstanding Vero Beach Police

3    Department arrest warrant for solicitation of

4    prostitution."

5          And you go through the details there by an

6    example, if you're in your discussions with him, it then

7    says, "I then concluded the interview with West, the

8    interview with West was digitally recorded."

9          Where are those digital recordings?

10   A.   Those are turned into evidence.  You don't have

11   it?

12   Q.   Do not have it.  It's not been turned over to us

13   and that's why I'm asking the question.  Because every

14   one of these reports on there refer to digitally

15   recorded.  And --

16   A.   Digitally recorded, audio recorded, yes.  If you

17   don't have that, I can get that for you.  I'm sure it was

18   done and it was turned into evidence.

19   Q.   Okay.  We would appreciate it if you would

20   because we never got that.

21   A.   So what -- who do you need?  James West?

22   Q.   Well, it's all of those that are on that report.

23   It's -- it's James Lawrence West.  And then you've got

24   other -- other pages on here referring to a --

25   A.   Raymond -- you don't have --

Lieutenant John Pedersen
July 19, 2021

1      Q.   We do not have -- we do not have any of the

2    initial reports.

3      A.   That I did or that every detective did?

4      Q.   Pardon?

5      A.   Are you asking for every -- I can get you the

6    ones that I did.  I know I recorded them and they were

7    turned in as evidence.

8      Q.   Well, we've asked for everything and we haven't

9    received that.  That's why I'm raising the question.  The

10   only other pages on here are about interviews that you

11   did --

12     A.   Yeah.

13     Q.   -- that -- with Lewis Crook.

14     A.   Yes.  Mr.  Crook, I know him.

15     Q.   Zullo.

16     A.   There was a couple of guys that -- before I even

17   had a chance to turn on my audio recorder, they're like,

18   "I don't want to talk to your lawyer."  Those were a

19   couple of guys at the county jail.

20     Q.   Okay.  Whatever it is, we need that

21   information --

22     A.   Sure.

23     Q.   -- that's why I'm asking the question.

24     A.   Sure, sure.

25          And when we're done, you just -- you just want me

Lieutenant John Pedersen
July 19, 2021

1  to give -- contact Mr. Bonner, and have Mr. Bonner give

2  them to you?  Or if you give me --

3      Q.   That would be fine.

4      A.   Okay.

5      Q.   Yeah, through your attorney.

6      A.   Okay.

7      Q.   At the end of the case, you and the other

8  officers involved received a unit commendation, and

9  Crowley and Gasbarrini were selected as Officers of the

10 Year relating to this investigation; is that correct?

11     A.   That's correct.

12          MR. RICHMAN:  Those are all the questions.

13     Thank you, sir.

14          THE WITNESS:  You are welcome.

15          MS. FLOOD:  No questions.

16          MR. BONNER:  No questions.  We will read.

17     You can send the errata sheet to me.

18          THE WITNESS:  I want to read.

19          THE STENOGRAPHER:  Okay.

20          MS. FLOOD:  I don't have any questions.

21          THE VIDEOGRAPHER:  Would anyone like the --

22          MR. RICHMAN:  Nothing further.

23          THE VIDEOGRAPHER:  We are off the video

24     record, 6:08 p.m., UTC time.  Thank you.

25                         - - - - - -

Lieutenant John Pedersen
July 19, 2021

1          (The deposition was concluded at 2:09 p.m.)

2          (Reading and signing of the deposition was

3    not waived by the witness and all parties.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Lieutenant John Pedersen
July 19, 2021

```
 1                    CERTIFICATE OF OATH

 2
     STATE OF FLORIDA
 3
     COUNTY OF ST. LUCIE
 4

 5

 6

 7          I, Laura E. Melton, RMR, CRR, FPR, Notary Public,

 8    State of Florida, certify that LIEUTENANT JOHN PEDERSEN

 9    was sworn in remotely pursuant to Florida Supreme Court

10    Administrative Order AOSC20-32 on the 19th day of

11    July, 2021, and was duly sworn.

12

13          Signed this 2nd day of August, 2021.

14

15

16

17             LAURA E. MELTON, RMR, CRR, FPR
                Notary Public - State of Florida
18                   Notary #GG 325555
                My Commission expires:  7-7-23
19

20

21

22

23

24

25
```

Lieutenant John Pedersen
July 19, 2021

                    CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF ST. LUCIE


            I, LAURA E. MELTON, RMR, CRR, certify that I

was authorized to and did stenographically report the

deposition of LIEUTENANT JOHN PEDERSEN remotely, pages 5

through 152; that a review of the transcript was

requested; and that the transcript is a true record of my

stenographic notes.


            I FURTHER CERTIFY that I am not a relative,

employee, attorney, or counsel of any of the parties, nor

am I a relative or employee of any of the parties'

attorney or counsel connected with the action, nor am I

financially interested in the action.

            DATED this 2nd day of August, 2021.

            _Smeeton_

            LAURA E. MELTON, RMR, CRR, FPR

Lieutenant John Pedersen
July 19, 2021

```
 1                          ERRATA SHEET

 2   DO NOT WRITE ON THE TRANSCRIPT~ENTER CHANGES ON THIS PAGE

 3   IN RE: KEITH TAIG, individually, and on behalf of others
       similarly situated and CITY OF VERO BEACH, CHIEF DAVID
 4   CURREY, in his individual capacity, CAPTAIN KEVIN MARTIN
       (RETIRED) in his individual capacity, LIEUTENANT JOHN
 5   PEDERSON in his individual capacity, DETECTIVE PHIL HUDDY
     in his individual capacity, DETECTIVE SEAN CROWLEY in his
 6   individual capacity, and DETECTIVE MIKE GASBARRINI in his
                         individual capacity
 7                     LIEUTENANT JOHN PEDERSEN
                           July 19, 2021
 8                        Job No. 2483762

 9   PAGE/LINE #           CHANGE                    REASON

10   _____  _____  _____

11   _____  _____  _____

12   _____  _____  _____

13   _____  _____  _____

14   _____  _____  _____

15   _____  _____  _____

16   _____  _____  _____

17   _____  _____  _____

18   Under penalties of perjury, I declare that I have
     read the foregoing document and that the facts stated in
19   it are true.

20   By the above corrections on the Errata Sheet, if any, and
     my signature hereon, I hereby sign my deposition.
21
     _____        _____
22
     Date
23                               LIEUTENANT JOHN PEDERSEN

24

25
```

```
 1                    WITNESS NOTIFICATION LETTER

 2

 3   August 3, 2021

 4   LIEUTENANT JOHN PEDERSEN
     c/o ROBERT E. BONNER, ESQ.
 5   MEIER BONNER MUSZYNSKI O'DELL & HARVEY
     260 Wekiva Springs Road
 6   Suite 2000
     Longwood, Florida 32779
 7   (407) 872-7774
     Reb@fltrialteam.com
 8
     In Re:
 9        KEITH TAIG, individually, and on behalf of others
          similarly situated and CITY OF VERO BEACH, CHIEF
10        DAVID CURREY, in his individual capacity, CAPTAIN
          KEVIN MARTIN (RETIRED) in his individual capacity,
11        LIEUTENANT JOHN PEDERSON in his individual
          capacity, DETECTIVE PHIL HUDDY in his individual
12        capacity, DETECTIVE SEAN CROWLEY in his individual
          capacity, and DETECTIVE MIKE GASBARRINI in his
13        individual capacity

14            Deposition taken on July 19, 2021
              U.S. Legal Support Job No. 2483762
15
     The transcript of the above proceeding is now available.
16   Please complete your review within reasonable amount of
     time.
17
     Sincerely,
18

19

20

     Laura E. Melton, RMR, CRR, FPR
21   U.S. Legal Support, Inc.
     700 East Dania Beach Boulevard
22   First Floor
     Dania Beach, FL 33004
23   (561) 835-0220

24
     cc:  via transcript
25   GERALD F. RICHMAN, ESQ.
```

## Exhibits

**EX 0002 John Pedersen 0719 21**
4:7 28:4,6

**EX 0006 John Pedersen 0719 21**
4:8 50:8,11

**EX 0009 John Pedersen 0719 21**
4:9 97:14,22

**EX 0011 John Pedersen 0719 21**
4:11 103:20, 23

**EX 0013 John Pedersen 0719 21**
4:12 118:9, 12

**EX 0014 John Pedersen 0719 21**
4:13 121:23 122:1,5

**EX 0015 John Pedersen 0719 21**
4:14 127:14 128:1

**EX 0016 John Pedersen 0719 21**
4:15 132:8, 10

**EX 0017 John Pedersen 0719 21**
4:16 143:10, 12

**EX 0019 John Pedersen 0719 21**
4:17 148:14, 24

---

**#**

**#54**
4:7 28:7

---

**-**

**--I**
136:23

---

**0**

**001119**
114:14
**0335**
144:16,21
**0335TAIG**
143:24

---

**1**

**1**
23:18 70:10 113:8
**10**
100:16 122:20 134:6 137:4,17
**100**
20:25
**101**
36:23
**101.34**
37:1,6
**101.36**
40:23 41:1,2 43:25 44:2
**103**
4:11

**1055**
7:19
**1098**
122:14
**10:00**
15:19,20
**10:03**
15:21,23
**10th**
16:4 96:25
**11**
4:11 50:9, 21,22 103:20,23
**1102**
124:3
**1119**
114:21
**118**
4:12
**11:00**
71:16,19,20 137:1
**11:12**
58:16,17
**11:21**
58:18,20
**12**
102:11 108:22 112:25
**120**
115:7
**122**
4:13
**125**
100:24
**126**
102:10
**128**
4:14
**13**
4:12 118:9, 12
**132**
4:15

**14**
4:13 121:23 122:1,5
**143**
4:16
**1438**
143:23
**1439**
144:3,9,10, 12 148:12,13
**148**
4:17
**15**
4:14 102:11 127:14 128:1 145:10
**153**
3:6
**154**
3:7
**156**
3:8
**16**
4:15 132:8, 10,13,15 133:1,6,9,11 144:18
**17**
4:16 101:13 132:23 143:10,12 144:19,23
**18**
144:4
**19**
4:17 5:2 107:9 144:1 148:10,14, 24,25
**1986**
8:1,3
**1988**
8:3
**1989**
9:3
**1995**
9:12,24 10:1

Lieutenant John Pedersen
July 19, 2021

**1996**
  9:24
**19th**
  5:16
**1:21**
  129:6,7
**1:29**
  129:8,10
**1:46**
  5:17

———————————

**2**

**2**
  4:7 28:4,6
  70:10
**20**
  94:23
**2000**
  10:5,6 43:11
  148:25
**2002**
  10:2,5,6
**2006**
  10:10
**2008**
  10:14,19
**2015**
  10:22 52:18
**2016**
  54:23,25
  55:6 57:25
  96:15
**2018**
  4:10 12:12,
  14 18:6
  22:13,16,25
  23:10,19
  78:16 80:20
  83:25 84:3
  97:16,23
  98:5 105:24
  107:9 122:20
  128:10 134:5
  136:23 147:7
**2018-2297**
  47:21

**2019**
  16:4 18:7
  21:16 38:8
  43:13 44:18
  47:22 51:1,5
  78:16 100:21
  134:4,6
  137:4,17
  138:2 145:10
  147:8
**2019000188**
  50:17
**2020**
  11:18,20
  13:13,24
  14:1
**2021**
  5:2,17 33:13
  43:23 50:18
**20th**
  7:19 96:25
  148:25
**21**
  113:4
**22**
  138:2
**22nd**
  138:8
**23**
  43:11 100:21
  134:4
**23rd**
  43:13
**24/7**
  61:6,14,15
  62:2,4
  64:16,17
  66:5,7,11
  108:11
**25-plus**
  73:19
**275**
  46:24 78:11
**28**
  4:7,10 51:1
  55:6 97:16,
  23 98:5

  128:9
**28th**
  9:3
**29**
  134:5
**29th**
  136:17,20

———————————

**3**

**3**
  30:9 51:5
  70:10 109:24
**30**
  66:21,23,24,
  25 67:2
  83:25 84:3
  116:4,11
  126:21,22
  127:17
  139:16
  140:15,16
  141:6,9
  145:19
**30th**
  136:23 137:1
**32**
  8:17
**32960**
  7:20
**38,000**
  9:2

———————————

**4**

**4**
  32:2 50:18,
  23,24,25
  70:10 123:6
**4th**
  80:20

———————————

**5**

**5**
  36:22 43:15

  70:10 105:24
**5/4/2021**
  143:22
**50**
  4:8
**54**
  28:3
**54.6**
  28:13,16
**54.7**
  29:10
**57**
  30:9
**57.2**
  30:16,20
**59**
  32:3
**59.1**
  32:9,12

———————————

**6**

**6**
  4:8 50:8,11
  70:11
**60**
  61:6 65:2
  66:11,13,20
  69:25 113:20
  125:7,9
  126:2
**68,000**
  20:3
**6:08**
  151:24

———————————

**7**

**7**
  3:5 54:9
  70:11
**7-eleven**
  69:18

Lieutenant John Pedersen
July 19, 2021

---

**8**

**8**
  37:4 55:2
  70:11
**8:00**
  137:1

---

**9**

**9**
  4:9 70:11
  97:14,22
**90**
  117:13
**95**
  10:2
**97**
  4:9
**9:46**
  5:2

---

**A**

**a.m.**
  5:2 15:19,
  20,21,23
  58:16,17,18,
  20
**abilities**
  82:17
**ability**
  33:19 54:18
  65:7 68:2,11
  82:19 85:18
  87:7 124:2
  125:11,12
**able**
  15:10,12
  28:9 39:15
  64:25 69:5,
  16 71:11
  126:6
**above**
  55:18 115:2,
  19

**abreast**
  53:8
**Absolutely**
  55:9 58:8
**abuse**
  89:13
**abused**
  88:14 89:3,
  6,8
**academy**
  9:4,20,22,23
  10:16,18
  19:5 81:23
**accepted**
  10:17
**access**
  60:13 61:9
**accord**
  9:16
**accordance**
  44:7,8 46:11
**account**
  92:10
**acknowledge**
  6:4
**acknowledged**
  130:21
**across**
  20:7 68:4
**act**
  104:14
  105:19
  115:14,15,
  16,21 116:6,
  13,18,25
  119:15
  121:3,11
  124:24
  130:22
  131:1,19
  137:7
**acting**
  33:4
**action**
  5:22 55:15
**active**
  37:7

**actively**
  69:4
**activities**
  134:11
**activity**
  68:14 96:11
  115:18,19
**acts**
  16:7 68:17
  92:16,25
  93:1 119:22
  121:18
  128:15
  129:19,22,23
  130:9 134:8,
  14
**actual**
  62:21 118:13
  120:16
  127:15
**add**
  30:1 125:10
**added**
  64:9
**additional**
  10:12 59:15
  139:16
**address**
  7:14,15,18
  55:25 112:7
  145:12
**addressed**
  7:7
**administer**
  6:6
**Administrative**
  6:8
**advance**
  92:15
**advice**
  17:1 109:13
  142:10
**advised**
  149:1
**advisers**
  111:19

**advising**
  143:7
**advocate**
  92:9
**affiant**
  141:19
**affidavit**
  4:13 30:15,
  25 109:5,7,
  18 112:25
  113:22
  116:1,16
  119:16
  122:1,6
  126:7,13,20
  128:16
  135:20
**affidavits**
  143:4
**aforementioned**
  113:4
**agencies**
  8:24
**agency**
  26:13
**agent**
  26:25 92:9
  104:2 137:12
  138:14
**agents**
  26:24 32:17
  33:25
**ago**
  11:5,18,19
  39:4 46:22
  59:24 93:8,
  25 100:1
  109:20
**agree**
  6:18,21,23
  57:8 86:23
  99:12 130:8,
  12 136:12,14
  147:3
**agreement**
  5:11 6:9,11

---

Lieutenant John Pedersen
July 19, 2021

agricultural
  56:22
ahead
  15:3,16 16:1
  22:21 26:21,
  22 27:9 38:5
  54:13 64:25
  65:14 84:20
  91:16 95:20
  99:21 120:19
  131:22
  146:14
Airport
  140:21
alien
  57:4
allegation
  58:1
allegations
  56:8 96:10,
  16
alleged
  56:7 92:2,22
  93:18 119:21
allegedly
  121:3
alleyway
  71:24
allow
  114:23 124:6
  137:22
allowed
  31:19 32:19
  62:22 69:19,
  20 70:7
  72:18
Alyssa
  6:19
amount
  80:6 99:18
amounts
  46:4
and/or
  5:12 38:18
  48:1
anonymous
  96:7

answer
  17:10 36:11
  42:17,19
  43:21 47:25
  62:6 65:13
  78:13 79:21
  88:18,19
  89:5 93:3,
  12,15,22,23
  94:7 96:2
  101:20
  102:15
  106:10
  109:21 125:6
  139:17,18
  140:9 146:24
answered
  76:11 101:7
  103:9 109:17
answers
  36:14 78:14
anybody
  17:4
anyone
  60:14 78:25
  87:7 89:9
  94:9 95:7
  151:21
Anytime
  58:9 96:15
anywheres
  112:13
AOSC20-32
  6:8
apartment
  70:15
apologize
  135:5
appeals
  128:7 138:23
  139:14
appeared
  72:5 123:12
  124:1
appears
  51:8

application
  21:10,24
  66:23 103:18
applications
  102:14,24
  103:5
applied
  8:23,25
  10:17 118:24
  142:5
applying
  142:4
appreciate
  40:7,10 43:8
  61:19 149:19
appropriate
  117:15
approval
  22:15,17,23
  23:16 27:1,
  17 30:23
  31:4,12
  33:10 126:8
approve
  32:13 67:17,
  21,22 68:3,
  12
approved
  24:6 32:1,
  14,21 33:15
  35:9 63:8,9
  74:24 75:2,7
  106:6
  109:12,14,
  15,16 118:25
  119:1 134:3
approving
  35:3,8
approximately
  11:17 52:11
  58:22 66:20
  73:16 80:21
April
  43:11,13,24
  44:18 100:21
archive
  44:7

Archives
  44:9
area
  7:25 56:1
arising
  101:5
around
  11:6 12:3
  70:12 71:2
  73:5 101:5
  135:2 140:18
arranged
  12:16 75:11
  104:8 105:11
arrangement
  6:6
arrest
  21:15 43:23
  88:2 107:16,
  20 108:18
  149:3
arrested
  41:13 147:20
  149:2
arrestee
  148:8
arrests
  41:12 42:10,
  20 43:19
  88:3 97:1
  101:5 107:12
arrive
  122:21
Art's
  8:4
articles
  86:4 139:1
ASA
  101:20,21,25
  127:2 139:4
ascertain
  25:10
Asian
  86:1 104:11
  105:14 112:3
  138:4

Lieutenant John Pedersen
July 19, 2021

Asians
  107:11
asked
  25:6,14 26:4
  38:23 76:11
  99:22 111:25
  125:3
  129:12,14
  150:8
asking
  21:19,20
  22:24 23:2,4
  34:18 39:16,
  19 49:13,14
  62:3 64:24
  66:6,8 72:9
  76:8 90:18,
  20 91:21
  92:4,19
  94:25 106:19
  107:19
  110:13
  112:11
  113:12,14
  117:16 119:3
  121:15 123:7
  131:4,10,14
  140:10
  149:13
  150:5,23
asks
  102:10
aspects
  32:16 33:24
  35:13,20,21,
  22
assign
  81:24 82:2
  87:12 88:4
assigned
  49:18 82:7
  83:9,10
  87:14 88:3,
  4,5,8,9
  95:12,15
  98:23
assignment
  29:1,17 91:3

107:6
assistance
  25:6,9,14,21
  26:23 27:6,
  7,10 30:21
  39:8 40:10
  96:22
  101:14,18
  104:4
assistant
  15:7 16:22
  30:21 60:5
  61:20
assisted
  21:1 35:25
  36:1 46:5
  49:20 59:3
  100:14
  101:7,12
associate's
  8:1
associated
  17:22
assume
  8:10 11:16
  27:1 138:3
assumed
  11:17
assuming
  72:4 146:3
  147:8
assured
  117:15
attach
  17:23 18:3
attached
  18:2 47:20
attend
  9:19 10:16
  12:14 13:25
  81:21 100:7
attended
  7:23,24 8:2
  9:4,22 12:18
  13:22 19:3
  81:22 86:6

attending
  79:10
attention
  32:9 36:25
  108:22
attorney
  16:23 18:1
  23:16 30:21,
  22 59:10
  60:6 61:20
  63:14,25
  103:19
  105:25 118:4
  131:3 139:5
  142:18 151:5
Attorney's
  16:5,13,17,
  20 17:4,25
  24:4,7,8,15,
  17 36:15
  42:5 50:6
  63:8 64:4,7,
  11,19,23
  65:6,23 67:9
  101:14,19
  102:17
  109:15
  113:11
  116:23 119:2
  124:19 127:3
  130:4 134:7,
  13,16 137:5
  143:7,9
attorney-
client
  5:12
attorneys
  6:3
audio
  75:17 76:16
  106:13
  114:23 124:6
  149:16
  150:17
August
  9:3 12:12,14
  55:6 79:18,
  19,20

authority
  32:13 33:9
  48:17 68:2
authorized
  60:11 63:19,
  20 64:6
  75:19 91:13
  103:4 130:15
authorizing
  102:12
available
  17:9 40:9
  148:2
Avenue
  96:25
aware
  5:8 17:17
  20:20,25
  22:14 26:7,
  11,14 27:11,
  21,24 31:15
  34:10 37:16,
  19,20,21,23
  38:4 53:14
  56:6 58:1,2
  59:25 61:7,
  17,21 65:23
  67:10 81:2,
  18 83:5,8,11
  85:12 90:5
  96:12 98:22
  111:11,13,
  15,18 113:19
  114:2 117:23
  119:19
  120:15,20
  121:6,15
  122:24 123:4
  127:12
  134:12
  138:6,18
  145:21 146:4

_____

B

_____

Bachelor
  8:4

Lieutenant John Pedersen
July 19, 2021

bachelor's
  8:4
back
  15:22,25
  25:24 40:19
  43:23 52:19
  57:25 58:20
  62:15,19
  63:10,12
  70:23,25
  78:2 81:8,9
  83:24 84:11,
  12 100:1
  103:11 107:9
  114:10
  133:12,20
background
  7:21,22 8:20
  81:2
bad
  146:16 147:2
badge
  148:4
ballpark
  58:23
bank
  45:16,17
  70:22 94:20
banks
  90:11
based
  77:5 93:12
  117:19
  127:10
  131:11 132:3
basic
  8:19 117:17
basically
  7:13 11:12
  45:8 52:14
  67:3 95:13
  108:22
basis
  17:6 20:15
  24:10 53:4,
  5,8 110:18
  130:5

Bates
  114:13
  144:15
Beach
  5:19 7:18,20
  9:18 10:15,
  20 12:10,20
  16:6 19:2
  22:4 24:14,
  19 29:6 45:1
  50:16 54:12,
  22 55:24,25
  56:1,7 68:22
  84:15 87:4
  96:13 99:5,
  11 104:4
  105:3 120:24
  127:11 135:3
  136:10 137:5
  147:7 149:2
bear
  15:9 43:2
  133:14 144:6
  147:12
beaten
  89:6
beginning
  50:23 58:9
  115:14 145:9
behalf
  5:20,25
  6:14,19
behind
  113:13
belief
  13:1
believe
  9:25 11:18,
  20 12:17,23
  13:3,9 16:15
  17:21,23
  18:1,2 21:21
  22:2 23:6,
  12,14 24:3
  25:17 31:14,
  21,25 32:22,
  23 35:9
  39:3,19 42:1

44:20,21,23
  47:21 49:21
  50:1 51:3
  55:13 57:11
  61:16 64:11,
  13,14 65:4
  66:14,24
  72:17,18,19
  73:11 79:17
  81:6,7 89:8
  93:10 96:10,
  25 100:11
  101:21
  105:10
  107:23
  109:8,17
  113:8,9,24
  117:8 118:7
  122:8 125:19
  130:15 131:9
  134:22
  136:21,23
  140:23
believed
  118:7 140:14
below
  4:1
beneath
  148:5,6
beside
  143:7
besides
  80:2
best
  33:19 36:12
  43:5,7 54:18
  73:5,15
  85:18 93:9
  98:18 136:6
better
  51:17 80:16
  117:12
big
  47:4 145:3
bigger
  51:14 145:2
Bill
  12:16 79:17

86:6
billed
  75:11
binoculars
  91:4
bit
  28:11 51:12
  52:13 144:25
blow
  51:11 144:25
blurry
  28:11
boards
  111:22
Bob
  6:14 78:24
Bonner
  6:14 28:5
  78:24 79:1
  88:19 89:4
  93:2 94:5
  151:1,16
book
  68:16
born
  87:3,7
bother
  27:3
bottom
  66:11
  114:16,18
  143:23,24
  144:12,15
  148:22
Brad
  147:10
break
  58:7,10
  127:18,19,22
  128:24
break-in
  142:6
breakdown
  77:9
Brevard
  12:17 79:20

Lieutenant John Pedersen
July 19, 2021

**brief**
128:24 139:4
142:13
**briefed**
27:20 60:5
130:5 140:11
**briefing**
34:14 87:25
**briefings**
130:7
**briefly**
7:21 56:15
137:20
**briefs**
63:24 139:3
**broad**
35:23
**Brock**
91:17,19,22
92:1 106:9,
13,14
108:13,15,16
122:21
123:25
129:13,14
**broke**
117:9
**broken**
11:13
**brought**
36:20 129:23
135:23
**brush**
70:25
**brushing**
94:17
**budgetary**
84:5
**build**
140:4
**building**
11:12,13
71:3 94:22,
23 140:3,17
142:16,21
148:4

**bunch**
64:10
**bureau**
80:20 83:25
85:7,13
**business**
7:18 69:13,
15 70:13
71:13,25
95:25 96:11
107:25
110:5,20,23
112:4 113:3,
4 114:10
123:3 136:25
**businesses**
112:5
**Butler**
16:23 17:5,
13 24:17,19,
21,25 53:13
60:6 61:7,16
66:1 101:20
102:1 117:22
127:2 139:4
142:19
**button**
125:11,13
**buy**
19:23 71:13
**buys**
33:7

---

**C**

---

**C-H-A-N-G**
111:7
**California**
55:19
**call**
7:10 26:12
50:8 55:18
57:5 77:13
98:8 100:10
110:4,6
**called**
7:3 8:24

13:10 41:19
96:24
**camera**
14:16,19
65:21,25
71:23
106:20,23
107:3 108:11
127:17 135:1
**cameras**
14:12,20
16:7,8 21:25
31:20 32:20
34:24 35:5
61:5 62:23
66:5,7,11
106:16,17,22
107:1 113:21
125:8,9
131:22,25
134:4,8,9,14
136:18,22
137:6,7,14,
18 138:7
**capabilities**
132:3,5
**capability**
65:11,15
114:22
124:5,20
126:9,12
**capacities**
6:18
**capacity**
6:21 9:8,9,
25 10:3,5,8,
11,20 19:18
33:4 35:10
74:24 82:11
87:10
**captain**
16:25 18:9,
10 24:21,24
27:12,15,19
32:15 33:22
34:1,2,3,10,
12,13,16
35:1 36:4

38:3,17,22
52:7,8,14,
16,21 53:7,
10,14,20
61:21 63:18
67:10 75:2,7
77:16,19
101:15
107:13,23
127:4 140:1,
10 141:17
142:10,24
**capture**
19:22
**capturing**
14:23
**car**
69:24
**care**
11:15
**career**
58:23
**carefully**
125:25
**Carla**
111:9
**carried**
126:13
**carry**
148:4
**case**
4:8 13:4
16:17 17:2,
17,22,24
18:1,3,11,
12,14,18,20,
23 20:11,25
21:10,12,24
25:8,24
26:1,7 27:22
28:25 29:1,
17,18 31:1
32:20 33:19
35:24 36:2
37:7 38:6
41:5,6,7,25
42:2,7,9,10,
14,16,19

44:10 45:1,
3,9,10,14,
15,23 46:6,9
47:1,2,3,11,
21,23 49:1,
6,8,9,10,16,
17,20,21,25
50:11,16
53:3,13
54:22,24
55:4,11,15,
16 59:11,21,
24,25 60:12,
17,18 61:1
64:1,5 66:18
68:7 75:1
77:8 78:3,
15,17,18
79:11 81:25
82:8,9
84:22,23
85:10,16,19
86:8,10,11,
12 87:12,17,
18 88:7,9,11
96:23 97:13
99:9,12,14
101:4 116:3
118:13,22
120:16 123:9
124:17
125:19 128:7
131:5,22
134:11
135:23
137:19
138:23
139:8,23
140:4,7,8,
12,17 141:17
142:16,19,21
143:5,8,16,
18 145:8
146:10
147:23
148:8,10
151:7
**cases**
37:7 41:2

44:2 47:22
59:23 73:18
82:18 84:15,
23 85:1,2,3,
18,21 87:18
88:1,2,3
134:25
138:20
**cash**
90:13
**catch-up**
147:4
**cattle**
86:22
**ceased**
66:16
**Cedar**
8:25 9:7,11,
15 19:19
**cell**
94:15,16
95:2,4,6,8
**certain**
12:3 13:5
33:20
**certainly**
54:14 68:20
**certificate**
3:6,7 12:14
**certification**
9:5
**chance**
137:22
150:17
**change**
11:21,23
22:11,25
23:11,14
80:16 91:6
**charge**
11:8,9,11,14
12:23 85:15
90:2 104:3
148:1
**charged**
38:19 135:25

**charges**
38:25 141:12
**chasing**
45:18
**check**
90:13 137:24
**checked**
12:13 107:5
**checks**
90:5
**chief**
4:9 6:17
11:5,24
12:2,6 16:25
18:10 24:21,
25 27:12,15,
19 31:14
32:12,24
33:3,5,9
34:10 36:3,5
38:3,18,22
39:5 52:12,
14,20,25
53:4,7,9,14,
20 54:6
61:21 63:18
67:10 75:3
82:8 85:17
95:16,19,25
96:3 97:22
98:4,11,19
99:22 100:2
101:15
107:14,23
110:4,6,7,
11,21 111:21
127:4 130:3,
5 139:21,22,
24 140:1,10
141:16
142:10,12,25
**chief's**
33:5 142:14
**Chinese**
75:23 92:9
**Chiprock**
78:20

**choose**
70:22
**chose**
70:20
**chronological
ly**
8:21
**circuit**
118:19
**circumstances**
25:23
**citizen**
25:11 109:24
110:1,16
**city**
5:19 6:20
7:24 9:2
10:15 20:3
54:12 55:25
140:24
**civilian**
11:10
**class**
13:23 108:7
**classes**
12:9 19:3
**clear**
8:9 31:18
36:11 51:7
85:18 130:18
**clearance**
29:1,18
85:16,20
**clearances**
85:10
**cleared**
41:2,7,8
44:2,3 88:2,
3
**clearly**
115:18
123:22,23
**clientele**
113:2
**clients**
121:10,11

Lieutenant John Pedersen
July 19, 2021

closed
  41:3 42:7,9,
  14,15,19,23
  43:17,22
  44:3,11
closely
  24:8
co-detectives
  97:13
co-lead
  97:13
coerced
  76:20
coercion
  57:10,16,21,
  22 89:13
  108:2,4
coercive
  123:18
cold
  85:3
collaborative
  110:25
college
  7:23,24,25
  8:23 12:16,
  18 79:11,16
  86:7
college-
educated
  68:1
combined
  142:9
come
  53:10,11
  54:24 55:23
  60:19 69:5,
  12,20 70:7,
  20,21,23,24,
  25 71:2,4
  81:8 84:12
  86:17,18,25
  87:2,18
  114:17
  120:13,25
  123:23 128:7

comes
  80:5 85:17
  87:11,12
  88:8 110:10
commander
  10:12 28:19,
  20 29:5,22
  30:2,24
  31:6,7 33:1
  67:24 103:2
commencing
  137:1
commendation
  151:8
comments
  76:25
commit
  68:16
committed
  130:14
common
  86:24 112:1,
  12
communication
  16:20 17:13
Community
  7:25
complain
  57:5
complained
  111:1
complaint
  78:18 82:23
  95:24 99:7
  100:3 105:4
  143:4
complaints
  96:7 109:24
  110:1,16,18
complete
  41:21 130:22
  131:19
completed
  43:20 45:5
  145:11
completely
  42:19,23

43:22 70:2
complex
  18:12,15
complicated
  133:17
comport
  136:19
computer
  17:14,20
  41:3,17
  44:3,11 48:4
  60:20
concept
  60:3 85:5
  117:17
concluded
  149:7
conclusion
  138:17
conditions
  57:3
conduct
  34:4 101:5
  124:14 126:6
conducted
  32:17 33:24
  60:15 76:2
  112:6
confederates
  124:13 126:5
conference
  38:7,9,10,
  11,13,16
  39:2,12,20,
  22,25 42:8,
  15,18 142:14
conferred
  24:4 130:3
confidential
  75:1 80:25
confirm
  19:11 57:12
  113:24
confirming
  61:20
confirms
  87:14

confusion
  133:11
consider
  18:11,21
  84:22
consideration
  82:12
considered
  76:20
consistent
  28:22 29:13
consists
  50:9,21,22
  82:4
constant
  16:19
constantly
  140:3
constitute
  104:14
  105:19
  131:25
contact
  16:16 24:13,
  16,18 100:3
  102:2 110:7
  111:8 119:1
  151:1
contacted
  25:16
contacting
  26:24
content
  109:11
context
  116:15
continually
  117:19
continue
  10:20 22:19
  42:10 67:6,
  11 70:2
  115:12,17
  130:1 139:25
  140:1,2,3,12
  142:15,16,
  19,20,25

Lieutenant John Pedersen
July 19, 2021

continued
18:15,16
67:6,11
130:6 137:18
142:23
continues
141:17
continuous
116:2,10
127:9
continuously
62:14 125:7
126:2,23
control
35:24
controlled
69:18
conversation
15:6 80:13
conversations
5:10,12 77:5
coordinate
32:16 33:23
36:7
coordinated
35:20
coordinating
24:13 35:6,
13
coordination
24:14
copy
40:12,17
79:13 98:16
corner
94:22,23
corporal
87:19 148:25
correct
8:16 13:7,14
14:24 17:11
27:10,18
29:3,25 30:6
34:12 35:21
37:13,18
41:25 42:5
45:9 46:7,17

52:2 56:13
57:21 61:15
62:2,5,13
66:12,22
72:24 73:3
75:18 85:14
88:8 96:5
97:6 99:6
101:9,10,22
102:8,19
103:8
105:20,22,23
108:19,20
109:19,21
112:15
113:7,8,17,
22,23 114:19
117:6 123:24
125:2,9,10
126:24,25
129:19,24
130:11,22,23
135:11,16
137:3 147:2
151:10,11
correctly
101:23
102:18
104:20
105:6,10,16
112:8 114:25
115:1,4,23
124:8,15
correspondenc
e
17:18 48:24
cost
77:14,18
costs
75:8
counsel
6:10 49:6
Counselor
85:8
country
26:2 57:20
112:14

county
5:1 12:18
56:1 70:1
79:20 81:4
118:20
150:19
couple
12:11 46:22
74:14,15
93:7 107:16
122:11 147:4
150:16,19
course
12:7,20,25
13:8,15,16,
19 14:6 30:5
52:1,24
54:14 83:16
courses
13:24 14:3,8
19:25 81:16
court
5:24 6:7
26:3 59:14
91:16 102:22
103:11
106:1,6,7
113:10
115:11
118:19
128:10
130:16
138:23
139:13
court-ordered
145:20
courts
63:2
cover
111:3
crime
59:4 73:23
80:10 84:19
85:15
130:13,19
141:5,8
146:10

crimes
10:4 20:23
84:16,18
112:2
criminal
124:14,24
126:5 135:19
criminology
8:5
crisp
51:9
Crook
150:13,14
Crowley
6:16 16:18
17:1 18:20,
22 21:5
23:24 24:23
25:5,18 38:2
47:6 51:1,22
65:19 72:16
80:19 81:14
82:5,13
83:5,12
89:19,24
90:3 91:12
92:12,14
93:10,11
94:1 95:15
97:5,8
100:6,15
104:6,25
109:6,23
112:20
113:1,23
117:7 120:4
121:5,12,21
125:20
126:15
128:22
137:21
141:18 151:9
Crowley's
93:6
cue
50:4
current
7:13 10:25

Lieutenant John Pedersen
July 19, 2021

11:2,3 22:22
28:22 29:14
112:6
**Currey**
4:9 6:17
16:25 18:10
24:21,25
27:13,15,19
34:10 38:3,
22 52:25
53:4,7,9,20
75:3 95:19,
25 96:3
97:23 98:4
99:22 101:16
107:14,24
110:21
111:18 127:5
140:10
141:22
**customer**
76:25 113:25
114:9,12
120:25
**customers**
61:25 62:8,
11,13 89:25
92:24 113:3
**cut**
141:15

————————

**D**

————————

**daily**
16:19 20:14,
18,19 34:14
49:4 53:8
66:3 67:13
74:17,18
91:5 130:5,7
**DARE**
9:9
**Darlene**
5:19
**Darrell**
147:11

**date**
11:19 33:17
43:3,13
44:22 47:23
50:24 51:1
52:23 55:18
60:14 66:16,
18 103:11
106:19
118:22 119:4
134:22
137:23
**dated**
97:15 128:9
**David**
18:10 101:16
127:5
**day**
16:20 34:15
35:25 49:22
54:19 64:5,6
77:16 84:1,2
86:13 88:1
91:6,15,25
117:24 119:2
136:22
**day-in**
78:3
**day-out**
78:4
**day-to-day**
20:22 24:10
49:7 53:4
82:18
**days**
61:6 65:2
66:11,13,20,
21,23,24,25
67:2 74:15
113:4,20
116:4,11
125:7,9
126:21,22
127:17
139:16
140:15,16
141:6,9
145:19

**DCA**
139:4,5
**dealing**
80:25
**Deanna**
100:13
**deaths**
82:19
**December**
78:15 122:20
128:9
**decided**
9:13 81:5,8
**decision**
34:25 81:24
82:2 130:1
139:15,20,
24,25 141:18
**decoy**
32:5,14
**deemed**
82:21
**defendant**
65:10 148:1,
7
**DEFENDANT'S**
4:19
**defendants**
6:15,20
38:25 135:19
136:23
137:23 143:4
146:22
**defense**
6:10 17:25
**definitely**
103:25
**definitive**
25:6
**degree**
8:1,4
**delegated**
36:8
**demonstrated**
82:17
**department**
7:18 9:1,7,

18,19 12:10,
21 16:6 19:2
22:5 24:15,
19 25:16,20
26:8,20 29:6
40:4 44:7,8
45:1 50:16
52:13,15,22
54:20,23
61:1 67:3
68:22 74:25
75:11 81:3,
20 84:15
96:18 97:3
98:10 99:6,
11 100:11
104:3,5,24
105:3 107:8
111:5,10,12,
14 120:24
127:11
132:20,24
134:2 136:5,
10 137:6
143:6 147:7
149:3
**department's**
46:11
**departmental**
82:22 84:24
**depending**
130:6
**deposition**
4:2 5:15
6:4,5 77:23
78:1,6 79:7
**depositions**
8:15
**deputy**
52:12,14
81:5
**describe**
20:16 44:25
**description**
4:6,20 54:12
146:21
**designate**
34:2,16

designated
32:23 34:3
designation
85:14
designed
97:8
designee
32:13,16
33:5,23
desk
68:4
detail
45:12 93:23
96:1
detailed
54:3 92:10
details
104:23 149:5
detective
6:16 10:4,
23,24 16:16,
24 18:6,18,
19,21 19:18
21:5,22
23:8,18
25:4,17,18
28:19,20
29:5,11,19,
22,23 30:3,
24 31:6,8,
21,22 32:22,
25 33:1,3
34:4,7 35:9,
10,11 36:1,
9,15,17
37:6,14
38:1,2
41:16,22
45:11 46:5,
14 47:5,14,
17 48:1,5,
11,17 49:18,
20 50:3
52:16,17
59:4 65:19
67:16,20,25
68:1,6,8
72:16 74:2,

11,18,20
76:1,6,13,23
77:15 78:20
79:25 80:1,
4,7,19,20
81:11,14,25
82:3,18
83:5,12,23,
24 84:10,11
85:6,13
87:10,15,24,
25 88:4,10
89:19,24
90:3,10,25
91:15,17,19,
22 92:1
93:6,10 94:1
97:9,12
102:20,23
103:2,3
104:5,25
106:9,13,14
108:15,16
109:6,9,14,
23 110:5,6,
7,11 112:16,
21 113:23
117:7 120:4
121:5,12
122:21
123:24
126:15
129:13,14
145:10 150:3
detectives
12:4 16:17,
25 18:20,23
21:2 24:4
59:3,14
61:10 74:14
78:19 79:24
80:5 91:2,9,
11,14 97:13
100:15
102:15
103:15
106:15
109:10
111:13

116:22
117:13
134:18
135:21
139:22 142:4
143:3 145:18
146:7 148:2
determine
115:13,20
116:5,12
130:10
determined
115:18
124:12 126:4
device
19:22 20:9
DHS
4:11,15
103:20 132:8
diaries
17:18 48:24
difference
14:11,18
56:11,16
different
8:24 46:1
47:22 56:17,
21 57:6
69:19 73:6,
16 94:25
104:11
105:14
107:11
110:13
111:22 135:3
138:4,11
140:23
144:11
difficult
116:7
digital
63:5 149:9
digitally
149:8,14,16
direct
3:5 7:5 21:4
29:12 32:9

36:25 52:6
99:16 107:13
108:21 110:4
119:1
directed
38:17 134:7
137:5
directing
16:5
direction
18:9 127:4
134:12 140:3
directive
28:22,23
29:14
directly
34:12 85:17
87:11 90:12
107:13
110:5,7,10,
11 114:1
125:20
discipline
28:25 29:17
disclosure
42:6
discontinue
16:6 134:7,
13,17,20,23
137:6
discontinued
135:16
discretion
11:24 12:6
discuss
80:7
discussion
133:18
discussions
140:6 149:6
disgusted
70:18
disposed
44:6
distinction
62:24,25

**District**
138:23
139:13
**division**
10:23,24
11:4 18:6
20:19 23:18
28:19,20,21
29:5,11,12,
19,22,23
30:24 31:6,
23 32:18,25
33:1,25
35:11 37:6
41:4,24 42:3
44:4,8,12
48:5,14
52:17 82:6
87:15,20,24
103:2
**divisions**
11:11
**divulge**
72:22
**document**
16:4,11
27:22,25
33:14,16,18,
20 36:14
38:4 40:23
44:1 50:9,20
54:11 55:3
80:24 97:15
98:12 99:1
104:1,23
108:23 111:3
119:8 127:22
133:16 134:2
135:9,10,14
136:3,7
142:1 146:16
147:13
**documentation**
88:7 146:5
**documented**
110:22
146:13,25

**documents**
15:17 16:1
28:2 37:10
45:4 47:24
48:23 68:12
117:8 134:10
137:22
**Doe**
70:9,10,11
122:25
123:2,6
**Doe's**
138:12
**doing**
20:20 27:13,
20 34:11,15
43:7 53:15,
16 56:24
60:16 61:10
64:1,4 65:24
79:2 83:13
95:13 96:20
108:10
117:23 118:7
133:15 143:2
146:25
**domestic**
56:21
**Dominguez**
148:25
**door**
71:4,7,11
72:1,2,3,6,7
75:18 76:17
94:24 114:8
**doubt**
67:1
**downsized**
52:13
**drafted**
38:3 102:16
**drafting**
30:15,22
102:14
**drafts**
23:22

**drink**
122:23
123:15
**drive**
113:16
**driver's**
57:1,19
93:19 111:16
**driving**
69:22 70:5,6
**dropped**
140:20
**drug**
9:10 19:19,
22 20:3 33:6
59:2 73:23
82:18,19
**duly**
7:3
**duties**
52:2 67:19
102:7
**duty**
67:21,22

---

**E**

**e-mail**
100:4
**earlier**
78:17 86:19
102:5 110:3
124:18,22
129:12
**early**
69:10 79:19
134:17
**easier**
33:15
**easiest**
65:10
**East**
16:14 18:12
20:15 21:13,
14 24:2,12
25:10 26:9
27:23 29:6,

20,24 30:5
31:9 34:23
41:6 44:16
47:2,8 48:25
53:6 56:9
59:20 65:2
68:23 69:7
73:13 75:5,6
82:3 84:22
88:12,25
94:3 95:10,
14 96:8,22
100:9 101:6
104:6,9,18,
19 105:12
107:11
108:14,22
110:24
120:25
122:7,22
134:5 141:2
145:12
146:15
**Eastern**
12:15,18
79:11,16
**Eder**
76:1,23
**education**
14:10
**educational**
7:22
**effect**
23:11 27:17
36:6
**effectively**
138:24
**effort**
131:21
**efforts**
59:13 132:1
**eight**
20:4 47:22
138:4
**either**
18:24 19:6
48:2 82:14
83:17 90:8

Lieutenant John Pedersen
July 19, 2021

92:12 113:6
114:9 136:4
141:23
**eject**
65:9
**elections**
111:19
**electronic**
19:15,17,20,
22 20:9,21
25:7 52:3
61:10 65:11
127:16
138:19
**electronically**
4:2 18:4
41:24 52:5
87:23 88:5,9
**element**
57:8,10,15,
21
**elicit**
121:3
**employed**
9:2 25:10
**employee**
94:21 114:9
123:10,13,
19,23 124:1
**employees**
11:10 69:6
89:16 90:6,
7,13 94:3,15
111:8
**end**
45:22,23
55:24 75:3,
10 109:14
115:3,15,22
116:25
117:3,5,6,10
119:16
124:25
134:11 151:7
**ended**
92:24

**enforce**
37:13
**enforcement**
9:4,23 19:4
26:13 59:11
63:1 73:24
81:23 105:25
112:2 139:7
**engaged**
56:19
119:15,21
121:11,18
128:15,19
**ensure**
28:20 29:13
**enter**
5:25 59:15
**entered**
52:17
118:13,18
**entering**
60:14
**entire**
26:14 49:12,
21 117:1
141:12
**entirely**
42:9
**entirety**
41:4 44:4
**entitled**
30:15 32:5
55:4
**entity**
98:11
**entry**
4:12,13,14
118:10,24
122:2 127:15
128:2,4
**equal**
97:9,10,12
**equipment**
25:8 26:21,
22 91:4
114:23
117:24

124:6,20
127:10
**errata**
151:17
**error**
48:10
**establish**
141:5,8
**establishment**
106:9 108:9
120:14
**establishments**
104:12
105:15
**Evans**
83:23 84:10
90:10
**event**
12:17 66:20
**events**
52:24
**everyone**
96:21 148:5
**evidence**
45:7 59:12,
15 63:6
68:21 89:20
130:13,16,17
131:6,7,10
140:6
149:10,18
150:7
**ex-girlfriend**
82:24
**exact**
11:19 13:22
59:5 66:16
121:6,12
134:22
**exactly**
138:24 139:9
**EXAMINATION**
3:5 7:5
**excellent**
64:1

**excerpt**
100:18
**exclusively**
113:3
**excuse**
10:1 24:23
48:16 59:18
77:24
**executing**
119:13
128:13
**exempt**
54:12
**exhaust**
59:13
**exhausted**
59:14
**exhibit**
4:6,7,8,9,
11,12,13,14,
15,16,17,20
28:4,6 50:8,
11 97:14,22
103:20,23
118:9,12
121:23
122:1,5
127:14 128:1
132:8,10,14
133:25 136:2
143:10,12
146:1
148:10,14,
17,24
**exhibits**
4:1 144:4,7
**exist**
126:12
**exists**
37:20 146:5
**exonerated**
83:18
**expand**
130:2
**expenditure**
74:25

Lieutenant John Pedersen
July 19, 2021

expenses
75:1,4 77:9,
10
experience
8:6,20 11:6
17:10 18:24
19:16 20:1,
2,8 25:19
59:16,19
80:6 81:12
82:13 85:24
115:22
126:22
experienced
80:1,4,5
explain
56:15 59:8
extent
37:12
exterior
106:17
eyewitness
131:6,7

_____

F

fact
32:1 37:24
61:5,19 62:4
63:22,23
72:7 73:22
98:22 111:18
113:19 114:2
117:8 118:22
125:1 128:6
141:14,24
142:1
facts
128:20
fair
19:7 54:17
58:3 83:22
95:23 99:23
126:18,19
fall
10:2

Falls
8:25 9:7,11,
15,16 19:19
familiar
22:3 29:2
30:4 37:11
40:16 54:11,
16,21 56:6
60:3 85:5
96:24
family
57:24 80:17
81:7
far
19:2,20 27:8
31:15 33:1,
14 35:3,8
36:14 40:9
43:17 53:3
60:5 77:9
90:1 95:7
96:5,6 121:9
131:19,21
134:24
fashion
97:18
father
70:18
FBI
10:16 59:24
FDLE
12:7,10
13:15,17
14:9
fear
57:17
February
21:16 38:8
51:1 78:15,
16 145:10
148:25
federal
20:6,7 100:8
feel
55:9 86:10
feet
94:23

felt
64:1,2,3,6
135:18 142:7
female
60:19 61:25
62:5,11,13
65:3 94:21
113:3,24
114:9,11
120:5,7,12,
13,22,25
121:17
122:22
123:19,23
females
62:11 86:1
112:4 114:4
119:25 138:5
field
20:21 21:2
fields
11:7
figure
77:18
file
12:14 17:23
18:3 26:14
39:16 44:6
46:7,20
47:21 49:17,
21 74:5,10
99:9 123:9
137:19
filed
65:22 113:22
files
37:7,8 44:5
99:10
filled
91:14
film
130:9
filming
131:1
Fin
123:21

final
30:23 31:4,
12,16 41:9
125:5 139:24
finally
37:5
financial
90:11
financially
5:22
find
40:6 79:13
133:19,25
fine
7:11 8:14
23:9 36:10
51:15 151:3
finish
65:13 129:1
finished
47:25 71:18
first
7:3,11,21
32:10 35:6,7
40:25 41:2
42:17 50:21
55:3 66:18
103:25
105:8,9
106:21
109:5,6
119:9 126:22
128:12
136:22
139:16
140:15
141:6,9
Fisher
6:12,22
five
12:5 58:12,
14 114:4
129:3
145:18,22
fix
48:11

Lieutenant John Pedersen
July 19, 2021

flag
  26:4
fled
  26:2 72:1
Flood
  6:19 76:11
  88:15
  151:15,20
Florida
  5:1 6:7 7:20
  9:13,22,23
  12:15,18
  16:5 26:3
  63:24 79:11,
  16 81:22
  86:7,22 87:4
  134:7 137:5
  138:18
Flushing
  87:1 112:7
follow
  54:16,19
  73:5 98:23
  99:6 117:23
follow-up
  58:3 88:10
followed
  69:21,24,25
  117:22 118:5
  135:2
following
  14:20 34:9
  36:3 64:2,3,
  19 65:6
  69:23 70:2
  107:14
  116:22 123:2
  124:18
  127:1,2,3,7
  140:18,25
  141:16
follows
  7:4
font
  51:8
food
  70:23 72:19

force
  9:11 19:19
  20:3,7 59:2
  73:24 108:2,
  4
forcing
  56:24
foreign
  25:12 26:2
  57:20
form
  18:4 88:15,
  17 89:22
  93:2 94:5,6
  120:3
forms
  56:18 57:7
  77:15
Fort
  9:23 69:25
forth
  36:20 54:17
  111:16
  119:16
  128:16
forward
  96:15 98:19
  100:4,5
forwarded
  87:23
found
  79:17
four
  10:8 12:2
four-hour
  13:19
fourth
  124:11
  138:23
  139:4,13
frame
  96:14
free
  55:9 70:13,
  14,19 71:5,
  11,14,15
  72:13 123:23

frequently
  17:1,3 55:23
Friday
  53:19
Fridays
  53:2
front
  11:19 13:20
  23:13 33:16
  55:11 68:16
  71:4,7,11,24
  99:1
frozen
  79:22
full
  7:13 9:20
  42:6 48:17
  66:13,24,25
  68:2 128:12
fully
  93:15
functions
  28:21,24
  29:12,15
  82:20
funds
  75:1

_____

G

gained
  115:22
gang
  73:23
Gasbarrini
  6:17 16:18,
  25 18:19,21
  21:7 23:24
  24:23 25:5,
  17 38:2 47:6
  65:19 72:16
  76:6,13
  79:25 80:3,7
  82:5 89:19,
  24 90:4
  91:11 92:12
  93:10 95:13,

15 97:5,9
  98:22 100:5,
  15 113:24
  117:7 120:5
  121:6,12,21
  125:20
  126:16
  128:22
  137:21
  145:11 151:9
gather
  59:12,15
  63:5 130:16,
  17 131:9
gave
  47:22 92:10
  93:22
gears
  73:25
general
  4:7 10:4
  22:4,6,12,
  22,25 28:3,6
  30:9 32:3
  36:22 40:16
  59:4 67:23
  96:21 103:1
General's
  63:25 139:5
generally
  22:3 53:20
  102:4 143:18
generated
  111:5
Gerald
  6:12
getting
  26:4 35:19
  40:12 77:1
  90:12 109:13
  116:14
  120:11 135:5
  140:3 142:9,
  10
girl
  69:22 70:8
girlfriend

Lieutenant John Pedersen
July 19, 2021

9:14
**girls**
 69:19 70:7,
 19,23 71:25
 73:5,7,16
**give**
 7:14 11:6
 31:12 38:19
 43:3,20
 48:10 53:12
 55:8 78:13
 95:25 96:22
 100:2 117:10
 129:3
 146:11,12
 151:1,2
**given**
 17:22,24,25
 65:4 82:12
 84:16,18
 92:3
**giving**
 36:13 43:5
 57:2 78:14
 131:11
**glance**
 50:14
**goes**
 13:1 23:16
 41:20 45:17
 83:3,4 86:12
**going**
 8:7 18:17
 21:1 33:18
 34:15 35:6
 37:1 38:5
 45:13 49:23
 50:7 51:19
 52:19 53:8,
 13 57:5
 62:16 63:6,
 15,16 64:12,
 18 65:24
 71:8 72:22
 75:8,20
 78:12 81:5
 85:22 88:6
 90:23 91:1

92:24 100:1
103:11
108:24
113:18,25
114:9 115:10
116:2,17
130:5 132:6
134:17 135:2
138:8,15
139:23
140:11
146:1,12,14
147:14
**good**
 9:16 28:11
 48:12 63:14
 81:10 85:21
 131:5 146:16
 147:1
**Googled**
 79:15
**GOS**
 102:4
**Gotti**
 59:24
**government-**
**issued**
 5:4
**grabbed**
 91:4
**graduated**
 7:25 8:3
**graduating**
 8:23
**grapefruit**
 86:21
**ground**
 8:8
**group**
 111:20
**guess**
 10:3 33:15
 59:7 71:9
 102:21
**guessed**
 72:10

**guidance**
 17:2 24:5
 64:3,19
 65:6,22
 116:23
 118:5,6
 124:19 127:2
**gun**
 148:4
**guy**
 69:21,23
**guys**
 20:7 82:8
 85:18
 150:16,19

---

**H**

**hair**
 70:25 94:17
**half**
 10:8 12:2
 20:4 93:14
**half-day**
 12:17
**hall**
 20:7 79:19
**hand**
 133:16
**handle**
 34:18 87:10
**handled**
 84:17
**handling**
 80:24
**happen**
 19:6 87:8
**happened**
 39:10
**happening**
 54:4
**happy**
 40:2
**hard**
 43:4 97:18
**head**
 39:7

**headaches**
 64:10
**health**
 97:3 100:10
 110:25
 111:6,10,12,
 14,20
**hear**
 42:12 64:21
 76:3,4,24
 77:1 88:16
 122:13
**heard**
 59:23 83:1
 88:13 89:21
**hearing**
 20:12 42:16,
 22,24 43:10,
 14 100:19
 111:1
 120:16,21
**held**
 5:10,13
**help**
 55:1
**Hendriks**
 101:21 102:1
**hey**
 27:13 33:17
 48:11 54:6,7
 75:8 77:16
 82:8 84:12
 90:23 95:17
 97:11 100:3
 110:6,8
 142:4,15,19,
 25
**hide**
 36:13 40:6
**high**
 7:22,23
 84:16,18,20
**highlighted**
 148:22
**hindsight**
 63:11

Lieutenant John Pedersen
July 19, 2021

hired
  9:3,18
history
  84:24,25
hit
  65:9
Hodas
  6:13,23
hold
  56:25
home
  7:15 70:15
Homeland
  25:2 26:20
  27:10 37:18,
  20,22,25
  57:6 104:3,
  24 107:8
  132:20,25
  134:3 136:5
hometown
  8:25
honest
  36:13 43:21
  78:14
horizontal
  97:17
hotel
  56:22 70:16
  86:20
hour
  78:2 109:20
hours
  53:15 60:16,
  23 61:12,23
  62:7,9,15,
  17,18,20
  66:1,4 67:9
  77:15,17
  80:16 93:14
  114:10
  116:24
  117:25
  119:23,24
  121:1 125:23
  126:2 127:1
  136:25

147:25
148:25
house
  69:12 70:15
  140:24
HSI
  61:9,17
  65:20 92:9
  100:12
  124:20
  135:10
  137:10,12,16
  138:13
Huddy
  6:16 12:22
  13:3 16:16,
  24 21:4,22
  23:8,17,23
  30:3 31:8,22
  32:22 33:3,
  7,8 34:4,7
  35:10,19
  36:1,9,16,19
  37:15 38:2
  41:16 47:14,
  17,18 48:1,
  2,16,17 50:3
  67:4,16,20
  68:6,8
  74:11,21
  79:6,9 80:4
  84:1 90:24
  101:8,12
  102:20,23
  103:3,7,17
  109:9,15
  139:21 142:9
human
  12:8,11,15,
  20 13:18
  16:8 18:25
  19:3,11,12
  54:21 56:7,
  12,17,20
  57:7,9,13,15
  58:2 68:23
  69:2,3
  72:17,22

73:2,8
79:10,16
81:13,17
82:14,16
85:23,25
86:9,10,11,
16,18,25
87:2,3 92:3,
22 93:18
96:9 108:6
112:2 134:9
136:13 137:8
husband
  70:18

_____

I

ICE
  25:20 26:7,
  8,16,18,19
  27:10
ID
  111:15
idea
  39:17 107:12
identificatio
n
  4:5,19 5:5
  13:18 28:7
  50:12 97:24
  103:21
  118:10 122:3
  128:2 132:9
  143:13
  148:15
identified
  73:8 124:14
  126:5 138:3,
  4,12 140:22,
  24
identify
  16:7,8 25:9
  73:4 134:8,
  9,14 137:7,8
illegal
  57:4

illegitimate
  146:17
image
  14:23,24,25
immediate
  18:9 34:13
  52:19,22
immediately
  124:12 126:3
imply
  117:5
importantly
  64:7
impossible
  125:17
  126:14
improper
  139:8
improve
  14:10
in-service
  10:13
Inadvertently
  112:24
inaudible
  15:6
incident
  46:2 50:17
  56:6 57:25
  58:1
include
  28:24 29:15
  30:25 37:8
  45:3 57:22,
  23 68:19
included
  17:19 45:22
  47:8 49:1
  99:9,10,14
including
  63:17,18
inclusive
  45:1,3,9,10,
  23,25 46:9,
  13 47:1,3
  49:1,8,10,16
  50:16 55:4,

Lieutenant John Pedersen
July 19, 2021

16 143:16,18
145:8 148:10
**incorporated**
44:5
**Indian**
56:1 118:19
**indicate**
6:9 94:3
116:17 138:7
**indicated**
51:21 62:22
64:25 112:13
145:7
**indicates**
50:24
**indicating**
76:18 89:2,
12 94:21
100:4 116:9
120:21
123:17
**indication**
88:12 95:1
108:1
**indicative**
72:13 108:5
**individual**
6:17 45:21
46:25 47:22
48:20 90:2
92:21
**informants**
80:25
**information**
11:9 13:6
56:4 60:24
77:3,12
90:11 104:6
105:2 107:7
110:9,10,12
112:16
120:11
136:10
137:11
140:15 141:4
142:21 147:6
150:21

**informed**
92:17
**initial**
46:2 80:23,
24 87:21
142:5,6
150:2
**initially**
78:19
**initials**
122:9
**innocent**
61:24
**input**
140:13
**inside**
69:14 71:1
75:17 96:11
114:10
136:25
**inspectors**
100:9
**install**
136:17
**installation**
21:25 31:19
32:20 34:24
118:25 126:7
127:16 128:5
**installed**
61:18
106:17,20,
22,23 113:22
114:23 124:6
134:5 136:18
**instructions**
115:19
**interactions**
5:13
**intercept**
60:1,8
**intercepts**
59:17,20,22,
23
**interested**
5:23 96:2

**interface**
5:14 17:3
**interfacing**
16:12
**intermittentl**
**y**
20:16
**internal**
77:5 83:2,3,
15
**International**
140:21
**interpreter**
75:24
**interpreters**
75:10,12
**interrupt**
65:13 66:8
**interview**
92:6,7,8,13
93:7,11,13
148:3 149:7,
8
**interviewed**
92:5 148:20
**interviewing**
147:18
**interviews**
41:11 150:10
**invasion**
119:14,20
120:1 121:16
128:14,18
**investigate**
18:16
**investigated**
37:7 84:17
99:4
**investigates**
45:17
**investigation**
12:8 13:18
16:13 17:18
18:11,12
20:15 24:9,
12 25:3 26:9
29:7,20,24

30:6 37:10
41:6 44:17
45:4 46:19
47:8 48:25
53:5,9 68:21
69:4 77:11,
14 79:25
80:1 82:12,
23 83:2,4,16
86:3 88:10
95:9,13,16
96:4 99:13
101:5,6,11
104:23
106:22,24
107:8 111:11
130:2,6
136:5 142:24
145:17
151:10
**investigation**
**s**
82:14,15
96:21 104:5
134:3
**investigative**
39:16 59:13
74:5,10
75:1,4,8
111:9 134:10
141:1
**investigator**
9:11 19:19
**investigators**
100:8 104:8,
17 105:11
**involve**
56:20
**involved**
16:12 20:10,
14 21:9 22:1
23:25 24:9
25:3 34:12
35:19 37:13
38:10,15,23
46:18 53:5
55:17 60:1,
18 61:25

69:4 73:2,18
74:2,6 79:24
80:1 86:16,
24 92:16
97:6 101:11
103:6 104:14
108:2 112:4
121:3 123:24
139:20 140:5
147:18,22,24
151:8

**involves**
57:15

**involving**
34:23 41:6
47:2 82:24
84:22 112:2

**Iowa**
7:24,25 8:2,
25 9:1,5,6
20:4

**issue**
65:21,24
85:23 136:1

**issued**
35:19,20
66:22

**issues**
81:7 84:5
85:25

---

### J

**Jacksonville**
81:6

**jail**
150:19

**James**
149:21,23

**Jane**
70:9,10,11
122:25
123:2,6
138:12

**January**
16:4 66:19
78:15 134:4,

6,17 137:4,
17 138:2,8
143:1

**jeez**
69:10

**Jeff**
101:25

**Jerry**
11:25

**job**
54:12,18
81:10 82:20
83:13 84:13
87:4 91:1

**John**
3:4 5:16
7:2,8,11,12,
17 20:10
51:2,23
58:22 59:24
127:6 149:1

**José**
55:19

**judge**
24:7 63:9,15
64:8,12,14,
15,20 103:19
109:16
118:19 119:1
126:8,11,16,
18 127:8
128:9
138:22,24
139:2,6,9,10
145:12

**July**
5:2,16 10:18
11:18,20
43:22

**jump**
38:5 54:25
98:15,20
145:24

**jumping**
15:2

**June**
4:10 97:16,

23 98:5

**junior**
7:23,24

---

### K

**Karchefski**
11:25

**keep**
46:13 49:10,
16 71:8
72:18 75:9
142:21

**keeping**
14:24 28:24
29:16 57:1

**Keith**
5:18

**Ken**
6:22

**Kenneth**
135:24

**kept**
53:7,14
60:13,24
66:2 70:12
77:15

**Kevin**
6:15 18:10
34:10 52:8,
16 101:15
127:4

**kidnapping**
26:1

**kind**
15:2 37:23
58:2 65:15
87:13 88:6
89:12 97:6
108:2 131:10

**kinds**
14:2

**knew**
24:3,6
63:15,16
64:12,15

**know**
8:10 11:23
12:10,12
16:22 17:14
19:6,9
22:11,15,24
23:14 25:15
26:7 27:5,9,
13 33:2,12
36:14 39:7,
10,13 40:3
43:5,18,21
44:10 48:7,8
52:20 55:11
56:11 59:6,
23,24 62:6,7
63:16 64:8
66:13,16,17,
21 67:1
68:14,15,16
70:6,9 71:16
72:3,7,9,14
75:7,16,24
76:1,8,9,22,
23 77:8,17
78:3,10,12,
17 79:3,13
81:14,16,19
83:17,19,20,
21,24 84:6,
9,10 85:3,21
86:8,9,11,14
87:8 89:9,
16,18 90:23,
25 91:22
93:4,17 94:6
95:6,12
96:5,6,9
97:1 98:24,
25 99:14
100:2,3
102:21
103:10,11,13
107:11,19
108:7
110:21,22,24
111:21,22
114:5 116:21
117:13

Lieutenant John Pedersen
July 19, 2021

118:6,21,23
120:14
123:6,7
124:17
125:18
126:20
130:2,6
131:21
134:22,23
137:10,17,25
138:10,13,14
139:2,6,7
141:20,21
142:3,18,23
146:10,19
148:3 150:6,
14
**knowledge**
39:2 62:1
68:24 71:22
76:19 77:6
85:2,24
86:15,24
90:8,10,12
91:22 99:16
108:3 109:25
110:2,14
112:1,12
113:6,14
120:13,17,
23,24 121:7,
19,20 126:17
128:17,20,21
134:24
135:23
**known**
25:20

_____

**L**

_____

**Ladies**
73:7
**Lan**
123:21
**Lanyun**
69:7 70:21
90:1 94:19
95:6 111:6

123:20
**large**
34:5 46:4
80:6 85:4
**largest**
84:23
**law**
9:4,22 19:4
26:13 28:22
29:14 59:11
63:1 64:2
81:1,23
105:24 112:2
138:18
139:7,8
**lawful**
118:8
**Lawrence**
149:23
**lawyer**
78:23 143:7
150:18
**lead**
18:18,20,23
81:24 82:2,6
97:6,8,11,13
**leads**
141:1
**learn**
141:24
**learned**
73:22 140:19
**learning**
59:4
**leash**
71:6
**leave**
54:9 69:16
70:14 72:8
80:9,14 81:6
123:20 124:2
**leaving**
108:8
**left**
9:15 52:20
55:5 69:8
71:21 94:19

103:7
**legal**
5:21,25 17:1
109:13 118:5
127:2 142:10
**legitimate**
145:18
146:3,5,17
**lengthy**
108:23
**letter**
3:8 64:2
98:11 99:23
110:4
**letting**
57:2
**Lewis**
150:13
**license**
57:1,19
93:19
**licenses**
111:16
**lie**
113:11
**lied**
82:22
**lieutenant**
3:4 6:15
7:2,7,8
10:11,12,15,
21,24 11:4,
7,25 12:22
13:3 16:15
20:19 21:23
24:23 47:17
48:2,15 50:2
52:18 54:15
68:10 74:24
79:9 87:10,
20 141:16
149:1
**lieutenants**
11:6 12:3
**life**
72:12 86:19

**limited**
28:24 29:16
56:4 89:12
**limits**
60:10
**line**
66:11 101:3,
13 102:11
124:5
**lines**
119:10
**list**
38:18,24
48:5 54:2
**listed**
4:1 72:23
111:7
**Listen**
125:25
**listened**
75:23
**little**
28:10,11
51:12 52:13
54:7 133:16
137:20
144:25
**live**
57:2 72:12
86:17
**lived**
78:3
**living**
73:1
**local**
20:6 102:1
**locate**
39:15
**located**
7:19 111:20
**location**
105:5 136:11
**locations**
135:3
**locked**
69:15 70:16
72:2,3,4,7,

Lieutenant John Pedersen
July 19, 2021

11 91:13

**log**
49:7 60:13
61:11 66:2,3
87:17 91:5
117:25

**log-in**
65:21

**Logisys**
41:18

**Logitrack**
41:19 48:6

**logs**
49:4

**long**
9:15 47:5
52:9 78:4
84:10 147:25

**long-distance**
9:14

**longer**
9:19 85:1
115:18

**look**
19:1 23:15
31:5 32:6
33:17 36:21
40:5 43:1,
23,25 51:11
55:7 60:20
62:19 66:17
71:24 78:12
79:9 92:1
95:17,20
98:9 103:13
106:5 109:22
110:8 111:23
118:23
122:14 124:3
132:10 136:2
137:22
141:25
148:21

**looked**
36:17,18
46:23 62:3,
25 78:7
79:12 91:5

103:1,17,18
123:9 137:20
146:11

**looking**
14:22,23
31:16 56:2
61:23 63:10,
12 101:24
103:14,16
106:10 125:5
134:25
148:17

**looks**
33:2 55:22
111:7

**lot**
13:24 18:17
36:16

**loud**
28:17 29:9
30:17 32:11
37:3 44:1
101:4 115:10

**lower**
85:20 114:14

**LUCIE**
5:1

**lunch**
129:2

———————

**M**

**Ma**
69:7 70:21
90:1 94:19
95:6 111:6
123:20

**made**
11:23 26:15,
18,20 34:25
37:25 39:1
41:12 42:10,
21 43:23
56:8 66:18
81:24 82:2
89:25 90:6,7
93:21 102:21

107:12 111:8
117:2,9
130:1
131:21,23
132:1 138:6
139:8,15
141:18

**main**
24:13,16,18
47:20 49:17
135:19

**maintain**
37:6

**maintained**
37:8

**major**
76:21

**majority**
86:24 112:3

**make**
36:10 39:6
40:13 51:13,
14 54:7 74:9
85:21
107:16,20
108:18
124:25 131:5
140:7 143:15
144:8 145:2

**makes**
139:24

**making**
11:14 62:24
76:25 130:18
134:25

**male**
62:4 65:3
76:24 113:3
114:9 121:17

**males**
121:2,4

**man-**
14:4

**management**
17:15 29:1,
17,18 44:9,
24 87:16,17

**Mandarin**
75:24 92:10

**mandatory**
13:17 14:3

**manner**
28:22 29:13

**March**
10:1 51:5,8
80:20

**marked**
4:1,5,19
28:7 50:12
97:23 103:21
118:10 122:2
128:2 132:9
143:13
148:15

**Martin**
6:15 16:25
18:10 24:21,
23,24 27:12,
15,19 34:10,
12,13,16
35:1 38:3,
17,18,22
52:7,8,16
53:7,11,20
75:2,7
77:16,19
101:15
107:14,23
127:4 140:1,
10 141:22
142:11,24

**Mason**
7:24

**massage**
56:23 86:1,
20 104:12
105:15
112:4,5
115:15 117:2
124:23
146:15

**massage/
sexual**
115:16

Lieutenant John Pedersen
July 19, 2021

**massages**
119:25 121:8
145:19
146:3,6,17,
18
**matter**
5:18 8:8
87:7 125:1
**Mcclary**
100:13
**mean**
17:11 19:20
27:19 45:25
46:13,22
49:11 65:12
66:8 80:9
83:2 84:18
85:10 92:4
96:20 110:9
112:22 116:7
137:23
141:15
**means**
88:18
**meet**
52:25 78:21,
23 141:22
142:12
**meeting**
24:24 53:22
78:23 134:16
142:13
**meetings**
53:1,17,25
54:4 100:7
**member**
81:7
**members**
111:21
**memo**
17:18 80:24
**memorandum**
4:9 27:21
37:23 97:22
98:4,8
**memorized**
43:2

**memory**
93:24 101:24
**memos**
48:24
**men**
113:18
**mental**
77:4 110:25
111:20
**mentioned**
53:17 75:12
97:5
**met**
25:1 78:24
79:6 101:20,
25 105:25
**Metz**
147:10
**Michael**
16:18 18:19
**mid-february**
9:24
**mid-january**
66:15
**mid-september**
10:19
**middle**
111:23
114:21
128:11
**Midwest**
59:3 73:21
**Mike**
79:25 80:3
82:4 97:10
**mind**
14:18
**minimalizatio
n**
116:15
117:18
**minimization**
60:3,9
117:22
**minimize**
119:14,20
120:1 121:16

128:14,18
**minimizing**
125:22
**minutes**
53:22 58:7,
12,14
115:13,20
116:5,12
129:3
**misdemeanor**
105:22 141:5
**moment**
15:9,16
73:25 79:22
144:6 147:12
**Monday**
5:2 53:18
**Mondays**
53:2
**money**
72:20
104:11,13
105:14,18
107:10
**monies**
77:10
**monitor**
16:7 62:23
63:3,10,11,
17 65:5 91:3
117:1 134:9
137:7,13
142:6
**monitored**
60:15 124:20
**monitoring**
14:12,19,22
16:6 60:23
61:11 64:5
65:17 67:8
88:24 91:2,
3,9,11,18,23
107:6 114:23
119:13 124:6
126:21
128:13
134:8,13,18,

20,24 135:15
136:24 137:6
146:7,14
**months**
20:4,5
**Moody**
139:6
**morning**
12:13 13:3
69:13 72:5
79:8,12,15
87:17 103:2
123:2 137:20
**motion**
20:11 100:19
**motorcycle**
73:23
**move**
9:13 100:16
132:7 133:20
138:15,17
146:1
**moving**
18:17
**Mulligan's**
122:23
123:16
**multiple**
41:10
**murder**
85:3

---

**N**

---

**nail**
56:23 86:20
**name**
5:19 6:11
7:10,11,13,
17 52:3
70:9,11
72:21 77:14
92:4 96:17
100:13 111:6
**named**
124:13 126:4

Lieutenant John Pedersen
July 19, 2021

names
  123:7
national
  10:16,18
  25:12
necessarily
  82:16 99:11
necessary
  116:18
  117:18 130:9
  140:14
need
  11:14 27:5
  48:7 49:13
  54:6 58:10,
  11 88:3
  95:17,20
  110:8 128:25
  135:18
  149:21
  150:20
needed
  25:8 30:22
  42:21 48:9
  75:10 91:15
  109:12
  115:20
  129:21
  134:18
needs
  23:15
negative
  83:11
never
  18:13 83:1
  149:20
newspapers
  139:1
night
  69:15 70:17
  71:16,19,20,
  21 72:8 88:1
  123:20
nightly
  137:1
nine
  73:11,13,16

138:11
noises
  111:1
nonstop
  65:3
normal
  52:1,24
  136:25
north
  7:25 96:17
  110:24
northeast
  9:1
Northern
  8:2
note
  40:13 54:1,7
  110:3
noted
  112:1
notepad
  100:2
notes
  17:18 48:24
  53:24 54:3
  63:7
notice
  50:22
notifications
  14:5
November
  10:10 78:15,
  16 83:25
  134:5
  136:17,20,23
  137:1
number
  12:3 28:3
  43:15 50:8,
  17 54:15
  58:25 59:5
  66:21 70:10
  73:12 97:14
  100:16
  103:23
  109:22
  112:25 113:8

115:13,20
116:5,12
118:12
121:9,12,23
122:5 123:6
127:14
132:10
143:10
144:14,15
146:21
148:20,24
numbers
  47:23 121:6
numerous
  109:24
  110:1,16,18

——————————

O

oath
  3:6 6:6
Object
  88:15 93:2
  94:5
objected
  94:6
objecting
  94:8
objection
  76:11 88:17
  89:4
observations
  46:16 74:8
observed
  113:20
  122:21
  123:25
  145:18
obtained
  27:6 104:17
obtaining
  106:1
obviously
  59:22 64:12
occasions
  104:10
  105:13

occurred
  58:3 75:13,
  14 88:25
  92:11 93:5
  113:21 125:7
  130:10
occurring
  56:7 61:14
  70:19 105:5
  121:8 136:11
OCDETF
  73:23
October
  9:23 10:22
  23:18 52:18
  105:24
of/purged
  44:6
off-the-
record
  133:18
off/on
  68:3
offense
  131:17,25
offer
  40:7 104:13
  105:18
  131:23
offered
  104:10
  105:13
  107:10
  131:24
office
  16:5,13,17,
  20 17:4,25
  24:4,7,8,15,
  17 36:15
  42:5 50:6
  53:12 60:10
  63:8,25
  64:4,7,11,
  20,23 65:7,
  23 67:10
  91:12
  101:14,19
  102:17 107:4

Lieutenant John Pedersen
July 19, 2021

109:15
113:11
116:23 119:2
124:19 127:3
130:4 134:7,
13,16 137:5
139:5 142:14
143:7,9
**officer**
7:14 8:17
9:5,6,8,9,25
10:3 11:9
13:1,7 14:9
45:16,21
46:1,5 51:22
56:3 63:1
73:19 81:9,
10 83:14
87:22 104:9,
10 105:12,13
108:13
119:14 131:9
147:6
**officer's**
41:21 48:20
50:25 83:17
**officers**
11:8,10
12:19 20:6,
20 30:20
32:17 33:24
41:14 46:2,
18,25 74:12,
13 80:15
100:8 107:5
113:9,13
117:1 118:23
124:23
128:14
151:8,9
**official**
6:20
**officials**
100:11
**okay**
6:2 7:12
8:12,19
15:8,25

16:10 19:24
28:12,13,14,
16 30:8,18
36:11,24
37:2,5,16
39:24 40:24
41:5 42:22
46:9 50:10,
19 51:19
58:13 61:19
64:14 70:9
75:20 79:14,
21,23 86:15
92:21 98:2
100:20,25
101:2 108:16
109:1 114:20
118:12 122:5
124:3 127:23
130:24
131:13,15,21
132:11,17,22
133:8,10,13,
24 134:1
135:8,12
139:12
142:15
143:2,11,20
144:5,14,22
145:14 146:1
147:15
149:19
150:20
151:4,6,19
**Okeechobee**
70:1
**old-style**
65:8
**on-the-job**
20:1,2
**once**
17:9 32:14
35:18 41:16
87:21 113:21
131:22,23
**one**
11:17,18
16:21 18:21

19:9 21:11
26:24 27:1
29:10 30:12
31:17 32:6,
23 34:1,6,20
37:20 40:19,
20 43:2
46:22 47:4,5
50:9,18
51:19 52:1
54:10 55:10
57:8 66:21
67:7 69:13
72:4,24
73:2,4,8,20,
21 74:16
76:9 80:3
84:23 85:1
92:2,22
93:18 94:18
97:20 102:7
108:13
110:22
113:9,14,24
114:3,11
116:8 117:8
120:5,12,13,
22,25 121:9
122:24
123:13 124:1
125:21
132:17
133:3,4,5,12
135:6 138:10
139:15
140:23
141:19 142:7
143:15,21
144:8,17,18,
20 146:22
147:7,8,9
148:1 149:14
**ones**
135:25 150:6
**online**
12:9 13:9,
11,24 14:9
79:15

**open**
62:9 69:13
**opened**
69:13
**opening**
84:7
**operating**
136:25
**operation**
28:23 32:14,
17 33:6,9,24
34:4,5,6,8
35:7,14,18,
21,22 53:15
60:16,23,24
61:13 62:7,
17,18,20
65:5 66:2,5
67:9,12
116:24 118:1
119:23,24
121:1 125:24
127:1
**operations**
18:6 20:22
29:15 32:6
49:4,7 91:6
**opinion**
131:11,12
138:22
**opportunity**
112:19
**opposed**
57:9 62:23
69:2 97:2
108:2 116:4,
11 147:23
**options**
34:19
**Orange**
81:4
**oranges**
86:21
**order**
4:7,12,14
6:8 22:22
23:1 26:3

28:3,6 30:9
32:3 36:22
40:16 63:3,
12 67:23
106:1,6,7
109:11
115:11
118:9,13,18
119:3,4,5
127:15
128:1,4,9,10
133:2,13
139:6 142:6
**orders**
22:4,6,12
24:5 34:9
36:4 90:24
102:11,14,
16,21,23
103:1 107:14
127:1,7
141:16
**organization**
107:15,24
140:4,18
141:13
142:17,22
**Organized**
73:23
**original**
44:6 45:19
**originally**
78:18
**originated**
98:10
**Orlando**
73:6 140:19,
20,22,24,25
**outcome**
5:23
**outside**
5:13 71:2,4,
20,23 72:6
94:15 95:8
98:10 106:17
135:1
**outstanding**
149:2

**overdose**
82:19
**overdoses**
82:19
**overnight**
108:9
**overseeing**
21:9
**overtime**
75:6
**owner**
95:25

---

**P**

**P-E-D-E-R-S-E-N**
7:17
**p.m.**
5:17 129:6,
7,8,10
151:24
**page**
3:2 4:6,20
30:14 37:4
50:23,24,25
55:10 78:13
100:24
102:10
104:22
106:11
109:22
111:2,3,5,
23,24
114:13,17
115:6 119:8
122:14,19
124:3,4
128:9,12
136:2
**pages**
46:24 50:9,
22 78:11
149:24
150:10
**paid**
72:14,15

89:17 90:12
**paid-for**
115:15
**paper**
18:4
**paperwork**
21:18 25:13
36:20 68:3
87:11,13
88:7
**paragraph**
30:19 32:10
33:21 105:7,
8,9,11
109:24 111:4
112:9,10,25
114:15,18,22
115:10 116:9
117:20 119:9
122:19
124:11
128:12
135:5,6
136:9,17
138:2 145:16
**Pardon**
15:5 55:21
150:4
**parental**
25:25
**parentheses**
145:17
**Park**
140:23
**parlor**
56:23 86:20
146:15
**parlors**
86:1
**part**
35:6,12
44:18 50:22
67:19,21,22
69:23 90:16
102:2 106:22
148:22

**part-time**
9:9
**participants**
5:8 124:14
126:5
**participating**
6:3
**particular**
20:10 22:8
31:1 50:18
88:11 117:11
**parties**
119:15
121:17
128:15,19
**parts**
18:17
**party**
5:22 119:20
**pass**
110:8
**passport**
26:5 57:20
**password**
61:12
**past**
36:17 99:2
**patrol**
9:8,25 10:3,
8,12,21,23
52:18 81:10
87:19,20
**pay**
57:3,23
72:19,20
**paycheck**
87:6
**paying**
90:2
**payment**
89:22,24,25
116:25
117:2,9
**payments**
90:6
**payroll**
28:25 29:16

Lieutenant John Pedersen
July 19, 2021

peace
  9:5
Pedersen
  3:4 5:16
  6:15 7:2,8,
  10,17 51:2,
  23 149:1
peek
  59:6
peer
  68:10
people
  25:9 60:11,
  17,18,25
  61:9,24
  67:17 69:5,
  10,14 72:6,
  12 73:1,12,
  13 75:14
  82:4 86:24
  97:6 107:16
  108:8,9
  121:10,13
  135:2
  140:18,19
  147:19,23
  148:20
percent
  20:25 117:13
perform
  82:20 93:1
performed
  28:21 29:13
period
  74:8
periods
  46:10
peripherally
  111:25
perjure
  113:10
permission
  63:3 65:5
person
  31:1 34:24
  56:24 57:17
  64:16 68:1,5

72:21,24
73:2 84:19
92:2,15
93:17 100:3
110:6 114:8
131:24
personal
  15:6 17:10
  80:17
personally
  23:22,25
  27:24 58:24
  69:21 89:1,
  7,18 100:7
  141:22
  147:18,22
personnel
  17:23 60:11
  91:13 105:25
  138:3
persons
  76:18
pertain
  28:23 29:15
pertaining
  104:6
Pham
  55:19
phases
  42:14
Phil
  12:22 16:16
  21:22 30:3
  31:8,22
  32:22 33:3
  34:7 35:10
  36:9,16,19
  37:14 41:16
  80:4 101:8,
  12 102:23
phone
  26:12 94:16
  95:4,7,8
phones
  94:15 95:2
phonetic
  78:20

photo
  111:15
photograph
  93:20
photographic
  93:24
photos
  17:19 38:23,
  24 48:24
physical
  89:13 104:14
  131:6,7
physically
  89:6 94:9
  125:17
  126:13
Pick
  15:8
picked
  41:13 69:22
  140:20 148:1
picking
  122:22
picture
  51:9
piece
  110:9,12
Pierce
  9:23 69:25
pigeonhole
  49:24
pitching
  96:21
place
  59:15 69:9
  70:5,16 89:8
  95:18,20
  96:17,25
  115:14,21
  116:3,6,13
  133:18
  145:19
places
  73:6
plaintiff
  6:9,13 7:3

plaintiff's
  4:5 28:6
  50:11 97:22
  103:20 118:9
  122:1 128:1
  132:8 143:12
  148:14
plan
  33:11
planning
  38:15
plans
  49:5 68:12
  91:6 134:19
plate
  146:21
play
  62:15
please
  5:25 6:9
  7:12 8:9
  29:9 30:17
  32:6,11 37:3
  44:1 55:2
  59:8 65:13
  70:7 98:6
  109:3 133:11
pleased
  69:20
pleasure
  76:25
plenty
  36:17,18
point
  24:13,16,18
  58:6 66:14
  71:10 95:24
  100:11 102:2
  114:3,4
  118:21 119:4
  135:15,17
  138:10
Polaris
  86:5
pole
  71:23
  106:16,20,

Lieutenant John Pedersen
July 19, 2021

22,23 107:1,
3 135:1
**police**
7:14,18 8:17
9:1,6,7,11,
18,19 11:10,
25 12:6,10,
20 13:7 16:6
19:2,19 22:4
24:14,19
25:15 29:6
32:12,24
36:3 40:4
45:1 50:16
52:21 54:15,
20,23 64:1
67:3 68:22
74:25 82:8
84:15 95:16,
19 96:18
99:5,11
104:4,9
105:3,12
120:24
127:11 131:9
136:10 137:5
143:6 147:7
149:2
**policies**
54:19
**policy**
23:13
**poor**
57:2
**pop**
48:7 107:17
**portion**
112:9 114:14
116:16
126:12
**Posey**
12:16 79:17
86:7
**position**
10:25 11:2,
3,16,17 12:1
18:5

**positive**
104:18
106:2,4
**possession**
48:23
**possible**
16:8 34:19
37:21 96:12
134:9 137:8
**possibly**
39:17 99:2
100:5,6
**post**
91:8
**Potter**
6:12,22
**Powerdms**
13:10 14:5
**Powerpoint**
39:1,5,6,10
40:2,3
**practically**
24:10
**predicate**
129:18,22,23
**predicated**
68:17
**prefer**
7:7,9
**preferred**
74:17
**premises**
71:21 119:13
128:13
**preparation**
78:5,21
**preparing**
24:5 77:22,
25
**presence**
5:14
**present**
38:13
**presentation**
39:1
**presented**
5:4

**press**
38:7,9,10,
11,13,16
39:2,12,20,
22,25 42:8,
15,18
**presume**
56:11
**pretty**
28:11
**prevent**
62:12 120:2
**previous**
52:20 85:20
112:6
**primary**
35:15,16
36:2,7
**print**
143:18
**printed**
50:18 79:18
**printer**
79:18
**prior**
18:24 56:7
59:19,20
82:21 83:9
86:3
**priority**
84:16,18,20
**privacy**
119:15,20
120:1 121:16
128:15,18
**Private**
5:12
**privy**
83:3
**Pro**
96:24 97:2
**probably**
17:5 23:12
25:4 47:13
48:21 53:1
59:1 80:12
84:25 109:20

117:13 122:9
147:9
**problem**
15:12 65:21
**problems**
76:21
**procedure**
23:11 46:12
51:21
**procedures**
17:8 54:16,
19
**proceed**
16:2
**proceeding**
5:9 6:1
**process**
21:10 26:21
27:9,22
**produced**
37:10 39:15
40:9 67:2
**professional**
11:7
**program**
41:18
**progress**
5:6 58:19
**prohibited**
60:13 83:12
138:19
**Project**
86:5
**promoted**
10:4,7,10
81:10 112:23
**pronounce**
51:3 111:6
**properly**
119:17
**prosecution**
129:22 131:2
**prostitution**
56:12,19
57:10 68:19
69:2 82:14,
17 84:15

Lieutenant John Pedersen
July 19, 2021

85:25 86:5
96:8,10,13
104:15,19
105:5,19
108:3,19
112:3,6
121:11
130:11,20,25
131:8,17,25
136:1,11
138:20
141:5,8,11
149:4
**provide**
38:18 96:22
**provided**
4:2 18:2
49:5 50:6
104:6 105:2
**provision**
29:2 30:4
37:11
**public**
11:9 147:6
**purposes**
131:1
**pursuant**
6:7
**pursue**
99:15
**push**
125:11,12
**pushed**
41:24
**put**
14:8 15:3,10
28:2 40:17
50:5,7 54:1
86:7 97:14
109:2 118:14
132:12 136:2
**putting**
38:24 57:17
118:17

---

## Q

---

**Quantico**
10:16
**question**
8:9 14:14,22
21:19,20
22:18 35:4
38:6 39:6
41:5 42:13
44:13,15,19
53:3 57:13
62:6,10
71:10 84:4,
21 88:17,21
89:11 93:4,
9,12,14,15
94:25 99:8
101:18
102:10,13
103:9 106:5
107:13
109:5,17
110:17
113:25 116:8
117:11
118:17
125:3,25
127:7,20
129:14
131:11,16
140:10 141:7
146:12
149:13
150:9,23
**questions**
17:8,10
22:19 34:20
42:11 108:24
117:16
121:15
122:11
138:16 147:4
151:12,15,
16,20
**quick**
133:11

**quickly**
133:19
**quite**
48:21 55:23
**quote**
115:3,22
119:16
128:11
134:6,11
**quoted**
135:7,13
**quotes**
115:2

---

## R

---

**Rachel's**
81:1
**racketeering**
68:14,18
**raid**
32:6,14 33:6
68:12
**raising**
150:9
**ran**
66:11
**ranch**
86:22
**rank**
10:7,11
**rankings**
85:6
**rate**
85:20
**ratings**
85:6,9
**Raymond**
149:25
**reach**
25:20,25
26:1
**reached**
25:19 26:8
111:13
**reaching**

26:6
**read**
3:8 23:22
28:9,10,16,
17 29:9
30:17 32:10
37:3 40:25
44:1 47:10
48:8,19
49:12,13,20,
21,22,24
52:4 55:9
86:4 93:4,5,
7,8,25 97:18
98:2 101:3,
9,22 102:18
103:24
104:7,20
105:6,10,16
112:8,9
114:25
115:4,10,23
119:12,17
123:14
124:15
129:17 137:9
138:9 139:1,
2,3,4 145:5,
24 151:16,18
**reading**
106:14 115:1
**real**
133:11
**reason**
8:8 87:6
**reasons**
80:17
**recall**
12:9 13:13
15:2 16:3,9
20:11 21:23
23:20 38:6
39:4,9 43:19
54:25 55:13
56:10 59:5
61:3 80:13,
15,18,21
82:24 84:7

Lieutenant John Pedersen
July 19, 2021

90:9 91:24,
25 92:23
93:24 94:16,
17 95:3,5,7
97:4 98:14,
16,19 99:3,
19,20,22,25
100:2,6,10
102:3 104:1
106:12,13
110:21
111:17
112:11 114:6
119:5 129:12
134:15,16
135:9 136:6
139:5,9
142:3
145:23,25

**receive**
99:2 101:18

**received**
9:5 10:13,14
40:8 92:18
95:24 101:14
105:4 136:10
137:11 150:9
151:8

**receiving**
89:22 98:16
119:25

**recently**
93:8

**recess**
15:20 58:17
129:7

**recollect**
13:22

**recollection**
13:23 33:14,
18 36:12
43:6 55:2
58:4 73:15
78:14 98:18
99:1 122:8
136:6,19
137:2

**record**
5:8,11 6:1,
11 7:12
13:11,21
14:7 15:12,
15,18,22,25
52:4 58:14,
15,20 62:22
63:4,11,19,
21 64:9,16
65:1,5,9
79:10,13
94:7 116:18,
19 117:18,19
123:7 129:5,
10 132:7
142:7 151:24

**recorded**
5:9,10 60:15
61:15 62:2,
4,16 63:5
67:7 76:3,19
77:6 120:2,
22 121:4
124:21
125:1,20
126:2
146:23,25
148:7 149:8,
15,16 150:6

**recorder**
150:17

**recording**
5:6 14:12,
20,22,24,25
58:19 61:14,
17,22 62:12
64:5 65:25
114:24
116:2,4,10,
18 117:24
124:7 125:7,
14 127:8,10
129:6,9
137:14,18

**recordings**
62:14,15
75:13,14,16,

22 76:17
94:14 149:9

**records**
11:11 12:13
13:7 17:15,
22 18:3 19:2
28:24 29:16
37:8 41:4,24
42:2 44:4,9,
12,24 48:14
87:16 99:5
109:23

**recruit**
9:22 19:4
81:23

**recruiting**
11:10

**refer**
30:8 40:23
103:23
119:21
149:14

**reference**
111:4 122:20

**referenced**
106:8

**referencing**
34:23 143:20

**referred**
32:2 36:22
74:25 106:4
146:4

**referring**
13:15 21:13,
16 22:6
26:19 31:2
47:4 75:4
91:10 92:22
93:18 110:1
149:24

**refers**
104:25 115:2
134:4 145:15

**reflected**
74:5,10

**refresh**
55:1

**refresher**
12:12,24
13:9

**refreshing**
101:24

**refusing**
57:23

**regard**
18:25 19:15,
16,25 20:15
21:25 22:1,
4,8,12,16,23
23:23 24:2,
12,14 26:9,
16,18 27:2,9
29:20,24
31:9 32:19
34:25 38:6
40:7 46:10
47:8 51:20
56:8 60:4
64:15 75:13,
22 76:16
77:3,8,11
81:3,16
82:13,22
83:23 84:16
85:25 88:7,
11,24 92:21
93:17 102:4
106:3 109:5
114:3 115:25
120:15
122:10
131:17
135:22 136:1
141:2

**regarding**
31:3 82:3
93:7 100:9
106:1 115:20
146:5

**regularly**
12:2

**regulatory**
100:8

**rehash**
132:6

Lieutenant John Pedersen
July 19, 2021

**related**
  5:21 16:11
  17:17 45:4
  48:25 75:6
  77:10 99:13
  108:24
  115:16
**relates**
  55:4 115:18
**relating**
  12:7 27:23
  30:9 38:15
  44:16 59:20
  75:5 79:6
  81:13,25
  82:13,23
  84:14 85:22
  86:1 94:2
  96:7 97:2
  117:16
  151:10
**relationship**
  123:12,16,18
**relied**
  34:7,8 36:16
**remember**
  14:1 43:4
  55:14 98:21
  100:13
  145:25
**remote**
  5:14,15,20
  6:1
**remotely**
  5:1 6:5,6
**rephrase**
  88:20
**report**
  4:8,11,15,
  16,17 26:8,
  11 41:18,23
  44:13 45:2,
  3,9,10,11,
  14,15,20,23,
  24 46:2,9,15
  47:1,3,5,18
  48:7,8,20
  49:1,3,6,8,

  10,12,16,17,
  24 50:4,5,
  11,16,24
  51:1 55:4,5,
  8,16,17,22
  56:3 63:10
  72:23 74:7,
  18 76:24
  85:16 87:9
  92:18 93:6,
  25 103:20
  111:5 132:8,
  25 134:10
  136:15
  137:12,16
  143:12,16,
  17,19 145:8,
  9 148:11,14
  149:22
**reported**
  5:1 54:22
  76:16 101:15
**reporter**
  3:7 5:24
**reporting**
  6:4 96:8
**reports**
  20:23 37:9
  41:9,15 42:1
  44:22 45:5
  46:3,10,18,
  23,25 47:15,
  19,20 48:3,
  6,15,18
  49:19 50:2,5
  51:21 52:1
  55:23 67:17
  68:12 74:12,
  13,17,20,21,
  23 76:2
  78:11 87:21
  92:1,11
  96:12 149:14
  150:2
**Representativ
e**
  12:16

**representing**
  6:13
**request**
  5:5,11 10:15
  11:21 26:13,
  15,18,20,22,
  25 27:7
  30:20 37:19,
  22,24 67:3
  80:7 104:4
  122:6
**requested**
  10:16 67:5
  115:11
**requests**
  37:17
**required**
  12:11,19
  13:25 14:5
  22:16,17,25
  23:2,7 61:11
  81:20 102:25
  116:25
**requirement**
  116:15
**requirements**
  56:12
**requires**
  22:22
**rescues**
  104:18
**research**
  40:1
**resident**
  104:2
**resource**
  11:8
**response**
  117:12
**responsibilit
y**
  30:23 31:2
  32:15 33:22
  34:17 35:15,
  17 36:3,7
  37:12 74:9

**responsible**
  18:5 28:20
  29:11 118:4
**Rest**
  117:15
**restate**
  42:13
**restaurant**
  56:22 86:20
**restrained**
  94:4,10
**resubmitted**
  48:12
**result**
  37:10 106:23
**results**
  104:18
  106:2,4
**retained**
  44:6
**retention**
  41:4 44:5
**retire**
  11:5
**retraining**
  13:17
**returned**
  10:19 55:18
  123:2
**revealed**
  113:2
**review**
  21:18 23:3,7
  31:24 33:18
  36:19 48:7,
  9,17,21
  49:14,25
  51:2,22
  67:13 78:5
  88:1 102:7,
  8,20,25
  103:4 109:7,
  18 118:18
  122:5,14
  138:22
  141:23,24

reviewed
  21:21 23:8
  24:6 31:21
  33:10,19,20
  47:1,13,14,
  18 48:3,19
  49:8,11
  51:25 74:11
  90:14 94:2
  98:25 100:21
  102:23,24
  106:12 109:9
  137:19
reviewing
  20:23 21:23
  23:25
reviews
  63:14
revision
  48:10
revolves
  101:4
Richman
  3:5 6:12 7:6
  15:5,7,8,15,
  24 28:1,8
  40:21,22
  43:12,16
  50:13 51:16
  58:8,13,21
  76:14 79:3,5
  88:16,20,23
  89:10 93:16
  94:6,11
  97:14 98:1
  100:16,17
  103:22
  109:2,4
  115:9
  118:11,14,16
  119:7,11
  121:22
  122:4,18
  127:14,21,24
  128:3,23
  129:4,11
  132:10,12,
  17,20,23

133:1,4,8,
  10,14,19,21
  143:14,21
  144:6,11,24
  145:4
  147:12,16,17
  148:9,16
  151:12,22
RICO
  73:18
  129:18,22
  135:19,22,
  23,25
right
  8:13 13:20
  23:13,21
  24:10 36:21
  42:12 46:20
  51:4 64:4
  66:7 71:3,13
  75:19,20
  80:22 87:13
  97:21 98:17
  99:15 107:21
  108:21
  112:14 115:2
  117:20
  118:4,8
  119:6 121:22
  122:16
  123:14
  126:23
  127:13,22
  128:23
  129:16
  135:22
  136:13,21
  137:2 138:15
  142:2 143:15
  144:8,23
River
  56:1 118:19
Rivers
  147:11
RMS
  17:14,15,19
  41:3 44:3,11
  87:16

road
  69:25 84:11
robbery
  45:16,17
role
  102:13
room
  15:13 20:22
  60:9,12,14,
  19 120:6,7,8
  121:9 136:24
  138:3 142:14
  146:23
rooms
  15:11 121:8
rotate
  12:4 97:19
rotated
  70:8 73:5,14
rotates
  12:3
rotating
  70:12
rough
  58:25
row
  74:15
rules
  8:8
rulings
  139:3
run
  70:23
running
  61:5
runs
  83:16
Ryan
  16:23 24:17,
  18 60:6
  61:7,16
  101:20 102:1

---

S

---

salon
  56:23 86:21

San
  55:19
sandwich
  69:17
sat
  92:7,13
  93:11 113:16
save
  15:17 50:7
  133:22
  147:16
saved
  64:10
saying
  19:10 36:6
  48:7 49:10,
  16 64:21
  77:4 99:8
  107:18 118:3
  122:13 127:6
  130:19 139:7
  142:11
says
  33:22 41:21
  50:25 51:7
  52:3 54:6
  55:18 63:14
  67:23 101:3
  104:2,8,17
  105:2,4,11,
  24 112:1
  113:1 114:21
  116:1,21
  117:17
  119:12
  124:5,10
  133:5 134:2,
  3,6 136:8,9,
  16,24 137:4
  138:2,3,24
  144:19
  145:10,17
  148:24 149:7
scene
  80:10
scheduling
  20:20 28:25
  29:16

Lieutenant John Pedersen
July 19, 2021

Scherer
 6:22 43:10,
 15 133:6,9
 143:24
 144:1,3,9,
 13,16,19,23
 148:13
school
 7:22,23 8:2
 10:17 11:8
scope
 84:14
screen
 15:4,10
 16:10 28:2
 30:11 40:17
 48:4 60:20
 79:22 91:1
 97:15 109:3
 118:15
 132:12 135:4
 136:3 148:9,
 21
scroll
 28:15 50:15,
 21 55:7,20
 98:6 101:1
 145:9,15
Sean
 14:7 16:18
 18:19 51:22
 81:4 82:5
search
 21:9,11,12,
 15,18,21,24
 22:8,12,16,
 17,23 23:3,
 15,23,25
 30:10,22
 31:3,9,12,
 15,16,19
 32:19 34:22
 35:3,5,7,8,
 18 36:18
 39:18 41:9
 58:22 59:3
 60:4 62:21
 67:21,22

68:3,13
 102:8,12
 103:5,7
 108:23
 118:24
 141:19,23,25
 145:11
searched
 119:13
 128:13
Sebastian
 123:11
second
 30:14 33:21
 35:6,12,25
 43:2 44:18
 66:24 109:22
 111:2 115:10
 119:7,8
 122:6,19
 128:9,11,12
 135:6 136:2,
 9 142:7
SECRETARY
 40:20 51:13
 97:21 115:8
 122:16
 132:15,19,
 22,24 133:3,
 7,13 143:23,
 25 144:2,4,
 10,12,14,17,
 21 145:2
 148:12
Section
 30:16
Security
 25:2 26:20
 27:10 37:18,
 20,22,25
 57:6 104:3,
 24 107:8
 132:21,25
 134:3 136:5
see
 28:5 30:12
 37:5 40:1,18
 45:17 50:4,

15 51:5,6,7,
 11 55:1,5
 62:21 64:15,
 24 67:23
 69:6 70:19,
 24 79:9
 81:21 86:12
 87:18 89:1,
 12,20 94:9
 95:1 97:17
 98:4 101:3
 104:2 106:7
 111:4,24
 114:11,15
 115:25 116:9
 118:18
 119:3,5
 120:9
 122:14,19
 124:4,10
 128:8
 132:15,24
 135:5 136:8
 137:13,14,22
 138:1,16
 143:25
 144:25
 145:14
 148:23
seeing
 55:14 69:5
 98:14,19
 99:19 100:6
 135:9 136:7
 145:23
selected
 151:9
seminar
 12:15 79:16,
 20 86:6
send
 151:17
senior
 16:23 18:22
 97:10
sense
 128:19

sentence
 33:21 40:25
 41:2 105:8
 111:24 113:1
separate
 74:18 143:6
September
 84:3 107:9
sergeant
 10:7 14:7
 16:16,24
 21:4,22
 23:8,17,23
 30:3 31:8,21
 32:22 33:3,
 7,8 34:4,7
 35:9,10
 36:1,9,15
 37:14 38:1
 41:16 47:14,
 17 48:1,16,
 17 50:3
 55:22 56:2
 67:3,16,20,
 25 68:6,8,11
 74:11,20
 80:4 87:20
 101:8
 102:20,23
 103:3 109:9,
 14 112:20,21
serve
 10:20
served
 9:8,9,24
 10:2,4,7,11
 20:5
server
 61:9,10,17
 65:7 67:7,8
 125:21
serves
 52:14 111:21
services
 11:4
serving
 9:16

servitude
  56:21
set
  54:16 69:9
  111:16
  119:16
  127:11
  128:16
seven
  20:4 119:10
several
  24:20 25:1
  135:24
sex
  16:7 104:11,
  13 105:14,18
  107:10 131:1
  134:8,14
  137:7
sexual
  92:16,25
  96:11 105:19
  115:13,15,
  19,21 116:5,
  12,18 121:3
  130:9
shakes
  39:7
shape
  120:3
shapes
  57:6
shared
  82:19
sheet
  151:17
shift
  10:12
shopping
  71:12
short
  9:15 12:24
  71:6 78:8
  133:4,5
  146:24 148:6
shortcut
  127:24

show
  16:3,11
  94:14 114:13
  118:12
showed
  79:19 110:3
shows
  26:15
shut
  60:19 65:7
  117:24
shutdown
  97:2
Shuxiang
  111:7
shy
  9:17
side
  55:5 110:24
sign
  33:2 41:20,
  22 68:2,12
  87:16 90:23
  107:5
signed
  33:11,15
  41:15 50:3
  52:4,5 74:21
  87:22 103:18
  145:12
signs
  33:4
simple
  131:16
simply
  51:20 79:8
  93:20 107:16
  127:7 130:10
single
  49:24 52:1
  56:6
sir
  8:18 13:20
  17:21 19:8
  22:6 23:12
  27:20 28:9,
  16 29:4

30:7,12
31:3,5,17
32:7,11
36:12 37:3,
19 38:12
39:3,13
42:1,25
46:8,21 47:4
49:10 51:24
53:23 54:17,
18,20 56:10
57:14 58:5
63:23 64:22
81:18 82:4
83:1 90:8
93:22 96:14
97:7 98:2,
18,24 99:15
100:22
102:18
103:9,24
106:10
108:7,12
112:8 115:23
116:21
117:7,21,23
118:23
120:10,17,
18,23 122:8
123:5,18
124:8,18
125:3,16
126:25
127:12,18
128:17,23
129:3 131:3,
20 134:12
137:9,15,16,
21 138:15
141:10 145:5
151:13
sister
  123:21
sit
  78:12 93:13
  141:25
sitting
  90:25

SIU
  36:16 60:10
  68:1 80:3,10
  82:4,7 83:10
  91:12 95:15
  112:15
  139:22
  142:14 148:2
skip
  37:1 104:24
  114:13
  138:15
smells
  86:11
sneak
  59:6
software
  41:19
solely
  139:18
solicitation
  108:18
  130:10,21
  131:8,18,23
  149:3
solicited
  108:13,17
  129:16,21
soliciting
  130:24
solid
  67:2
solvability
  85:5,9
son
  26:3
sort
  57:11
sounds
  23:21 80:22
  137:3
sources
  112:17
south
  69:24 94:23
spa
  16:14 18:12

Lieutenant John Pedersen
July 19, 2021

20:15 21:13,
14 24:2,12
25:10 26:10
27:23 29:7,
20,24 30:5
31:10 34:24
41:6 44:16
47:2,9 48:25
53:6 56:9
59:21 62:1
65:2 68:23
69:7 73:13
75:5,6,15,
16,17 81:25
82:3 84:22
88:12,14,25
89:16 90:1,
7,15 92:17,
24 94:3,15
95:10,14
96:8,23,24
97:2 100:9
101:6 104:6,
9,18,19
105:12
106:18
107:11,17
108:14,22
110:24
111:20
120:25
122:7,22
123:11
130:24 134:5
141:2 145:12
146:15
147:19
**spas**
96:13
140:22,23
**speak**
19:14 53:10,
11 60:25
**speaking**
102:4
**special**
19:24 104:5

**specialist**
111:9
**specialty**
82:7
**specific**
14:21 53:2
77:8 137:23
**specifically**
13:23,25
26:9 30:10,
16 34:22
95:9 105:4
107:10
111:17
134:15
**speculating**
131:13
**speculation**
131:11
**spelled**
48:11
**spelling**
48:10
**spend**
77:22,25
**spent**
77:11 114:10
**spoke**
53:14 92:9
100:12
**spoken**
16:24 17:1
27:12
**spring**
10:2,6
**SR**
144:3
**ST**
5:1
**staff**
53:1,17,22,
24
**stalking**
82:23
**stamp**
114:14

**stand**
108:5 113:13
**standards**
11:7
**standpoint**
82:10
**start**
69:23 134:18
143:3
**started**
66:14 86:8
92:16 135:20
136:20
146:12
**starting**
28:2 50:24
**state**
7:13 9:6,21
12:15,18
16:5,13,17,
20,22,23
17:4,25 20:5
23:16 24:4,
6,8,15,16
28:22 29:14
30:21 32:1
36:15 42:4
44:7,8 50:6
60:5 61:20
63:8,14,17
64:3,6,11,
18,19,23
65:6,22
67:6,9 68:15
69:25 77:4
79:11,16
86:7 100:8
101:14,19
102:16
103:13,19
105:25
109:12,13,15
113:11
116:23
118:3,25
119:2
124:19,21,22
127:3 130:4

131:3 134:6,
13,16 137:4
142:18
143:7,8
**stated**
61:16 109:8
124:8,18
134:14
**statement**
6:1 19:7
54:17 58:3
90:8 93:5
95:23 99:24
101:10,22
102:22 106:3
113:7,9,17
114:15
115:25 124:4
126:18,19
128:10
138:6,9,13
145:21 148:7
**statements**
37:9 111:24
**stating**
6:10 26:25
**station**
17:6
**statistics**
85:16
**status**
25:11
**statute**
68:16
**stay**
70:13,16
72:20
**stayed**
148:3
**staying**
69:11,14
108:9
**stenographer**
4:3 5:5 6:2
151:19
**step**
120:1

Lieutenant John Pedersen
July 19, 2021

steps
  119:14,19
  121:16
  128:14
Steve
  101:20,25
stick
  55:13
stop
  65:9 86:14
  107:4 125:8,
  11,13 143:2
stopped
  125:14
  126:24 129:6
store
  70:22 94:19
stored
  40:4
story
  9:15
street
  7:19 45:18
  69:12,17
strict
  90:24
Suavo
  5:20
subject
  83:15
subjects
  38:18
submission
  109:7,18
submitted
  42:2 80:8
  87:22 109:6
  112:25
  145:11
subordinates
  67:14
subsequent
  22:13
subsequently
  147:20
substantiate
  96:19

suggest
  83:6
suggesting
  39:14
suite
  113:18
suited
  93:9
summer
  10:14
super-
  31:7
superintenden
t
  11:13
supervise
  32:16 33:23
  34:5,6 36:7
  101:6 102:7
supervised
  34:8 35:20,
  21,23 36:2
supervising
  35:13 67:14,
  18
supervision
  29:12
supervisor
  10:9,24
  18:10 21:4
  22:15,18,23
  23:3,7,9,15
  27:18 29:11,
  19,23 30:1,
  3,24 31:6,7,
  22 32:25
  34:6,13
  35:11 41:20,
  23 44:21
  51:2,22
  52:6,9,17,
  19,22 67:13,
  24 68:9,10,
  11 82:11
  87:19,23
  103:3,17
  110:10

  111:19
supervisors
  23:6 27:1
  38:20
supervisory
  102:13
supplement
  41:13 45:19
  47:5,10
  49:23 52:5
  74:16 78:8
supplemental
  41:9 45:11,
  14,15,24
  46:3,15,24
  47:19 48:20
  49:19 50:25
  74:7,21,22
  76:2 93:6,25
  145:7,8
supplements
  41:10 45:22
  46:4 47:15
  48:19 106:14
support
  5:21,25 11:3
  65:20 68:23
  104:18
  116:16
supposed
  74:4,7
  146:13,16
suppress
  20:11 100:19
suppression
  42:16,22,24
  43:10,13
  120:21
Supreme
  6:7
sure
  7:16 8:22
  11:14 13:22
  15:14 17:7
  19:13 26:12
  30:18 32:4,8
  33:17 34:3,

  14,21 36:9,
  11 40:3,4,
  11,15 43:24
  55:21 61:2
  67:15 72:1,
  11 74:1,9
  76:7 80:9,12
  88:22 98:7
  110:15
  118:21
  122:12
  124:25 126:1
  128:6 130:3
  143:15 144:8
  148:19
  149:17
  150:22,24
surmised
  72:10
surreptitious
  4:12,13,14
  118:9 122:2
  127:15
  128:1,4
surveillance
  19:15,17,20
  20:21,22
  21:2 25:7
  32:5,13
  46:11,14,19
  47:19 60:15
  69:5,10,23
  71:20 74:2,
  6,8,14,15,
  19,22 91:4,7
  106:1,8,15
  107:4 108:5
  113:2,5,21
  114:7,11
  115:3,12,17
  116:19
  120:6,8
  121:9 122:7
  124:11
  127:16 134:4
  136:18
  138:19
  145:20

Lieutenant John Pedersen
July 19, 2021

146:20 147:1
148:6
**suspect**
26:2
**suspend**
127:9
**suspended**
124:12
**suspending**
126:3
**sustained**
83:18
**Sutherland**
111:9
**switched**
15:11
**Switching**
73:25
**sworn**
7:4 126:7
**synopsis**
103:24 133:5
**system**
13:10 14:8
17:14,15,20
41:3,17
44:3,12,24
87:16 132:4,
6

———————

**T**

**Tab**
28:4 30:9
32:2 36:22
54:9 55:2
100:16
108:22
132:15
**Taig**
5:19
**take**
8:15 12:7,
11,19,24
13:23 14:6,9
33:5,9,12
35:7 53:24

54:1,3,4
56:17 58:7,
10 63:6 76:9
103:12
107:15
112:18
119:14
127:18,19,
21,22
128:14,24
136:1 145:19
148:21
**taken**
5:16 11:15
12:9 15:20
53:22 58:17
90:15 93:20
119:20 120:1
121:16
127:17 129:7
**takes**
116:3
**taking**
13:13 14:2
55:15 57:18,
19,20 70:4
115:14,21
116:6,13
123:15
**talk**
8:5 60:17
112:19
150:18
**talked**
102:5
**talking**
31:16,17
47:7 68:7
73:7 96:14
102:11
103:15
109:10
139:11
**talks**
122:22
**tape**
65:9

**taped**
121:4
**targets**
124:13 126:4
**task**
9:11 19:19
20:3,6 59:2
73:24
**technical**
15:12 65:20
**technician**
5:20
**technologically**
125:13
**tell**
7:21 8:19
25:2 39:23
43:1 53:12
55:16 57:4
58:5 60:7
69:1 78:22
79:1 113:10
114:6,7
123:10
128:25
**telling**
40:8 125:13
**ten**
59:1
**term**
35:23 46:13
**terms**
8:20 16:13
26:6 31:2
35:18 46:1
65:17 71:20
77:2 87:11
**testified**
7:4 20:12
37:17 135:13
**testify**
83:6
**testimony**
100:18 114:3
120:15,20
131:6,7

**Texas**
111:16
**Thank**
40:14 45:13
151:13,24
**themself**
34:7
**thing**
49:2 76:23
146:11
**things**
39:4 56:21
61:2 71:13
84:14
**think**
9:17 15:17
17:12 46:23
71:14,15
77:14 79:19
84:8 92:13
93:9,14,23
96:17,18
98:13 112:23
115:8 117:11
122:16
130:16
132:13
144:21
147:14
**third**
114:15,17
124:4 136:8
**thought**
18:14 47:25
93:3
**threaten**
87:5
**threatening**
57:1,24
**three**
34:18 39:4,8
43:4 53:19
92:8 93:13
100:1 114:3
**three-and-a-half-hour**
92:7,8

**tidbit**
110:10
**time**
5:17,24 9:12
15:17 18:22
20:24,25
29:6,23
34:20 35:24
41:7 42:7,
15,16,17,22
43:17 44:23
48:16 49:15
50:7 52:7
55:5,18 56:3
58:11 60:14
70:24 77:22,
25 78:4 81:2
82:21 83:9
84:9,10,25
91:15 96:14,
20 99:18
103:9,25
107:12,22
108:1 110:22
112:19
114:12
115:17
116:8,11
117:14
125:9,15
126:3,20,24
128:25
129:23
133:23
134:21 138:7
142:24 143:8
147:16
151:24
**times**
24:22 25:1
45:10 53:19
65:19 90:22
104:10
105:13 107:2
113:16
116:24
117:2,4,9
124:21,24

125:4,5
135:1 142:13
**tips**
72:18
**title**
50:15 52:15
**to-do**
54:2
**today**
5:16 19:6
64:13
**told**
13:3 61:2,3,
7 62:17
67:11 79:1,4
92:15,23,25
102:20 103:6
109:20
117:22,25
126:11,16,18
127:8 128:8
131:16 132:3
139:21,22
**Toole**
14:7 55:22
56:2,3
**top**
97:19 124:4
143:17
**topic**
85:22
**total**
46:23 73:11,
12 84:14
145:18
**totally**
59:2 144:11
**town**
45:16 53:21
**track**
75:9 77:15
**trafficking**
12:8,12,15,
20 13:18
16:8 18:25
19:3,12
54:22 56:7,

12,17,20
57:7,9,13,15
58:2 68:23
69:2,3
72:17,23
73:3,9
79:11,16
81:13,17,22
82:15,16
85:23,25
86:9,10,11,
17,18,25
87:2,3 92:3,
23 93:19
96:9 108:7
112:3 134:10
136:13 137:8
**training**
8:6 9:4
10:13,14
12:23 13:2,
10,11 14:2,7
18:25 19:12,
13,16,25
28:25 29:17
79:10,20
80:23,24
81:20,22
**transcripts**
37:9
**transfer**
11:5 80:8,14
**transferred**
8:1 10:22
12:1 23:18
80:20 81:3
83:24 84:1
**translated**
75:15 76:5
**transmission**
70:1
**Tri-county**
9:10 19:18
20:2
**trickled**
50:2
**trips**
140:19

**true**
71:8 117:20
131:1,8
**trusted**
36:19
**truth**
79:1 102:22
**try**
40:5 43:3
54:19 59:12
65:12,15
142:20 148:2
**trying**
25:9 39:4
43:23 51:14
61:3 77:14
84:8 107:15
141:12
**turn**
45:5 60:20
61:8 65:16
66:10 95:22
125:8 131:22
132:1 150:17
**turned**
42:4 44:14,
23 45:6,7
49:3 66:9
132:1
149:10,12,18
150:7
**twice**
108:17
129:16,21
**two**
9:17 12:24
13:2 17:12
19:13 42:14
50:25 66:19
68:16 82:4
91:25 93:25
102:11
104:9,11
105:12,14
107:10 121:7
129:18,22,23
140:22

Lieutenant John Pedersen
July 19, 2021

type
  13:11 25:13
  45:11 48:9
  115:19
  123:12
typed
  137:12 146:8
types
  10:13 37:7
typing
  66:14 134:18
  135:20 143:3
typo
  112:5 138:4

**U**

U.S.
  5:21,25
  25:11 26:4
  57:20
UCR
  85:10
Uh-huh
  14:17 22:10
  31:11 36:9
  74:3 101:17
  102:6 105:1
  123:1 141:3
unauthorized
  60:13
unaware
  27:16
unclear
  115:16
undercover
  32:5,14 33:6
  104:9,10
  105:12,13
understand
  7:15 8:9
  14:3,11,14
  19:10 43:7
  62:23,25
  92:19 107:18
  113:13
  116:15

121:14 127:6
129:24 132:5
136:16
understanding
  44:25 56:15
  59:9,10 69:1
  83:7 86:16
  131:4,5
  135:15
understood
  8:11 30:5
uniform
  85:15
unincorporate
d
  55:25
unit
  18:3 23:9
  30:2 44:21,
  24 68:9
  80:10 82:4
  84:8 97:11
  103:4,17
  104:5 151:8
University
  8:2
unlawful
  119:15,21
  121:18
  128:15,20
unlocked
  71:25 72:6
upstairs
  79:8
username
  61:12
UTC
  5:17 151:24
utilized
  66:25

**V**

vacancy
  84:9
vacation
  78:3 98:24

various
  24:22
vary
  115:21
Vaughn
  145:13
VBPD
  4:7,8,16,17
  28:6 50:11
  105:3 134:7
  143:12
  148:14
VCR
  65:8
vehicle
  69:21,25
  70:1
verbal
  57:18
verbalize
  133:22
verified
  41:17 48:13
  87:19
verify
  41:23
Vero
  5:19 7:18,20
  9:18 10:15,
  20 12:10,20
  16:6 19:2
  22:4 24:14,
  19 29:6 45:1
  50:16 54:12,
  22 55:24,25
  56:1,7 68:22
  81:8,9 84:15
  87:4 96:13
  99:5,11
  104:4 105:3
  120:24
  127:11 135:3
  136:10 137:5
  147:7 149:2
vertically
  97:19

victim
  72:17,23
  73:9 87:2,3
  92:3,23
  93:19
victim's
  92:9
victims
  16:8 86:18
  134:10 137:8
video
  5:7,20 14:16
  61:14,17
  65:1 88:11
  94:2 106:1,
  7,12,25
  113:2,5,20
  115:12,16
  116:19
  120:6,8,22
  121:9 122:6
  124:10
  133:15
  151:23
video-
recorded
  5:15
VIDEOGRAPHER
  5:7 15:18,22
  58:15,19
  129:5,9
  151:21,23
videos
  17:19 88:13
  90:14
videotaped
  120:22
videotaping
  128:19
Vien
  55:19
view
  62:19 66:1
  97:19 98:12
  106:3,25
  108:11
  117:1,25

Lieutenant John Pedersen
July 19, 2021

viewed
  89:1,21
  119:23
  126:25 146:8
viewing
  91:2 116:23
  117:12
violation
  83:17
violations
  104:19
Virginia
  10:17,18
visa
  25:12,13
visit
  104:9 105:12
visited
  113:4
visual
  115:3
voice
  75:13
voluntarily
  14:9
voluntary
  57:9

_____

        W

_____

waiting
  114:17
walk
  69:16 71:2,
  4,7,11 86:18
  114:12
walked
  72:1
walking
  69:11
wall
  77:1
walls
  111:1
want
  7:14 8:6

28:13,17
30:8,14
32:2,9 36:25
40:1 45:12
49:12 57:12
63:19 75:21
79:3 84:12
85:21 88:20
89:7,9 92:25
93:12 96:4
112:18
113:13 121:1
130:16 144:7
150:18,25
151:18
wanted
  9:13,19 11:5
  36:10 38:24
  80:14 81:8
  107:24
  108:21 146:2
warrant
  21:10,12,15,
  19,21,24
  22:17 23:3,
  15 30:15,22,
  23 31:3,9,
  13,15,16,19
  32:19 34:23
  35:3,5,7,8,
  19 41:10
  59:6,15
  62:22 66:22,
  25 67:2 68:3
  102:12
  108:23 115:3
  116:4,17
  117:20
  118:24
  141:19,23,25
  145:11 149:3
warranted
  88:10
warrants
  22:9,13,16,
  23 23:23,25
  30:10 36:18,
  19 58:22

59:3,20 60:4
64:24 66:15
67:21,22
68:13 102:8
103:5,7
watch
  62:18 63:5,6
  117:1 124:24
watched
  38:11 62:16
watching
  14:19 67:8
  91:1 125:21,
  23
Waterloo
  20:4
way
  19:6,9 27:8
  31:5 61:8
  73:6 76:9
  77:20 90:8
  113:6,15
  118:3 120:3
  125:14 127:9
  139:10
ways
  106:21
Wednesday
  53:18
Wednesdays
  53:2
week
  17:9 53:19
  66:18
weekly
  17:6 53:4
weeks
  9:17 17:12
went
  8:24 10:18
  27:14 36:15
  39:20 40:5
  50:4 62:14
  65:1,2 70:2
  79:8,15,20
  84:11 91:7
  95:20 101:13

103:19 108:6
110:23 120:8
123:11
136:22
146:20,22
west
  69:24,25
  94:23 149:1,
  7,8,21,23
whatnot
  80:25
whatsoever
  37:17 81:12
  119:19
wife
  9:14
Wilson
  101:21,25
Winter
  140:23
wire
  59:16,20,22,
  23 60:1,8
  136:24 138:2
withhold
  87:6
withholding
  57:3
withstanding
  51:9
witness
  3:2,8 5:4
  7:3 15:14
  45:19 51:15
  58:6,12
  76:12 88:22
  89:6 93:3
  94:9 97:20
  124:23
  127:18,23
  129:3 132:11
  147:15
  151:14,18
woman
  94:17 139:10
women
  73:16 77:2

Lieutenant John Pedersen
July 19, 2021

86:16 88:13
89:2,13,17
90:1,2 94:18
104:11
105:14
113:19
138:11

**word**
57:11 63:21
137:14

**words**
14:19 20:17
23:24 39:11
44:11 63:11
77:10 92:17
120:2 131:23
137:13
146:14

**work**
8:20 25:12
56:24 59:11
64:1 67:13
71:19 77:19
82:8,9,18
85:18

**work-related**
8:5

**worked**
8:24 9:7,10
18:13 20:5
33:7 64:5
73:16 81:9
85:1,2,4
86:13 91:7

**worker**
70:4

**worker-type**
94:20

**working**
20:24 35:24
57:2 60:12
61:1 73:13,
24 75:14
77:2 82:18
86:1,8 87:4
88:14 89:3,
14,17 92:17
104:11

105:14
107:11 112:2
140:8 142:20
147:23,25

**works**
86:20,21

**write**
41:14 46:3
74:7,13,16
136:15

**writes**
46:1

**writing**
27:2,4,6,22,
24 41:18

**written**
26:8,11 31:5
37:8,9,17,
19,21,24
46:4,10,18
49:18 58:24
63:24 67:17
78:8 80:23
106:14 139:3
146:8

**wrong**
48:12 118:2
132:13

**wrote**
46:15 74:22
76:2,3,24
137:9 146:20

---

**Y**

---

**Yan's**
140:24

**yeah**
8:7 40:18
57:22 67:5
68:15 70:21
72:25 80:12
85:12 95:24
97:7 98:21
100:14
101:11,24
102:19

103:16 104:7
107:2 114:21
115:8 122:24
123:5,9
127:21 133:7
135:24
140:25
148:23
150:12 151:5

**year**
9:10 11:5,
17,18 85:21
151:10

**years**
8:17 9:16,17
10:8 12:2,4,
5,11,24 13:2
19:13 25:24
36:19 39:4,8
43:4 46:22
54:15 59:24
73:19 93:8,
25 100:1

**Yong**
140:24

**York**
87:1 111:16
112:7

**Youtube**
39:20,22

---

**Z**

---

**Z-U-L-L-O**
122:21

**Zhang**
140:24

**Zullo**
122:21
123:2,11,24
135:24
150:15