STATE OF FLORIDA vs. ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ETC.   DCA CASE NO. 4D19-1655, ET AL

Filing # 92852289 E-Filed 07/19/2019 02:36:41 PM

Page 1

IN THE CIRCUIT COURT OF THE
NINETEENTH JUDICIAL CIRCUIT
IN AND FOR INDIAN RIVER COUNTY
STATE OF FLORIDA

VOLUME I OF II

STATE OF FLORIDA,

  Plaintiff,

vs.

| | |
|---|---|
| JOVANY AGUILERA | CASE NO.: 3119MM393A |
| MOHAMMED TURKI ALHARBI | CASE NO.: 3119MM404A |
| FUAD S. ALJADAANI | CASE NO.: 3119MM572A |
| GARRETT M. ALLEN | CASE NO.: 3119MM561A |
| JOSEPH R. ANGLESANO | CASE NO.: 3119MM366A |
| GREGORY ARNONE | CASE NO.: 3119MM367A |
| JUSTIN L. BAUER | CASE NO.: 3119MM421A |
| DAVID RAY BLACK | CASE NO.: 3119MM350A |
| JON BROECKER | CASE NO.: 3119MM353A |
| DONALD SCOTT BROWN | CASE NO.: 3119MM355A |
| PATRICK VINCENT BROWN | CASE NO.: 3119MM392A |
| PAUL DENNIS BROWNING | CASE NO.: 3119MM357A |
| SCOTT BUESCHER | CASE NO.: 3119MM369A |
| VANDERLEI CASTRO | CASE NO.: 3119MM432A |
| WILLIAM ERVIN CHANCELLOR | CASE NO.: 3119MM436A |
| JEFFREY CHANDLER | CASE NO.: 3119MM480A |
| DAVID CLARK | CASE NO.: 3119MM368A |
| KEVIN COYNE | CASE NO.: 3119MM372A |
| JOHN CRAIN | CASE NO.: 3119MM371A |
| LOUIS R. CROOK | CASE NO.: 3119MM417A |
| FRANK DE LISI | CASE NO.: 3119MM397A |
| CLAUDIO DE OLIVEIRA | CASE NO.: 3119MM387A |
| OTTAVIO FRANCESO DIDOMENCIO | CASE NO.: 3119MM379A |
| WALTER L. DIXON, II | CASE NO.: 3119MM445A |
| ISIAH DRISDOM | CASE NO.: 3119MM330A |
| MANUEL ESQUIVEL | CASE NO.: 3119MM422A |
| WILLIAM ESTES | CASE NO.: 3119MM399A |
| WILLIAM ESTES, JR. | CASE NO.: 3119MM395A |
| JON FOREST | CASE NO.: 3119MM385A |
| ROBERT FREELS | CASE NO.: 3119MM328A |
| ROMAN GAMEZ | CASE NO.: 3119MM389A |
| STEPHEN GEARY | CASE NO.: 3119MM337A |
| VITO C. GIOIA | CASE NO.: 3119MM412A |
| RICHARD GOLLILNGE | CASE NO.: 3119MM406A |
| MICHAEL GRIGGS | CASE NO.: 3119MM420A |

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 141

STATE OF FLORIDA vs. ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ETC.    DCA CASE NO. 4D19-1655, ET AL

```
                                                               Page 2

 1   CARL GUIDICE, JR.             CASE NO.: 3119MM334A
     NEAL ALLEN HAGER             CASE NO.: 3119MM449A
 2   MARK D. HASSETT              CASE NO.: 3119MM333A
     DAVID F. HEALY               CASE NO.: 3119MM348A
 3   JOSEPH E. HENDRICKS, JR.     CASE NO.: 3119MM405A
     RANDY HINES                  CASE NO.: 3119MM560A
 4   MICHAEL W. HUCKS             CASE NO.: 3119MM410A
     JOSEF JORG                   CASE NO.: 3119MM345A
 5   HARRY RICHARD KAPLAN         CASE NO.: 3119MM343A
     HAROLD E. KEMP               CASE NO.: 3119MM342A
 6   LOUIS G. KIRBY               CASE NO.: 3119MM339A
     MARK LOUIS KIRK              CASE NO.: 3119MM438A
 7   JOHN DAVID KOSTYLA           CASE NO.: 3119MM336A
     KEVIN LAPHAM                 CASE NO.: 3119MM384A
 8   SHUN LEE                     CASE NO.: 3119MM402A
     ALAN LHOTA                   CASE NO.: 3119MM394A
 9   RONG LI                      CASE NO.: 3119MM398A
     JAMES LUNDEEN                CASE NO.: 3119MM391A
10   KENNETH M. MAKSYM            CASE NO.: 3119MM373A
     JAMES MARCIL                 CASE NO.: 3119MM426A
11   GERARD MAZZA                 CASE NO.: 3119MM424A
     CLEMENT MCBRIDE              CASE NO.: 3119MM419A
12   PETER MCBRIDE                CASE NO.: 3119MM415A
     CLARENCE MCCLAIN             CASE NO.: 3119MM409A
13   JOHN MCCULLEY                CASE NO.: 3119MM451A
     TERRY ALFRED MERWIN          CASE NO.: 3119MM354A
14   BARRY MILLS                  CASE NO.: 3119MM428A
     JOSEPH RAY MOYER             CASE NO.: 3119MM484A
15   BRIAN K. OLAISEN             CASE NO.: 3119MM411A
     ADAM READ PALMA              CASE NO.: 3119MM413A
16   JONATHAN PESHKE              CASE NO.: 3119MM358A
     KENNETH PHILLIPS, JR.        CASE NO.: 3119MM407A
17   NEIL POWERS                  CASE NO.: 3119MM378A
     BRUCE PURPLE                 CASE NO.: 3119MM490A
18   ANTHONY RANDAZZO             CASE NO.: 3119MM433A
     GREGORY ALAN READER          CASE NO.: 3119MM376A
19   BILL MICHAEL RIZKALLAH       CASE NO.: 3119MM562A
     PAUL A. RODLIFF              CASE NO.: 3119MM554A
20   CONNER THOMAS RUF            CASE NO.: 3119MM556A
     SHAWN ROBERT RYAN            CASE NO.: 3119MM338A
21   WILLIAM SAUNDERS             CASE NO.: 3119MM388A
     MICHAEL SEARS                CASE NO.: 3119MM441A
22   MARK PATRICK SPERO           CASE NO.: 3119MM383A
     KEITH ALLAN TAIG             CASE NO.: 3119MM365A
23   JOHN W. TAYLOR               CASE NO.: 3119MM447A
     SCOTT L. TAYLOR              CASE NO.: 3119MM359A
24   LUIS R. VEGA                 CASE NO.: 3119MM352A
     GEORGE TIMOTHY WARD          CASE NO.: 3119MM361A
25   CHARLES WATERHOUSE           CASE NO.: 3119MM454A
```

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 142

Page 3

```
 1   HANS WEDE                     CASE NO.: 3119MM459A
     KENNETH WESSELL               CASE NO.: 3119MM347A
 2   JAMES L. WEST                 CASE NO.: 3119MM340A
     BRUCE JAMES WICKERS           CASE NO.: 3119MM335A
 3   DEANGILO LARAYE WILLIAMS      CASE NO.: 3119MM400A
     MARK YOUSSEF                  CASE NO.: 3119MM363A
 4
       Defendants.
 5   _____/

 6

 7              TRANSCRIPT OF HEARING PROCEEDINGS

 8                    MOTION TO SUPPRESS

 9              THIS CAUSE came on for hearing before

10       the Honorable Nicole P. Menz, Judge of the

11       above court at the Indian River County

12       Courthouse, Vero Beach, Florida, on the 23rd

13       day of April, 2019.

14

15

16

17

18

19

20

21

22

23

24

25
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

```
                                                              Page 4

 1    THE APPEARANCES were as follows:
 2    FOR PLAINTIFF:    Office of the State Attorney
                        2000 16th Avenue
 3                      Vero Beach, Florida 32960
                        BY:  Steven R. Wilson, Esquire
 4                           Levering Evans, Esquire
                             Ryan L. Butler, Esquire
 5
      FOR DEFENDANT:    Adam Chrzan, Attorney at Law
 6                      1443 20th Street, Suite F
                        Vero Beach, Florida 32960
 7                      BY:  Adam Chrzan, Esquire
 8    FOR DEFENDANT:    The Law Offices Of David Golden, P.A.
                        903 SE Central Parkway
 9                      Stuart, Florida 34994
                        BY: David Golden, Esquire
10
      FOR DEFENDANT:    Law Office of Bobby Guttridge
11                      1601 20th Street
                        Vero Beach, Florida 32960
12                      BY:  Bobby D. Guttridge, Esquire
13    FOR DEFENDANT:    Thomas A. Kennedy, P.A.
                        1426 21st Street
14                      Vero Beach, Florida 32960
                        BY:  Thomas A. Kennedy, Esquire
15
      FOR DEFENDANT:    The Kessler Law Firm
16                      101 North US Highway 1, Suite 200
                        Fort Pierce, Florida 34950
17                      BY:  Michael J. Kessler, Esquire
18    FOR DEFENDANT:    Kibbey Wagner
                        416 Camden Avenue
19                      Stuart, Florida 34994
                        BY:  Richard Kibbey, Esquire
20
      FOR DEFENDANT:    Margaret Keys McCain, P.A.
21                      1605 19th Place
                        Vero Beach, Florida 32960
22                      BY:  Margaret K. McCain, Esquire
23    FOR DEFENDANT:    Wayne R. McDonough, P.A.
                        1901 25th Street
24                      Vero Beach, Florida 32960
                        BY:  Wayne R. McDonough, Esquire
25
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 144

STATE OF FLORIDA vs. ROBERT FREEUS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL   DCA CASE NO. 4D19-1655, ET AL

```
                                                              Page 5
 1

 2   FOR DEFENDANT:    Green & Metcalf, P.A.
                       1245 20th Street
 3                     Vero Beach, Florida 32960
                       BY:  Andrew B. Metcalf, Esquire
 4
     FOR DEFENDANT:    Law Office of Edward J. Mosher, P.A.
 5                     210 South Depot Drive
                       Fort Pierce, Florida 34950
 6                     BY:  Edward J. Mosher, Esquire

 7   FOR DEFENDANT:    Ohle & Ohle
                       423 Delaware Avenue
 8                     Fort Pierce, Florida 34950
                       BY:  Michael R. Ohle, Esquire
 9
     FOR DEFENDANT:    John H. Power, Attorney at Law
10                     2182 Ponce De Leon Circle
                       Vero Beach, Florida 32960
11                     BY:  John H. Power, Esquire

12   FOR DEFENDANT:    Sercombe Law
                       601 21st Street, Suite 300
13                     Vero Beach, Florida 32960
                       BY:  Daniel Sercombe, Esquire
14
     FOR DEFENDANT:    Stone & Stone
15                     1964 14th Avenue
                       Vero Beach, Florida 32960
16                     BY:  Robert E. Stone, Esquire

17   FOR DEFENDANT:    Law Office Kenneth N. Weaver
                       2285 West Eau Gallie Boulevard
18                     Melbourne, Florida 32935
                       BY:  Kenneth N. Weaver, Esquire
19
     FOR DEFENDANT:    Steve Ziskinder Law Office, P.A.
20                     311 S 2nd Street, Suite 102B
                       Fort Pierce, Florida 34950
21                     BY:  Steve Ziskinder, Esquire

22

23

24

25
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

STATE OF FLORIDA VS. ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ETC.   DCA CASE NO. 4D19-1655, ET AL

```
                                                           Page 6
 1                      I N D E X
 2   VOLUME I.......................................Page 1
 3   WITNESS
 4    KEITH TAIG
       Direct Examination by Mr. Metcalf............Page 17
 5
     OFFICER SEAN CROWLEY
 6     Direct Examination by Mr. Metcalf............Page 29
       Cross-Examination by Mr. Ziskinder...........Page 88
 7     Cross-Examination by Mr. Sercombe............Page 89
       Cross-Examination by Mr. Golden..............Page 90
 8     Cross-Examination by Mr. Kennedy.............Page 91
       Cross-Examination by Mr. Kibbey..............Page 94
 9     Cross-Examination by Mr. Butler..............Page 97
       Redirect Examination by Mr. Metcalf..........Page 102
10
     VOLUME II.....................................Page 106
11
     JOHN PEDERSEN
12     Direct Examination by Mr. Metcalf............Page 125
13   CHIP BROCK
       Direct Examination by Mr. Metcalf............Page 128
14     Cross-Examination by Mr. Guttridge...........Page 140
       Redirect Examination by Mr. Metcalf..........Page 142
15
     CARLA SUTHERLAND
16     Direct Examination by Mr. Metcalf............Page 144
17   KYLE EDER
       Direct Examination by Mr. Metcalf............Page 148
18     Cross-Examination by Mrs. McCain.............Page 155
       Cross-Examination by Mr. Sercombe............Page 157
19     Cross-Examination by Mr. Golden..............Page 158
       Cross-Examination by Mr. Chrzan..............Page 161
20     Cross-Examination by Mr. Golden..............Page 162
       Cross-Examination by Mr. Kessler.............Page 163
21
     MICHAEL GASBARRINI
22     Direct Examination by Mr. Metcalf............Page 165
       Cross-Examination by Mr. Guttridge...........Page 184
23     Cross-Examination by Mr. Kennedy.............Page 186
       Cross-Examination by Mr. Chrzan..............Page 190
24
     CERTIFICATE OF REPORTER......................Page 105
25                                                 Page 218
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 146

```
                                                           Page 7

 1

 2

 3                  EXHIBITS ADMITTED INTO EVIDENCE

 4    Defendant's Exhibit No. 1.......................Page 36
      Defendant's Exhibit No. 2.......................Page 36
 5    Defendant's Exhibit No. 3.......................Page 36
      Defendant's Exhibit No. 4.......................Page 36
 6    Defendant's Exhibit No. 5.......................Page 41
      Defendant's Exhibit No. 6.......................Page 97
 7    Defendant's Exhibit No. 7.......................Page 97

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 8

1      (Thereupon, the above-entitled hearing was held on

2    April 23, 2019 at 8:30 a.m.)

3          THE COURT:  Good morning.  For purposes of

4    organization what I need to do is I need to go through each

5    of the lawyers.  I am going to have you all state your

6    clients.  And if you have case numbers for purposes of the

7    record, it would be very helpful to the clerk.  Mr. Metcalf,

8    we will accommodate you, sir.

9          MR. METCALF:  Thank you.

10          THE COURT:  So I have a list, but I think there

11    have been several add-ons since 5:00 yesterday.  So we will

12    have to update everybody's list.  First of all, let's start

13    with Mr. Golden.

14          MR. GOLDEN:  Good morning.  Mark Kirk is 2019-438.

15          THE COURT:  Mark Kirk?

16          MR. GOLDEN:  Yes, ma'am, K-I-R-K.  There is Carl

17    Guidice, 2019-334.  Walter Dixon is 2019-445.  Jeff Chandler

18    is 2019-480.

19          THE COURT:  Mr. Golden, I did review the motion

20    to suppress that you filed in each of those cases.  It

21    appears to mirror that of Mr. Metcalf's.

22          MR. GOLDEN:  Yes, ma'am.

23          THE COURT:  Was there anything additional specific

24    to your client that was not included in Mr. Metcalf's?  I

25    did not see anything, but for purposes of how we are going

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

Page 9

1    to proceed today I wanted to know.

2            MR. GOLDEN:  I appreciate you asking.  No, ma'am.

3            THE COURT:  Thank you, sir.  Mr. Guttridge?

4            MR. GUTTRIDGE:  Yes, ma'am.  Mahammed Alharbi,

5    Case No. 2019MM404.  Aljadaani which is 2019MM572.  Donald

6    Brown, 2019MM355.  William Estes, Jr. and there is a William

7    Estes.  William Estes, Jr. is Case No. 2019MM395.  Michael

8    Hinshaw is -- we are not doing the sheriff's cases, just the

9    Vero Beach cases?

10           THE COURT:  Right.

11           MR. GUTTRIDGE:  Barry Mills, 2019MM428.  John

12   Taylor 2019MM447.  William DeAngilo, 2019MM400.  That is it.

13           THE COURT:  Mr. Guttridge, did you just file the

14   motion to adopt Mr. Metcalf's with just that brief factual

15   summary?  You didn't file a separate motion to suppress?

16           MR. GUTTRIDGE:  We filed a motion adopting his

17   motion in its entirety without additions or deletions.  The

18   motion includes his motion in our motion.  We don't have any

19   other issues, your Honor, other than the issues that were

20   raised.

21           THE COURT:  Thank you.  Mr. Kennedy?

22           MR. KENNEDY:  Just one, Josef Jorj 2019MM345.

23           THE COURT:  Mr. Kennedy, you also just filed a

24   motion adopting Mr. Metcalf's.  Correct?

25           MR. KENNEDY:  Correct.

Page 10

1          THE COURT:  Mr. Kessler?

2          MR. KESSLER:  Good morning, Judge.  Judge, I have

3   Mark Hassett, H-A-S-S-E-T-T, 2019MM333.  I join Mr.

4   Metcalf's motion.

5          THE COURT:  Mrs. McCain?

6          MRS. MCCAIN:  Yes, your Honor.  I am representing

7   David Kostyla, he is No. 312019MM00336.  Judge, I did file

8   an earlier motion.  I have not had the opportunity to adopt

9   Mr. Metcalf's recent motion.  So I would make an ore tenus

10  motion to adopt his motion in its entirety.

11         THE COURT:  Mr. Kirschner?  He is not here.  Mr.

12  Metcalf, we will save you for the end.  Mr. Mosher?

13         MR. MOSHER:  Good morning, your Honor.  I am

14  present on behalf of Isaiah Drisdom, 2019MM330.  Present on

15  behalf of Stephen Geary, 2019MM337.  Present on behalf of

16  James Marcil, 2019MM426.  And Joseph Moyer, 2019-484.  And I

17  adopted Mr. Metcalf's motion in its entirety.

18         THE COURT:  You also filed a separate motion to

19  suppress in the each of those, but it references the

20  sheriff's office in every single one of these.  The motion

21  that you filed in each of those of four you just --

22         MR. MOSHER:  It must have been an error.  I

23  apologize.  They are all Vero Beach cases.

24         THE COURT:  So the motion that you specifically

25  filed I should ignore?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 150

Page 11

```
 1          MR. MOSHER:  Yes.

 2          THE COURT:  And you will adopt Mr. Metcalf's?

 3          MR. MOSHER:  Yes.

 4          THE COURT:  Mr. Ohle?

 5          MR. OHLE:  Good morning, your Honor.  William

 6  Estes, 2019MM399.  Kevin Lapham, 2019MM384.  And last I have

 7  Peter McBride which is 2019MM415.  And I adopt Mr. Metcalf's

 8  motion.

 9          THE COURT:  Thank you.  Mr. Power?

10          MR. POWER:  I don't have the case numbers with me,

11  Judge, but I can give you names.  Bill Rizkallah, Ken

12  Phillips, Bruce Purple, Neil Powers, and James Lundeen.  I

13  have adopted the motion.

14          THE COURT:  Mr. Sercombe?

15          MR. SERCOMBE:  Yes, your Honor.  Congratulations.

16          THE COURT:  Thank you.

17          MR. SERCOMBE:  Your Honor, I have Mr. Anglesano,

18  2019MM000366.  I have adopted Mr. Metcalf's motion.

19  However, one thing that is different I think with my case is

20  there is audio of my client.  And I would also additionally

21  ask you to suppress that.

22          THE COURT:  Did you file a separate motion?

23          MR. SERCOMBE:  I didn't, your Honor.

24          THE COURT:  You did not?

25          MR. SERCOMBE:  No.  I only joined at the late
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

Page 12

1    hour.

2              THE COURT:  Do you also have Louis Kirby?

3              MR. SERCOMBE:  Yes, your Honor.  2019MM000339,

4    your Honor.

5              THE COURT:  Mr. Stone?

6              MR. STONE:  Good morning, your Honor.  I have the

7    first page Mr. Richard Gollinge in the case of 2019-406.

8    Harry Kaplan, 2019-343.  Harold Kemp, 2019-342.  That may be

9    the sheriff's department.

10             THE COURT:  I have a Jovany Aguilera.

11             MR. STONE:  I think that is a sheriff's department

12   case.  I did have one other, Judge.  Harold Kemp, Harry

13   Kaplan, Mr. Gollinge.

14             THE COURT:  Jovany Aguilera is Vero Beach.  So

15   that might be the one you are thinking of.

16             MR. STONE:  Okay, Jovany Aguilera.  I thought that

17   was the sheriff's department.  I do have one sheriff's

18   department case.  I think that is it.

19             THE COURT:  Okay, thank you.  Kenneth Weaver, Mr.

20   Weaver?  Mr. Ziskinder?

21             MR. METCALF:  Judge, he is here.  I think he might

22   be in front of Judge Vaughn.

23             THE COURT:  Mr. Kibbey, did you join?

24             MR. KIBBEY:  Yes, your Honor.  Mr. Metcalf and I

25   are cocounsel on Mr. Youssef's case.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 13

1          MR. STONE:  Your Honor, I forgot.  I join in Mr.

2     Metcalf's motions.

3          THE COURT:  Okay.  And Mr. Chrzan, do you have a

4     motion pending?

5          MR. CHRZAN:  Just observing, Judge.

6          THE COURT:  Is there anyone --

7          MALE ATTORNEY:  Judge, I am also co-counsel in Mr.

8     Youssef's case with Mr. Metcalf and Mr. Kibbey.

9          THE COURT:  Mr. Metcalf, do you have your list of

10    all of your clients in front of you?

11         MR. METCALF:  I don't, Judge.

12         THE COURT:  I do have a list.  I will rattle them

13    all off.  Will you let me know if you think I have missed

14    somebody?

15         MR. METCALF:  Yes.

16         THE COURT:  Gregory Arnone, Justin Bauer, Paul

17    Browning, Castro Vanderlie, Claudio DeOliveria, Ottavio

18    Didomenico, Jon Forest, Robert Freels, Roman Gomez, Vito

19    Gioia, David Healy, Randy Hines, Alan Lhota, John McCulley,

20    Anthony Randazzo, Paul Rodliff, Keith Taig, Hans Wede,

21    Kenneth Wessel, Bruce Wickers and Mark Youssef?

22         MR. METCALF:  That sounds correct, your Honor.

23         THE COURT:  Did I miss anybody?

24         MR. GOLDEN:  There is one other gentleman set on

25    your document, Shun Lee, L-E-E.  I have a Case No. that was

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 14

1    a Vero Beach PD case that could certainly apply to the

2    motion, but it hasn't been filed because it was set before

3    you down the road.  It wasn't one of the cases originally.

4              THE COURT:  So it is a solicitation case, and it

5    is a Vero Beach Police Department?

6              MR. GOLDEN:  Yes, ma'am.

7              THE COURT:  Do you want ore tenus to adopt Mr.

8    Metcalf's motion for purposes of today to resolve it today?

9              MR. GOLDEN:  Yes, ma'am, I would, please.  It is

10   2019MM402 is the case number.

11             THE COURT:  State, did you all get that?  We are

12   going to add one on?

13             MR. GOLDEN:  Thank you.

14             THE COURT:  You are welcome.  Mr. Metcalf, this is

15   your motion.  I am imagining you are going to do the bulk of

16   the heavy lifting today.

17             MR. METCALF:  Judge, if I may, I provided the

18   State a Xerox of this.  It is a notebook that might help you

19   sort through all of this.  Your Honor, first, I would invoke

20   the rule of sequestration of the witnesses.

21             THE COURT:  If you have been subpoenaed as a

22   witness in this case, the rule of sequestration has been

23   invoked.  That means you do have to wait out in the hall

24   until you are called to testify.  You may not discuss your

25   testimony with anyone other than the lawyers.  So make sure

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

STATE OF FLORIDA vs. ROBERT FREELS, ET AL

L. T. CASE NO. 312019MM000328A, ET AL    DCA CASE NO. 4D19-1655, ET AL

Page 15

1    that you do not discuss your testimony while you are

2    waiting.  So if you have been subpoenaed as a witness to

3    testify at any point today, I would ask that you step out

4    into the hallway, please.

5           MR. METCALF:  Judge, with your permission, do you

6    mind if I sit during this?

7           THE COURT:  That is fine.

8           MR. METCALF:  I cant' really see.  Judge, I would

9    first like before we get too far into it, I would like

10   recognition that we have standing, that each defendant is an

11   aggrieved person with a right of privacy, a specific right

12   of privacy that has been invaded in this case by government

13   intrusion.  I assume the State has no objection to the

14   standing?

15          MR. BUTLER:  No, we do.  Standing has to be

16   proven.  Defense has the burden here.  State v. Setzler, 667

17   So. 2d 343.  It is a First DCA case from 1995 explains that

18   in the context of exception, the burden of standing is on

19   the defense.  And they have to either show that they were,

20   in fact, recorded or at least were the owners of the

21   premises where the recording took place.

22          So I know that some of the defendants in these

23   cases are claiming it is not them, it was mistaken identity.

24   I don't know which ones are claiming that and which ones

25   aren't, but we are not going to waive standing at this

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

STATE OF FLORIDA vs ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, 218    DCA CASE NO. 4D19-1655, ET AL

Page 16

1    point.

2            MR. METCALF:  Judge, I am happy to call at least

3    one client today just in case the State did that.  But I

4    would point out if the State, it seems as though they are

5    adopting 934 as analogous authority to do what they did

6    here.  Is that what I just heard, Mr. Butler?

7            MR. BUTLER:  No.

8            MR. METCALF:  He referenced the wiretap.  That is

9    all.  But, Judge, under 934, if that is the analogous

10   authority, then 934 specifically calls for a motion to

11   suppress by aggrieved persons.  I can establish that my

12   clients are aggrieved.

13           The State has alleged that each of them are in the

14   video, but I can call a witness or I can call all

15   twenty-four of my clients and have the Court at a later date

16   have you reserve on the issue of standing, but I can call

17   one just to go forward with today.

18           THE COURT:  Yes, sir.

19           MR. METCALF:  I call Keith Taig.

20           BAILIFF:  Up here, sir.

21           THE COURT:  Raise your right hand.  Do you swear

22   or affirm that the testimony you are about to give is the

23   truth, the whole truth and nothing but the truth?

24   AND THEREUPON,

25                         KEITH TAIG,

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 156

Page 17

1       Called as a witness on behalf of the Defendants

2       herein, after having been first duly sworn, was

3       examined and testified as follows:

4                    DIRECT EXAMINATION

5            THE WITNESS:  Yes, ma'am.

6            THE COURT:  Thank you, sir.  Have a seat.

7    BY MR. METCALF:

8       Q    Sir, can you state your name.

9       A    Keith tag.

10      Q    Where do you live, Mr. Taig?

11      A    6886 61st Street in Vero Beach, Florida.

12      Q    You have lived here in Vero for many years?

13      A    Twenty-five years.

14      Q    Did it come to pass that you visited a facility in

15   Vero Beach, in the City of Vero Beach called East Spa during

16   the month of either November or December of 2018?

17      A    Yes, sir.

18      Q    You have been charged in this case with

19   solicitation of prostitution; is that true?

20      A    Yes, sir.

21      Q    Have you had the chance to review a video

22   purporting to be you receiving a massage and sexual conduct

23   is portrayed on that video?

24      A    Have I seen it?

25      Q    Are you aware that the video exists?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

Page 18

1      A    Yes, sir.

2      Q    Do you dispute in any way that you visited East

3   Spa, and that you were engaged in a consensual sexual act in

4   East Spa?

5      A    I went there.  Yes.

6      Q    Did you have sex on a video?

7      A    Did I have sex?  What is the definition of sex?

8      Q    Intercourse or masturbation or in any way touched

9   by in a sexual manner by a spa employee?

10      A    Yes.

11      Q    You don't deny your identity of that being you on

12   that video.  Correct?

13      A    No.

14      Q    Was that a closed -- was it in a business, East

15   Spa?  Is that a business?

16      A    Yeah.  It was in a licensed owned therapeutic

17   massage building.

18      Q    Was the door closed when you were in the room?

19      A    Yes.

20      Q    Were there windows in that room?

21      A    No, sir.

22      Q    Was there anyone present other than you and the

23   employee of East Spa?

24      A    No.

25      Q    Did you anticipate that you would be recorded in

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 19

1   any way when you went into that facility?

2       A    No, sir.

3       Q    When you went into that facility, did you expect

4   to become unclothed as part of your massage?

5       A    Yes, sir.

6            MR. METCALF:  Your Honor, I have nothing further.

7            THE COURT:  State?

8            MR. BUTLER:  Judge, we would agree that would

9   establish standing.

10           THE COURT:  Okay.  Thank you, sir.

11           MR. METCALF:  Your Honor, I would certainly like

12  to proceed and ask the Court to reserve ruling as the

13  standing on each and every other defendant that has joined

14  into the motion today, if that is going to be the State's

15  stance.

16           THE COURT:  State?

17           MR. BUTLER:  Judge, I don't have any objection if

18  he is not prepared today to establish standing.  I think

19  there are other defendants here, though.  So if they are

20  here, I think we should go ahead and establish standing for

21  those who are present.

22           MR. METCALF:  I will do that on another day.  I

23  have got twenty-four other people to deal with.  I don't

24  think that is necessary today.

25           THE COURT:  We will reserve on that issue.  I will

STATE OF FLORIDA vs. ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ETAL   DCA CASE NO. 4D19-1655, ET AL

Page 20

1    do that on behalf of all of the defendants who have adopted

2    or have filed their own motion to suppress unless there is

3    other lawyers here that have their clients here and would

4    like to take care of that this morning.  Mr. Guttridge?

5             MR. GUTTRIDGE:  I don't, Judge, but are you going

6    to set a date or a procedure or we can do it by affidavit,

7    if the State is agreeable to that?

8             THE COURT:  Yes.  I thought I saw Mr. Ziskinder

9    walk in.  Mr. Ziskinder, for the record, will you tell me

10   the clients that you have, sir, and if you happen to have

11   their case numbers for the purposes of the motion?

12            MR. ZISKINDER:  Yes, your Honor.  One is Frank

13   DeLisi, D as in David, E-L-I-S-I.  The Case No. is

14   397MM2019.

15            THE COURT:  Okay.

16            MR. ZISKINDER:  The other one is Manuel Esquivel.

17   That is Case 2019-422-MM.

18            THE COURT:  Did you adopt Mr. Metcalf's or did you

19   file your own separate motion?

20            MR. ZISKINDER:  I filed a pleading adopting the

21   multi motions.

22            THE COURT:  Okay, great.

23            MR. ZISKINDER:  And I was up in Judge Vaughn's

24   courtroom, your Honor.

25            THE COURT:  No problem.  Thank you, sir.  Mr.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 21

1    McDonough, did you have a case this morning?

2              MR. MCDONOUGH:  Yes.  I join with the motion.

3              THE COURT:  Who is your client, sir?

4              MR. MCDONOUGH:  Mr. Crain, C as in Charlie,

5    C-R-A-I-N.

6              THE COURT:  And the first name?

7              MR. MCDONOUGH:  John Crain.

8              THE COURT:  Do you happen to have that case

9    number?

10             MR. MCDONOUGH:  Yes, ma'am, if I can get my

11   glasses.

12             THE COURT:  Sure.

13             MR. MCDONOUGH:  I actually do not have the file

14   with me, Judge.  I am sorry.

15             THE COURT:  Okay.  We will look it up, but you

16   filed a motion adopting Mr. Metcalf's?

17             MR. MCDONOUGH:  Yes, I joined in.

18             THE COURT:  Very good, thank you.  Go ahead, Mr.

19   Metcalf.

20             MR. METCALF:  Judge, just a way of brief opening,

21   this is kind of new frontier in that the government has gone

22   farther than I have ever seen it go in a misdemeanor case,

23   which all of our clients are charged with misdemeanors.

24             I look for precedent in the State of Florida and

25   was surprised that there was none.  On the other hand I am

Page 22

1    not surprised at all, Judge, because this just shocks the

2    conscience, in my view.  There is no more invasive

3    technique, investigatory technique that could ever be

4    employed than to go into a business where people have a

5    heightened right of privacy and surreptitiously install

6    cameras with a delayed notification on the warrant.  We call

7    them sneak-and-peek warrants.

8            Florida is not right with a lot of precedent on

9    that.  There is Federal precedent.  The Court I am sure is

10   going to be aware in Indian River County cases, I assume

11   that this office, the State Attorney's Office were involved

12   with both because they are in their jurisdiction.  They

13   actually cite Mesa-Ricon as the gold standard for the

14   issuance of these warrants which tracks Title 3

15   authorization.

16           Chapter 934 adopted Title 3 almost word for word,

17   your Honor.  So I assume that the authority they were going

18   to rely on today is Chapter 934, Mr. Butler did not yield

19   that.  So now I am at a loss to what authority they are

20   possibly looking at.  If they are not looking at 934, it

21   would appear that they are just making up the capability to

22   tape people.

23           Judge, before we get into whether the warrants --

24   you know, we don't deal with warrants in misdemeanor court

25   that often because they are misdemeanors.  But before we

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 162

Page 23

1  look at warrant reviews in general and what our burden is

2  and we look at Franks and Leon and Johnson and Jackson,

3  before we look any of that, we have to see what is their

4  authority to do what they did and what is the authority of

5  the Court to issue that kind of a warrant.

6       You can establish probable cause that a crime is

7  being committed and establish probable cause that you should

8  get a search warrant, but that doesn't mean you can order as

9  a Judge waterboarding to establish as part of the search.

10 You can't order something that is illegal.

11      So in this case, without governing authority, if

12 they were not adopting 934, if they are not adopting Title

13 3, what is their authorization to do what they did?  So I

14 find no Florida authority to allow surreptitious video

15 recording.

16      The other issue, your Honor, that we need to deal

17 with before we get into hours of testimony and a hearing is

18 who authorized this application.  934, your Honor, deals

19 with wiretap.  There are cases, and I have supplied in the

20 memorandum, your Honor, that tell us this deserves a higher

21 scrutiny.  That is what U.S. v. Mesa-Ricon stands for.  This

22 is more evasive than wiretap.

23      Men are going into a place that they don't expect

24 a camera to be.  They are being recorded.  And these people

25 knew, law enforcement knew, your Honor, that they were going

Case 9:21-cv-80391-RLR   Document 109-15   Entered on FLSD Docket 04/09/2022   Page 24 of 218

STATE OF FLORIDA vs. ROBERT KRAFT, ET AL
L. T. CASE NO. 312019MM000328A, 211A   DCA CASE NO. 4D19-1655, ET AL

Page 24

1    to be nude.  They knew they were going to be nude.

2            So in Mesa-Ricon, this was a business.  And the

3    Court applied a medium standard of privacy.  It was a

4    business with blacked out windows, and they were

5    investigating counterfeiting, but a man was caught at his

6    desk masturbating.  And they gave that a medium level of

7    privacy and established that other businesses could have a

8    higher.

9            Your Honor, they know going into this that people,

10   whether they are going in there for prostitution or regular

11   massage are going to get naked in a massage parlor.  I think

12   we can all agree to that.  You are going to get nude by

13   definition.  This is higher than Mesa-Ricon.  Mesa-Ricon

14   didn't even address anything higher than medium.

15           I know I am talking about cases that we haven't

16   gone through yet, but, Judge, we need to establish in 934

17   who authorized the warrant, the warrant application.  And

18   934 tells us that if it was not authorized by the State

19   Attorney, not assistants, not them looking at it, not them

20   saying this is okay, but the State Attorney, and it must

21   have been done in writing, then it is gone.  We don't go

22   another step further if that is the authority.

23           So this Court adopts 934 as analogous authority,

24   if they can't establish that Bruce Colton himself authorized

25   this warrant in writing pursuant to State v. Birs, pursuant

Page 25

1    to Copeland v. State, and I will give you the cites, Judge.

2    435 So. 2d 842 is Copeland.  For the record, 394 So. 2d 1054

3    is State v. Birs.  If they don't establish that it was in

4    writing by Bruce Colton, we don't go any further.  It is

5    over.

6            Your Honor, we next look at 933.08 and how it was

7    executed.  The affiant in this case is Sean Crowley.  Your

8    Honor, 933.08 and the Vargas case and the Morris case, and I

9    will give the Court a cite on that.  Morris is 622 So. 2d

10   67.  Vargas is 667 So. 2d 175 which is a Supreme Court case

11   in the State of Florida.

12           If Officer Crowley was not present in supervising

13   the installation of the cameras, under 933.08, those cases,

14   we are done.  It is over.

15           Next, your Honor, we must look at the order

16   itself.  Without disparaging Judge Cox at all, Courts are

17   not to be rubber stamped or quasi law enforcement officers

18   in issuance of warrants.  They are to look at applications

19   and they are to provide learned educated orders either

20   granting or not granting the authority to do what they are

21   asking to do.

22           Judge Cox issued an order that requires, that

23   allowed monitoring only.  There was no authorization to

24   record any of these men.  Specifically, she issued a ten-day

25   return, your Honor, where they were to come back, report

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 26

1    their doings to Judge Cox.  I would suppose at that point

2    Judge Cox could determine if recording was say going to be

3    authorized.  But they in their application, being Sean

4    Crowley, designates a difference between monitor and record.

5    They differentiate the two.

6            There are some cases out there, your Honor, that

7    deal with the fact that if you are allowed to monitor, then

8    you could record, but those are not in situations where

9    there is a right of privacy.  That is an officer wearing a

10   wire where he has been invited into a home.  We have

11   Article 1, section 23 establishing citizens of Florida the

12   right of privacy.  In that situation, Judge Cox found it

13   apropos to only give them monitoring.  She did not allow the

14   recording.

15           So I think the motion wins on those three issues

16   right now, your Honor, but we are prepared to go forward and

17   address Franks.  We are prepared to address Leon.  We are

18   prepared to address whatever authority, I am guessing 934,

19   but they seem not, but we are prepared to go forward on that

20   issue.

21           THE COURT:  State, what is your response to Mr.

22   Metcalf's assertion that under 934 it must have been

23   authorized by the State Attorney?

24           MR. BUTLER:  Chapter 934 governs the wiretaps.

25   This is not a wiretap.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 27

 1              MR. METCALF:  Judge, then I would ask what their

 2    authority to proceed with this warrant is?

 3              THE COURT:  State?

 4              MR. BUTLER:  The Fourth Amendment.

 5              THE COURT:  What about with regard to Statute

 6    933.08 the fact that Crowley must have been present during

 7    the installation?

 8              MR. BUTLER:  I thought we were going to hear some

 9    testimony on that, Judge.

10              THE COURT:  You are prepared to present that?

11              MR. BUTLER:  Well, it is their burden.

12              THE COURT:  All right, Mr. Metcalf.

13              MR. METCALF:  Your Honor, I would call Officer

14    Crowley.

15              Judge, I guess if they are not going under 934,

16    just to say the Fourth Amendment, I don't know that that

17    gets us anywhere because there is clearly analogous cases in

18    the Federal Court system that deal with video recording.

19    And if the Fourth Amendment, Article 1, section 12 adopts

20    the Fourth Amendment.  And the decisions of the United

21    States Supreme Court and the relative case law.

22              So Article 1, section 12 it is written in that, if

23    I am not mistaken, in that article that we are to look to

24    the Supreme Court and we are to look at Federal authority

25    when it comes to that and to the Fourth Amendment.  It has

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 167

Page 28

1    been interpreted in Federal Court, Judge.  This has been

2    dealt with.

3           So if they are looking in the Fourth Amendment and

4    Federal authority, we look at Mesa-Ricon.  And Mesa-Ricon

5    adopts Title 3 or Title 18 rather, Chapter 119, section 2510

6    through 2522.  It adopts them.  Florida has adopted those

7    under 934.  So there exists no possible other authority.

8    You can't say Fourth Amendment.  That is not going to fly

9    when you have Article 1, section 12.

10          So I believe, your Honor, it could potentially

11   save a lot of time, but I think the Court, I would ask the

12   Court with all due respect to make a ruling on that issue.

13          THE COURT:  I imagine that they are going to rely

14   on Mesa because they cite that in their applications for the

15   warrant.  So I am imagining that that is going to be the

16   foundation of their argument.

17          MR. METCALF:  It does not.

18          THE COURT:  Correct me if I am wrong, but I am

19   anticipating that is what it is you are going to argue.  And

20   I would imagine they are going to make that same argument

21   with regard to the Vero Beach Police Department as we

22   proceed.  I think that is what they are going to be hanging

23   their hat on.

24          MR. METCALF:  If they hang their hat on that, then

25   Title 3, Chapter 18, section 2516, 934 mimics it.  But if

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

STATE OF FLORIDA vs. ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL    DCA CASE NO. 4D19-1655, ET AL

Page 29

1   they are relying on that, I guess it doesn't require our

2   State Attorney because they could have envisioned that.  We

3   have a statute that adopts that.  So in wiretap cases it

4   requires the State Attorney.  If they are saying that, then

5   they are just relying on Mesa-Ricon and not State authority.

6           THE COURT:  I would anticipate that is probably

7   going to be the argument or at least one of the arguments

8   from the State.

9           MR. METCALF:  Your Honor, I call Officer Crowley.

10           THE COURT:  Raise your right hand.  Do you swear

11   or affirm that the testimony you are about to give is the

12   truth, the whole truth and nothing but the truth?

13   AND THEREUPON,

14                 OFFICER SEAN CROWLEY,

15       Called as a witness on behalf of the Defendants

16       herein, after having been first duly sworn, was

17       examined and testified as follows:

18                 DIRECT EXAMINATION

19           THE WITNESS:  Yes, I do.

20   BY MR. METCALF:

21       Q    Sir, can you state your name.

22       A    Sean Crowley.

23       Q    Officer Crowley or is it officer or detective?

24       A    Detective.

25       Q    How long have you been a detective?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

STATE OF FLORIDA VS. ROBERT KRAFT, ET AL
L. T. CASE NO. 312019MM000328A, ET AL    DCA CASE NO. 4D19-1655, ET AL

```
                                                           Page 30
   1        A      Since February of 2018.

   2        Q      Since February of 2018?

   3        A      Yes, sir.

   4        Q      You were the lead detective in this case?

   5        A      Co-case agent.

   6        Q      Who was the other case agent?

   7        A      Detective Gasbarrini.

   8        Q      How did this investigation begin?

   9        A      The Vero Beach Police Department received a few

  10   citizen complaints in reference to a massage parlor in town,

  11   East Spa.

  12        Q      Who were those complaints made by?

  13        A      They were anonymous complaints.  They wanted to

  14   remain anonymous.

  15        Q      Did they make them directly to you?  How did you

  16   become aware of it?

  17        A      One was made directly to our chief of police who

  18   alerted myself and, well, actually both of them were to the

  19   chief of police.  And he alerted myself and Detective

  20   Gasbarrini.

  21        Q      And that spawned all of this?

  22        A      Yes, sir.

  23        Q      So you had no knowledge at all of what was going

  24   on in the sheriff's office or down in Jupiter and Palm Beach

  25   or in Martin County?
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 31

```
1      A     No.

2      Q     It wasn't all one big thing?

3      A     Not initially, no.

4      Q     So it just all happened coincidentally at the same

5   time?

6      A     Yes, sir.

7      Q     At some point, and we will get to it later, you

8   made an application for a search warrant; is that correct?

9      A     Yes, sir.

10     Q     You are the affiant in that case?

11     A     Yes, sir.

12     Q     Who authorized that application?

13     A     As far as what Judge signed it?

14     Q     Well, no.  Did you work with the State Attorney?

15     A     Yes, ASA Butler.

16     Q     Did you ever have any dealings with Mr. Colton

17  himself?

18     A     No, sir.

19     Q     What is your, if you have any, what is your

20  specific experience with regards to prostitution?

21     A     Nothing beyond my years as a detective in the

22  special investigations unit that deals with vice crimes in

23  the city.  And then I have had basically in-service training

24  throughout my nine-year career that related to prostitution

25  here and there and made prostitution arrests on patrol.
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 32

1     Q     So you have never investigated, I mean, had you

2   ever made a prostitution arrest?

3     A     Um, no, I don't believe I made an arrest for

4   prostitution.  No.

5     Q     You at this point had been a detective for a

6   couple of months, a few months?

7     A     Seven or eight months.

8     Q     Had you had any investigations with regards to

9   human trafficking or money laundering?

10    A     Not as lead to anything.  I have assisted in

11  cases.

12    Q     As a detective?

13    A     No, sir.

14    Q     When the warrant was -- I am going to jump ahead,

15  and I will come back.  When the warrant was finally issued

16  in this case and executed and the cameras were being

17  installed, that happened.  Right?

18    A     Yes.

19    Q     Were you present?

20    A     Yes.

21    Q     And you supervised the installation of the

22  cameras?

23    A     I was present on scene.

24    Q     What does that mean?

25    A     I didn't put the cameras in the building myself,

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

STATE OF FLORIDA VS. ROBERT REELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL    DCA CASE NO. 4D19-1655, ET AL

Page 33

1    but I was on scene assisting.

2         Q    Where were you?

3         A    Throughout the process, I was I either in the

4    adjoining business.  I was in the actual business itself

5    briefly and then also out in front of the business.

6         Q    When you said briefly, you were actually in the

7    room when they were installing them, but, otherwise, you

8    were in the building next door?

9         A    As it was being set up, I was in the building next

10   door.

11        Q    Out in the front?

12        A    Yes, sir.

13        Q    Who assisted -- you said it was you and Gasbarrini

14   that started it after you received this complaint from Chief

15   Curry?

16        A    Yes, sir.

17        Q    What is the first thing you did after you received

18   the complaint?

19        A    Initially, we conducted surveillance at the

20   location just kind of checking out, observing what goes on

21   there.

22        Q    Was there already a special investigative unit set

23   up or was it just at this point you and Gasbarrini?

24        A    That is our special investigations unit at Vero

25   Beach Police Department.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 173

Page 34

1       Q      Had you ever drafted, been a part of a warrant

2   application process before?

3       A      Search warrants, not installation orders.

4       Q      The order that was executed in this case, was that

5   a proposed order that you provided to the Judge or is that

6   something the Judge drafted herself?

7       A      I drafted it.

8       Q      You drafted it?

9       A      Yes, sir, it was proposed.

10      Q      Was there any questions from Judge Cox after you

11  gave it to her or she just signed it?

12      A      She read it.  I can't recall any specific

13  questions.

14      Q      Were there any amendments that you to needed to

15  make or any clarifications?

16      A      No, sir.

17             MR. METCALF:  Your Honor, if I can approach?

18             THE COURT:  Yes.

19  BY MR. METCALF:

20      Q      I am going to show you what has been marked as

21  Defense Exhibits 1, 2, 3 and 4, and ask you if you know what

22  those are?

23      A      Those are the applications and orders for the

24  installation.

25      Q      You are familiar with these documents?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 35

1        A    Yes, sir.

2        Q    Those are true and accurate copies of those

3   documents?

4        A    Yes, sir.

5        Q    The order in this case that was executed, it

6   called for a ten-day inventory, did it not?

7        A    Yes, sir, I believe it did.

8        Q    Did you provide an inventory?

9        A    No.  We didn't remove anything from the business

10  so there was no inventory.

11       Q    Did it require a ten-day report back to report

12  your doings?

13       A    I believe it did, but like I said, we didn't have

14  anything to return to the Court.

15       Q    I am not asking anything to return.  You had

16  something to report, though.  You took some action, did you

17  not?

18       A    Yes.

19       Q    Did you ever report back to Judge Cox?

20       A    No.

21       Q    Within that order, was there any instruction about

22  termination once your investigatory goals were obtained or

23  was there just a thirty-day cap?

24       A    Thirty days on how long we could actually do the

25  monitoring of the video.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 36

1          MR. METCALF:  Your Honor, I would render these

2    into evidence.  I think they are in your packet.  The State

3    has the same copy.

4          THE COURT:  Any objection from the State?

5          MR. BUTLER:  No objection.

6          THE COURT:  It will be admitted as 1, 2, 3 and 4

7    without objection.

8          THE CLERK:  We need to verify the first one.

9          MR. METCALF:  1, 2, 3 and 4.  Do you need them

10   back?

11         THE CLERK:  Yes.

12         MR. METCALF:  The affidavits are 1 and 3.  The

13   orders are 2 and 4.  Judge, for the record, Exhibit 1 is the

14   11/27 application.  Exhibit 2 is the 11/27 order.  Exhibit 3

15   is the extension application which is December 28.  And

16   Exhibit 4 is the order.

17      (Defendant's Exhibit Nos. 1, 2, 3 and 4 were admitted

18   into evidence.)

19   BY MR. METCALF:

20      Q    So you started some surveillance, you and

21   Gasbarrini?

22      A    Yes, sir.

23      Q    At some point, Department of Homeland Security

24   became involved.  When was that?

25      A    I am not sure the exact date.  It was the

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

STATE OF FLORIDA vs. ROBERT PREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL   DCA CASE NO. 4D19-1655, ET AL

Page 37

1    beginning of September.

2        Q    Was it right out of the gate?

3        A    Within the first couple of weeks of the

4    investigation.

5        Q    What kind of surveillance did you take?

6        A    Initially, myself and Detective Gasbarrini just

7    did it in a covert vehicle in the area of the exterior of

8    the business.

9        Q    Who was supervising you?  Anybody in the

10   investigation, you and Gasbarrini or were was anyone --

11       A    Our Detective Sergeant Huddy and Detective

12   Lieutenant Pedersen.

13       Q    At some point, moving along in your application

14   under the facts that led up to all of this, you engaged a

15   Department of Health Inspector?

16       A    Yes, sir.

17       Q    Tell us about that?

18       A    Detective Gasbarrini is the one who actually spoke

19   to the inspector, Carla Sutherland, and basically made her

20   aware of the complaints that we received.  She advised that

21   she would do like an annual inspection of the business.

22       Q    Did she do that?

23       A    Yes, sir.

24       Q    When did she do that?

25       A    That was on September 10, 2018.

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 177

Page 38

1          Q      What was the result of her insertion into the
2    business and her inspection?
3          A      She advised that she encountered two female
4    massage therapists working in the business.  They had
5    up-to-date licenses and provided us with information on
6    them.  And that was it.
7          Q      So you sent her in there; is that correct?
8          A      We advised her of the complaint that we had, and
9    she advised that she could do that.  We didn't tell her to
10   go in there.
11         Q      She had been doing this all throughout the circuit
12   and down in Palm Beach as well.  Correct?
13         A      I can't speak on that.  I am not sure.
14         Q      You had no idea about other investigations going
15   on?
16         A      I don't know if Carla Sutherland was involved in
17   that.
18         Q      But this was the MO that each agency used, insert
19   an inspector --
20         A      At this point in the investigation I had no idea
21   about any other agency's investigations.
22         Q      You sent her in there under your direction.
23   Correct?
24         A      No.
25         Q      No?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 39

1     A    No.  We just advised her of the complaint.  She

2  advised that she would do an inspection.

3     Q    Did she find anything out of the ordinary

4  whatsoever?

5     A    I believe she stated that there was like daybeds

6  in there, but she didn't say that anything necessarily stuck

7  out to be too off the wall.  No.

8     Q    In fact, one of the questions is whether people

9  are domiciling within the facility, is it not?

10    A    I believe so.  Yes.

11    Q    And she said no, didn't she?

12    A    I don't recall.  I don't remember her necessarily

13  saying that, but I also don't remember her telling me that

14  people were.

15    Q    Did she provide you with the inspection 369 with

16  the Department of Health that goes in there and goes through

17  a checklist?  Did she go through a checklist with you?

18    A    She briefly explained to that us.  Yes.

19    Q    There were no violations?

20    A    No.

21    Q    One of the questions in the checklist is whether

22  people are living in the place or domiciling in the place;

23  is that right?

24    A    I don't have it in front of me, but it could be.

25  Yes.

STATE OF FLORIDA vs. ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ETC.   DCA CASE NO. 4D19-1655, ET AL

```
                                                          Page 40
1         Q     Do you know who Cynthia Pagano is?

2         A     I believe she is Ms. Sutherland's partner.

3         Q     Are you aware she did an inspection the very next

4  day?

5         A     She went in -- I don't believe that is accurate.

6  She went in there with Ms. Sutherland.

7         Q     Did she go in the same day?

8         A     Yes, sir.

9         Q     Ms. Pagano?

10        A     I believe so.  Yes, sir.

11        Q     And she did the inspection, and you were given a

12 copy of that?

13        A     Yes.

14              MR. METCALF:  Your Honor, if I could approach?

15              THE COURT:  Yes.

16 BY MR. METCALF:

17        Q     Let me show you what has been marked as Defense

18 No. 5 and see if your recognize that.

19        A     Yes, sir.

20        Q     What is that?

21        A     The health inspection.

22        Q     What is the date on that, the date of the

23 inspection?

24        A     It says 9/11/18.

25        Q     But the date that you said Ms. Sutherland went in
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 41

1    was September 10?

2         A    Yes, I believe so.

3         Q    So were there two inspections or just one?

4         A    There was only one inspection.  There was either

5    an error on her part or an error on our part.

6              MR. METCALF:  Your Honor, I offer into evidence

7    Defense Exhibit No. 5.

8              THE COURT:  Any objection?

9              MR. BUTLER:  No objection.

10             MR. METCALF:  It is in your packet.

11             THE COURT:  Exhibit 5 will be admitted without

12   objection.

13        (Defendant's Exhibit No. 5 was admitted into evidence.)

14   BY MR. METCALF:

15        Q    So at this point with the complaints you have sent

16   in the Department of Health person, and there is no

17   violations.  Has your suspicion been quelled?

18        A    No, sir.

19        Q    Why not?

20        A    Like I said, we did surveillance of the spa.  The

21   clientele in and out of the spa was predominantly male.  I

22   don't think we saw any females go in the spa within the time

23   of physical surveillance.

24        Q    How much time of physical surveillance had gone

25   by?

```
                                                       Page 42
1        A    We did surveillance every single day from the

2   beginning of the complaint throughout the investigation.

3        Q    As of September 11.  Do you have a start date in

4   the investigation?  We are talking about September 11.

5        A    It was the fourth week of August is when we

6   started.  I don't remember the exact date.

7        Q    Maybe two weeks you had been investigating so far?

8        A    Could be, yes, two weeks.

9        Q    Is that the only suspicion you have now?

10       A    No, sir.  I also conducted a search of the

11  business' phone number online which immediately produced,

12  just a Google search produced a number of advertisements for

13  escorts and basically sexual favors for money.

14       Q    How did you obtain the phone number?

15       A    It is on the front door of the business.

16       Q    You confirmed.  So that phone number matched the

17  front door?

18       A    Yes, sir.

19       Q    The one that you Google searched?

20       A    Yes, sir.

21       Q    When you say advertisements and you write that in

22  your application, are these paid for advertisements by that

23  spa or do they just happen to be advertisements on websites

24  that review people?

25       A    They are a paid for advertisement.  At that time,
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

Page 43

1    I can't 100 percent say who paid for the advertisement, but

2    generally it is the business advertising itself.

3        Q    How do you know they are paid for advertisements

4    and not up by a third party that reviews spas?

5        A    Because throughout the investigation we observed,

6    and there is certain specific review sites, but then there

7    is also -- these aren't just review sites.  These are actual

8    ads that are placed online.

9        Q    You did some financial work later on in the case?

10       A    Yes, sir.

11       Q    Did you ever uncover any payments to these sites?

12       A    Yes, I did.

13       Q    The review site, but at the time you had the

14   application, did you subpoena any of those records?

15       A    Not initially, no.

16       Q    You did that after you got the video?

17       A    I don't know if the subpoenas were sent out prior

18   to the video or they were in the middle of the

19   investigation.

20       Q    Did you send out any subpoenas in this case,

21   period, before you put that video up?

22       A    I did not personally.

23       Q    Did anybody?

24       A    Not that I recall.  I am not sure.

25       Q    So you had no, in your mind there was no

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 44

1    confirmation that they had paid for anything at this point?

2    You didn't issue one single subpoena prior to that video?

3         A    No.

4         Q    You talked about numerous citizen complaints.  Did

5    you review with Ms. Sutherland and now Ms. Pagano whether

6    there had been any Department of Health complaints?

7         A    I am sure we did.  I don't recall.

8         Q    There is a public portal that is maintained by law

9    that is accessible to you just like it is to me that does

10   complaints of every massage parlor; is that right?  Do you

11   degree with me on that?

12        A    I am not sure of that.

13        Q    Floridahealthsource.gov?

14        A    I am not sure.  I am not aware of that.

15        Q    So the Department of Health didn't tell you we can

16   put our fingers on whether or not there has been any

17   complaints of this spa?

18        A    I never had that conversation with anyone.

19        Q    You didn't ask, did you?

20        A    Not that I recall, no.

21        Q    So you are not aware that there has never been a

22   single complaint against East Spa through the Department of

23   Health?  Not one?

24        A    No, I am not aware of that.

25        Q    Did you go to SunBiz.org and look up the business

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 45

1   structure?

2       A     Yes, sir.

3       Q     So you knew who owned the spa?

4       A     Yes.

5       Q     Or who at least was designated to be -- does it

6   say the owner on SunBiz.org?

7       A     I believe it says president on the SunBiz.  Yes,

8   sir.

9       Q     Who was that?

10      A     Yongzhang Yan was the male's name.

11      Q     Did it have anyone listed on SunBiz.org?

12      A     No, I don't believe so.

13      Q     You mention in your application that there was an

14  ad on Backpage?

15      A     Yes, sir.

16      Q     Backpage, are you aware that Backpage was shut dun

17  to the public in April of 2018?

18      A     Yes, sir.

19      Q     How were you able to see that?

20      A     When you Googled the phone number, as I did, there

21  is still links to specific Backpage ads.  I attached the

22  specific Backpage ad that I located in the warrant.  And it

23  is on page 2 of the warrant, I believe.

24      Q     This is one of those ads that you never confirmed

25  through any kind of subpoena work that linked it back to the

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 46

1    business itself; is that correct?

2         A    Correct.

3         Q    The other people working within the spa, Ms. Zhang

4    and Lanfen Ma or Lanyun Ma, how did you become aware of

5    their identity?

6         A    Of Ms. Zhang?

7         Q    Yes.  Was that through the infiltration with the

8    Department of Health?

9         A    Ms. Sutherland provided us with her name.

10        Q    So the business had a valid license.  Correct?

11        A    Yes, sir.

12        Q    Those two women had valid licenses.  Correct?

13        A    Yes.

14        Q    Did you review any NCIC records at this time with

15   regards to Lanfen Ma and Ms. Zhang?  I can't pronounce her

16   first name.

17        A    I believe we accessed their, um, we ran them to

18   get their driver's license information.

19        Q    Was there any criminal history record of either of

20   these two women?

21        A    No, I don't believe so.

22        Q    No links to prostitution whatsoever?

23        A    For Lanfen and Ms. Zhang?

24        Q    Correct.

25        A    No, I don't believe so.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 47

1        Q     So did that quell your suspicions at this point?

2    There is no complaints?  There is nothing in their past?

3        A     No, sir.

4        Q     Is it fair to say at this point all you have are

5    advertisements that you didn't doublecheck at this point?

6        A     No.  We had complaints from concerned citizens.

7    We had our physical surveillance that we did.  And then we

8    always had the advertisements.

9        Q     And the physicals surveillance is the men?  It

10   just seems to be a lots of men going there?

11       A     Yes, sir.

12       Q     At some point Homeland Security identified Lanyun

13   Ma?

14       A     Yes, sir.

15       Q     How did that happen?

16       A     After getting in contact with Special Agent

17   McCreary with Homeland Security, she conducted a search of

18   one of their applications that we don't have access to and

19   advised that had Lanyun Ma was married to the owner

20   Yongzhang Yan and provided us with information on her.

21       Q     What kind of information?

22       A     Gave us a photograph of her, advised us that she

23   had a massage license.  And she previously ran spas in other

24   states and was arrested in other states for different

25   charges related to her running the spas.

STATE OF FLORIDA vs. ROBERT PREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL    DCA CASE NO. 4D19-1655, ET AL

Page 48

1       Q       Any related to prostitution?

2       A       Yes.  She was arrested for prostitution and human

3    trafficking.

4       Q       Were you provided the disposition of those cases?

5       A       Yes, sir.

6       Q       Was she convicted of them?

7       A       Yes.  She was convicted of prostitution.

8       Q       Is that just simple prostitution?

9       A       Yes.  And that was noted in the warrant.

10      Q       It was noted in the application?

11      A       Yes, sir.

12      Q       That she had a prostitution conviction?

13      A       Yes, sir.

14      Q       But you placed in there that she had a criminal

15   history of human trafficking?

16      A       Yes.  She was arrested for that.

17      Q       But she was acquitted of that or that charge was

18   dropped?

19      A       Yes, sir.

20      Q       Did you inform the Court of that?

21      A       That wasn't specifically noted.

22      Q       But you did note there was a criminal history

23   leading the Court to believe she was involved with human

24   trafficking?

25      A       Just advised she was arrested for human

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 49

1    trafficking.

2         Q    It doesn't say that, does it?  What does it say in

3    the application?

4         A    It says she has a criminal history that included

5    charges of human trafficking and prostitution.

6         Q    And you provided no disposition outlining that

7    that charge was dropped; is that right?

8         A    No.  I just provided the prostitution charge she

9    was convicted of.

10        Q    But you knew that charge of human trafficking had

11   been dropped, didn't you?

12        A    I knew there was a plea deal of some sort.

13        Q    That case had been dropped as part of whatever?

14        A    Yes, sir.

15        Q    Ms. Lanyun Ma resides with Mr. Yan?

16        A    She did.  Yes, sir.

17        Q    Was Lanfen Ma and Ms. Zhang, were they seen

18   exiting, coming and going from the spa?

19        A    No, they were not unless in the company of Lanyun

20   ma.

21        Q    Where was your surveillance set up?

22        A    We would park in different locations around in the

23   area of the spa.

24        Q    Did you have 360-degree surveillance of the spa at

25   all times?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 50

1    A    No, but we always had visual on the front door.
And there is only one exit.

2

3    Q    There is no backdoor to this spa?

4    A    No, sir.

5    Q    No side entrance?

6    A    No.

7    Q    Only one exit and one entrance?

8    A    Yes.

9    Q    That is the front door?

10   A    Yes, sir.

11   Q    Did you ever see either of Lanfen Ma or Ms. Zhang
with cell phones in their hands?

12

13   A    We did throughout the investigation, yes.  I am
not sure when, but yes.

14

15   Q    They were able to call?

16   A    They had cell phones.

17   Q    Did you ever prior to putting in a camera or
requesting cameras, did you do any kind of pen registers or
trap and traces on their cell phones?

18

19

20   A    No, sir.

21   Q    Did you ever have an opportunity to know what
their cell phone was?

22

23   A    No, sir, not at that point.

24   Q    You sent in an undercover.  Right?

25   A    Yes.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

STATE OF FLORIDA VS. ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL   DCA CASE NO. 4D19-1655, ET AL

Page 51

1      Q      Who was that?

2      A      Detective Brock.

3      Q      Tell us about that.

4      A      Detective Brock went in on the 14th of September

5   and the 18th of September.  He was equipped both with audio

6   and visual surveillance equipment to monitor the events that

7   took place inside, was given department-issued funds.  Went

8   in there asked for, I believe, a thirty-minute massage both

9   times.  Received a massage, and then was propositioned for

10  sex acts following the massage.

11     Q      So he was solicited?

12     A      Yes.

13     Q      The genitalia was actual touched?

14     A      I believe he advised that he was grazed over his

15  boxer briefs.

16     Q      So is it fair to say that Ms. Zhang -- was it both

17  times Ms. Zhang or was it each?

18     A      It was both of them, one each time.

19     Q      So the two people working, let's get this clear,

20  in the spa is Lanfen Ma and Ms. Zhang?

21     A      At this time, yes.

22     Q      Lanyun Ma is just coming and going?

23     A      At this point, we would observe her coming and

24  going from the spa.  So we assumed she worked there, but at

25  the time of the undercover operation she was not inside the

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 191

Page 52

1   spa.

2       Q    And Lanyun, her connection is she lives with the

3   owner?

4       A    Yes, sir.

5       Q    When Brock went in, he was solicited and otherwise

6   offered to commit a sex act for money?

7       A    Yes, sir.

8       Q    They went through an entire price list with him?

9       A    Yes, sir.

10      Q    And both times the female was the initiator?

11      A    Yes.

12      Q    Not Officer Brock?

13      A    No.

14      Q    The second visit on September 18, was Officer

15  Brock provided the opportunity to have Ms. Zhang's phone

16  number?

17      A    I believe he stated that she told him she could

18  give him her phone number.

19      Q    Did he take it?

20      A    No.

21      Q    So he had an opportunity to obtain a phone number

22  where you could do a pen registry or a trap and trace,

23  subpoena records for the phone, and he didn't take it; is

24  that right?

25      A    I suppose so.  He didn't take the phone number.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 53

1     Q     Did you guys talk about how important maybe

2   getting a phone number would be to furthering identify the

3   people that are part of some alleged criminal enterprise?

4     A     No, we didn't.

5     Q     In your experience, wouldn't that be very valuable

6   if you had the phone number where you could do a trap and

7   trace or pen registry to see who is calling that person?

8     A     It could be beneficial to see who is calling the

9   person, but it wouldn't be beneficial to prove the charge of

10  racketeering what we were trying do.

11    Q     Part of racketeering is to identify the

12  enterprise.  Right?  That is the first step; isn't it?

13    A     Correct, but just getting the phone number of who

14  she is calling, we didn't feel --

15    Q     Have you ever applied for a pen registry or a trap

16  and trace?

17    A     No.

18    Q     Do you know what I am talking about when I say pen

19  registry and trap and trace?

20    A     I know what you are talking about, but at that

21  point in the investigation we didn't think to do that.

22    Q     No.  You thought to go get a camera first.  Right?

23    A     Not at that exact point, no.

24    Q     After Officer Brock goes in there and he is

25  propositioned by the two women, you then have some

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 54

1   interaction with two civilian men that come out; is that

2   correct?

3        A    Yes, sir.

4        Q    What are their names?

5        A    I don't recall their names off the top of my head.

6        Q    Did you have direct interaction with either one of

7   them?

8        A    Yes, sir.

9        Q    Is this Michael Gary and Oscar Gomez?

10       A    Yes.

11       Q    How did you have contact with them?  How did that

12   come about?

13       A    We were doing surveillance at the spa.  We

14   observed Mr. Gary, that is who we spoke to first, we

15   observed him leaving the spa and approached him and made

16   contact with him after he left the spa.

17       Q    What did you tell him?

18       A    Detective Gasbarrini had the conversation with him

19   initially, but basically we advised him that we had

20   complaints at that spa that he just came from.  And we would

21   like if, he was willing, to make a statement for us of what

22   took place inside.

23       Q    This is Mr. Gary you are talking about now?

24       A    Yes, sir.

25       Q    Was Mr. Gomez stopped that same very day?

STATE OF FLORIDA VS. ROBERT PREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL     DCA CASE NO. 4D19-1655, ET AL

Page 55

1     A     Yes, sir.

2     Q     How many other stops had you done prior to that?

3     A     Those are the only two.

4     Q     How many stops did you do after that?

5     A     Those are the only two.

6     Q     The only two guys you ever talked to in this whole

7  thing, both readily without any hesitation talked to you and

8  told you exactly what are you needed to know?

9     A     Yes, sir.

10    Q     And you guys made the conscious decision not to

11 mind that source of information any further by doing any

12 other stops like that.  Right?

13    A     No.  We didn't want to stop too many individuals

14 and possibly have somebody alert the people inside the

15 business of police stopping and talking to individuals about

16 what goes on.

17    Q     Did you give them some sort of offer of immunity

18 if they talked to you?

19    A     No.  We made it clear that there is no promises or

20 anything like that, and there was no threats or anything.

21    Q     You didn't tell them if you talk to us, we are not

22 worried about what you did in there, we are not going to

23 bother?  You didn't tell them that?

24    A     Not that I recall, no.

25    Q     Did Detective Gasbarrini?

Page 56

1      A    Like I say, I don't recall that.  I know that we
2    said we can't make any promises and we can't threaten you.
3    If you are willing to make a statement to us, we appreciate
4    it.
5      Q    So no comments at all about we are not worried
6    about what you did, we just need to know?
7      A    Not that I recall.  I don't recall making that
8    statement.
9      Q    Did the men to the exact T tell you exactly what
10   Brock told you, that they were the onces soliciting?
11     A    Very similar accounts.  Yes.
12     Q    They made it clear it was the female prostitutes
13   that initiated the contact?
14     A    That is what they told us.  Yes.
15     Q    Did you ever send in another undercover after
16   Brock had two successful visits?
17     A    No, sir.
18     Q    No other one was willing to do it or you guys
19   thought you are not going to do it?
20     A    We didn't want to send in an undercover too many
21   times.  Even the second time he was in there, she was
22   suspicious of him and was saying she thought he may be
23   police.  So we didn't want to send in an undercover again
24   and possibly compromise the investigation.
25     Q    Between these two women you have four acts of

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 196

STATE OF FLORIDA vs. ROBERT KREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL    DCA CASE NO. 4D19-1655, ET AL

Page 57

1    solicitation; is that correct?

2         A    We have the two undercover and then the statements

3    of the individuals that exited.

4         Q    You had the ability to get her phone number, but

5    you didn't; is that right?

6         A    Detective Brock was offered her phone number.

7         Q    You know the corporate structure.  Yan owns it.

8    You have got Lanfen Ma.  Right?

9         A    We know Yongzhang Yan owns the spa, but he was

10   never seen at this point at the spa.  So we didn't really

11   know who ran the day-to-day operations or who collected

12   money or anything like that.

13        Q    And he has never been charged, right, because you

14   couldn't get enough evidence on him?

15        A    Yes, sir.  He hasn't been charged.

16        Q    You never got a trap and trace on his phone at

17   all, did you?

18        A    No, sir.

19        Q    At this point, did you become aware that Indian

20   River County Sheriff was running an investigation as well at

21   the exact same time?

22        A    I am not sure the exact date that we were aware of

23   that.  We were initially advised that Martin County had an

24   investigation at the exact same time as us that I believe

25   they started prior to ours that we were unware of.  Then I

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 58

1    believe Indian River County began an investigation around

2    the same time.  I am not sure when exactly.

3         Q    The State Attorneys that you were working with,

4    who were you working with?

5         A    Ryan Butler and Jeff Hendriks was working with the

6    Martin County case.

7         Q    Did they not share information with the sheriff

8    who was running the investigation?

9         A    No.  Like I said, I know they were running an

10   investigation.  I am not sure at what time Indian River

11   started their investigation.

12        Q    How many different prostitutes up until the point

13   we are at now which is after Brock and after the two men,

14   how many prostitutes were you aware of working at each spa?

15        A    The two that Brock encountered.

16        Q    So after the two men visit, what do you do next?

17        A    We just continued surveillance at that point and

18   began to observe Lanyun Ma frequent the business more so

19   than she had prior.

20        Q    At some point you followed her to a store where

21   she made purchases; is that correct?

22        A    Yes, sir.

23        Q    Where did she go?

24        A    She went to the Wal-Mart Grocery on U.S. 1 and

25   17th Street.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 59

1       Q       She made some purchases with a debit card?

2       A       Yes, sir.

3       Q       After she left, you had contact with loss

4  prevention or someone working within Wal-Mart?

5       A       Yes, sir.

6       Q       They agreed to provide you video?

7       A       Yes.

8       Q       You were aware at that point she did use a card to

9  make payments?

10      A       Yes, sir.

11      Q       Did you issue any sort of subpoena for her credit

12  card?

13      A       Those were subpoenaed at some point.

14      Q       But after you got the cameras?

15      A       I am not sure.

16      Q       What would you need to look at to tell me when you

17  got it?

18      A       It was either Detective Evans or Detective Eder

19  who subpoenaed those records.  I am not sure the exact date.

20      Q       Earlier, I thought we established that you guys

21  didn't issue a single subpoena prior to going in and getting

22  cameras?

23      A       I am not sure the exact dates of the subpoenas

24  being issued.

25      Q       Let me ask the question this way.  Did you issue

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 60

1   one single subpoena prior to asking Judge Cox to give you

2   permission to install cameras at each spa?

3      A    Again, I am not sure of the exact date.  So I

4   can't say yes or no.

5      Q    I know you are not sure of the exact dates.  I am

6   asking you if you issued any subpoenas prior to the

7   installation of cameras.  I don't need the exact date.

8      A    I cant' answer that.  I don't know because I don't

9   know the dates.

10      Q    After this visit to Wal-Mart, you didn't issue the

11   debit card subpoena.  That was done later.  We can say that.

12   Right?  The debit card subpoena, that was done later?

13      A    I am not sure on the dates of the subpoenas.

14      Q    For the purposes of the hearing, who is going to

15   be able to answer my question when I call them?

16      A    Detective Evans and Detective Eder are the ones

17   that subpoenaed financial records.  So they would be the

18   ones to answer that.

19      Q    You then conduct some trash pulls?

20      A    Yes, sir.

21      Q    Within those trash pulls, did you find any

22   receipts?

23      A    Yes, sir.

24      Q    For purchases?

25      A    Receipts that were -- the name Lanyun Ma was on

STATE OF FLORIDA VS. ROBERT KRAUS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL    DCA CASE NO. 4D19-1655, ET AL

Page 61

1    the receipts.  There were no purchases, customer purchases

2    in the trash pulls we completed.

3         Q    You found evidence of used condoms and semen?

4         A    Yes, sir.

5         Q    Did that solidify your belief that there is

6    prostitution going on which you already knew.  Right?

7         A    That assisted us in that belief.  Yes, sir.

8         Q    Were there any appointment notebooks or ledgers or

9    anything in those trash pulls?

10        A    Yes, sir.

11        Q    What were they?

12        A    There was different sheets of like notebook paper

13   that had apparent ledgers on them handwritten with a

14   Sharpie.

15        Q    You would agree that cameras within the massage

16   room were not going to produce any kind of evidence like

17   that, right, ledgers, receipts, notebooks?  You are just

18   going to capture sex.  Right?

19        A    Well, no.  You are going to capture money

20   transactions in the massage rooms.  At that point, I didn't

21   know where they kept their ledger.  It could have been in

22   the massage room.  It could have been anywhere.

23        Q    After the very first day, you knew that.  Right?

24        A    The very first day?

25        Q    You knew where the ledgers were kept after the

Page 62

1    first day?

2         A    Of the?

3         Q    Installation?

4         A    We knew there was a ledger at the front desk.

5         Q    You guys looked around when you installed the

6    cameras.  Right?

7         A    Briefly.  It wasn't a search of the business.  We

8    were just in there to install the cameras.

9         Q    How did you do that?  If women were never leaving,

10   tell me how you installed the cameras.

11        A    We went to the business under the ruse of a power

12   issue.  With the assistance of City of Vero Power, the women

13   came out of the business, and we went in and installed it.

14        Q    Up in the roof, in the ceiling?

15        A    Yes, sir.

16        Q    Were you there?  You said you were in and out.

17   Right?

18        A    Yes, sir.

19        Q    So a lot of installation was being done while you

20   were outside or in another room?

21        A    Yes, sir.

22        Q    Did you actually see, were you actually able to

23   see them installing the cameras?

24        A    Yes.

25        Q    Physically see them?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 63

1      A      Yes, at different points.

2      Q      Did you tell them where to put it?  Who is they

3  anyway?

4      A      The Department of Homeland Security tech officers.

5      Q      It was their decision where to put the cameras?

6      A      Yes, sir.

7      Q      They were climbing up in the ceiling to do it?

8      A      They were feeding stuff through the ceiling and

9  then from below the ceiling.  They weren't crawling in the

10 ceiling.

11     Q      The women were in the room when that was

12 happening?

13     A      No.  The women came outside.

14     Q      With you?

15     A      With me.  Yes, sir.

16     Q      You talked to them about what was going on in

17 there?

18     A      Yes.

19     Q      Did you see any evidence anyone was living in

20 there when you went in there?

21     A      No, not at that time.

22     Q      So the cameras get installed.  What are the hours

23 that you are to record?

24     A      The initial twenty, the first twenty days we

25 recorded from 8:00 a.m. or we viewed it from 8:00 a.m. until

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 64

1    11:00 p.m. each day.

2         Q     In your application, in your affidavit, that was

3    drafted by you?

4         A     Yes, sir.

5         Q     What were you using as authority?

6         A     I am sorry?

7         Q     Like what statute?  What were you trying to

8    outline?  What were you following?  There is a lot of very

9    specific things about the details of the offense and the

10   description of the location.

11        A     The possible racketeering enterprise.

12        Q     I mean, who came up with the language in obtaining

13   in the affidavit?  Was it you or was it the State Attorney?

14        A     It was with the assistance of the State Attorney.

15        Q     Did you have an identifying authority?  The

16   wiretap statute or Title 3?  What did you guys uses as

17   authority?

18        A     I don't recall the exact which one it is.  It

19   wasn't a wire, not a T3.

20        Q     What is that?

21        A     It wasn't a wiretap because there was no audio.

22        Q     I know it is not.  So what statute did you use; do

23   you know?

24        A     I can't cite the exact.

25        Q     Was it a Federal statute or a State statute?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 204

Page 65

1      A    I am not sure.

2      Q    In your application you discussed -- if you will

3  look at, I will give you Exhibit No. 1.  Within the

4  application you start making paragraphs it is requested, it

5  is further requested.  That is going to be about page 13 in

6  the application.

7      A    Yes, sir.

8      Q    Did you inform the Court in the application

9  exactly where you were going to put the cameras?

10     A    No, sir.

11     Q    Did you inform the Court in the application that

12 you were going to put a camera in a massage room where

13 people were getting massages?

14     A    It wasn't specifically stated which rooms they

15 were placed in.

16     Q    Did the order instruct you where specifically to

17 put any cameras?

18     A    No.

19     Q    Did you ask the Court to monitor the authority to

20 monitor and record?

21     A    Did I ask the Court for that?

22     Q    Yes.  In your application?

23     A    Yes.  On the last page I stated the recording and

24 monitoring.

25     Q    You made it explicit that there would be no

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 66

1    monitoring or recording of audio?

2         A    Of audio, yes, sir.

3         Q    That is on page 13 under the first it is

4    requested?

5         A    Yes, sir.

6         Q    Can you read that paragraph?

7         A    It is requested that your affiant is allowed to

8    surreptitiously enter the described location for the purpose

9    of covertly conducting electronic video surveillance of the

10   interior location of the location to identify participants

11   in the criminal enterprise commonly referred to as a visual

12   surveillance warrant.  There shall be no capability on any

13   of the installed equipment to allow audio monitoring or

14   recording.

15        Q    At that point, there is a difference between

16   monitoring and recording.  Right?  You call it out as two

17   separate things.  You are not going to monitor or record

18   audio.  Right?

19        A    I stated there shall be no capability of audio

20   monitoring or recording.

21        Q    Monitoring is something totally different than

22   recording.  Correct?

23        A    I suppose it could be.

24        Q    I mean, you are an educated man.  The word monitor

25   means something different than record to you, doesn't it?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

STATE OF FLORIDA vs. ROBERT KRELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL    DCA CASE NO. 4D19-1655, ET AL

Page 67

```
 1      A    Specifically, it is not the same definition.  No.

 2      Q    It is two different things.  If they meant the

 3 same thing, you wouldn't say two words.  Right?

 4      A    I said two words.  I don't know.

 5      Q    The order, did it ever give you the authority to

 6 record?

 7      A    I believe the exact language was monitor in the

 8 order.

 9      Q    So I am asking you a different question.  Did it

10 give you the authority to record?

11      A    It was a criminal case, and that is evidence of

12 the crime.  So I believe there was authority to record.

13 Yes.

14      Q    You believe there was?

15      A    Yes.

16      Q    I understand that.  Did the order give you

17 authority to record?

18      A    Yes.

19      Q    It says that in the order?

20      A    The specific word of record was not stated, but --

21      Q    So I can have you read the order, but I don't want

22 to do that.  Did the order say you could record?

23      A    Not specifically record, no.

24      Q    You knew going into this, you made it clear in the

25 application that you were going intercept in massage rooms.
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 68

```
1    Was that implicit in your order?  You didn't specifically

2    call it out.  Was that what you wanted?

3         A    Yes, sir.

4         Q    You knew people by definition would become nude

5    even if they are innocently going in to get a massage?

6         A    I knew that was a possibility.

7         Q    Women take their tops off, their bras off.  Men

8    take their shorts off, underwear off?

9         A    Yes, sir.

10        Q    The Judge called -- you asked for the Judge to

11   specifically require you guys to take steps to minimize the

12   invasion of privacy to any parties not participating in

13   criminal conduct?

14        A    Yes, sir.

15        Q    That was put in the order?

16        A    Yes.

17        Q    That was asterisked and highlighted?  There was an

18   asterisk put there by Judge Cox.  Correct?

19        A    Yes, sir.

20        Q    Did you guys ever record people that were in there

21   not partaking in sex?  Did that ever happen?

22        A    There was three individuals throughout the entire

23   time of surveillance that did not receive a sex act.

24        Q    Were they recorded, too?

25        A    Yes, sir.
```

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 208

STATE OF FLORIDA vs. ROBERT KRAFT, ET AL
L. T. CASE NO. 312019MM000328A, ET AL     DCA CASE NO. 4D19-1655, ET AL

Page 69

```
 1        Q     So you didn't minimize that invasion of their

 2   privacy, did you?

 3        A     We took steps to minimize, but the sex act

 4   sometimes happened at the end of the massage.  So we had to

 5   watch the entire massage to see if that was going to take

 6   place.

 7        Q     Who were the three people that you recorded?

 8        A     There was one individual who came in the room and

 9   received a legitimate massage and then exited.

10        Q     What is their name?

11        A     I have it in our notes.  I am not sure.

12        Q     Do you know any of their names?

13        A     I know the other two names.  Yes, sir.

14        Q     What are they?

15        A     Louis Crook and Paul De Lisi because they also

16   came back on other occasions or previously received sex acts

17   at the spa.

18        Q     But on these two occasions they did not?

19        A     Yes.

20        Q     But you recorded them anyway?

21        A     Yes, sir.

22        Q     Was anyone actually sitting there watching the

23   live feed?

24        A     Yes.

25        Q     At all times?
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 70

1       A     Yes, sir.  It would be minimized if there was no

2   one in the room.

3       Q     But there was never, the Department of Homeland

4   Security set up a recording to take place starting at

5   8:00 a.m. and terminating at 11:00 p.m.  Correct?

6       A     The video recorded at all times, but it was

7   minimized.  When no one was in the room, the room wasn't

8   being observed.  The desk was always being watched between

9   hours we were conducting the surveillance.  So the initial

10  twenty days, yes, 8:00 a.m. to 11:00 p.m. myself and

11  Detective Gasbarrini were the ones doing that surveillance.

12  And the desk would be being viewed during those hours.  The

13  room being viewed when individuals entered.

14      Q     What did minimize mean to you?

15      A     To minimize the invasion of privacy of individuals

16  in the location.

17      Q     So you felt like you had to watch all the way up

18  until the person left?

19      A     Yes, sir.  Like I said, some people received

20  massages first and then the sex act took place at the end of

21  the massage.  So if we minimized it at the beginning of the

22  massage, there is potential that you could have missed a

23  crime being committed.

24      Q     How many men were assigned to watch these videos,

25  the live feed?

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 71

1      A      Only two at the time.  It was myself and Detective

2  Gasbarrini the entire investigation except for two hour

3  periods on one day each.

4      Q      So you were in there from 8:00 until 11:00 every

5  day other than you missed two hours?

6      A      Yes, sir.  That was on the first twenty days.

7  Later in the investigation, we didn't stay until 11:00 p.m.,

8  but it would be from 8:00 a.m. until late afternoon.

9      Q      How many sex acts were recorded in first thirty

10  days?

11      A      In the first thirty days?  I don't have the exact

12  number.  It was upwards of 100.

13      Q      Outside of the people we named, were there any

14  other prostitutes identified in the first thirty days?

15      A      In the first thirty days?  There was other, there

16  were other prostitutes in the business.  They were not

17  identified at that point.

18      Q      Were they observed committing sex acts?

19      A      Yes, sir.

20      Q      Why weren't they identified?

21      A      Because all we had was video of them at that

22  point.  We didn't have any way to identify them at that

23  point.

24      Q      How many women were there that you can't identify

25  in the first thirty days?

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 72

1     A     Five, I believe, four in the first thirty days.

2   One was later identified.   Three of them we never

3   identified.

4     Q     What was her name that you later identified?

5     A     Yan Xu, Y-A-N X-U.

6     Q     Were these women ever arrested or charged with a

7   crime?

8     A     She was, yes, sir.

9     Q     Other than that, the other ones?

10    A     Other than her?

11    Q     The other women?

12    A     There was other women arrested.   Yes, sir.

13    Q     In the first thirty days, any women in the first

14  thirty days?

15    A     No one was arrested in the first thirty days.

16    Q     I am saying that you knew about in the first

17  thirty days?

18    A     A warrant was issued for Lanfen Ma who was

19  previously identified.   The other three women, we did not

20  identify and Yan Xu that later identified was arrested.

21  They were all observed in the first thirty days.

22    Q     How did these other women arrive at the spa?

23    A     Yan Xu was picked up and driven to the spa by

24  Lanyun Ma.   The other women arrived by unknown males

25  dropping them off in front of the spa.

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 212

STATE OF FLORIDA VS. ROBERT KREIS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL   DCA CASE NO. 4D19-1655, ET AL

Page 73

1     Q    Of those three women that you are not able to

2    identify, how far into the thirty days did the first one

3    appear?  My question is this:  Outside of Zhang and Lanfen

4    Ma who you knew about before you ever went in there?

5     A    Yes, sir.

6     Q    How many days go by before you find another?

7     A    Zhang was transported away from the spa and

8    replaced by another female who we did not identify within

9    the first two days of viewing.

10    Q    The camera goes in on November 27?

11    A    The 29th it was installed.

12    Q    The 29th it is installed.  You are watching.  And

13   when the is the first time you see someone that you don't

14   know come into that spa?  You know Lanyun Ma.  You know

15   Lanfen Ma and you know Zhang.  So when is the first time you

16   see someone come in?

17    A    I believe the first day we were actually observing

18   which is the second -- the camera was put in on the 29th.

19   We started observing on the 30th.  There was a new female in

20   the spa.

21    Q    Who was that?

22    A    She was never identified.

23    Q    Other than simple payments, tips, whatever you

24   want to call it after the sex act is consummated, that it

25   happened, did you ever see on video in the room transactions

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 74

1    of racketeering or money laundering or human trafficking?

2        A    Women would collect money in the room.  And then

3    they would give money to Lanyun Ma who was primarily at the

4    front desk throughout the investigation.  And she would put

5    money in different envelopes which we were able to observe

6    via that camera and different things like that that we would

7    then be able to know when she was leaving with money and

8    making bank runs, things of that nature.

9        Q    You are able to identify women handing money to

10   Lanfen Ma?

11       A    Yes, sir.

12       Q    Did you see the other women with cell phones as

13   well, the unidentified women?

14       A    I don't know if all of them did, but we did

15   observe women with cell phones.  Yes, sir.

16       Q    The application in this case, was it ever

17   authorized in writing to you by anybody?

18       A    Are you waiting on me?

19            THE COURT:  Is that a question?

20   BY MR. METCALF:

21       Q    I asked you a question.

22            THE COURT:  It seemed like an unfinished question.

23   BY MR. METCALF:

24       Q    Was it ever authorized by anyone in writing?  Did

25   anyone authorize your application in writing?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 214

STATE OF FLORIDA vs. ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, 210L   DCA CASE NO. 4D19-1655, ET AL

                                                              Page 75

 1        A     I guess I don't understand the question.

 2        Q     Did the State Attorney, Mr. Colton, did he

 3   authorize the issuance of this warrant in writing to you?

 4        A     No, sir.

 5        Q     The application?

 6        A     No, sir.

 7        Q     Never signed off on it?  Never reviewed it?

 8        A     Not that I am aware of, no.

 9        Q     You knew within the room you are not going to see

10   this corporate structure of this spa.  Right?  That is not

11   something you are going to get a camera in the room.  Right?

12        A     We didn't know exactly what we would see in the

13   rooms.

14        Q     Was there any discussion about just employing

15   maybe an alternative investigative technique like just a

16   simple audio wiretap so you can hear what is going on in the

17   room?  You kind of already know.  Right?

18        A     Well, we wanted to be able to actually visually

19   observe the crimes taking place and see where the money and

20   things like that were -- how the transactions and the

21   structure of the business from inside.

22        Q     You don't have to see it to know it is taking

23   place, do you?

24        A     I feel as though seeing it would have been a

25   better option than just hearing audio.  I don't think that

Page 76

1    would allow us to know exactly what is going on inside.

2        Q    Your goal was to identify women engaging in

3    prostitution and deriving funds?  Is that basically it?

4    That was your goal, your investigatory goal?

5        A    It was to identify the racketeering enterprise and

6    then the deriving support from the prostitution and the

7    prostitution.

8        Q    As you said, the payments to Lanyun Ma and to

9    Lanfen Ma, those are happening at the desk.  Correct?

10       A    There is both payments at the desk and payment in

11   the room.

12       Q    Payments in the room are between the man and the

13   woman.  Right?

14       A    Generally, yes.

15       Q    They go out.  And the payments that are then given

16   to the house, that is done at the desk?

17       A    Some individuals paid directly at the desk.  They

18   may have not paid in the room.  Some paid just in the room

19   and did not pay at the desk.  Payment happened in both

20   spots.

21       Q    I am talking about when the prostitute pays the

22   house their cut, that is done at the desk.  Right?

23       A    Generally, yes, sir.

24       Q    You knew you had Brock go in and identify two

25   women soliciting him and otherwise asking him to engage in

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 77

1    prostitution?

2         A    Yes.

3         Q    You had the two men?

4         A    Yes, sir.

5         Q    Was there any thought put into, hey, if a new

6    woman comes in and we have to identify yet another player,

7    we could send in an undercover because that is a new woman?

8    She wouldn't know.

9         A    Like I said, every time you send in an undercover,

10   that heightens the chance that they may be identified.

11   After the first time when the female he had just met wasn't

12   the same girl as the first time advised that she thought he

13   may be police, that made us believe that that was a risk

14   that could jeopardize the investigation.

15        Q    It is the same guy you sent in there twice.  You

16   could use another guy?

17        A    Right.  That was the reason why we did not.

18        Q    Maybe if his behavior is consistent with other

19   people, they would say this is normal?

20        A    That is the reason we did not send in an

21   undercover an additional time.

22        Q    But undercovers, the times you sent in, they

23   worked and you were able to identify two separate

24   individuals soliciting?

25        A    Yes, sir.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 78

1    Q    As far as wiretaps into the phones, did you guys

2  ever ask for that?

3    A    No, sir.

4    Q    Was that contemplated prior to issuing

5  surveillance video?

6    A    It was spoken about, but we found this was the

7  best option.

8    Q    Your agency is famously involved with a wiretap

9  that captured 100,000 calls in the local pill mill case.

10  Right?

11    A    I believe that took place.  I wasn't working here.

12    Q    But you are aware that 100,000 different phone

13  calls that exposed the entire racketeering, allegedly

14  exposed an entire racketeering organization was captured

15  from taps on phones.  Right?

16    A    I can't speak on that.

17    Q    Did you guys ever discuss that?

18    A    I haven't discussed that with anyone.  No.

19    Q    No inventory was provided to the Judge telling her

20  where you install cameras.  Correct?

21    A    No, sir.

22    Q    No report backs ever happened about what you were

23  finding out, what you were discovering.  Correct?

24    A    No, sir.

25    Q    You didn't talk about how it would be minimized.

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 79

1    Right?

2         A    That was discussed at the initial her signing it.

3         Q    So you would agree that within that order, both

4    orders, the extension which is Exhibit 4 and the original

5    order which is Exhibit 2, you would agree that there was a

6    requirement that you forthwith make return of your doings

7    upon executing this warrant?

8         A    Yes, sir.

9         Q    That never happened.  You agree with me?

10        A    Yes.

11        Q    Did anyone tell you why that provision exists?

12        A    No.  Due to the fact that we didn't take anything

13   out of the spa, that is why we did not.

14        Q    They didn't ask you tell us what you took out of

15   the spa.  It says report back your doings.

16        A    Right.  I am just telling you why we didn't.

17        Q    The things that you did after you got the cameras,

18   they include GPS tracking.  Correct?

19        A    Yes.

20        Q    Subpoenaing bank records.  Correct?

21        A    Yes.

22        Q    You even had a situation where you went into the

23   business next door and began listening through the walls.

24   Right?

25        A    Yes, I believe Detective Eder did.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 80

1      Q      And Detective Eder audio recorded it.  Correct?

2      A      Yes.

3      Q      Was that ever authorized?

4      A      No.  It is in the adjoining business.  So he is

5      allowed to record in there.

6      Q      Did he use any amplification to record or you are

7      saying he could hear the conversation through the walls?

8      A      He could hear it through the wall.

9      Q      So no microphone, nothing?

10     A      No, sir.

11     Q      Did you see the device he used to record with?

12     A      Yes.  It was just his handheld recorder.

13     Q      Were you able to overhear for yourself?

14     A      I never did surveillance from that room, but while

15     we were in that room, in that adjoining business looking in

16     there prior to the install and during the install, you could

17     hear through the wall.  Yes, sir.

18     Q      So we have GPS tracking.  We have subpoenas going

19     out to banks?

20     A      Yes, sir.

21     Q      That wasn't done prior to this.  Right?

22     A      I don't remember the exact dates.  They were done

23     throughout the investigation.  So they were done after as

24     well.

25     Q      You are now traditionally just tailing people,

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

Page 81

1   right, following them around?

2        A    Yes, sir.

3        Q    That is after the warrant?

4        A    Yes.

5        Q    Did you discuss in the order -- there is a

6   thirty-day cap.  We talked about this briefly.  But was

7   there any language in there that says it shall terminate

8   when the described communication is obtained?  Once you are

9   able to, not communicate each individual time, but once you

10  get enough evidence to document the crimes you were looking

11  at, was there any language about terminating surveillance?

12       A    No, sir.

13       Q    So it was just a thirty-day cap?

14       A    Yes, sir.

15       Q    Do you know how many predicate acts are required

16  to show racketeering?

17       A    Two.

18       Q    You had 100 after the first thirty days?

19       A    Yes, sir.

20       Q    Were you aware that the Palm Beach County Sheriff,

21  you became aware that they issued delayed notification for

22  video surveillance.  Correct?

23       A    Yes, sir.

24       Q    Their observation lasted five days.  Does that

25  sound right?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

STATE OF FLORIDA VS. ROBERT KRAFT, ET AL
L. T. CASE NO. 312019MM000328A, ET AL    DCA CASE NO. 4D19-1655, ET AL

Page 82

1      A    I am not familiar with exactly how long theirs

2   lasted.

3      Q    You are not familiar?

4      A    I am not.  No, sir.

5      Q    Yours went on for sixty days.  Right?

6      A    Yes, sir.  Thirty days of actual monitoring the

7   room and forty-two days of monitoring the desk, but there

8   were two thirty-day warrants.

9      Q    Did there come a point in time where you were

10  contacted by the Office of the State Attorney saying, hey,

11  enough is enough.  Stop looking in the rooms.  On

12  January 10, did that happen?

13     A    Yeah.  January 9 was the last day we monitored the

14  actual room.  That was basically due to the fact that we

15  were building the case, following the money more at that

16  point.

17     Q    But the whole basis of keeping the warrant going

18  for the extension was that there was, what, new females

19  coming in and out?

20     A    New females coming in and out as well as the owner

21  Yongzhang Yan emerged and started showing up at the business

22  more.  And there was another gentleman who emerged as a

23  possible part of the enterprise.

24     Q    Those two guys weren't in massage rooms soliciting

25  prostitution, were they?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 83

1       A    No, but like you said, there was other girls

2   coming in as well.

3       Q    Did the girls stop?  On January 10 did that all

4   stop?

5       A    No.

6       Q    So you guys just decided, you were told by the

7   State Attorney enough is enough, stop videoing in the room?

8       A    No.  It was just a decision that was made jointly.

9   We could have continued.  We weren't told not to.  We felt

10  it was at that point in the investigation that we didn't

11  need to.

12      Q    Did you have a suspect that you guys believed was

13  engaged in human trafficking?

14      A    Yes, sir.

15      Q    Have you found any victims of human trafficking?

16      A    Yes, sir.  We interviewed one individual who

17  advised that she did it, committed the acts against her will

18  and was in fear.

19      Q    Who is that?

20      A    What is her name?

21      Q    Yes.

22           MR. BUTLER:  Judge, I am going to object.  There

23  is a protective order signed by Judge Vaughn prohibiting the

24  release of that victim's name.  I think also under the

25  Florida Constitution she has a right to keep confidential.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

STATE OF FLORIDA vs. ROBERT KRAFT, ET AL
L. T. CASE NO. 312019MM000328A, ET AL    DCA CASE NO. 4D19-1655, ET AL

Page 84

1            THE COURT:  Sustained.

2    BY MR. METCALF:

3         Q    Was this prostitute working within the spa?

4         A    Yes, sir.

5         Q    What about the other unidentified one?

6         A    They were unidentified because they left prior to

7    the execution of our search warrant at the end.

8         Q    This last one, the one you are referring to, she

9    was identified when you executed the search warrant at the

10   end?

11        A    She was identified that day.  Yes, sir.

12        Q    By logic, are you saying that the other women

13   could have been alleged victims?  You guys just didn't

14   decide to stop it and find out who they were?  Is that what

15   you are saying?

16        A    The reason we didn't stop it is because we were

17   still building our racketeering case.

18        Q    That was more important than human trafficking

19   victims potentially?

20        A    At that point we didn't know if anyone was a

21   victim.

22        Q    I want to be clear.  You didn't receive a

23   directive from the State Attorney, Ryan Butler, to stop

24   filming prostitution on January 10, 2019?

25        A    It was a joint decision.  It wasn't a direct order

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 85

1    or anything like that.

2        Q    Did he call you and say I think you should stop?

3        A    I don't recall that conversation.  I think it was

4    just in talking about the case we decided that.

5        Q    You would agree that the second order, the

6    extension order which is Exhibit 4 had the exact same

7    language as the order in Exhibit No. 1.  Correct?

8        A    Much of it.  Yes, sir.

9        Q    Anything different?

10       A    There is additional probable cause added in

11   reference to movement of girls, the emergence of the male

12   who was possibly involved and things related to movement of

13   money.

14       Q    I am talking about the order, not your

15   application.

16       A    The order itself, no, sir.

17       Q    The order itself is the exact duplicate.  Correct?

18       A    Yes, sir.

19       Q    Of the first one.  Correct?

20       A    Yes.  With the standard changes of dates and

21   stuff.

22       Q    Again, it authorizes you to monitor.  It wants you

23   to report back to this Judge within ten days?

24       A    Yes.

25       Q    Did you report back?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

STATE OF FLORIDA vs. ROBERT PREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL    DCA CASE NO. 4D19-1655, ET AL

Page 86

1      A     No, sir.

2      Q     By this time, you have got a ton of videos.

3   Before, you said you just installed cameras.  Now you have

4   got a lot of videos.  You referenced a couple of them, but

5   did you report back anything to them?

6      A     No, sir.

7      Q     This is a separate and distinct order, would you

8   agree?

9      A     Yes.

10     Q     I want to be clear.  That is two orders because we

11  have two orders.  So we have two warrants, two orders?

12     A     Yes.

13     Q     Earlier, you discussed that you drafted that

14  order?

15     A     Yes, sir.

16     Q     When you say you drafted it, what I mean, I mean

17  you typed it up?

18     A     Yes.

19     Q     Is it something you cut and pasted from something

20  else or is it something you typed up?

21     A     No, I typed it up.

22     Q     Did you look at some other order?

23     A     I looked at other examples of this type of order.

24  Yes, sir.

25     Q     You had other examples of video surveillance

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 226

Page 87

1  orders?

2      A    Yes, sir.

3      Q    Where from?

4      A    Indian River County Sheriff's Office had a case

5  prior.

6      Q    When?  Like fifteen years ago?

7      A    I am not sure of the exact date.  It was previous

8  to this case.

9      Q    This order seems to be identical to the one used

10 in Martin County, the exact same words.  Is that just a

11 coincidence?

12     A    No, I don't believe that is accurate.

13     Q    So you got the order from Indian River County

14 Sheriff?  You asked them to send you an order?

15     A    I honestly do not recall who sent me the order,

16 but it was an Indian River County Sheriff's Office order.

17          MR. METCALF:  Judge, at this time I don't have any

18 other questions.  A lot of other men, lawyers here who have

19 joined in are certainly free to.

20          THE COURT:  Does anyone else have any questions?

21 Any of the other defense lawyers on behalf of any --

22          MR. ZISKINDER:  I do, your Honor.

23          THE COURT:  Mr. Ziskinder.

24          MR. ZISKINDER:  He mentioned one of my clients.

25                    CROSS-EXAMINATION

Page 88

1    BY MR. ZISKINDER:

2         Q    Detective, you said that Mr. DeLisi --

3         A    Yes, sir.

4         Q    -- came in for a legitimate massage?

5         A    Yes, he came in.  I don't know.  I don't have the

6    exact dates off the top of my head.  I believe in December

7    he came in and did not receive a legitimate massage and got

8    a sex act and then came in on a later date and at that time

9    he got a legitimate massage.

10        Q    Was it Frank DeLisi?  You said different first

11   names.

12        A    I may have said the wrong name.  I know his last

13   name was DeLisi.

14        Q    There was only one DeLisi that you encountered?

15        A    Yes.

16        Q    So the first time you videotaped him there was a

17   sex act involved?

18        A    Yes, sir.

19        Q    And then there was one other time where you saw

20   him come in and there was none?

21        A    Yes, sir.

22        Q    Did you speak with him after he was videotaped?

23        A    No, sir.

24        Q    What about the other time?

25        A    I have never spoken to him.  No, sir.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

STATE OF FLORIDA vs. ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, 4th DCA CASE NO. 4D19-1655, ET AL

Page 89

1      Q     To your knowledge, did any other law enforcement

2   officer speak with him?

3      A     Not to my knowledge.

4      Q     Do you recall whether payment was made on that

5   video?

6      A     On which one?

7      Q     The first one?

8            MR. BUTLER:  Judge, that is not something that is

9   pled in the motion to suppress.

10            THE COURT:  Sustained.

11            MR. ZISKINDER:  Nothing further.  Thank you.

12            THE COURT:  Mr. Sercombe?

13            MR. SERCOMBE:  I do, your Honor.

14                       CROSS-EXAMINATION

15   BY MR. SERCOMBE:

16      Q     My client Mr. Anglesano, he was mentioned in

17   discovery for audio.  Did you have a warrant for that audio?

18            MR. BUTLER:  Judge, I am going to object to also

19   there has been no motion filed as to that.

20            THE COURT:  Sustained.  Mr. Sercombe, if you have,

21   since you didn't file a separate motion, obviously the State

22   has not been put on notice that you perhaps were going to

23   challenge some audio.  So I am going to ask if you do have a

24   challenge to that, we will hear that separately.

25            MR. SERCOMBE:  So I can file that, your Honor?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 229

Page 90

1              THE COURT:  Yes.  Anybody else?  Mr. Golden?

2                        CROSS-EXAMINATION

3    BY MR. GOLDEN:

4         Q    Just briefly.

5              Officer, in the application you mention that you

6    put in the language monitor and record; is that correct?

7         A    Yes, sir.

8         Q    That was your doing?

9         A    Yes, sir.  I wrote the order.

10        Q    And you also prepared the order, too.  Correct?

11        A    Yes, sir.

12        Q    Did you draft it yourself?  Did you type it?

13        A    Yes, sir.

14        Q    Your order specifically left out the word record;

15   is that correct?

16        A    I don't believe the word record is in there.

17        Q    I mean, so you intentionally left it out.  You

18   omitted it?

19        A    I don't believe I intentionally left it out.

20        Q    But you did?

21        A    Yes.  I wrote -- I didn't put record in there.

22        Q    When the Judge reviewed the application, she saw

23   you intended to monitor and record, but then relied on your

24   order that you would only be monitoring.  Correct?

25        A    I don't know what the Judge believed.  I don't

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 91

1    know how to answer that.

2         Q    The Judge didn't cross out record?

3         A    Okay.

4         Q    Right?

5         A    No.

6         Q    You did by leaving it out?

7         A    I didn't cross out record.  It wasn't written.

8         Q    Right.  So the Court had every reason to believe

9    that you would not be recording but only monitoring based on

10   your preparation of that order?

11        A    I don't believe that is, I don't, I mean, I don't

12   believe that is true.

13        Q    You told Mr. Metcalf that there was some idea that

14   monitor meant record or you would have that authority to

15   record, but you are the one that actually recognized the

16   distinction when you prepared the application?

17        A    Again, I don't know how to answer that.  Record

18   was not written in the order itself.  No.

19             THE COURT:  Any other lawyers?  Mr. Kennedy.

20                       CROSS-EXAMINATION

21   BY MR. KENNEDY:

22        Q    Just a couple on behalf of Josef Jorg.

23             Good morning, Detective.  You testified that

24   despite the order instruction to report back within ten

25   days, you did not do that.  Correct?

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 92

1      A    Yes, sir.

2      Q    Within the first ten days of -- you began

3  recording in November of 2018.  Correct?

4      A    Yes, sir.

5      Q    Within the first ten days of recording, you had

6  quite a number of examples of sex acts from the massage

7  room.  Correct?

8      A    Yes, sir.

9      Q    Is it fair to say that those acts were all of a

10  similar ill?  They were all sort of the same?  They involved

11  different acts, but involved an act and perhaps a payment?

12      A    I wouldn't say they were all that.  I wouldn't say

13  they were the same.  Some people received a massage and then

14  a sex act and vice versa.  Some people just received a sex

15  act.  I wouldn't say they were the same.

16      Q    They were all acts that you subsequently could

17  charge as solicitation of prostitution, perhaps engaging in

18  prostitution.  Correct?

19      A    Yes, sir.

20      Q    But you didn't see any sort of coercive activity

21  as it relates to human trafficking, correct, during the

22  first ten days?

23      A    In the massage room?

24      Q    Yes.

25      A    No.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 232

Page 93

1    Q    You didn't see any business enterprise activity

2  within the massage room other than the act of prostitution

3  itself?

4    A    The acts of prostitution as well as the collection

5  of money that was then given to the person who emerged as

6  the one running the spa.

7    Q    That was given outside of the massage room?

8    A    And collected, but previously collected in the

9  massage room.  Yes.

10   Q    Everything that happened, is it fair to say that

11  what happened inside the massage room was consistent with

12  the crime of prostitution?  Yes?

13   A    Prostitution occurred in there, but there was also

14  the collection of money that aided our investigation into

15  the racketeering and the other charges.

16   Q    In terms of numbers you said, without holding you

17  to it, upwards of 100 acts occurred in the first thirty

18  days?

19   A    Yes, sir.

20   Q    Is it fair to say something like five to ten acts

21  per day occurred in the first ten days?

22   A    I would say that is fair.  I don't know the exact.

23   Q    Whatever it was, but it was a substantial number

24  of these similar acts.  Correct?

25   A    Yes, sir.

Page 94

1        Q    All of which could have been reported back to the

2    Court for modification or limitation of your authority.

3    Correct?

4        A    Yes, they could have been.

5             MR. KENNEDY:  Nothing further.

6             THE COURT:  Anybody else?  Mr. Kibbey, yes, sir.

7                       CROSS-EXAMINATION

8    BY MR. KIBBEY:

9        Q    Sir, is it your testimony this morning that when

10   you prepared the order that Judge Cox signed that you would

11   be surprised if it matched the wording of the Martin County

12   order?

13       A    Yes, I would be, I guess.  They are similar

14   orders.  I don't know.

15       Q    But you didn't have any access to the Martin

16   County order to prepare your order?

17       A    Not that I recall.

18       Q    When you say you prepared it, what equipment did

19   you prepare it on?

20            MR. BUTLER:  Judge, what is the relevance of this?

21            MR. KIBBEY:  It goes to his credibility, your

22   Honor.

23            MR. BUTLER:  What equipment he prepared it on?

24            MR. KIBBEY:  Yes.

25            MR. BUTLER:  How is that relevant to his

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 95

1   credibility?

2            MR. KIBBEY:  You will see.

3            MR. BUTLER:  A typewriter versus a computer?

4            THE COURT:  What are you showing him, Mr. Kibbey?

5            MR. KIBBEY:  I am going to show him, your Honor,

6   the order from Martin County signed by Judge Belanger about

7   forty days prior.

8            THE COURT:  Show that to Mr. Butler.

9            MR. KIBBEY:  The State has got a copy.

10  BY MR. KIBBEY:

11     Q    I would like to show you Exhibit A.  You have

12  already seen it.  That is your order.  Correct?

13     A    Yes, sir.

14     Q    Exhibit B is one from Judge Belanger.  You are

15  saying you haven't seen Exhibit B before?

16     A    Like I said, not that I recall.  No.

17     Q    Getting back to the equipment, what printer did

18  you use to print the order on?

19            MR. BUTLER:  Objection, relevance.

20            THE WITNESS:  I don't recall.

21            THE COURT:  Overruled.

22  BY MR. KIBBEY:

23     Q    You don't recall.  Was it in your department or

24  was it at the State Attorney's Office?

25     A    I would have printed it in my department.

STATE OF FLORIDA vs. ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ETC.    DCA CASE NO. 4D19-1655, ET AL

Page 96

1      Q     So is there any explanation for why Judge

2   Belanger's order looks to have been printed exactly the same

3   way on the same equipment?  Did you print his order?

4      A     I have no idea.

5      Q     Wait a minute.  You don't know if you printed

6   Judge Belanger's order?

7      A     Like I said, I don't recall seeing the order.  No.

8            MR. KIBBEY:  Your Honor, we would move to have

9   these both admitted as exhibits.

10           THE COURT:  Any objection?  The one order is

11  admitted already.

12           MR. BUTLER:  Right.  I believe the witness

13  couldn't identify Judge Belanger's order.  What is the

14  relevance of that?  He says he hadn't seen it before.

15           MR. KIBBEY:  Your Honor can draw the relevance

16  when you look at they are identical, wording, type font,

17  spacing, etc.

18           MR. BUTLER:  That is a smoking gun as to what?

19           MR. KIBBEY:  It goes to credibility of this

20  witness, your Honor.

21           THE COURT:  We will allow it over objection.

22           MR. KIBBEY:  No further questions.

23           THE COURT:  Let's continue.  Mr. Kibbey is with

24  Mr. Metcalf.  So we will number his next exhibit, whatever

25  that next number is.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 97

```
 1          THE CLERK:  Six and 7.

 2          (Defendant's Exhibit Nos. 6 and 7 were admitted into

 3     evidence.)

 4          MR. METCALF:  Judge, I don't think there is any

 5     further questions.

 6          THE COURT:  Any other questions?  Mr. Butler, do

 7     you have any questions of Detective Crowley?

 8                         CROSS-EXAMINATION

 9     BY MR. BUTLER:

10          Q    Just a couple of questions, Detective.  When you

11     were talking about the complaints that you had received

12     prior to getting the actual warrant signed by Judge Cox, did

13     you receive complaints from any of the adjoining businesses?

14          A    I believe one of the people that called the chief

15     was of the adjoining business.

16          Q    What was the nature of that complaint?  What was

17     that person complaining about?

18          A    The frequency of men in and out.

19          MR. METCALF:  Judge, I am going to object.  If it

20     is not in the application, then it doesn't really matter.  I

21     am asking questions that were in the application.  It

22     doesn't matter what is in his mind.  It matters that he

23     wrote numerous citizen complaints.  So it really doesn't

24     matter who made them.  I don't see the relevance.  If it is

25     in the application, it is what is in the application.
```

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

J.A. 237

Page 98

1            MR. BUTLER:  Judge, he has questioned him for two

2    hours about things that weren't in the application.

3            MR. METCALF:  Because, Judge, I have to prove

4    omissions.  I have to.  They can't -- I have to prove

5    omissions under Franks and misleading statements.  So I am

6    allowed to ask that.

7            MR. BUTLER:  And I am allowed to followup.

8            THE COURT:  Overruled.

9    BY MR. BUTLER:

10       Q    You can answer.

11       A    There was basically a frequency of men in and out

12    of the business.  They could also hear what they thought

13    were sex, I guess sex noises taking place in the spa.  That

14    was basically the complaint.

15       Q    I am sorry?

16       A    That was basically the complaint.

17       Q    When you were describing the actual installation,

18    at some point you said that you were in the building next

19    door.  I just wanted to clarify that.  Was there a separate

20    physical structure next to the spa?

21       A    It is basically a strip of offices.  Directly next

22    door there is another office that shares a wall.

23       Q    So it is one building with multiple businesses in

24    the building?

25       A    Yes, sir.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 99

1      Q    Were you in the office next door to the spa at

2  some point?

3      A    The office directly next to it.  Yes.

4      Q    You were asked about the Wal-Mart purchase.  Do

5  you recall what it was that Lanyun Ma purchased with the

6  debit card?

7      A    Yes.  She purchased assorted food.  Then she also

8  purchased a box of condoms.

9      Q    Did she pay for the condoms with the debit card?

10      A    I will have to refer to the order.  I don't recall

11  exactly.

12      Q    Look at paragraph 10 of your application.  You

13  have a photograph in there of Lanyun Ma bending down and

14  picking up a box of condoms at the Wal-Mart.  Do you see

15  that?

16      A    Yes, sir.

17      Q    Right above that you talk about how she paid for

18  the condoms?

19      A    She paid for the condoms with cash.  And she made

20  the other purchases with a card.

21      Q    For how many total days were you authorized

22  between Judge Cox and Judge Kanarek to watch what was going

23  on inside the business?

24      A    Sixty days.

25      Q    How many days did you actually watch what was

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

                                                        Page 100

1    going on inside the massage rooms?

2         A     Thirty days.

3         Q     How many additional days did you watch the cash

4    register area?

5         A     A total of forty-two days.

6         Q     You described already how from the first twenty

7    days or so you and Detective Gasbarrini monitored for about

8    fifteen hours a day?

9         A     Yes, sir.

10        Q     After that, did you monitor for less?

11        A     Yes.

12        Q     Can you give us a breakdown of that?

13        A     Yes, sir.  We didn't monitor -- we monitored the

14   first two weekends.  Following that, we would monitor the

15   week and then Saturdays and Sunday we no longer monitored.

16   As of the 26th of December, we monitored from 8:00 a.m. to

17   9:00 p.m.  That was on the 26th and 27th.

18        The 28th we monitored from 8:00 a.m. until 16:30

19   hours.  We did not monitor the 29th and 30th.  The 31st we

20   monitored from 8:00 a.m. to 5:00 p.m.  We did not monitor on

21   January 1.  And then the remaining days that was monitored

22   was no later from 8:00 a.m. to no later to 17:00.  The last

23   two days were 4:00 in the afternoon.

24        Q     During the time, the thirty days that you were

25   monitoring what was going on inside the massage room, how

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Case 9:21-cv-80391-RLR Document 109-15 Entered on FLSD Docket 04/09/2022 Page 101 of 218

STATE OF FLORIDA vs. ROBERT KRAUS, ET AL
L. T. CASE NO. 312019MM000328A DCA CASE NO. 4D19-1655, ET AL

Page 101

1    many times did you monitor an individual going into the

2    massage room receiving some kind of service?

3         A    That was 145.

4         Q    Of those 145, how many of those involved sex acts?

5         A    142.

6         Q    I think you have already said that the three that

7    didn't involve sex acts, two of those were actually repeat

8    customers who had previously or subsequently involved in a

9    sex act?

10        A    Yes, sir.

11        Q    And there was one individual that didn't come back

12   that was not involved in a sex act?

13        A    Yes, sir.

14        Q    Of the 142 sex acts that you were observing, how

15   many of those sex acts began with a massage, a regular

16   massage?

17        A    Eighty-three.

18        Q    How many of those sex acts involved a sex act

19   occurring first?

20        A    Fifty-nine.

21        Q    So the majority of the time people received a

22   legitimate massage and then a sex act followed?

23        A    Yes, sir.

24        Q    Yet there were fifty -- I am sorry.  How many?

25        A    Fifty-nine.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 102

1      Q      Fifty-nine different times when people came and

2    just had the sex act up front.  Was that then followed by a

3    massage?

4      A      Some the sex act was up front and then followed by

5    a massage and some they came and just received a sex act.

6            MR. BUTLER:  Thank you, Judge.

7            THE COURT:  Any redirect, Mr. Metcalf?

8                    REDIRECT EXAMINATION

9    BY MR. METCALF:

10     Q      As far as you mentioned being next door, and we

11   are talking about, I want to talk about specifically when

12   the cameras are being installed.  So the times you were next

13   door in that office building?

14     A      Yes, sir.

15     Q      Not with the guys installing the cameras?

16     A      Correct.

17     Q      A lot of the time you were outside with the women?

18     A      Yes.

19     Q      Distracting them?

20     A      Yes.

21     Q      That was your job, to kind of dupe them while the

22   guys were in there installing the cameras?

23     A      Yes, sir.

24     Q      Is that correct?

25     A      Yes.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 103

1      Q      As far as you eluded to the fact that a lot of

2    this was only visited by men during that twenty-one-day

3    period?

4      A      Yes, sir.

5      Q      Did you guys look at what the national average is

6    on how many men go to spas as opposed to women?  Was that

7    something abnormal?

8      A      The fact that there was no women clientele at all,

9    I found that abnormal.  Yes.

10     Q      Based on what?  Just your personal gut?

11     A      Just based on I believe common knowledge that both

12   sexes receive massages.

13     Q      That debit card, whether what it was purchased

14   for, you knew there was a debit card and you knew it was

15   used at Wal-Mart.  And you had subpoena power with Wal-Mart

16   to theoretically get those records.  Right?

17     A      Yes, sir.

18     Q      And you later did get those records on that debit

19   card, didn't you?

20     A      Yes, sir.

21     Q      By this time, the use of this debit card and

22   through your surveillance, you knew there were two

23   undercover visits?

24     A      Yes, sir.

25     Q      Two men who had gone in there.  So you knew there

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 104

1   was prostitution going on?

2       A    Yes, sir.

3            MR. METCALF:  Nothing further.

4            THE COURT:  Any other defense lawyers have any

5   other questions?  May this witness be excused?

6            MR. METCALF:  Judge, I would ask him to stick

7   around.

8            THE COURT:  Okay.  If you will wait in the

9   hallway, sir.  Do not discuss your testimony with anybody.

10  Call your next witness.

11                      (END OF VOLUME I OF II)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Page 105

```
 1    STATE OF FLORIDA          )
                               :  SS
 2    COUNTY OF INDIAN RIVER   )

 3

 4                        CERTIFICATE

 5

 6            I, KATHY DUNCOMBE, a Shorthand

 7     Reporter and Notary Public of the State of Florida

 8    at Large, do hereby certify that I was authorized to and

 9    did report stenographically the foregoing proceedings and

10    that the transcript is a true and correct transcription of

11    those proceedings.

12            DATED this 24th day of April, 2019.

13

14

      KATHY DUNCOMBE

15

16

17

18

19

20

21

22

23

24

25
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

c4b592f3-cb15-4e1c-b1d6-a82a8fa15027

Filing # 92852289 E-Filed 07/19/2019 02:36:41 PM

Page 106

```
                        IN THE CIRCUIT COURT OF THE
                        NINETEENTH JUDICIAL CIRCUIT
                        IN AND FOR INDIAN RIVER COUNTY
                        STATE OF FLORIDA


                        VOLUME II OF II

STATE OF FLORIDA,

   Plaintiff,

vs.

JOVANY AGUILERA                 CASE NO.: 3119MM393A
MOHAMMED TURKI ALHARBI          CASE NO.: 3119MM404A
FUAD S. ALJADAANI               CASE NO.: 3119MM572A
GARRETT M. ALLEN                CASE NO.: 3119MM561A
JOSEPH R. ANGLESANO             CASE NO.: 3119MM366A
GREGORY ARNONE                  CASE NO.: 3119MM367A
JUSTIN L. BAUER                 CASE NO.: 3119MM421A
DAVID RAY BLACK                 CASE NO.: 3119MM350A
JON BROECKER                    CASE NO.: 3119MM353A
DONALD SCOTT BROWN              CASE NO.: 3119MM355A
PATRICK VINCENT BROWN           CASE NO.: 3119MM392A
PAUL DENNIS BROWNING            CASE NO.: 3119MM357A
SCOTT BUESCHER                  CASE NO.: 3119MM369A
VANDERLEI CASTRO                CASE NO.: 3119MM432A
WILLIAM ERVIN CHANCELLOR        CASE NO.: 3119MM436A
JEFFREY CHANDLER                CASE NO.: 3119MM480A
DAVID CLARK                     CASE NO.: 3119MM368A
KEVIN COYNE                     CASE NO.: 3119MM372A
JOHN CRAIN                      CASE NO.: 3119MM371A
LOUIS R. CROOK                  CASE NO.: 3119MM417A
FRANK DE LISI                   CASE NO.: 3119MM397A
CLAUDIO DE OLIVEIRA             CASE NO.: 3119MM387A
OTTAVIO FRANCESO DIDOMENCIO     CASE NO.: 3119MM379A
WALTER L. DIXON, II             CASE NO.: 3119MM445A
ISIAH DRISDOM                   CASE NO.: 3119MM330A
MANUEL ESQUIVEL                 CASE NO.: 3119MM422A
WILLIAM ESTES                   CASE NO.: 3119MM399A
WILLIAM ESTES, JR.              CASE NO.: 3119MM395A
JON FOREST                      CASE NO.: 3119MM385A
ROBERT FREELS                   CASE NO.: 3119MM328A
ROMAN GAMEZ                     CASE NO.: 3119MM389A
STEPHEN GEARY                   CASE NO.: 3119MM337A
VITO C. GIOIA                   CASE NO.: 3119MM412A
RICHARD GOLLILNGE               CASE NO.: 3119MM406A
MICHAEL GRIGGS                  CASE NO.: 3119MM420A
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Case 9:21-cv-80391-RLR  Document 109-15  Entered on FLSD Docket 04/09/2022  Page 107
STATE OF FLORIDA VS. ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A of 218  DCA CASE NO. 4D19-1655, ET AL

Page 107

```
 1   CARL GUIDICE, JR.            CASE NO.: 3119MM334A
     NEAL ALLEN HAGER            CASE NO.: 3119MM449A
 2   MARK D. HASSETT             CASE NO.: 3119MM333A
     DAVID F. HEALY              CASE NO.: 3119MM348A
 3   JOSEPH E. HENDRICKS, JR.    CASE NO.: 3119MM405A
     RANDY HINES                 CASE NO.: 3119MM560A
 4   MICHAEL W. HUCKS            CASE NO.: 3119MM410A
     JOSEF JORG                  CASE NO.: 3119MM345A
 5   HARRY RICHARD KAPLAN        CASE NO.: 3119MM343A
     HAROLD E. KEMP              CASE NO.: 3119MM342A
 6   LOUIS G. KIRBY              CASE NO.: 3119MM339A
     MARK LOUIS KIRK             CASE NO.: 3119MM438A
 7   JOHN DAVID KOSTYLA          CASE NO.: 3119MM336A
     KEVIN LAPHAM                CASE NO.: 3119MM384A
 8   SHUN LEE                    CASE NO.: 3119MM402A
     ALAN LHOTA                  CASE NO.: 3119MM394A
 9   RONG LI                     CASE NO.: 3119MM398A
     JAMES LUNDEEN               CASE NO.: 3119MM391A
10   KENNETH M. MAKSYM           CASE NO.: 3119MM373A
     JAMES MARCIL                CASE NO.: 3119MM426A
11   GERARD MAZZA                CASE NO.: 3119MM424A
     CLEMENT MCBRIDE             CASE NO.: 3119MM419A
12   PETER MCBRIDE               CASE NO.: 3119MM415A
     CLARENCE MCCLAIN            CASE NO.: 3119MM409A
13   JOHN MCCULLEY               CASE NO.: 3119MM451A
     TERRY ALFRED MERWIN         CASE NO.: 3119MM354A
14   BARRY MILLS                 CASE NO.: 3119MM428A
     JOSEPH RAY MOYER            CASE NO.: 3119MM484A
15   BRIAN K. OLAISEN            CASE NO.: 3119MM411A
     ADAM READ PALMA             CASE NO.: 3119MM413A
16   JONATHAN PESHKE             CASE NO.: 3119MM358A
     KENNETH PHILLIPS, JR.       CASE NO.: 3119MM407A
17   NEIL POWERS                 CASE NO.: 3119MM378A
     BRUCE PURPLE                CASE NO.: 3119MM490A
18   ANTHONY RANDAZZO            CASE NO.: 3119MM433A
     GREGORY ALAN READER         CASE NO.: 3119MM376A
19   BILL MICHAEL RIZKALLAH      CASE NO.: 3119MM562A
     PAUL A. RODLIFF             CASE NO.: 3119MM554A
20   CONNER THOMAS RUF           CASE NO.: 3119MM556A
     SHAWN ROBERT RYAN           CASE NO.: 3119MM338A
21   WILLIAM SAUNDERS            CASE NO.: 3119MM388A
     MICHAEL SEARS               CASE NO.: 3119MM441A
22   MARK PATRICK SPERO          CASE NO.: 3119MM383A
     KEITH ALLAN TAIG            CASE NO.: 3119MM365A
23   JOHN W. TAYLOR              CASE NO.: 3119MM447A
     SCOTT L. TAYLOR             CASE NO.: 3119MM359A
24   LUIS R. VEGA                CASE NO.: 3119MM352A
     GEORGE TIMOTHY WARD         CASE NO.: 3119MM361A
25   CHARLES WATERHOUSE          CASE NO.: 3119MM454A
```

00267179-acac-40ed-90b6-273d293d8722

J.A. 247

Page 108

```
 1    HANS WEDE                    CASE NO.: 3119MM459A
      KENNETH WESSELL              CASE NO.: 3119MM347A
 2    JAMES L. WEST                CASE NO.: 3119MM340A
      BRUCE JAMES WICKERS          CASE NO.: 3119MM335A
 3    DEANGILO LARAYE WILLIAMS     CASE NO.: 3119MM400A
      MARK YOUSSEF                 CASE NO.: 3119MM363A
 4
        Defendants.
 5    _____/

 6

 7                  TRANSCRIPT OF HEARING PROCEEDINGS

 8                        MOTION TO SUPPRESS

 9                  THIS CAUSE came on for hearing before

10         the Honorable Nicole P. Menz, Judge of the

11         above court at the Indian River County

12         Courthouse, Vero Beach, Florida, on the 23rd

13         day of April, 2019.

14

15

16

17

18

19

20

21

22

23

24

25
```

00267179-acac-40ed-90b6-273d293d8722

```
                                                          Page 109

 1    THE APPEARANCES were as follows:

 2    FOR PLAINTIFF:   Office of the State Attorney
                       2000 16th Avenue
 3                     Vero Beach, Florida 32960
                       BY:  Steven R. Wilson, Esquire
 4                          Levering Evans, Esquire
                            Ryan L. Butler, Esquire
 5
      FOR DEFENDANT:   Adam Chrzan, Attorney at Law
 6                     1443 20th Street, Suite F
                       Vero Beach, Florida 32960
 7                     BY:  Adam Chrzan, Esquire

 8    FOR DEFENDANT:   The Law Offices Of David Golden, P.A.
                       903 SE Central Parkway
 9                     Stuart, Florida 34994
                       BY: David Golden, Esquire
10
      FOR DEFENDANT:   Law Office of Bobby Guttridge
11                     1601 20th Street
                       Vero Beach, Florida 32960
12                     BY:  Bobby D. Guttridge, Esquire

13    FOR DEFENDANT:   Thomas A. Kennedy, P.A.
                       1426 21st Street
14                     Vero Beach, Florida 32960
                       BY:  Thomas A. Kennedy, Esquire
15
      FOR DEFENDANT:   The Kessler Law Firm
16                     101 North US Highway 1, Suite 200
                       Fort Pierce, Florida 34950
17                     BY:  Michael J. Kessler, Esquire

18    FOR DEFENDANT:   Kibbey Wagner
                       416 Camden Avenue
19                     Stuart, Florida 34994
                       BY:  Richard Kibbey, Esquire
20
      FOR DEFENDANT:   Margaret Keys McCain, P.A.
21                     1605 19th Place
                       Vero Beach, Florida 32960
22                     BY:  Margaret K. McCain, Esquire

23    FOR DEFENDANT:   Wayne R. McDonough, P.A.
                       1901 25th Street
24                     Vero Beach, Florida 32960
                       BY:  Wayne R. McDonough, Esquire

25
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

```
                                                    Page 110
 1

 2   FOR DEFENDANT:   Green & Metcalf, P.A.
                      1245 20th Street
 3                    Vero Beach, Florida 32960
                      BY:  Andrew B. Metcalf, Esquire
 4
     FOR DEFENDANT:   Law Office of Edward J. Mosher, P.A.
 5                    210 South Depot Drive
                      Fort Pierce, Florida 34950
 6                    BY:  Edward J. Mosher, Esquire

 7   FOR DEFENDANT:   Ohle & Ohle
                      423 Delaware Avenue
 8                    Fort Pierce, Florida 34950
                      BY:  Michael R. Ohle, Esquire
 9
     FOR DEFENDANT:   John H. Power, attorney at Law
10                    2182 Ponce De Leon Circle
                      Vero Beach, Florida 32960
11                    BY:  John H. Power, Esquire

12   FOR DEFENDANT:   Sercombe Law
                      601 21st Street, Suite 300
13                    Vero Beach, Florida 32960
                      BY:  Daniel Sercombe, Esquire
14
     FOR DEFENDANT:   Stone & Stone
15                    1964 14th Avenue
                      Vero Beach, Florida 32960
16                    BY:  Robert E. Stone, Esquire

17   FOR DEFENDANT:   Law Office Kenneth N. Weaver
                      2285 West Eau Gallie Boulevard
18                    Melbourne, Florida 32935
                      BY:  Kenneth N. Weaver, Esquire
19
     FOR DEFENDANT:   Steve Ziskinder Law Office, P.A.
20                    311 S 2nd Street, Suite 102B
                      Fort Pierce, Florida 34950
21                    BY:  Steve Ziskinder, Esquire

22

23

24

25
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

```
                                                      Page 111
 1                    I N D E X
 2   VOLUME I.......................................Page 1
 3   WITNESS
 4    KEITH TAIG
        Direct Examination by Mr. Metcalf............Page 17
 5
      OFFICER SEAN CROWLEY
 6      Direct Examination by Mr. Metcalf............Page 29
        Cross-Examination by Mr. Ziskinder...........Page 88
 7      Cross-Examination by Mr. Sercombe............Page 89
        Cross-Examination by Mr. Golden..............Page 90
 8      Cross-Examination by Mr. Kennedy.............Page 91
        Cross-Examination by Mr. Kibbey..............Page 94
 9      Cross-Examination by Mr. Butler..............Page 97
        Redirect Examination by Mr. Metcalf..........Page 102
10
      VOLUME II.....................................Page 106
11
      JOHN PEDERSEN
12      Direct Examination by Mr. Metcalf............Page 125
13    CHIP BROCK
        Direct Examination by Mr. Metcalf............Page 128
14      Cross-Examination by Mr. Guttridge...........Page 140
        Redirect Examination by Mr. Metcalf..........Page 142
15
      CARLA SUTHERLAND
16      Direct Examination by Mr. Metcalf............Page 144
17    KYLE EDER
        Direct Examination by Mr. Metcalf............Page 148
18      Cross-Examination by Mrs. McCain.............Page 155
        Cross-Examination by Mr. Sercombe............Page 157
19      Cross-Examination by Mr. Golden..............Page 158
        Cross-Examination by Mr. Chrzan.............Page 161
20      Cross-Examination by Mr. Golden..............Page 162
        Cross-Examination by Mr. Kessler.............Page 163
21
      MICHAEL GASBARRINI
22      Direct Examination by Mr. Metcalf............Page 165
        Cross-Examination by Mr. Guttridge...........Page 184
23      Cross-Examination by Mr. Kennedy.............Page 186
        Cross-Examination by Mr. Chrzan.............Page 190
24
      CERTIFICATE OF REPORTER.......................Page 105
25                                                    Page 218
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 251

Page 112

1

2

3                    EXHIBITS ADMITTED INTO EVIDENCE

4    Defendant's Exhibit No. 1.......................Page 36
     Defendant's Exhibit No. 2.......................Page 36
5    Defendant's Exhibit No. 3.......................Page 36
     Defendant's Exhibit No. 4.......................Page 36
6    Defendant's Exhibit No. 5.......................Page 41
     Defendant's Exhibit No. 6.......................Page 97
7    Defendant's Exhibit No. 7.......................Page 97

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

00267179-acac-40ed-90b6-273d293d8722

J.A. 252

Page 113

1      (The above-entitled hearing continued as follows in

2   Volume II.)

3            MR. METCALF:  Judge, at this time before we go any

4   further, under State v. Morris, 622 So. 2d 67, it is a

5   Fourth District Court of Appeals case.  I can provide it to

6   the Court and Mr. Butler a copy.

7            THE COURT:  Can you just give me the cite again?

8            MR. METCALF:  622 So. 2d 67.  The companion case

9   to that is Vargas which is a Supreme Court of Florida case,

10  667 So. 2d 175.  Your Honor, I direct you to footnote 3 on

11  Morris on the first page, but it goes onto the second page

12  which is actually page 68 of the opinion.

13           Basically while a police officer waited in a

14  separate room, it did not take part in the search or take

15  custody of the records.  That is a search for records, but

16  933.02 deals with search warrants and what you have to do.

17           You can't go and apply for a search warrant and be

18  the affiant and then have nothing to do with execution.  The

19  execution of this warrant, Judge, was the installation of

20  the cameras.  That was the execution.  They were

21  installing cameras.

22           It had to be done in such a way as to minimize the

23  invasion of privacy and to follow the exact prescription of

24  the order.  That is what happened in this case.

25           They went in and searched a doctor's office.  The

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 253

Page 114

1  officer waited in a separate room and let the solicitor

2  general do the search.  The Court said, the Fourth DCA said,

3  no, you can't do that.  You were the one who applied.  You

4  are the one who asked for the search warrant.  And you are

5  the one authorized to execute the search warrant.

6         The delay here, Judge, the search is when they

7  installed the camera.  The notification comes later.  He

8  didn't have anything to do really with the installation of

9  those cameras.  I just asked him five times.

10         He was in the room next door.  He was outside as

11  the dupe.  He was the guy faking out the women.  He had

12  nothing to do.  He wasn't in there supervising.  And you

13  can't delegate that to anyone else.  He had to be there to

14  make sure the order was followed.  He can't let the

15  Department of Homeland Security do it.  He cut them loose.

16  He can't do it.

17         Under Morris, the prescription for the cure for

18  this is suppression.  The warrant is gone.  It is not a

19  wishy-washy case, Judge.  In that case, under 933.08 it

20  provides search warrants to be served by officers mentioned

21  therein.  These guys weren't mentioned in the application.

22  They weren't the affiants.

23         The search warrant shall in all cases be served by

24  any of the officers mentioned in its discretion, in its

25  direction.  No one else was authorized in the order.  No

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

J.A. 254

Page 115

1    one, but by no one other person except in the aid of the

2    officer requiring it.

3           That is what is written in there, but Morris goes

4    on to say if you delegate the authority of other people,

5    that is the end of it.  So he did exactly that.  He went

6    outside and tricked these women into coming outside with

7    him, hung out with them while he delegated it to the

8    Department of Homeland Security.  They are not mentioned

9    anywhere in this order as being authorized to install or to

10   execute the warrant.  So I would say we stop right here and

11   that is the end of it under Morris.

12           THE COURT:  State?

13           MR. BUTLER:  Florida Statute 933.08 specifically

14   says that officers who are serving the warrant can be aided

15   by other officers, other people.  That is exactly what

16   Detective Crowley said.  He was present.  He served the

17   warrant.  He was inside the actual building.  He was

18   outside.  He was next door.  He was clearly there.  He was

19   conducting the search.  He was serving it.  He was aided by

20   I think he said technicians from Homeland Security who were

21   crawling around in the ceiling installing the cameras.  That

22   is complete authorized by the statute.

23           MR. METCALF:  Judge, Morris interprets the

24   statute, and it is a Fourth District Court of Appeals case.

25           THE COURT:  What about the paragraph on the bottom

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 116

1    of page 3?  Obviously, I just was handed this case so I am

2    only looking at it for the first time.

3              But in the first column at the bottom where it

4    says under the statute it essentially says that the person

5    who authorizes the warrant must participate in or supervise

6    the search even where he requires the assistance of others

7    to do so.  Isn't that exactly what happened here?

8              MR. METCALF:  Judge, if you are outside, you are

9    not supervising the search.  That is exactly right.  He must

10   participate in or supervise.

11             THE COURT:  Right.  So isn't his presence being

12   there, would that not be supervising others or assisting him

13   with the installation?

14             MR. METCALF:  Judge, if you look at the Morris

15   case, what he did is he went there and he said to the

16   solicitor general or whoever it was I will wait in another

17   room.  That is exactly --

18             THE COURT:  He didn't say that.  I don't think

19   there was any testimony that the detective said that.

20             MR. METCALF:  Judge, he left the room.  How do you

21   supervise from outside?  How do you participate in the

22   installation of cameras from outside?  What we are talking

23   about, Judge, is --

24             THE COURT:  I can think of a number of ways you

25   can participate.  You can have a discussion about how you

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 117

 1   are going to install those cameras.  The person installing

 2   the cameras can come back and say this is how we installed

 3   those cameras.  I can think of any number of ways you could

 4   participate in the execution of the installation of

 5   the cameras.

 6              MR. METCALF:  Judge, I would ask the Court to

 7   examine carefully that case.  It appears that he showed up

 8   that day.  He was there and then basically turned over the

 9   search to other people and went into another room.  I am

10   sure he could have had discussions, too, about what they

11   were going to look for and what to do, but that is not what

12   the Court says.

13              The Court distinguished it when you leave the room

14   and turn it over to someone to execute your warrant and you

15   are not in the same room, that is it.  Vargas is the same

16   exact thing in a Supreme Court setting, your Honor.

17              THE COURT:  Mr. Butler, any additional argument?

18              MR. BUTLER:  No, Judge.

19              THE COURT:  I don't think Statute 933.08 and the

20   Morris case states the proposition that you are proposing,

21   Mr. Metcalf.  So I am going to deny your request to grant

22   the motion to suppress at this time under those reasons,

23   sir.

24              MR. METCALF:  Your Honor, I think Mr. Butler

25   referred to Mesa-Ricon.  Again, he simply answered the

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 257

Page 118

1    Fourth Amendment allows us to install cameras.  I take great

2    issue with that statement, but the specific Mesa-Ricon is a

3    Tenth Circuit Case that derives, it sets the standard for

4    the five things that must be present if you are going to use

5    video.  It is the only case that I know of that specifically

6    deals with that on a Federal level.

7            It derives its authority from United States

8    Code 18, Chapter 119, section 2516 which is the

9    authorization of a wiretap.  Your Honor, Mesa-Ricon doesn't

10   exist without an authorizing statute.  That case would not

11   be able to -- it doesn't exist without it.  So it draws from

12   that.

13           2516 on the Federal level requires that the

14   warrant be authorized in writing by in this case the

15   Attorney General, the Deputy Attorney General, the Associate

16   Attorney General or any Assistant Attorney General.  It goes

17   through a list of that.

18           Florida, if we are going to allow this kind of

19   behavior in Florida by the government to go in and tape, we

20   are going to be making new case law I guess because

21   Mesa-Ricon is the Federal.  So here the State is analogous

22   authority going to 934.  934 requires the State Attorney in

23   wiretap cases to in writing authorize applications.

24           So Mr. Butler cannot just get away with saying the

25   Fourth Amendment.  Mesa-Ricon, there is only one case out

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 119

 1   there that authorizes surreptitious video surveillance, and

 2   that is it.  And it derives it from an enacting statute in

 3   the Federal law.

 4              Here, we are in the State of Florida now.  934 is

 5   the enacting statute.  It requires Bruce Colton, only Bruce

 6   Colton to authorize in writing this application.  It was not

 7   done here.  That is the testimony that has been elicited.

 8              The State doesn't get to pick and choose and throw

 9   out, hey, we are allowed to do this and you guys figure out

10   why.  The Fourth Amendment doesn't give them permission to

11   do this, Judge.  They have to have an authority.  And that

12   is the only possible authority they can draw on.

13              So I am asking the Court to grant the motion to

14   suppress at this time citing 2516 as the acting authority

15   for Mesa-Ricon and 934 for the state wiretap statute.  It is

16   the only possibly enacting statute.

17              THE COURT:  State, your response?

18              MR. BUTLER:  Are we done with the evidentiary

19   portion?

20              MR. METCALF:  No.

21              MR. BUTLER:  I prefer to -- I think for purposes

22   of the record, it is more work for us.  I think that

23   submitting a written closing, a written brief at the end,

24   apply case law would be a better practice than doing

25   piecemeal.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 120

 1           THE COURT:  I think Mr. Metcalf is trying to

 2    shorten the motion to suppress by indicating it should be

 3    granted at this time based on the testimony that we have

 4    already heard under Mesa.  Right?

 5           MR. METCALF:  Yes.  And I am also trying to figure

 6    out what direction to go with witnesses because the State,

 7    with all due respect to Mr. Butler, the game they are

 8    playing is we don't have to tell you why we are authorized

 9    to do this.  They can solve the whole mystery if they tell

10    us under what authority do they think they can put video

11    cameras in a place where people have a right of privacy.

12           MR. BUTLER:  Mesa-Ricon which is a Tenth Circuit

13    Case, and there are other numerous other Federal Appellate

14    Court cases that talk about the use of covert surveillance

15    cameras that don't capture audio.  But what Mesa-Ricon talks

16    about and they discuss this is that Title 3 which is the

17    Federal Wiretap Code provision doesn't apply to non-audio

18    surveillance.

19           But they do say in the opinion that nevertheless,

20    the general Fourth Amendment requirements are still

21    applicable to video surveillance and suppression is required

22    when the government fails to follow these requirements.

23           So then what the Court does is the Court says

24    let's figure out what provisions the Fourth Amendment

25    requires for video surveillance.  And they look to some of

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Case 9:21-cv-80391-RLR Document 109-15 Entered on FLSD Docket 04/09/2022 Page 121

STATE OF FLORIDA vs. ROBERT FREELS, ET AL

L. T. CASE NO. 312019MM000328A of 218 DCA CASE NO. 4D19-1655, ET AL

Page 121

1    the provisions in the wiretap statutes for guidance such as

2    the provision that the applicant show that they used other

3    investigative methods short of installing the cameras.  So

4    they adopt that.  In fact, what they say is that we adopt.

5    We adopt these five requirements.

6            So they are not saying that suddenly Title 3

7    applies.  In fact, they are saying the opposite, that Title

8    3 does not apply.  Chapter 934 is virtually identical to

9    Title 3, but there are numerous provisions in 934 that go to

10   wiretaps.  They don't all apply to video surveillance.

11           The general constitutional principles that the

12   Ricon Court adopted seemed to be what the Federal Courts say

13   should apply when you are dealing with a covert video

14   surveillance camera.  It still goes back to the Fourth

15   Amendment.

16           So this idea that there is a reliance on Chapter

17   934 is incorrect.  That is not what the case says.  In fact,

18   there is a Florida case.  It is Paul Minotty v. Baudo;

19   B-A-U-D-O.  It is 42 So. 3d 824, a Fourth DCA from 2010

20   where the Fourth DCA dealt with the issue of a surveillance

21   camera that was installed in a business that did not -- it

22   wasn't supposed to record audio.

23           And what the Court said, I will go to the actual

24   page number here.  I am looking at page 832 of the opinion.

25   We agree with our sister circuits and they are quoting from

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 122

1    United State v. Larios which is a First Circuit Court of

2    Appeals case.  We agree with our sister circuits that by

3    explaining meaning the text of Title 3 does not apply to

4    silent video surveillance.

5            There is no question that every requirement of 934

6    Title 3 doesn't apply to video surveillance.  What does

7    apply are general Fourth Amendment principles which the rack

8    case lays out pretty well, the ones that they have adopted.

9            MR. METCALF:  Judge, in Ricon, No. 5 in it, the

10   order does not allow the period of interception to be longer

11   than necessary to achieve the objective of the authorization

12   or in any event no longer than thirty days.

13           934, the State is saying Ricon is cherrypicking

14   what it wants out of the wiretap statute when the case is

15   riddled with just saying, look, factually, this is more

16   intrusive than wiretaps.  The safeguards that are in place

17   for wiretaps, this is even worse to take someone's video.

18   You are audio recording someone here.  They are taking

19   images of naked people.  What more invasiveness could you

20   be.

21           Ricon codifies, puts into their five-step

22   procedure, Judge, that that is the order that has to have

23   that limiting instruction.  It is written within 934 that

24   you have to have it.  If you don't have it, and there are

25   cases dealing with wiretaps that if you don't have that

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 123

1    language in there, if you just put a thirty-day cap, that

2    defeats the warrant.  Ricon doesn't extinguish the

3    safeguards of 2316.  It amplifies them.  The State is

4    saying, hey, if you get these five things of Ricon, that is

5    all you need, but you still have to look at the authorizing

6    analogous statutes because those are there to protect us.

7          Ricon doesn't just eliminate those protections.

8    There is no law.  So Ricon is just an interpretation.  They

9    basically begged the Federal Government, I think, in their

10   wording to pass a law if they want to.  Until then they are

11   borrowing from the wiretap statute.  That is what Ricon is

12   all about.

13         Ricon is not necessarily controlling here.  This

14   is the State of Florida.  We have Article 1, section 23.

15   And we have a specific right of privacy in this state.

16   Article 1, section 12, you can't ignore the Fourth

17   Amendment, but Judge, Ricon is an amplification of enacting

18   statutes that govern wiretap.

19         Here, there is reasons that you have the State

20   Attorney do it.  They didn't do that.  These guys were cut

21   loose.  And they submitted an order that is just some

22   generic junk.  We are talking about invading the right of

23   privacy of people in the most intimate setting.  And Ricon

24   only deals with -- also is not controlling over this case

25   because it deals with a medium level of the right to

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 263

Page 124

1   privacy, just a medium level.  We have a high level here.

2   This was an office.  This is a massage place.

3          I disagree with Mr. Butler that you can ignore the

4   governing statutes because that is what Ricon looked to.

5          THE COURT:  Mr. Butler, did you want to make any

6   further argument?

7          MR. BUTLER:  No, your Honor.

8          THE COURT:  I am not going to grant the motion to

9   suppress at this point.  I will take that point under

10  advisement.  I do know the State wants to submit some case

11  law with to that.  So for purposes of the hearing --

12         MR. METCALF:  We will plod on.  Judge, could we

13  call John Pedersen?

14         THE COURT:  Would you raise your right hand.

15  Do you swear or affirm that the testimony you are about to

16  give is the truth, the whole truth and nothing but the

17  truth?

18  AND THEREUPON,

19                      JOHN PEDERSEN,

20      Called as a witness on behalf of the Defendants

21      herein, after having been first duly sworn, was

22      examined and testified as follows:

23                   DIRECT EXAMINATION

24         THE WITNESS:  I do.

25         THE COURT:  Thank you, sir.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 264

Page 125

1    BY MR. METCALF:

2         Q    Sir, can you state your name.

3         A    John Pedersen.

4         Q    You are employed at the Vero Beach Police

5    Department?

6         A    I am.

7         Q    What is your role?

8         A    I am the supervisor of the detective division,

9    lieutenant.

10        Q    With regards to this case that revolves around the

11   investigation arrest arising out of conduct at East Spa, did

12   you supervise in that investigation?

13        A    I was, and I was assisted by Sergeant Phil Huddy.

14        Q    Was there anyone above you other than the Chief of

15   Police?  Was the State Attorney involved in the

16   investigation?

17        A    We received assistance from the State Attorney's

18   Office.  I reported to my captain, Captain Kevin Martin and

19   Chief David Curry.

20        Q    Who did you receive assistance from at the State

21   Attorney's Office?

22        A    We met with ASA Ryan Butler and Steve Wilson and I

23   believe there was ASA Hendriks.

24        Q    Were you working in concert with Indian River

25   County Sheriff's in their investigation going on as well?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 126

1   Were you familiar with that?

2        A     We were not working their case.

3        Q     Were you guys reporting back and forth to each

4   other about your finding and what was going on?

5        A     What is your exact question?

6        Q     Were you and the sheriff liaisoning back and forth

7   about what was happening in your case?

8        A     I was not, no.  I mean, some of my detectives

9   might have had conversations with other detectives, but, no,

10  I was not meeting with other sheriff's department detectives

11  and asking them about their ongoing case.

12       Q     The application and orders, there are two

13  applications for search warrant executed by Vero Beach

14  Police Department.  There is two orders authorizing the

15  search warrant.  Did you have any supervisory role in

16  drafting those applications or orders?

17       A     No, I did not.  The detectives, they drafted the

18  orders and they took them to the State Attorney's Office.

19       Q     Do you know how they drafted them?  Did they type

20  them out or did they cut and past them from some other

21  order?

22       A     I don't know.  They would have typed the order and

23  taken them to the State Attorney's Office for approval and

24  then to a Judge.

25       Q     As far as your active role in the investigation,

00267179-acac-40ed-90b6-273d293d8722

Page 127

1  did you have any like on a day-to-day basis with monitoring

2  or following witnesses, anything like that?

3      A    On a day-to-day basis I monitored the case.  On

4  some days I assisted with field surveillance.  I followed

5  suspects, persons of interest.  I assisted other detectives.

6  I reviewed reports.

7      Q    Did you apply for any subpoenas or for records or

8  anything like that?

9      A    No, I did not.

10     Q    You actively covertly followed people, like tailed

11  them in your car?

12     A    As best as I can in the unmarked police car that I

13  have.  I don't know how covert it was, but, yes, I do follow

14  people in my unmarked police car.

15     Q    Were you present the day the video was installed?

16     A    I was not present on scene.

17     Q    Were you present the day that the notification was

18  provided and the arrests were made at the spa?

19     A    Was I present at East Spa on the date that the

20  warrant was served?

21     Q    Right.

22     A    I was at the bank that morning on February 19.  I

23  later went to East Spa that morning while our officers were

24  still there conducting the search and arrest warrant.

25          MR. METCALF:  Nothing further.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

Page 128

1           THE COURT:  No other attorneys have questions?

2   Mr. Butler?

3           MR. BUTLER:  No questions.

4           THE COURT:  May this witness be excused?

5           MR. METCALF:  Yes.

6           THE COURT:  Thank you.  You may go about your day.

7           MR. METCALF:  I call Detective Chip Brock.

8           BAILIFF:  What was the last name, sir?

9           MR. METCALF:  Brock.

10          THE COURT:  Would you raise your right hand.

11  Do you swear or affirm that the testimony you are about to

12  give is the truth, the whole truth and nothing but the

13  truth?

14  AND THEREUPON,

15                     CHIP BROCK,

16      Called as a witness on behalf of the Defendants

17      herein, after having been first duly sworn, was

18      examined and testified as follows:

19                   DIRECT EXAMINATION

20          THE WITNESS:  I do.

21          THE COURT:  You may have a seat.

22  BY MR. METCALF:

23      Q    Good afternoon, sir.

24      A    Good afternoon.

25      Q    Good morning.  Can you state your name.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 129

1    A    Detective Chip Brock.

2    Q    You are a detective obviously with the Vero Beach

3    Police Department?

4    A    Yes, sir, I am.

5    Q    You were employed back last year during the

6    investigation of East Spa?

7    A    Yes.

8    Q    It is our understanding that you went in East Spa

9    as an undercover?

10   A    Yes, sir, I did.

11   Q    You went to East Spa.  Did you arrive in your

12   personal vehicle or an unmarked car?

13   A    It was an unmarked.

14   Q    How were you dressed?

15   A    I was dressed I believe in shorts and a T-shirt I

16   think is what it was.

17   Q    Were you aware that East Spa existed prior to

18   this?

19   A    No, sir.

20   Q    When you were brought into this, were you part of

21   the investigation ongoing or did they bring you in to be an

22   undercover?

23   A    I was the undercover.  I did some surveillance

24   after that.

25   Q    What kind of surveillance did you do after your

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 130

1    undercover?

2        A    Just sitting in the parking lot just observing

3    cars coming and going.

4        Q    Preparing applications and warrants, you had

5    nothing to do with that.  Right?

6        A    No, sir, I did not.

7        Q    In the day-to-day operations of the investigation,

8    you had no supervisory role or anything like that?

9        A    No, sir.

10       Q    As far as September 14 and September 18, those are

11   the dates you went in as an undercover?

12       A    Yes, sir.

13       Q    You go in, and you are wearing shorts and T-shirt?

14       A    Something like that.  Street clothes.

15       Q    Were you familiar at this time with who you

16   thought would be inside of the spa?

17       A    Yes, sir.

18       Q    Who were you told would be in there?

19       A    I was told it was going to be Lanfen Ma.

20       Q    Were you provided a photograph of her?

21       A    Yes, sir.  Her driver's license.

22       Q    Anyone else?

23       A    Not that day it wasn't.  That day it was Lanfen Ma

24   is who I was told.

25       Q    When you went there, was there any other female

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 131

1    present?

2         A    I didn't see anyone else.  When I first walked in,

3    I heard Lanfen Ma speak to someone else.  There was like a

4    curtain, and someone was behind the curtain.  I heard her

5    speak to someone.

6         Q    You were not told about Ms. Zhang?

7         A    I had, but I don't know the exact if it was during

8    that time or if it was that or what.

9         Q    I guess for the record Liyan Zhang?

10        A    Yes, it was -- I don't know how you say it.  Zhang

11   is the last name.

12        Q    So those are the two people that you thought could

13   be there?

14        A    Yes.

15        Q    Were you told to ask for Lanfen Ma?

16        A    No, sir.

17        Q    When I asked you who would you expect to be there

18   and you said Lanfen, why did you --

19        A    That was the person that day that they said would

20   probably be there.  I just knew from the driver's license

21   photo I had seen.

22        Q    So they were coming and going.  You were told that

23   was going to be the day that Ms. Ma would be the one

24   working?

25        A    I don't know who was coming and going.  I just

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Case 9:21-cv-80391-RLR   Document 109-15   Entered on FLSD Docket 04/09/2022   Page 132

STATE OF FLORIDA vs. ROBERT FREELS, ET AL

L. T. CASE NO. 312019MM000328AOF 218 DCA CASE NO. 4D19-1655, ET AL

Page 132

1    know that they had shown me the driver's license and said

2    that is probably who is going to be there.  And I went in

3    there, and that was who it was.

4        Q    I don't want to beat a dead horse, but they didn't

5    show you a picture of Ms. Zhang?

6        A    I don't know if they did or not, sir.

7        Q    So on September 14 you go in there.  Tell us what

8    happens.  When you walk in the door, what happens?

9            MR. BUTLER:  If I could just interpose an

10   objection.  My understanding of the motion is there is a

11   motion which challenges the overall probable cause to issue

12   the warrant which we know is limited to the four corners of

13   the affidavit.  So you have to go just on the affidavit.

14           And then there is another part of the motion which

15   alleges there were certain material omissions of exculpatory

16   material.  I know that one of those was a claim that

17   Detective Brock didn't get the phone number of this woman.

18   But I am not aware of any other claims regarding his work as

19   an undercover.  So this sounds more like a deposition than a

20   motion to suppress that really deals with a fairly discreet

21   issue that is pled in the motion.

22           MR. METCALF:  Judge, I should be afforded the

23   opportunity.  We are in a misdemeanor case where, A, we have

24   an escalated time period.  This Court, this county doesn't

25   afford a gazillion continuances to accommodate a misdemeanor

Page 133

1    case.  I was told by Judge Morgan this case is going to be

2    over in June.  We have moved as quickly as we can.

3             So we don't have depositions.  I can't possibly

4    know if there is an omission based on 2,000 pages of

5    discovery provided by the State because they saw fit to

6    give me everybody's discovery.  So I should be able to ask

7    Detective Brock some questions to see if he omitted anything

8    from the report because that is under Johnson, one of the

9    ways to attack a warrant.

10            THE COURT:  Overruled.  You may proceed.

11   BY MR. METCALF:

12        Q    Sir, when you went in, tell us what you saw.

13        A    I walked in the door.  There was like a desk right

14   there.  They had the prices of the different times, you

15   know, the different lengths of massage you could get.

16        Q    So they had a menu?

17        A    Yes, sir.

18        Q    What were the prices?

19        A    I don't remember all of the prices.  From my

20   report, I remember what I had written down which was a

21   thirty-minute massage for $50.

22        Q    Is that what you paid?

23        A    Yes, sir.

24        Q    Was that the price on the menu?

25        A    Yes, sir.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 134

1    Q    You walked in.  You now know you are with Lanfen

2  Ma?

3    A    Yes.  I was greeted by her.  She escorted me to a

4  room.

5    Q    Once inside the room -- I don't need every

6  blow-by-blow detail, but basically what happened?

7    A    I went inside.  She told me.

8        MR. BUTLER:  Again, I am going to object.  You

9  have to specifically plead the motion to suppress.  If I

10  understand correctly, he wants to fish.  So what that means

11  is if he hears something which he says is a material

12  omission, then he is suddenly going to add that to his

13  motion to suppress.

14        The rule is very specific that we are entitled to

15  know why we are here.  We are entitled to know what the

16  claims are.  He has filed a motion which specifically lays

17  out a number of claims that he says are material omissions.

18  It is unfair to the State to allow them to go and conduct a

19  deposition and then just Willy-Nilly ad hoc amend motions to

20  suppress from the middle of a hearing.  That is a lack of

21  notice to the State.  How can we prepare for something like

22  that?

23        MR. METCALF:  Your Honor, he didn't prepare the

24  application.  I don't know if he even knows what is in the

25  application.  He didn't have anything to do with it.  His

00267179-acac-40ed-90b6-273d293d8722

J.A. 274

Page 135

1   testimony, his direct testimony could show that the

2   applicant misled the Court by misinterpreting everything he

3   said.

4           I have every right to ask him about it.  And to

5   find out in advance is impossible.  I can't know what his

6   testimony is.  Depositions aren't allowed in a misdemeanor

7   case.  So how in the world can I accommodate Mr. Butler.

8           MR. BUTLER:  He could file a motion for a

9   deposition because Courts do allow depositions in

10  misdemeanor cases.  And it would certainly shorten the

11  length of the hearing if we are going to have to sit here

12  and listen to a deposition of the fifteen people he has

13  waiting outside.

14          MR. METCALF:  Judge, I am not going to call all

15  fifteen people.  Detective Brock is a material witness to

16  what happened in there that established probable cause.

17          THE COURT:  I will overrule the objection, but --

18          MR. METCALF:  We will go quick.

19  BY MR. METCALF:

20      Q    Sir, you paid what was on the menu?

21      A    Yes, sir.

22      Q    Went into the room.  Did you receive a half-hour

23  massage?

24      A    Yes, sir.

25      Q    At the end of that massage, what happened?

Page 136

1      A      I got dressed and left.

2      Q      Were you ever solicited for sex?

3      A      Yes.

4      Q      Tell me about that.

5      A      Well, it started off like any normal massage.  I

6    go in there.  I disrobe down to my boxers.  She tells me to

7    lay on my stomach.  I laid on my stomach.  She started

8    rubbing my back.  I thought this is no different than any

9    other massage.

10           Then at one point I felt the bed kind of rock.

11   And I look and I see one knee on one side of my head,

12   another knee on the other side of my head.  She is wearing a

13   little bitty miniskirt.  I just kind of looked up and her

14   crotch is right basically on top of my head, maybe this

15   close from me.

16     Q      At some point it progresses into did she touch you

17   in your genitalia?

18     A      Yes.

19     Q      You elude to in your, well, you don't elude.  It

20   is eluded to that you go through some price structure for

21   sex?

22     A      Yes, sir.

23     Q      What was that?  How did you do that?

24     A      Well, she, of course, she flipped me over on my

25   back and she started rubbing my legs and then came up and

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 137

1   rubbed my penis, just kind of brushed over it.  Then she

2   crawled up like straddling my legs.  So she is in a little

3   Spandex minidress now up to her waist so all I see is just

4   panties.

5          She is giggling really awkwardly.  She asked me

6   what I wanted.  I played dumb.  I was like I don't know.

7   What are you talking about?  Then she started pointing.  She

8   wasn't saying anything, but she would be pointing like at

9   her mouth or at her crotch or the hand job.  That is what

10  she would do.

11     Q    You did nothing to solicit her?

12     A    No, sir.

13     Q    She solicited you?

14     A    Threw it right out there.

15     Q    You would agree that she at that point had

16  solicited you for sex or offered to commit sexual acts for

17  payment?

18     A    Yes, sir.

19     Q    She discussed the acts with motions?

20     A    She was doing the motions, and I kept playing

21  dumb.  I don't know what you are saying.

22     Q    She discussed money and sex?

23     A    Yes.

24     Q    The transaction, how did it end?  Obviously, you

25  didn't have sex with her.  So how did you get out of there?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 277

Page 138

1      A    I told her I didn't bring enough money with me

2    that day.

3      Q    Did that raise any problems that you told her that

4    that or you just walked out?

5      A    No, that was it.  She said get dressed.

6      Q    Did she offer to provide you a phone number?

7      A    No, sir.

8      Q    The second time on September 18, now it is with

9    Ms. Zhang?

10     A    Yes, sir.

11     Q    The same thing?

12     A    Same basic thing.  She was a little more

13   aggressive, but the same basically.

14     Q    So she came on to you even harder than Ms. Ma?

15     A    I think so.

16     Q    At the end of that, any problems?  Did you use the

17   same excuse I don't have any money?

18     A    The same thing.

19     Q    Any issue with that?

20     A    No.  She said check, make sure.  So I went over

21   and looked in my pocket and I said no.  She said, yeah, you

22   do.  I said, no, I don't.  I said because I want all of it.

23   I don't want the cheap stuff.

24     Q    Did she tell you to do it next time?

25     A    Yeah.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 139

1      Q     Did she have any problem with that?

2      A     No, she didn't seem to.  She seemed to be okay

3  with it.

4      Q     Did she offer to give you her phone number?

5      A     She did.  Yes, sir.

6      Q     Did you accept it?

7      A     No, sir.  I just got -- I don't know.  For

8  whatever reason I was getting dressed.  At one point she

9  reaches over.  I thought she was going to whisper something

10  to me so I kind of turned and she kissed me which was kind

11  of, you know, I wasn't ready for it.  And I think everything

12  just kind of got lost from there.  I just kind of forgot

13  about it.  And she didn't mention it anymore.

14      Q     Over the years of your training and experience,

15  have you ever investigated criminal enterprises, you know,

16  racketeering, money laundering, any of that?

17      A     No, sir.  I was always at the street level as a

18  patrolman.

19      Q     Were you given any instruction when you went in

20  there?  If you can obtain information, let us know what it

21  is.

22      A     My whole job was just to go in there and, of

23  course, report everything that I had seen, witnessed and

24  stuff.

25      Q     You were solicited twice.  You were being told

Page 140

1    what to do by Crowley?

2         A    I mean, they are the ones that told me to go in

3    and who the people were and what to kind of expect.

4         Q    Was there no discussion since now they had engaged

5    in prostitution twice and soliciting you both of just

6    shutting it down and making an arrest right then and there?

7         A    I don't know what they discussed.  They didn't

8    discuss it with me.  No, sir.  I just went in, and I did my

9    report.  I was pretty much done with it other than, like I

10   said, the surveillance once in a while.

11        Q    So you watched some of the videos, live feeds?

12        A    Yeah.

13             MR. METCALF:  Nothing further.

14             THE COURT:  Any questions from any other of the

15   defense counselors.  Mr. Butler?  I am sorry, Mr. Guttridge.

16                       CROSS-EXAMINATION

17   BY MR. GUTTRIDGE:

18        Q    Officer Brock, when you first went in there, you

19   sat down.  You went there.  She solicited you.  There was no

20   problem with that.  You didn't follow through with that and

21   you left on good terms.  Right?

22        A    Yes, sir.

23        Q    And the second time you went in there the same

24   thing.  Correct?

25        A    Yes, sir.

00267179-acac-40ed-90b6-273d293d8722

Page 141

1      Q     Did you get the number at the end of the second

2    time?  Did she give you the number?

3      A     No, sir.  That is what I told Mr. Metcalf is I

4    think it just kind of went over my head.  I didn't even

5    really pay attention to it other than she asked for it.  I

6    just, I didn't ask her for it.  She didn't give it to me or

7    anything like that.

8      Q     That was at the end?

9      A     That was at the end.

10      Q     At the end of the second one?

11      A     The second one.

12      Q     At any point in time was there any kind of

13    uncomfortable, were you put in an uncomfortable position

14    where she thought you were a law enforcement officer?

15      A     Yeah, she kept saying -- because she was trying to

16    explain to me like once again doing the gestures.  I was

17    just playing dumb, like I don't understand what you want.

18    She is like you trouble, you trouble, you are police, you

19    are police, you trouble, stuff like that.

20      Q     Is that how it ended?

21      A     Like I said, it ended she kissed me on the lips,

22    you know.

23      Q     Notwithstanding this idea that you are trouble,

24    you are trouble, which is sort of a term of art with them,

25    they don't want to get arrested by the police?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 142

1      A    Yes, sir.

2      Q    It ended with her kissing you.  So she wasn't very

3   suspicious at that point.  Correct?

4      A    I guess not.  Even after she was saying you

5   trouble, you trouble, she was still discussing money.  And

6   then, like I say, gave me the peck on the lips at the end.

7      Q    So based on those two encounters, you would expect

8   if you went in there again, they would give you a massage

9   and still see you again.  Correct?

10     A    Well, if they didn't recognize me, yes, sir, I

11   would think so.

12     Q    If they didn't recognize you -- they would

13   recognize you as being the same person that came in if they

14   didn't recognize you as a law enforcement officer?

15     A    Right.

16     Q    But you had no reason to believe she recognized

17   you as a law enforcement officer because of the fact she

18   kissed you?

19     A    No, sir.

20          THE COURT:  Any other defense attorneys have

21   questions?

22          MR. METCALF:  I have one.

23                       REDIRECT EXAMINATION

24   BY MR. METCALF:

25     Q    Sir, you are not the only officer at Vero Beach

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 143

1   Police.  Right?

2      A    No, sir, I am not.

3      Q    They could have pooled from a different guy.

4   Right?

5      A    Absolutely.

6           THE COURT:  Mr. Butler, any questions?

7           MR. BUTLER:  No questions.

8           THE COURT:  May this witness be excused?

9           MR. METCALF:  Yes, sir.

10          THE COURT:  Thank you.  You are free to go about

11   your day.

12          THE WITNESS:  Thank you, Judge.

13          THE COURT:  Call your next witness, Mr. Metcalf.

14          MR. METCALF:  Your Honor, can I call Carla

15   Sutherland.

16          BAILIFF:  Face the Judge and raise your right

17   hand.

18          THE COURT:  Do you swear or affirm that the

19   testimony you are about to give is the truth, the whole

20   truth and nothing but the truth?

21   AND THEREUPON,

22                    CARLA SUTHERLAND,

23      Called as a witness on behalf of the Defendants

24      herein, after having been first duly sworn, was

25      examined and testified as follows:

```
                                                      Page 144

 1                      DIRECT EXAMINATION

 2              THE WITNESS:  Yes, I do.

 3              THE COURT:  Thank you.  Have a seat.

 4  BY MR. METCALF:

 5       Q    Can you state your name, ma'am.

 6       A    Carla Sutherland.

 7       Q    Where do you work?

 8       A    For the Florida Department of Health.

 9       Q    How long have you been there?

10       A    Since 2015.

11       Q    You are familiar with why you are here?

12       A    Yes, sir.

13       Q    On September 10 or 11 did you conduct an

14  inspection of East Spa?

15       A    I did not conduct the inspection.  No.

16       Q    Did you go inside East Spa?

17       A    Yes, I did.

18       Q    Why did you go in there?

19       A    I went in to do a compliance inspection along with

20  the inspector that was inspecting, doing an inspection of

21  the spa.

22       Q    Is that normal that the two of you go in there?

23       A    Sometimes.

24       Q    The other person with you was who?

25       A    Cynthia Pagano.
```

00267179-acac-40ed-90b6-273d293d8722

Page 145

1     Q     Did an inspection get done?

2     A     Cynthia conducted an inspection.

3     Q     Was there any violations at all during the

4  inspection?

5     A     I did not conduct the inspection so I cannot say

6  on that.

7     Q     Are you aware of any complaints that have ever

8  been filed against East Spa with the Department of Health?

9     A     Yes.

10    Q     Are there any?

11    A     There were some in the past.  Yes.

12    Q     What kind of complaints?

13    A     There were unlicensed medical activity going on

14  which means there were individuals that could have been

15  practicing and was practicing medicine without a license

16  which means they were supposed to be licensed as a

17  therapist.  And some of the therapists were not licensed,

18  but this was in the past.

19    Q     Did that shut them down or what happened?

20    A     No.  Typically, when an individual is practicing

21  without a license, they are issued a notice to cease and

22  desist and sometimes a citation.

23    Q     Did you see any indication of people domiciling in

24  East Spa?

25    A     I did not get past the reception area.

00267179-acac-40ed-90b6-273d293d8722

J.A. 285

Page 146

1      Q    If an officer said that you reported back that,

2  that would not be correct?

3      A    That I seen --

4      Q    Yes.

5      A    I did not see if anybody was living there because

6  I was only in the reception area.

7      Q    As far as any other complaints, has there ever

8  been any complaint ever about prostitution in East Spa?

9      A    I was contacted by Vero Beach PD back in July of

10 last year that they had received a complaint that there was

11 prostitution going on in that facility.

12     Q    From these anonymous sources.  Right?  Is that

13 what they told you, from anonymous sources?

14     A    They didn't say where the complaint came from.

15 They just said they had received a complaint.

16     Q    DOH doesn't have any those kind of complaints, do

17 they, from anybody?

18     A    Solicitation complaints?

19     Q    Right.

20     A    Sometimes the public does file a complaint with

21 DOH alleging that there is prostitution going on in an

22 establishment.

23     Q    Did that ever happen with East Spa?

24     A    Not to my knowledge.

25     Q    The women inside East Spa were licensed massage

00267179-acac-40ed-90b6-273d293d8722

J.A. 286

Page 147

1   therapists?

2        A    On the day that I went in, yes, sir.

3             MR. METCALF:  Nothing further.

4             THE COURT:  Any questions from any other defense

5   attorneys?  No?  Mr. Butler, any questions?

6             MR. BUTLER:  No, ma'am.

7             THE COURT:  May this witness be excused?

8             MR. METCALF:  Yes.

9             THE COURT:  Thank you.  You are free to go about

10  your day.

11            THE WITNESS:  Thank you.

12            MR. METCALF:  Judge, can I call Kyle Eder.

13            THE COURT:  Good morning.  Would you raise your

14  right hand.  Do you swear or affirm that the testimony you

15  are about to give is the truth, the whole truth and nothing

16  but the truth?

17  AND THEREUPON,

18                      KYLE EDER,

19      Called as a witness on behalf of the Defendants

20      herein, after having been first duly sworn, was

21      examined and testified as follows:

22                  DIRECT EXAMINATION

23            THE WITNESS:  I do.

24            THE COURT:  Thank you.  You may have a seat.

25  BY MR. METCALF:

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 287

Page 148

```
 1        Q      Can you state your name, sir.

 2        A      Kyle Eder.

 3        Q      You work for Vero Beach Police?

 4        A      That is correct.

 5        Q      Were you involved with the investigation with East

 6   Spa?

 7        A      Yes.

 8        Q      What was your role?

 9        A      I sent out subpoenas and I did surveillance at the

10   spa.

11        Q      When did you send out subpoenas?

12        A      Multiple times.  Probably a dozen.

13        Q      What kind of subpoenas?

14        A      Bank records, credit cards, statements.

15        Q      When you say multiple times, did this happen after

16   the video was already installed at East Spa?

17        A      Which one?  Throughout the whole investigation I

18   sent out subpoenas.

19        Q      I understand.  On November 28 there was an order

20   entered I believe within a day or so that cameras were

21   installed at East Spa?

22        A      Okay.

23        Q      You are aware of that.  Right?

24        A      I am aware there was video surveillance at East

25   Spa.  Yes.
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 288

Page 149

1    Q    Did your subpoena start after the cameras were

2    already put in there?

3    A    I can't recall.

4    Q    When did you become aware that there was cameras?

5    A    When we started doing surveillance over there.

6    Q    You don't have any idea when your first subpoena

7    got issued?

8    A    I could find out.  I don't know off top of my head

9    which one.

10    Q    You wouldn't have been doing things without

11    Officer Crowley knowing about it, would you?

12    A    No.

13    Q    If you had subpoenaed things, you would think that

14    Officer Crowley would have put that in the application,

15    right, if he knew that you had already subpoenaed records?

16         MR. BUTLER:  Objection, calls for speculation.

17         THE COURT:  Sustained.

18    BY MR. METCALF:

19    Q    Tell me about your surveillance.  Did there come a

20    time that you were next door to East Spa during working

21    hours?

22    A    Yes, sir.

23    Q    What was the purpose of that?

24    A    To get a better view of the people coming in and

25    out.  And I was also recording audio.

Page 150

1      Q      Was there a pole camera already installed

2   recording people coming in and out?

3      A      Yes.

4      Q      There was only one entrance?

5      A      That is correct.

6      Q      What better angle did you need than the pole cam?

7      A      To see them when they are coming in towards the

8   door.  The camera is not a high-resolution camera.  You

9   definitely get a better view yourself when you are standing

10  right there less than five feet away from the door.

11     Q      You needed a person to do that?  You couldn't have

12  put a camera there?

13     A      I wasn't involved with the camera install.

14     Q      How many times did you go next door?

15     A      Probably about eight.

16     Q      How did you get in there?

17     A      I had a key.

18     Q      Who gave you the key?

19     A      I got it from the special investigation office.

20     Q      Did they get permission from the landlord to have

21  that key or do you know?

22     A      I don't know.

23     Q      They didn't tell you whether you were entering

24  unlawfully or not?

25     A      They did not.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

```
                                                    Page 151
  1       Q     You went in and listened.  You went inside there.
  2    Correct?
  3       A     That is correct.
  4       Q     The purpose of that was to audio?
  5       A     To get a better view of the people coming in and
  6    out.  During that, I happened to hear audio from the
  7    neighboring business so I recorded it.
  8       Q     How many times did that happen?
  9       A     Every time I was in there.
 10       Q     Did anyone know you were doing that?
 11       A     At my department?
 12       Q     Yes.
 13       A     Yes.
 14       Q     They knew you were audioing?
 15       A     Yes.
 16       Q     Did you use any kind of enhancing equipment?
 17       A     No.
 18       Q     So you could hear through the walls?
 19       A     No.
 20       Q     Do you know the business that used to be there?
 21       A     I do not.  No.
 22       Q     Do you have any idea how long it was vacant?
 23       A     I think it was pretty recent, but I don't know.
 24    It looked like they were doing work in there.
 25       Q     Do you know how many different men you audioed?
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

Page 152

1          MR. BUTLER:  Judge, I am going to object as to

2     relevance.  There has been no motion filed with respect to

3     audio recordings.

4          THE COURT:  Sustained.

5          MR. METCALF:  I will move on.

6     BY MR. METCALF:

7     Q    When you audio recorded, when you did, could you

8     here acts of sex going on?

9          MR. BUTLER:  Same objection, Judge.

10          MR. METCALF:  Judge, at this point it is not

11     included.  There is a material omission and a misleading,

12     they are misleading the Court by saying we explored all

13     possible, I mean, that is not the exact language, but

14     alternative less invasive means.  This is an alternative

15     less invasive means.  And if it is working for him, then I

16     want to know when he started it and why he didn't do it.

17     And then he can testify.

18          MR. BUTLER:  Was that pled in your motion?

19          MR. METCALF:  Absolutely.

20          THE COURT:  They do articulate several lists of

21     intrusive means.

22          MR. BUTLER:  Is this one of the ones that was pled

23     they should have recorded the audio from the business next

24     door?

25          MR. METCALF:  Judge, I don't have to specifically

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

Page 153

1    call out every less invasive means in the motion.

2              THE COURT:  I will overrule the objection at this

3    point.  I will let you go into that.

4    BY MR. METCALF:

5         Q    Was the camera already installed when you were

6    listening in there?

7         A    Yes.

8         Q    And you could hear just fine in there?

9         A    I can't say hear everything, but there are times

10   when you could hear very clearly.

11        Q    Did you ever go in there before the cameras were

12   installed?

13        A    No.

14        Q    Do you know if anyone from Vero Beach did or had

15   access before the cameras were installed?

16        A    I don't know.

17        Q    Could you hear sex acts?

18        A    You could hear noise associated with sex acts.

19   Yes.  Moaning, yes.

20        Q    One person in particular, could you hear them

21   negotiate for sex or talk about sex?

22        A    I heard them ask for how long they wanted.  Most

23   of them said an hour.  Then some guys asked to see what

24   girls were working.  So they brought the girls out.  Some

25   people asked for more than one.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 154

1        Q     And then heard them have sex?

2        A     I heard moaning, yes.  From the front entrance

3    from when they walk in, I heard them talking.  And then they

4    go back and down the hall is where I hear them.

5        Q     How many men were in there at one time when you

6    were doing it?  There wasn't like twenty men in there, were

7    there?

8        A     No.

9        Q     Just one?

10       A     Most of the time just one.

11       Q     You had seen that specific person come in?

12       A     Yes.

13       Q     You watched them come in?

14       A     Yes.

15       Q     So you could identify them?

16       A     Yes.

17       Q     And then you could hear them negotiate for sex and

18   have sex just by listening?

19       A     I don't hear the negotiation for sex.  I hear

20   asking about other girls working and then people going back

21   in the room.

22       Q     Did you say someone said what do you want?

23       A     Yeah.  That is that commonly asked.  They asked

24   about time, like an hour long, half hour.  Usually they

25   would just say times, like I want an hour.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 294

Page 155

1       Q     If you had an amplifying source, do you think you

2    could have heard better?

3       A     Maybe because you don't hear everything that is

4    going on.

5       Q     When you went into the room, did you have to get

6    closer to the wall or put your ear up against the wall?

7       A     I didn't put my ear up against the wall.

8    Obviously, the closer I was to the wall the better I could

9    hear, but I never had to physically touch the wall to hear.

10      Q     Have you reviewed your recordings?

11      A     Some of them.

12      Q     You can clearly hear people talking?

13      A     Some are better than others.  Some are very clear.

14      Q     You are able to attribute to that specific person,

15   the defendants in this case, those conversations because you

16   were able to identify them.   Correct?

17      A     For a couple of them, yes.

18            MR. METCALF:  Nothing further.

19            THE COURT:  Any questions from any other defense

20   attorneys?  Mrs. McCain?

21                         CROSS-EXAMINATION

22   BY MRS. MCCAIN:

23      Q     Sir, when did you send out your first subpoena in

24   this case?

25      A     I don't know.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 156

1     Q     You didn't bring any of your information with you

2  today?

3     A     No.

4     Q     About when you sent out for a subpoena?

5     A     No.

6     Q     Were you assisting Detective Crowley in preparing

7  the application for the search warrant?

8     A     I did meet Evans.  The other detective was the one

9  that completed the subpoenas for the search warrants.

10    Q     I am asking about the application for the search

11 warrant.  You are saying that Lee Evans prepared the

12 application for the search warrant?

13    A     For the bank records?  What are we talking about?

14    Q     No.  For the search warrant to put the cameras in?

15    A     I did not do the cameras.  No.

16    Q     Did you assist Detective Crowley in doing that?

17    A     I don't believe so.  No.

18    Q     Who assisted Detective Crowley in doing that?

19    A     I don't know.

20    Q     You are saying that Lee Evans --

21    A     I thought you were talking about bank records.

22    Q     Lee Evans subpoenaed the bank records?

23    A     We were both doing subpoenas for the bank records.

24 You were asking about a search warrant.  He did the search

25 warrant to lock the funds in the banks.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 157

```
 1        Q    What was the first search warrant you did, without
 2   giving me the date, which is the first subpoena that you
 3   sent out in this case?
 4        A    The first subpoena?
 5        Q    Yes, sir.
 6        A    I don't know.  It was probably for the Wal-Mart
 7   purchases.
 8        Q    For the Wal-Mart purchases?
 9        A    If I had to guess.  I am only guessing.
10        Q    Which one was the second one?
11        A    I don't know.
12        Q    How many did you prepare?
13        A    Probably a dozen.  Possibly more.
14        Q    When did you first begin working on this case?
15        A    I believe it was October.
16             MRS. MCCAIN:  I don't have any further questions.
17             THE COURT:  Mr. Sercombe, yes, sir.
18                        CROSS-EXAMINATION
19   BY MR. SERCOMBE:
20        Q    Detective, who were you able to specifically
21   identify listening through the wall?  Which defendants?
22        A    I don't know off the top of my head.
23        Q    Do you know Anglesano?  Was he one?
24        A    The name.
25        Q    How were you able to identify him based on
```

Page 158

1    listening through the wall?  How did you do that?

2         A    As I said, I was watching them coming in and out

3    of these businesses.

4         Q    So you timed him going in and then be able to know

5    that it was him?  Could there have been other customers in

6    there as well?

7         A    I don't know if there were any other customers in

8    there at the time.

9         Q    So did you identify him based on the fact that he

10   was the only one who went in?

11        A    If I was at the business next door or I was in

12   close proximity to where I had eyes on him.

13             THE COURT:  Mr. Golden, yes, sir.

14                       CROSS-EXAMINATION

15   BY MR. GOLDEN:

16        Q    I just want to make sure we are seeing the same

17   thing you are saying.  You are in the adjoining business or

18   property monitoring what is occurring next door.  Right?

19        A    Yes.  It is a strip plaza.

20        Q    Yes, sir.  And the business that you are in, does

21   it run as deep as the spa business next door?

22        A    I don't know if it has the same layout, but it

23   runs just as deep.  There is a long hallway that goes all

24   the way back.

25        Q    So when you are listening, you are able to change

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 159

1    locations within the premises you are in.  Correct?

2         A    Correct.

3         Q    So when someone walks into the business next door

4    where the front desk is, you are positioned, I am assuming,

5    more up front?

6         A    Correct.  I am still close to the door where they

7    first walked in.

8         Q    When they are taken farther back to one of the

9    interior rooms, you are able to change your location, also?

10        A    Yes.

11        Q    When you tell us that you are able to hear, you

12   are not hearing as you state put up front where you were

13   initially or I am assuming you are moving back, also?

14        A    I get a better view back further into the

15   business.

16        Q    So you are able to do that on each occasion

17   depending on where you think they are moving next door,

18   also?

19        A    Yes.

20        Q    Are you wired in at all visually to any of

21   the cameras or monitors that are set up there?

22        A    No.

23        Q    At all?

24        A    Correct.

25        Q    So you are doing this by guesstimation, if you

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 160

1    will.  Once you assume that the business is done or

2    concluded at the front desk and they are moved to the back,

3    you are moving along inside?

4         A    That is correct.

5         Q    Are there adjoining walls to any of the those

6    massage rooms to where you are standing inside?

7         A    Are there adjoining walls?

8         Q    Well, I mean, any of the massage rooms that you

9    are talking about, are they adjoining --

10        A    They share a wall?

11        Q    Yes, sir.

12        A    Like am I on the other side of the wall directly?

13   I don't know.  I have never been in the East Spa.

14        Q    But that is how you are able to hear what you have

15   described.  Correct?

16        A    Yes.  I am trying to get as close as possible so I

17   can get the best audio.

18             THE COURT:  Mr. Chrzan, I think you are here as an

19   observer, sir.

20             MR. CHRZAN:  Well, no, actually, Judge, about an

21   hour and a half ago I filed motions to join.  I just haven't

22   had an opportunity to put that on the record.

23             THE COURT:  Who is your client?

24             MR. CHRZAN:  My clients are Jon Peshke,

25   P-E-S-H-K-E, 2019MM358.  Brian Olaisen, 2019-411.  Rong Li,

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 161

1    L-I, 2019MM398.  John Broecker, 2019MM353.  And Louis Crook,

2    2019MM417.

3              THE COURT:  Say the second again, sir.

4              MR. CHRZAN:  Brian Olaisen, O-L-A-I-S-E-N.  Rong

5    Li was L-I.  And Broecker was B-R-O-E-C-K-E-R.

6              THE COURT:  Okay.  Yes, sir.

7                    CROSS-EXAMINATION

8    BY MR. CHRZAN:

9        Q    Three brief questions.  You said you moved

10   throughout to get a better view?

11       A    I could never see what was going on.  If I said

12   that, I misspoke.

13       Q    What was the type, and I know that said this so if

14   you did I apologize, the type of recording device that you

15   used?

16       A    It is a small one you can buy at the store.

17       Q    Like a little micro recorder?

18       A    Yes.

19       Q    Did you hold that up against the wall?

20       A    No.  I held to close to the wall.  I never held it

21   against the wall.

22             MR. CHRZAN:  I have nothing further.

23             THE COURT:  Mr. Golden.

24                    CROSS-EXAMINATION

25   BY MR. GOLDEN:

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

```
                                                    Page 162
1        Q    I have just a couple of followups.

2             The premises that you were in, do you know when

3   you were able to gain access to that location?

4        A    Can you explain further?

5        Q    Sure.  When were you first able to have access to

6   that?

7        A    That business?  The adjoining business?

8        Q    Yes, sir.

9        A    I believe it was in December.  I don't remember

10  the specific dates.

11       Q    Was how that obtained?

12       A    I don't know.

13       Q    Was that anything you did or you were just told --

14       A    I was told that the next door place was vacant and

15  that they had a key for it.  I forgot how they said they got

16  the key, but they had the key for it.  And we were able to

17  go this in there.

18       Q    I think you indicated that it had been vacant for

19  quite some time.  Correct?

20       A    I don't recall saying that.  I don't know how long

21  that was vacant.

22       Q    Do you recall what business was there previously?

23       A    No.

24       Q    Do you know why access wasn't obtained earlier?

25       A    No.
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 302

Page 163

1           MR. GOLDEN:  Thank you.

2           THE COURT:  Mr. Sercombe, did you have another

3   question?

4           MR. SERCOMBE:  Chrzan asked my exact question.

5           THE COURT:  Any other defense attorneys with

6   questions?  Mr. Kessler, yes, sir.

7                   CROSS-EXAMINATION

8   BY MR. KESSLER:

9       Q    Can you tell us how many different patrons or

10  customers that you audio recorded?

11      A    I believe it was only three that I could identify.

12      Q    How many additional that you did not identify?

13      A    There were times I took recordings where there

14  weren't even customers in there.  When the employees were

15  talking amongst each other and I could hear it barely, I

16  would record that, also.

17      Q    But how many customers or patrons do you believe

18  that you also recorded that you have not identified?

19      A    I don't know.

20          MR. KESSLER:  Thank you, Judge.

21          THE COURT:  Any other defense attorneys?  Mr.

22  Butler, any questions?

23          MR. BUTLER:  No, your Honor.

24          THE COURT:  May this witness be excused?

25          MR. METCALF:  Yes, your Honor.

```
                                                      Page 164
 1            THE COURT:  Thank you, sir.  You may go about your

 2   day.

 3            MR. METCALF:  Your Honor, I would call Joseph

 4   Cappetto.

 5            THE COURT:  Okay.

 6            MR. METCALF:  Homeland Security probably ignored

 7   by subpoena.  Let me just confirm that I gave him the list.

 8            BAILIFF:  There is no response in the hall.

 9            MR. METCALF:  Dedre McCreary.

10            BAILIFF:  No response.

11            MR. METCALF:  Xavier Martinez.

12            BAILIFF:  No response.

13            MR. METCALF:  The last guy is Mark Phillips.

14            BAILIFF:  No answer.

15            MR. METCALF:  Gasbarrini.

16            THE COURT:  Raise your right hand.  Do you swear

17   or affirm that the testimony you are about to give is the

18   truth, the whole truth and nothing but the truth?

19   AND THEREUPON,

20                   MICHAEL GASBARRINI,

21       Called as a witness on behalf of the Defendants

22       herein, after having been first duly sworn, was

23       examined and testified as follows:

24                   DIRECT EXAMINATION

25            THE WITNESS:  I do.
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

```
                                                          Page 165
 1              THE COURT:  Go ahead.  Thank you have a seat.
 2    BY MR. METCALF:
 3         Q    Can you state your name.
 4         A    Michael James Gasbarrini.
 5         Q    You are a detective with Vero Beach Police
 6    Department?
 7         A    I currently do crime scene investigation.
 8         Q    What was you assignment back in November or
 9    December of last year?
10         A    I was assigned special investigations unit.
11         Q    Were you a detective then?
12         A    Yes, sir.
13         Q    You were, I guess, kind of co in charge with this
14    investigation along with Sean Crowley?
15         A    Yes.  I worked with Detective Crowley.
16         Q    How did you become involved?  Was it assigned to
17    you by the Chief?
18         A    I would say probably in the fall of 2018 Detective
19    Van D'Huynslager who was a detective at the time had
20    received a couple of anonymous complaints about East Spa.
21         Q    Today, detective Crowley came back out, and you
22    haven't discussed any of your testimony with him, have you?
23         A    No, sir.
24         Q    The videos, were you present the day they were
25    being installed by the Department of Homeland Security?
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 305

Page 166

```
 1       A     Yes, sir.

 2       Q     Where were you located when that was happening?

 3       A     Outside the building.

 4       Q     Where was Detective Crowley?

 5       A     He was partially inside the building and partially

 6  outside the building.

 7       Q     Who installed the cameras?

 8       A     Homeland Security.

 9       Q     Who decided where to put the cameras?

10       A     Homeland Security.

11       Q     Where did you get the cameras?

12       A     Homeland Security.

13       Q     Did you and Officer Crowley in any way participate

14  in the installation of those cameras?

15       A     Minimally.

16       Q     How is that?

17       A     Getting the ceiling tiles where the cameras were

18  placed for Homeland Security as the Department rented the

19  suite next door for a few months.  So while they were in

20  there working, we had been responsible for the suite.  So we

21  just kind of managed the suite for them.

22       Q     So the suite had nothing to do, I mean, the suite

23  was next door.  Right?

24       A     Yes, sir.  We installed all of the cameras in the

25  suite next door and then had moved them over to East Spa.
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 167

1        Q     Okay.  So you kind of stored them there?  What do

2   you mean?

3        A     Earlier in the day, we had taken the ceiling tiles

4   and the video and had put the video into the actual tiles.

5   And then once installation was going to occur, moved the

6   tiles to East Spa.

7        Q     Who did that?

8        A     I think partially Detective Crowley and mostly

9   Homeland Security.

10       Q     So he helps stage it next door and put the cameras

11  inside the ceiling tiles?

12       A     Yes, sir.  He may have helped him, you would have

13  to ask him, but he may have helped them pass the tiles from

14  building to building because they did it through the

15  ceiling.

16       Q     As far as the location and the decision making,

17  that was delegated over to Homeland Security?

18       A     Yes, sir.

19       Q     Detective Crowley wasn't in there with them when

20  they were doing that?  He was next door?

21       A     You would have to ask Deputy Crowley.

22       Q     Did you ever see him go outside?

23       A     Yes, sir.

24       Q     What was that for?

25       A     The females that were working at the spa were

Page 168

1    outside.  They had some questions.  So he was helping to

2    answer some questions.

3        Q     Were you out there with him?

4        A     Yes, sir.

5        Q     What were the questions?

6        A     They had questions of when they could go back in.

7    If they had a vehicle there, they wanted to go in the

8    vehicle because it was a little chilly outside.  So they

9    wanted to go in and get warm.

10       Q     This all started from numerous citizen complaints.

11   Were you privy to those complaints?

12       A     Some of them, yes.

13       Q     They were made to you?

14       A     Through either the Chief or through email.

15       Q     So you don't know who made the complaints?

16       A     The owner of Vero.com was probably our main

17   complaint.

18       Q     Like the newspaper Vero.com?

19       A     It is Vero.com.  They originally had the suite

20   next door.

21       Q     Okay.  Were you present when Carla Sutherland and

22   Cynthia Pagano entered from the Department of Health?

23       A     I was not present at the spa.  No.

24       Q     Do you know when the first subpoena was issued in

25   this case?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 169

1     A     No, sir.  You probably would have to ask either

2  Detective Eder or Detective Evans.

3     Q     Are you safe in saying that it was the

4  installation of the cameras?

5     A     I actually can't say.

6     Q     Did you have dealings with the two men that were

7  stopped outside of East Spa?

8     A     Yes, I did.

9     Q     Did you attempt to stop anyone else other than

10  those two men in the entire history of this case?

11     A     Yes.  Once the installation of the cameras

12  occurred, we had stopped some men leaving.

13     Q     That were not arrested?

14     A     No, sir.

15     Q     What were you stopping them for?

16     A     No.  We had arrested the ones we had stopped once

17  the cameras were installed.

18     Q     So guys would go in -- I don't understand what you

19  are saying.  What are you saying?

20     A     It is my understanding you asked if we had stopped

21  anyone after the installation of the cameras, and my answer

22  was yes because we had stopped some gentlemen leaving the

23  spa after they had attended.

24     Q     So you confirmed who they were and stuff like

25  that?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 170

1    A    Yes, sir.

2    Q    So if you couldn't get them on a pole camera, you

3  would pull them over?

4    A    Yes, sir.

5    Q    The sole purpose of that stop was to identify

6  them?

7    A    Yes, sir.

8    Q    As far as the installation of the cameras, going

9  back to that, is it fair to say that the Detective Crowley

10  delegated that task to the Department of Homeland Security?

11    A    I wasn't inside the building so you would have to

12  ask Detective Crowley what he did.  Like I said, when he was

13  on the outside of the building, he was helping with the

14  females that worked at the spa.

15    Q    The equipment was all Homeland?

16    A    Yes, sir.  We didn't own any of the equipment,

17  Vero Beach Police.

18    Q    So the subpoenas you say are Eder and that is Lee

19  Evans?

20    A    Yes.

21    Q    Did all of the subpoenas?

22    A    Yes, sir.

23    Q    Did you do any surveillance?

24    A    I did.

25    Q    Going back to those two men, though, they were

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

Page 171

1    stopped before the camera.  Do you know who I am talking

2    about?

3         A    I do.

4         Q    That is in September some time?

5         A    I know the gentlemen you are speaking of.  Yes.

6         Q    Were there any other male subjects stopped prior

7    to the installation of the cameras?

8         A    Detective Van D'Huynslager and I had stopped

9    one gentleman coming out of there probably six months prior

10   before Detective Crowley and I even started with

11   investigation.

12        Q    How was that?  What happened there?

13        A    We started a brief investigation and Detective Van

14   D'Huynslager was sent back to road patrol.  And we didn't

15   have anyone else working the unit.

16        Q    What did the guy tell you?

17        A    He advised that he was there from Orlando

18   installing I think elevators, I believe.  He had found the

19   website.  I think it was Romance.  That he had received a

20   hand job.

21        Q    That was six months prior?

22        A    Yes, sir.

23        Q    Did that find its way into the affidavit?

24        A    I don't believe so.

25        Q    Did you tell that to Detective Crowley?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 172

```
 1       A     Yes, sir.

 2       Q     This man, did you threaten him with prosecution if

 3   he didn't talk you or arrest if he didn't talk to you?

 4       A     We didn't make any threats or promises.

 5       Q     I am talking about the one guy.

 6       A     Correct, no.

 7       Q     The same with the other two guys?

 8       A     Correct.

 9       Q     Did he tell you that the actions were initiated by

10   the women inside?

11       A     He didn't say.  He just advised that there was a

12   payment involved.

13       Q     Do you know if it was the same women?

14       A     I do not know if it was the same women.

15       Q     What made you stop that guy?

16       A     The same thing.  We received like a citizen

17   complaint or through the Chief.  I don't recall which.  We

18   had done some surveillance out there and decided just to

19   stop someone that was leaving and just ask them.

20       Q     Because of Van D'Huynslager kind of moved onto

21   something else, it just died?

22       A     Yeah.  I was in the unit by myself.  I started

23   working some general crimes cases.  So I didn't have time or

24   the manpower to re-pick up the investigation.

25       Q     Outside of that third guy, any other stops?
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 173

```
 1       A    No, sir.

 2       Q    The videos, as far as minimizing what you

 3  captured, every minute that they were on was someone

 4  watching the video live?

 5       A    No, sir.  Only the time that we were manning the

 6  computers.  If we weren't at the computer station or at

 7  home, we had logged off the portal.

 8       Q    There would be times where the spa was open and

 9  functioning and running where you guys logged off?

10       A    Yes, sir.

11       Q    Were they still recording, the cameras?

12       A    Yes, they were recording.

13       Q    Then what would you do, go back and watch them

14  later?

15       A    No, sir.  No one has seen the videos.

16       Q    So there could be a whole lot of people captured

17  on video that you know nothing about?

18       A    Correct.

19       Q    On civilians?

20       A    Yes, sir.

21       Q    There has been no minimization efforts at all with

22  regard to those people.  Right?

23       A    No one has looked at the video.  So I believe

24  there has been some minimization.

25       Q    But no one has looked at those videos.  How much
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 174

1    footage is there?  How many hours?

2         A    I wouldn't know the hours or the amount of time or

3    footage in this.  I haven't gone back and looked at it.

4         Q    So the cameras never stopped recording.  They were

5    set by Homeland Security to record from 8:00 a.m. to

6    11:00 p.m.  Does that sound right?

7         A    No, sir.  They recorded twenty-four hours a day.

8    We were just viewing a certain portion of each day.

9         Q    Okay.  So they didn't stop ever recording while

10   they were up?

11        A    Yes, sir, that is correct.

12        Q    Do you know where those videos are today, the

13   recordings?

14        A    Yes.  They are stored on a hard drive that is in

15   the Vero Beach Police Department evidence.

16        Q    They were recording the entire time.  Were you

17   guys watching that place the entire time?  I mean, you took

18   Sundays and Saturdays off.  Right?

19        A    Yes.  We had taken days off.

20        Q    If people, if a little old lady went in there and

21   received a massage, that is captured and recorded?

22        A    Theoretically.

23        Q    Anyone that went in there on your day off, it got

24   recorded?

25        A    Yes, sir.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 314

Case 9:21-cv-80391-RLR   Document 109-15   Entered on FLSD Docket 04/09/2022   Page 175

STATE OF FLORIDA vs. ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A of 218 DCA CASE NO. 4D19-1655, ET AL

Page 175

1    Q    Were you aware of the directives in the order or

2    was that mostly Crowley?

3    A    Detective Crowley wrote the order.

4    Q    When you say he wrote it, he like came up with

5    those words or he like cut and pasted from somewhere else?

6    A    We had used some guidelines from an Indian River

7    County case.  I don't recall the exact case.

8    Q    So the minimization requirement that is within

9    that that says that you guys are to take minimization

10   efforts to make sure that -- it says while monitoring the

11   premises to be searched, the executing officer shall take

12   steps to minimize the invasion of privacy to any parties not

13   engaged in the unlawful act set forth in the affidavit?

14   A    Yes, sir.

15   Q    Realistically, that didn't happen, did it, if you

16   guys are recording all the time?

17   A    I believe it did.

18   Q    How so?

19   A    We were only viewing the video when we are

20   actually at the computer desk.  So we are minimizing any

21   time, you know, when there is no one in front of the screen.

22   Q    So your definition of minimization is when you are

23   watching it?

24   A    There is only a certain portion of the time that

25   we are watching.  So at the time we are not at the screen or

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 315

Page 176

1    the desk, like I said, we are not viewing the footage.  No

2    one has seen the footage.

3        Q    Was there any discussion amongst you and Detective

4    Crowley about the fact his order requested the ability to

5    monitor and record, but your order only allowed you to

6    monitor?

7        A    Yes, sir.  I think once we were able to get or

8    once Detective Crowley was able to get the affidavit signed,

9    we believed that it was okay for us to record what was

10   taking place inside the spa.

11       Q    But that wasn't -- you read the order.  Correct?

12       A    I read it.

13       Q    It does not authorize recording, does it?

14       A    No, sir.

15       Q    Were you familiar with the fact that Eder and a

16   few others were recording things next door, audio recording?

17       A    Yes, sir.

18       Q    Did you guys ever contemplate installing wiretaps,

19   audio wiretaps as opposed to video?

20       A    No, we did not.

21       Q    Do you know if Eder was recording in that room

22   before or after the installation of cameras?

23       A    I believe it was after.

24       Q    Are you aware of any subpoena that was issued

25   prior to the installation of cameras?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

```
                                                      Page 177
 1        A     Not to my knowledge, no.

 2        Q     Every single woman that worked in that spa would

 3   you agree at some point was a witness to have a cell phone?

 4        A     I guess I couldn't say 100 percent, but I would

 5   say the majority definitely had a cell phone.

 6        Q     Were there any thoughts of issuing pen registers,

 7   trap and traces or wiretaps onto their phones to record

 8   their calls?

 9        A     I don't recall.

10        Q     That certainly never happened.  Right?

11        A     No, sir, it didn't happen.

12        Q     Did you go with Detective Crowley when the order

13   was executed by Judge Cox?

14        A     To have it signed off here at the courthouse?

15        Q     Yes.

16        A     I believe so.

17        Q     Did Judge Cox have any clarification questions or

18   was it in any way unclear what she was ordering?

19        A     She had gone back to her chambers with Detective

20   Crowley.  I stayed in the courtroom because they were in the

21   middle of court.

22        Q     The order required you guys to report back to

23   Judge Cox.  Are you aware of that?

24        A     Yes, sir.

25        Q     Did you guys ever do that?
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 178

1      A    I did not.

2      Q    Do you know if Detective Crowley ever did that?

3      A    You would have to ask him.

4      Q    Your application specifically asked for language

5    that terminates the authorization to monitor and record once

6    the investigative goals are achieved; is that correct?

7      A    Yes, sir.

8      Q    Does that language appear in the order?

9      A    I don't have the order in front of me.

10          MR. METCALF:  So 1 is application, and 2 is order,

11   3 is application, 4 is order.

12          THE COURT:  Make sure you have No. 1 and 2.

13          MR. METCALF:  Judge, to correct the record, I have

14   been referring to it, Exhibit 1 is the November 27

15   application.  Exhibit 2 is the order for November 27.

16   Exhibit 3 is the application for December 28.  And Exhibit 4

17   is the order.

18   BY MR. METCALF:

19     Q    I am going to show you what has been entered as

20   Defense Exhibit 3 and 4.  These are the orders --

21          MR. METCALF:  I am sorry, Judge.

22          THE COURT:  That is okay.

23   BY MR. METCALF:

24     Q    I am showing you what has been marked as Defense

25   Exhibit 4.  That is Judge Kanarek's order.  Defense

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 179

1    Exhibit 2 is Judge Cox's order.  Judge Cox is the first one.

2    That is the second one.

3          A    Okay.

4          Q    Going into that order, we talked about the report

5    that was there.  Was there any language in there telling you

6    guys to cease and desist, to stop, terminate, whatever words

7    the surveillance once the investigative goals have been

8    achieved or thirty days?

9          A    Yes, sir.

10         Q    Is it just the thirty days or does it tell you to

11   stop once your objective is met?

12         A    It stops once your objectives have been met.

13         Q    Does it say that in the order?

14         A    I don't recall.

15         Q    That is why I gave it to you.

16         A    Okay.  Yes, sir.

17         Q    Where does it say that?

18         A    That it should cease the surveillance.

19         Q    Can you read it?

20         A    Yes.  It says to monitoring of the surveillance

21   cameras for a period of no longer than thirty days.

22         Q    So it says thirty days?

23         A    Yes, sir.

24         Q    I got that.  But does it say anything about

25   ceasing, stopping once your investigative goals have been

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 180

1   obtained?

2       A    No, sir.

3       Q    But the application you are requesting that the

4   Judge issue an order says that; is that right?

5       A    That is fair.

6       Q    That same language does not appear in the order?

7       A    Correct.

8       Q    The extension order, by the time that next order

9   is signed, is it fair to say over a 100 sex acts had been

10  videoed?

11      A    Yes.  I would say somewhere around that.

12      Q    Were you familiar with the logic of why there

13  would be a need to continue?

14      A    Yes, sir.  There was some new suspects.  Some were

15  new.  We were also trying to gather more information and

16  some more evidence on the suspects that we were continuing

17  investigating.

18      Q    Suspects that wound up being arrested or women

19  that couldn't be identified because you guys didn't stop?

20      A    There were women that weren't identified at the

21  time.  There was the business owner, Yongzhang Yan.

22      Q    He has never been arrested?

23      A    Correct.  We were still working on that

24  investigation.  So, like I said, we were extending the

25  further investigation.

Indian River Court Reporting & Video Conferencing LLC – 772.564.6761

J.A. 320

Page 181

1      Q    As far as the cameras, were there any new people

2  other than the women, any of new people involved with the

3  criminal enterprise?

4      A    We had money changing hands.  We had a gentleman

5  that was transporting the women.  Like I said, we still had

6  Yongzhang Yan who was not consistently at the spa.

7      Q    The money you are talking about exchanging hands

8  and the man that was transporting people, that was captured

9  via surveillance that had nothing to do with videos inside

10 massage rooms; isn't that right?

11     A    You wouldn't know that unless you continued to

12 monitor.

13     Q    You are referring to Ken Zullo?  He is mentioned

14 in the report?

15     A    Yes, Mr. Zullo and Yan.

16     Q    You never see him transporting women into a

17 massage room.  Right?  That is something you see out in the

18 road?

19     A    Well, that is where you would have to transport

20 them is out on the road.  Yes.

21     Q    So alternative techniques, other than what has

22 been going on, I am talking what is going on in that massage

23 room, you don't see any of those continuing things in the

24 massage room itself?  There is no need to --

25     A    Not to that point.

00267179-acac-40ed-90b6-273d293d8722

Page 182

 1      Q      So there was no need to keep videoing until let's

 2   say fifty sex acts?

 3      A      Just because it didn't happen to the point doesn't

 4   mean that we could have seen something in that room that

 5   could have benefited our investigation effort.

 6      Q      All of the women that were seen after the

 7   installation of the cameras other than Zhang, Lanyun Ma,

 8   Lanfen Ma, you knew about Mr. Yan the owner.  In the second

 9   extension, did you discover any new suspects in the criminal

10   enterprise?

11      A      Not in the room, no, sir.

12      Q      So all of the people in the criminal enterprise

13   had been identified by the time the extension comes?

14      A      There was still some female employees that we

15   hadn't identified.

16      Q      And they have never been identified?  Prostitutes?

17      A      After, I believe in Orlando there was one woman

18   that was identified that was in our spa.

19      Q      As far as the criminal enterprise and the

20   structure and the exchange of the money, transporting people

21   and going to and from banks, you would agree all of that is

22   obtained outside of what was going on in that room; is that

23   fair to say?

24      A      Yes, sir.

25      Q      What is being captured in that room are just acts

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 183

1    of prostitution?

2         A    Yes, sir.

3         Q    You don't see inside of that room what happens to

4    the money that individual prostitute gets?

5         A    Sometimes you do.

6         Q    Like what?

7         A    Well, if the gentleman that is in the room hands

8    the female the money, sometimes she may put it in her

9    brassiere, put it in the desk that is in the room or you can

10   see her carry the money outside of the room and still have

11   it her hand when she approaches the desk and put it into a

12   drawer or bag or what have you.

13        Q    Were you able to establish tribute payments to the

14   house from the workers or was the house making the money on

15   the front end?

16        A    I think it just depends on the customer.

17        Q    Are you able to in any way establish that from the

18   video inside the room what the house is taking?

19        A    Well, if they pass the desk on the way into the

20   business and they don't make a payment and then make a

21   payment inside the room, I mean, it is fair to say that they

22   are paying the house fee and the prostitution fee in the

23   room.

24        Q    Are you able to ever then see them get paid back

25   to the house ever?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

Page 184

1      A    No, sir.

2      Q    Again, the only thing exchanging hands and going

3  on in that room is sex and someone paying the prostitute for

4  sex?

5      A    Paying a fee.  Yes, sir.

6      Q    Were you aware of the investigations going on with

7  the sheriff in Palm Beach and Jupiter?

8      A    Yes, sir.

9      Q    Were you guys all working together or was it just

10  all a big coincidence this happened at one?

11      A    When we first started our investigation, ASA

12  Hendriks advised us it was a coincidence that Martin County

13  had also had an investigation.

14      Q    I think I am about done.  Are you aware of any

15  written authorization provided by the State Attorney Mr.

16  Colton in this case?

17      A    No.

18      Q    For the application?

19      A    Not to my knowledge.

20           MR. METCALF:  I don't have anything.

21           THE COURT:  Mr. Guttridge.

22                     CROSS-EXAMINATION

23  BY MR. GUTTRIDGE:

24      Q    Just briefly.  You had video recorded

25  approximately 100 in the first search warrant.  You videoed

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 324

```
                                                      Page 185
1    recorded approximately 100 people that were arrested; is
2    that correct?
3         A    Yes.
4         Q    There was a lot of the videotape from that that
5    was in the massage room that you actually never looked at;
6    is that correct?
7         A    Anything during that period when we were operating
8    at our computers that we were actually on our computers and
9    watching we looked at.  Anything after that was after our
10   hours was never looked at.
11        Q    During all of those incidents and all of that
12   watching in the massage room, was there anything that would
13   have given you an indication that you would have obtained
14   more evidence or evidence of future crimes or things that
15   you did not already have based on what you had already seen?
16        A    Yes.  The owner of the business, he wasn't a
17   staple, if you will, at the business.  We had some
18   unidentified girls.  So, yeah, we were building our
19   investigation through those videos.
20        Q    You felt that the video would give you more
21   information about the owner of the business?
22        A    Probably.
23        Q    If I am going to somehow be in the massage room?
24        A    Yeah, it was certainly a possibility.
25        Q    I understand it was a possibility, but did any of
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 325

Page 186

1    the evidence that you obtained from looking at the massage

2    videos in the massage room indicate that?  Did any of the

3    things that you saw in there indicate that you are going to

4    get any other sort of evidence you had not already gotten?

5         A    No, sir.

6              MR. GUTTRIDGE:  Thank you.

7              THE COURT:  Any other questions from any other

8    defense attorneys?  Mr. Kennedy?

9                       CROSS-EXAMINATION

10   BY MR. KENNEDY:

11        Q    On behalf of Mr. Jorg.

12        A    Hi, Mr. Kennedy, how are you?

13        Q    Hi.  Going to the pole cameras, do you know what I

14   mean when I say pole camera?

15        A    Yes, sir.

16        Q    That was installed several weeks, maybe a month

17   before the issuance of the surreptitious cameras; isn't that

18   right?

19        A    That is correct, sir.

20        Q    It was set up in the same way, around-the-clock

21   recording as the interior cameras?

22        A    Yes, sir.

23        Q    So there is around the clock capturing of people

24   coming in and going out of the business?

25        A    Correct.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

Page 187

1     Q     The day of the installation was November 28?

2     A     I believe the 29th.

3     Q     The 29th?

4     A     Yes, sir.

5     Q     Including November 29.  So the pole camera would

6     have captured the execution of that warrant.  Correct?

7     A     Yes.

8     Q     At least as it relates to the outside?

9     A     Correct, it would have.

10    Q     That material is on a hard drive in the Vero Beach

11    Police Department?

12    A     Yes, sir.

13    Q     With regard to the two gentlemen, I guess you

14    added a third gentleman that was actually stopped and you

15    asked them about what had occurred.  Correct?

16    A     Correct.

17    Q     They basically admitted to the information that

18    you later gained through this video within the massage room.

19    They basically admit those things happened.  Correct?

20    A     Correct.

21    Q     And Van D'Huynslager, I guess you didn't continue

22    that because he was no longer involved in that operation?

23    A     Yes, sir.

24    Q     But you could have.  You could have continued to

25    selectively ask people coming out of the business,

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

Page 188

1    inobtrusively, discreetly asked people if they wanted to

2    talk to you.  Correct?

3        A    I was moved to a different unit.  I was doing a

4    different job.  The unit basically got disbanded until

5    Detective Crowley had joined.  That is when we re-picked up

6    the investigation.

7        Q    You are a detective.  So you are familiar with the

8    use of confidential informants?

9        A    Yes, sir.

10       Q    No confidential informant was utilized in this

11   case.  Correct?

12       A    No, sir.

13       Q    That is a very common law enforcement technique.

14   Correct?

15       A    Correct.

16       Q    In fact, when you arm confidential informants with

17   money, you can even record, once you conduct a later search

18   you can record that that money changed hands.  Right?

19       A    Correct.

20       Q    So you would not only have a transaction and

21   tangle evidence of that, but you would also have the

22   testimony of the confidential informant.  Correct?

23       A    Correct.

24       Q    Confidential informants were never used in this

25   case?

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 189

1      A     No.  We used an undercover officer.

2      Q     You are aware of a GPS warrant, a Jones warrant?

3  Have you ever heard that term?

4      A     Yes, sir.

5      Q     You are familiar that in this case on two

6  occasions, at least two occasions that I am aware of those

7  were applied for and granted.  Correct?

8      A     Yes, sir.

9      Q     Were there any other vehicles that you continued

10  to use that technique to track participants in the

11  enterprise with this sort of suspected trafficking?

12      A     Yeah.  There was some other vehicles that we

13  possibly could have used the GPS.

14      Q     And you didn't do that?

15      A     No, sir.

16      Q     With regard to wiretap warrants, did you

17  participate in the formulation of the video warrants in this

18  case or was it just Detective Crowley?

19      A     The actual affidavits?

20      Q     Yes, the applications.

21      A     Yeah.  I assisted him with the applications and

22  some of the things leading up to the applications.

23      Q     Did you interact with the State Attorney's Office?

24      A     Yes, sir.

25      Q     Did you discuss wiretap warrants?

Page 190

1       A     I don't recall.

2       Q     Do you recall a discussion that maybe a video

3    warrant might be easier to get than a wiretap warrant?

4       A     Not that I recall.

5       Q     With regard to the third person that you

6    discovered, a guy from Orlando, you said he was an elevator

7    technician or something like that?

8       A     Yes, sir.

9       Q     There is actually an elevator company right next

10   door; is that correct?

11      A     Yes, sir.

12      Q     Did he work for that company?

13      A     No.

14      Q     He worked for a different elevator company?

15      A     The elevator company was out of Orlando.

16            MR. KENNEDY:  Nothing further.

17            THE COURT:  Any of defense attorneys?  Mr. Chrzan,

18   yes, sir.

19                       CROSS-EXAMINATION

20   BY MR. CHRZAN:

21      Q     Detective, I think you were talking about

22   continuing the videoing.  First of all, about a third of the

23   time the cameras were not monitored or there was no live

24   body viewing.  Correct?

25      A     There was a portion of time there was no live.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

```
                                                        Page 191

 1       Q     4:00 p.m. to 8:00 a.m.?

 2       A     For the first I think twenty days.

 3       Q     Did you ever go back and review any of that

 4    footage?

 5       A     No, sir.

 6       Q     What would you have potentially found in the rooms

 7    or in the videoing of the rooms that might have helped with

 8    either the exchange of money in furtherance of a criminal

 9    conspiracy or the transportation of the women?  What would

10    you expect to find in those rooms as you continued your

11    taping?

12       A     You asked me why we got the extension?

13       Q     No.  I am asking you specifically what you have

14    expected to find in the rooms, what would be videoed, what

15    would be captured on video to show the furtherance of the

16    criminal conspiracy in terms of exchange of money with the

17    house and the owners or the transportation of the women?

18       A     I apologize.  I might misunderstand.  Are asking

19    for like after hours?

20       Q     No.  I am asking at any point did you see anything

21    that furthered the criminal conspiracy inside those rooms

22    beyond just a sex act between gentlemen and the prostitutes

23    that were there?

24       A     Just the money changing hands from the room to

25    back up front at the desk.
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

```
                                                      Page 192

 1        Q    But you didn't actually see the money being taken

 2   to the front desk, did you?

 3        A    On some occasions, yes.

 4        Q    So there were cameras outside the rooms, too?

 5        A    Yes, sir.

 6        Q    But you never saw how that was being divvied up or

 7   who it was potentially going to in furtherance of the

 8   racketeering?

 9        A    Sure.  The majority of the cash was given to

10   Lanyun Ma.

11        Q    That was done outside the rooms.  Correct?

12        A    I believe on a few occasions there was money

13   handed to Lanyun inside the room.

14        Q    By who?

15        A    Female worker.

16        Q    You also mentioned that you said you guys

17   continued videoing because some of the female employees had

18   not been identified yet?

19        A    Yes.

20        Q    How would you expect other than capturing them,

21   their faces on video, how would you expect to identify them

22   through video footage that was taken inside the room?  Like

23   a driver's license that fell on the ground?

24        A    For instance, the female that we had recovered in

25   Orlando, she started out in East Spa in December.  She had
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 193

1    been transported to a spa in Orlando in January.  We weren't

2    able to identify her.  Once we recovered her in Orlando in

3    February, we were able to look at the video in the room and

4    match her up to identify her.

5         Q    The pole camera is in existence the entire time.

6    Correct?

7         A    Sure.  But each camera gives different angles and

8    better views.

9         Q    That identification was not made based on what you

10   had captured in the room, but based on actually what you

11   obtained in Orlando?

12        A    Able to match up it up with video that was in the

13   room.

14             MR. CHRZAN:  I have nothing further.

15             THE COURT:  Any other questions from defense

16   attorneys?  Mr. Butler, any questions?

17             MR. BUTLER:  No questions.

18             THE COURT:  May this witness be excused?

19             MR. METCALF:  Yes, your Honor.

20             THE COURT:  Thank you, sir.  You are free to go

21   about your day.

22             THE WITNESS:  Thank you.

23             MR. METCALF:  Judge, I have no more witnesses.

24             THE COURT:  Is the State calling any witnesses?

25             MR. BUTLER:  No.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 333

Page 194

1          THE COURT:  Did you, Mr. Metcalf, want to present

2    argument today or do you want to rely on your memo?  I was

3    going to allow everybody an opportunity to submit additional

4    authority.  I wanted some input from both the State and the

5    group of defense attorneys as to how much time.

6          MR. METCALF:  I would like some brief argument,

7    not just rely.

8          THE COURT:  Can we take a five-minute break?

9          MR. METCALF:  Yes, ma'am.

10          THE COURT:  Let's take a five-minute break.

11          BAILIFF:  All rise.  Court will be in recess.

12                    (BREAK)

13          BAILIFF:  All rise.  You may be seated.

14          THE COURT:  We are back on the record.  And I do

15    need to add an additional attorney, Attorney Kenneth Weaver.

16    Mr. Weaver, who is your client, sir?

17          MR. WEAVER:  His name is Charles Waterhouse, your

18    Honor, Case No. 2019MM000454.

19          THE COURT:  Thank you, sir.  You have been here

20    throughout the hearing, and I appreciate that.

21          MR. WEAVER:  Yes, I have.

22          THE COURT:  Mr. Metcalf, did you want to present

23    some argument?

24          MR. METCALF:  Your Honor, just briefly because I

25    think some things kind of came out that I wasn't aware of.

Page 195

1          Judge, I don't think I need to go through the
2     general warrant review.  I think the Court knows how to
3     review warrants, Franks, Johnson and Leon.
4          Your Honor, I have got to be honest.  I know that
5     Mesa-Ricon does limit.  I guess my point has been in the
6     Federal system Mesa-Ricon says we don't have to adopt all of
7     the requirements of Title 3 of Title 18 because the Fourth
8     Amendment will kick in.  We don't have to adopt all of that
9     because that is a Congressional action.  So Congress hasn't
10    acted.
11         So they adopted their own requirements, but they
12    pulled the most specific protections out of 2516 that they
13    could.  And No. 5, your Honor, is a big one.  In Mesa-Ricon
14    the fifth requirements, Judge, is that the order does not
15    allow the period of interception to be longer than necessary
16    to achieve the objective of the authorization or any of them
17    no longer than thirty days.  So the order must say that.
18         Now, I am going to guess that the State is saying
19    that that "or" means you have to have one or the other.  You
20    don't have to have both.  But the cases in Florida, your
21    Honor, that interpret 934, and I know that they are saying
22    934 is not it, they tell us that you have to have both and
23    so does the statute.  You have to have both.  And it has
24    been interpreted what the "or" means in 934.
25         And just a reminder, Judge, 934 tracks the exact

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

Page 196

1    same language of 2516 which authorizes wiretaps.  Mesa-Ricon

2    pulled from 2516 the very most important parts in this exact

3    language they pulled from 2516.

4              What we are here today, Judge, to do is decide is

5    Mesa-Ricon the gold standard?  Is it?  Because if it is,

6    they adopted that very language.  In Copeland, I will cite

7    again for the record, Judge, I think it is a very important

8    case, 435 So. 2d 842.

9              In that it talks about this language.  It says the

10   purpose of the requirement of 934.094(e) which is the exact

11   same statute as 2516(4)(e), the exact same statute.  It says

12   the purpose of this requirement that the issuing Court

13   indicate the order whether the order shall automatically

14   terminate when the desired conversation has been, first,

15   seized as to prevent a general search in violation of the

16   Fourth and Fourteenth Amendments to the Federal Constitution

17   and Article 1, section 12 of the Florida Constitution.

18             Mr. Butler is saying he derives his authority,

19   their authority to do this from the Fourth Amendment, that

20   you can do searches and seizures.  There is a Florida case

21   that says the reason that language is in there is because we

22   don't want a general search and violation of the Fourth

23   Amendment.  So I guess there is some small agreement there

24   that the Fourth Amendment governs.

25             It goes on to say that the thirty-day statutory

Page 197

1   maximum is simply a statutory limitation which terminates

2   every order at the expiration of thirty days regardless of

3   whether desired communication has been obtained or the

4   object of the order has been obtained.

5           They require that limiting language with the

6   thirty-day order in this case.  So Mesa adopts the language

7   of 2516(4)(e) and (5).  It adopts that language.

8           THE COURT:  Isn't that language more you can't go

9   past thirty days, but if your purpose has been accomplished,

10  then you may only record for twenty days?  I think that is

11  what especially in Mesa is saying.  I don't see in Mesa

12  where it indicates that you have to have those two phrases,

13  parts of No. 5 spelled out.

14          MR. METCALF:  Well, Mesa doesn't --

15          THE COURT:  Are you saying Copeland is the one

16  that is going to tell me in the order it is going to say you

17  have say until your purpose is achieved or thirty days?

18          MR. METCALF:  Right.  Mesa doesn't say that,

19  Judge.  I grant that, but Mesa adopts that No. 5.

20          THE COURT:  Agreed.

21          MR. METCALF:  We are in Florida.  So we have to

22  look to Florida law.  And Florida law, again, says under

23  934, and remember that has been adopted, that has adopted

24  the language of 2516, but Mesa pulls from that very

25  important language of 2516(4)(e) that requires, that statute

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 198

1    requires both be there.  It requires that the order shall

2    say that.

3           Copeland interprets basically what the word "or"

4    means.  What the word "or" means is that the thirty days is

5    just telling you that is a cap, an absolute cap, but you

6    better have in the order instructions to law enforcement

7    that they are to stop.  Otherwise, Judge, they are going to

8    run every one thirty days if they want.

9           I applaud the fact that they may have taken

10   holidays off and Sundays off and not recorded.  Well,

11   actually, I guess they did record nonstop.  That never

12   stopped.  But the fact that they didn't look when they

13   wanted a Sunday and Saturday off, they didn't feel like

14   watching pornography and wanted to have a normal day, they

15   didn't look.

16          But this is designed to prohibit them from just

17   making an investigation go on forever, that language.  And

18   they didn't include it.  What is really important, Judge, is

19   they put it in their application.  They knew they had to

20   have that language in the application.  But where they

21   failed, your Honor, is they printed out some form order that

22   has been bouncing around for fifteen years, according to

23   Detective Crowley, that hasn't been reviewed.  They failed

24   in putting that limiting instruction.

25          Your Honor, there may not a specific -- Mesa-Ricon

Page 199

1    may not say that, but the Copeland case is binding because

2    it adopts the same logic of Mesa.  And that protection is

3    there for a reason.  It talks about it is there in Copeland

4    to prohibit general searches that are prohibited in the

5    Fourth Amendment.

6            Judge, we must also recognize in Article 1,

7    section 23 we are free from government intrusion.  We have a

8    specific right of privacy.  So, Judge, that is one of the

9    big points I would also make.  Your Honor, the building next

10   door was never contemplated in the motion because that came

11   out today.  They are in there basically listening.

12           One of the requirements in Mesa-Ricon is that

13   No. 4, the Judge issuing the order find that normal

14   investigative procedures have been tried and have failed and

15   reasonably appear unlikely to succeed.  They have tried for

16   a period to be too dangerous.

17           Your Honor, this case is chocked full of

18   alternative techniques that I believe Officer Crowley

19   intentionally misled this Court about whether they would be

20   successful.  He admitted the ones that he didn't put in

21   there.  If he does that, he cannot reasonably rely on the

22   protection of Leon.  You can't do that.  You can't mislead

23   the Court and have material admissions and then fall back on

24   Leon and say, well, I just followed what the Judge said.  If

25   you are responsible for the material misleading, then Leon

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 200

1    is not going to shield you.

2         But what they did in here is they misled the Court

3    in believing we sent in a guy, an undercover in the second

4    visit.  There is a little suspicion because it is the same

5    guy.  They have a whole arsenal of police at their beck and

6    call they could have sent in there.  They could have sent in

7    an unknown number every time a new girl came in.

8         THE COURT:  And how is sending in ten different

9    undercovers ever going to lead to evidence of deriving

10   support for prostitution or RICO?

11        MR. METCALF:  Because, Judge, you can do it in

12   combination with other investigatory techniques.  If you put

13   a wiretap in there which is less invasive and you have an

14   audio wiretap or you have Eder next door with a listening

15   device listening in, maybe get a warrant to amplify that.

16        So it is the totality of the things they could

17   have done.  They could have had a wiretap along with sending

18   in undercovers.  Undercovers establish every time a new girl

19   comes in.  You establish who she is.  And she solicits that

20   undercover.  So now you know she is engaging in

21   prostitution.

22        All you need now -- you don't have to see it.  I

23   don't mean to sound -- we don't have to see crimes being

24   committed to prosecute them.  This is a new standard that

25   they have committed.  I guess I am going to have a defense

00267179-acac-40ed-90b6-273d293d8722

J.A. 340

Page 201

1    in every case from now on that if they don't have videotape,

2    they can't prove it.

3              They could have used less invasive techniques of

4    sending in undercovers, establishing each individual girl as

5    they came was engaging in prostitution.  Then at that point

6    you wiretap.  You get their phones.  They all had phones.

7    You find out who they are.  They didn't get the first phone.

8    They didn't do the first trap and trace, no pen registers.

9    They could have tapped their phone calls.

10             They could have identified the entire racket, who

11   was doing what.  And they mislead the Court in saying that

12   those techniques don't work.

13             Judge, they don't say that we can't achieve our

14   goals by using the undercover.  They are saying it won't

15   work because he will get found out or that you have to

16   consummate the act.  You don't have to consummate the act.

17   Solicitation is a crime in and of itself.  Engaging is

18   offering to commit.  They establish it every time they send

19   in an undercover.

20             You use that in combination with other

21   investigatory techniques like wiretap that you don't have to

22   invade privacy of God knows how many people because they

23   really don't know.  They have no idea how many people they

24   have recorded.

25             So, Judge, I think that leads us into there was no

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

minimization. Minimization is, okay, we are not just going to not watch it. They recorded nonstop. Judge Cox asterisks that part in her order. She told them.

What is an invasion of privacy, Judge? Is an invasion of privacy, are they only protected if the officers actually watch it or is the actual invasion the video itself?

Judge Cox put a big asterisk next to the line while monitoring the premises to be searched, the executing officer shall take steps to minimize the invasion of privacy to any parties not engaged in the unlawful act set forth in the affidavit.

THE COURT: Do you think just by its very nature that the cameras recorded twenty-four hours a day for sixty days, that that in and of itself indicates no minimization?

MR. METCALF: Absolutely. Absolutely, Judge. I will tell you it is part of the motion, and I understood you were hearing the next one, I know this because I was sent a recording of a woman. They just happened to let it loose in the sheriff's case. They haven't let these loose yet. They exist. They know they exist. And they invaded the right of privacies of innocent people. And they said at least three men that they know of went in there and didn't commit sex acts but were recorded. So not monitoring it. They were in charge.

Page 203

1              THE COURT:  What would it matter if it was

2    recording from 11:00 p.m. to 8:00 a.m. when the business was

3    closed?

4              MR. METCALF:  Well, I suppose that wouldn't.  But,

5    Judge, if they took a day off and they weren't at their

6    computers but that spa was open, which they did Saturday,

7    Sunday, big days maybe for that spa.  They recorded all day

8    long.  And they captured innocent people by their own

9    admissions, the three men.

10             Judge, there was no minimization techniques

11   employed here.  If you capture -- unfortunately, even

12   through deposition I will never know.  It will require --

13   and Judge Morgan entered an order in the other case for them

14   to turn over every video to me because of that exact act.

15             We know the Vero Beach Police did the exact same

16   thing.  They recorded innocent people.  That is what Judge

17   Cox told them not to do.  How many times can you not

18   minimize and it be a problem?  If it is just one little

19   thing and they slipped up, okay.  They admitted under oath

20   that it went on all the time.

21             So the thirty days, the first thirty, I think they

22   said out of the total sixty they know about thirty of them.

23   They still tape the other thirty days.  So they only have

24   given over 50 percent of the videos.

25             THE COURT:  I anticipate the State probably will

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 343

1   assert an argument that the minimization occurred when they

2   are sitting at their computer and they are monitoring those

3   cameras.  And that when they see that there is not a sex

4   act, they are not watching it.

5           MR. METCALF:  But, Judge --

6           THE COURT:  Is that not minimizing?

7           MR. METCALF:  No, because here is the problem.

8   They recorded it.  They weren't authorized to do that, by

9   the way.  They recorded it.  And they now have it in their

10  possession.  And I am quite positive they didn't mean to

11  turn it over to me in the other case, but they did.

12          So if he can turn it over in that other case, I am

13  not going to accuse the police that they are going to mass

14  release it, but they could.  When they record it is the

15  invasion.  It is not the dissemination of it.  It is the

16  invasion that potentially -- your Honor, I would be

17  petrified to think that there is a recording of me

18  innocently going to a spa, and it is out there.

19          If it is a woman that is going in there that is

20  sixty years old, I guess they could probably know.  They are

21  making that judgment call, and they didn't make the judgment

22  call.  So just shutting their eyes off or turning their

23  computer off and not watching this video, the invasion

24  happened and they admitted it about three men.  That is the

25  most important part.  They admitted that three innocent men

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 205

1    were recorded that weren't charged.

2            They also omitted a material fact that they

3    stopped a third John.  That is huge because they said, oh,

4    we didn't want to tip off anymore.  They did two in one day.

5    Both cooperated.  Six months earlier they get a full

6    cooperator.  These men aren't offered immunity.  They tell

7    exactly the same story that Detective Brock tells.  They say

8    they can't use them anymore.  They write in their affidavit,

9    oh, we can't use them because we are afraid they will tip.

10   That is just not believable.  It is a material misstatement

11   to the Court.

12           I think Mr. Kennedy brought up that they didn't

13   even contemplate or address with the Court the possibility

14   of using a confidential informant.  They could have sent in

15   a CI to go in there to infiltrate the entire organization.

16   Judge, this is what they keep referring to.  We are

17   concerned about money laundering.  We are concerned about

18   racketeering.  They are using prostitution as a predicate

19   act.  I get it.

20           But how many predicate acts of prostitution do

21   they need to prove racketeering?  The minimum is two.  They

22   have got 100.  And it is not until January 10 that there is

23   a conversation with the State that they basically say, okay,

24   we are going to stop video in the rooms.  After 150 people,

25   they decide, oh, we have got enough.

Case 9:21-cv-80391-RLR   Document 109-15   Entered on FLSD Docket 04/09/2022   Page 206

STATE OF FLORIDA vs. ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A   of 218   DCA CASE NO. 4D19-1655, ET AL

Page 206

1            Under their logic, this warrant could keep going

2     and going every time a new woman came in.  They could say,

3     well, she is deriving funds.  We need that predicate act to

4     prove that.  They knew the four central people involved in

5     this case on the first day.  Ken Zullo is the only other

6     person that comes along.  And he is charged with

7     transporting prostitution.  That is it.

8            Everyone else they knew about.  They knew who

9     Lanyun Ma was.  They knew Lanfen Ma.  They knew Ms. Zhang

10    and one other lady that they wound up getting captured in

11    the video.  That is it.  And for that they ran a video until

12    they got 150 men.

13           Finally, Judge, the monitoring only, I know that

14    has been hammered and hammered.  Judge, I expect the State

15    is going to argue a case called State v. Hume.

16           THE COURT:  How do you spell that last name?

17           MR. METCALF:  H-U-M-E.  It is in my memorandum.

18    Actually, it is not in my memorandum.  It is State v. Hume.

19    I can give you the case cite.  It is 512 So. 2d 185.  It is

20    a Supreme Court of Florida case.  It basically says if

21    officers are allowed to record with a body camera, then they

22    are allowed to monitor.

23           So an officer goes in in an undercover capacity.

24    He is wearing a body camera.  It is a drug bust, I believe.

25    They are saying if you can monitor that, he can send it out

00267179-acac-40ed-90b6-273d293d8722

J.A. 346

STATE OF FLORIDA vs. ROBERT FREELS, ET AL
L. T. CASE NO. 312019MM000328A, ET AL   DCA CASE NO. 4D19-1655, ET AL

Page 207

1    to the other officers.  They can sit there and write notes

2    about what they are hearing and seeing on the body cameras.

3    But why do that because when you can just record because the

4    recording would be a better memorialization than a writing.

5    So they say if you can monitor in that case, of course, you

6    can record.

7              THE COURT:  But that is a body camera?

8              MR. METCALF:  That is a body camera case on a

9    warrantless search.  It is not a search rather, Judge.  Here

10   is the big difference.  I want the State if they have it to

11   show a case where you can go into a place where there is a

12   right of privacy where a warrant has been issued, and they

13   say monitoring and recording there is no difference.  I

14   can't find that case.

15             So the fact that these men had an expectation of

16   privacy, it appears we don't know and we are not here to say

17   who wrote that order, whether it was Crowley or they cut and

18   pasted or it was Judge Cox who did it herself.  It doesn't

19   matter.  Judge Cox signed it.  Judge Cox had the ability to

20   add things to it, subtract things to it.  They could

21   question her.  They could clarify it.  They could do all

22   kinds of things.  They didn't do that.  She signed an order

23   that only allowed monitoring.

24             The big important part to this, Judge, is she had

25   a ten-day report back.  You are to report back to me within

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 208

1   ten days about what you did, about your doings.  They

2   ignored that.

3           I believe, Judge, there is case law that

4   establishes that a fatal flaw in and of itself.  You can't

5   ignore that.  It is not just you are in contempt of the

6   Court's order.  There is a reason for report back.  I want

7   to know what you did, what you installed.  They are saying

8   we don't have an inventory yet because we don't have any

9   recordings yet.

10           I don't know that that is true.  They have to come

11  back with an inventory which exists in the sheriff's case,

12  by the way, where they installed how many cameras, what they

13  were doing, what they were receiving.

14           At that point, Judge, the purpose of you coming

15  back to me and telling me what you did, maybe then she

16  grants the recording.  Maybe she just wants them to monitor

17  it first to see if they can see what they think they are

18  going to see and then, okay, now you can record.

19           But she limited it.  Whether she wrote it, whether

20  she came up with that language or they materially misled

21  her, it doesn't matter.  She didn't authorize it.  And they

22  are not allowed to decide for themselves what they can and

23  cannot do.  They are limited by that order.  I think that is

24  a fatal flaw to what they did.  They executed it wrong.

25           And I started out this by saying, Judge, you can

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 209

1  find probable cause.  I can fail Franks.  I can fail all of
2  that, but you cannot issue an order that is illegal.  And
3  you have to abide by the rules and you can't operate outside
4  the order.
5          You can't authorize waterboarding.  And if you
6  authorize a search and seizure of, you know, a car, they
7  can't go out on their on and say, well, we are going to
8  search the house.  You have to follow the commands that you
9  were given.  There is a ten-day callback.  They don't do it.
10 They don't provide an inventory as required in the order.
11 Judge, finally, they go ahead and record when monitoring was
12 only allowed.
13         Those are the big points, your Honor.  I provided
14 obviously a very long memorandum.  I would ask the Court to
15 find those the things I felt I needed to supplement.
16         THE COURT:  Does any other defense lawyers want to
17 make any other closing argument on the record?  I am going
18 to allow an opportunity for you all to submit authority.  We
19 are going to talk about that.  Is there any additional
20 argument?
21         MR. KENNEDY:  I just want to say two things, your
22 Honor.
23         THE COURT:  Yes, sir, Mr. Kennedy.
24         MR. KENNEDY:  With regard to the ten days, I just
25 want to point out if that violation of the warrant is

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

Page 210

1    considered to be fatal, and I think it should be, then it is

2    not a dispositive ruling.  In other words, the State can

3    still proceed based on what the officer saw if he takes out

4    what they saw isn't right.

5         So this Court could grant that motion and prevent

6    the introduction of the evidence that was recorded.  I just

7    add to that being Fourth Amendment invasion because it is an

8    ongoing invasion because that intrusion continues so long as

9    that evidence exists.

10        With regard to comment of Mr. Butler that the

11   Fourth Amendment is a source of authority for invasion of

12   privacy, that is the opposite of my understanding of the

13   Constitutional protections and even 934 limit the State's

14   law enforcement ability to invade privacy.  It is not a

15   source of authority.

16        In Florida, under Article 123, section 23 there

17   has to be a specific source of authority, and I believe it

18   is this kind of interception of communication.  So if there

19   isn't specific grant of authority and the State is not

20   relying on 934, then there is no authority for the issuance

21   of a warrant.  It is a warrantless search.  We all agree if

22   it is a warrantless search, it is illegal.

23        I just join with Mr. Metcalf in all of the

24   deficiencies as it relates to the failure to exhaust the

25   techniques, the misleading and omissions as it relates to

00267179-acac-40ed-90b6-273d293d8722

J.A. 350

Page 211

1    those efforts.

2          MR. METCALF:   Just very quickly, the huge task

3    before the Court, if the Court was to find that those

4    deficiencies in and of themselves, and what I am talking

5    about is the ten-day callback, not having the limiting

6    language to stop and these things that just kill the warrant

7    by themselves, if the Court was to find that those didn't

8    have, you know, Judge, you have to look at necessity.  When

9    did this stop becoming necessary.  When was enough enough.

10          And Mesa-Ricon talks about what needs to be in the

11   order, how long do they keep getting to say we need to do

12   this?  We have to look at necessity as well.  Is that no

13   longer needed.  So we have to analyze maybe the warrants if

14   we get to that point, and I think we don't get to that point

15   clearly, but is the extension necessary?  In Palm Beach,

16   five days was enough.  That is crazy to me that we needed

17   sixty.

18          Your Honor, the last thing is I do not yield that

19   Bruce Colton wasn't required to authorize this application.

20   Again, that is 934 language, but it exists in the statute

21   that gave rise to Mesa-Ricon that they pulled from.  I don't

22   read Mesa-Ricon saying if these five things are done that we

23   don't have any problem with you.  You might have a problem

24   with the Fourth Amendment, but you still, your Honor, there

25   are reasons prosecutors have to authorize applications like

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

```
                                                              Page 212

1    this.

2              I have a lot of cases that talk about, again, with

3    no disparaging meant to Judge Cox, rubber stamping orders.

4    It looks like that is what happened here.  There was no

5    review.  It was okay.  Judge, we have to protect our

6    citizens.  That is why those statutes exist.  That is why we

7    require the State Attorney to review this and not just cut

8    these guys loose.

9              THE COURT:  Any other argument?  Any other

10   defense?  Mr. Mosher.

11             MR. MOSHER:  I just wanted to address something.

12   I think Mr. Kennedy said that it is not, I guess,

13   dispositive if you find -- I would disagree with that

14   because I don't think witnesses are allowed to testify about

15   a video unless it is presented to the jury itself.

16             I would also agree with Mr. Metcalf.  His

17   memorandum is comprehensive.  Law enforcement needs to try

18   the least intrusive means first and to fail before they

19   begin to climb that ladder to get the video surveillance.

20             THE COURT:  Anyone else?  Mr. Sercombe, did you

21   have something to add, sir?

22             MR. SERCOMBE:  Yes, briefly.  Your Honor, I would

23   like to say I don't have knowledge and wisdom of my

24   colleagues to that extent, but I would like to say that this

25   is a door that would be open that would degrade the
```

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 352

Page 213

1   Constitutional rights and the privacy right of our fellow

2   citizens.  Any man or woman that goes into a massage room

3   will be affected by this, and they will not know that they

4   are not being monitored.  That is all.

5          THE COURT:  Thank you, sir.  Any other defense

6   attorneys?  Mr. Kessler.

7          MR. KESSLER:  You said you are going to allow

8   reasonable time for us to submit --

9          THE COURT:  Yes.  First, let me see if the State

10  wants to -- are you all going to argue anything this

11  afternoon?

12         MR. WILSON:  Not orally, Judge.  I think the only

13  issue that I would bring up is we reserve on the issue of

14  standing.  I think that that should be resolved prior to any

15  deadline being set for a response.

16         MR. METCALF:  Judge --

17         THE COURT:  Well, I mean, I will disagree with you

18  there, but, yes, I do understand we reserved on the

19  standing, and we will address that.  How long would you all

20  like to be able to submit authority, any authority that you

21  would like the Court to consider?

22         MR. KESSLER:  Judge, I am going to ask if you

23  could give two weeks.  I could do it sooner than that, but

24  my mother is going to undergo a heart procedure in about

25  half an hour.  And I don't know what is going to happen.

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

Page 214

1          THE COURT:  Is two weeks sufficient for everyone?

2     That it is probably more than enough.

3          MR. WILSON:  I believe two weeks would be

4     sufficient.

5          MR. KENNEDY:  Would that give an opportunity to

6     reply, since we are the moving party, we could have an

7     opportunity to reply after the State responds. I would ask

8     for a brief period of time after the State's filing.

9          THE COURT:  Okay, so let's do this.  Let's require

10    both sides, any defense attorneys that want to submit and

11    for those that are not here, if you all will pass this

12    message onto those that are not here, I will require both

13    the defense and the State to submit any additional authority

14    that you would like the Court to consider by Tuesday, May 7

15    by 5:00 p.m.

16          And then I will allow the defense to respond to

17    anything that the State has.  I am only going to give you a

18    week to do that.  If you could do that by Tuesday, May 14 at

19    5:00 p.m. I will hold off issuing any ruling until after

20    date, May 14.  And then in between then and now we will

21    address the issue of standing.  Is that sufficient for

22    everyone?  Any questions?  Let me talk to Judge Morgan and

23    see if we can.

24          MRS. MCCAIN:  Judge, if I may, the issue perhaps

25    is that Judge Morgan's docket call on my particular case is

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

Page 215

1  set for May 15. You are allowing deadlines beyond that

2  time. We would obviously need to be able to continue our

3  cases without prejudice to our clients.

4          THE COURT: Judge Morgan will be told my

5  deadlines. I am going to go tell him that right now.

6          MR. METCALF: For the record, I am handing her

7  Copeland.

8          MR. MOSHER: And just to clarify, as far as the

9  issue of standing goes --

10          THE COURT: We will have a special hearing to

11  address every clients' issue with regard to standing.

12          MR. MOSHER: I thought I heard Mr. Kessler mention

13  something about affidavit.

14          THE COURT: I don't know if the State --

15          MR. WILSON: It may be sufficient, Judge. We just

16  have to see what that affidavit contains.

17          THE COURT: If the State will allow that to happen

18  by affidavit, then we will not have to have a hearing.

19          MR. METCALF: Can I just say something? Here is

20  my problem. I established standing with one client. So the

21  State is in a way, and I know what they are doing, prior to

22  the issuance of the Court's order, they want these men to

23  come in and go that is me on the video, identify themselves.

24          Now, to the Court, and I am not predicting that

25  you are granting my motion, I am not saying that, Judge, but

00267179-acac-40ed-90b6-273d293d8722

Page 216

1    if you grant the motion, they are going to have a mad rush

2    of people going, yeah, that is me on the video.

3              THE COURT:  I think the State's argument is I

4    couldn't even begin to consider to grant your motion if you

5    haven't shown --

6              MR. METCALF:  Well, you could on Mr. Taig.

7              THE COURT:  Correct.

8              MR. METCALF:  And then we could let everyone else

9    establish standing after that ruling.  Your Honor, if you

10   deny my motion, which I pray that you won't, if you deny the

11   motion, why should these men have to come forward and

12   establish standing and say that is me on that video?

13             I don't agree.  They are wanting us to give them

14   an element of their charge by identifying our clients.  I

15   think Mr. Taig, you can just make the ruling on Mr. Taig.

16   Now these men have all joined in and they can establish

17   standing after Mr. Taig's ruling if they need to.

18             I would caution my fellow lawyers that they might

19   be setting themselves up for 3.850 motion if they go and

20   establish standing.

21             THE COURT:  I anticipate this will come as an

22   issue in the second series of motions to suppress in front

23   of Judge Morgan.

24             MR. METCALF:  I have a person coming for that as

25   well, Judge.  I figured Mr. Butler would pull something like

Indian River Court Reporting & Video Conferencing LLC - 772.564.6761

00267179-acac-40ed-90b6-273d293d8722

J.A. 356

Page 217

1    this.

2          THE COURT:  Is there anything else we need to put

3    on the record?  I am going to go off the record.

4       (Thereupon, at 1:30 p.m., the above-entitled hearing

5    was concluded.)

6

7                   (END OF VOLUME II OF II)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

00267179-acac-40ed-90b6-273d293d8722

J.A. 357

Page 218

1    STATE OF FLORIDA        )
                             :   SS
2    COUNTY OF INDIAN RIVER  )

3

4                            CERTIFICATE

5

6           I, KATHY DUNCOMBE, a Shorthand

7     Reporter and Notary Public of the State of Florida

8    at Large, do hereby certify that I was authorized to and

9    did report stenographically the foregoing proceedings and

10   that the transcript is a true and correct transcription of

11   those proceedings.

12          DATED this 24th day of April, 2019.

13

14   *Kathy Duncombe*

     KATHY DUNCOMBE

15

16

17

18

19

20

21

22

23

24

25

00267179-acac-40ed-90b6-273d293d8722

J.A. 358