**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

**Case No. 9:21-CV-80391**

KEITH TAIG, individually, and on behalf of
others similarly situated,

      Plaintiffs,

v.

CITY OF VERO BEACH, CHIEF DAVID
CURREY in his individual capacity, CAPTAIN
KEVIN MARTIN (RETIRED) in his individual
capacity, LIEUTENANT JOHN PEDERSEN in
his individual capacity, DETECTIVE PHIL
HUDDY in his individual capacity, DETECTIVE
SEAN CROWLEY in his individual capacity,
AND DETECTIVE MIKE GASBARRINI in his
individual capacity,

      Defendants.

_____/

## PLAINTIFF KEITH TAIG'S SUPPLEMENTAL BRIEFING IN SUPPORT OF HIS AMENDED MOTION FOR CLASS CERTIFICATION

Plaintiff, Keith Taig, hereby files his Supplemental Briefing in Support of his Amended

Motion for Class Certification, requested *sua sponte* by the Court at the April 12, 2022 hearing.

### Class Action Certification on Liability

At the class certification hearing on liability, the Court requested additional case law

permitting courts to certify a class on liability alone.  Such law is included below for the Court's

reference.

"[E]very aspect of liability can be resolved on a class-wide basis, it would be neither

efficient nor fair to anyone . . . to hold over 300 trials to hear the same evidence and decide the

same liability issues." *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1309 (N.D. Fla. 2017). "Individualized damages calculations are insufficient to foreclose the possibility of class certification, especially when . . . the central liability question is so clearly common to each class member." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 988 (11th Cir. 2016).

Indeed, courts may maintain a class status "solely for the determination of liability" and "[i]f plaintiffs prevail on the liability portion of their case, the Court will determine the appropriate method of adjudicating causation and damages issues at that juncture." *Slaven v. BP America, Inc.,* 190 F.R.D. 649, 658 (C.D. Cal. 2000). "If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification." *Butler v. Sears, Roebuck & Co.,* 727 F.3d 796, 801 (7th Cir. 2013). The Eleventh Circuit has specifically commented that "the issue of liability" may be tried at the first stage of a class action. *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1554 (11th Cir. 1986) (trying, class-wide and at stage one, the question of whether the defendant actually had a policy of discriminating against women).

The Supreme Court of Florida has turned to federal case law to guide Florida in its inquiry on the bifurcation of liability and damages in a class action. In *Engle v. Liggett Grp., Inc.*, the Florida Supreme Court remarked that "the [federal] Second and Seventh Circuits . . . [have stated] that the determination that class treatment of damages issues is inappropriate can be made after a finding on liability." *Engle v. Liggett Grp., Inc.*, 945 So. 2d 1246, 1269 (Fla. 2006) (citing *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004)). In *Carnegie*, the Seventh Circuit addressed the manageability of a class action alleging RICO violations and explained:

> Often . . . there is a big difference from the standpoint of
> manageability between the liability and remedy phases of a class

action. The number of class members need have no bearing on the burdensomeness of litigating a violation of RICO. Whether particular members of the class were defrauded and if so what their damages were are another matter, and it may be that if and when the defendants are determined to have violated the law separate proceedings of some character will be required to determine the entitlements of the individual class members to relief. That prospect need not defeat class treatment of the question whether the defendants violated RICO. Once that question is answered, if it is answered in favor of the class, a global settlement ... will be a natural and appropriate sequel. And if there is no settlement, that won't be the end of the world. Rule 23 allows district courts to devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues.

376 F.3d at 661 (citations omitted).

In *Visa Check/MasterMoney Antitrust Litigation,* the Second Circuit acknowledged that individual issues that might arise from certifying the class could be resolved by the courts' "ability to modify its class certification order, sever liability and damages, or even decertify the class if such an action ultimately became necessary." *See In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001). Alternatively, courts can appoint a special master or a magistrate judge to assist in calculating damages at a later stage. *See In re Terazosin Hydrochloride*, 220 F.R.D. 672, 701 (S.D. Fla. 2004) (suggesting three solutions for remedying the problem: (1) alter or amend its class certification order; (2) bifurcate the liability and damages phases of the litigation, and only allow the action to proceed as a class for liability purposes; and (3) appoint a special master or a magistrate judge to assist in calculating damages).

As demonstrated above, the Court possesses the ability to certify the class on liability alone; any concern regarding mini-trials on individualized damages is easily remedied by appointing a special master to decide the issue of damages at a later stage.[1]

---

[1] As an addendum, and for the Court's reference, Plaintiff is attaching a law journal article which addresses certification of a class on liability alone. *See* Exhibit A.

At the April 12, 2022 hearing, the Court expressed that it would like Plaintiff to explicitly tie class liability to causation.  A district court must consider how the class will prove causation and injury and whether those elements will be subject to class-wide proof.  *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1358 (11th Cir. 2009) (citing *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 320 (5th Cir. 1978)).  In the set of facts of before the Court, liability does not turn upon highly individualized facts.[2]  Liability turns on whether the class members' Fourth Amendment rights were violated by the police officers conducting illegal surveillance of them at the Spa.  "The issue of causation . . . must be subject to a clear out determination with generalized proof . . . generalized proof may well be suited for those cases in which the cause of the damages is a single tragic happening."  *Dahlgren's Nursery, Inc. v. E.I. du Pont de Nemours & Co.*, No. 91-8709-CIV, 1994 WL 1251231, at *12 (S.D. Fla. Oct. 30, 1994).  There is a single investigation here – comprised of the police officers' illegal surveillance acts – that serves as generalized proof that the prospective class members suffered a Fourth Amendment violation.[3]  The acts of the police officers in their investigation of the East Spa are the *operative set of facts* that establish liability and proximate cause for each potential class member.  If the potential class members were not illegally video recorded by the police officers in their investigation, then the class members would not have suffered a Constitutional violation and other injuries.  But, the inquiry as to what type of injury was suffered and the extent of damages in relation to those injuries is a question for the bifurcated trial on damages (e.g., a later stage).

---

[2] This is further belied by the consolidation of the facts and issues for several different spas in the Fourth District Court of Appeal's opinion in *State v. Kraft*, 301 So. 3d 981 (Fla. 4th DCA 2020). Clearly, there are common facts and issues that are generalized for the class.

To conclude, the case law, as set forth above, unequivocally establishes that Plaintiff may seek to certify the class on liability alone.  Further, Plaintiff has delineated for the Court the causal link in this action—namely, the police officers' illegal surveillance of the class members, which in turn, caused a Fourth Amendment violation and injuries/damages to be determined at a later point in time.  Should this Court have any hesitation as to whether certification on liability is proper because there is a concern over mini-trials for damages, Plaintiff requests that the Court consider alternative remedies that may resolve that concern such as, the appointment of a special master.

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on this 19th day of April, 2022, I electronically filed the forgoing with the Clerk of the Courts by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

**FISHER POTTER HODAS, PL**
515 North Flagler Drive - Suite 800
West Palm Beach, FL 33401
Telephone:    561-832-1005
Facsimile:    561-820-9375
*Attorney for Plaintiffs*

By: *<u>/s/Gerald F. Richman</u>*
      Gerald F. Richman
      Florida Bar No.: 066457
      gerry@fphlegal.com

5

# EXHIBIT A



SMU Law Review

Volume 36 | Issue 2                                                    Article 4

November 2016

# Bifurcation of Liability and Damages in Rule 23(b)(3) Class Actions: History, Policy, Problems, and a Solution

Susan E. Abitanta

Recommended Citation
Susan E. Abitanta, Comment, *Bifurcation of Liability and Damages in Rule 23(b)(3) Class Actions: History, Policy, Problems, and a Solution*, 36 Sw L.J. 743 (2016)
https://scholar.smu.edu/smulr/vol36/iss2/4

This Comment is brought to you for free and open access by the Law Journals at SMU Scholar. It has been accepted for inclusion in SMU Law Review by an authorized administrator of SMU Scholar. For more information, please visit http://digitalrepository.smu.edu.

## ·COMMENTS

# BIFURCATION OF LIABILITY AND DAMAGES IN RULE 23(b)(3) CLASS ACTIONS: HISTORY, POLICY, PROBLEMS, AND A SOLUTION

### *by Susan E. Abitanta*

**B**OTH the class action[1] and bifurcation[2] emerged from equity[3] as devices to dispose expeditiously of issues in complex litigation. When law and equity merged in 1938, the new Federal Rules of Civil Procedure introduced the bifurcating device in rule 42(b).[4] Under rule 42(b) courts may order separate trials of any claims or issues within the action before them. In 1966, amendments to the Federal Rules of Civil Procedure also revised rule 23.[5] In addition to enunciating prerequisites for class certification, the rule now includes a bifurcating device peculiar to class actions in rule 23(c)(4)(A).[6]

Bifurcation has historically served to permit courts to conserve judicial resources and to manage complex litigation. As applied in class actions, bifurcation has evolved into a restructuring tool available to the courts in determining class certification. By advancing the inquiry into separate adjudication of liability and damage issues to the certification stage, courts are able to approach the question of the suitability of class status with an

---

1. Equity defined a class action as follows: "When the question is one of common or general interest to many persons constituting a class so numerous as to make it impracticable to bring them all before the court, one or more may sue or defend for the whole." Equity Rule 38 (1911).

2. Bifurcation is the division or splitting of the whole into separate branches or compartments. WEBSTER'S SEVENTH NEW COLLEGIATE DICTIONARY 83 (19th ed. 1971). As used in this Comment, bifurcation is the use of separate trials for the separate issues of liability and damages.

3. *See* Equity Rule 29 (1911) (allowing separate hearings on issues).

4. FED. R. CIV. P. 42(b). Rule 42(b) originally provided in part: "The court in furtherance of convenience or to avoid prejudice may order a separate trial of any claim, cross-claim, counterclaim, or third party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third party claims, or issues." Fed. R. Civ. P. 42(b) (1958). In 1966 an amendment added the phrase "or when separate trials will be conducive to expedition and economy" following the word "prejudice." FED. R. CIV. P. 42(b).

5. FED. R. CIV. P. 23.

6. *Id*. The text of rule 23(c)(4)(A) provides: "(4) When appropriate (A) an action may be brought or maintained as a class action with respect to particular issues . . . ." *Id*.

enlightened view of the practicalities involved in effective class adjudication.

Focusing on the separate adjudication of liability and damage issues, this Comment traces the history of the bifurcating device and its application in complex litigation. The use of the bifurcating device to satisfy prerequisites to class certification under rule 23(b)(3) is explored, and particular attention is given to the viewpoints of proponents and opponents to the use of bifurcation as a discretionary device. Finally, this Comment examines alternatives to burdensome damage calculations and proposes a judicially manageable solution.

## I.   HISTORICAL USE OF BIFURCATION IN THE SEPARATE ADJUDICATION OF LIABILITY AND DAMAGES

Arising from the equity proceeding of separate hearings under Equity Rule 29,[7] Federal Rule of Civil Procedure 42(b)[8] allows the courts to order a separate trial of certain claims and issues when a single trial would be cumbersome, confusing, or unfair to the parties.[9] The rule provides the trial judge with broad discretion to use the separate trial device[10] "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy."[11] The federal courts have relied upon the grant of power in rule 42(b) to effect a bifurcation of liability and damage issues in a variety of substantive contexts.[12] Proponents of bifurcation suggest that considerations of judicial economy, efficient disposition of cases, simplification of complex issues, and procedural convenience support a separate adjudication of the liability and damage claims.[13] Opponents argue that the potential unfairness to the litigants outweighs any benefits that the device may produce,[14] particularly when the issues of

---

7. *See supra* note 3.

8. *See supra* note 4 for text of the rule.

9. *See* 9 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2387, at 277 (1971 & Supp. 1982); Note, *Separate Trial of a Claim or Issue in Modern Pleading: Rule 42(b) of the Federal Rules of Civil Procedure*, 39 MINN. L. REV. 743, 744 (1955).

10. *See* Bowie v. Sorrell, 209 F.2d 49, 51 (4th Cir. 1953) (within judge's sound discretion to grant separate trials); Grissom v. Union Pac. R.R., 14 F.R.D. 263, 264 (D. Colo. 1953) (rule 42(b) separate trial exercised in discretion of judge); *see also* Miner, *Court Congestion: A New Approach*, 45 A.B.A. J. 1265, 1268 (1959); Note, *supra* note 9, at 744.

11. FED. R. CIV. P. 42(b). Separation of issues is especially favored if it will result in the avoidance of prejudice and the promotion of convenience, fairness, and speedy trial. Miner, *supra* note 10, at 1268; *see* Chapman v. United States, 169 F.2d 641 (10th Cir.), *cert. denied*, 335 U.S. 860 (1948).

12. *See generally* 9 C. WRIGHT & A. MILLER, *supra* note 9, § 2390, at 297 n.49 (citing cases in antitrust, patent, personal injury, and property damage law that allowed separate trials of liability and damage).

13. *See* Miner, *supra* note 10, at 1268. Judge Miner's enumerated reasons included: simplification of the jury's task; the reduction of the court's docket when the defendant is found not liable; inducement for the defendant to settle if found liable; elimination of "nuisance" cases that have tenuous liability claims; discouragement of dilatory tactics; encouragement of more efficient attorney preparation; absolution; and reduction of expense to both parties. *Id.*; *see also* Note, *supra* note 9, at 745-55.

14. *See* Moss v. Associated Transp., Inc., 344 F.2d 23 (6th Cir. 1965). The court questioned the employment of bifurcated trials in personal injury cases. The court stated:

Case 9:21-cv-80391-RLR   Document 120   Entered on FLSD Docket 04/19/2022   Page 10 of 28

liability and damages are inextricably interwoven.[15]

When liability and damage issues are separable, bifurcation has generally been accepted in the litigation of complex cases.[16] In *In re Texas City Disaster Litigation*[17] the court consolidated 273 suits on the issue of the United States' liability following a disaster that occurred in April 1947. When two steamships loaded with government manufactured fertilizer exploded in the Texas City Harbor, the ensuing fires and explosions resulted in 560 deaths, many other personal injuries, and extensive property damage. The court's finding, in the consolidated action, that the United States was not liable obviated a determination of damages for 8,485 plaintiffs on individualized injury claims.[18] This case illustrates the economic benefits achieved through bifurcation.[19] One study has revealed that trials with bifurcated liability and damage issues consume twenty percent less time than traditional single trials.[20] As a practical matter, disposition of the liability issue often leads to the disposition of the entire case.[21]

Despite the economic benefits that bifurcation produces, one opponent of the device suggests that separation of liability from damages has a prej-

---

> Some look upon the practice as but another procedural "gimmick" designed to assist current judicial efforts to mass produce dispositions of pending cases, but which merely multiplies the burdens of litigation. They feel that the occasional good it produces is greatly outweighed by the danger of unfairness being visited upon litigants who from right motives prefer to try their suits in the traditional fashion.

*Id.* at 25. Although the Texas Rules of Civil Procedure include a provision comparable to rule 42(b), the Texas Supreme Court in applying TEX. R. CIV. P. 174(b) refused to sever liability from the issue of damages in a personal injury suit because the court found the issues inseparable. Iley v. Hughes, 158 Tex. 362, 367, 311 S.W.2d 648, 651 (1958). Commentators have disagreed on the advisability of bifurcating liability and damages in personal injury suits. *Compare* Weinstein, *Routine Bifurcation of Jury Negligence Trials: An Example of the Questionable Use of Rule Making Power*, 14 VAND. L. REV. 831 (1961) (opposing separate adjudication of liability and damages) *with* Miner, *supra* note 10, at 1334 (insisting bifurcation proper).

15. *See, e.g.*, C.W. Regan, Inc. v. Parsons, Brinckerhoff, Quade & Douglas, 411 F.2d 1379 (4th Cir. 1969); United Air Lines, Inc. v. Weiner, 286 F.2d 302 (9th Cir.), *cert. denied*, 366 U.S. 924 (1961); McClain v. Socony-Vacuum Oil Co., 10 F.R.D. 261 (D. Mo. 1950). *See generally* 9 C. WRIGHT & A. MILLER, *supra* note 9, § 2390, at 298 (separation of liability and damages).

16. *See* Nettles v. General Accident Fire & Life Assurance Corp., 234 F.2d 243 (5th Cir. 1956); Hassett v. Modern Maid Packers, Inc., 23 F.R.D. 661 (D. Md. 1959); Chudyk v. 5th Ave. Coach Line, Inc., 6 A.D.2d 1003, 177 N.Y.S.2d 981 (1958); *see also* Weinstein, *supra* note 14, at 840-41.

17. 197 F.2d 771 (5th Cir. 1952), *aff'd sub nom.* Dalehite v. United States, 346 U.S. 15 (1953). Plaintiffs brought this action under the Federal Torts Claim Act, ch. 646, 62 Stat. 933 (1948) (current version at 28 U.S.C. § 1346(b) (1976)). Under the Act no right to jury trial attaches. 28 U.S.C. § 2402 (1976).

18. *See* Weinstein, *supra* note 14, at 840; Note, *supra* note 11, at 760.

19. For an additional example of the economic benefit produced by bifurcation, see Rickenbacker Transp., Inc. v. Pennsylvania R.R., 3 F.R.D. 202 (S.D.N.Y. 1942). By finding for the defendant on the liability issue first, the court avoided damage proof from 35 consignors nationwide whose property was destroyed when defendant's train collided with plaintiff's truck. *Id.* at 202-03.

20. Zeisel & Callahan, *Split Trials and Time Saving: A Statistical Analysis*, 76 HARV. L. REV. 1606, 1619 (1963).

21. *See* Note, *supra* note 9, at 755.

udicial impact on the rights of the parties.[22]  For example, while defendants prevail in forty-two percent of traditional personal injury trials, they have a seventy-nine percent success rate when the issue of liability is tried alone.[23]  Commentators attribute this phenomenon to the fact that the extent of a plaintiff's injuries influences a jury's identification with and sympathy for the plaintiff in the determination of liability.[24]  The potential impact of bifurcation upon a party's legal rights has prompted another commentator to caution that bifurcation could effect a significant change in the relative position of the parties, and as such it can not be viewed solely from the standpoint of procedural efficiency.[25]

In addition to the possibility that bifurcation may effect an imbalance in the relative positions of the parties, bifurcation may jeopardize a litigant's right to a jury trial[26] under the seventh amendment to the Constitution.[27] The preferred practice, which entails hearing issues separately before the same jury,[28] does not violate the command of the seventh amendment.[29] The use of separate juries presents a more difficult question.[30]  In *United Air Lines, Inc. v. Weiner*[31] the United States District Court for the Southern District of California ordered consolidation of twenty-three suits that the heirs and personal representatives of the victims of a 1958 mid-air collision had brought against the United States and United Air Lines.[32]  The court ordered a bifurcated trial with separate juries on the issues of liability and damages.[33]  On appeal by the defendant airline, the Ninth Circuit reversed and held that the liability and damage issues were so tightly interwoven that separate juries would be confused, thus depriving the defend-

---

22. *See* Weinstein, *supra* note 14, at 831-32.
23. *See* 9 C. WRIGHT & A. MILLER, *supra* note 9, § 2390, at 299 n.56.
24. *See* 9 C. WRIGHT & A. MILLER, *supra* note 9, § 2390, at 299; Note, *supra* note 9, at 761. The author of the Note concludes that the single trial system may be preferable in personal injury litigation because the jury views liability quantitatively as well as qualitatively. *Id.* One court, however, expressed satisfaction with the efficiency that bifurcation produces, and at the same time pointed approvingly to the elimination of jury sympathy and prejudice in separate liability trials. O'Donnell v. Watson Bros. Transp. Co., 183 F. Supp. 577, 581 (N.D. Ill. 1960).
25. Weinstein, *supra* note 14, at 832.
26. *Id.* at 845.
27. U.S. CONST. amend. VII, which provides: "In Suits at common law . . . the right of trial by jury shall be preserved . . . ."
28. *See* O'Donnell v. Watson Bros. Transp. Co., 183 F. Supp. 577 (N.D. Ill. 1960). The court noted that submitting the split damage and liability issues to the same jury was the preferred practice and the more expeditious and economical procedure. *Id.* at 580.
29. *See* Moss v. Associated Transp., Inc., 344 F.2d 23, 27 (6th Cir. 1965); Hosie v. Chicago & N.W. Ry., 282 F.2d 639, 643 (7th Cir. 1960), *cert. denied*, 365 U.S. 814 (1961); Bvocik v. Firestone Tire & Rubber Co., 277 F. Supp. 210, 211 (E.D. Wis. 1967).
30. *See* United Air Lines, Inc. v. Weiner, 286 F.2d 302, 306 (9th Cir. 1961) (refusing to answer the more difficult question of separate juries); FED. R. CIV. P. 42(b) advisory committee note (noting potential problems with separating issues in jury trials); Weinstein, *supra* note 14, at 848-49 (enumerating double efforts necessary for separate juries, *i.e.*, two voir dire examinations).
31. 286 F.2d 302 (9th Cir. 1961).
32. *Id.* at 303. The collision occurred between an aircraft owned and operated by the United States and a passenger plane owned by United Air Lines. *Id.*
33. *Id.* at 302. The district court's order for consolidation provided the defendant an option to appeal pursuant to 28 U.S.C. § 1292(b) (1976). 286 F.2d at 304.

ants of a fair trial.[34]

One commentary, analogizing to the use of partial new trials, has indicated that the use of separate juries would be constitutional,[35] as long as the issues are separable.[36] Despite *Weiner*, early seventh amendment objections primarily focused on the prejudice to the plaintiff, who is unable to bring his proof of injury before a sympathetic jury during the liability phase of the trial.[37] In the context of class actions the focus has shifted to the unfairness to the defendant. The main argument is that defendants have a right to confront each plaintiff before a single jury on the issue of individual damages.[38]

## II.  THE 1966 AMENDMENTS TO RULE 23: AN INTRODUCTION OF RULE 23(c)(4)(A)

Prior to the 1966 amendments courts had refused to certify proposed classes when diverse claimants appeared to lack the necessary common interests to justify class adjudication.[39] In the leading case of *Hansberry v. Lee*[40] the Supreme Court held that landowners who were seeking to secure the benefits of a racially restrictive convenant could not bind within the same class those challenging the validity of the convenant.[41] Without the bifurcating tool of rule 23(c)(4) *Hansberry* severely restricted the viability of class actions prior to the 1966 amendments.[42]

Recognizing the need to fulfill the policy purposes of class actions, including assuring access to the courts, providing a forum for the grievances of many small claimants, promoting efficiency through group adjudication, and deterring wrongdoing of large corporate entities,[43] the drafters of the 1966 amendments added section (c)(4)(A) to rule 23.[44] This section allows the splitting of issues in class actions. As a result, the courts are permitted to "treat common things in common and to distinguish the

---

34.  286 F.2d at 306.

35.  9 C. WRIGHT & A. MILLER, *supra* note 9, § 2391, at 302-03. The authors point out that when a verdict is tainted on one issue when rendered by a first jury, new trial to a second jury can be limited to that one issue. *Id.*; *see* Gasoline Prods. Co. v. Champlin Ref. Co., 283 U.S. 494 (1931).

36.  9 C. WRIGHT & A. MILLER, *supra* note 9, § 2391, at 303; *see supra* notes 15 & 34 and accompanying text.

37.  *See supra* notes 24-25 and accompanying text.

38.  *See infra* notes 154-65 and accompanying text.

39.  7A C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1790, at 185 (1972 & Supp. 1982).

40.  311 U.S. 32 (1940).

41.  *Id.* at 44-45. A basic principle of equity mandates that a judgment can bind absent class members only if they are adequately represented. In *Hansberry* the Supreme Court found that the adverse interests of the absent members were not adequately represented and, therefore, those members could not be bound by res judicata. *Id.*; *see* Recent Decisions, *Equity—Class Suits—Due Process*, 29 GEO. L.J. 922 (1941).

42.  7A C. WRIGHT & A. MILLER, *supra* note 39, at 185. The authors point out that the *Hansberry* opinion was later employed by courts as a means to refuse class certification if the class consisted of members with antagonistic interests. *Id.*

43.  *See* Berry, *Ending Substance's Indenture to Procedure: The Imperative for Comprehensive Revision of the Class Damage Action*, 80 COLUM. L. REV. 299, 305 (1980).

44.  FED. R. CIV. P. 23(c)(4)(A); *see id.* 23 advisory committee note.

Case 9:21-cv-80391-RLR  Document 120  Entered on FLSD Docket 04/19/2022  Page 13 of 28

distinguishable."[45]

Shortly after adoption of the 1966 amendments the court in *Kronenberg v. Hotel Governor Clinton, Inc.*[46] noted the new rule's provisions for flexibility and innovation.[47] Confronted with a unwieldy class and a variety of misrepresentations in a securities fraud action, the court restructured both the class and the issues.[48] The court noted the addition to rule 23 of devices to aid in managing the action,[49] and because of these devices, the court determined that it was capable of dealing adequately with the complexities of the case.[50]

Judge Frankel viewed the revision of rule 23 as "broad outline of general policies and directions. . . . [The rule] confides to the district judges a broad range of discretion."[51] By adding section (c)(4)(A) to rule 23,[52] however, the drafters imposed a duty upon the courts not to dismiss the class before making every effort to restructure the issues in order to meet certification requirements.[53] Dismissal of class claims is appropriate only when complexity or prejudice "outweighs the advantage of common treatment."[54] Justice Black, who dissented from the adoption of the 1966 amendments, objected to the restructuring power that rule 23 placed in the hands of the district judges to manipulate class certification.[55] He cautioned that without legal standards to follow, judges could dismiss or reconstruct classes at will, thus exposing class members to unnecessary dangers.[56]

Defending rule 23's revision, Professor Miller approvingly notes the procedural arsenal available to district judges in subdivisions (c) and (d) of the rule.[57] He commends judicial recognition of certification as an exploratory process, observing that "[i]nstead of wielding a meat axe, courts increasingly are operating with a scalpel."[58] Another defender of the powers granted by rule 23 has noted: "Practical procedural effects . . . ought to

---

45.  Jenkins v. United Gas Corp., 400 F.2d 28, 35 (5th Cir. 1968); *see supra* note 6 and accompanying text.

46.  41 F.R.D. 42 (S.D.N.Y. 1966).

47.  *Id.* at 44.

48.  *Id.*

49.  *Id.*

50.  *Id.* at 45-46.

51.  Frankel, *Some Preliminary Observations Concerning Civil Rule 23*, 43 F.R.D. 39, 39 (1967). Judge Frankel further observed that "we've been challenged to piece out a huge body of procedural common law by giving all the hard labor and creative imagination we can muster . . . ." *Id.*

52.  *See supra* note 6 and accompanying text.

53.  7A C. WRIGHT & A. MILLER, *supra* note 39, § 1790, at 186-87.

54.  *Id.* at 189.

55.  Amendments to Rules of Civil Procedure for the United States District Courts, 383 U.S. 1029, 1035 (1966) (Black, J., dissenting from order of transmittal).

56.  *Id.*; *see also* Cohn, *The New Federal Rules of Civil Procedure*, 54 GEO. L.J. 1204, 1228 (1966).

57.  Miller, *Of Frankenstein Monsters and Shining Knights: Myth, Reality, and the "Class Action Problem,"* 92 HARV. L. REV. 664, 680 (1979). As a staunch defender of the amended rule 23, Professor Miller espouses the conviction that the rule needs time to prove its effectiveness, and that predictions of doom are premature. *Id.* at 693-94.

58.  *Id.* at 680.

govern. A satisfactory rule can only lay down broad guidelines . . . depending upon the tradition and good sense of our judges to prevent abuse."[59]

Economy of judicial resources is one of the primary goals of class actions under rule 23(b)(3).[60] Many of the policy justifications supporting bifurcation under traditional rule 42(b) procedure, including efficient disposition of cases and procedural convenience, are justifications for bifurcation of (b)(3) class actions as well.[61] Effective administration of (b)(3) class actions will depend upon the frequent use of the bifurcating tool.[62]

Although the bifurcating device in rule 23(c)(4)(A) is not limited to (b)(3) class actions, separation of liability and damage issues is particularly appropriate to (b)(3) actions where complicated damage issues are the mainstay of the proceedings. The types of cases best suited for bifurcated trials are those in which common questions such as fraud, conspiracy, or negligence can be decided first, leaving individual proof of reliance or injury to later trials.[63] Unlike 23(b)(1) actions where plaintiffs seek one recovery, and damage determination is not difficult, or (b)(2) actions where the claim to primarily injunctive relief negates the problem of unwieldy class size, (b)(3) actions typically involve diverse claims bound only by common questions and motivated by procedural convenience. Although the damages sought by (b)(3) claimants are often individualized in both character and amount, the liability issues are often inextricably linked.[64]

The availability of a restructuring device under rule 23(c)(4)(A) is of particular significance in (b)(3) class actions because of the additional hurdles to certification that confront the (b)(3) class. In addition to the rule 23(a) prerequisites,[65] the drafters of the 1966 amendments conditioned

---

59. Weinstein, *Revision of Procedure: Some Problems in Class Actions*, 9 BUFFALO L. REV. 433, 470 (1960).

60. According to the advisory committee's report, 23(b)(3) class actions, though not as mandatory in nature as (b)(1) or (b)(2) suits, served to "achieve economies of time, effort, and expense, and promote, uniformity as to persons similarly situated." FED. R. CIV. P. 23 advisory committee note.

61. *See* Berry, *supra* note 43, at 305. Berry notes, "Class procedure is supposed to be designed to facilitate cost-spreading, to avoid repetitious, overlapping litigation, and to protect the less advantaged from intimidation." *Id.*

62. Frankel, *supra* note 51, at 47. Judge Frankel stated, "And I submit that a lively awareness of this sensible device should serve to postpone or minimize some of the excessively frightening complications that seem overwhelming from a threshold view of the case." *Id.*

63. *Id.* at 43. Judge Frankel considers mass accidents, mass frauds, and antitrust violation actions among the types of suits amenable to separate trial. *Id.*; *cf.* FED. R. CIV. P. 23 advisory committee note. The committee indicates that mass accidents are ordinarily inappropriate for separate treatment of issues. *Id.*

64. *See* Miller, *Problems in Administering Judicial Relief in Class Actions Under Federal Rule 23(b)(3)*, 54 F.R.D. 501, 503-04 (1972).

65. FED. R. CIV. P. 23(a) provides:
    Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Case 9:21-cv-80391-RLR   Document 126   Entered on FLSD Docket 04/19/2022   Page 15 of 28

availability of (b)(3) class adjudication upon a showing of the predominance of common questions[66] and the superiority of class treatment.[67] In order to determine that class adjudication is superior to other methods of adjudication, rule 23(b)(3)(D) requires the court to assess "the difficulties likely to be encountered in the management of a class action."[68] Without the availability of the bifurcating device, the obstacles to the class certification in a 23(b)(3) action would permit the court to deny class status whenever the size, complexity, or remedial difficulties involved give the appearance that common questions do not predominate, or that manageability problems preclude a finding that class treatment is the superior method of adjudication. Thus, bifurcation of issues under rule 23(c)(4)(A) has taken on a new character. While bifurcation originated as a method of controlling complex litigation already at trial, the separation of issues in a (b)(3) action has evolved into a means of achieving class certification.

### III.    ESTABLISHING THE PREDOMINANCE REQUIREMENT WITH RULE 23(c)(4)(A)

In attempting to achieve certification, the potential (b)(3) class must overcome the preliminary obstacle of establishing that issues common to its members predominate over those that are individual.[69] The drafters of the 1966 amendments assumed that the imposition of this additional requirement upon the (b)(3) class would preserve the economies of the class action.[70] A (b)(3) class action is characteristically a damage action that involves numerous individual proofs of causation and injury.[71] The proper method of determining predominance has led to numerous disputes.[72] If courts include damage determinations while weighing predominance in terms of the number of common issues against the number of individual claims and issues, the scale will always tip in favor of a determination of nonpredominance.

In *Green v. Wolf Corp*.[73] the plaintiff sought certification of a (b)(3) class in a suit that alleged a violation of section 10b-5 of the Securities Exchange Act of 1934.[74] The court addressed the issue of whether the common issue of violation predominated over the 2,200 individual questions of reliance

---

66. FED. R. CIV. P. 23(b)(3). The first clause of (b)(3) requires that "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members . . . ." *Id.*

67. *Id.* The court must find "that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Id.*

68. FED. R. CIV. P. 23(b)(3)(D). This provision is commonly referred to as the manageability requirement.

69. *See supra* note 66 and accompanying text.

70. *See* FED. R. CIV. P. 23 advisory committee note.

71. *See supra* note 64 and accompanying text.

72. *See* Landers, *Of Legalized Blackmail and Legalized Theft: Consumer Class Actions and the Substance—Procedure Dilemma*, 47 S. CAL. L. REV. 842, 861-63 (1974) (offering numerous approaches to predominance determinations by class proponents and courts).

73. 406 F.2d 291 (2d Cir. 1968), *cert. denied*, 395 U.S. 977 (1969).

74. 15 U.S.C. § 78j(b) (1976). The complaint alleged that the defendant employed deception in three prospectuses, which inflated the price of the defendant's stock and led

and damages.[75] Finding that a separate trial on the issue of misrepresentation would be the most expeditious method of adjudication,[76] the court concluded that the common issue of misrepresentation predominated,[77] and noted that the avoidance of multiple suits for a common wrong was the precise function of the class action device.[78] Despite the diverse individual claims inherent in (b)(3) classes, the reality remains that issues common to the class, for example Wolf Corporation's misrepresentations, are more expeditiously adjudicated on a classwide basis.[79] The predominance question is thus determined by a qualitative balancing process that weighs the gravity and scope of a common issue, rather than on a quantitative process that counts the number of common issues against the number of individual questions. Courts have held that common issues predominate, despite the fact that the individual questions outnumber common issues.[80]

Professor Landers has observed that some courts are refusing to struggle with the interpretation of predominance, opting to employ what he terms "a rough pragmatism."[81] He notes that if class treatment can dispose of a good part of the litigation, the class action is appropriate.[82] To attain this pragmatic end, the courts certify the class on the common issues and postpone the other issues for separate trial[83] by establishing "partial class actions."[84] Rule 23(c)(4) allows restructuring of the class membership by providing the subclassing tool in rule 23(c)(4)(B). Subclassing a diverse group of people with various and conflicting interests allows each subclass to achieve certification and advance its claims in a separate trial. The partial class action is also achieved by employing rule 23(c)(4)(A), which like

---

Green and approximately 2,200 class members to rely on the misstatements. 406 F.2d at 295.

75. 406 F.2d at 301. The court noted that defendant's argument that individual reliance issues predominated would effectively negate class treatment of 10b-5 actions, since reliance is always an element of the action. *Id.*

76. *Id.*

77. *Id.* at 300.

78. *Id.*

79. *See* Berry, *supra* note 43, at 303 (despite class opponent attempts to flood the court with uncommon issues, common questions may be efficiently resolved only on class basis).

80. *See, e.g.*, Green v. Wolf Corp., 406 F.2d 291, 301 (2d Cir. 1968), *cert. denied*, 395 U.S. 977 (1969); Fogel v. Wolfgang, 47 F.R.D. 213, 217 (S.D.N.Y. 1969). The *Fogel* court concluded that "[a]side from damages, the only significant issue which might not be common to the class is 'reliance'. Efficiency will be served by allowing plaintiffs to litigate all the complex issues common to the class, and requiring individual proofs of reliance and damages at a later stage." *Id.*

81. Landers, *supra* note 72, at 862.

82. *Id.*

83. *See* 7A C. WRIGHT & A. MILLER, *supra* note 39, at 187; FED. R. CIV. P. 23 advisory committee note. The committee points out that subdivision (c)(4)(A) recognizes that some class actions may go forward only on particular issues. The committee stated further that "in a fraud or similar case the action may retain its 'class' character only through the adjudication of liability to the class; the members of the class may thereafter be required to come in individually and prove the amounts of their respective claims." *Id.*

84. 7A C. WRIGHT & A. MILLER, *supra* note 39, at 187. For examples of cases where partial class actions went forward on the common issues, reserving the damage questions for later treatment, see Samuel v. University of Pittsburgh, 538 F.2d 991 (3d Cir. 1976); Bing v. Roadway Express, Inc., 485 F.2d 441 (5th Cir. 1973); American Trading & Prod. Corp. v. Fischbach & Moore, Inc., 47 F.R.D. 155 (N.D. Ill. 1969).

Case 9:21-cv-80391-RLR   Document 120   Entered on FLSD Docket 04/19/2022   Page 17 of 28

rule 42(b), originated as a tool of economy.[85] The difference, however, is that this tool of economy now serves as a means to establish predominance. The courts now postpone the predominance question until after they restructure the class membership through subclassing and recharacterize the issues through bifurcation.

In *Pruitt v. Allied Chemical Corp*.[86] the court used the subclassing and bifurcating techniques of rule 23(c)(4) to overcome the predominance hurdle. Twenty-nine named plaintiffs, who were engaged in various seafood occupations in the Chesapeake Bay and James River areas, filed a class action,[87] asserting that defendant's acts and omissions had polluted the waters with Kepone deposits.[88] The court found that in its original form the class did not present a predominance of common questions.[89] Rather than dismiss the action, the court employed the subclassing technique of rule 23(c)(4)(B) and then, pursuant to rule 23(c)(4)(A), restructured by bifurcating the issues of liability and damages.[90] The bifurcation allowed the newly formed subclasses to establish the defendant's liability to the class as a whole, while postponing proof of damages until a later proceeding.[91]

Defendants in (b)(3) class actions are quick to argue that the individual issues outnumber those that are common. In many substantive contexts, however, courts have held that to dismiss classes because of numerous individual injuries would preclude all (b)(3) class actions.[92] One court viewed the defendant's predominance argument as "an emasculation of the vitality and pliability of the amended rule."[93] Another court discounted the argument primarily because an issue counting process would mean the end of (b)(3) actions.[94] When the numerous individual claims have been incidental to the weightier common issue, the class has been allowed to proceed.[95] By using rule 23(c)(4)(A) the courts have thus been able to overcome the preliminary hurdle of predominance. Predominance

---

85. *See* FED. R. CIV. P. 23 advisory committee note.

86. 85 F.R.D. 100 (E.D. Va. 1980).

87. *Id.* at 103. The class consisted of approximately 30,000 residents of Virginia and Maryland who earned their livings "catching, taking, buying, selling, processing, packing, packaging, or distributing" seafood. *Id.* at 104.

88. *Id.* at 103.

89. *Id.* at 104.

90. *Id.* at 111.

91. *Id.* at 113.

92. *See* Bing v. Roadway Express, Inc., 485 F.2d 441, 447 (5th Cir. 1973) (title VII class action); Green v. Wolf Corp., 406 F.2d 291, 301 (2d Cir. 1968), *cert. denied*, 395 U.S. 977 (1969) (securities fraud action); Shelter Realty Corp. v. Allied Maintenance Corp., 442 F. Supp. 1087, 1089 (S.D.N.Y. 1977), *dismissed without opinion*, 578 F.2d 1370 (2d Cir. 1978) (private antitrust action); Dolgow v. Anderson, 43 F.R.D. 472, 488 (E.D.N.Y. 1968), *aff'd*, 464 F.2d 437 (2d Cir. 1972) (securities fraud action).

93. Siegel v. Chicken Delight, Inc., 271 F. Supp. 722, 727 (N.D. Cal. 1967).

94. Green v. Wolf Corp., 406 F.2d 291, 301 (2d Cir. 1968), *cert. denied*, 395 U.S. 977 (1969).

95. For example, see Bing v. Roadway Express, Inc., 485 F.2d 441, 448 (5th Cir. 1973). One court concluded that "[t]he predominance requirement calls only for predominance, not exclusivity, of common questions. There are many causes of action, e.g., securities frauds, consumer injuries—for which each individual plaintiff must show individual damages in

of common issues, however, is merely an initial hurdle. In order to justify class treatment under rule 23(b)(3), a court must also determine that another method of adjudication, with superior practical advantages, is not available.[96]

## IV. Establishing the Superiority Requirement Using Rule 23(c)(4)(A)

The predominant factor in determining whether a class action is superior is found in rule 23(b)(3)(D).[97] In order for class treatment to be superior, the court must evaluate the management difficulties and determine if the action can be realistically maintained without straining judicial resources.[98] Because (b)(3) class actions present such diverse claims, issues, and defenses, and involve expenditure of vast sums of money and time,[99] some courts have established criteria for weighing manageability.[100] Factors frequently considered include class size,[101] significance of claims,[102] relief distribution problems,[103] and complexity of litigation.[104] The countervailing economies of handling as much as possible of the complex case in one proceeding prompt the courts whenever possible to structure the action through rule 23(c)(4)(A) to achieve a manageable suit. The courts must consider the burdens of separate suits, both in terms of their own judicial resources and the resources of the class opponent.[105]

Courts have used the superiority requirement to prevent certification of

order to prevail. This has not barred certification . . . ." Shelter Realty Corp. v. Allied Maintenance Corp., 75 F.R.D. 34, 37 (S.D.N.Y. 1977).

96. Fed. R. Civ. P. 23 advisory committee note.

97. *Id.* 23(b)(3)(D) provides: "The matters pertinent [in determining class action is superior include]: (D) the difficulties likely to be encountered in the management of a class action."

98. *See* Shelter Realty Corp. v. Allied Maintenance Corp., 75 F.R.D. 34, 38-39 (S.D.N.Y. 1977). The defendant argued that certifying the class would spawn thousands of individual lawsuits that would not otherwise be brought and would lead to an unmanageable strain on the court. The court rejected this argument, stating that the claims ought to be heard and the class action was the most economical way to hear them. *Id.* The court concluded: "The threat of inundation comes from the prospect of individual, duplicative actions rather than this single proceeding." *Id.* at 38.

99. *See* Manual for Complex Litigation § 143, at 34-35 (1977).

100. *See Developments in the Law—Class Actions*, 89 Harv. L. Rev. 1318, 1499 (1976); 62 Cornell L. Rev. 177, 186 (1976).

101. *See In re* Hotel Tel. Charges, 500 F.2d 90-91 (9th Cir. 1974) (millions of plaintiffs and over 600 defendants); Boshes v. General Motors Corp., 59 F.R.D. 589, 599 (N.D. Ill. 1973) (over 17 million plaintiffs); City of Philadelphia v. American Oil Co., 53 F.R.D. 45, 71 (D.N.J. 1971) (over six million plaintiffs and unknown number of transactions). *But see* Link v. Mercedes-Benz of N. America, Inc., [1975-2] Trade Cas. ¶ 60,534 (E.D. Pa. 1975), in which the court bifurcated liability from damages and certified a class of 300,000 plaintiffs.

102. *See In re* Hotel Tel. Charges, 500 F.2d 86, 92 (9th Cir. 1974) (court denied class certification where average claim was $2); Cochett v. Avis Rent A Car Sys., Inc., 56 F.R.D. 549 (S.D.N.Y. 1972) (average claim equalled $1).

103. *See* Al Barnett & Sons v. Outboard Marine Corp., 64 F.R.D. 43, 55-56 (D. Del. 1974).

104. *See* Schaffner v. Chemical Bank, 339 F. Supp. 329, 335 (S.D.N.Y. 1972); United Egg Producers v. Bauer Int'l Corp., 312 F. Supp. 319, 321 (S.D.N.Y. 1970).

105. *See* Gabel v. Hughes Air Corp., 350 F. Supp. 624, 627 (C.D. Cal. 1972).

Case 9:21-cv-80391-RLR   Document 126   Entered on FLSD Docket 04/19/2022   Page 19 of 28

(b)(3) classes when confronted with massive and complicated litigation,[106] and at least one commentator has been critical of dismissal under the superiority requirement when it is based upon perceived management difficulties.[107] The advisory committee suggested that an inquiry into the superiority of class adjudication might involve an investigation of alternate methods such as test or model cases and consolidation,[108] and has recommended that the courts assess the relative advantages of these alternative procedures.[109] In *Pruitt v. Allied Chem. Corp.*[110] the court disagreed with the defendant's contention that numerous alternative methods existed that would be more manageable than a class action,[111] including individual suits, joinder, intervention, consolidation for discovery, and the test case methods.[112] Similarly, the court reasoned that consolidation would not be superior because it would only provide "partial savings of parties' time and expense."[113] The court likewise rejected the test case method,[114] finding it doubtful that any one plaintiff would be able to afford the costs of the action or acquire consent of the other class members.[115] Disposing of these alternatives, the *Pruitt* court concluded that subclassing and bifurcating liability and damages streamlined an unmanageable suit into what the court deemed the superior method of adjudication.[116]

Judge Frankel admonishes that, to administer (b)(3) class actions efficiently, the bifurcating device of rule (c)(4)(A) "should serve to postpone or minimize some of the excessively frightening complications that seem overwhelming from a threshold view of the case."[117] One court viewed the bifurcating tool as a means to advance the policy of rule 23 to "eliminate repetitive and burdensome litigation."[118] By bifurcating liability and damages, a court can await the outcome of a prior liability trial before deciding how to provide relief to the individual class members.[119] When the court resolves liability in favor of the defendant, the action is dismissed and the judgment is binding upon the class. The need for settlement of

---

106. *See* Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 169 (1974); Schaffner v. Chemical Bank, 339 F. Supp. 329, 337 (S.D.N.Y. 1972); City of Philadelphia v. American Oil Co., 53 F.R.D. 45, 72-73 (D.N.J. 1971).

107. *See* Berry, *supra* note 43, at 319.

108. FED. R. CIV. P. 23 advisory committee note. For an extended discussion of alternate methods in the mass accident context, see Comment, *Mass Accident Class Actions*, 60 CALIF. L. REV. 1615, 1624-33 (1972).

109. FED. R. CIV. P. 23 advisory committee note.

110. 85 F.R.D. 100 (E.D. Va. 1980).

111. *Id.* at 115.

112. *Id.* The court disposed of the intervention and joinder alternatives as mere postponements of the management problem, which ultimately would become burdensome on the court and costly to the plaintiffs. *Id.*

113. *Id.* at 115-16.

114. *Id.* at 116; *cf.* Katz v. Carte Blanche Corp., 496 F.2d 474 (3d Cir.), *cert. denied*, 419 U.S. 885 (1974) (court employed test case approach, having plaintiff individually litigate the substantive issues on behalf of entire class).

115. 85 F.R.D. at 116.

116. *Id.* at 118.

117. Frankel, *supra* note 51, at 47.

118. Gabel v. Hughes Air Corp., 350 F. Supp. 624, 627 (C.D. Cal. 1972).

119. Miller, *supra* note 64, at 505.

individual claims arises only when the class prevails on the liability issue.[120]

The decided advantage inherent in determining a defendant's liability before requiring individual proof of damages is the conservation of resources if a defendant is exonerated.[121] Separate trials also provide the defendants with a clear indication, early in the proceedings, of the extent of their liability.[122] This in turn prevents defendants from engaging in in terrorem[123] settlements when plaintiffs' claims are without merit.[124] Courts that oppose denial of certification on the grounds of manageability have concluded that managerial problems can be overcome with the procedural tools available in rule 23.[125] In *Yaffee v. Powers*[126] the First Circuit reversed the lower court's decertification on the basis of management problems, and found that by basing a refusal of class certification upon perceived management difficulties, the lower court contravened rule 23's policy and neglected to employ the flexible powers available to cope with the class suit.

According to one commentator, resolution of the conflicts inherent in the determination of superiority hinges upon the decision of when to protect defendants from enormous damage exposure and when to prevent defendants from taking refuge behind the class action prerequisites.[127] He suggests three reasons why the prerequisites should not be used to prevent the class action simply because the remedy will be difficult to manage: (1) limitation of defendants' exposure to damage to only those plaintiffs who suffer large injury; (2) prevention of plaintiffs' access to the court, resulting in weakened incentive to sue; and (3) culmination in a "cloak and dagger process" where both parties cannot achieve a fair result.[128]

The primary concern of the courts in determining manageability centers on what will happen if the plaintiffs prevail on liability, necessitating individual damage calculations and distribution. In *Windham v. American Brands, Inc.*[129] a complex price-fixing class action was brought against cig-

---

120. Frankel, *supra* note 51, at 47. Addressing the unmanageable prospect of thousands of litigants storming the courthouse doors, Judge Frankel noted, "If the common questions have been aptly defined, there should be no need at an earlier stage to have all the individual class members before the court for discovery or any other purpose." *Id.*

121. Miller, *supra* note 64, at 505; *see* Berry, *supra* note 43, at 315, where the author states, "wasteful squandering of resources on causation and damage proof" will be prevented if the defendant prevails.

122. Berry, *supra* note 43, at 315.

123. *Id.* The literal meaning of "in terrorem" is "in terror or warning; by way of threat." BLACK's LAW DICTIONARY 735 (5th ed. 1979).

124. *Berry, supra* note 43, at 315.

125. *See* Samuel v. University of Pittsburgh, 538 F.2d 991, 996 (3d Cir. 1976); Shelter Realty Corp. v. Allied Maintenance Corp., 75 F.R.D. 34, 38 (S.D.N.Y. 1977).

126. 454 F.2d 1362, 1365 (1st Cir. 1972).

127. Berry, *supra* note 43, at 320; *see* Goldman v. First Nat'l Bank, 532 F.2d 10, 15 (7th Cir.), *cert. denied*, 429 U.S. 870 (1976).

128. Berry, *supra* note 43, at 320.

129. 68 F.R.D. 641 (D.S.C. 1975), *aff'd*, 565 F.2d 59 (4th Cir. 1977) (en banc), *cert. denied*, 435 U.S. 968 (1978). The proposed class consisted of approximately 20,000 members, and the claims involved thousands of sales over a four-year period. 68 F.R.D. at 648.

arette manufacturers. In the trial court no attempt was made to bifurcate the issues, and the court dismissed the class of tobacco growers as unmanageable.[130] The Fourth Circuit reversed, holding that the district court abused its discretion by using management problems to refuse certification,[131] and remanded for a separate trial on the violation issue as a means to overcome the manageability obstacle.[132] On rehearing, the Fourt Circuit en banc reversed this decision.[133] The chief concerns of the en banc court included the enormity of the damage exposure faced by defendants if liability were found,[134] the prospect of forced settlement, and the tremendous judicial strain resulting from numerous damage mini-trials.[135] While some courts have chosen to ignore the individual questions or have treated damage calculation difficulties as irrelevant to certification,[136] other courts have denied certification because the numerous damage questions render the class unmanageable.[137]

As a result of the remedial problems inherent in (b)(3) class damage actions, commentators have proposed numerous alternatives to provide relief in the event that the plaintiff class prevails on the liability issue.[138] The courts may employ a broad range of available techniques, including summary judgment procedures, damage calculations on a class-wide basis, masters' determinations, and other administrative claims processing.[139] Courts have frequently employed a proof of claim procedure to ease the damage proof problem. In this procedure each member of the class is instructed to complete within a specified time period a standardized questionnaire describing his injury.[140] A number of courts have proposed to employ the concept of a fluid class recovery, whereby aggregate damages

---

130. 68 F.R.D. at 659.

131. Windham v. American Brands, Inc., 539 F.2d 1016, 1021-22 (4th Cir. 1976).

132. *Id.* at 1022.

133. 565 F.2d 59, 72 (4th Cir. 1977) (en banc), *cert. denied*, 435 U.S. 968 (1978).

134. 565 F.2d at 66.

135. *Id.* at 66-67.

136. *See* Katz v. Carte Blanche Corp., 496 F.2d 747, 762 (3d Cir.), *cert. denied*, 419 U.S. 885 (1974); Green v. Wolf Corp., 406 F.2d 291, 301 (2d Cir. 1968), *cert. denied*, 395 U.S. 977 (1969); Esplin v. Hirschi, 402 F.2d 94, 101 (10th Cir. 1968), *cert. denied*, 394 U.S. 928 (1969).

137. Boshes v. General Motors, 59 F.R.D. 589, 600 (N.D. Ill. 1973) (30-40 million buyers of G.M. automobiles alleging overpricing); *see* Ralston v. Volkswagenwerk, 61 F.R.D. 427 (W.D. Mo. 1973) (class of 4.5 million denied because of divergent individual damage claims).

138. *See* Freeman, *Current Issues in Class Litigation*, 70 F.R.D. 251 (1976); Hinds, *To Right Mass Wrongs: A Federal Consumer Class Action Act*, 13 HARV. J. ON LEGIS. 776, 811-16 (1976); Landers, *supra* note 72, at 866-80; Miller, *supra* note 64, at 506; Miller, *Special Damage Considerations in Class Action Situations*, 49 ANTITRUST L.J. 211, 214-18 (1980); *Developments in the Law—Class Actions*, *supra* note 100, at 1517-36; Comment, *Proof of Damages*, 68 NW. U.L. REV. 1049, 1054-62 (1974); Comment, *Damages Distribution in Class Actions: The Cy Pres Remedy*, 39 U. CHI. L. REV. 448, 452-65 (1972).

139. *See Developments in the Law—Class Actions*, *supra* note 100, at 1517; *infra* notes 178-205 and accompanying text.

140. *See* Korn v. Franchard Corp., 50 F.R.D. 57, 59 (S.D.N.Y. 1970), *reversed and remanded on other grounds*, 456 F.2d 1206 (2d Cir. 1972); Iowa v. Union Asphalt & Roadoils, Inc., 281 F. Supp. 391, 403-04 (S.D. Iowa 1968); Minnesota v. United States Steel Corp., 44 F.R.D. 559, 577 (D. Minn. 1968); Philadelphia Elec. Co. v. Anaconda Am. Brass Co., 43 F.R.D. 452, 459 (E.D. Pa. 1968).

are calculated and distribution is achieved through a proof-of-claim proce-
dure.[141]  One commentator suggests trying the damage issue only once,
with a single award to the class, followed by an administrative mechanism
to divide the lump sum recovery among the individual members.[142]

## V.  Adverse Implications of Separate Trials in Class Actions

One of the primary arguments against bifurcating liability and damages
in a massive (b)(3) damage action is the fact that, by doing so, the courts
are merely postponing the burdensome individual claims until liability is
determined.[143]  The Fourth Circuit in *Windham v. American Brands,
Inc.*[144] refused separate trials because of "fears that trying violation issues
first [would] merely postpone difficulties of individual proof and therefore
not eliminate management problems."[145]  The individual claims that are
merely postponed must eventually surface, and this will burden judicial
resources.[146]

A second argument against bifurcating liability and damages addresses
the proposition that, faced with multiple claims of enormous damage ex-
posure, defendants will be forced into in terrorem settlements.[147]  One
court has been critical of the use of the class action to impose settlement
pressure.[148]  Commentators voice fears that class actions expose business

---

141. *See* Bebchick v. Public Util. Comm'n, 318 F.2d 187 (D.C. Cir.), *cert. denied*, 373
U.S. 913 (1963); West Virginia v. Charles Pfizer & Co., 314 F. Supp. 710 (S.D.N.Y. 1970),
*aff'd*, 440 F.2d 1079 (2d Cir.), *cert. denied*, 404 U.S. 871 (1971); Daar v. Yellow Cab Co., 67
Cal. 2d 695, 433 P.2d 732, 63 Cal. Rptr. 724 (1967).  *But see* Eisen v. Carlisle & Jacquelin,
479 F.2d 1005 (2d Cir. 1973) (*Eisen III*), *vacated on other grounds*, 417 U.S. 156 (1974).  The
Second Circuit suggested that fluid recovery violated due process and was illegal.  479 F.2d
at 1018.  The Supreme Court declined to rule on the subject, however, when it reviewed
*Eisen III*, 417 U.S. 156 (1974); *see also* Windham v. American Brands, Inc., 565 F.2d 59 (4th
Cir. 1977), *cert. denied*, 435 U.S. 968 (1978).  The court rejected the fluid recovery concept.
565 F.2d at 72 (citing *Eisen III*, 479 F.2d at 1018); *accord* Lohse v. Dairy Comm'n, [1977-2]
Trade Cas. ¶ 61,805, at 73,339 (D. Nev. 1977) (citing *Eisen III*).
142. Comment, *Manageability of Notice and Damage Calculation in Consumer Class Ac-
tions*, 70 Mich. L. Rev. 338, 360 (1971).
143. *See* Handler, *The Shift from Substantive to Procedural Innovations in Antitrust
Suits—The Twenty-Third Annual Antitrust Review*, 71 Colum. L. Rev. 1, 7-8 (1971).
144. 565 F.2d 59 (4th Cir. 1977), *cert. denied*, 435 U.S. 968 (1978); *see supra* notes 129-35
and accompanying text.
145. Berry, *supra* note 43, at 338.
146. Handler, *supra* note 143, at 8.  Another commentator warns: "The commendable
social policy of providing a judicial remedy for vindicating or denying great numbers of
small claims cannot override the important policy of protecting the judicial process itself
from collapse through the sheer mass of unfounded and unbridled litigation."  Schuck, *An
Overview of Class Actions*, 70 F.R.D. 289, 309 (1976).
147. *See* Handler, *supra* note 143, at 8-9, where the author observes: "Any device which
is workable only because it utilizes the threat of unmanageable and expensive litigation to
compel settlement is not a rule of procedure—it is a form of legalized blackmail."  *But see*
Berry, *supra* note 43, at 315; *supra* notes 123-24 and accompanying text.
148. Bogosian v. Gulf Oil Corp., 62 F.R.D. 124 (E.D. Pa. 1973).  The court held:
Certifying class actions, when everyone recognizes that the individual claims
can never be fully litigated, with the constitutionally guaranteed right of trial
by jury, because of the prohibitive costs of litigation, does not lend itself to "a
fair and efficient adjudication of the controversy" and violates the purpose of
Rule 23 class actions.
*Id.* at 139.

defendants to a "financial death sentence,"[149] from having to pay large settlements without a judicial determination of causation and damages.[150] At least one commentator, however, suggests a strong argument against the fear of forced settlement as an adverse consequence of class certification.[151] He notes that the defendant's superior financial situation puts the decision of settlement in his own hands.[152] His argument concludes that "frequent settlements do not reflect legalized blackmail, but rather, a hard look at both the realities of the case and defendants' litigation posture . . . . To give defendants immunity from class actions because most will be settled . . . is without apparent basis in procedure or policy."[153]

Separating the trials of liability and damages gives rise to a third major consideration. Heated debate exists over the propriety of bifurcation in light of the defendant's constitutional right to jury trial under the seventh amendment.[154] If trials are split to overcome the superiority requirement and achieve manageability, does the defendant have a right to hear proof and rebut evidence from each individual plaintiff? One commentator urges that the Constitution mandates such a right.[155] Others suggest that bifurcation preserves constitutional rights of the defendant and allows him the benefit of final, binding adjudication of class rights in his favor should he prevail on the merits.[156] A critic of the constitutional argument observes that "if defendants have the right to require each class member to come forward . . . the right to impose such a requirement is both an invitation to the defendant to keep his ill-gotten gains and an inducement to continue such conduct in the future."[157]

Although there is a staunch opposition to bifurcation based on the seventh amendment right to jury trial, trying the issues separately to the same jury is not violative of the Constitution.[158] The more imposing problem is whether a defendant's right to a jury trial is violated if the separate issues

---

149. Handler, *supra* note 143, at 9.
150. Berry, *supra* note 43, at 319.
151. Landers, *supra* note 72, at 881.
152. *Id.*
153. *Id.*
154. U.S. Const. amend. VII. 28 U.S.C. § 2072 (1976) provides: "Such rules [FRCP] shall not abridge, enlarge or modify any substantive right and shall preserve the right of trial by jury as at common law and as declared by the Seventh Amendment to the Constitution." *See* Handler, *supra* note 143, at 7.
155. Handler, *supra* note 143, at 7. "[S]ince the seventh amendment guarantees defendants a constitutional right to a jury trial with respect to each damage claim asserted, at some point there will have to be either a massive trial lasting for years or a multitude of mini-trials . . . ." *Id.* at 7-8 (footnote omitted).
156. *See* Hinds, *supra* note 138, at 811; *see also* Freeman, *supra* note 138, at 266. *Compare* Ralston v. Volkswagenwerk, 61 F.R.D. 427 (W.D. Mo. 1973) (finding individual evidence presentation on damages necessary) *with* Link v. Mercedes-Benz of N. Am., Inc., [1975-2] Trade Cas. ¶ 60,534 (E.D. Pa. 1975) (rejecting defendant's argument that individual proofs were necessary).
157. Landers, *supra* note 72, at 867.
158. *See, e.g.*, Moss v. Associated Transp., Inc., 344 F.2d 23, 27 (6th Cir. 1965); Brocik v. Firestone Tire & Rubber Co., 277 F. Supp. 210, 211 (E.D. Wis. 1967); Shoreham Village, Inc. v. Bush Constr. Co., 185 F. Supp. 534, 537 n.7 (E.D. Pa. 1960).

are heard by separate juries.[159] In the context of retrial, the Supreme Court has established that issues may be retried by a separate jury.[160] When considering bifurcated trials of separate issues, one court has found that a single jury is not mandatory,[161] while another has left the separate jury issue open.[162] In *In re Master Key Antitrust Litigation*[163] the court directed separate trials on liability and damages and rejected defendant's argument that a single jury was mandated.[164] Strong precedent is emerging for the proposition that in complex litigation liability and damage issues may be tried before separate juries.[165] Finally, opponents urge that by bifurcating liability and damages in certain types of actions, the courts are using procedural rules to change substantive law,[166] and that this change is prohibited by the Rules Enabling Act.[167] The argument is made that courts should not use the procedural devices in rule 23 to modify the manner of proof for a specific substantive cause of action.[168] For example, in securities fraud litigation, in order to prove damages due to violations of section 10(b) of the 1934 Securities Exchange Act[169] and the SEC's rule 10b-5,[170] a plaintiff must allege misrepresentation or material omission, reliance, and damage.[171] In determining if common issues predominate over individual questions,[172] a court must decide whether to certify the class on the common issue of materiality of the misrepresentations, while it postpones the individual proof of reliance for the damage phase of the bifurcated trial. A decision to certify the class in this instance would serve to permit a procedural rule to have "direct impact on the definition of the

159. *See* 9 C. WRIGHT & A. MILLER, *supra* note 9, § 2391; Note, *Proposed Rule 23: Class Actions Reclassified*, 52 VA. L. REV. 629, 643 n.44 (1965).

160. Gasoline Prods. Co. v. Champlin Ref. Co., 283 U.S. 494, 498-99 (1931).

161. *See, e.g.*, O'Donnell v. Watson Bros. Transp. Co., 183 F. Supp. 577, 585 (N.D. Ill. 1960).

162. *See* United Air Lines, Inc. v. Wiener, 286 F.2d 302, 306 (9th Cir. 1961). Although the court did not allow bifurcation because the issues were inseparably interwoven, the court did hold that there may be circumstances in which separate juries would suffice. *Id.*

163. 70 F.R.D. 23 (D. Conn.), *appeal dismissed*, 528 F.2d (2d Cir. 1975).

164. 70 F.R.D. at 28-29; *cf.* Swofford v. B & W, Inc., 336 F.2d 406, 415 (5th Cir. 1964) (validity, title, infringement, and damages may be separately tried in patent and copyright cases), *cert. denied*, 379 U.S. 962 (1965); LoCicero v. Humble Oil & Ref. Co., 52 F.R.D. 28, 30 (E.D. La. 1971) (damages and liability may be separately tried in antitrust case).

165. *See* Link v. Mercedes-Benz of N. Am., Inc., 550 F.2d 860 (3d Cir.), *cert. denied*, 431 U.S. 933 (1977); Arthur Young & Co. v. U.S. Dist. Court, 549 F.2d 686 (9th Cir.), *cert. denied*, 434 U.S. 829 (1977).

166. Handler, *supra* note 143, at 6-7; Landers, *supra* note 72, at 865-66; Simon, *Class Actions—Useful Tool or Engine of Destruction*, 55 F.R.D. 375, 386 (1972). Full discussion of this area, although pertinent to the subject of bifurcation, is beyond the scope of this Comment. *See generally* Handler, *supra*; Landers, *supra*; Simon, *supra*; *Developments in the Law—Class Actions*, *supra* note 100, at 1504-16; Comment, *The Impact of Class Actions on Rule 10b-5*, 38 U. CHI. L. REV. 337, 337-38, 345-47 (1971).

167. 28 U.S.C. § 2072 (1976); *see supra* note 154.

168. Handler, *supra* note 143, at 7; Landers, *supra* note 72, at 866.

169. 15 U.S.C. § 78j(b) (1976).

170. 17 C.F.R. § 240.10b-5 (1981).

171. *See* Green v. Wolf Corp., 406 F.2d 291, 300-01 (2d Cir. 1968), *cert. denied*, 395 U.S. 977 (1969). *See generally* Comment, *supra* note 166.

172. *See supra* notes 69-96 and accompanying text.

Case 9:21-cv-80391-RLR   Document 120   Entered on FLSD Docket 04/19/2022   Page 25 of 28

substantive basis for liability."[173]

Nevertheless, courts have held that separate trial on the matter of reliance is proper.[174] Prior to a determination of predominance, at least two courts have resolved the reliance issue on the merits.[175] The advisory committee suggests that class action compatibility with the substantive law is not determinative; rather, class actions are appropriate if litigatory economies result.[176] Assuming the policies behind the substantive law are to deter wrongdoing, class actions are often the most effective means to accomplish deterrence on a widespread basis.[177]

## VI. A Proposed Solution

If the courts are to use the bifurcating tool effectively in class actions, they must have an economical and fair means of handling the damage phase of the litigation in the event that the class prevails on the liability issue. No recorded class action has been litigated to a conclusion before a jury.[178] This may be attributed to the fact that once a defendant is found liable, he usually settles before the trial on damages.[179] Nevertheless, the possibility still exists that settlement will not occur. Thus, the courts must develop a manageable method of dispensing damages to individual plaintiffs.

A method that the courts have tried with some success is the appointment of a special master pursuant to rule 53.[180] The master processes claims, determines class membership, and assesses the amount of damages due to each plaintiff.[181] For example, in *Switzer Brothers, Inc. v. Locklin*[182] the trial court found that the defendants had violated antitrust

---

173. Landers, *supra* note 72, at 866. Another area in which this argument is broadly recognized is antitrust law when treble-damage class actions are brought under § 4 of the Clayton Act, 15 U.S.C. § 15 (1976 & Supp. IV 1980). Under § 4 a plaintiff must prove both injury in his business or property caused by defendant's malfeasance *and* and dollar amount of the injury. *See* Alabama v. Blue Bird Body Co., 573 F.2d 309 (5th Cir. 1978). In *Alabama* the defendants argued that by separating liability and damages, the substantive elements of an antitrust violation would be changed. *Id.* at 317. The Fifth Circuit affirmed the certification of the statewide class, but held that bifurcation could not diminish the substantive requirement that plaintiff prove some injury before liability could be found. *Id.; see also* Handler, *supra* note 143, at 7 (substantive problem under the Clayton Act); *Developments in the Law—Class Actions*, *supra* note 100, at 1507-10 (substantive problems with bifurcation in antitrust cases dealing with franchise "tying").

174. *See* Korn v. Franchard Corp., 456 F.2d 1206, 1212-13 (2d Cir. 1972); Green v. Wolf Corp., 406 F.2d 291, 301 (2d Cir. 1968), *cert. denied*, 395 U.S. 977 (1969); Fogel v. Wolfgang, 47 F.R.D. 213, 217 (S.D.N.Y. 1969).

175. Blackie v. Barrack, 524 F.2d 891, 905-08 (9th Cir. 1975), *cert. denied*, 429 U.S. 816 (1976); Lorber v. Beebe, 407 F. Supp. 279, 288-91, 294 (S.D.N.Y. 1975).

176. FED. R. CIV. P. 23 advisory committee note; *see Developments in the Law—Class Actions*, *supra* note 100, at 1505.

177. *Developments in the Law—Class Actions*, *supra* note 100, at 1502-06.

178. *See* Becker, *The Class Action Conflict: A 1976 Report*, 75 F.R.D. 167, 190 (1976).

179. *Id.*

180. FED. R. CIV. P. 53; *see, e.g.*, Eastern Fireproofing Co. v. United States Gypsum Co., 50 F.R.D. 140 (D. Mass. 1970).

181. *See* Foster v. City of Detroit, 405 F.2d 138, 146-47 (6th Cir. 1968); Hayden v. Chalfant Press, Inc., 281 F.2d 543, 544 (9th Cir. 1960).

182. 1961 Trade Cas. ¶ 70,166 (N.D. Ill. 1961).

laws[183] and appointed a master to discover the extent of damages suffered.[184] The Seventh Circuit held that the procedure of reference to a master was proper.[185] The same procedure was approved in *Union Carbide & Carbon Corp. v. Nisley*,[186] where the Tenth Circuit allowed the appointment of a special master to assess the individual damages and to assist in damage distribution after a determination of liability.[187]

As early as 1920, in the leading case of *Ex parte Peterson*,[188] the Supreme Court approved the reference to a special master in jury cases that involve complex calculations, accounts, and voluminous evidence.[189] The Supreme Court ruled that reference to a special master did not violate the seventh amendment because the amendment does not prohibit the use of new forms of practice and procedure.[190] The master gathered evidence from the parties and submitted a report deemed prima facie evidence for the jury to consider.[191]

United States District Judge William Becker construed the *Peterson* case to mean that the special master procedure allows the original jury to be recalled to hear the master's report.[192] When the *Pruitt* court faced the problem of potential damage calculations, it ruled that the special master procedure was to be used if a damage phase of the trial became necessary.[193] Using Judge Becker's approach, the court held that the original jury would be temporarily excused after its liability verdict, the master would prepare his calculations of individual damages, and the jury would be recalled to render judgment on the master's report.[194] The *Pruitt* decision raises some practical problems. In *Pruitt* the damage calculations for approximately 30,000 class members, with claims varying in amount and character,[195] will consume a considerable length of time. If discovery is postponed as to each individual's damage claim until after the jury determines that the defendant is liable,[196] can the court realistically expect to extend jury duty over an indeterminable time? If discovery of damages is not postponed, but commences at the outset of the liability trial, the judicial system will lose the economic benefits of the bifurcating tool.[197]

For purposes of preserving both judicial economy and pragmatic treat-

---

183.  *Id.* at 78,665.

184.  *Id.*

185.  297 F.2d 39, 47-48 (7th Cir. 1961).

186.  300 F.2d 561 (10th Cir. 1962).

187.  *Id.* at 589.

188.  253 U.S. 300 (1920).

189.  *Id.* at 313; *see also* LaBuy v. Howes Leather Co., 352 U.S. 249, 259 (1957) (detailed accounting to calculate damage amounts may be referred to master).

190.  253 U.S. at 309-10.

191.  *Id.* at 311; *see* Connecticut Importing Co. v. Frankfort Distilleries, Inc., 42 F. Supp. 225, 227 (D. Conn. 1940).

192.  Becker, *supra* note 178, at 190.

193.  Pruitt v. Allied Chem. Corp., 85 F.R.D. 100, 117 (E.D. Va. 1980).

194.  *Id.* (citing Becker, *supra* note 178, at 190).

195.  *See supra* note 87 and accompanying text.

196.  *See supra* notes 117-28 and accompanying text.

197.  *Id.*

Case 9:21-cv-80391-RLR   Document 120   Entered on FLSD Docket 04/19/2022   Page 27 of 28

ment of juries, the special master's report must be submitted to a separate jury.[198] Although concern exists that such a procedure would violate the seventh amendment,[199] precedent can be found that holds such a procedure not violative of constitutional rights. In *Eastern Fireproofing Co. v. United States Gypsum Co*.[200] the court on a jury verdict entered an interlocutory liability judgment on antitrust violations[201] and instructed a special master to determine the damage issues.[202] After conducting damage hearings, the master submitted his findings to the court.[203] The *Eastern Fireproofing* court proceeded to the second phase of the trial with a similar but different jury, deeming the process not violative of the seventh amendment.[204] Two more recent antitrust cases have tried the damage phase of the trial to a different jury.[205] In both cases the defendants apparently did not raise the seventh amendment issue, and the Fifth Circuit did not address it. In *Arthur Young & Co. v. U.S. District Court*[206] the Ninth Circuit directly stated that trial to a single jury is not an absolute constitutional right.[207] In the (b)(3) class action, the complexity and time involved in the master procedure will necessitate separate juries for each phase of the trial.

## VII. Conclusion

The growing complexity of litigation has compelled a reconsideration of the traditional mode of trial procedure in class actions. The courts have responded by restructuring the complicated actions through rule 42(b) bifurcation, separating the trials in progress into more manageable partial actions. Through rule 23(c)(4)(A), bifurcation has emerged in the (b)(3) class action context as a means to achieve both certification and judicial economy. Treating the issues of liability and damages separately, the courts can more readily overcome the prerequisites of predominance and manageability. The bifurcating device permits the courts to postpone the calculation and distribution of damages until a later proceeding, which seldom occurs due to settlement.

By referring the damage issues to a special master, the court will not be crushed by hordes of individual damage claimants storming the courthouse doors if settlement efforts fail. The special master can process the

---

198. *See* Freeman, *supra* note 138, at 268.
199. *See supra* notes 154-65 and accompanying text.
200. 50 F.R.D. 140 (D. Mass. 1970).
201. *Id*. at 141.
202. *Id*.
203. *Id*.
204. Freeman, *supra* note 138, at 268; *see* Hosie v. Chicago & N.W. Ry., 282 F.2d 639, 642-44 (7th Cir. 1960), *cert. denied*, 365 U.S. 814 (1961); O'Donnell v. Watson Bros. Transp. Co., 183 F. Supp. 577, 585 (N.D. Ill. 1960); 9 C. WRIGHT & A. MILLER, *supra* note 9, § 2391.
205. Lehrman v. Gulf Oil Corp., 500 F.2d 659, 662 (5th Cir. 1974); Terrell v. Household Goods Carriers' Bureau, 494 F.2d 16, 18 (5th Cir. 1974).
206. 549 F.2d 686 (9th Cir.), *cert. denied*, 434 U.S. 829 (1977).
207. 549 F.2d at 692-93. The court concluded that "[a]ssuming the first trial is heard and the class issues determined by one jury, as had been requested by the defendants, we perceive no absolute bar, constitutional or otherwise, to resolution of any remaining issues before either the same or a second jury." *Id*. at 693.

claims, make factual determinations of the often voluminous material, and submit his findings to the court. Discovery on individual damage claims may be postponed until a preliminary finding of liability occurs, thus fulfilling the bifurcation policy of economy. When the damage phase of the trial begins, a separate jury can be summoned to dispose of the damage issues. Employment of this method will neither violate the mandate of the seventh amendment nor effect a deleterious change in the substantive law. Through this procedure the defendant can be assured of an accurate determination of damages; the plaintiff can be assured a remedy; and the court can be assured the time necessary to conduct its judicial functions effectively.