UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:21-CV-80391-RLR

KEITH TAIG,

    Plaintiff,

v.

CHIEF DAVID CURREY in his individual
capacity, CAPTAIN KEVIN MARTIN
(RETIRED) in his individual capacity,
LIEUTENANT JOHN PEDERSEN in
his individual capacity, DETECTIVE PHIL
HUDDY in his individual capacity,
DETECTIVE SEAN CROWLEY in his
individual capacity, and DETECTIVE MIKE
GASBARRINI in his individual capacity,

    Defendants.
_____/

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** comes before the Court on Defendants' Motion for Summary Judgment[1] ("the Motion"). DE 101. The Court has carefully considered the Motion, Plaintiff's Response [DE 110], the Reply [DE 116], and is otherwise fully advised in the premises. For the reasons set forth below, Defendants' Motion for Summary Judgment is **GRANTED**.

### I. BACKGROUND

**A. Factual Background**

Unless otherwise noted, the following facts are undisputed. Defendants Detective Crowley, Detective Gasbarrini, Sergeant Huddy, and Lieutenant Pedersen were employed by the Vero Beach Police Department ("VBPD") and participated in the 2018 investigation of East Spa massage

---

[1] Upon the Court's order at DE 98, Defendants' Motion to Dismiss was converted partially into a Motion for Summary Judgment.

parlor. DE 72 ¶¶ 9-12. Defendant Currey was and continues to serve as the Chief of Police in Vero Beach, *id.* ¶ 7, and Captain Martin (now retired) served as the Captain of Police during the investigation that is the subject of this suit. *Id.* ¶ 8.

In August 2018, the Special Investigations Unit of VBPD, in conjunction with the U.S. Department of Homeland Security ("DHS"), began investigating East Spa at 2345 14th Avenue, Suite 10, in Vero Beach, Florida, for suspected criminal activity involving prostitution, racketeering, and human trafficking. DE 100 ¶ 1, undisputed at DE 109 ¶ 1. In September 2018, Defendants Crowley and Gasbarrini began surveilling East Spa. DE 100 ¶ 2; undisputed at DE 109 ¶ 2. A member of VBPD, not party to this suit, conducted two sting operations between September 14 and 18, 2018. DE 100 ¶¶ 3-8; undisputed at DE 109 ¶¶ 3-8.

On November 27, 2018, Judge Cynthia Cox of the Circuit Court of the Nineteenth Judicial Circuit for the State of Florida signed an "Order for Surreptitious Entry and Installation of Electronic Surveillance Camera." DE 100-1 at 27-28 ("Order for Surreptitious Entry" or "search warrant"). In relevant part, that Order provides,

> [Y]ou . . . are hereby commanded in the name of the state of Florida, . . . to enter the said premises of 2345 14th Ave. suite #10. Vero Beach, FL, to enter and install . . . video surveillance cameras, and to monitor these surveillance cameras for a period of no longer than 30 days . . . . While monitoring the premises to be searched, the executing officers shall take steps to minimize the invasion of privacy to any parties not engaged in the unlawful acts set forth in the affidavit. The officers shall also make efforts to minimize the disclosure of this surveillance operation to only those sworn law enforcement officers pertinent and relevant to this surreptitious investigation . . . .

*Id.* at 28. On December 28, 2018, Judge Paul Kanarek of the Nineteenth Judicial Circuit signed a second order for surreptitious entry and installation of electronic surveillance camera, extending the surveillance period for another 30 days. DE 100-1 at 49 ("Exhibit D"). The second order from December 28 uses the exact same language as quoted above. *Id.* at 50.

In the course of the investigation, and pursuant to the Order for Surreptitious Entry, VBPD and agents from Homeland Security installed cameras inside the East Spa on November 29, 2018.[2] DE 100-8. The cameras transmitted a live feed (video only; no sound) to monitors inside a controlled room at the VBPD. DE 100 ¶ 18; undisputed at DE 109 ¶ 18. The video feed was recorded on a VBPD hard drive,[3] but at no time was audio transmitted or recorded. *Id.* Although the video feed could not be turned off remotely, the video feed was not monitored 24/7. DE 100 ¶¶ 19, 21-22; undisputed at DE 109 ¶¶ 19, 21-22. With respect to the controlled room at VBPD, VBPD required a username and password to access the video feed and kept a log of the date and time of anyone entering the room. DE 100 ¶ 21; undisputed at DE 109 ¶ 21.

On December 27, 2018, Mr. Taig patronized East Spa and engaged in sexual touching with the masseuse, after which he tipped the masseuse $100. DE 100 ¶¶ 26-27; undisputed at DE 109 ¶¶ 26-27. This encounter was captured and recorded by the VBPD surveillance camera at East Spa. DE 100 ¶¶ 26-29; undisputed at DE 109 ¶¶ 26-29. On February 14, 2019, Taig was charged with soliciting prostitution in violation of Florida law. DE 100 ¶ 28; undisputed at DE 109 ¶ 28.

**B. Procedural History**

Last year, Taig filed this suit, seeking redress under 42 U.S.C. § 1983. DE 72 ¶ 1. He alleges that the video surveillance constituted an unconstitutional search in violation of the Fourth Amendment. Specifically, Taig claims that the individual officers conducting the surveillance

---

[2] Defendants' statement of material facts [DE 100 ¶ 17] and Detective Crowley's affidavit [DE 100-1 ¶ 18] state that the cameras were installed on October 29, 2018, a fact that Plaintiff does not dispute [DE 109 ¶ 17]. However, the Court believes this to be a scrivener's error (based on page 7 of The Order Granting Defendant's Motion to Suppress written by County Judge Nicole Menz issued on May 16, 2019, in 312019-MM-000365-A, filed in this case as DE 100-8), and that the cameras were actually installed on *November* 29, 2018, not October 29.

[3] Defendants' statement of material fact avers that the Order for Surreptitious Entry does not *prohibit* recording of the video feed. DE 100 ¶ 16. Plaintiff facially disputes this fact, but he does so by arguing that the "Orders did not *authorize* recording of the video feed." DE 109 ¶ 16 (emphasis added). Plaintiff has not adequately disputed Defendants' statement of fact because Plaintiff does not directly respond to Defendants' statement of fact. Combined with the Court's review of the record, DE 100-1 at 27-28, 49-50, the statement that the Order did not prohibit recording of the video feed is deemed admitted and, furthermore, is self-evident from the text of the Order itself.

violated his Fourth Amendment rights and that they failed to train and warn. With respect to remedies, Taig seeks money damages for the alleged reputational loss he suffered when his information was disclosed to the public in connection with the investigation. Defendants moved to dismiss the Amended Complaint [DE 76], which the Court granted as to the City of Vero Beach but denied as to the individual Defendants [DE 98]. Taig also sought class certification [DE 81], which this Court denied at DE 125. The individual Defendants' motion for summary judgment now sits ripe for disposition.

## II.  LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Grayson v. Warden, Comm'r, Ala. Dep't of Corr.*, 869 F.3d 1204, 1220 (11th Cir. 2017) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In reviewing a motion for summary judgment, the court must "view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Furcon v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1304 (11th Cir. 2016) (quoting *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011)). Thus, a district court "may not weigh conflicting evidence or make credibility determinations" when reviewing a motion for summary judgment. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (citing *FindWhat Investor Grp.*, 658 F.3d at 1307). And where the facts specifically averred by the non-moving party contradict facts averred by the movant, the motion must be denied, assuming the facts in dispute are material. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no

4

reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Defendants argue that summary judgment must be granted in their favor under the doctrine of qualified immunity. Qualified immunity, as a general matter, insulates government officials from liability when certain conditions are met. A government official "is entitled to qualified immunity where his actions would be objectively reasonable to a reasonable [official] in the same situation." *Thompson v. Flowers*, 2:21-cv-14184-KMM, 2021 WL 4707611, at *4 (S.D. Fla. Sept. 4, 2021) (quoting *Quinette v. Reed*, 805 Fed. App'x 696, 701 (11th Cir. 2020)). For qualified immunity to apply, the officer "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)).

After the defendant establishes that he was acting within his discretionary authority, the burden then "shifts to the plaintiff to show that qualified immunity is not appropriate." *Id.* "To overcome a qualified immunity defense, the plaintiff must make two showings." *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019). The plaintiff "must establish that the defendant violated a constitutional right," and "that the violation was clearly established" under then-existing law, *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1199 (11th Cir. 2007), though courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first," *Corbitt*, 929 F.3d at 1311.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). "Put another way, the defendant must have fair notice of his conduct's

5

unconstitutionality, which derives from one of the following sources: (1) the obvious clarity of constitutional or statutory language; (2) broad holdings or statements of principle in case law that are not tied to particularized facts; or (3) fact-specific judicial precedents that are not fairly distinguishable." *Eloy v. Guillot*, 289 Fed. App'x 339, 346 (11th Cir. 2008) (citing *Vinyard*, 311 F.3d at 1350-52). In short, the key question is whether the law gave the officer "fair warning" that his conduct violated the plaintiff's rights. *McClish v. Nugent*, 483 F.3d 1231, 1248 (11th Cir. 2007). Within the Eleventh Circuit, only the "decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state (here, the Supreme Court of Florida)" constitute clearly established law. *Id.* at 1237.

Alternatively, even in the absence of clearly established law, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). This is sometimes referred to as the "obvious clarity" caveat, and it raises the same fundamental question as the "clearly established law" analysis: that is, "Did the defendant have fair warning when she engaged in the conduct giving rise to the claim that the conduct was unconstitutional?" *Cantu v. City of Dothan, Ala.*, 974 F.3d 1217, 1233 (11th Cir. 2020). In other words, it must be obvious to a reasonable official that the conduct in question amounts to an unconstitutional deprivation of rights, even though the conduct had not previously been held to be unlawful. *Id.* (citing *Hope*, 536 U.S. at 739).

### III. ANALYSIS

Here, it is undisputed that all Defendants were acting within the scope of their discretionary authority. DE 72 ¶¶ 7-12. The burden thus shifts to the Plaintiff to demonstrate that Defendants violated a constitutional right, and that the violation was clearly established under Florida or federal law. Plaintiff has failed to make such a showing.

### A. Video Surveillance

Plaintiff first argues that, based on a mishmash of Florida statutes, he had a constitutional right to be free from surreptitious video surveillance in the Spa, and that those statutes constituted "clearly established law" for the purposes of qualified immunity. Because Defendants' surveillance was authorized by a judicial order, however, the Court construes this argument to be an attack on the legal validity of the Order for Surreptitious Entry. The thrust of Plaintiff's argument, then, is that because the Order for Surreptitious Entry was clearly invalid under established law, Defendants are not entitled to qualified immunity.

Plaintiff's citations to various Florida statutes[4] are unpersuasive for a few reasons. First and foremost, these statutes are not recognized as sources of "clearly established law" in the Eleventh Circuit. This is because only the "decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state (here, the Supreme Court of Florida)" constitute clearly established law. *McClish*, 483 F.3d at 1237. Because Plaintiff does not cite any case law from the United States Supreme Court, the Eleventh Circuit, or the Florida Supreme Court, Plaintiff has failed to demonstrate that there was clearly established law precluding warrant-based video surveillance of this kind. Second, and relatedly, state statutes do not create or define *federal* constitutional rights, which Plaintiff is asserting, for the purposes of qualified immunity.

Third, as for the statutes themselves, even if they were recognized as clearly established law, the analogies Plaintiff attempts to make are inapposite. Plaintiff first cites the following language from a Florida video voyeurism statute in support of his argument that he had a statutory expectation of privacy in the Spa:

---

[4] The statutes upon which Plaintiff relies are Fla. Stat. §§ 810.145(1)(c), 877.26, 934.07, 933.02.

7

> "Place and time when a person has a reasonable expectation of privacy" means a place and time when a reasonable person would believe that he or she could fully disrobe in privacy, without being concerned that the person's undressing was being viewed, recorded, or broadcasted by another, including, but not limited to, the interior of a residential dwelling, bathroom, changing room, fitting room, dressing room, or tanning booth.

Fla. Stat. § 810.145(1)(c). But this definition has been taken out of context, and Plaintiff ignores two key provisions of the statute. First, he fails to mention the following subsection that defines the proscribed criminal conduct. Specifically, the statute defines "video voyeurism" as the installation of an imaging device to "secretly view, broadcast, or record a person, without that person's knowledge and consent, who is dressing, undressing, or privately exposing the body, at a place and time when that person has a reasonable expectation of privacy" for the voyeur's "own amusement, entertainment, sexual arousal, gratification, or profit, or for the purpose of degrading or abusing another person . . . ." § 810.145(2)(a). Unless Plaintiff is alleging that the officers installed the surveillance cameras for their "own amusement, entertainment, sexual arousal, gratification, or profit, or for the purpose of degrading or abusing another person," (a proposition wholly unsupported by the record), this statute does not apply to Defendants' conduct and therefore does not have any bearing on qualified immunity. Plaintiff also fails to reference the section that explicitly exempts "law enforcement agenc[ies] conducting surveillance for a law enforcement purpose" from the purview of the statute. § 810.145(5)(a). Plaintiff argues that the statute would have put the Defendants on notice that the video surveillance of the East Spa constituted an unlawful invasion of privacy. Exactly the opposite. Rather, the statute *affirmatively allows video surveillance* for law enforcement purposes. Therefore, this statute could not serve as the basis for either the notion that Defendants violated a constitutional right, nor as the "clearly established law" upon which the claim rests. Simply put, reliance on the video voyeurism statute is inapt.

8

Plaintiff relies on another, similarly inappropriate, statutory provision. Plaintiff cites to Fla. Stat. § 877.26, which prohibits *merchants* from observing or recording, directly or by video surveillance, "customers in the merchant's dressing room, fitting room, changing room, or restroom when such room provides a reasonable expectation of privacy." § 877.26(1). A "merchant" means "an owner or operator, or the agent, consignee, employee, lessee, or officer of an owner or operator, of any premises or apparatus used for retail purchase or sale of any merchandise." § 877.26(2). The problem with this analogy is that the Defendants were law enforcement officers, not merchants. Their conduct clearly was not covered by the statute.

Next, Plaintiff argues that Defendants had clear notice because Florida law prohibits audio surveillance for non-violent prostitution surveillance. Fla. Stat. § 934.07. Again, Plaintiff's argument is unavailing. It is undisputed that the surveillance of East Spa did not transmit or record audio at any time during the entire sixty-day period of surveillance. DE 100 ¶ 18 ("The cameras installed at the East spa on [November] 29, 2018 were video-only cameras. No audio was intercepted, transmitted or recorded by the cameras."); undisputed at DE 109 ¶ 18. So, this statute, too, is inapplicable.

Lastly, Plaintiff relies on Fla. Stat. § 933.02, which provides the "Grounds for issuance of search warrant," to argue that the statute does not permit video surveillance of prostitution-related offenses. But the Court is not persuaded. The statute simply makes no mention of video surveillance one way or another. It speaks only to the issuance of search warrants. To support this argument, Plaintiff relies principally on language from a non-binding concurrence in *State v. Kraft*. 301 So. 3d 981, 999 (Fla. Dist. Ct. App. 2020) (May, J., concurring). Even if the Court considered Judge May's statutory interpretation to be persuasive—that the statute does not permit video surveillance in prostitution investigations—the investigation here involved more than just

prostitution. The officers were investigating potential "racketeering and human trafficking taking place at the East Spa" as well. DE 100 ¶ 1; undisputed at DE 109 ¶ 1.

Taken together, Plaintiff's arguments fail. Plaintiff provides no clearly established law precluding any Defendant from conducting surveillance pursuant to the Order for Surreptitious Entry. And even if the Court were to consider state statutes as a source of clearly established law, each of the statutes upon which Plaintiff relies is inapposite.

### B. Minimization

Plaintiff also argues that Defendants failed to minimize the invasion of privacy to the patrons of East Spa (an obligation imposed on the officers in the Order for Surreptitious Entry), that this failure to minimize constitutes a Fourth Amendment violation, and that clearly established law put the officers on notice that the minimization techniques they employed were patently insufficient. The Court construes this argument not as an attack on the validity of the Order for Surreptitious Entry, but rather as an attack on whether Defendants complied with the terms of the Order.

It is undisputed that Defendants did take at least some steps to minimize the invasion of privacy, assuming any right to privacy existed in the first place. Defendants established a secure location to which the video feed was streamed and recorded. DE 100 ¶ 21; undisputed at DE 109 ¶ 21. The secure room prohibited unauthorized access. *Id.* Defendants kept a date/time log of who entered the room. *Id.* A username and password was required to access the video feed. *Id.* And although the feed was always recording, it was not monitored 24 hours per day. DE 100 ¶ 22; undisputed at DE 109 ¶ 22.

Undoubtedly, Defendants took *some* steps to minimize. The question is thus whether the steps they did take were constitutionally adequate. But even assuming that the minimization

techniques employed were insufficient and that in failing to do more violated Plaintiff's constitutional rights, there is no clearly established law on point. Plaintiff has not provided, nor could the Court find, any case law that would have put the officers on notice that the measures they took were insufficient. To the extent that Plaintiff tries to argue that the cases on page 12 of his Response are examples of clearly established law, the two citations Plaintiff provides are (1) a Tenth Circuit opinion,[5] and (2) *Kraft* from the Florida Fourth District Court of Appeal. Neither constitutes clearly established law in the Eleventh Circuit, and *Kraft* was not decided until after the events in this case took place.

### C. Egregiousness

Finally, and in the alternative, Plaintiff argues that even in the absence of clearly established law, the facts of this case are so egregious that any reasonable officer would have known that the conduct amounted to a constitutional violation. This is a narrow exception and an exacting standard. *Thomas ex rel. Thomas v. Roberts*, 323 F.3d 950, 955 (11th Cir. 2003) ("This exception is a narrow one, applying only when the conduct in question is so egregious that the government actor must be aware that he is acting illegally."); *Rodriguez v. Farrell*, 280 F.3d 1341, 1350 n.18 (11th Cir. 2002) ("We very occasionally encounter the exceptional case in which a defendant officer's acts are so egregious that preexisting, fact-specific precedent was not necessary to give clear warning to every reasonable . . . officer that what the defendant officer was doing must be 'unreasonable' within the meaning of the Fourth Amendment."); *Skrtich v. Thornton*, 280 F.3d 1295, 1304 n.9 (11th Cir. 2002) ("[S]ome conduct is so obviously contrary to constitutional norms that even in the absence of caselaw, the defense of qualified immunity does not apply.").

---

[5] Plaintiff relies upon *United States v. Mesa-Rincon*, 911 F.2d 1433, 1442 (10th Cir. 1990).

Plaintiff's argument, which includes no citations or discussion of case law, fails to persuade the Court that either the video surveillance (expressly permitted by the Order for Surreptitious Entry) or Defendants' minimization techniques were so egregious that *every*[6] reasonable officer would have known that what Defendants were doing violated the Fourth Amendment. *Rodriguez*, 280 F.3d at 1350 n.18. If Defendants had conducted the video surveillance without a warrant, for example, that might be a different story. But Defendants sought and received multiple warrants for surveillance. DE 100 ¶ 16, 23; undisputed at DE 109 ¶¶ 16, 23.[7] They operated in concert with federal DHS agents. They restricted access to the surveillance feed—both by limiting physical entry to the room in which it was stored and by password protecting access. DE 100 ¶ 21; undisputed at DE 109 ¶ 21.

When the Court looks to other Fourth Amendment privacy cases, this case does not rise to the level of egregiousness recognized in this Circuit as the basis for denying qualified immunity. Let's take *Thomas ex rel. Thomas v. Roberts* ("*Thomas II*") as an example. 323 F.3d 950 (11th Cir. 2003) *aff'g* 261 F.3d 1160 (2001) ("*Thomas I*"). The facts of *Thomas* are as follows. In October 1996, a fifth grader brought $26 to school for a field trip. *Thomas I*, 261 F.3d at 1163. That student placed the money in an envelope on his teacher's desk. *Id.* Moments later, the envelope had disappeared. *Id.* The teacher then asked the students in the class if they had seen the money; each replied that they had not. *Id.* The teacher then sought permission from the acting principal to conduct a search of the students and the classroom for the missing money and to enlist the help of

---

[6] The Court notes that many officers were involved in the investigation at issue in this case, and that several other law enforcement agencies conducted similar surveillance operations using similar warrants. *E.g.*, *Thompson v. Flowers*, 2021 WL 4707611 (S.D. Fla. Sept. 4, 2021) (Moore, J.).

[7] As a technical matter, Plaintiff objects to the part of paragraph 16 that says, "The order did not prohibit recording of the video feed," to the extent that that statement is even a valid objection. DE 109 ¶ 16. In any event, because Plaintiff does not levy specific challenges against the other statements of fact within paragraph 16, the Court deems the other facts therein to be admitted.

the school resource officer. *Id.* The acting principal gave her permission, though the scope of said permission was disputed. *Id.* The teacher searched the students' book bags, desks, purses, pockets, and shoes. *Id.* The search did not yield any results in terms of money or suspects. *Id.* at 1164.

At that point, the school resource officer then took groups of four or five male students to the restroom where he required the boys to pull down their pants and inspected the boys' underwear for the missing envelope. *Id.* He also told them that if they refused to comply, they would be taken to jail. *Id.* Some boys lowered just their pants, others lowered their pants and underwear, fully exposing their genital region. *Id.* After all the boys had been searched, they returned to the classroom. *Id.* The female teacher then took groups of two to five girls to the bathroom to similarly strip search them. *Id.* The female students testified that the teacher made them lower their pants or lift their dresses or skirts. *Id.* She also asked the female students to lift their bras. *Id.* Some students testified that she touched them as she searched for the envelope. *Id.* The teacher threatened the students that they would be sent to "juvie" if they did not comply. *Id.*

The students, by way of their parents, sued the teacher, the acting principal, and the school resource officer, among others, for violation of their Fourth Amendment rights.[8] The individual defendants asserted qualified immunity as a defense. Ultimately, the Eleventh Circuit concluded that the strip searches were unconstitutional because the school officials lacked individualized suspicion to search the students. *Id.* at 1177; *see also Thomas II*, 323 F.3d at 351. However, because there was no clearly established law forbidding strip searches without individualized suspicion, the court nevertheless concluded that the defendants were entitled to qualified immunity. *Thomas I*, 261 F.3d at 1171. The case was further appealed, and the Supreme Court remanded the case to the Eleventh Circuit to reconsider *Thomas I* in light of the Supreme Court's

---

[8] The students asserted other claims, but none is relevant to the discussion here.

decision in *Hope v. Pelzer*. *Thomas II*, 323 F.3d at 951. The Eleventh Circuit reaffirmed its decision in *Thomas I*, holding that the individual defendants were entitled to qualified immunity for two reasons: first, there was no clearly established law that would have put them on notice that the searches were unlawful at the time they were conducted. *Id.* at 952. Second, although strip searches of students absent particularized suspicion were unconstitutional, "the conduct [was not] so egregious that the unconstitutionality of it would be readily apparent to Defendants absent clarifying caselaw." *Id.* at 956.

If anything, the facts of *Thomas* are more egregious than the ones before us. The school officials lacked individualized suspicion, let alone a warrant. The children were forced to strip for a visual (and sometimes physical) inspection. The school officials didn't "minimize" the intrusion—they searched every student in the class. They even searched students walking by who were not in the class at the time the envelope went missing. *Thomas I*, 261 F.3d at 1164. They threatened the children with jailtime if they refused to comply. Appropriately, the Eleventh Circuit recognized that the searches were unconstitutional. But the Eleventh Circuit held that even considering the constitutional violation, the facts still did not rise to the level of egregiousness required to say that "even without case law, you knew that what you were doing was illegal." *Thomas II*, 323 F.3d at 956. And if the Eleventh Circuit was not prepared to apply the egregiousness exception there, the Court sees no basis to do so here. In the instant case, the officers sought and received a warrant. They put at least some minimization procedures in place. Without further guidance as to what minimization techniques are constitutionally required, it cannot be said that the conduct here was so egregious that the unconstitutionality of the search would have been readily apparent to Defendants. Accordingly, and for all of the reasons set forth above, Defendants are entitled to qualified immunity and, necessarily, summary judgment.

### D. Failure to Train and Supervise

Plaintiff asserts a § 1983 claim against Defendants on the basis that they failed to properly train or supervise. Defendants assert qualified immunity as a defense.

#### 1. Failure to Train

"A supervisory official is not liable under section 1983 for an injury resulting from his failure to train subordinates unless his failure to train amounts to deliberate indifference to the rights of persons with whom the subordinates come into contact and the failure has actually caused the injury of which the plaintiff complains." *Belcher v. City of Foley, Ala.*, 30 F.3d 1390, 1397 (11th Cir. 1994). "Thus, a plaintiff alleging a constitutional violation premised on a failure to train must demonstrate that the supervisor had 'actual or constructive notice that a particular omission in their training program causes [his or her] employees to violate citizens' constitutional rights,' and that armed with that knowledge the supervisor chose to retain that training program." *Keith v. DeKalb Cnty., Ga.*, 749 F.3d 1034, 1052 (11th Cir. 2014) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). Plaintiff has failed to provide evidence that Defendants had actual or constructive notice that a particular omission in any training program caused Defendants to violate Plaintiff's rights. Plaintiff has not pointed to any evidence that there was some prior misconduct or constitutional violation that would have indicated to Defendants a need for better training before this investigation took place. Consequently, Defendants are entitled to summary judgment on Plaintiff's claim of failure to train.

#### 2. Failure to Supervise

Plaintiff also alleges that Defendants failed to properly supervise one another during the investigation. Importantly, the *only* inadequate supervision Plaintiff alleges took place in the course of this investigation.

For state officials, supervisory liability cannot rest solely on a theory of *respondeat superior* or vicarious liability. *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999). Rather, supervisory liability will exist only where either (a) the defendant "personally participates in the unconstitutional conduct" or (b) "there is a causal connection between such conduct and the defendant's actions." *Harper v. Lawrence Cnty., Ala.*, 592 F.3d 1227, 1237 (11th Cir. 2010). There are three ways for Plaintiff to establish a causal connection: (1) "a history of widespread abuse put[] the responsible supervisor on notice of the need to correct the alleged deprivation, and he fail[ed] to do so"; (2) "a supervisor's custom or policy . . . result[ed] in deliberate indifference to constitutional rights"; or (3) "facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Id.* To qualify as "widespread abuse," the unlawful conduct must be "obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences." *Hartley*, 193 F.3d at 1269. Notably, the standard under which a state actor is held liable in his individual capacity for the actions of a subordinate is "extremely rigorous." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003).

Here, Plaintiff does not provide evidence of widespread abuse, nor does Plaintiff provide evidence that the supervisors had a custom or policy that resulted in deliberate indifference to Plaintiff's constitutional rights. Plaintiff does not argue that widespread abuse or a custom or policy existed. Accordingly, the Court interprets the Response as arguing that Defendants either participated themselves or "directed the subordinates to act unlawfully or knew they would act unlawfully and failed to stop them from doing so." *Harper*, 592 F.3d at 1237.

The problem with that argument is that the Court has found that each Defendant is entitled to qualified immunity for his own conduct during the course of the investigation. Plaintiff has not

alleged any prior misconduct or constitutional violation that would have put Defendants on notice of a need to supervise during the course of this investigation. And as discussed above, it was not clearly established that the investigation—either the video surveillance or the minimization techniques—violated Plaintiff's constitutional rights. Because Defendants are entitled to qualified immunity for the underlying conduct—that is, the surveillance and investigation—it necessarily follows that they are entitled to qualified immunity for the failure to supervise claim as well. Put simply, there is no legal basis on which Defendants could be held liable. *Mitchell v. McKeithen*, 672 Fed. App'x 900, 903-04 (11th Cir. 2016) (stating that when a subordinate is not liable for a violation of constitutional rights, the supervisor cannot be held liable in his supervisory role). Think about it: what could they be liable *for*? Subordinate liability is a requisite condition of supervisory liability. *Id.* To hold otherwise would defy all sense of logic.

Accordingly, there is no legal basis on which the Defendants could be held liable under a theory of supervisory liability or would otherwise not be entitled to the defense of qualified immunity. Summary judgment is hereby granted in Defendants' favor.

## IV. CONCLUSION

It is hereby **ORDERED AND ADJUDGED**:

1. Defendants' Motion for Summary Judgment [DE 101] is **GRANTED**.

2. All pending motions are **DENIED AS MOOT**, all hearings are **CANCELLED**, all deadlines are **TERMINATED**, and the Clerk of the Court shall **CLOSE** this case.

3. Defendant shall email to Chambers a proposed final judgment in Microsoft Word format within three (3) business days of the filing of this order.

**DONE AND ORDERED** in Chambers, West Palm Beach, Florida, this 28th day of June, 2022.

_____
ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Copies furnished to: Counsel of record